**EXHIBIT 1**

PROSKAUER ROSE LLP
Louis M. Solomon (LS-7906)
1585 Broadway
New York, NY 10036-8299
Telephone 212.969.3000
- and -
BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
Max W. Berger (MB-5010)
1285 Avenue of the Americas
New York, NY 10019
Telephone 212.554.1400
*Attorneys for Lead Plaintiffs and the Prospective Class*



UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - X
THE FOOTBALL ASSOCIATION PREMIER    :
LEAGUE LIMITED and BOURNE CO., on   :
behalf of themselves and all others similarly  :
situated,                           :
                                    :
                   Plaintiffs,      :
                                    :
           v.                       :
                                    :
YOUTUBE, INC., YOUTUBE, LLC and     :
GOOGLE, INC.,                       :
                                    :
                   Defendants.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - X
```

07 Civ. _____  3582

**<u>CLASS ACTION COMPLAINT</u>**

**JURY TRIAL DEMANDED**

Plaintiffs, The Football Association Premier League Limited and Bourne Co., on behalf of themselves and all others similarly situated, by their attorneys Proskauer Rose LLP and Bernstein Litowitz Berger & Grossmann LLP, allege for their Complaint against defendants YouTube, Inc., YouTube, LLC (together "YouTube", which also refers to Defendants' website YouTube.com) and Google, Inc. ("Google", and together with YouTube, "Defendants"), on personal knowledge as to matters relating to themselves, and on information and belief as to all other matters, as follows:

## NATURE OF ACTION

1.      This action is brought to vindicate the rights of owners of copyrighted intellectual property, both large and small.  This intellectual property was created and made valuable by the investment – sometimes the life-long investment – of creativity, time, talent, energy, and resources of content producers other than Defendants.  Yet Defendants, which own and operate the website YouTube.com, have knowingly misappropriated and exploited this valuable property for their own gain without payment or license to the owners of the intellectual property.

2.      The Class (as that term is defined in Paragraph 23 of this Complaint) consists of copyright owners (together with the owners of exclusive rights in sound recordings protected under state law) whose proprietary content Defendants have copied, stored, and electronically disseminated, publicly displayed, or performed, in whole or substantial infringing part, without the authorization of the rights owners.  YouTube has done so, first independently and, since November 13, 2006, with the active, knowing encouragement and complicity of, and for the direct financial benefit of, its parent, Google.  Defendants have continued and will continue their brazen acts of willful copyright infringement unless enjoined by this Court.

3.      The Class is adequately represented by The Football Association Premier League Limited ("PL" or the "Premier League") and Bourne Co. ("Bourne", together with the Premier League, "Lead Plaintiffs").  The financial success and ability of Lead Plaintiffs and other Class members (collectively, sometimes referred to herein as "Plaintiffs") to continue to produce and distribute original and valuable creative works, including musical compositions, sound recordings, motion pictures, television productions, and sports broadcasting, is dependent upon this Court's protection of their property rights.

4.    YouTube bills itself as "the leading destination on the Internet for video entertainment" and boasts millions of monthly visitors to its website. In the operation of its website, YouTube copies and electronically disseminates, on a massive and wide-ranging scale, content including the valuable intellectual property of the Class. Defendants know that YouTube's very popularity (and concomitant value, including advertising revenues and desirability as a platform for other uses) derive from the unauthorized presence and exploitation of valuable intellectual property rights owned by the Class.

5.    YouTube functions by permitting, encouraging, and enabling users to upload and share, among other content: television programming; broadcasts of sporting events; videos, synchronized with sound consisting largely of copyrighted music, commercial sound-recordings and bootlegged recordings of well-known musical groups and other performers; full length features movies; and other proprietary content, the exclusive rights to which are owned by the Class. YouTube not only "stores" user directed content in unmodified form; it engages in, encourages, and enables the unlawful copying, alteration, display, dissemination, and performance of Class members' intellectual property, and profits handsomely as a result.

6.    Defendants are pursuing a deliberate strategy of engaging in, permitting, encouraging, and facilitating massive copyright infringement on the YouTube website because the presence of large amounts of valuable intellectual property generates interest in that website, resulting in public and media attention and increased traffic (which, in turn, increase YouTube's advertising revenues and projected value as a site, platform, or destination). Fully aware that this business model violates laws protecting the copyrighted content that they have misappropriated on a massive scale, Defendants have adopted a cynical and self-contradictory strategy designed to perpetuate the unlawful exploitation of the Class's valuable property rights. For example,

Defendants have feigned blindness and an inability to reduce the wholesale infringement that occurs, constantly and unremittingly, every day on the YouTube website, distorting the balance created by Congress and forcing the victims – the content producers themselves – to go through the meaningless exercise of pointing out to Defendants what Defendants plainly already know: that there is copyrighted material being exploited on the YouTube website without the authorization of the rights owners. Defendants have deliberately refrained from implementing readily available technical measures to prevent infringement. Defendants know full well that to employ such measures would undermine the very essence of their business model – to maximize the amount of infringing content available to users of YouTube – and would cause them to lose the benefit of the vast audience the YouTube website now enjoys and the substantial "draw" that such infringing material represents in attracting users.

7.    Recent events have confirmed that Defendants are able to identify copyrighted material on the YouTube website – and to remove such material if they wish – so long as victims of Defendants' infringing conduct agree to pay Defendants to do so, by authorizing the otherwise infringing exploitation of their works by Defendants. In a Twenty-First Century embodiment of an age-old scheme, Defendants have agreed to provide "protection" against their own infringing conduct through a series of "partnership" agreements with various copyright owners. Put another way, when the license fee sought by a copyright owner is low enough to be deemed satisfactory to Defendants, Defendants find themselves able to shed their blinders and employ technology to safeguard the rights of their new "partners." By contrast, Defendants steadfastly refuse to respect the rights of members of the Class who insist on asserting their rights under the laws Congress has enacted to protect them rather than being forced to sell those rights on the cheap as part of Defendants' "protection" scheme.

- 4 -

8.      Within a year of the launch of YouTube's website, YouTube sold its business to Google for $1.65 billion in what YouTube touts as "one of the most talked-about acquisitions to date." The resulting increase in Google's share price added nearly $4 billion in market capitalization to that company on the day of the acquisition. YouTube's tremendous financial success was the direct result of Defendants' unlawful exploitation of the proprietary works of the Class. The $1.65 billion paid by Google to purchase YouTube in 2006, and the concomitant $4 billion increase in Google's market capitalization, vastly understates both the value of the intellectual property rights of the Class that YouTube has misappropriated and the harm to the Class caused by Defendants' unlawful conduct. In fact, Google paid this amount for YouTube even though Google already had its own video sharing website called "Google Video." However, as Google was well aware, YouTube had a key edge over Google Video and the scores of other video sharing websites: a massive archive of misappropriated copyrighted material.

9.      Each of the Lead Plaintiffs and the members of the Class has been victimized by Defendants. Absent judicial intervention, Lead Plaintiffs and the Class will continue to be victimized by Defendants. For the foregoing reasons, and those set forth below, Plaintiffs seek injunctive and other equitable relief and damages.

