PROSKAUER ROSE LLP
Louis M. Solomon (LS-7906)
1585 Broadway
New York, NY 10036-8299
Telephone 212.969.3000
- and -
BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
Max W. Berger (MB-5010)
1285 Avenue of the Americas
New York, NY 10019
Telephone 212.554.1400
*Attorneys for Lead and Named Plaintiffs and the Prospective Class*

RECEIVED
· 2 6 2008
U.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

THE FOOTBALL ASSOCIATION PREMIER
LEAGUE LIMITED, BOURNE CO. (together
with its affiliate MURBO MUSIC PUBLISHING,
INC.), CHERRY LANE MUSIC PUBLISHING
COMPANY, INC., CAL IV ENTERTAINMENT
LLC, ROBERT TUR d/b/a LOS ANGELES
NEWS SERVICE, NATIONAL MUSIC
PUBLISHERS' ASSOCIATION, THE
RODGERS & HAMMERSTEIN
ORGANIZATION, STAGE THREE MUSIC
(US), INC., EDWARD B. MARKS MUSIC
COMPANY, FREDDY BIENSTOCK MUSIC
COMPANY d/b/a BIENSTOCK PUBLISHING
COMPANY, ALLEY MUSIC CORPORATION,
X-RAY DOG MUSIC, INC., FÉDÉRATION
FRANÇAISE DE TENNIS, THE MUSIC FORCE
MEDIA GROUP LLC, THE MUSIC FORCE
LLC, and SIN-DROME RECORDS, LTD. on
behalf of themselves and all others similarly
situated,

          Plaintiffs,

          v.

YOUTUBE, INC., YOUTUBE, LLC and
GOOGLE, INC.,

          Defendants.

------------------------------------ X

07 Civ. 3582 (LLS)

**SECOND AMENDED CLASS
ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

1

Lead Plaintiffs, The Football Association Premier League Limited and Bourne Co. (together with its affiliate Murbo Music Publishing, Inc.) and Named Plaintiffs Cherry Lane Music Publishing Company, Inc., Cal IV Entertainment, LLC, Robert Tur d/b/a Los Angeles News Service, National Music Publishers' Association, The Rodgers & Hammerstein Organization, Stage Three Music (US), Inc., Edward B. Marks Music Company, Freddy Bienstock Music Company d/b/a Bienstock Publishing Company, Alley Music Corporation, X-Ray Dog Music, Inc., Fédération Française de Tennis, The Music Force Media Group LLC, The Music Force LLC, and Sin-Drome Records, Ltd. on behalf of themselves and all others similarly situated, by their attorneys Proskauer Rose LLP and Bernstein Litowitz Berger & Grossmann LLP, allege for their Second Amended Complaint against defendants YouTube, Inc., YouTube, LLC (together "YouTube," which also refers to Defendants' website YouTube.com) and Google, Inc. ("Google," and together with YouTube, "Defendants"), on personal knowledge as to matters relating to themselves, and on information and belief as to all other matters, as follows:

## NATURE OF ACTION

1.     This action is brought to vindicate the rights of owners of copyrighted intellectual property, both large and small.  This intellectual property was created and made valuable by the investment – sometimes the life-long investment – of creativity, time, talent, energy, and resources of content producers other than Defendants.  Yet Defendants, which own and operate the website YouTube.com, have knowingly misappropriated and exploited this valuable property for their own gain without payment or license to the owners of the intellectual property.

2.     The Class (as that term is defined in Paragraph 45 of this Amended Complaint) consists of copyright owners (together with the owners of exclusive rights in sound recordings

2

protected under state law) whose proprietary content Defendants have copied, stored, and electronically disseminated, publicly displayed, or performed, in whole or substantial infringing part, without the authorization of the rights owners. YouTube has done so, first independently and, since November 13, 2006, with the active, knowing encouragement and complicity of, and for the direct financial benefit of, its parent, Google. Defendants have continued and will continue their brazen acts of willful copyright infringement unless enjoined by this Court.

3.    The Class is adequately represented by The Football Association Premier League Limited ("PL" or the "Premier League") and Bourne Co. ("Bourne," together with the Premier League, "Lead Plaintiffs"), and Bourne's affiliate Murbo Music Publishing, Inc. The Class is also represented by the Named Plaintiffs Cherry Lane Music Publishing Company, Inc., Cal IV Entertainment, LLC, Robert Tur d/b/a Los Angeles News Service, National Music Publishers' Association, The Rodgers & Hammerstein Organization, Stage Three Music (US), Inc., Edward B. Marks Music Company, Freddy Bienstock Music Company d/b/a Bienstock Publishing Company, Alley Music Corporation, X-Ray Dog Music, Inc., Fédération Française de Tennis, The Music Force Media Group LLC, The Music Force LLC, and Sin-Drome Records, Ltd. (collectively, "Named Plaintiffs"). The financial success and ability of Lead and Named Plaintiffs and other Class members (collectively, sometimes referred to herein as "Plaintiffs") to continue to produce and distribute original and valuable creative works, including musical compositions, sound recordings, motion pictures, television productions, and sports broadcasting, is dependent upon this Court's protection of their property rights. The National Music Publishers' Association, which represents over 700 music publishers, is suing as an association on behalf of its copyright owner members and seeks only equitable relief, not damages.

3

4.    YouTube bills itself as "the leading destination on the Internet for video

entertainment" and boasts millions of monthly visitors to its website.  In the operation of its

website, YouTube copies and electronically disseminates content, on a massive and wide-

ranging scale, including the valuable intellectual property of the Class.  Defendants know that

YouTube's very popularity (and concomitant value, including advertising revenues and

desirability as a platform for other uses) derive from the unauthorized presence and exploitation

of valuable intellectual property rights owned by the Class.

5.    YouTube permits, encourages, and enables users to upload and share, among

other content: television programming; broadcasts of sporting events; videos, synchronized with

sound consisting largely of copyrighted music, commercial sound-recordings and bootlegged

recordings of well-known musical groups and other performers; full length feature movies; and

other proprietary content, the exclusive rights to which are owned by the Class.  YouTube not

only "stores" user directed content in unmodified form; it engages in, encourages, and enables

the unlawful copying, alteration, display, dissemination, and performance of Class members'

intellectual property, and reaps substantial financial benefits as a result.  YouTube does so by

joining commercial advertising with such infringing content, and by selecting and adapting such

content, which YouTube then distributes under commercial agreements to third parties who

operate websites or conduct other businesses such as mobile phone services.

6.    Defendants have pursued and are continuing to pursue a deliberate strategy of

engaging in, permitting, encouraging, and facilitating massive copyright infringement on the

YouTube website because the presence of large amounts of valuable intellectual property

generates interest in that website, resulting in public and media attention and increased traffic

(which, in turn, increase YouTube's advertising revenues and projected value as a site, platform,

4

or destination).  Fully aware that this business model violates laws protecting the copyrighted

content that they have misappropriated on a massive scale, Defendants have adopted a cynical

and self-contradictory strategy designed to perpetuate the unlawful exploitation of the Class's

valuable property rights.  For example, Defendants have feigned blindness and an inability to

reduce the wholesale infringement that occurs, constantly and unremittingly, every day on the

YouTube website, distorting the balance created by Congress and forcing the victims – the

content producers themselves – to go through the meaningless and costly exercise of pointing out

to Defendants what Defendants plainly already know:  that there is copyrighted material being

exploited on the YouTube website without the authorization of the rights owners.  Defendants

have deliberately refrained from implementing readily available technical and other measures to

prevent infringement.  Defendants know full well that to employ such measures would

undermine the very essence of their business model – to maximize the amount of infringing

content available to users of YouTube – and would cause them to lose the benefit of the vast

audience the YouTube website now enjoys and the substantial "draw" that such infringing

material represents in attracting users.

7.    Recent events have confirmed that Defendants are able to identify copyrighted

material on the YouTube website – and to remove such material if they wish – so long as victims

of Defendants' infringing conduct agree to pay Defendants to do so, by authorizing the otherwise

infringing exploitation of their works by Defendants.  In a Twenty-First Century embodiment of

an age-old scheme, Defendants have agreed to provide "protection" against their own infringing

conduct through a series of "partnership" agreements with various copyright owners.  Put

another way, when the license fee sought by a copyright owner is low enough to be deemed

satisfactory to Defendants, Defendants find themselves able to shed their blinders and employ

technology to safeguard the rights of their new "partners." By contrast, Defendants steadfastly refuse to respect the rights of members of the Class who insist on asserting their rights under the laws Congress has enacted to protect them rather than being forced to sell those rights on the cheap as part of Defendants' "protection" scheme.

8.    Within a year of the formal launch of YouTube's website, YouTube sold its business to Google for $1.65 billion in what YouTube touts as "one of the most talked-about acquisitions to date." The resulting increase in Google's share price added nearly $4 billion in market capitalization to that company on the day of the acquisition. YouTube's tremendous financial success was the direct result of Defendants' unlawful exploitation of the proprietary works of the Class. The $1.65 billion paid by Google to purchase YouTube in 2006, and the concomitant $4 billion increase in Google's market capitalization, vastly understates both the value of the intellectual property rights of the Class that YouTube has misappropriated, and the harm to the Class caused by Defendants' unlawful conduct. In fact, Google paid this amount for YouTube even though Google already had its own video sharing website called "Google Video." However, as Google was well aware, YouTube had a key edge over Google Video and the scores of other video sharing websites: a massive archive of misappropriated copyrighted material.

9.    Each of the Lead Plaintiffs, Named Plaintiffs, and the members of the Class has been victimized by Defendants. Absent judicial intervention, Lead Plaintiffs, Named Plaintiffs, and the Class will continue to be victimized by Defendants. For the foregoing reasons, and those set forth below, Plaintiffs seek injunctive and other equitable relief and damages.

# THE PARTIES

## A.    Plaintiffs

## Premier League

10.    Lead Plaintiff Premier League, the top division of English soccer, broadcasts its copyrighted creations in 204 countries worldwide and is viewed by audiences estimated at 2.59 billion people.  Premier League is a private limited company incorporated in England and Wales with a principal place of business at 30 Gloucester Place, London, W1U 8PL.  Premier League owns the copyright and/or the relevant exclusive rights in the following Protected Works (as that term is defined in Paragraph 45 of this Amended Complaint), audiovisual footage consisting of soccer matches (the "PL Works"), among others:

        A.     Chelsea v Tottenham, April 7, 2007

        B.     Arsenal v West Ham, April 7, 2007

        C.     Portsmouth v Manchester United, April 7, 2007

        D.     Watford v Portsmouth, April 9, 2007

        E.     Fulham v Manchester City, April 9, 2007

        F.     Bolton v Everton, April 9, 2007

        G.     Liverpool v Wigan, April 21, 2007

        H.     Fulham v Blackburn, April 21, 2007

        I.     West Ham v.Everton, April 21, 2007

        J.     Manchester United v Middlesbrough, April 21, 2007

        K.     Tottenham v Arsenal, April 21, 2007

        L.     Chelsea v Bolton, April 28, 2007

        M.     Everton v Manchester United, April 28, 2007

N.    Middlesbrough v Tottenham, April 28, 2007

O.    Wigan v West Ham, April 28, 2007

P.    Arsenal v Fulham, April 29, 2007

Q.    Liverpool v Chelsea, August 19, 2007

R.    Manchester United v Tottenham, August 26, 2007

S.    Tottenham v Arsenal, September 15, 2007

11.    Notwithstanding the fact that Defendants had actual and constructive knowledge
of the presence of the above works on the YouTube website, certain of these works remained or
remain on the YouTube website having been posted or re-posted by users to YouTube despite
YouTube's actual and constructive knowledge of their infringing nature. The fact that these
works were added back to the YouTube website *after* YouTube had actual and constructive
knowledge of their presence further shows that notifying Defendants of the infringements is
futile. These re-posted works include:

A.    Liverpool v Chelsea, August 19, 2007. A video clip from this match was
initially uploaded on August 19, 2007. After a takedown notice was sent, the same clip
was subsequently re-posted twice on August 21, 2007, once on August 22, once on
August 26, once on August 27, once on August 28, and once again on August 30.

B.    Manchester United v Tottenham, August 26, 2007. A video clip from this
match was initially uploaded on August 26, 2007. After a takedown notice was sent, the
same clip was subsequently re-posted twice on August 27, twice on August 28, and twice
again on August 30.

8

C.    Tottenham v Arsenal, September 15, 2007. A video clip from this match
was initially uploaded on September 15, 2007. After a takedown notice was sent, the
same clip was subsequently re-posted on September 16, 2007.

12.    These re-posts were or are made in a deliberate effort to maintain these copies of
infringing works on the YouTube site with full knowledge of their infringing nature. For
instance, one work was reposted with an introductory frame "F**K THE NETRESULT
W*NKERS," (referring to the monitoring and take-down agency used by the Premier League)
and showing that the re-post was made with the full knowledge of the Premier League's rights.
(Profanity omitted.)

13.    Defendants are fully aware of such re-posting activity but, as set forth below,
have chosen not to take meaningful steps to prevent it.

14.    Since the commencement of this action more than 14,000 unauthorized postings
of PL Works have been made to the YouTube website.

15.    The PL Works are not "United States works" within the meaning of the U.S.
Copyright Act and are therefore not subject to any registration requirements under U.S.
copyright law. In addition, and without limiting the Premier League's rights or remedies, the
Premier League is, pursuant to section 411(b) of the U.S. Copyright Act, entitled to all remedies
under U.S. copyright law, including statutory damages and attorneys' fees.