## THE PARTIES

### A.    Plaintiffs

10.     Lead Plaintiff Premier League, the top division of English soccer, broadcasts its copyrighted creations in 204 countries worldwide and is viewed by audiences estimated at 2.59 billion people. Premier League is a private limited company incorporated in England and Wales with a principal place of business at 30 Gloucester Place, London, W1U 8PL. Premier League

- 5 -

owns or controls the relevant exclusive rights in the following Protected Works, audiovisual footage consisting of soccer matches (the "PL Works"), among others:

A.    Chelsea v Tottenham, April 7, 2007

B.    Arsenal v West Ham, April 7, 2007

C.    Portsmouth v Manchester United, April 7, 2007

D.    Watford v Portsmouth, April 9, 2007

E.    Fulham v Manchester City, April 9, 2007

F.    Bolton v Everton, April 9, 2007

G.    Liverpool v Wigan, April 21, 2007

H.    Fulham v Blackburn, April 21, 2007

I.    West Ham v Everton, April 21, 2007

J.    Manchester United v Middlesbrough, April 21, 2007

K.    Tottenham v Arsenal, April 21, 2007

L.    Chelsea v Bolton, April 28, 2007

M.    Everton v Manchester United, April 28, 2007

N.    Middlesbrough v Tottenham, April 28, 2007

O.    Wigan v West Ham, April 28, 2007

P.    Arsenal v Fulham, April 29, 2007

11.    Lead Plaintiff Bourne is an independent music publisher formed in 1919, with a principal place of business at 5 West 37th Street, New York, NY. Bourne holds the exclusive copyright interests in some of the world's most beloved and well-known songs. Bourne owns or controls the relevant exclusive rights in the following Protected Works, musical compositions (the "Bourne Works"), among others:

- 6 -

A.    "Inka Dinka Doo", registration number Eu 78547, renewed R 266593, registration number EP 39319, renewed R 267341-42.

B.    "Let's Fall In Love", registration number Eu 77136, renewed R 264257, R 263531, registration number EP 39325, renewed R 275972.

C.    "Popcorn", registration number Eu 131704, renewed RE 750-746, registration number EP 293632, renewed R 799-458.

D.    "San Antonio Rose", registration number Eu 225380, renewed R 412838, registration number EP 84968, renewed R 412839.

E.    "Smile", registration number EP 81725, renewed RE 151-113, RE 129-387.

**B.    Defendants**

12.    Defendant YouTube, Inc. is a corporation organized and existing under the laws of the State of Delaware and with its principal place of business at 1000 Cherry Avenue, San Bruno, California. YouTube, Inc. was founded in February 2005. YouTube launched the service challenged here on December 15, 2005.

13.    Defendant YouTube, LLC is a limited liability company organized and existing under the laws of the State of Delaware and with its principal place of business at 1000 Cherry Avenue, San Bruno, California. YouTube, LLC is a wholly owned and controlled subsidiary of Google. YouTube, LLC is the successor in interest of YouTube, Inc.

14.    YouTube maintains an office and employs personnel in New York State and the Southern District of New York. YouTube also advertises employment positions based in New York State and in the Southern District of New York.

- 7 -

15.     Defendant Google is a publicly held corporation organized and existing under the laws of the State of Delaware and with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California.  Google has a place of business in New York State and the Southern District of New York at 76 Ninth Avenue, New York, New York.  On November 13, 2006, Google closed its acquisition of YouTube for $1.65 billion dollars in stock.

16.     Google is sued here in two capacities:  First, as a successor in interest to YouTube.  As Google has publicly stated, as a result of the merger, Google acquired all of YouTube's "properties, rights, privileges, purposes, and powers and debts, duties, and liabilities."  Second, Google is sued as an active participant, inducer, aider, and abettor and for actively participating in, contributing to, and knowingly and directly profiting from YouTube's unlawful conduct.  To achieve a return on its $1.65 billion investment in the purchase of YouTube, Google intends to cause and is causing YouTube to continue the unlawful conduct alleged herein, and at all times since that purchase Google's sole ownership of YouTube has provided it with a direct financial benefit from YouTube's infringing activities, as well as the legal and practical ability to influence and control the activities of, and decisions made by, YouTube.

17.     In addition, Google is independently profiting from the illegal activity.  For example, Google's own website enables its users' direct access to YouTube's infringing content.  Google exercises complete domination and control over YouTube, maintains a substantial, continuing connection with YouTube with regard to the infringing activities complained of herein, with respect to the matters alleged is utilizing YouTube to commit a fraud or wrong to carry out Defendants' unlawful activity, and the funding of Google has contributed to additional damages to the Class.

- 8 -

## JURISDICTION AND VENUE

18.    This action arises under the Copyright Act, 17 U.S.C. §§ 101 *et seq.* and under statutory and common law unfair competition laws.

19.    This Court has original subject matter jurisdiction of this action under 28 U.S.C. §§ 1331 and 1338(a) and (b) and pursuant to the supplemental jurisdiction provisions of 28 U.S.C. § 1367.

20.    This Court has personal jurisdiction over Defendants. Defendants, individually and collectively, acting alone and in concert, do continuous and systematic business in New York State and in this District and maintain one or more offices and employ personnel in New York State, and therefore are domiciliaries of New York State. New York Civil Practice Law and Rules ("CPLR") § 301.

21.    This Court also has personal jurisdiction over Defendants pursuant to CPLR § 302. Defendants, individually and collectively, acting alone and in concert, transact business within New York State and this District and supply goods and services in New York State by permitting users who reside in New York State frequently to upload and view videos. CPLR § 302(a)(1). Defendants commit tortious acts of copyright infringement within New York State every time they permit, encourage, and enable a user to view a copyright protected video without license or permission of the copyright owner. CPLR § 302(a)(2). Defendants commit tortious acts of copyright infringement outside of New York State, which cause injury within New York State, every time they permit, encourage, and enable a user to view an infringing video clip without the express permission or license of New York State resident copyright holders. CPLR § 302(a)(3). Defendants regularly do and solicit business within New York State and derive substantial revenue from their services within New York State. CPLR § 302(a)(3)(i).

- 9 -

Defendants derive substantial revenue in interstate commerce and should reasonably expect their copyright infringement to have consequences in New York State. CPLR § 302(a)(3)(ii).

22.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a).