**Bourne**

16.    Lead Plaintiff Bourne is an independent music publisher formed in 1919, with a
principal place of business at 5 West 37th Street, New York, NY. Bourne holds the exclusive
copyright interests in some of the world's most beloved and well-known songs. Bourne owns

the copyright and/or the relevant exclusive rights in the following Protected Works, musical compositions (the "Bourne Works"), among others:

      A.    "Inka Dinka Doo," registration number Eu 78547, renewed R 266593, registration number Ep 39319, renewed R 267341-42.

      B.    "Let's Fall In Love," registration number Eu 77136, renewed R 264257, R 263531, registration number Ep 39325, renewed R 275972.

      C.    "Popcorn," registration number Eu 131704, renewed Re 750-746, registration number Ep 293632, renewed R 799-458.

      D.    "San Antonio Rose," registration number Eu 225380, renewed R 412838, registration number Ep 84968, renewed R 412839.

      E.    "Smile," registration number Ep 81725, renewed Re 151-113, Re 129-387.

      F.    "Far Away Places," registration number Eu 92652, renewed R 585879, registration number Ep 25000, renewed R 602745.

      G.    "Confessin' (That I Love You)," registration number Eu 17265, renewed R 187325, registration number Ep 14162, renewed R 189021.

17.    Bourne specifically identified a number of the above works by title, copyright registration, and infringing URLs where such works appeared on the YouTube website in the original Complaint in this action dated May 4, 2007 and in the First Amended Complaint, dated November 7, 2007, including the work entitled "Smile" at http://www.youtube.com/ watch?v=7r9qwAZnl64. Despite the fact that Defendants were thereby notified of this infringement, the work remained on the YouTube website, at the same URL, for many additional weeks.

**Murbo Music Publishing, Inc.**

18.    Plaintiff Murbo Music Publishing, Inc. ("Murbo"), an affiliate of Lead Plaintiff Bourne, is an independent music publisher with a principal place of business at 5 West 37th Street, New York, NY.  Murbo owns the copyright and/or the relevant exclusive rights in the following Protected Works, consisting of musical compositions (the "Murbo Works"), among others:

        A.    "Black Magic Woman," registration numbers Eu 59671, renewed Re 719-457, registration number Ep 287018, renewed Re 774-250.

**Cherry Lane Music Publishing Company, Inc.**

19.    Plaintiff Cherry Lane Music Publishing Company, Inc. ("Cherry Lane") is a New York-based privately held music publisher founded in 1960 by renowned producer/arranger Milt Okun.  Cherry Lane oversees an extensive catalogue of legendary songs from Elvis Presley, John Denver, Quincy Jones and Ashford & Simpson, to more recent popular songs from the Black Eyed Peas, John Legend and Wolfmother.  Cherry Lane's partners and clients include DreamWorks Pictures, DreamWorks Animation SKG, The Weinstein Company, Lakeshore Entertainment, Walden Media, Sanrio (Hello Kitty), NASCAR, Icon Productions, NFL Films, World Wrestling Entertainment, Professional Bull Riders, Pokémon USA, Inc. and 4Kids TV, among others.  Cherry Lane is incorporated in New York and has its principal place of business at 6 East 32nd Street, New York, NY.  Cherry Lane owns the copyright and/or the relevant exclusive rights in the following Protected Works, consisting of musical compositions (the "Cherry Lane Works"), among others:

A.    "Afternoon Delight," registration number Eu 648070, renewed Re 895-945, registration numbers Ep 354820, Ep 358013 and Ep 360542.

B.    "Thank God, I'm a Country Boy," registration number Eu 469657, renewed Re 861-042, registration numbers Ep 370986, Ep 371122, Ep 371123.

C.    "American Beauty," registration number Pa 1-004-147.

D.    "Soul Bossa Nova," registration number Ep 169395, renewed Re 468-838, registration number Ep 340886.

E.    "Strawberry Letter #23," registration number Eu 270903, registration number Pa 587 523.

## Cal IV Entertainment, LLC

20.    Plaintiff Cal IV Entertainment, LLC (hereinafter "Cal IV") is a privately-held independent music publisher organized under the laws of Tennessee, and has its principal place of business at 808 19th Avenue South, Nashville, TN. Cal IV holds the copyright interests in nearly 15,000 songs, many of which have been recorded by leading country music artists. Cal IV owns the copyright and/or the relevant exclusive rights in the following Protected Works, consisting of musical compositions (the "Cal IV Works"), among others:

A.    "If You're Going Through Hell," registration number Pa 1321261.

B.    "Sharing The Night Together," registration numbers Eu 640334, Eu 666747.

## Robert Tur d/b/a Los Angeles News Service

21.    Plaintiff Robert Tur d/b/a Los Angeles News Service ("Tur") is a world-renowned broadcast journalist who virtually invented live televised coverage of events from the vantage

point of a helicopter. Tur's work, which has won several Emmy awards and the prestigious Edward R. Murrow award, includes the now infamous O.J. Simpson slow speed "White Bronco" chase and the Reginald Denny beating during the LA Riots. Tur's principal place of business is at 1247 Lincoln Blvd., Santa Monica, California, 90401. Tur owns the copyright and/or the relevant exclusive rights in the following Protected Works, consisting of video or audiovisual works (the "Tur Works"), among others:

      A.    "Beating of Man in Brown Hatchback with rescue," registration number Pa 576 702.

      B.    "Beating of Man in White Panel Truck," registration number Pa 576 703.

      C.    "Beating of Reginald Denny," registration number Pa 576 704.

      D.    "Earthquake," registration number Pa 839-603.

      E.    "North Hollywood Shootout," registration number Pa 862-544.

## National Music Publishers' Association

22.    Plaintiff NMPA is the preeminent trade association representing the interests of music publishers in the United States, with a principal place of business at 101 Constitution Ave. NW, Suite 705 East, Washington DC. Founded in 1917, NMPA's mission for nearly a century has been to protect, promote, and advance the interests of the creators and owners of copyrighted musical works. NMPA currently has over 700 members, including both small and large music publishers, whose interests it has long protected before Congress, the U.S. Copyright Office, and the courts. NMPA's wholly owned licensing subsidiary, The Harry Fox Agency, Inc. ("HFA"), acts as an agent for almost 35,000 music publishing entities that collectively own and/or control more than 1.6 million copyrighted musical works. HFA is by far the largest mechanical licensing and collection agency for musical publishers in the United States, with a principal place

of business at 601 West 26th Street, 5th Floor, New York, NY. HFA licenses copyrighted musical

works for reproduction and distribution in the form of physical phonorecords (CDs, cassette

tapes and phonorecords), as well as for reproduction, distribution and display over the Internet

through digital download and streaming services in the form of digital phonorecord deliveries, or

"DPDs." HFA also licenses musical compositions in connection with other physical and digital

uses. HFA collects and distributes royalties derived from these licensed uses of copyrighted

music and conducts royalty examinations of licensees on behalf of its publisher-principals.

     23.    Central to NMPA's purpose is safeguarding the value of its members' intellectual

property. The present action presents critical issues for owners of copyrighted works, including

all of NMPA's members whose copyrights are being infringed by Defendants. Because the

question of the legality of Defendants' conduct affects NMPA's members in an identical manner,

the equitable relief sought by NMPA herein does not require the participation of NMPA's

individual members.

### The Rodgers & Hammerstein Organization

     24.    Plaintiff Rodgers & Hammerstein Organization ("RHO"), on behalf of itself and

Williamson Music Co., is a joint venture established under the laws of the State of New York,

with a principal place of business at 1065 Avenue of the Americas, Suite 2400

New York, NY. RHO is a member of NMPA and a principal of HFA. RHO owns the copyright

and/or the relevant exclusive rights in the following Protected Works, consisting of musical

compositions (the "RHO Works"), among others:

     A.    "Bali Ha'i," registration number Ep 34987, renewed R 647156.

    B.    "The Carousel Waltz," registration number Eu 421279, renewed R 549622, registration number Ep 831, renewed R 560321, renewed R 554966, registration number Pa 175155.

    C.    "Climb Ev'ry Mountain," registration number Ep 141696, renewed Re 338-191.

    D.    "Do-Re-Mi," registration number Ep 134312, renewed Re 329-350, renewed Re 335-268.

    E.    "Edelweiss," registration number Eu 602935, renewed Re 332-881, renewed RE 335-357, registration number Ep 136496, renewed Re 358448.

    F.    "Getting to Know You," registration number Ep 54068, renewed Re 17-518.

## Stage Three Music (US), Inc.

25.    Plaintiff Stage Three Music (US), Inc. ("Stage 3"), is a leading independent music publisher formed in 2003, with a principal place of business at 13A Hillgate Street, London, W8 7SP. Stage 3 is a member of NMPA and a principal of HFA. Stage 3 owns the copyright and/or the relevant exclusive rights in the following Protected Works, consisting of musical compositions (the "Stage 3 Works"), among others:

    A.    "Walk This Way," registration number Eu 569366, renewed Re 886-653, registration number Ep 380213.

    B.    "Dream On," registration number Eu 381003, renewed Re 844-286.

    C.    "Back in the Saddle," registration number Eu 758246, registration number Ep 380124.

    D.    "Sweet Emotion," registration number Eu 569371, renewed Re 887-602.

E.    "La Grange," registration number Eu 426196, renewed Re 834-512, registration number Ep 337257.

F.    "Tush," registration number Eu 568381, renewed Re 886-650, registration number Pa 35-744.

G.    "Sharp Dressed Man," registration number Pa 170-377.

H.    "Legs," registration number Pa 170-380.

I.    "Gimme All Your Lovin," registration number Pa 170-557.

**Edward B. Marks Music Company**

26.    Plaintiff Edward B. Marks Music Company ("EBMMCo"), formed in 1894, holds the exclusive copyright interests in numerous concert music and popular song titles. EBMMCo is a partnership organized under the laws of the state of New York and has its principal place of business at 126 East 38th Street, New York, NY, 10016. EBMMCo owns the copyright and/or the relevant exclusive rights in the following Protected Works, consisting of musical compositions (the "EBMMCo Works"), among others:

A.    "I'd Do Anything For Love (But I Won't Do That)," registration numbers PA 668-441, PA 677-622.

B.    "God Bless The Child," registration number Ep 96565, renewed R 440611.

**Freddy Bienstock Music Company**

27.    Plaintiff Freddy Bienstock Music Company d/b/a Bienstock Publishing Company ("Bienstock") holds the exclusive copyright interests in numerous concert music and popular song titles. Bienstock is a partnership organized under the laws of the state of New York and has

16

its principal place of business at 126 East 38th Street, New York, NY, 10016. Bienstock owns the copyright and/or the relevant exclusive rights in the following Protected Works, consisting of musical compositions (the "Bienstock Works"), among others:

        A.    "The Revolution Will Not Be Televised," registration number Eu 269324, renewed RE 671-567.

### Alley Music Corporation

28.    Plaintiff Alley Music Corporation ("Alley") holds the exclusive copyright interests in numerous concert music and popular song titles. Alley is incorporated in New York and has its principal place of business at 126 East 38th Street, New York, NY, 10016. Alley owns the copyright and/or the relevant exclusive rights in the following Protected Works, consisting of musical compositions (the "Alley Works"), among others:

        A.    "I Get the Sweetest Feeling," registration number Eu 58217, renewed
            Re 718-147, Re 740-294, registration number Ep 250514, renewed
            Re 718-157, Re 740-293.

29.    Alley, Bienstock, and EBMMCo are affiliates or subsidiaries of Carlin America, Inc., a leading independent music publishing company.

### X-Ray Dog Music, Inc.

30.    Plaintiff X-Ray Dog Music, Inc. ("X-Ray Dog") was formed in 1996 and is an innovator in the creation of original music and sound recordings used in motion picture film trailers, including such theatrical blockbusters as The Lord of the Rings, Pirates of the Caribbean, Spiderman and Harry Potter. Its musical compositions and sound recordings are

licensed to film producers for limited purposes and X-Ray Dog retains all rights in them, for future licensing in connection with other films and projects. X-Ray Dog is incorporated in California and has its principal place of business at 1023 N. Hollywood Way, Suite 103, Burbank, CA. X-Ray Dog owns the copyright and/or the relevant exclusive rights in the following Protected Works, consisting of musical compositions and sound recordings ("X-Ray Dog Works"), among others:

      A.    "Here Comes The King," registration number SR 363-745.

      B.    "Dethroned," registration number SR 363-767.

### Fédération Française de Tennis

31.    Plaintiff Fédération Française de Tennis ("FFT") is France's national tennis organization, and organizes the Roland-Garros International Championships, also known as the French Open. FFT has its principal place of business at 2 Avenue Gordon Bennett, 75016 Paris, France. FFT owns the copyright and/or the relevant exclusive rights in the following Protected Works, consisting of audiovisual footage of tennis matches ("FFT Works"), among others:

      A.    Roger Federer v Nicolay Davydenko, June 8, 2007.

      B.    Ernests Gulbis v Tim Henman, May 29, 2007.

      C.    Ana Ivanovic v Maria Sharapova, June 7, 2007.

32.    The FFT Works are not "United States works" within the meaning of the U.S. Copyright Act and are therefore not subject to any registration requirements under U.S. copyright law. In addition, and without limiting FFT's rights or remedies, FFT is, pursuant to section 411(b) of the U.S. Copyright Act, entitled to all remedies under U.S. copyright law, including statutory damages and attorneys' fees.