## CLASS ACTION ALLEGATIONS

23.    Lead Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and/or 23(b)(3), on behalf of a class initially defined as all persons and entities that (a) own the copyright and/or the relevant exclusive rights in an original work, (b) for which a certificate of registration has issued or the deposit, application, and fee required for registration have been properly submitted to the U.S. Copyright Office; and/or (c) in the case of certain sound recordings, own the exclusive rights protected under state law; and/or (d) own the exclusive rights in an unregistered copyrighted work and will have registered that work prior to the time of final judgment or be found not to require registration (the foregoing, collectively, are sometimes referred to herein as "Protected Works") that, without authorization, was reproduced, adapted, distributed, publicly displayed, performed, or otherwise transmitted or disseminated on or through the YouTube.com website on or after December 15, 2005 through the date that YouTube's illegal actions cease (the "Class"). Excluded from the Class are: (a) Defendants; (b) the subsidiaries and affiliates of Defendants; (c) any person or entity who is a partner, officer, director, employee, or controlling person of any Defendant; (d) any entity in which any Defendant has a controlling interest; (e) any copyright holder who has duly authorized Defendants to exercise the relevant exclusive rights at the time Defendants engaged in such acts; and (f) the legal representatives, heirs, successors and assigns of any excluded party.

- 10 -

24.     The members of the Class are so numerous that joinder of all members is impracticable. According to Nielsen/NetRatings, a leading Internet audience measurement firm, YouTube has approximately 20 million visitors per month. YouTube has admitted in court filings that in July 2006 more than 20 million unique visitors viewed YouTube's website. Since July 2006, YouTube has reported in its press releases that its users view more than 100 million videos every single day. A January 15, 2007 article in the New York Times reported that academics and media executives estimate that as much as 70 percent of the material on YouTube is copyrighted material uploaded to YouTube without the owners' consent.

25.     Lead Plaintiffs' claims are typical of the claims of the members of the Class. Lead Plaintiffs hold rights in Protected Works that have been posted on YouTube without Lead Plaintiffs' permission and publicly performed and otherwise exploited in violation of their rights numerous times. Like other members of the Class, Lead Plaintiffs require injunctive relief to prevent Defendants from continuing to infringe their exclusive rights and have sustained damages as a result of Defendants' wrongful conduct, entitling them to recover those damages or, at their election, recover statutory damages.

26.     Lead Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in complex class actions and copyright litigation. Lead Plaintiffs are committed to the vigorous prosecution of this action and have no interests that are adverse or antagonistic to the Class.

27.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy, particularly where, as here, injunctive relief is primarily sought. In addition, because damages suffered by some individual members of the Class, although not inconsequential, may be relatively small, the expense and burden of individual litigation make it

impracticable for Class members individually to seek redress for the wrongful conduct alleged herein. Should separate actions be required to be brought by each individual member of the Class, the resulting multiplicity of lawsuits would cause undue hardship and expense on the Court and the litigants. Lead Plaintiffs anticipate no undue difficulty in the management of this litigation as a class action.

28.    A class action approach to the adjudication of this controversy is manageable. The benefits of adjudicating this controversy as a class action far outweigh any difficulties in managing the Class.

29.    The members of the Class are reasonably ascertainable through methods typical of class action practice and procedure and through Defendants' own records.

30.    Numerous common questions of law and/or fact exist as to Lead Plaintiffs and all members of the Class, and these common issues predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

A.    Whether Defendants' conduct as alleged herein constitutes direct infringement of the Protected Works held by Lead Plaintiffs and the Class;

B.    Whether Defendants' conduct as alleged herein constitutes contributory infringement of the Protected Works held by Lead Plaintiffs and the Class;

C.    Whether Defendants' conduct as alleged herein constitutes vicarious infringement of the Protected Works held by Lead Plaintiffs and the Class;

D.    Whether Defendants' conduct as alleged herein constitutes "inducing" infringement by others of the Protected Works held by Lead Plaintiffs and the Class;

E.    Whether Defendants acted willfully with respect to the acts complained of herein;

F.    Whether Defendants have deliberately avoided taking reasonable precautions to deter infringement on YouTube;

G.    Whether Defendants have the right and ability to control the infringing activities taking place on YouTube;

- 12 -

H.  Whether Defendants derive direct financial and related benefits from the infringing activities taking place on YouTube;

I.  Whether YouTube's procedures for copyright holders to request removal of their copyrighted works through "takedown notices" are futile because, among other things, YouTube allows users to re-post the same works following the receipt of a takedown notice, YouTube does not take effective steps to prevent users who post infringing material from continuing to post material to the YouTube website and the methods provided by YouTube to search for infringing material are inadequate;

J.  Whether Defendants place an undue burden on copyright holders constantly to monitor YouTube in order to identify and locate their copyrighted works posted on YouTube's website;

K.  Whether there exists technology to identify and remove copyrighted material;

L.  If, as the Class alleges, such technology exists, whether Defendants selectively employ that technology solely for the benefit of copyright holders who agree to enter into a licensing agreement that is satisfactory to YouTube;

M.  Whether Defendants have installed or can install any filtering technology to identify and remove copyrighted material owned by copyright holders who have not agreed to enter into licensing agreements that is satisfactory to YouTube;

N.  Whether Defendants' conduct as alleged herein constitutes "storage at the direction of a user" of copyrighted material as that phrase is used in 17 U.S.C. § 512(c)(1);

O.  Whether YouTube does more than simply store user directed content without modification and/or provides a number of features and facilities to propagate that content in modified form;

P.  Whether copyrighted materials displayed by YouTube "reside" on a system or network controlled by Defendants as that term is used in 17 U.S.C. § 512(c)(1);

Q.  Whether Defendants have or had actual knowledge that the material or an activity using the material on their systems or networks is infringing;

R.  Whether Defendants are aware of facts or circumstances from which their infringements of the Protected Works of Lead Plaintiffs and the Class are apparent;

S.  Whether, upon notification of claimed infringement as set forth in 17 U.S.C. § 512(c)(3), Defendants respond expeditiously to remove or disable access to the material that is claimed to be infringing;

T.  Whether the defenses set forth in 17 U.S.C. § 512 or elsewhere in the Copyright Act are available to Defendants;

U.  Whether Defendants provide means and facilities to enable the infringing activities at issue;

V.  Whether Defendants promote, encourage, invite and/or induce the infringing activities at issue;

W.  Whether, when a user uploads a video to YouTube, YouTube converts the video into YouTube's own software format and makes it available for viewing on YouTube's website;

X.  Whether Defendants offer users a facility to "embed" into another website videos available on YouTube, which allows videos hosted on YouTube to play on separate websites;

Y.  Whether Defendants enable users to upload videos onto YouTube and restrict access and viewership of, or render "private," those videos to individuals that the user designates as "friends";

Z.  Whether Defendants permit users to share video files with other individuals;

AA.  Whether Defendants have entered into partnerships with certain copyright holders whereby YouTube has agreed to pay these copyright holders royalties for the use of their copyrighted material on YouTube;

BB.  Whether injunctive relief is appropriate; and

CC.  Whether Lead Plaintiffs and the Class are entitled to damages for Defendants' wrongful conduct as alleged herein, including (1) statutory damages; (2) monetary damages; (3) disgorgement of profits; (4) prejudgment interest; and (5) attorneys' fees and court costs.

31.  Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate final injunctive relief with respect to the Class as a whole.

### ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

#### A.    YouTube's Website, Its Content, and Its Features

32.  YouTube is a popular website that enables users to upload, view, and share video and audio clips and other material.  YouTube contains a wide variety of material, including video and audio clips from sporting events, movies, popular music, television shows, and music videos.

- 14 -

Founded in February 2005, in its short time on the web YouTube has grown at an unprecedented rate and received a massive amount of media attention. YouTube is currently one of the fastest-growing websites in the world and, according to Nielsen/Net Ratings, accounts for approximately 46% of online video traffic. YouTube enables users to post and view material without charge, choosing instead to derive its profits in other ways, including from advertising revenues generated through the popularity of the website and projected value as a site, platform, or destination.

33.    One of the primary drivers of traffic to the YouTube website is the ability of users to view popular commercial material such as popular music, sports broadcasts, music videos, concert footage, television programs, movies, and other mainstream media content and artistic works. Much of this content was created by artists and other individuals or entities who own the intellectual property rights to these Protected Works.

34.    YouTube's content includes not only currently released infringing material, but also material that has not yet been released or authorized for broadcast through authorized distribution channels. YouTube thus serves as a well known source for obtaining unauthorized, pre-released content.

35.    The sheer bulk of infringing content on YouTube is staggering. The British Broadcasting Corporation ("BBC") demanded that YouTube remove more than 100,000 videos relating to its highly popular television show *Top Gear*. In another instance, the Japanese Society for Rights of Authors, Composers and Publishers ("JASRAC"), representing 23 Japanese TV stations and movie and music companies, demanded that YouTube remove almost 30,000 video clips of movies, television shows and music videos that had been posted on YouTube in violation of the owners' copyrights. In yet another instance, Viacom International Inc. and its

- 15 -

associated companies demanded YouTube remove more than 100,000 separate infringing video

programs. These instances – numerous as they are – represent only the tip of the infringement

iceberg. Thousands of Protected Works owned by members of the Class are infringed by

Defendants on a daily basis.

36.     Defendants are well aware of the infringing nature of the content YouTube

provides but depend on the appearance of such material to attract viewers and thereby create and

enhance the value of its business. As an industry analyst has reported, "It's clear that YouTube

has the ability (like their competitors) to filter out copyrighted materials right now, and they are

choosing not to do so. That would gut YouTube's core content and that isn't going to happen

without a judge getting involved." http://www.techcrunch.com/tag/YouTube/page/2/.

37.     Defendants invite and encourage users not just to view, share, save, and post

unauthorized copies of these works that are available for "free" on YouTube, but to upload

additional content on YouTube, to enable millions of others to view it. These unauthorized and

infringing copies are made and stored on computer servers owned and/or controlled by

Defendants, in order to facilitate the further unauthorized copying, distribution, public display

and performance of the works to as many users as possible. Each unauthorized copy of such

work is made available to users for further unauthorized copying, distribution, public display,

and performance at the click of a button or two, all without charge. Each unauthorized copy of

such work is displayed in conjunction with the conspicuous appearance of the YouTube logo, as

a "watermark" on the video image itself, and/or on the web page on which the video appears.

38.     YouTube offers a number of features to users to enable the further unauthorized

dissemination of these works, including the ability to "Save to Favorites," "Add to Groups,"

"Share" and "Post." These functions create additional unauthorized copies and/or electronically

store, transmit, or propagate for access and viewing by others, content that infringes the rights of others, including the rights of Lead Plaintiffs and Class members.

39.    YouTube also provides a feature and software code that permits, encourages, and enables users to "embed" transparently a player facility on virtually any other website in the world (such as a personal home computer page, blog, etc.) to publicly perform that content, including infringing content. For each video uploaded on YouTube, YouTube provides the HTML "code" for any user to thereafter "embed" that video on another website (whether affiliated with YouTube or otherwise), whether or not a user requests that such HTML code be provided. In exchange for voluntarily providing the means and facilities to "embed" videos in this manner, YouTube alters each such video so as to place its logo prominently on videos that are embedded on other websites.

40.    YouTube allows its users to write "comments" on material displayed on the website, and those comments can be viewed by other users. A review of user comments linked to infringing content is notable for what it reveals about the extent that YouTube users expect to find and view unauthorized copies of copyrighted content.

41.    User comments reveal that YouTube users expect to find and view unauthorized copies of copyrighted content and encourage and invite such activity by others.

42.    Such user comments also underscore the value that YouTube's users place on accessing copyrighted content illegally and free-of-charge.

43.    User comments also reveal that the free availability of such copyrighted works on YouTube is a substitute for access to such works by legitimate means.

44.    Google participates directly in the infringing activities on the YouTube website. Among other things, when a user accesses the "video search" function on Google's own website, the results returned from that search include, in substantial part, videos located on the YouTube website. By doing so, Google benefits by having YouTube provide it with infringing content accessible to users of the Google website, and, in addition, Google directs its own users to the YouTube website to view infringing content found there.

**B.    Defendants' Infringement of the Protected Works**

45.    The owners of the Protected Works in this case control the exclusive rights in valid and subsisting copyrighted works protected under federal law and/or sound recordings protected under state law, by authorship or assignment.

46.    For each of the Protected Works at issue, all statutory and other applicable formalities have been complied with and as to each, with the exception of sound recordings protected under state law, a certificate of registration has issued or the deposit, application and fee required for registration have been properly submitted to the U.S. Copyright Office (or will have been prior to the judgment in this case or will be found not to be required).

47.    Each of the Protected Works at issue has been copied and electronically displayed and/or performed publicly, and/or otherwise disseminated, made available for downloading or further electronic distribution or transmission via the YouTube website, in whole or substantial infringing part, without the authorization of the respective Plaintiff.

48.    Regarding certain of the Protected Works of Lead Plaintiffs, a non-exhaustive list of URLs at which certain infringing materials are or were located on YouTube, on or about the dates listed as well as other dates, is set forth on the attached Exhibit A.

49.    In addition to the specific instances of infringement set forth on Exhibit A, infringement by Defendants of all of the Protected Works has occurred and continues to occur in that videos that infringe Lead Plaintiffs' and the Class' exclusive rights in their works have been and continue to be uploaded to YouTube, resulting in their reproduction, alteration, dissemination, public display, and public performance by (or facilitated or induced by) YouTube in violation of the Plaintiffs' exclusive rights.

50.    For the length of time each infringing video was or is posted on YouTube and/or viewed or otherwise made available due to or in connection with such posting (and for some period thereafter, given that users can copy and further disseminate unauthorized copies of such works that appear on YouTube), Lead Plaintiffs' and the Class' rights of reproduction, distribution, public performance, public display, preparation of derivative works, and/or to transmit digitally over the Internet were violated.

51.    The infringed works specified herein and on Exhibit A are representative of Protected Works that are and have been infringed by Defendants and/or YouTube's users.  The massive scale of the infringing acts at issue and the nature of the infringement – specifically, the fact that numerous infringing copies of Protected Works are posted daily, if not hourly – makes a full statement of each and every act of infringement in this Complaint unwarranted.