### The Music Force

33.     Plaintiffs The Music Force Media Group LLC, a major independent record company organized under the laws of Tennessee, The Music Force LLC, a highly respected independent music publisher organized under the laws of Tennessee, and Sin-Drome Records, Ltd., an independent record company incorporated in California, together with their affiliated and related companies (collectively, "The Music Force"), all with a principal place of business at 4658 Wortser Ave. Sherman Oaks, CA, 91423, represent musical compositions embodied in sound recordings which have sold in excess of 50 million units, recorded by Artists such as Alicia Keyes, Neil Diamond, Peter Cetera, Anita Baker, Tupac Shakur, and Notorious B.I.G.; have received multiple Grammy nominations, including a Grammy award and other awards; and own the copyrights and/or the relevant exclusive rights in the following Protected Work(s) consisting of sound recordings, visual material and musical compositions ("The Music Force Works"), among others:

    A.     "Stuck on You," registration number SR 132325 (sound recording).

    B.     "Stuck on You," registration number Pau 1 6143 70 (visual material).

    C.     "Stuck on You," registration number PA 527882 (musical composition).

    D.     "What You Won't Do For Love," registration number SR 04796 (sound recording).

### B.     Defendants

34.     Defendant YouTube, Inc. is a corporation organized and existing under the laws of the State of Delaware and with its principal place of business at 1000 Cherry Avenue, San Bruno, California. YouTube, Inc. was founded in February 2005. Although YouTube

formally launched the service challenged here on December 15, 2005, a version of the site was available to the public since early 2005.

35.    Defendant YouTube, LLC is a limited liability company organized and existing under the laws of the State of Delaware and with its principal place of business at 1000 Cherry Avenue, San Bruno, California. YouTube, LLC is a wholly owned and controlled subsidiary of Google. YouTube, LLC is the successor in interest of YouTube, Inc.

36.    YouTube maintains an office and employs personnel in New York State and the Southern District of New York. YouTube also advertises employment positions based in New York State and in the Southern District of New York.

37.    Defendant Google is a publicly held corporation organized and existing under the laws of the State of Delaware and with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California. Google has a place of business in New York State and the Southern District of New York at 76 Ninth Avenue, New York, New York. On November 13, 2006, Google closed its acquisition of YouTube for $1.65 billion dollars in stock.

38.    Google is sued here in two capacities: First, as a successor in interest to YouTube. As Google has publicly stated, as a result of the merger, Google acquired all of YouTube's "properties, rights, privileges, purposes, and powers and debts, duties, and liabilities." Second, Google is sued as an active participant, inducer, aider, and abettor and for actively participating in, contributing to, and knowingly and directly profiting from YouTube's unlawful conduct. To achieve a return on its $1.65 billion investment in the purchase of YouTube, Google intends to cause and is causing YouTube to continue the unlawful conduct alleged herein, and at all times since that purchase Google's sole ownership of YouTube has provided it with a direct financial benefit from YouTube's infringing activities, as well as the

legal and practical ability to influence and control the activities of, and decisions made by, YouTube.

39.    In addition, Google is independently profiting from the illegal activity. For example, Google's own website enables its users' direct access to YouTube's infringing content. Google's "Google Video" website also features YouTube's infringing content, as well as additional infringing content that users have uploaded and continue to upload directly to the Google Video website. Google also exercises complete domination and control over YouTube, maintains a substantial, continuing connection with YouTube with regard to the infringing activities complained of herein, with respect to the matters alleged is utilizing YouTube to commit a fraud or wrong to carry out Defendants' unlawful activity, and the funding by Google has contributed to additional damages to the Class.

## JURISDICTION AND VENUE

40.    This action arises under the Copyright Act, 17 U.S.C. §§ 101 *et seq.* and under statutory and common law unfair competition laws.

41.    This Court has original subject matter jurisdiction of this action under 28 U.S.C. §§ 1331 and 1338(a) and (b) and pursuant to the supplemental jurisdiction provisions of 28 U.S.C. § 1367.

42.    This Court has personal jurisdiction over Defendants. Defendants, individually and collectively, acting alone and in concert, do continuous and systematic business in New York State and in this District and maintain one or more offices and employ personnel in New York State, and therefore are domiciliaries of New York State. New York Civil Practice Law and Rules ("CPLR") § 301.

43.    This Court also has personal jurisdiction over Defendants pursuant to CPLR § 302. Defendants, individually and collectively, acting alone and in concert, transact business within New York State and this District and supply goods and services in New York State by permitting users who reside in New York State frequently to upload and view videos. CPLR § 302(a)(1). Defendants commit tortious acts of copyright infringement within New York State every time they permit, encourage, and enable a user to view a copyright protected video without license or permission of the copyright owner. CPLR § 302(a)(2). Defendants commit tortious acts of copyright infringement outside of New York State, which cause injury within New York State, every time they permit, encourage, and enable a user to view an infringing video clip without the express permission or license of New York State resident copyright holders. CPLR § 302(a)(3). Defendants regularly do and solicit business within New York State and derive substantial revenue from their services within New York State. CPLR § 302(a)(3)(i). Defendants derive substantial revenue in interstate commerce and should reasonably expect their copyright infringement to have consequences in New York State. CPLR § 302(a)(3)(ii).

44.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a).

## CLASS ACTION ALLEGATIONS

45.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a), and 23(b)(1), 23(b)(2), 23(b)(3), and/or 23(c)(4) on behalf of a class initially defined as all persons and entities that (a) own the copyright and/or the relevant exclusive rights in an original work, and (b) for which a certificate of registration has been issued or the deposit, application, and fee required for registration have been properly submitted to the U.S. Copyright Office; and/or (c) in the case of certain sound recordings, own

22

the exclusive rights protected under state law; and/or (d) own the exclusive rights in an unregistered copyrighted work and will have registered that work prior to the time of final judgment in this action; and/or (e) own a work that does not require registration as a matter of law (subsections (a)-(e), collectively, are sometimes referred to herein as "Protected Works") that, without authorization, was reproduced, adapted, distributed, publicly displayed, performed or otherwise transmitted or disseminated on or through the YouTube.com website on or after April 15, 2005 through the deadline for submitting a claim form in this action, as will be determined by the Court (the "Class"). Excluded from the Class are: (a) Defendants; (b) the subsidiaries and affiliates of Defendants; (c) any person or entity who is a partner, officer, director, employee, or controlling person of any Defendant; (d) any entity in which any Defendant has a controlling interest; (e) any copyright holder, including any Strategic Partner, in respect of those Protected Works and uses which had been duly authorized for the Defendants to exploit at the time Defendants engaged in such acts; (f) the legal representatives, heirs, successors and assigns of any excluded party.

46.    This action has been brought and may properly be maintained, pursuant to Federal Rules of Civil Procedure 23(a)(1)-(4), 23(b)(1), (2) or (3), 23(c)(4), and case law thereunder.

47.    Numerosity Of The Class – Fed.R.Civ.P. 23(a)(1). The members of the Class are so numerous that joinder of all members is impracticable. According to Nielsen/NetRatings, a leading Internet audience measurement firm, YouTube has approximately 20 million visitors per month. YouTube has admitted in court filings that in July 2006 more than 20 million unique visitors viewed YouTube's website. Since July 2006, YouTube has reported in its press releases that its users view more than 100 million videos every single day. A Nielsen Online Report indicates that in July 2008, YouTube had more than 74 million unique visitors. These visitors

23

were drawn to YouTube by the large number of infringing videos on the site. A January 15, 2007 article in the <u>New York Times</u> reported that academics and media executives estimate that as much as 70 percent of the material on YouTube is copyrighted material uploaded to YouTube without the owners' consent. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

48.     Typicality – Fed.R.Civ.P. 23(a)(3). Lead Plaintiffs' and Named Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs hold rights in Protected Works that have been posted on YouTube without Lead Plaintiffs' and Named Plaintiffs' permission and publicly performed and otherwise exploited in violation of their rights. Lead Plaintiffs and Named Plaintiffs are typical of other Class members in that they require injunctive relief to prevent Defendants from continuing to infringe their exclusive rights and have sustained damages as a result of Defendants' wrongful conduct, entitling them to recover those damages or, at their election, recover statutory damages.

49.     Adequacy – Fed.R.Civ.P. 23(a)(4). Lead Plaintiffs and Named Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in complex class actions and copyright litigation. Lead Plaintiffs and Named

Plaintiffs are committed to the vigorous prosecution of this action and have no interests that are adverse or antagonistic to the Class.

50.     Superiority – Fed.R.Civ.P. 23(b)(3).  A class action is superior to all other available means for the fair and efficient adjudication of Plaintiffs' claims.  The damages suffered by some individual members of the Class may be relatively small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.  It would be virtually impossible for the Class members individually to redress effectively the wrongs done to them.  Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system from the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, is in fact manageable, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  The members of the Class are reasonably ascertainable through methods typical of class action practice and procedure and through Defendants' own records.  The benefits of adjudicating this controversy as a class action far outweigh any difficulties in managing the Class.

51.     Existence And Predominance Of Common Questions Of Law And Fact – Fed.R.Civ.P. 23(a)(2), 23(b)(3) and 23(c)(4).  Numerous common questions of law and/or fact exist as to Lead Plaintiffs, Named Plaintiffs and all members of the Class, and these common issues predominate over any questions affecting solely individual members of the Class.  The claims of every Class member are uniformly premised upon the posting of their copyrighted

material on YouTube, in respect of which Defendants have not obtained appropriate authorization.  Among the questions of law and fact common to the Class are:

        A.      Whether Defendants' conduct as alleged herein constitutes direct infringement of the Protected Works held by Lead Plaintiffs, Named Plaintiffs, and the Class;

        B.      Whether Defendants' conduct as alleged herein constitutes contributory infringement of the Protected Works held by Lead Plaintiffs, Named Plaintiffs, and the Class;

        C.      Whether Defendants' conduct as alleged herein constitutes vicarious infringement of the Protected Works held by Lead Plaintiffs, Named Plaintiffs, and the Class;

        D.      Whether Defendants' conduct as alleged herein constitutes "inducing" infringement by others of the Protected Works held by Lead Plaintiffs, Named Plaintiffs, and the Class;

        E.      Whether Defendants acted willfully with respect to the acts complained of herein;

        F.      Whether Defendants have deliberately avoided taking reasonable precautions to deter infringement on YouTube;

        G.      Whether Defendants have the right and ability to control the infringing activities taking place on YouTube;

        H.      Whether Defendants derive direct financial and related benefits from the infringing activities taking place on YouTube;

I.    Whether YouTube's procedures for copyright holders to request removal of their copyrighted works through "takedown notices" are futile because, among other things, YouTube allows users to re-post the same works following the receipt of a takedown notice, YouTube does not take effective steps to prevent users who post infringing material from continuing to post material to the YouTube website and the methods provided by YouTube to search for infringing material are inadequate;

J.    Whether Defendants place an undue burden on copyright holders constantly to monitor YouTube in order to identify and locate their copyrighted works posted on YouTube's website;

K.    Whether there exists technology to identify and remove copyrighted materials;

L.    If, as the Class alleges, technology exists to identify and remove infringing materials, whether Defendants selectively employ that technology solely for the benefit of copyright holders who agree to enter into a licensing agreement that is satisfactory to YouTube;

M.    Whether Defendants have installed or can install any filtering technology to identify and remove copyrighted material owned by copyright holders who have not agreed to enter into licensing agreements that is satisfactory to YouTube;

N.    Whether Defendants' conduct as alleged herein constitutes "storage at the direction of a user" of copyrighted material as that phrase is used in 17 U.S.C. § 512(c)(1);

27

O.    Whether YouTube does more than simply store user directed content without modification and/or provides a number of features and facilities to propagate that content in modified form;

P.    Whether copyrighted materials displayed by YouTube "reside" on a system or network controlled by Defendants as that term is used in 17 U.S.C. § 512(c)(1);

Q.    Whether Defendants have or had actual knowledge that the material or an activity using the material on their systems or networks is infringing;

R.    Whether Defendants are aware of facts or circumstances from which their infringements of the Protected Works of Lead Plaintiffs, Named Plaintiffs, and the Class are apparent;

S.    Whether, upon notification of claimed infringement as set forth in 17 U.S.C. § 512(c)(3), Defendants respond expeditiously to remove or disable access to the material that is claimed to be infringing;

T.    Whether the defenses set forth in 17 U.S.C. § 512 or elsewhere in the Copyright Act are available to Defendants (including whether certain of these issues are suited for Class-wide determination pursuant to Fed.R.Civ.P. 23(c)(4));

U.    Whether Defendants provided means and facilities to enable the infringing activities at issue;

V.    Whether Defendants promote, encourage, invite and/or induce the infringing activities at issue;

W.    Whether, when a user uploads a video to YouTube, YouTube converts the video into YouTube's own software format and makes it available for viewing on YouTube's website;

X.     Whether Defendants offer users a facility to "embed" into another website videos available on YouTube, which allows videos hosted on YouTube to play on separate websites;

Y.     Whether Defendants enable users to upload onto YouTube and restrict access and viewership of, or render "private," those videos to individuals that the user designates as "friends";

Z.     Whether Defendants permit users to share video files with other individuals;

AA.     Whether Defendants have entered into partnerships with certain copyright holders whereby YouTube has agreed to pay these copyright holders royalties for the use of their copyrighted material on YouTube;

BB.     Whether Defendants have entered into commercial agreements to distribute videos through other media services or platforms, including mobile phones and television.

CC.     Whether Defendants modify, select and repackage videos so that they can be distributed through other media services or platforms, including mobile phones and television;

DD.     Whether particular issues are suited for Class-wide determination pursuant to Fed. R. Civ. P. 23(c)(4);

EE.     Whether injunctive relief is appropriate; and

FF.     Whether Lead Plaintiffs, Named Plaintiffs, and the Class are entitled to damages for Defendants' wrongful conduct as alleged herein, including (1) statutory

damages; (2) monetary damages; (3) disgorgement of profits; (4) prejudgment interest; and (5) attorneys' fees and court cost.