52.    The massive scale of the infringement at issue is only magnified by the large audience that YouTube attracts to view infringing works.  For example, in the case of Lead Plaintiff Premier League, in a matter of days, a video infringing Premier League's exclusive rights can easily be, and in some instances has been, viewed more than a hundred thousand times, and the longer the infringing video is available on YouTube, or the more it is reposted on

other websites, it is accessed, copied, publicly performed, and further disseminated an exponentially greater number of times.

53.    As alleged below, Defendants ensure that their infringing activity continues unchecked by placing a number of insurmountable obstacles in the path of any copyright owner who attempts to monitor YouTube and identify removal of Protected Works.

### C.    Defendants' Refusal to Deter Infringing Activity

54.    As alleged herein, Defendants have actual and constructive knowledge of the infringing activities occurring on the YouTube website. In addition, Defendants materially contribute to those infringing activities by, among other things, providing the means and facilities to infringe; inducing, encouraging, and facilitating infringement; providing functions designed to proliferate unauthorized copies of Protected Works, without the authorization of the rights owner; and by enabling and encouraging users to engage in the unauthorized copying and dissemination of infringing copies of works.

55.    Defendants have the right and ability to control the presence of infringing content on YouTube by various means, including through the use of widely-accepted filtering technologies such as audio-fingerprinting. Defendants, however, either refuse to deploy these technologies, inhibit copyright owners from employing or utilizing them, or, as alleged below, offer them only in exchange for licenses from content owners who are otherwise threatened by YouTube's continued (and massive) infringement of their copyrighted works. As alleged herein, Defendants have received and continue to receive direct financial benefit from such infringing content and activity.

56.    Defendants pay lip-service to a purported desire to avoid violating intellectual property laws. In reality, however, they deliberately refuse to take meaningful steps to deter the rampant infringing activity readily apparent on YouTube (which would, in turn, have a negative impact on the advertising and other revenues and other value achieved through the large volume of traffic on the YouTube website).

57.    Defendants have created a number of barriers that make it virtually impossible and wholly impractical for owners of Protected Works to prevent Defendants' infringing activities. For example:

58.    First, although Defendants state that copyright holders can submit "takedown notices" requesting removal of infringing material, Defendants are well aware that, in the case of YouTube, takedown notices are essentially meaningless. To begin with, it is extremely difficult for copyright holders (who have nowhere near the technological access of Defendants) to identify all of the different infringements of their copyrights taking place on YouTube. The only way for copyright holders to locate infringing activity is to use YouTube's "search" feature in an effort to canvas the millions of videos on the website in order to locate their Protected Works. As a result, in order to locate material that infringes their copyright, a Class member might have to construct countless "searches" designed to account for different names, titles, nicknames, and spellings that could be chosen by the users who uploaded the material. The scope of infringement is also a moving target, in that videos uploaded are not identified by copyright owner or registration number, but rather by the uploader's choice of descriptive terms to describe the content of the video (typically referred to as "tags"), whether or not those "tags" bear any relation to the video uploaded or the work(s) that video infringes.

- 21 -

59.    Even if a Class member were able – by sheer blind luck – to conceive of all possible search terms that might reveal the many infringements of the Class member's copyrights taking place on YouTube, it would not be enough.  YouTube offers its users the ability to make any video that they upload "private."  When a video is designated as "private," it can still be shared for free with certain designated users (*i.e.* designated "friends" of the posting user) but it cannot be detected by YouTube's "Search" function.  Thus, when users upload infringing videos and designate them as "private," it is impossible for copyright owners to locate such infringing videos so that they can identify them and/or send a "takedown notice" to YouTube.  The "private video" feature, therefore, makes it impossible for anyone other than Defendants to assess accurately the amount of infringing works on the YouTube system, prevents copyright owners from accurately identifying all the works on YouTube that infringe their copyright interests, and demonstrates the futility of relying upon notice-and-takedown procedures to prevent infringement by Defendants and YouTube's users.

60.    Furthermore, even if a Class member somehow did locate each and every infringement of their copyright on YouTube (including the "private" ones) and issued a proper "take down notice," it would still not be enough to prevent future infringement.  Users can readily re-post such matter under different user and/or file names.  This is a common practice, easily accomplished by users with even a modicum of computer skill, and a practice that Defendants make absolutely no effort to prevent.

61.    Lead Plaintiff Premier League has also experienced difficulties in securing Defendants' cooperation to remove infringing matter from the YouTube site.  Although YouTube provided the Premier League with access to YouTube's so-called "Content Verification Program" as what is incorrectly dubbed as a preferred method of communication to

notify YouTube of the presence of infringing matter in its site, the Premier League's experience in using that facility has been fraught with problems. Its account has on some occasions been blocked or closed. In the meantime, the Premier League has been forced to send time-consuming and ineffectual notices of infringement to YouTube. Defendants have not responded to those notices or removed the infringing material identified in them expeditiously but instead, when YouTube acts at all, it is only after considerable delay, *e.g.*, in some cases, more than seven days elapses between the date of notice to YouTube and the latter's response.

62.    In sum, providing YouTube with written notice of specific infringements of works appearing on its website is futile: such notices do not prevent unauthorized copies of those same works from reappearing on YouTube thereafter.

63.    Another example of Defendants' paying lip-service to a desire to respect intellectual property rights is their limitation of video clips to ten minutes. As Defendants are well aware, YouTube is frequently used to make available infringing copies of audiovisual works exceeding the ten minute limit, which would include sporting events and feature length motion pictures, many of which are large national or international productions that are highly desirable to its users, particularly when they can be viewed at, "shared" by, or copied from, YouTube for free.

64.    At some point, YouTube imposed a 10-minute clip limitation allegedly to inhibit this practice, but, as Defendants know, audio visual works, including feature length movies and other unauthorized, copyrighted content continue to be frequently posted to YouTube in multiple, seriatim segments, easily circumventing the 10-minute clip limitation. Although the 10-minute length limitation on clips uploaded to YouTube does nothing to inhibit the posting, storage, dissemination, public display, and performance of infringing materials, as Defendants

- 23 -

are aware, it does demonstrate that YouTube has actual and constructive knowledge that its services and facilities are being used for these unauthorized and infringing activities.

65.    Defendants claim that they do not enable any downloading of copies to be made from the YouTube website, but any moderately experienced computer user can copy the material posted on YouTube to his or her own computer with little difficulty and at virtually no cost.

66.    Defendants' ability (but unwillingness) to control the infringing activities on the YouTube Website is further demonstrated by YouTube's ability to filter "offensive" and "pornographic" material from its website.  YouTube claims that it actively polices its website to identify and remove "pornography, obscene or defamatory material," but refuses to take active steps to identify and remove blatant violations of the copyright laws.