52.    Certification under Fed. R. Civ. P. 23(b)(1) and/or 23(b)(2).    Certification is also appropriate under Fed. R. Civ. P. 23(b)(1) and/or (b)(2) because:

    A.    the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Defendants;

    B.    the prosecution of separate actions by individual Class members would create a risk of adjudications which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

    C.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

### A.    YouTube's Website, Its Content, and Its Features

53.    YouTube is a popular website that enables users to upload, view, and share video and audio clips and other material. YouTube contains a wide variety of material, including video and audio clips from sports broadcasts, movies, popular music, television shows, and music videos. Founded in February 2005, in its short time on the web YouTube has grown at an unprecedented rate and received widespread media attention. YouTube is currently one of the fastest-growing websites in the world and, as of February 2008, according to Nielsen/Net Ratings, accounts for approximately 48.5% of online video traffic. YouTube enables users to

post and view material without charge, choosing instead to derive its profits in other ways, including from advertising revenues generated through the popularity of the website and projected value as a site, platform, or destination.

54.     One of the primary drivers of traffic to the YouTube website is the ability of users to view popular commercial material such as popular music, sports broadcasts, music videos, concert footage, television programs, movies, and other mainstream media content and artistic works.  Much of this content was created by artists and other individuals or entities who own the intellectual property rights to these Protected Works.

55.     YouTube's content includes not only currently released infringing material, but also material that has not yet been released or authorized for broadcast through authorized distribution channels.  YouTube thus serves as a well known source for obtaining unauthorized, pre-released content.

56.     The sheer bulk of infringing content on YouTube is staggering.  The British Broadcasting Corporation ("BBC") demanded that YouTube remove more than 100,000 videos relating to its highly popular television show *Top Gear*.  In another instance, the Japanese Society for Rights of Authors, Composers and Publishers ("JASRAC"), representing 23 Japanese TV stations and movie and music companies, demanded that YouTube remove almost 30,000 video clips of movies, television shows and music videos that had been posted on YouTube in violation of the owners' copyrights.  In yet another instance, Viacom International Inc. and its associated companies demanded YouTube remove more than 100,000 separate infringing video programs.  These instances – numerous as they are – represent only the tip of the infringement iceberg.  Thousands of Protected Works owned by members of the Class have

been infringed by Defendants and thousands more are being infringed by Defendants on a daily basis.

57.     Defendants are well aware of the infringing nature of the content YouTube provides but depend on the availability of such material to attract viewers and thereby create and enhance the value of its business. As an industry analyst has reported, "It's clear that YouTube has the ability (like their competitors) to filter out copyrighted materials right now, and they are choosing not to do so. That would gut YouTube's core content and that isn't going to happen without a judge getting involved." http://www.techcrunch.com/tag/YouTube/page/2/.

58.     Defendants invite and encourage users not just to view, share, save, and post unauthorized copies of these works that are available for "free" on YouTube, but to upload additional content on YouTube, to enable millions of others to view it. These unauthorized and infringing copies are made and stored on computer servers owned and/or controlled by Defendants, in order to facilitate the further unauthorized copying, distribution, public display and performance of the works to as many users as possible. Each unauthorized copy of such work is made available to users for further unauthorized copying, distribution, public display, and performance at the click of a button or two, all without charge. Each unauthorized copy of

32

such work is displayed in conjunction with the conspicuous appearance of the YouTube logo, as a "watermark" on the video image itself, and/or on the web page on which the video appears.

59.    The number of outlets for YouTube's videos has proliferated, even as YouTube continues to be aware of, and encourages users to share and distribute, huge amounts of infringing content on its website, and even as it has failed to implement readily available technical measures to prevent infringement.  Despite its knowledge and awareness of the infringing content on its website, YouTube has launched additional "local" websites, including websites in Brazil, France, Ireland, Italy, Japan, Netherlands, Poland, Spain, the UK, and South Korea.

60.    YouTube is also making its videos available to be viewed on mobile phones and other devices, and has entered into agreements with mobile phone manufacturers, including Apple and others.  Indeed, a key selling feature of Apple's iPhone, which originally retailed at a price of at least $499, was its ability to search for and play the content available on the YouTube website, including the infringing content complained of here, for free; this feature was heavily promoted in television ads and elsewhere.  The feature is also available on Apple's iPod Touch, which allows users to view YouTube videos over WiFi internet access directly on their iPod music player.  In addition to mobile phones and other devices, YouTube has also struck an agreement with Apple to allow YouTube videos to be streamed directly to a television set via Apple TV, again for free.  This unauthorized dissemination of rights owners' works into additional markets and via additional media outlets and platforms further eviscerates the ability of Class members to control the delivery, manner, and means by which their works are made available to the public, and further impairs their ability to derive revenue from their works.  It

33

also directly harms the ability of Class members to make or maintain agreements relating to their copyrighted content with third parties, including mobile providers.

61.    YouTube offers a number of features to users to enable the further unauthorized dissemination of these works, including the ability to "Save to Favorites," "Add to Groups," "Share" and "Post." These functions create additional unauthorized copies and/or electronically store, transmit, or propagate for access and viewing by others, content that infringes the rights of others, including the rights of Lead Plaintiffs, Named Plaintiffs, and Class members.

62.    YouTube also provides a feature and software code that permits, encourages, and enables users to "embed" transparently a player facility on virtually any other website in the world (such as a personal home computer page, blog, etc.) to publicly perform that content, including infringing content. For each video uploaded on YouTube, YouTube provides the HTML "code" for any user to thereafter "embed" that video on another website (whether affiliated with YouTube or otherwise), whether or not a user requests that such HTML code be provided. In exchange for voluntarily providing the means and facilities to "embed" videos in this manner, YouTube alters each such video so as to place its logo prominently on videos that are embedded on other websites.

63.    YouTube allows its users to write "comments" on material displayed on the website, and those comments can be viewed by other users. A review of user comments linked to infringing content is notable for what it reveals about the extent that YouTube users expect to find and view unauthorized copies of copyrighted content.

64.    User comments reveal that YouTube users expect to find and view unauthorized copies of copyrighted content, and the comments encourage and invite such activity by others.

34

65.     Such user comments also underscore the value that YouTube's users place on accessing copyrighted content illegally and free-of-charge.

66.     User comments also reveal that the free availability of such copyrighted works on YouTube is a substitute for access to such works by legitimate means.

67.     Google participates directly in the infringing activities on the YouTube website. Among other things, when a user accesses the "video search" function on Google's own website, the results returned from that search include, in substantial part, videos located on the YouTube website. By doing so, Google benefits by having YouTube provide it with infringing content accessible to users of the Google website, and, in addition, Google directs its own users to the YouTube website to view infringing content found there. Google's Google Video website also feature's additional infringing content that users have uploaded and continue to upload directly to the Google Video website.

**B.     Defendants' Infringement of the Protected Works**

68.     The owners of the Protected Works in this case own the copyright and/or the relevant exclusive rights in valid and subsisting copyrighted works protected under federal law and/or sound recordings protected under state law, by authorship or assignment.

69.     For each of the Protected Works at issue, all statutory and other applicable formalities have been complied with and as to each, with the exception of sound recordings protected under state law, a certificate of registration has issued or the deposit, application and fee required for registration have been properly submitted to the U.S. Copyright Office (or will have been prior to the judgment in this case or will be found not to be required).

70.     Each of the Protected Works at issue has been copied and electronically displayed and/or performed publicly, and/or otherwise disseminated, made available for downloading or further electronic distribution or transmission via the YouTube website, in whole or substantial infringing part, without the authorization of the respective Plaintiff, at the time each Plaintiff owned the copyright and/or the relevant exclusive rights.

71.     Regarding certain of the Protected Works of Lead Plaintiffs and Named Plaintiffs, a non-exhaustive list of URLs at which certain infringing materials are or were located on YouTube, on or about the dates listed as well as other dates, is set forth on the attached Exhibit A.

72.     In addition to the specific instances of infringement set forth on Exhibit A, infringement by Defendants of all of the Protected Works has occurred and continues to occur in that videos that infringe Lead Plaintiffs', Named Plaintiffs' and the Class' exclusive rights in their works have been and continue to be uploaded to YouTube, resulting in their reproduction, alteration, dissemination, public display, and public performance by (or facilitated or induced by) YouTube in violation of the Plaintiffs' exclusive rights.

73.     For the length of time each infringing video was or is posted on YouTube and/or viewed or otherwise made available due to or in connection with such posting (and for some period thereafter, given that users can copy and further disseminate unauthorized copies of such works that appear on YouTube), Lead Plaintiffs', Named Plaintiffs' and the Class' rights of reproduction, distribution, public performance, public display, preparation of derivative works, and/or to transmit digitally over the Internet were violated. In addition, each time a video is viewed on the YouTube website, a copy of that video is made and placed on the users' personal computer, and is thereafter available for further reproduction, distribution, performance, and

36

display. Further, the dissemination of Protected Works to mobile devices, and other devices, pursuant to commercial arrangements with Apple and others, constitutes additional violations of Lead Plaintiffs', Named Plaintiffs' and the Class' rights.

74.     The infringed works specified herein and on Exhibit A are representative of Protected Works that are and have been infringed by Defendants and/or YouTube's users. The massive scale of the infringing acts at issue and the nature of the infringement – specifically, the fact that numerous infringing copies of Protected Works are posted daily, if not hourly – makes a full statement of each and every act of infringement in this Complaint unwarranted.

75.     The massive scale of the infringement at issue is only magnified by the large audience that YouTube attracts to view infringing works. For example, in the case of Lead Plaintiff Premier League, in a matter of days, a video infringing Premier League's exclusive rights can easily be, and in some instances has been, viewed more than a hundred thousand times, and the longer the infringing video is available on YouTube, or the more it is reposted on other websites, it is accessed, copied, publicly performed, and further disseminated an exponentially greater number of times.

76.     As alleged below, Defendants ensure that their infringing activity continues unchecked by placing a number of insurmountable obstacles in the path of any copyright owner who attempts to monitor YouTube and identify removal of Protected Works.

**C.     Defendants' Refusal to Deter Infringing Activity**

77.     As alleged herein, Defendants have actual and constructive knowledge of the infringing activities occurring on the YouTube website. In addition, Defendants materially contribute to those infringing activities by, among other things, providing the means and

facilities to infringe; inducing, encouraging, and facilitating infringement; providing functions designed to proliferate unauthorized copies of Protected Works, without the authorization of the rights owner; and by enabling and encouraging users to engage in the unauthorized copying and dissemination of infringing copies of works.

78. Defendants have the right and ability to control the presence of infringing content on YouTube by various means, including through the use of widely-accepted filtering technologies such as audio-fingerprinting. Defendants, however, either refuse to deploy these technologies, inhibit copyright owners from employing or utilizing them, or, as alleged below, offer them only in exchange for licenses from content owners who are otherwise threatened by YouTube's continued (and massive) infringement of their copyrighted works. As alleged herein, Defendants have received and continue to receive direct financial benefit from such infringing content and activity.

79. Defendants pay lip-service to a purported desire to avoid violating intellectual property laws. In reality, however, they deliberately refuse to take meaningful steps to deter the rampant infringing activity readily apparent on YouTube (which would, in turn, have a negative impact on the advertising and other revenues and other value achieved through the large volume of traffic on the YouTube website).

80. Infringements had a significant presence on the YouTube website from its inception, even in the months before YouTube's formal launch in December 2005. Defendants' recognized that not only was infringing content being uploaded and viewed, but it was a major factor behind YouTube's success. ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



81.

82.     YouTube was and is fully aware of the amount of copyrighted material to be found on its website, ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████     In a massive number of instances, infringing material has been reposted after Defendants have actual notice that the underlying content is infringing.  Despite this awareness of the magnitude of infringing material on their site, however, Defendants have created a number of barriers that make it virtually impossible and wholly impractical for owners of Protected Works to prevent Defendants' infringing activities.  First, although Defendants state that copyright holders can submit "takedown notices" requesting removal of infringing material, Defendants are well aware that, in the case of YouTube, takedown notices are essentially meaningless.  To begin with, it is extremely difficult for copyright holders (who have nowhere near the technological access of Defendants) to identify all of the different infringements of their copyrights taking place on YouTube.  The only way for copyright holders to locate infringing activity is to use YouTube's "search" feature in an effort to canvass the millions of videos on the website in order to locate their Protected Works.  As a result, in order to locate material that infringes their copyright, a Class member might have to construct countless "searches" designed to account for different names, titles, nicknames, and spellings that could be chosen by the users who uploaded the material.  The scope of infringement is also a moving target, in that videos uploaded are not identified by copyright owner or registration number, but rather by the uploader's choice of descriptive terms to describe the content of the video (typically referred to as "tags"), whether or not those "tags" bear any relation to the video uploaded or the work(s) that video infringes.

83.    Defendants disregarded efforts by YouTube's users to police and identify infringing content on the site. ████████████████████████████



Defendants in fact changed the flagging system to eliminate the ability of users to flag content for copyright violations.