67.    Defendants induce others to infringe by offering the means and facilities to infringe, encouraging users to post and/or view infringing content on YouTube and use YouTube's various functions and features to further proliferate the unauthorized copying and dissemination of the copyrighted works of others, all as part of a deliberate scheme to increase the value of its business based on the presence of unauthorized and infringing copies of the copyrighted works of others.

### D.    Defendants' Financial Incentives to Violate the Class's Copyrights

68.    Numerous media reports have recognized that YouTube's business model depends on copyright infringement.  *See, e.g.*, Andrew Ross Sorkin, "Dot-Com Boom Echoed in Deal to Buy YouTube", <u>New York Times</u>, October 10, 2006, (*available at* http://www.nytimes.com/2006/10/10/technology/10deal.html?ex=1174190400&en=2bfad8c018e 5933b&ei=5070).  Indeed, it has been recognized that Defendants are trying to garner licenses

for some content because it knows that, if it implements any meaningful precautions to mitigate or prevent infringement, YouTube is going to lose popularity (and revenue).

69.    The direct financial benefit to Defendants from these infringing activities has been enormous. In addition to the $1.65 billion dollars paid by Google for the YouTube business (which caused an increase in Google's stock price and thereby increased Google's market capitalization by billions of dollars), YouTube attracts potential revenue and enhances its value in other ways precisely because so many users are drawn by the availability of the highly desirable, infringing content that appears there. Internet sites depend on traffic and "eye-balls" because advertisers and others are interested in spending dollars on sites that offer the greatest potential reach. The huge volume of traffic that YouTube enjoys is generated in very substantial part by the infringing conduct at issue in this case. Accordingly, there is a direct causal connection between the infringing activities complained of and the financial benefits Defendants enjoy in their business. Defendants monetize the YouTube website, through, among other things, advertising and branding arrangements (both now and in the future) with existing and potential advertisers and content partners, which are designed to (and do) convert the substantial draw or "eye-balls" reaching YouTube, because of the infringing activity taking place there, into cash and financial benefits. For example, YouTube runs advertisement banners on top of every video clip, including clips that infringe on the copyrights of others. YouTube also created a daily "Participatory Video Ad" on its opening page which is estimated to bring in about $175,000 per day and has entered into long term promotional agreements with companies, such as Cingular, each of which is estimated to be worth several millions of dollars. The more users Defendants can attract to YouTube, the more revenue the website generates from advertising and other uses of the site.

70.    Defendants recently announced that YouTube is developing a business model to share advertising revenue with YouTube's users, which will in effect reward and encourage even more infringement.

**E.    YouTube's "Strategic Partnerships"**

71.    Instead of taking any meaningful steps to thwart the pervasive copyright infringement occurring on YouTube, and faced with the threat of lawsuits from some of the largest media and entertainment companies in the world, YouTube began entering into so-called "strategic partnerships" with several major media companies. These "strategic partnerships" provided that YouTube would promote these companies' programming and/or pay them royalties and licensing fees in exchange for agreements that these companies would not pursue legal action against YouTube for its past infringement of their copyrighted material. Essentially, YouTube's strategy has been to compensate only those copyright owners that it believes actually have the financial wherewithal to pursue legal remedies against it, while continuing to take the material of numerous other creators as well as smaller media, entertainment, and other content-creating companies, who are less able to bring their own lawsuits. Along the same lines, Google, upon the consummation of its acquisition of YouTube, opted to reserve at least $200 million from the $1.65 billion it paid for YouTube to fund a litigation war chest that it intends to use to repel legal actions by those less-resourced owners of Protected Works, instead of eliminating those Protected Works from the YouTube website.

72.    To date, YouTube has entered into "strategic partnerships" with certain large media entities. Upon the consummation of the deals with each of these entities, YouTube issued joint press releases discussing the terms of the deals. The statements made by YouTube and these partners in the press releases establish that: (1) YouTube is fully aware that it is

committing copyright infringement on a massive scale; (2) YouTube has the ability to identify such infringing material; (3) YouTube has the technology to monitor viewership on its website and pay copyright owners appropriate royalties; (4) YouTube has technology that is far superior to what it currently offers to copyright holders (other than its "strategic partners") for searching and identifying copyrighted material on its website; and (5) YouTube is willing to make its technology for filtering and/or identifying copyrighted material available only to companies that it believes have the wherewithal to pursue an individual lawsuit.

73.     YouTube has offered to some prospective licensors of content that YouTube would adopt technological steps to prevent or mitigate the infringing content on its website if, but only if, the content owner agreed to license its content to YouTube. *See* Kenneth Li, "YouTube Anti Piracy Software Policy Draws Fire," Reuters, Feb. 16, 2007 (*available at* http://today.reuters.com/news/articlenews.aspx?type=internetNews&storyID=2007-02-17T003505Z_01_N13216636_RTRUKOC_0_US-YOUTUBE-MEDIA.xml).  In doing so, YouTube has sought illegally to leverage its position by offering "protection" from wholesale legal violations only on terms acceptable to YouTube.  If a content owner fails to conclude a negotiation with YouTube, its content remains "unprotected," *i.e.*, it continues to remain exposed to YouTube's massive appetite for the unauthorized exploitation of copyrighted content.  And, for those Class members too small or powerless or who choose not to do business with somebody who has profited by misappropriating their property, YouTube has made no offer to "protect" or implement technological steps to prevent or mitigate infringement.  It is for protection of such victims that this case is being pursued.

74.     Defendants' business practices of offering some form of content "protection" only to parties who agree to license their content to YouTube not only leaves rights holders unwilling

to negotiate in such an environment exposed to the continuing threat of YouTube's unremitting infringement, but forces parties to grant licenses on terms which—absent the threat posed by YouTube's conduct—would be more commercially advantageous to such rights holders.

75.    YouTube's conduct encourages and induces further infringement by users and rewards a business model that ultimately depends on infringement.

76.    Unless and until Defendants take meaningful steps to prevent or mitigate the appearance of unauthorized copies of copyrighted works on the YouTube website through the technologies available to them, and/or change YouTube's business model, infringement of Protected Works will continue by and through the auspices of YouTube, in an unremitting and widespread fashion.

### F.    The Section 512 Defense Is Unavailable to Defendants

77.    Defendants purport to rely on the "notice and takedown" and qualified "safe harbor" provisions of 17 U.S.C. § 512 ("§ 512"), by claiming that YouTube is, in effect, a passive intermediary which merely hosts video and other content posted by users and that it is vigilant in responding to, and removing, any infringing content that is brought to its attention through formal written notices in compliance with the provisions of that statute.

78.    Defendants do not qualify for any of the limitations on remedies – the so-called limited "safe harbors" – set forth in § 512 for numerous reasons, including without limitation the following:

79.    Defendants are not merely "storing" infringing content at the direction of a user. Certain of Defendants' activities are not user directed.  They provide various features, functions and facilities to further save, share, and otherwise disseminate such content.  Defendants

- 28 -

encourage and enable – and profit handsomely as a result. Defendants impose YouTube's own watermark/logo on the content; make that content available through "private" sharing facilities to members of the public for viewing in a manner that is not detectable by the copyright owner; and provide computer code to "embed" direct access to YouTube's facilities in other websites on the Internet, to enable further unauthorized public performance, display, and copying in other locations on the Internet that are not part of a system or network controlled or operated by or for Defendants. Defendants take multiple voluntary acts to encourage and/or facilitate infringing activity, including (without limitation) by creating, on behalf of users, the HTML code necessary to "embed" videos on other web sites.