84.    Even if a Class member were able – by sheer blind luck – to conceive of all possible search terms that might reveal the many infringements of the Class member's copyrights taking place on YouTube, it would not be enough.  YouTube offers its users the ability to make any video that they upload "private."  When a video is designated as "private," it can still be shared for free with certain designated users (*i.e.* designated "friends" of the posting

user) but it cannot be detected by YouTube's "Search" function. Thus, when users upload infringing videos and designate them as "private," it is impossible for copyright owners to locate such infringing videos so that they can identify them and/or send a "takedown notice" to YouTube. The "private video" feature, therefore, makes it impossible for anyone other than Defendants to assess accurately the amount of infringing works on the YouTube system, prevents copyright owners from accurately identifying all the works on YouTube that infringe their copyright interests, and demonstrates the futility of relying upon notice-and-takedown procedures to prevent infringement by Defendants and YouTube's users. Indeed, one of the infringements of an FFT Work (http://www.youtube.com/watch?v=OK630bDqRrw), which was originally posted openly on YouTube, has since been made "private" by the user, making it impossible for the copyright owner to detect it, although the unlawful copy is still being exploited and "shared" on YouTube. Users have publicly boasted on the YouTube website that videos deleted from YouTube for copyright infringement have been re-posted as "private" videos, purposefully to avoid detection by content owners, and have publicly invited other users to watch infringing videos that they have marked "private." Thus, far from "private," these videos are shared with members of the public in a manner intended to avoid identification by copyright owners.

85.    In addition, because YouTube encourages and permits the uploading of content, without timely indexing that content on its website, YouTube precludes content owners from finding infringing videos using its search feature, despite the fact that the infringing videos can, during that time, be freely viewed, shared, linked to or embedded in other websites. Thus, after an infringing clip is posted to the YouTube website, and while the clip is being viewed and disseminated by users, it is impossible for content owners to find the clip and notify YouTube of

the infringement, for a period of eight hours or more.  Given that YouTube makes its videos available around the world and through multiple websites and outlets, including mobile phones and other platforms, and given the speed with which these videos are disseminated, the inability to find and identify an infringing video for such a substantial amount of time can quickly destroy the value of a rights owner's works.

86.     Furthermore, even if a Class member somehow did locate each and every infringement of their copyright on YouTube (including the "private" ones) and issued a proper "take down notice," it would still not be enough to prevent continued infringement.  Users can readily re-post such matter under different user and/or file names.  This is a common practice, easily accomplished by users with even a modicum of computer skill, and a practice that Defendants make absolutely no effort to prevent.  Indeed, notwithstanding Defendants' actual knowledge of the infringing material, such material continues to be reposted to the YouTube website as of the date of this Complaint.  See Exhibit A.  And moreover, even when YouTube is notified of an infringing work, YouTube has chosen not to take it down.

87.     Lead Plaintiff Premier League has also experienced difficulties in securing Defendants' cooperation to remove infringing matter from the YouTube site.  Although YouTube provided the Premier League with access to YouTube's so-called "Content Verification Program," incorrectly characterized as a preferred method of communication to notify YouTube of the presence of infringing matter in its site, the Premier League's experience in using that facility has been fraught with problems.  Its account has on some occasions been blocked or closed.  In the meantime, the Premier League has been forced to send costly and time-consuming and ineffectual notices of infringement to YouTube.  Defendants have not responded to those notices or removed the infringing material identified in them expeditiously but instead,

43

when YouTube acts at all, it is only after considerable delay, *e.g.*, in some cases, more than seven days elapses between the date of notice to YouTube and the latter's response.

88.     Moreover, the mechanisms provided by YouTube to notify Defendants of infringing content not only work intermittently, or not at all, but when communications are addressed to YouTube advising of this, and requesting that YouTube remove already identified infringing videos, those communications are simply ignored. For example, on October 25, 2008, the YouTube "takedown" mechanism quit functioning. Despite the efforts of the Premier League to identify and remove infringing videos using this mechanism, the videos continued to be made available on YouTube. Other means to remove the infringing videos from YouTube were also unavailable and despite a written demand that YouTube address the problem, no response was forthcoming, and videos identified as infringing continued to be made available by Defendants. It took Defendants five days to act on the Premier League's takedown notices for over 192 different videos which infringed the Premier League's rights.

89.     In sum, providing YouTube with written notice of specific infringements of works appearing on its website is futile:  such notices are not acted upon promptly enough to prevent continuing infringement and do not prevent unauthorized copies of those same works from reappearing on YouTube thereafter.

90.     Another example of Defendants' paying lip-service to a desire to respect intellectual property rights is their limitation of video clips to ten minutes.  As Defendants are well aware, YouTube is frequently used to make available infringing copies of audiovisual works exceeding the ten minute limit, which would include sporting events and feature length motion pictures, many of which are large national or international productions that are highly desirable

44

to its users, particularly when they can be viewed at, "shared" by, or copied from, YouTube for free.

91.    At some point, YouTube imposed a 10-minute clip limitation allegedly to inhibit this practice, but, as Defendants know, audiovisual works, including feature length movies and other unauthorized, copyrighted content continue to be frequently posted to YouTube in multiple, seriatim segments, easily circumventing the 10-minute clip limitation.  Moreover, ten minutes is plenty of time to perform most popular songs and many other copyrighted works, including highlights of sports broadcasts, from beginning to end.  Although the 10-minute length limitation on clips uploaded to YouTube does nothing to inhibit the posting, storage, dissemination, public display, and performance of infringing materials, as Defendants are aware, it does demonstrate that YouTube has actual and constructive knowledge that its services and facilities are being used for these unauthorized and infringing activities.  ██████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████

92.    Defendants claim that they do not enable any downloading of copies to be made from the YouTube website, but any moderately experienced computer user can copy the material posted on YouTube to his or her own computer with little difficulty and at virtually no cost.  Even worse, *each time* a user views a video on the YouTube website, YouTube automatically makes a copy of the video *directly onto* the user's personal computer, without the user taking any extra steps.  That copy can then be easily viewed and disseminated by the user.  Defendants' ability (but unwillingness) to control the infringing activities on the YouTube Website is further demonstrated by YouTube's ability to filter "offensive" and "pornographic"

material from its website.  YouTube claims that it actively polices its website to identify and remove "pornography, obscene or defamatory material," but refuses to take active steps to identify and remove blatant violations of the copyright laws.  YouTube's largely successful efforts to eradicate "pornographic, obscene or defamatory material" within its website stand in stark contrast to its failure to reduce the amount of Protected Works on the site.

93.    Contrary to their claims, Defendants do have the ability to screen videos for copyright content, but only selectively utilize that ability.



94.    As alleged elsewhere in this Complaint, Defendants have had access to a variety of technologies and other means by which they could block or substantially mitigate infringing content on the YouTube site.  But Defendants have chosen not to deploy these technologies effectively or even-handedly.



95.     Moreover, Defendant Google knew of YouTube's infringing activity long before
it purchased YouTube in November 2006. ████████████████████████

96.     Defendants have deliberately taken advantage of the vast amount of infringing
content they have encouraged and facilitated on the YouTube site by using the existence of these
infringements – which Defendants are aware of without the need to first receive formal notices
from the content owners – to target and leverage licensing deals with content owners whose
rights are being infringed.  Defendants have offered such content owners tools to ameliorate
those infringements, which tools were not and are still not being made equally available to other
content owners who do not agree to YouTube's terms.  Even when Defendants have slowly made
technology available to certain content owners for identifying, blocking or removing
unauthorized content from the YouTube site, Defendants have engaged in a pattern of disparate
treatment where favored content owners obtained access to these technology capabilities that
were not available to other content owners who refused to release Defendants from legal liability
on past and future infringement claims or otherwise refused to accede to Defendants'
unconscionable demands.

97.     Although Defendants publicly announced that they would make certain
fingerprinting technology available to content owners, they have withheld important details.  For

47

example, on October 25, 2007, Plaintiff Cherry Lane requested basic information about Defendants' announcement, and a little more than a month later, on November 30, 2007, received an email from YouTube Video ID Support seeking additional information from Cherry Lane, to which Cherry Lane promptly responded. Cherry Lane heard nothing from Defendants until February 19, 2008, when it received a multiple page agreement that provided no concrete information about Defendants' fingerprinting system, its operation, features or limitations but did require the applicant to agree to turn over to Defendants, on a permanent basis, reference copies of any works which were to be subject to Defendants' program. Under the terms on which Defendants insisted, they would cease to employ, and delete, any resulting fingerprint should a content owner seek to have the reference copy of its work returned to it. Cherry Lane responded by raising a number of questions concerning the terms of Defendants' fingerprinting program, by letter dated April 21, 2008. As of the date of this Complaint, Defendants have not responded to this letter or Cherry Lane's request for more information about Defendants' fingerprinting program.

98.     Further, Defendants have not been forthcoming with the Lead and Named Plaintiffs about the availability of fingerprinting or filtering technology, and in the past offered such technology to the Premier League only if it became a content partner with YouTube and agreed to unfavorable commercial terms that would have wreaked havoc with its existing license programs. After learning that Premier League could not proceed on those terms, Defendants have not, to date, made that technology available to the Premier League.

99.     Defendants' ability to screen, select and control the content on the YouTube website is also evidenced by YouTube's announcement that it has begun to attach "overlay" advertising, among other types of advertising, to certain videos that are made available by

commercial content partners from whom YouTube has already extracted an agreement.
YouTube's stated ability to place overlay ads on only certain videos and not others, and to match
the subjects of the ads to specific videos, as well as YouTube's other advertising programs,
shows that YouTube is able to and does screen and control the content on its website, but that it
chooses to do so only when it is financially beneficial for it to do so. As of July 2008, *The
New York Times* reported that, according to YouTube, the Website had "monetize[d]" 3% of its
online videopages through advertising, and noted that "Google has pushed the video site to
innovate in the ad arena." *See* Brian Stelter, "Some Media Companies Choose to Profit From
Pirated YouTube Clips," New York Times, August 16, 2008 (*available at*
http://www.nytimes.com/2008/08/16/technology/16tube.html?scp=1&sq=now%20playing%20o
n%20youtube:%20clips%20with%20ads&st=cse). Google has also demonstrated an ability to
screen, select, and control video content on the Internet. For example, in early 2005, even before
it acquired YouTube, Google launched a television search function called Google TV, which was
able to index, search and retrieve real-time broadcast television programming from major media.

100.    Defendants induce others to infringe by offering the means and facilities to
infringe, encouraging users to post and/or view infringing content on YouTube and use
YouTube's various functions and features to further proliferate the unauthorized copying and
dissemination of the copyrighted works of others, all as part of a deliberate scheme to increase
the value of its business based on the presence of unauthorized and infringing copies of the
copyrighted works of others. For example, Defendants' ability to index and search videos on
their site – and indeed their ability to steer users to infringing videos – further evidences their
control over the content and their role in inducing infringements.

### D.    Defendants' Financial Incentives to Violate the Class's Copyrights

101.    Numerous media reports have recognized that YouTube's business model depends on copyright infringement. *See, e.g.*, Andrew Ross Sorkin, "Dot-Com Boom Echoed in Deal to Buy YouTube," <u>New York Times</u>, October 10, 2006, *(available at* http://www.nytimes.com/2006/10/10/technology/10deal.html?ex=1174190400&en=2bfad8c018e 5933b&ei=5070).    Indeed, it has been recognized that Defendants are trying to garner licenses for some content because it knows that, if it implements any meaningful precautions to mitigate or prevent infringement, YouTube is going to lose popularity (and revenue).

102.    The direct financial benefit to Defendants from these infringing activities has been enormous.  In addition to the $1.65 billion dollars paid by Google for the YouTube business (which caused an increase in Google's stock price and thereby increased Google's market capitalization by billions of dollars), YouTube attracts potential revenue and enhances its value in other ways precisely because so many users are drawn by the availability of the highly desirable, infringing content that appears there.  Internet sites depend on traffic and "eye-balls" because advertisers and others are interested in spending dollars on sites that offer the greatest potential reach.  The huge volume of traffic that YouTube enjoys is generated in very substantial part by the infringing conduct at issue in this case.  Accordingly, there is a direct causal connection between the infringing activities complained of and the financial benefits Defendants enjoy in their business.  Defendants monetize the YouTube website, through, among other things, advertising and branding arrangements (both now and in the future) with existing and potential advertisers and content partners, which are designed to (and do) convert the substantial draw or "eye-balls" reaching YouTube, because of the infringing activity taking place there, into cash and financial benefits.  For example, YouTube runs advertisement banners on top of every

video clip, including clips that infringe on the copyrights of others. YouTube also created a daily "Participatory Video Ad" on its opening page which is estimated to bring in about $175,000 per day and has entered into long term promotional agreements with companies, such as Cingular, each of which is estimated to be worth several millions of dollars. YouTube has also recently created a new overlay advertising program to run ads on top of certain videos that YouTube chooses. The more users Defendants can attract to YouTube, the more revenue the website generates from advertising and other uses of the site. Indeed, Defendants have placed advertising, and generated revenues, specifically with respect to infringing content.

### E.    YouTube Is In Reality A Platform For Commercial Content

103.    Defendants' business plan for YouTube is to make it the single most important Internet location to access and view video content, in particular commercial content, the rights to which are owned by others. Google has plainly acknowledged that an integral part of the value of YouTube is in its ability to deliver commercial content created by others. In fact, news media have stated that "Advertising on YouTube is a key component in the aggressive growth plan of Google, which made 98% of its first quarter [2008] revenue from advertisements." *See* Tom Bawden and Dan Sabbagh, "Wary advertisers pose new problems as YouTube fights to increase revenue," *Times (UK)*, July 10, 2008 (*available at* 2008 WLNR 12903100).