80. Defendants further have failed to adopt and reasonably implement a policy pursuant to which YouTube terminates subscribers and account holders who are repeat infringers. In addition, and notwithstanding their representations to copyright owners that once YouTube receives a formal notice of infringement with respect to a particular work, that Defendants will prevent that work from reappearing on YouTube, they have not done so. Defendants' representation to intellectual property rights owners that they will prevent the reappearance of specifically identified infringement on the YouTube website is false.

81. As YouTube presently operates, sending it notices to demand removal or "takedown" of infringements on its website is futile. Defendants have failed to police YouTube for the appearance and reappearance of infringing material, including material that has been the subject of written notices by intellectual property owners, have not provided any effective means to receive and process notices, and have not responded expeditiously to remove infringing content when they do acknowledge receiving notices.

82.     Defendants have available certain technical measures that are readily available to prevent or mitigate infringement. Defendants should be estopped to deny the availability or value of such measures in assessing its obligations to prevent or mitigate infringement.

83.     Defendants' failure to adopt such technical measures is willful and knowing and materially contributes to, causes, encourages, promotes, and induces the infringing conduct complained of herein.

84.     The existence and availability of such technical measures and Defendants' willful and knowing decision not to implement them demonstrate a right and ability to control the infringing activities complained of herein, from which Defendants derive direct financial benefits.

85.     Defendants' false representations about their compliance with applicable law and their failure to police YouTube and take meaningful steps to prevent or mitigate infringing activity are all deliberate and knowing elements of a strategy to maximize the financial and other benefits accruing to Defendants from the presence of such infringing activity on YouTube.

86.     Defendants have actual knowledge of the infringing activity rampant on their system, and have cast a blind eye toward the constant and unremitting "red flags" of infringing activity that occur constantly on YouTube.

### G.     Harm to the Class

87.     The harm to Lead Plaintiffs and the Class caused by Defendants' acts is substantial and to a large extent irreparable. Lead Plaintiffs and the Class not only lose the ability to control the delivery, manner, and means by which their respective works are made available to the public, but also lose revenue, directly and indirectly, by the substitution of

unauthorized "free" viewing and copying on YouTube, which displaces legitimate sales through authorized channels of distribution and exhibition. In addition, the uncontrolled, "viral" availability of the Class members' content, without any meaningful protection against copying and proliferation, works to interfere with authorized licensing and marketing of these works, and jeopardizes Class members' ability to derive revenue from the valuable intellectual property each owns or controls.

88.    Defendants have effectively arrogated to themselves, without authorization, a new "platform" for the delivery of the proprietary content of others and have drawn an unprecedented audience from which Defendants extract numerous financial and related benefits for YouTube's business, the core of which depends upon making available highly desirable intellectual property without authorization from, or payment to, the rights owners. Defendants have effectively reversed the operating principles of applicable law by appropriating proprietary content first, without authorization, and seeking out licensing arrangements from relevant content owners only after complaints or demands are lodged against YouTube.

89.    Notably, in the case of Lead Plaintiff Premier League, Defendant Google declined to bid on certain media rights that would have made footage of certain Premier League football matches available to it for Internet exploitation under appropriate licenses. Various explanations for declining to bid on these rights were offered by Google, including that it was not yet ready to pay for commercial content.

90.    Defendants' conduct is causing, and unless enjoined by this Court, will continue to cause Lead Plaintiffs and members of the Class great and irreparable injury that cannot be fully compensated or measured in money damages. Lead Plaintiffs and members of the Class have no adequate remedy at law.

## FIRST CLAIM FOR RELIEF

### (Direct Copyright Infringement – Against All Defendants)

91.    Lead Plaintiffs and the Class repeat and reallege each and every allegation contained in other paragraphs of the complaint.

92.    Defendants' conduct as described above constitutes direct copyright infringement of each of the Protected Works.

93.    The infringement of each such work is a separate and distinct act of infringement.

94.    The foregoing acts of infringement by Defendants are willful, intentional, and purposeful and in disregard of and indifference to the rights of Lead Plaintiffs and the Class members.

95.    The foregoing acts constitute direct infringement of the exclusive rights in Protected Works.

## SECOND CLAIM FOR RELIEF

### (Contributory Copyright Infringement – Against All Defendants)

96.    Lead Plaintiffs and the Class repeat and reallege each and every allegation contained in other paragraphs of the complaint.

97.    Defendants provide the site, means, and facilities for massive copyright infringement of Protected Works that takes place each time an unauthorized copy of such a work is copied and uploaded to YouTube, images from that work are publicly displayed on YouTube, and each time a user accesses and streams, publicly performs, copies, forwards or otherwise

- 32 -

transmits such work. Each and every one of these infringements is encouraged, and made possible and facilitated by Defendants.

98.    Such acts have been undertaken with full knowledge, actual and constructive, of the infringing activities alleged herein.

99.    The infringement of each such work is a separate and distinct act of infringement.

100.    The foregoing acts of infringement by Defendants are willful, intentional, and purposeful and in disregard of and indifference to the rights of Lead Plaintiffs and the members of the Class.

101.    The foregoing acts constitute contributory infringement of the exclusive rights in Protected Works.

### THIRD CLAIM FOR RELIEF

#### (Vicarious Copyright Infringement – Against All Defendants)

102.    Lead Plaintiffs and the Class repeat and reallege each and every allegation contained in other paragraphs of the complaint.

103.    Defendants have the right and ability to control the infringing activities alleged herein.

104.    Defendants derive direct financial and related benefits from the infringing activities alleged herein.

105.    The infringement of each of the Protected Works is a separate and distinct act of infringement.

106.    The foregoing acts of infringement by Defendants are willful, intentional, and purposeful and in disregard of and indifference to the rights of Lead Plaintiffs and members of the Class.

107.    The foregoing acts constitute vicarious infringement of the exclusive rights in Protected Works

### FOURTH CLAIM FOR RELIEF

**(Inducing Copyright Infringement – Against All Defendants)**

108.    Lead Plaintiffs and the Class repeat and reallege each and every allegation contained in other paragraphs of the complaint.

109.    Defendants have infringed Protected Works by inducing others to reproduce, adapt, distribute, and publicly perform or display and otherwise transmit those works.

110.    The infringement of each such work is a separate and distinct act of infringement.

111.    The foregoing acts of infringement by Defendants are willful, intentional, and purposeful and in disregard of and indifference to the rights of Lead Plaintiffs and members of the Class.