### F.    YouTube's "Strategic Partnerships"

104.    Instead of taking any meaningful steps to thwart the pervasive copyright infringement occurring on YouTube and encouraged by its business model, and faced with the threat of lawsuits from some of the largest media and entertainment companies in the world, YouTube began entering into so-called "strategic partnerships" with several major media companies, whose rights YouTube had already been, and been accused of, infringing. These

51

"strategic partnerships" provided that YouTube would promote these companies' programming and/or pay them royalties and licensing fees in exchange for agreements that these companies would not pursue legal action against YouTube for its past infringement of their copyrighted material. Essentially, YouTube's strategy has been to compensate only those copyright owners that it believes actually have the financial wherewithal to pursue legal remedies against it, while continuing to misappropriate the content owned by numerous other creators as well as smaller media, entertainment, and other content-creating companies, who are less able to bring their own lawsuits. Along the same lines, Google, upon the consummation of its acquisition of YouTube, opted to reserve at least $200 million from the $1.65 billion it paid for YouTube to fund a litigation war chest that it intends to use to repel legal actions by those less-resourced owners of Protected Works, instead of eliminating those Protected Works from the YouTube website.

105.    To date, YouTube has entered into "strategic partnerships" with a number of large media entities. Upon the consummation of the deals with each of these entities, YouTube issued joint press releases discussing the terms of the deals. The statements made by YouTube and these partners in the press releases establish that: (1) YouTube is fully aware that it is committing copyright infringement on a massive scale; (2) YouTube has the ability to identify such infringing material; (3) YouTube has the technology to monitor viewership on its website and pay copyright owners appropriate royalties; (4) YouTube has technology that is far superior to what it currently offers to copyright holders (other than its "strategic partners") for searching and identifying copyrighted material on its website; and (5) YouTube is willing to make its technology for filtering and/or identifying copyrighted material available only to companies that it believes have the wherewithal to pursue an individual lawsuit.

106.     YouTube has offered to some prospective licensors of content that YouTube would adopt technological steps to prevent or mitigate the infringing content on its website if, but only if, the content owner agreed to license its content to YouTube. *See* Kenneth Li, "YouTube Anti Piracy Software Policy Draws Fire," Reuters, Feb. 16, 2007 (*available at* http://today.reuters.com/news/articlenews.aspx?type=internetNews&storyID=2007-02-17T003505Z_01_N13216636_RTRUKOC_0_US-YOUTUBE-MEDIA.xml). In doing so, YouTube has sought illegally to leverage its position by offering "protection" from wholesale legal violations only on terms acceptable to YouTube. If a content owner fails to conclude a negotiation with YouTube, its content remains "unprotected," *i.e.*, it continues to remain exposed to YouTube's massive appetite for the unauthorized exploitation of copyrighted content. And, for those Class members too small or powerless or who choose not to do business with somebody who has profited by misappropriating their property, YouTube has made no offer to "protect" them from infringement or implement technological steps to prevent or mitigate infringement. It is for protection of such victims that this case is being pursued.

107.     Defendants' business practices of offering some form of content "protection" only to parties who agree to license their content to YouTube not only leaves rights holders unwilling to negotiate in such an environment exposed to the continuing threat of YouTube's unremitting infringement, but forces parties to grant licenses on terms which—absent the threat posed by YouTube's conduct—would be more commercially advantageous to such rights holders.

108.     YouTube's conduct encourages and induces further infringement by users and rewards a business model that ultimately depends on infringement.

109.     Unless and until Defendants take meaningful steps to prevent or mitigate the appearance of unauthorized copies of copyrighted works on the YouTube website through the

technologies available to them, and/or change YouTube's business model, infringement of Protected Works will continue by and through the auspices of YouTube, in an unremitting and widespread fashion.

### G.    The Section 512 Defense Is Unavailable to Defendants

110.    Defendants purport to rely on the "notice and takedown" and qualified "safe harbor" provisions of 17 U.S.C. § 512 ("§ 512"), by claiming that YouTube is, in effect, a passive intermediary which merely hosts video and other content posted by users and that it is vigilant in responding to, and removing, any infringing content that is brought to its attention through formal written notices in compliance with the provisions of that statute.

111.    Defendants do not qualify for any of the limitations on remedies – the so-called limited "safe harbors" – set forth in § 512 for numerous reasons, including without limitation the following:

112.    Defendants are not merely "storing" infringing content at the direction of a user. Certain of Defendants' activities are not user directed.

113.    Defendants have sought out and obtained, and continue to seek out and obtain, commercial content for the YouTube website, via agreements with "strategic partners" and otherwise. YouTube then pushes this content to viewers, who have been lured to the YouTube website by YouTube's vast archive of unauthorized content. Defendants have also exploited the content on the YouTube website by seeking out new media platforms for the delivery of that content, including mobile phones and other devices. Such activities are obviously not directed by users, and on their face far exceed the mere "storage" of content as contemplated by § 512.

114.    Moreover, Defendants provide various features, functions and facilities to further save, share, and otherwise disseminate YouTube's content.  Defendants encourage and enable infringing content to be uploaded -- and profit handsomely as a result.  Defendants impose YouTube's own watermark/logo on the content; make that content available through "private" sharing facilities to members of the public for viewing in a manner that is not detectable by the copyright owner; review, sort and edit the content on the YouTube website, including by selecting "featured" and "promoted" videos for special display on the website; and provide computer code to "embed" direct access to YouTube's facilities in other websites on the Internet, to enable further unauthorized public performance, display, and copying in other locations on the Internet that are not part of a system or network controlled or operated by or for Defendants. Defendants take multiple voluntary acts to encourage and/or facilitate infringing activity, including (without limitation) by creating, on behalf of users, the HTML code necessary to "embed" videos on other web sites.

115.    Defendants further have failed to adopt and reasonably implement a policy pursuant to which YouTube terminates subscribers and account holders who are repeat infringers.  In addition, and notwithstanding their representations to copyright owners that once YouTube receives a formal notice of infringement with respect to a particular work, that Defendants will prevent that work from reappearing on YouTube, they have not done so. Defendants' representation to intellectual property rights owners that they will prevent the reappearance of specifically identified infringement on the YouTube website is false.

116.    As YouTube presently operates, sending it notices to demand removal or "takedown" of infringements on its website is futile.  Defendants have failed to police YouTube for the appearance and reappearance of infringing material, including material that has been the

55

subject of written notices by intellectual property owners, have not provided any effective means to receive and process notices, and have not responded expeditiously to remove infringing content when they do acknowledge receiving notices.

117.    Defendants have available certain technical measures that are readily available to prevent or mitigate infringement. Defendants should be estopped to deny the availability or value of such measures in assessing its obligations to prevent or mitigate infringement.

118.    Defendants' failure to adopt such technical measures is willful and knowing and materially contributes to, causes, encourages, promotes, and induces the infringing conduct complained of herein.

119.    The existence and availability of such technical measures and Defendants' willful and knowing decision not to implement them demonstrate a right and ability to control the infringing activities complained of herein, from which Defendants derive direct financial benefits. Indeed, Defendants have offered such technical measures to its "strategic partners" – entities from whom Defendants have extracted licenses under threat of infringement – but have refused to make this technology available to other content owners.

120.    Defendants' false representations about their compliance with applicable law and their failure to police YouTube and take meaningful steps to prevent or mitigate infringing activity are all deliberate and knowing elements of a strategy to maximize the financial and other benefits accruing to Defendants from the presence of such infringing activity on YouTube.

121.    Defendants have repeatedly promised to make available technology to prevent the appearance of infringing content on the YouTube website, but have either failed to deliver the technology or have made it available to only a select few "partners" who have agreed to give

YouTube their copyrighted content on terms favorable to YouTube. Recently, Defendants represented that they were developing a technology to detect infringing content so that "within a minute or so" of a video being uploaded to YouTube, "the computers will figure out that that's one of the items that the copyright owner said they don't want up on the system, and we would be able to pull that down." Defendants further promised that this technology would be "in place sometime in the fall, hopefully in September" of 2007. Yet this new technology, however it is intended to function, has not been made available to the members of the Class as of the date of this Amended Complaint. In the meantime, other websites have implemented tools to block or filter uploads.

122.    Defendants have actual knowledge of the infringing activity rampant on their system, and have cast a blind eye toward the constant and unremitting "red flags" of infringing activity that occur constantly on YouTube.

### H.    Harm to the Class

123.    The harm to Lead Plaintiffs, Named Plaintiffs, and the Class caused by Defendants' acts is substantial and to a large extent irreparable. Lead Plaintiffs, Named Plaintiffs, and the Class not only lose the ability to control the delivery, manner, and means by which their respective works are made available to the public, but also lose revenue, directly and indirectly, by the substitution of unauthorized "free" viewing and copying on YouTube, which displaces legitimate sales through authorized channels of distribution and exhibition. In addition, the uncontrolled, "viral" availability of the Class members' content, without any meaningful protection against copying and proliferation, works to interfere with authorized licensing and marketing of these works, and jeopardizes Class members' ability to derive revenue from the valuable intellectual property each owns or controls.

124.    Defendants have effectively arrogated to themselves, without authorization, a new "platform" for the delivery of the proprietary content of others and have drawn an unprecedented audience from which Defendants extract numerous financial and related benefits for YouTube's business, the core of which depends upon making available highly desirable intellectual property without authorization from, or payment to, the rights owners.  Defendants have effectively reversed the operating principles of applicable law by appropriating proprietary content first, without authorization, and then seeking out licensing arrangements from certain content owners they believe worthy of consideration, based on the value of the infringing content to YouTube.

125.    Notably, in the case of Lead Plaintiff Premier League, Defendant Google declined to bid on certain media rights that could have made footage of certain Premier League football matches available to it for Internet exploitation under appropriate licenses.  Various explanations for declining to bid on these rights were offered by Google, including that it was not yet ready to pay for commercial content.

126.    Defendants' conduct is causing, and unless enjoined by this Court, will continue to cause Lead Plaintiffs, Named Plaintiffs, and members of the Class great and irreparable injury that cannot be fully compensated or measured in money damages. Lead Plaintiffs, Named Plaintiffs, and members of the Class have no adequate remedy at law.

## FIRST CLAIM FOR RELIEF

### (Direct Copyright Infringement – Against All Defendants)

127.    Lead Plaintiffs, Named Plaintiffs, and the Class repeat and reallege each and every allegation contained in other paragraphs of the complaint.

58

128.    Defendants' conduct as described above constitutes direct copyright infringement of each of the Protected Works.

129.    The infringement of each such work is a separate and distinct act of infringement.

130.    The foregoing acts of infringement by Defendants are willful, intentional, and purposeful and in disregard of and indifference to the rights of Lead Plaintiffs, Named Plaintiffs, and the Class members.

131.    The foregoing acts constitute direct infringement of the exclusive rights in Protected Works.

## SECOND CLAIM FOR RELIEF

### (Contributory Copyright Infringement – Against All Defendants)

132.    Lead Plaintiffs, Named Plaintiffs, and the Class repeat and reallege each and every allegation contained in other paragraphs of the complaint.

133.    Defendants provide the site, means, and facilities for massive copyright infringement of Protected Works that takes place each time an unauthorized copy of such a work is copied and uploaded to YouTube, images from that work are publicly displayed on YouTube, and each time a user accesses and streams, publicly performs, copies, forwards or otherwise transmits such work. Each and every one of these infringements is encouraged, and made possible and facilitated by Defendants.

134.    Such acts have been undertaken with full knowledge, actual and constructive, of the infringing activities alleged herein.

135.    The infringement of each such work is a separate and distinct act of infringement.

136.    The foregoing acts of infringement by Defendants are willful, intentional, and purposeful and in disregard of and indifference to the rights of Lead Plaintiffs, Named Plaintiffs, and the members of the Class.

137.    The foregoing acts constitute contributory infringement of the exclusive rights in Protected Works.

## THIRD CLAIM FOR RELIEF

### (Vicarious Copyright Infringement – Against All Defendants)

138.    Lead Plaintiffs, Named Plaintiffs, and the Class repeat and reallege each and every allegation contained in other paragraphs of the complaint.

139.    Defendants have the right and ability to control the infringing activities alleged herein.

140.    Defendants derive direct financial and related benefits from the infringing activities alleged herein.

141.    The infringement of each of the Protected Works is a separate and distinct act of infringement.

142.    The foregoing acts of infringement by Defendants are willful, intentional, and purposeful and in disregard of and indifference to the rights of Lead Plaintiffs, Named Plaintiffs, and members of the Class.

143.    The foregoing acts constitute vicarious infringement of the exclusive rights in Protected Works.

## FOURTH CLAIM FOR RELIEF

### (Inducing Copyright Infringement – Against All Defendants)

144.    Lead Plaintiffs, Named Plaintiffs, and the Class repeat and reallege each and every allegation contained in other paragraphs of the complaint.

145.    Defendants have infringed Protected Works by inducing others to reproduce, adapt, distribute, and publicly perform or display and otherwise transmit those works.

146.    The infringement of each such work is a separate and distinct act of infringement.

147.    The foregoing acts of infringement by Defendants are willful, intentional, and purposeful and in disregard of and indifference to the rights of Lead Plaintiffs, Named Plaintiffs, and members of the Class.

148.    The foregoing acts constitute inducing copyright infringement of the exclusive rights in Protected Works under applicable law.