112.    The foregoing acts constitute inducing copyright infringement of the exclusive rights in Protected Works under applicable law.

**WHEREFORE**, Lead Plaintiffs, on behalf of themselves and the Class, pray for judgment against Defendants as follows:

1.     That the Court determine that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and direct that reasonable notice of this action be given to the Class as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure;

2.     Granting Plaintiffs, including all Class members, injunctive and other equitable relief, in accordance with the provisions of Rule 65 of the Federal Rules of Civil Procedure, enjoining Defendants, their officers, agents, servants, employees and attorneys, and all those in active concert or participation with them or any of them who receive actual notice of the Court's injunctive order:

A.     from directly or indirectly reproducing, adapting, distributing, publicly displaying or performing or otherwise infringing in any manner any of the Protected Works, including but not limited to the works identified herein, or any work in which any member of the Class owns or controls the exclusive rights in valid and subsisting copyrighted works and/or sound recordings protected under state law, which is now in existence or yet to be created;

B.     from causing, contributing to, inducing, enabling, facilitating or participating in the infringement of any of the works referred to in Paragraph A, above;

C.     from displaying Defendants' logos, or any colorable versions thereof, in connection with any unauthorized copies, public displays or performances, or other transmission, dissemination or exploitation of any of the works referred to in Paragraphs A and B, above;

- 35 -

D.      affirmatively to adopt, implement and offer to all persons, those

technological measures that are now, and shall be in the future, available, including but

not limited to those technologies developed pursuant to a broad consensus of copyright

owners and service providers in the relevant industries without unnecessarily substantial

costs or burdens on their system(s), to identify and protect copyrighted content and

prevent it from being posted or otherwise made available through the facilities owned

and/or operated or controlled by Defendants; and

E.      awarding such other equitable relief as will protect the members of the

Class's rights to their copyrighted content and any exclusive rights in sound recordings

protected by state law, including imposing a constructive trust on all the assets of

Defendants, if necessary, to secure to the Class the benefits that the Constitution and

Congress have promised them;

3.      Awarding Plaintiffs' damages and Defendants' profits attributable to their

infringing acts, and/or statutory damages, as applicable, in the maximum amount permitted by

law with respect to each work infringed;

4.      Directing disgorgement of all profits, direct and/or indirect, illegally gained;

5.      Awarding punitive damages on all sound recordings protected by state law, as

permitted by law;

6.      Finding Defendants jointly and severally liable for all monetary damages

awarded;

7.      Awarding prejudgment interest according to law;

8.      Awarding Plaintiffs' attorneys' fees, costs, and disbursements in this action; and

- 36 -

9.    Awarding such other and further relief as the Court may deem just and proper.


Dated:    New York, New York
          May 4, 2007

                                   _____
                                   Louis M. Solomon (LS-7906)
                                   William M. Hart (WH-1604)
                                   Jerry L. Dasti (JD-1673)
                                   PROSKAUER ROSE LLP
                                   1585 Broadway
                                   New York, NY  10036-8299
                                   Phone:  (212) 969-3000

                                       - and -

                                   _____
                                   Max W. Berger (MB-5010)
                                   John P. Coffey (JC-3832)
                                   Gerald H. Silk (GS-4565)
                                   John C. Browne (JB-0391)
                                   Eric T. Kanefsky (EK-3511)
                                   BERNSTEIN LITOWITZ BERGER &
                                   GROSSMANN LLP
                                   1285 Avenue of the Americas
                                   New York, NY 10019
                                   Phone:  (212) 554-1400

                                   *Attorneys for Lead Plaintiffs and the*
                                   *Prospective Class*

**EXHIBIT A**

*Infringing copies of the copyrighted works identified below have been found on the YouTube.com website at the URLs listed below, as well as at other URLs*

| Title of Infringed Work | URL where Infringing Work Found | Date Posted |
|---|---|---|
| **PREMIER LEAGUE WORKS** | | |
| Chelsea v Tottenham, April 7, 2007 | http://www.youtube.com/watch?v=kXtjVVqeZwM | April 7, 2007 |
| Arsenal v West Ham, April 7, 2007 | http://www.youtube.com/watch?v=dM0cqftTSVU | April 7, 2007 |
| Portsmouth v Manchester United, April 7, 2007 | http://www.youtube.com/watch?v=aB0Pb3RiMoI | April 8, 2007 |
| Watford v Portsmouth, April 9, 2007 | http://www.youtube.com/watch?v=900wOOdihrc | April 10, 2007 |
| Fulham v Manchester City, April 9, 2007 | http://www.youtube.com/watch?v=py_1TJ2SXV0 | April 9, 2007 |
| Bolton v Everton, April 9, 2007 | http://www.youtube.com/watch?v=03cTR7UkG7g | April 9, 2007 |
| Liverpool v Wigan, April 21, 2007 | http://www.youtube.com/watch?v=wqw8K99pwHI | April 21, 2007 |
| Fulham v Blackburn, April 21, 2007 | http://www.youtube.com/watch?v=BTa8c2WAyGY | April 22, 2007 |
| West Ham v Everton, April 21, 2007 | http://www.youtube.com/watch?v=tDaEBP2FkNM | April 21, 2007 |
| Manchester United v Middlesbrough, April 21, 2007 | http://www.youtube.com/watch?v=pjLvEaCpZy0 | April 22, 2007 |
| Tottenham v Arsenal, April 21, 2007 | http://www.youtube.com/watch?v=1HOxSZdy8jg | April 21, 2007 |
| Tottenham v Arsenal, April 21, 2007 | http://www.youtube.com/watch?v=niPBCy1GMNk | April 21, 2007 |

1

| Chelsea v Bolton, April 28, 2007 | http://www.youtube.com/watch?v=X8_7eCHcbJs | April 28, 2007 |
|---|---|---|
| Everton v Manchester United, April 28, 2007 | http://www.youtube.com/watch?v=ov3FxCriZdc | April 28, 2007 |
| Middlesbrough v Tottenham, April 28, 2007 | http://www.youtube.com/watch?v=aF7xQ3HZ2Yw | April 28, 2007 |
| Wigan v West Ham, April 28, 2007 | http://www.youtube.com/watch?v=sRTUDkdTxpg | April 28, 2007 |
| Arsenal v Fulham, April 29, 2007 | http://www.youtube.com/watch?v=dEBS1zmdBag | April 29, 2007 |
| **BOURNE WORKS** | | |
| Inka Dinka Doo | http://www.youtube.com/watch?v=ZkukCCSThN8 | February 23, 2007 |
| Let's Fall In Love | http://www.youtube.com/watch?v=oN9KaEDDP10 | December 13, 2006 |
| Popcorn | http://www.youtube.com/watch?v=aSBqyuYKlWE | November 15, 2006 |
| San Antonio Rose | http://www.youtube.com/watch?v=d0rhl62iJxs | October 21, 2006 |
| Smile | http://www.youtube.com/watch?v=7r9qwAZnl64 | July 15, 2006 |