**WHEREFORE,** Lead Plaintiffs and Named Plaintiffs, on behalf of themselves and the Class, pray for judgment against Defendants as follows:

149.    That the Court determine that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and direct that reasonable notice of this action be given to the Class as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure;

150.    Granting Plaintiffs, including all Class members, injunctive and other equitable relief, in accordance with the provisions of Rule 65 of the Federal Rules of Civil Procedure, and Sections 502 and 503 of the Copyright Act, enjoining Defendants, their officers, agents, servants,

employees and attorneys, and all those in active concert or participation with them or any of them who receive actual notice of the Court's injunctive order:

      A.    from directly or indirectly reproducing, adapting, distributing, publicly displaying or performing or otherwise infringing in any manner any of the Protected Works, including but not limited to the works identified herein, or any work in which any member of the Class owns the copyright and/or the relevant exclusive rights in valid and subsisting copyrighted works and/or sound recordings protected under state law, which is now in existence or yet to be created;

      B.    from causing, contributing to, inducing, enabling, facilitating or participating in the infringement of any of the works referred to in Paragraph A, above;

      C.    from displaying Defendants' logos, or any colorable versions thereof, in connection with any unauthorized copies, public displays or performances, or other transmission, dissemination or exploitation of any of the works referred to in Paragraphs A and B, above;

      D.    affirmatively to adopt, implement and offer to all persons, those technological measures that are now, and shall be in the future, available, including but not limited to those technologies developed pursuant to a broad consensus of copyright owners and service providers in the relevant industries without unnecessarily substantial costs or burdens on their system(s), to identify and protect copyrighted content and prevent it from being posted or otherwise made available through the facilities owned and/or operated or controlled by Defendants; and

      E.    awarding such other equitable relief as will protect the members of the Class's rights to their copyrighted content and any exclusive rights in sound recordings

protected by state law, including imposing a constructive trust on all the assets of Defendants, if necessary, to secure to the Class the benefits that the Constitution and Congress have promised them;

151.    Awarding Plaintiffs' damages and Defendants' profits attributable to their infringing acts, and/or statutory damages, which are available for U.S. and non-U.S. works alike, as applicable, in the maximum amount permitted by law with respect to each work infringed (except Named Plaintiff NMPA, which seeks only the equitable relief described herein on behalf of the Class);

152.    Directing disgorgement of all profits, direct and/or indirect, illegally gained;

153.    Awarding punitive damages on all sound recordings protected by state law, or as otherwise permitted by law;

154.    Finding Defendants jointly and severally liable for all monetary damages awarded;

155.    Awarding prejudgment interest according to law;

156.    Awarding Plaintiffs' attorneys' fees, costs, and disbursements in this action; and

157.    Awarding such other and further relief as the Court may deem just and proper.

Dated:     New York, New York
           11/25/ , 2008

_____
Louis M. Solomon (LS-7906)
William M. Hart (WH-1604)
Bert H. Deixler (BD-0870)
Colin A. Underwood (CU-3445)
Noah S. Gitterman (NG-0106)
PROSKAUER ROSE LLP
1585 Broadway
New York, NY  10036-8299
Phone:  (212) 969-3000

    - and -

_____
Max W. Berger (MB-5010)
John P. Coffey (JC-3832)
John C. Browne (JB-0391)
Eric T. Kanefsky (EK-3511)
BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019
Phone:  (212) 554-1400

*Attorneys for Lead Plaintiffs, Named Plaintiffs
Murbo Music Publishing, Inc., Cherry Lane
Music Publishing Company, Inc., Robert Tur
d/b/a Los Angeles News Service, X-Ray Dog
Music, Inc., Fédération Française de Tennis,
and for the Prospective Class*

Daniel Girard
Aaron Sheanin
Christina Connolly
GIRARD GIBBS LLP
601 California Street, 14th Floor
San Francisco, CA 94108

*-and-*

Gerald E. Martin
Laurel Johnston
BARRETT JOHNSTON & PARSLEY
217 Second Avenue North
Nashville, TN 37201

*-and-*

Kevin Doherty
BURR & FORMAN
700 Two American Center
3102 West End Avenue
Nashville, TN 37203

*Attorneys for Cal IV Entertainment LLC*

David S. Stellings
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
780 Third Avenue, 48th Floor
New York, NY 10017-2024
Tel. (212) 355-9500
Fax. (212) 355-9592

*-and-*

James E. Hough
Jacqueline C. Charlesworth
MORRISON & FOERSTER
1290 Avenue of the Americas
New York, New York 10104
Phone (212) 468-8158
Facsimile (212) 468-7900

*Attorneys for the National Music Publishers'
Association, Rodgers & Hammerstein
Organization, Stage Three Music (US), Inc.,
Edward B. Marks Music Company, Freddy
Bienstock Music Company d/b/a Bienstock
Publishing Company, and Alley Music
Corporation.*

Christopher Lovell (CL 2595)
Christopher M. McGrath (CM-4983)
LOVELL STEWART HALEBIAN LLP
500 Fifth Avenue, 58th Floor
New York, New York 10110
Telephone: (212) 608-1900
Facsimile: (212) 719-4677

*-and-*

Jeffrey L. Graubart (JG-1338)
LAW OFFICES OF JEFFREY L.
GRAUBART
350 West Colorado Boulevard, Suite 200
Pasadena, California 91105-1855
Telephone: (626) 304-2800
Facsimile: (626) 304-2807

*-and-*

Steve D'Onofrio (SD-8794)
5335 Wisconsin Avenue, N.W. Suite 950
Washington, D.C. 20015
Telephone: (202) 686-2872
Facsimile: (202) 686-2875

*Attorneys for The Music Force Media Group
LLC, The Music Force LLC, and Sin-Drome
Records, Ltd.*

## EXHIBIT A

*Infringing copies of the copyrighted works identified below have been found on the YouTube.com website at the URLs listed below, as well as at other URLs*

| Title of Infringed Work | URL where Infringing Work Found | Date Posted |
|---|---|---|
| PREMIER LEAGUE WORKS | | |
| Chelsea v Tottenham, April 7, 2007 | http://www.youtube.com/watch?v=kXtjVVqeZwM | April 7, 2007 |
| Arsenal v West Ham, April 7, 2007 | http://www.youtube.com/watch?v=dM0cqftTSVU | April 7, 2007 |
| Arsenal v West Ham, April 7, 2007 (re-posted) | http://www.youtube.com/watch?v=GQ7EHjzCPNU | June 7, 2008 |
| Portsmouth v Manchester United, April 7, 2007 | http://www.youtube.com/watch?v=aB0Pb3RiMoI | April 8, 2007 |
| Watford v Portsmouth, April 9, 2007 | http://www.youtube.com/watch?v=900wOOdihrc | April 10, 2007 |
| Fulham v Manchester City, April 9, 2007 | http://www.youtube.com/watch?v=py_1TJ2SXV0 | April 9, 2007 |
| Bolton v Everton, April 9, 2007 | http://www.youtube.com/watch?v=03cTR7UkG7g | April 9, 2007 |
| Liverpool v Wigan, April 21, 2007 | http://www.youtube.com/watch?v=wqw8K99pwHI | April 21, 2007 |
| Fulham v Blackburn, April 21, 2007 | http://www.youtube.com/watch?v=BTa8c2WAyGY | April 22, 2007 |
| West Ham v Everton, April 21, 2007 | http://www.youtube.com/watch?v=tDaEBP2FkNM | April 21, 2007 |
| Manchester United v Middlesbrough, April 21, 2007 | http://www.youtube.com/watch?v=pjLvEaCpZy0 | April 22, 2007 |
| Tottenham v Arsenal, April 21, 2007 | http://www.youtube.com/watch?v=1HOxSZdy8jg | April 21, 2007 |
| Tottenham v Arsenal, April 21, 2007 | http://www.youtube.com/watch?v=niPBCy1GMNk | April 21, 2007 |

1

| | | |
|---|---|---|
| Chelsea v Bolton, April 28, 2007 | http://www.youtube.com/watch?v=X8_7eCHcbJs | April 28, 2007 |
| Everton v Manchester United, April 28, 2007 | http://www.youtube.com/watch?v=ov3FxCriZdc | April 28, 2007 |
| Middlesbrough v Tottenham, April 28, 2007 | http://www.youtube.com/watch?v=aF7xQ3HZ2Yw | April 28, 2007 |
| Middlesbrough v Tottenham, April 28, 2007 (re-posted) | http://www.youtube.com/watch?v=XdOTw6xdaG8 | March 10, 2008 |
| Wigan v West Ham, April 28, 2007 | http://www.youtube.com/watch?v=sRTUDkdTxpg | April 28, 2007 |
| Arsenal v Fulham, April 29, 2007 | http://www.youtube.com/watch?v=dEBS1zrndBag | April 29, 2007 |
| Liverpool v Chelsea, August 19, 2007 | http://uk.youtube.com/watch?v=njZz_0eWtsE | August 19, 2007 |
| Liverpool v Chelsea, August 19, 2007 (re-posted) | http://uk.youtube.com/watch?v=4f0heMW6w9M | August 21, 2007 |
| Liverpool v Chelsea, August 19, 2007 (re-posted) | http://uk.youtube.com/watch?v=Y1EWQ3DzyMo | August 21, 2007 |
| Liverpool v Chelsea, August 19, 2007 (re-posted) | http://uk.youtube.com/watch?v=pbAa9JUe-oQ | August 22, 2007 |
| Liverpool v Chelsea, August 19, 2007 (re-posted) | http://uk.youtube.com/watch?v=56R6CnPnwTo | August 26, 2007 |
| Liverpool v Chelsea, August 19, 2007 (re-posted) | http://uk.youtube.com/watch?v=3KdseQafeHw | August 27, 2007 |
| Liverpool v Chelsea, August 19, 2007 (re-posted) | http://uk.youtube.com/watch?v=MeB1bD652yc | August 28, 2007 |
| Liverpool v Chelsea, August 19, 2007 (re-posted) | http://uk.youtube.com/watch?v=8HFtLgerSx0 | August 30, 2007 |

2

| | | |
|---|---|---|
| Manchester United v Tottenham, August 26, 2007 | http://www.youtube.com/watch?v=nY2I2H8pUgU | August 26, 2007 |
| Manchester United v Tottenham, August 26, 2007 (re-posted) | http://www.youtube.com/watch?v=N4Q0z_aF3xc | May 17, 2008 |
| Manchester United v Tottenham, August 26, 2007 (re-posted) | http://www.youtube.com/watch?v=qbZTX9XgvXA | August 27, 2007 |
| Manchester United v Tottenham, August 26, 2007 (re-posted) | http://www.youtube.com/watch?v=sJ-1AJ9uAU0 | August 27, 2007 |
| Manchester United v Tottenham, August 26, 2007 (re-posted) | http://www.youtube.com/watch?v=8c_aATOMUgM | August 28, 2007 |
| Manchester United v Tottenham, August 26, 2007 (re-posted) | http://uk.youtube.com/watch?v=5pj8hAEZf_o | August 28, 2007 |
| Manchester United v Tottenham, August 26, 2007 (re-posted) | http://uk.youtube.com/watch?v=cHWZW0HkMSv | August 30, 2007 |
| Manchester United v Tottenham, August 26, 2007 (re-posted) | http://uk.youtube.com/watch?v=nX2GoOo2Z_g | August 30, 2007 |
| Tottenham v Arsenal, September 15, 2007 | http://www.youtube.com/watch?v=SR6s5phhTmU | September 15, 2007 |
| Tottenham v Arsenal, September 15, 2007 (re-posted) | http://www.youtube.com/watch?v=1g4pQLwMKtc | September, 16, 2007 |
| BOURNE WORKS | | |
| Inka Dinka Doo | http://www.youtube.com/watch?v=ZkukCCSThN8 | February 23, 2007 |
| Inka Dinka Doo | http://youtube.com/watch?v=Ert30-HpbcU | August 16, 2006 |
| Inka Dinka Doo | http://youtube.com/watch?v=sCNFe_ruIXg | March 1, 2007 |
| Let's Fall In Love | http://www.youtube.com/watch?v=oN9KaEDDP10 | December 13, 2006 |
| Let's Fall In Love | http://www.youtube.com/watch?v=WqFxBY_YkXI | January 27, 2007 |
| Let's Fall In Love | http://www.youtube.com/watch?v=sFo1LRcM-Gk | March 21, 2008 |

| (re-posted) | | |
|---|---|---|
| Let's Fall In Love | http://www.youtube.com/watch?v=Twv_L1uBgP0 | February 25, 2007 |
| Let's Fall In Love | http://www.youtube.com/watch?v=Pn3rSLPIpvA | March 23, 2007 |
| Popcorn | http://www.youtube.com/watch?v=aSBqyuYKlWE | November 15, 2006 |
| Popcorn | http://www.youtube.com/watch?v=TKI7Tcjiqw0 | August 17, 2006 |
| Popcorn | http://www.youtube.com/watch?v=Pc3orYnY2Io | June 16, 2006 |
| Popcorn (re-posted) | http://www.youtube.com/watch?v=yQumKuo6meE | December 10, 2007 |
| Popcorn | http://www.youtube.com/watch?v=A85TskjfGxo | July 4, 2006 |
| San Antonio Rose | http://www.youtube.com/watch?v=d0rhI62iJxs | October 21, 2006 |
| San Antonio Rose | http://www.youtube.com/watch?v=mHgyc7VrYTA | August 27, 2006 |
| San Antonio Rose | http://www.youtube.com/watch?v=PTu1FJMEMaY | October 27, 2006 |
| Smile | http://www.youtube.com/watch?v=7r9qwAZnl64 | July 15, 2006 |
| Smile (re-posted) | http://www.youtube.com/watch?v=0k0OPxHtqgc | April 26, 2008 |
| Smile | http://www.youtube.com/watch?v=IjccQo3DW-8 | December 17, 2006 |
| Smile (re-posted) | http://www.youtube.com/watch?v=Y2eLk00rnok | July 06, 2008 |
| Smile | http://www.youtube.com/watch?v=zTWsUjupO3U | January 27, 2007 |
| Smile | http://www.youtube.com/watch?v=zTWsUjupO3U | January 27, 2007 |
| Far Away Places | http://www.youtube.com/watch?v=RN8o54yGJ6A | February 23, 2007 |
| Far Away Places | http://www.youtube.com/watch?v=dr2h5u2zykM | July 27, 2007 |
| Confessin' (That I Love You) | http://www.youtube.com/watch?v=vZnLOJ590ks | July 17, 2007 |
| Confessin' (That I Love You) | http://www.youtube.com/watch?v=WtpSztkjFE0 | July 16, 2007 |
| Confessin' (That I Love You) | http://www.youtube.com/watch?v=aa2vTi38qSA | October 15, 2006 |
| Confessin' (That I Love You) (re-posted) | http://www.youtube.com/watch?v=KA24Sg1K_Ys | July 21, 2008 |
| Confessin' (That I Love You) | http://www.youtube.com/watch?v=6AgxOT9Cijg | August 02, 2007 |

| MURBO WORKS | | |
|---|---|---|
| Black Magic Woman | http://www.youtube.com/watch?v=FQwSAFUE1qk | October 12, 2006 |
| Black Magic Woman (re-posted) | http://www.youtube.com/watch?v=8nqDiBlvnRM | January 04, 2008 |
| Black Magic Woman | http://www.youtube.com/watch?v=OMjMPQb2kJY | July 15, 2006 |
| Black Magic Woman (re-posted) | http://www.youtube.com/watch?v=x80awArX5UY | February 09, 2008 |
| Black Magic Woman | http://www.youtube.com/watch?v=ltqF9q-H3cE | December 20, 2006 |
| Black Magic Woman (re-posted) | http://www.youtube.com/watch?v=O1DROKrOOOc | March 21, 2008 |
| CHERRY LANE WORKS | | |
| Afternoon Delight | http://www.youtube.com/watch?v=X5axMyJ_-Z8 | November 19, 2006 |
| Afternoon Delight (re-posted) | http://www.youtube.com/watch?v=eaHYvkjH_QY | February 03, 2008 |
| Afternoon Delight (re-posted) | http://www.youtube.com/watch?v=FfoinnTh690 | June 25, 2008 |
| Afternoon Delight | http://www.youtube.com/watch?v=wSWYMfXlR20 | August 12, 2007 |
| Afternoon Delight | http://www.youtube.com/watch?v=5FGgfluvHVE | August 24, 2007 |
| Thank God, I'm a Country Boy | http://www.youtube.com/watch?v=WRgcYDdzqik | May 4, 2007 |
| Thank God, I'm a Country Boy | http://www.youtube.com/watch?v=793xdkdz-zA | September 25, 2007 |
| Thank God, I'm a Country Boy | http://www.youtube.com/watch?v=XEoTYClGizM | February 27, 2007 |
| Thank God, I'm a Country Boy (re-posted) | http://www.youtube.com/watch?v=7A9uZRDIOhc | January 19, 2008 |
| American Beauty | http://youtube.com/watch?v=XffyG1Kp6z8 | August 21, 2007 |
| American Beauty (re-posted) | http://www.youtube.com/watch?v=fsZ0NbfupJg | March 16, 2008 |
| American Beauty | http://youtube.com/watch?v=KmnHFYZXygk | October 16, 2006 |
| Soul Bossa Nova | http://youtube.com/watch?v=eBPdrvyCz6s | October 18, 2006 |

5

| Soul Bossa Nova | http://youtube.com/watch?v=h1PgWrRKQY4 | September 25, 2006 |
| Soul Bossa Nova | http://youtube.com/watch?v=iD0wwVmN2Vc | February 7, 2007 |
| Soul Bossa Nova | http://youtube.com/watch?v=JGsf1_KN5t0 | June 16, 2007 |
| Strawberry Letter #23 | http://youtube.com/watch?v=uSDH2tmAxtQ | September 1, 2007 |
| Strawberry Letter #23 (re-posted) | http://www.youtube.com/watch?v=5Oi4kpHXujE | August 18, 2008 |
| CAL IV WORKS | | |
| If You're Going Through Hell | http://www.youtube.com/watch?v=LGtLzgulIWk | July 3, 2007 |
| If You're Going Through Hell | http://www.youtube.com/watch?v=xIhfJyefCvk | July 2, 2007 |
| If You're Going Through Hell (re-posted) | http://www.youtube.com/watch?v=O_50FKHkTYM | May 12, 2008 |
| If You're Going Through Hell | http://www.youtube.com/watch?v=yYf-fT7mSR8 | June 28, 2007 |
| If You're Going Through Hell (re-posted) | http://www.youtube.com/watch?v=ajtrUC2Lf3I | March 24, 2008 |
| If You're Going Through Hell (re-posted) | http://www.youtube.com/watch?v=N_Ki4TyXjfM | August 5, 2006 |
| If You're Going Through Hell (re-posted) | http://www.youtube.com/watch?v=zTgPl_HAYh0 | December 30, 2007 |
| If You're Going Through Hell | http://www.youtube.com/watch?v=PjXvLQvXUIw | July 8, 2007 |
| If You're Going Through Hell | http://www.youtube.com/watch?v=D6ETF63wWM0 | October 16, 2007 |
| If You're Going Through Hell | http://www.youtube.com/watch?v=aDgqWXzdTPY | September 13, 2007 |
| Sharing The Night Together | http://www.youtube.com/watch?v=6IkNx2bDpzM | March 12, 2007 |
| Sharing The Night Together (re-posted) | http://www.youtube.com/watch?v=8dYHsJ2F_4 | January 10, 2008 |

6

| Sharing The Night Together | http://www.youtube.com/watch?v=jODR0to0KQs | June 10, 2007 |
| Sharing The Night Together | http://www.youtube.com/watch?v=ElbczVEgiy4 | July 10, 2007 |

| TUR WORKS | | |

| Certain YouTube URLs accessed and/or posted on dates previously provided to Defendants in prior proceedings in <u>Robert Tur, an individual, d/b/a Los Angeles News Service vs. YouTube, Inc.</u>, Case No. CV 06-4436-FMC (AJWx). | | |

| RHO WORKS | | |

| Bali Ha'I | http://www.youtube.com/watch?v=3uFPyrwyf-4 | June 18, 2007 |
| The Carousel Waltz | http://www.youtube.com/watch?v=HvN3vjZHN_Y | July 13, 2007 |
| The Carousel Waltz (re-posted) | http://www.youtube.com/watch?v=nMb_NMX8zbQ | May 5, 2008 |
| Climb Ev'ry Mountain | http://www.youtube.com/watch?v=Jd9dbMyJBeE | July 9, 2007 |
| Climb Ev'ry Mountain | http://www.youtube.com/watch?v=CkYzcV4K7lQ | November 15, 2006 |
| Do-Re-Mi | http://www.youtube.com/watch?v=zL2MQTuWk4g | February 8, 2007 |
| Do-Re-Mi | http://www.youtube.com/watch?v=PXT1B2ozykM | November 18, 2006 |
| Edelweiss | http://www.youtube.com/watch?v=2UKkvEObQxM | August 5, 2007 |
| Getting to Know You | http://www.youtube.com/watch?v=5_N_jroffKg | June 29, 2006 |

| STAGE 3 WORKS | | |

| Walk This Way | http://youtube.com/watch?v=aBwcydLLD0g | March 9, 2006 |
| Dream On | http://www.youtube.com/watch?v=RF8VLPglMWo | June 20, 2007 |
| Dream On (re-posted) | http://www.youtube.com/watch?v=Pax76o1Tun0 | April 26, 2008 |
| Dream On | http://www.youtube.com/watch?v=UNCPh0Ct0FQ | March 11, 2007 |
| Dream On (re-posted) | http://www.youtube.com/watch?v=WEkLOg0aUGQ | January 4, 2008 |
| Dream On | http://youtube.com/watch?v=hV4kpOk3pbg | September 27, 2006 |
| Back in the Saddle | http://www.youtube.com/watch?v=DkYn8TdFS9o | December 24, 2006 |

7

| Sweet Emotion | http://www.youtube.com/watch?v=PFX46G9xGR8 | June 23, 2006 |
|---|---|---|
| Sweet Emotion | http://www.youtube.com/watch?v=hIgNLLIOT5c | July 27, 2006 |
| Sweet Emotion (re-posted) | http://www.youtube.com/watch?v=3ePFFMfsnIk | December 9, 2007 |
| Sweet Emotion | http://www.youtube.com/watch?v=53nh61e8exo | February 7, 2007 |
| Sweet Emotion (re-posted) | http://www.youtube.com/watch?v=47GFyYmrvgs | August 17, 2008 |
| La Grange | http://www.youtube.com/watch?v=o0NOFOqTMgY | May 20, 2006 |
| La Grange (re-posted) | http://www.youtube.com/watch?v=VDjgwIXtKLk | August 22, 2008 |
| La Grange | http://www.youtube.com/watch?v=xwpajCvAO7A | January 7, 2007 |
| La Grange | http://www.youtube.com/watch?v=KWQPfAeJQTQ | February 15, 2007 |
| La Grange (re-posted) | http://www.youtube.com/watch?v=i5QmAM6DgyI | January 27, 2008 |
| Tush | http://www.youtube.com/watch?v=O-z2SU-7Dhw | August 27, 2006 |
| Tush (re-posted) | http://www.youtube.com/watch?v=NmeBbkw5ulk | August 2, 2008 |
| Tush | http://www.youtube.com/watch?v=Pvr8b4B3gyo | May 21,2007 |
| Tush | http://www.youtube.com/watch?v=i5QmAM6DgyI | January 27,2008 |
| Sharp Dressed Man | http://www.youtube.com/watch?v=ksYUo1tfpyY | April 16, 2007 |
| Legs | http://www.youtube.com/watch?v=ZH5imDXKlzs | November 14, 2006 |
| Gimme All Your Lovin | http://www.youtube.com/watch?v=PCqlc00ffHM | September 30, 2006 |
| Gimme All Your Lovin | http://www.youtube.com/watch?v=ophq-mAzjh8 | March 11,2007 |
| **EBMMCo WORKS** | | |
| I'd Do Anything For Love (But I Won't Do That) | http://www.youtube.com/watch?v=M7PuJazm9Vg | June 5, 2007 |
| I'd Do Anything For Love (But I Won't Do That) | http://www.youtube.com/watch?v=ORi0qie8xYc | July 20, 2007 |

8

| God Bless the Child | http://www.youtube.com/watch?v=jywoMumO3mk | May 13, 2007 |
| God Bless the Child | http://www.youtube.com/watch?v=e7Qnxz2fijQ | June 3, 2006 |
| God Bless the Child | http://www.youtube.com/watch?v=Dzqpni5gN98 | March 27, 2007 |
| **BIENSTOCK WORKS** | | |
| The Revolution Will Not Be Televised | http://www.youtube.com/watch?v=GPvmCoHSwo | April 30, 2007 |
| The Revolution Will Not Be Televised (re-posted) | http://www.youtube.com/watch?v=ssQGHVlsZ-Y | May 22, 2008 |
| **ALLEY WORKS** | | |
| I get the Sweetest Feeling | http://www.youtube.com/watch?v=C-HlHcGgROU | May 5, 2007 |
| I get the Sweetest Feeling (re-posted) | http://www.youtube.com/watch?v=iIs1klBOd_M | December 6, 2007 |
| **X-RAY DOG WORKS** | | |
| Here Comes the King | http://www.youtube.com/watch?v=CfdBDqv-gFg | June 6, 2007 |
| Here Comes the King (re-posted) | http://www.youtube.com/watch?v=CrGz-P_8tss | July 23, 2008 |
| Here Comes the King | http://youtube.com/watch?v=IQk-PEXTg4g | July 14, 2007 |
| Here Comes the King (re-posted) | http://www.youtube.com/watch?v=QfkTKBtOarQ | March 29, 2008 |
| Dethroned | http://www.youtube.com/watch?v=czXPNvX9Rvo | January 25, 2007 |
| Dethroned (re-posted) | http://www.youtube.com/watch?v=MQMOcV8lRAc | May 14, 2008 |
| Dethroned (re-posted) | http://www.youtube.com/watch?v=asdyxuYbvqs | August 18, 2008 |
| Dethroned (re-posted) | http://www.youtube.com/watch?v=piYgKSbyfLk | June 30, 2008 |
| Dethroned | http://www.youtube.com/watch?v=fHLlIJ0o-bA | May 16, 2007 |
| Dethroned (re-posted) | http://www.youtube.com/watch?v=t7JD0EO-aD8 | March 24, 2008 |

9

| | | |
|---|---|---|
| Dethroned (re-posted) | http://www.youtube.com/watch?v=AcO-6o5mmvg | December 28, 2007 |
| Dethroned (re-posted) | http://www.youtube.com/watch?v=JayW1ifeDdI | June 03, 2008 |
| **FFT WORKS** | | |
| Roger Federer v Nicolay Davydenko, June 8, 2007 | http://www.youtube.com/watch?v=WWIvjvCjdGM | July 6, 2007 |
| Ernests Gulbis v Tim Henman, May 29, 2007 | http://www.youtube.com/watch?v=OK63ObDqRrw | September 3, 2007 |
| Ana Ivanovic v Maria Sharapova, June 7, 2007 | http://www.youtube.com/watch?v=MFtePq4uLd0 | July 26, 2007 |
| **THE MUSIC FORCE WORKS** | | |
| Stuck on You | http://youtube.com/watch?v=Q-L7oF1SoHY | October 3, 2006 |
| Stuck on You (re-posted) | http://www.youtube.com/watch?v=YqLqXq-QNkk | April 19, 2008 |
| What You Won't Do For Love | http://youtube.com/watch?v=gLm3K_TnZZg | April 22, 2007 |
| What You Won't Do For Love (re-posted) | http://www.youtube.com/watch?v=xc4Jq2KxpD8 | February 12, 2008 |
| What You Won't Do For Love | http://youtube.com/watch?v=m9EwK8hbF3s | September 29, 2007 |

10