UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

THE FOOTBALL ASSOCIATION PREMIER
LEAGUE LIMITED, BOURNE CO. (together
with its affiliate MURBO MUSIC PUBLISHING,
INC.), CHERRY LANE MUSIC PUBLISHING
COMPANY, INC., CAL IV ENTERTAINMENT
LLC, ROBERT TUR d/b/a LOS ANGELES
NEWS SERVICE, NATIONAL MUSIC
PUBLISHERS' ASSOCIATION, THE
RODGERS & HAMMERSTEIN
ORGANIZATION, STAGE THREE MUSIC
(US), INC., EDWARD B. MARKS MUSIC
COMPANY, FREDDY BIENSTOCK MUSIC
COMPANY d/b/a BIENSTOCK PUBLISHING
COMPANY, ALLEY MUSIC CORPORATION,
X-RAY DOG MUSIC, INC., FÉDÉRATION
FRANÇAISE DE TENNIS, THE MUSIC FORCE
LLC, and SIN-DROME RECORDS, LTD. on
behalf of themselves and all others similarly
situated,

　　　　　　　　　　Plaintiffs,

　　　　　　v.

YOUTUBE, INC., YOUTUBE, LLC and
GOOGLE, INC.,

　　　　　　　　　　Defendants.

------------------------------------- X

07 Civ. 3582 (LLS)
(related case no. 07 Civ. 2103 (LLS),
the "*Viacom* action")


**ECF CASE**


**MEMORANDUM OF LAW IN SUPPORT OF CLASS PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT DISMISSING DEFENDANTS' FIRST DEFENSE
(DMCA SAFE HARBOR DEFENSE)**

Page

INTRODUCTION ......................................................................................................... 1

Summary of Uncontroverted Facts ............................................................................... 3

I.    YouTube, From The Outset, Knew That Its Traffic Depended On Infringing Content ...... 3

II.    Google Acquired YouTube Knowing YouTube's Business Model Depended on Infringing Content ......................................................................................................... 5

III.    Defendants Continuously Knew About And Encouraged The Exploitation Of Infringing Sports, Music, News, Entertainment And Other Content On YouTube .................... 7

    A.    Sports content ...................................................................................................... 8

    B.    Music content .................................................................................................... 10

    C.    News, entertainment and other content ............................................................ 14

IV.    Defendants had systems and tools to identify infringing videos, but deliberately used those tools to monetize their inventory rather than remove infringements .............................. 14

    A.    Discontinuing "community flagging" and manual review ................................ 15

    B.    Selective text-based filtering and search systems ........................................... 15

    C.    Selective digital fingerprinting ........................................................................ 18

ARGUMENT ............................................................................................................... 21

I.    Defendants Cannot Rely Upon § 512(c) of the Copyright Act ......................................... 21

    A.    *Netcom* and the origins of § 512(c) ............................................................... 21

    B.    Overview of § 512(c) ....................................................................................... 23

II.    YouTube's Knowledge or Awareness of Infringing Activity Disqualifies It From Any Safe Harbor Under Section 512(c). ................................................................................ 25

III.    Defendants' Right And Ability To Control Infringing Activity While At The Same Time Profiting From That Activity Disqualifies Them From Any Safe Harbor Under Section 512(c). 30

    A.    Defendants Have the Right and Ability to Control the Infringing Activities ................ 31

    B.    Defendants Receive a Direct Financial Benefit From the Infringing Activity on the YouTube Website ............................................................................................... 33

CONCLUSION ............................................................................................................ 35

# TABLE OF AUTHORITIES

## CASES

Page(s)

*A&M Records v. Napster, Inc.,*
239 F.3d 1004 (9th Cir. 2001) ...................................................................29-30, 34

*A&M Records v. Napster, Inc.,*
284 F.3d 1091 (9th Cir. 2002) ........................................................................29, 30

*ALS Scan, Inc. v. RemarQ Cmtys, Inc.,*
239 F.3d 619 (4th Cir. 2001) ................................................................23, 25, 26, 29

*Arista Records, LLC v. USENET.com, Inc.,*
633 F. Supp. 2d 124 (S.D.N.Y. 2009) .................................................24, 25, 27, 28

*Columbia Pictures Indus., Inc. v. Fung,*
No. CV 06-5578, 2009 U.S. Dist. LEXIS 122661 (C.D. Cal. Dec. 21, 2009) ........28

*Ellison v. Robertson,*
357 F.3d 1072 (9th Cir. 2004) ................................................................................34

*In re Aimster Copyright Litig.,*
252 F. Supp. 2d 634 (N.D. Ill. 2002),
*aff'd,* 334 F.3d 643 (7th Cir. 2003)...............................................26-27, 28, 33, 34

*In re Aimster Copyright Litig.,*
334 F.3d 643 (7th Cir. 2003) ..................................................................................27

*MGM Studios Inc. v. Grokster, Ltd.,*
545 U.S. 913 (2005) ................................................................................................32

*Perfect 10, Inc. v. Amazon.com, Inc.,*
508 F.3d 1146 (9th Cir. 2007) ................................................................................30

*Perfect 10, Inc. v. CCBill, LLC,*
488 F.3d 1102 (9th Cir. 2007) ...........................................................................33-34

*Perfect 10, Inc. v. Cybernet Ventures, Inc.,*
213 F. Supp. 2d 1146 (C.D. Cal. 2002) ....................................................28, 32, 33

*Religious Tech. Ctr. v. Netcom On-Line Commun. Servs.,*
907 F. Supp. 1361 (N.D. Cal. 1995).................................................................21, 22

*Robert Tur v. YouTube, Inc.,*
Appeal No. 07-56683 (9th Cir.)...............................................................................33

ii

*UMG Recordings, Inc. v. Veoh Networks, Inc.,*
665 F. Supp. 2d 1099 (C.D. Cal. 2009) ................................................................33

## STATUTES

17 U.S.C. §512(c) .......................................................................................*passim*

17 U.S.C. §512(c)(1) ...........................................................................................1, 23

17 U.S.C. § 512(c)(1)(A) ....................................................................................1, 24

17 U.S.C. § 512(c)(1)(A)(ii) ...................................................................................25

17 U.S.C. § 512(c)(1)(A)(iii) ..................................................................................26

17 U.S.C. § 512(c)(1)(B) .......................................................................1, 22, 25, 30

17 U.S.C. § 512(c)(3) ..............................................................................................29

17 U.S.C. § 512(c)(3)(A)(ii) ...................................................................................29

## OTHER AUTHORITIES

H.R. Rep. 105-551(I) ..................................................................................22, 25, 30

H.R. Rep. 105-551(II) .........................................................................22, 24, 25, 27

Nimmer on Copyright, § 12B.04[A][2] ..................................................................34

## INTRODUCTION

On this motion, the Class Plaintiffs seek partial summary judgment that Defendants YouTube, Inc., YouTube, LLC and Google, Inc. (collectively, "Defendants" or "YouTube") do not qualify for the "safe harbor" under §512(c) of the U.S. Copyright Act ("DMCA" or the "Copyright Act" or "Act") for their knowing, deliberate acts of copyright infringement – infringements that they exploit to their enormous financial benefit. Far from being a passive Internet intermediary that is unaware of the infringing activities on its systems, or that promptly and meaningfully responds to occasional copyright infringement appearing on its site, the vast amount of infringing activity on the YouTube site is an essential element of Defendants' success: removing just the "obviously copyright infringing stuff," according to one of YouTube's founders, would cause the loss of over 80% of their audience. SUF ¶ 4.

The provisions of the DMCA under which Defendants seek to limit their liability for copyright infringement only extend to qualifying Internet "service providers" engaged in storing content "at the direction of a user." 17 U.S.C. § 512(c)(1). Although such a service provider must act expeditiously to remove infringing material identified in a statutory "takedown notice" sent by a copyright claimant, the service provider's obligations do not end there: even in the absence of such notices, the provider has a duty to remove infringing material if it has knowledge that the material on its system is infringing or an awareness of facts or circumstances from which infringing activity is apparent. 17 U.S.C. § 512(c)(1)(A). Even a service provider that has no knowledge or awareness of infringements cannot avail itself of the safe harbor if it receives a financial benefit directly attributable to the infringing activity where, as here, it has the right and ability to control infringing activity. 17 U.S.C. § 512(c)(1)(B).

Defendants have been identifying, quantifying, "tracking" and corralling infringing content for strategic business purposes, including to help them in license negotiations with the very entities whose works are being infringed; are readily able to associate the content with subject-specific advertising; and selectively offer content owners willing to license their content to YouTube a variety of technologies designed to identify and "monetize" their content, whenever and wherever it appears on the YouTube site. But for those content owners unwilling to authorize Defendants to exploit their content, Defendants feign ignorance of a vast, constant amount of infringing activity. Despite the considerable technological resources at Defendants' disposal, Defendants ignore specific information that their systems provide about unlicensed, infringing material on the YouTube site and have selectively implemented features and functionalities of their site that would have allowed them to identify and remove infringing content of which Defendants were already aware.

Defendants' knowledge, awareness and exploitation of widespread and obvious infringing activity throughout the site, including infringements of Class Plaintiffs' content, disqualifies them from any so-called "safe harbor" from copyright infringement liability under the DMCA as a matter of law. Defendants' refusal to use the technologies and features within their control to mitigate those infringing acts, from which they continue to derive real and direct financial benefits, also disqualifies them from shelter under the DMCA.

Class Plaintiffs join in Viacom's motion for summary judgment on the inapplicability of the "safe harbor" defense to Defendants under the DMCA in *Viacom International Inc., et al. v. YouTube, Inc. et al.*, 07 Civ. 2103 (LLS) ("Viacom" and the "Viacom Action"), to minimize the

burden on the Court where possible. This separate submission addresses other issues applicable to Class Plaintiffs.[1]

**Summary of Uncontroverted Facts**

In addition to the Statement of Undisputed Facts filed in support of Viacom's summary judgment brief ("Viacom SUF"), which is incorporated into Class Plaintiffs' motion, the following uncontroverted facts establish that Defendants are not entitled to the "safe harbor" provisions of §512(c) of the Copyright Act as a matter of law.[2]

## I. YouTube, From The Outset, Knew That Its Traffic Depended On Infringing Content

Since its inception in 2005, YouTube has depended on the unauthorized exploitation of copyrighted sports, music, news, entertainment and other content to draw users to its site and expand its business. YouTube became the "the leading destination on the Internet for video entertainment" just a year and a half after its launch, and has continued to grow exponentially since then. Class Plaintiffs' Statement of Uncontroverted Facts ("SUF") ¶ 9. By the summer of 2009, YouTube videos were being watched almost 9 billion times per month by over 120 million people. SUF ¶ 3.

From the outset, YouTube's founders knew that user traffic to their site was heavily dependent on the presence of infringing audiovisual clips on the YouTube website, including sports and other television programming and popular songs that rights owners had never authorized to appear, and in many cases repeatedly objected to, estimating that they would lose

---

[1] Although Viacom, for reasons specific to it, limits its companion motion to the period ending May 2008 (Viacom Br. n.1), Class Plaintiffs do not do so because Defendants' clear conduct falling outside the DMCA safe harbor requirements continues with respect to the Class.

[2] For the purposes of this motion only, Class Plaintiffs assume, *arguendo*, that YouTube qualifies as a "service provider" within the meaning of §512(c).

upwards of 80% of that traffic just by removing the "obviously copyright infringing stuff." SUF ¶ 4 ("…if we remove all that content, we go from 100,000 views a day down to about 20,000 views or maybe even lower.") To build user traffic as aggressively as possible, so they could "sell out quickly" – as they did, by selling the business to Defendant Google, Inc. ("Google") just over a year after its launch for over $1.65 billion – YouTube's founders privately expressed little hesitation about relying on the rampant and obviously infringing material given the massive potential reward. SUF ¶¶ 4, 5, 9, 11.

The emails from this time period reveal that YouTube knew about, but decided not to remove, infringing content, and uploaded and deliberately maintained infringing content on its site in order to build its audience. SUF ¶¶ 4, 5. This was not a function of unsophisticated entrepreneurs making a few early mistakes. The YouTube founders had extensive experience building internet businesses, and their explicit goal was to build an audience as quickly as possible to maximize value in an expected sale of the business. SUF ¶ 10, 38 ("concentrate all of our efforts in building up our numbers as aggressively as we can through *whatever tactics, however evil*.") (emphasis added). YouTube publicly paid lip service to copyright concerns, but the reality was otherwise. SUF ¶ 5 ("That way, the perception is that we are concerned about this type of material and we're actively monitoring it. [But the] actual removal of this content will be in varying degrees. That way, . . . you can find truckloads of . . . copyrighted content . . . [if] you [are] actively searching for it."). In February 2006, YouTube executive Maryrose Dunton calculated that among the most popular videos available on the site, "over 70%" had "copyrighted material" in them. SUF ¶ 4 ("I did a little exercise on friday and went through all the most viewed/most discussed [sic]/top favorites/top rated to try and figure out what percentage is or has copyrighted material. it was over 70%.) But YouTube deliberately left such

unlicensed videos on the website. SUF ¶¶ 4, 5, 15 ("This data suggests that our users do want to watch professional content, but [...] we haven't yet licensed the content that they're looking for"). Copyright infringement was fundamental to YouTube's business strategy from the outset, and remains so today.

## II. Google Acquired YouTube Knowing YouTube's Business Model Depended on Infringing Content

When Google negotiated the purchase of YouTube in the fall of 2006, it did so with full knowledge of the rampant infringing activity on the YouTube site that was the key to YouTube's success. Google had unsuccessfully tried to compete with YouTube through its own "Google Video" site, using copyright practices that inhibited its growth compared to YouTube's. SUF ¶ 12. Unlike YouTube, Google implemented a policy to review videos before they were shown on its site, and to reject those videos that contained inappropriate content, including infringing material. *Id.* Approximately 90% of the videos rejected by Google were due to copyright infringement. *Id.* Prior to the YouTube acquisition, Google executives candidly assessed the extent to which YouTube's success depended on widespread, systematic copyright infringement. One executive informed Google CEO Eric Schmidt that, "[a] large part of [YouTube's] traffic is from pirated content. When we compare our traffic numbers to theirs, we should acknowledge that we are comparing our 'legal traffic' to their mix of traffic from legal and illegal content." SUF ¶ 13.

While Google was trying to distinguish itself from YouTube, YouTube relied on pirated content to outstrip Google in the most critical metric in the fledgling web-based video industry – creating a base of users drawn to its site. SUF ¶¶ 9, 11. Unable to compete against YouTube's mass of infringing content, Google decided to acquire YouTube in October 2006, fully aware

5

that YouTube's audience was built on the backs of content owners who had not authorized YouTube to exploit their content. Google's due diligence prior to the acquisition showed that 60% of YouTube's videos were "premium" professional content, and Google estimated that by 2007 only 10% of that content would be licensed. SUF ¶ 11; *see also* Viacom SUF ¶¶ 167-77. (In October 2006, 65,000 new videos per day were being uploaded to and shown on YouTube, equating to tens of thousands of new infringements per day. SUF ¶ 3.) Far from being deterred by the potential infringement liability of the YouTube site, Google viewed it as an acceptable risk in light of Google's focus on the growth of its audience, a directive that came from Google's CEO himself. SUF ¶¶ 11, 14 ("1.65 billion included a premium for […] making sure that we could participate in the user success of YouTube"; "our policy from acquisition was to grow the user base").

Google seamlessly adopted YouTube's approach to copyright, which depended on the encouragement and knowledge of, or willful blindness to, the vast amount of infringing activity on the site. When Google purchased YouTube, it did not institute any policy to remove the infringing material it knew was there. SUF ¶ 14; *see also* Viacom SUF ¶ 189. Instead, its goal was at first to grow the site by increasing videos, viewers and traffic, and then to seek licenses for "premium" professionally-made content by offering an array of processes that could identify, track and run advertisements next to that content for revenue-sharing purposes. SUF ¶¶ 15, 28, 38. As shown below, those processes give Defendants specific knowledge of the very infringements which Defendants claim to be unaware of absent a "takedown notice."

Google admits that professional content is the focus of YouTube's monetization efforts, not "user-generated" home videos. SUF ¶¶ 15, 35. This professional content is "easy enough" to identify, but Defendants choose to keep it indiscriminately on the YouTube website, knowing

full well that much of it was on the site without authorization from, and in many instances over the repeated objections of, the copyright owner. *Id.* Even when Class Plaintiffs identified specific infringing videos to Defendants, those same infringements repeatedly appear on YouTube, no matter how many takedown notices were sent. SUF ¶ 18.

## III. Defendants Continuously Knew About And Encouraged The Exploitation Of Infringing Sports, Music, News, Entertainment And Other Content On YouTube

Defendants identified a broad gamut of content on the site as being of high value in attracting viewers, and made a deliberate decision to exploit that content despite their knowledge that it was infringing, and without regard to whether or not Defendants obtained the requisite license from the copyright owner to do so. SUF ¶ 15. Defendants refer to this content, which included sports, music, news and other entertainment content owned by Class Plaintiffs, as "premium" or "professional" content to differentiate it from less valuable personal home-made videos. SUF ¶ 15. Defendants recognize that this content was the most searched for content on the YouTube website, and know that they would lose viewers if they did not have this content on their website. *Id.* ("premium content/brands are an important element to bringing people into the YT house"). And they recognize not only its value in attracting viewers, but, when it is in their strategic interests, the need to get proper licenses for it, offering hundreds of millions of dollars to major media companies for the right to show their premium content and run advertisements next to it. SUF ¶ 31. Even though Defendants know that the vast majority of the "premium" content on YouTube requires licensing, Defendants continue exploiting it without authorization. SUF ¶ 32 ("our users do want to watch professional content, but we [...] haven't yet licensed the content that they're looking for").

## A.    Sports content

From the outset, YouTube made the decision to keep unauthorized sports content on its site because it drew viewers. SUF ¶¶ 15, 19 ("take down XXX stuff. everything else keep including sports, commercials, news, etc."). For example, Defendants know they have been exploiting large quantities of content owned by Class Plaintiff Premier League, which is, in the words of Defendants, the "world's biggest and most recognized sporting league." SUF ¶ 19. Defendants know this, not only by reason of the thousands of takedown notices they received from the League beginning in October 2006, and not only because users of the site had readily pointed YouTube to the "millions of Football goals on YouTube" by a simple search query, but because *Defendants themselves* ran searches to collect evidence of Premier League's popularity on their site to "run some commercial models to gauge value." SUF ¶ 21.

As Defendants evaluated a possible proposal to bid for the rights to Premier League's soccer footage in February 2007, Patrick Walker, director of video partnerships for Google and YouTube, requested that colleagues calculate the number of daily searches on YouTube for the keywords "soccer," "football," and "Premier League," as well as the number of videos with those words in the title or as part of a descriptive tag that is associated with each video on YouTube. *Id.* Google recognized that analyzing the popularity of unlicensed material "might become a recurring need." SUF ¶ 21. According to these analyses, Premier League content was "already proven as key programming based on GV [Google Video] and YT [YouTube] popular videos/usage."[3] SUF ¶ 19.

---

[3] This established popularity was a key reason to try to "do the deal" for Premier League's rights; ultimately, however, YouTube "decided not to make a bid for these rights." SUF ¶¶ 21-22. Yet, even though YouTube opted not to make a bid for the license, it did not remove the Premier League videos from its site. *Id.*

8

Even before then, Walker demonstrated that he knew how to identify and remove infringing Premier League content through simple queries when it suited Defendants' business interests. In March 2006, Walker directed Google Video employees to remove videos containing footage of the Premier League's top clubs in advance of a meeting where broadcasters of those club's matches would be present: "I'll be attending a seminar…in Dublin with the heads of several major sports leagues and teams. It would be much appreciated if you could have a quick look through the index and post on the sparrow page/takedown any clearly infringing, official broadcast footage that you notice from these rights holders below…", then went on to list specific sports teams and leagues from whom Google had no licenses. SUF ¶ 22. Despite this knowledge of and ability to identify and quickly remove infringing content in order to better position themselves in negotiating licenses with content owners, Defendants thereafter made no meaningful effort to remove that content from or prevent its reappearance on YouTube. SUF ¶¶ 15, 19, 20, 22.

The Premier League is only one of a number of professional sports leagues and sporting events that YouTube's internal analyses determined were "already popular" and were "prime content" offering advertising opportunities because of the number of viewers they drew to the site. SUF ¶¶ 19, 20. Defendants are aware of the presence of unlicensed content owned by various sports league and events on the YouTube site, and targeted those copyrighted holders for potential licensing deals.[4] SUF ¶ 19, 21. A YouTube product manager concluded, in view of the

---

[4] While at Google Video, Walker created a "nice list of sports-related content providers and subjects to help us with our search for unauthorized content," a list which included Roland Garros (French Open). SUF ¶ 12. Google halted the practice of screening for unauthorized content just prior to its acquisition of YouTube. SUF ¶ 14.

popularity of such unlicensed sports content, that, "we need more sports content to monetize." SUF ¶ 35.

## B. Music content

Defendants also deliberately exploit a large amount of professional music content without the permission of the rights owner. As early as May 2005, YouTube co-founder Steve Chen wrote in an email entitled "copyright concerns" that, "for these mixed videos with music backgrounds, will we get in trouble for them because the music is copyrighted?" Co-founder Chad Hurley replied: "I won't be too concerned for now… but it might be a problem down the road for public videos." SUF ¶¶ 5, 24. Co-founder Jawed Karim similarly observed that "we'll leave *music videos*, news clip and comedy shows for now." SUF ¶¶ 5, 23 (emphasis added). By early 2008, YouTube employees concluded that "music content is a key element to YouTube's success. *Premium music content is the most watched genre of content on YouTube*." SUF ¶ 23.

In light of this, YouTube implemented a variety of systems and processes under the rubric "Claim Your Content" or "CYC" to identify music content on the YouTube site so it could run advertisements against that content. SUF ¶ 28. Yet, as discussed below, Defendants: 1) selectively implemented these functions only on behalf of content owners from whom they obtained licenses, to display and run advertising against the content; and/or 2) even for the content subject to these agreements, did not secure all of the necessary rights they knew were required from rights holders.

The identification system YouTube implemented made use of a well-established third party digital fingerprinting provider called Audible Magic to scan videos on the YouTube website and digitally match the audio content of those videos against Audible Magic's large reference databases of copyrighted works. SUF ¶ 29; *see also* Viacom SUF ¶¶ 281-288.

10

YouTube also created an internal database to track the identity rights holders of works matched through Audible Magic. SUF ¶ 28. Knowing that it needed licenses in order to use this system to identify and run advertisements next to music content, YouTube concluded license deals with the major record labels and their publishing arms,[5] with performance rights societies,[6] as well as a number of "blanket deals" in countries outside of the United States for the relevant music publishing, reproduction, and synchronization rights.[7] SUF ¶ 31. In connection with those licenses, YouTube provided systems to identify music content. Thus, in YouTube's March 2007 deal with Sony/ATV, YouTube agreed to provide a content identification system that would be "at least as good as the industry standard solution for similar services," and that the system "must include" "Audio fingerprinting," as well as an ability to "determine based on the metadata" whether or not identified works are authorized. Yet these "industry standard" solutions were simply turned off for content owners not willing to make a deal (including those with "small market share" whose content YouTube was not interested in paying for). SUF ¶ 28. Despite being offered access to Audible Magic's entire set of reference databases of copyrighted musical works, YouTube chose to match the videos on its site *only* against music owned by entities with whom it had *already* negotiated a license. SUF ¶¶ 28, 30; *see also* Viacom SUF ¶¶ 294-298.

Even worse, the music YouTube has identified for its favored content partners is in many cases infringing, because YouTube deliberately took the risk that it was not worth pursuing all of the necessary rights for it. YouTube recognized that "clearing music inventory" involved

---

[5] There are four major record companies, each with its own publishing arm: Universal Music Group ("UMG"), Warner Music Group ("Warner"), Sony Music Entertainment ("Sony") and EMI Group ("EMI").

[6] See, e,g., Google-SESAC Agreement at SUF ¶ 28.

[7] For example, YouTube concluded a license with the music rights collection society MCPS-PRS in the United Kingdom and GEMA in Germany. SUF ¶ 31.

obtaining licenses for the music composition from the music publisher, a synchronization license for the pairing of videos with composition and sound recordings, and a license for the sound recording from the record label, among other licenses. SUF ¶¶ 23, 24. YouTube's legal counsel Zahavah Levine, who had previously worked for an Internet music service, was intimately familiar with the need to secure licenses from a variety of music rights holders, including music publishers, for exploitation of music content on the Internet. SUF ¶ 24. YouTube was also plainly aware that it lacked the necessary music publisher rights to a vast amount of musical content on the site, including, for example, user-generated content where a copyrighted song was performed by a user as a "cover" or used as a soundtrack to a user-generated video. SUF ¶¶ 6, 24. And it knew that "[music] publisher data," showing which publishers owned which songs, was "publicly accessible through a variety of websites." *Id.* While YouTube executives claim that they sought to rely on music labels to clear third-party publishing rights (SUF ¶ 32), in fact, YouTube knew full well that the labels could not provide YouTube with necessary publishing rights for user-generated videos. SUF ¶ 32. Indeed, in YouTube's deals with certain record labels, the agreements expressly acknowledge that the labels do not own all of the rights required to exploit their sound recordings on YouTube, and put the responsibility on YouTube to obtain the necessary publishing rights. SUF ¶ 28.

At first, because of these concerns, YouTube did not deploy its identification system for music partners. SUF ¶ 28 ("Actually, we don't want to turn on fingerprinting matching for music partners, because we don't have clear licenses from them (publisher issue)." However, in an effort to wring as much profit as possible from "the most watched genre" of videos on its site, YouTube eventually "turned on" the system by giving its music content partners three choices: (1) they could "monetize" content identified by the system by allowing advertisements to appear

alongside content to which the labels purported to hold rights, and then share in the revenue; (2) they could "block" content they believed to be their own and have it removed by YouTube; or (3) they could "track" content by approving it to remain on the site even though not purporting to grant a license. SUF ¶ 28. As a result, by YouTube's design, YouTube's content identification system was set up to identify a specific recorded song for which it did not have – or even purport to have – the publishing rights, and YouTube encouraged such songs to be left on the site to draw viewers. SUF ¶ 32 (CYC can "track" music content "where we don't have 100% publishing"). For example, using "metadata available to" Google as well as Google's "content identification tools," Google agreed to provide SESAC (one of the music performance rights organizations) with quarterly reports of videos on the YouTube site that contained musical works that SESAC was authorized to license. SUF ¶ 28. But the same agreement acknowledges that SESAC could not grant rights such as the right of reproduction for the underlying musical composition – a right owned by the music publishers. *Id.* Thus, Defendants' content identification system gave it specific knowledge of specific songs being exploited on its site that it knew it had not licensed; yet, rather than remove the unlicensed content through its readily available "blocking" technology, YouTube knowingly permitted it to remain on its site. On some occasions, YouTube's identification system runs advertisements against music content it does not have the rights to exploit. SUF ¶ 36.

Defendants' systems identify music content on a song by song basis, and are sufficient to determine not only that the song is infringing, but also which rights holder owned or controlled the relevant rights to it. SUF ¶¶ 24, 28, 29. But for many independent labels and independent publishers, who are named Class Plaintiffs and putative class members, Defendants have taken a calculated risk in exploiting their content without a license. SUF ¶¶ 25, 32. For example, Class

Plaintiff Cherry Lane sought out YouTube to discuss the presence of Cherry Lane's content on YouTube site and "was summarily told that YouTube had no interest in Cherry Lane given its small market share." SUF ¶ 25.

### C. News, entertainment and other content

As with sports and music content, Defendants recognized that professional news content was another big draw for viewers, and decided kept that content on their site. SUF ¶ 26 ("Re: monitoring videos...let's keep short news clips for now") ("take down XXX stuff. everything else keep including sports, commercials, news, etc."). Co-founder Jawed Karim observed that "we'll leave music videos, news clip and comedy shows for now." SUF ¶ 4.

Defendants also knew that the YouTube website was exploiting popular movie and television clips, including comedy shows. Defendants identified that content and had the ability to remove it had they chosen to do so. *See* Viacom Br. at 31-37.

## IV. Defendants had systems and tools to identify infringing videos, but deliberately used those tools to monetize their inventory rather than remove infringements

Rather than identify and remove the infringing material on which its site depended for exponential growth and value, Defendants publicly feigned ignorance of the "copyright infringement stuff," on the pretext that, as privately expressed by one of YouTube's founders, they can "presumably claim that we don't know who owns the rights to that video." SUF ¶ 17. Internal discussions at YouTube demonstrate that YouTube knew about the infringing material, but chose to wait until it received a "cease and desist," so it would benefit for as long as possible from the presence of that material on its site. *Id.* In short, despite their knowledge and awareness of specific infringing videos and the array of tools at their disposal for identifying and tracking that content when they chose to do so, Defendants decided to play "ostrich" and

continue exploiting such infringing material until they received a takedown notice for a specific video at a specific web address or "URL."

### A. Discontinuing "community flagging" and manual review

Early on, YouTube instituted a "community flagging" feature through which users could flag videos as containing offensive or inappropriate content. These videos were then reviewed by a team of YouTube employees "24 hours a day, 365 days a year," who remove videos that in Defendants' view contain "inappropriate" content, such as pornographic or violent content. SUF ¶ 6. In September 2005, YouTube decided to allow users to flag videos as potentially copyright infringing using the community flagging feature; however, it soon reversed this decision, precisely because it realized the feature created a documentary trail establishing YouTube's actual knowledge of specific videos and would force YouTube to remove, rather than continue to benefit from, the presence of this content on the site. SUF ¶ 7 ("it's actually better if we don't have the link [to the copyright flag]")." That still did not prevent users from pointing out the obvious: that YouTube was offering "millions" of infringing clips for just one of the Class Plaintiffs alone. SUF ¶ 16. YouTube continues to use the community flagging feature to rid its site of content that it considers "inappropriate," such as pornography or other offensive material, but not to identify and remove copyright infringing material from which it financially benefits. SUF ¶¶ 6, 7. Google Video also had a policy to review videos before they were shown on the site for inappropriate material, including infringing material. SUF ¶ 12. Yet Google abandoned the review for copyright infringements around the time it acquired YouTube. SUF ¶ 14.

### B. Selective text-based filtering and search systems

In addition to the "community flagging" feature, YouTube had the ability to proactively identify infringing content on its website through text-based filters prior to a video being

uploaded, or through text-based searches of its video "inventory." SUF ¶ 28, 33. YouTube requires that users who upload videos to the website provide a title, description, and certain descriptive tags for the video, which YouTube uses to organize, promote and monetize the video content on its site. SUF ¶ 33. While YouTube uses this information to enable users to search for infringing videos and to tie subject-specific advertising to those searches (SUF ¶ 40), YouTube refuses to use the same information to weed out infringing material it knows is on the site. YouTube considered implementing an automated keyword filter to identify likely infringing videos before they went live on the site, but abandoned it precisely because it would be effective. SUF ¶ 34. In an instant message exchange between YouTube engineer Matt Rizzo and YouTube executive Maryrose Dunton, Rizzo explained that setting up that tool "isn't hard" and would only "take another day or w/e [weekend]," but Dunton responded, "[I] hate this feature. I hate making it easier for these aholes" – referring to copyright owners – and directed the engineer "to forget about this." She explained, "we're just trying to cover our asses so we don't get sued." *Id.*

Instead, YouTube used its text-based search capabilities to find content only for content owners who agreed to license their content to YouTube, and to promote its own business interests. For example, YouTube agreed to run daily "text-based searches of User-inputted metadata" to further identify content for the major record label EMI. SUF ¶ 28. YouTube also used text-based searches to proactively scan for and remove unlicensed content for certain favored content owners. SUF ¶ 8 ("Other than American idol and SNL, please stop the scans so that we can spend more time on email"); SUF ¶ 6 ("Weezer is on our list of content that we pro-actively scan for"). This use of user-inputted descriptions to identify infringing content is one of the easiest methods of control that YouTube refused to exercise on behalf of the Class Plaintiffs.

16

To justify its failure to use such a system, YouTube now claims that such proactive scanning would not lead to accurate results. SUF ¶ 8. However, Defendants have admitted it is "easy enough" for them to distinguish professional content (which YouTube knows must be licensed) from user-generated home videos. SUF ¶ 35. Indeed, for preferred content partners, YouTube makes no pretense that it is incapable of specifically identifying their content. Defendants ran searches, quickly and easily, to identify content on YouTube when it gave them leverage in licensing negotiations, or to pursue some other business interest. SUF ¶¶ 6, 8, 12, 28.

YouTube also used a text-based identification systems to capitalize and profit from users' searches for infringing content. Until January 2007, YouTube ran advertisements on virtually all web pages of the YouTube website that played videos ("Watch Pages"), even though it knew that 60-80% of its videos were infringing. SUF ¶ 36. After Google acquired YouTube it halted that practice, explaining that "for legal reasons […] all ads/monetization on the watch pages for user generated content will need to come down. This will have a tremendous impact on inventory." SUF ¶ 35; *see also* Viacom SUF ¶¶ 247-251. Defendants then focused their efforts on wringing more profit from advertisements associated with users' searches for videos in YouTube's inventory, knowing that users were primarily searching for premium content. SUF ¶ 16, 37. Defendants decided to display content-specific advertising on the search results page, where a still image and a link to the videos being searched for are displayed along with advertising specifically targeted to the keywords used in the user's search ("Search Page"). SUF ¶ 41.

One way Defendants did this was to take commonly used terms or phrases that users searched for, and associate those terms or phrases with categories of content they named "verticals," so that, for example, an "'nba' query maps to 'Sports/Basketball' vertical." SUF ¶ 40. YouTube also makes use of Adsense on the Search Page, a Google advertising program

17

where "ads are triggered based on search terms." *Id.* So, for example, when a viewer searches for "Premier League" footage, the YouTube Search Page displays a clickable link showing a still shot of the "Premier League"-related videos, along with a variety of sports-related advertisements. SUF ¶ 41. YouTube routinely targets and displays content-specific advertising in conjunction with Search Pages for works owned by Class Plaintiffs. *Id.* Some of the advertisements are targeted directly to the name of the infringing works. For example, a search for "French Open" results in links to videos related to the French Open tennis tournament, and advertisements directly referencing the French Open tennis tournament. SUF ¶ 41. Defendants can also block certain search queries that they consider inappropriate, so that advertisements do not appear next to such queries. SUF ¶ 40.

At the same time Defendants set up this text-based system for tying advertisements to searches, Defendants knew that searches for premium content were the most popular searches on the YouTube website site. SUF ¶¶ 15, 16 ("40% to as high as 70% of search queries may involve premium terms"). In fact, Defendants knew that search page advertisements were the most effective advertisements on their website precisely because so many viewers were drawn to the site in order to search for premium content. SUF ¶ 37. Even worse, Defendants refused to use the same text-based identification systems that they used to tie advertisements to Class Plaintiffs' unauthorized content to identify and remove that content from which they were directly profiting. SUF ¶ 28.

### C. Selective digital fingerprinting

YouTube also chose to use digital fingerprinting technologies to identify videos uploaded to its site, but consistent with its overriding objective to attract viewers and increase traffic, it selectively used those technologies to "monetize" content rather than remove infringements. It

took YouTube until the fall of 2006 to engage the services of Audible Magic, a fingerprinting vendor that offered audio fingerprinting services to Internet businesses years before YouTube even existed. SUF ¶ 29; *see also* Viacom SUF ¶¶ 281-288. However, YouTube only contracted for a package of very limited services from Audible Magic. SUF ¶¶ 29, 30 ("the business side of YouTube wanted an extremely cheap – really, really, really cheap – deal from us. They were willing to cut out all kinds of features to get the price lower.").

Fingerprinting works by taking a digital fingerprint of the uploaded video, and comparing it to a reference database of fingerprints of copyrighted works. SUF ¶ 29; *see also* Viacom SUF ¶¶ 281-288. But YouTube specifically tailored its engagement with Audible Magic so that it only used Audible Magic's reference databases to identify content on behalf of content owners from whom YouTube obtained licenses to exploit their works. SUF ¶ 29; *see also* Viacom SUF ¶¶ 294-298. For example, in August 2006, a YouTube employee reported that Audible Magic, "suggested we check [fingerprints] against their *entire* reference database and then have flags for the Warner content (*ignore* other matches). This is not only a hassle but probably violates DMCA safe harbors." (emphasis added). SUF ¶ 28. YouTube did not want the "hassle" of those "other matches" – matches identifying unlicensed content on its website – in its hands, even though Audible Magic was, in the words of one YouTube executive, optimized for this purpose. SUF ¶ 29. It therefore deliberately chose only to check fingerprints against databases that contained content it had licensed. *See* SUF ¶ 28 (directing Audible Magic to "please for now include only Warner catalog"). Thus, while YouTube scanned every single video that was uploaded to its site for matching purposes, and had access to Audible huge databases of reference files that could identify the content owner of the videos being uploaded, YouTube chose only to identify those videos owned by content owners who had ***already agreed to license their content***

19

to YouTube. SUF ¶¶ 28, 29; *see also* Viacom SUF ¶¶ 293-295. YouTube pursued this course, even though it knew that it was infringing the rights of music publishers. SUF ¶ 23. Even for the content it did identify and monetize through digital fingerprinting, YouTube often chose not to secure all of the necessary rights. Supra, at 9-13. YouTube nonetheless runs advertisements next to videos containing Class Plaintiffs' music content. SUF ¶¶ 36, 41.

YouTube was candid about its practice of offering its fingerprinting system – often referred to as "Claim Your Content" – only to content owners who agreed to license their content to YouTube. SUF ¶ 29 ("Claim Your Content" was "only offered to partners who enter into a revenue deal with [YouTube]."). YouTube offered the technology only to content owners willing to grant a license precisely because YouTube wanted to use the fingerprinting system to tie additional advertising to that content, not to reduce or eliminate infringing content, given its value in drawing viewers. SUF ¶ 28.

Rather than avail itself of existing third party technology, Google's strategy was to develop its own proprietary fingerprinting technology to create a product it could license to third parties, even though that both limited and delayed copyright protection tools for content owners. YouTube thus decided to "remain […] ignorant of the intricacies of industry solutions," so that they could "proceed untainted by others IP." SUF ¶ 30. Although its technology was ostensibly available to others, Defendants made it impossible for parties, such as Class Plaintiff Cherry Lane, to gain access to it. *See* SUF ¶ 29 (Defendants provided a form agreement three months after Cherry Lane's request, and waited another nine months to respond to Cherry Lane's comments on that document.) Even when the system was implemented for certain "content partners," YouTube held back features that would easily and broadly identify infringing material – for example, by making a fingerprint of every video removed through a DMCA takedown

notice – unless the content owner specifically negotiated for it. SUF ¶ 28 ("only give the feature to partners that ask for it (we can toggle the feature off in admin)").

All of this demonstrates not only a willful indifference to, but the *knowing* facilitation of, a vast amount of infringing activity on its site that YouTube was readily able to identify and remove had it chosen to do so. However, because YouTube benefits from increasing rather than reducing its "inventory" of "premium" content, and has exercised its right and ability to control the presence of this infringing content on its site in a way intended to maximize its revenue-generating activities, YouTube's conduct falls far outside of any behavior that could reasonably be argued to fit within §512 of the DMCA.

## ARGUMENT

### I. Defendants Cannot Rely Upon § 512(c) of the Copyright Act

#### A. *Netcom* and the origins of § 512(c)

Section 512 was enacted in 1998 in part as a response to the *Netcom* decision, which held that Netcom, an Internet service provider, could not escape liability for copyright infringing material posted by a user to an Internet "bulletin board" operated by one of its subscribers. *Religious Tech. Ctr. v. Netcom On-Line Commc'n. Servs. Inc.,* 907 F. Supp. 1361, 1381 (N.D. Cal. 1995). Even if Netcom engaged in no volitional acts to cause the infringement in the first instance, the Court ruled, it had a duty to remove the infringing material once it became aware of its existence. *Id.* at 1374. The court denied Netcom's motion for summary judgment, holding that once Netcom had knowledge of the allegedly infringing nature of the material (in that case, by reason of cease and desist letters sent by the plaintiffs), its failure to act and allow the infringing material to remain, and for additional postings to be uploaded, exposed it to liability under well-established common law principles of contributory infringement, based both on its

21

knowledge of the infringing activity, as well as its provision of a service that enabled the infringing postings to continue. *Id.*

In *Netcom*'s wake, Congress enacted §512 of the Copyright Act to address the potential liability of passive Internet service providers by creating a series of so-called "safe harbors" from copyright infringement liability. In defined circumstances, the statute protects against the inadvertent copyright infringement liability of a qualifying Internet intermediary that does not, through its own volitional acts, cause, control or directly benefit from the infringing activity at issue. *See* H.R. Rep. 105-551 (I) at 12 ("[a]s to direct infringement, liability is ruled out for passive, automatic acts engaged in through a technological process initiated by another."). However, Congress provided that once the Internet intermediary has knowledge or awareness of infringing activity, it has a duty to act even if it engaged in no volitional acts to cause the infringements in the first instance. *See* H. R. Rep. 105-551 (II) at 54 ("a service provider wishing to benefit from the limitation on liability under new subsection (c) must 'take down' or disable access to infringing material residing on its system or network in cases where it has actual knowledge or that the criteria for the 'red flag' test are met–even if the copyright owner or its agent does not notify it of a claimed infringement."). Congress also denied "safe harbor" protection to Internet intermediaries that have the ability to control and directly benefit from the infringing activity. 17 U.S.C. § 512(c)(1)(B)

In this way, the DMCA reflects the principles of secondary liability expressed in *Netcom* and other cases. H.R. Rep. 105-551 (I) at 11 (the DMCA "codifies the core of current case law" and "essentially codifies the result in" *Netcom*). It protects innocent, passive intermediaries, but makes a service provider responsible for the infringement once it has knowledge or awareness of infringing activity, or benefits from and has ability to control the infringing activity. *ALS Scan,*

*Inc. v. RemarQ Cmtys, Inc.*, 239 F.3d 619, 625 (4th Cir. 2001) ("[t]he DMCA's protection of an innocent service provider disappears at the moment the service provider loses its innocence... At that point, the Act shifts responsibility to the service provider to disable the infringing matter."). Here, Defendants not only have actual knowledge and awareness of specific infringements, but have remained willfully indifferent to that knowledge, going so far as to ignore specific instances of infringements identified by its systems already in place, or by selectively implementing the very processes and technologies they *did* use, when it benefited them, to derive revenue from these same infringing materials. Defendants cannot benefit from the §512(c) safe harbors here.

**B.    Overview of § 512(c)**

Section 512(c) contains a series of requirements, *each* of which must be ***independently*** satisfied in order for the Internet intermediary to qualify for safe harbor treatment. *See ALS Scan*, 239 F.3d at 623 (to qualify, the defendant "must demonstrate that it has met all" the requirements of Section 512(c)). Class Plaintiffs' motion focuses on three of those requirements.[8]

***First***, as a threshold requirement, the safe harbors in §512(c) only protect a service provider against liability "by reason of the storage at the direction of a user of [the infringing] material... ." 17 U.S.C. §512(c)(1). If the service provider engages in acts with respect to infringing content that go beyond "storage at the direction of a user," it cannot qualify for any protection under this section. Viacom Br. at 60-64. YouTube's business goes far beyond the indifferent, passive transmission and storage of infringing content. In fact, unlike websites that merely store content for users to access later, YouTube edits, selects, promotes, sorts, categorizes

---

[8] Defendants have not claimed that any other safe harbor provision in §512 protects them from liability, nor could they. *See* Defendants' December 28, 2009 letter to the Court, at 1.

and distributes infringing content, and does so across multiple media platforms, including mobile phones and television. SUF ¶ 39. *See, e.g., Arista Records, LLC v. USENET.com, Inc.*, 633 F. Supp. 2d 124, 148-149 (S.D.N.Y. 2009) (where defendants "took active steps, including both automated filtering and human review, to remove access to certain categories of content, and to block certain users" defendants were transformed "from passive providers of a space in which infringing activities happened to occur to active participants in the process of copyright infringement"). YouTube also ties advertisements to viewers' searches for infringing content on its website. SUF ¶ 36. YouTube uses this content, including Class Plaintiffs' works, as its "inventory," which it brands and sells to other content platforms. SUF ¶¶ 35, 38. In the words of Google CEO Eric Schmidt, YouTube is a "global media platform" that provides a "new form of video entertainment." SUF ¶ 3. It sees itself as a competitor of television and other major media, focused on "premium content and the premium viewing experience." SUF ¶ 15. These activities depend on the exploitation and packaging of infringing material, and go well beyond "storage at the direction of a user." Because YouTube fails this threshold requirement, it cannot qualify for any of the safe harbor provisions contained in § 512(c), and Class Plaintiffs join Viacom's motion in this respect. Viacom Br. at 60-64.

*Second*, even those service providers that *do* passively store content at the direction of a user are duty-bound to remove allegedly infringing material if the service provider has "actual knowledge" of the infringement or is "aware of facts or circumstances from which infringing activity is apparent." 17 U.S.C. §512 (c)(1)(A). Once charged with such knowledge or awareness, the service provider must take expeditious action to stop it or it cannot qualify for protection under §512(c). As explained by Congress, "copyright owners are not obligated to give notification of claimed infringement in order to enforce their rights." H.R. Rep. No. 105-

551(II), at 54. Thus, if an internet service provider "becomes aware of a 'red flag' from which infringing activity is apparent," it "lose[s] the limitation of liability if it takes no action." *Id.* at 53. *See also Arista Records LLC*, 633 F. Supp. 2d at 142 ("[t]o show that it is entitled to [DMCA] protection, Defendants must not have been aware of "red flags" indicating infringement on the part of their users."). As shown below, Defendants' knowledge of infringements goes far beyond "red flags" and any claimed lack of knowledge is deliberately self-imposed.

*Third*, if the service provider "receive[s] a financial benefit directly attributable to the infringing activity" and has "the right and ability to control such activity," no safe harbor under §512(c) is available. 17 U.S.C. §512 (c)(1)(B). YouTube uses its right and ability to control the infringing content on the site for myriad purposes to build its audience and generate revenue, but not to ameliorate infringing activities.

We address these latter two requirements in more detail below.[9]

## II. YouTube's Knowledge or Awareness of Infringing Activity Disqualifies It From Any Safe Harbor Under Section 512(c).

The type of knowledge that disqualifies YouTube under §512(c) is not limited to infringements identified by a specific web address or "URL." The plain language of the statute and its legislative history speak not only to actual knowledge of infringements, but to "aware[ness] of facts or circumstances from which infringing activity is apparent." 17 U.S.C. §512(c)(1)(A)(ii); H. R. Rep. 105-551 (II) at 54 ("a service provider wishing to benefit from the limitation on liability under new subsection (c) must 'take down' or disable access to infringing

---

[9] We do not address in this motion the many other requirements in §512(c), all of which Defendants must prove that they satisfy in order to qualify for the protections under the statute. *ALS Scan, Inc.*, 239 F.3d at 623; *see also* H.R. Rep. No 105-551(I) at 26 (1998) (a defendant asserting a Section 512 defense "bears the burden of establishing its entitlement.").

material […] where it has actual knowledge or that the criteria for the 'red flag' test are met—*even if the copyright owner or its agent does not notify it of a claimed infringement*.") (emphasis added). Here, YouTube has both actual knowledge and "red flag" knowledge. YouTube's failure to expeditiously stop the infringing activity once it knew or was aware of such activity disqualifies YouTube from the protections of the DMCA. 17 U.S.C. §512(c)(1)(A)(iii).

YouTube knew about the infringing activity on its website from the outset, and recognized that this infringing activity was a key to its success.[10] *Supra* at 7-14; SUF ¶ 19 ("take down XXX stuff. everything else keep including sports, commercials, news, etc."). Defendants knew full well that the content of Class Plaintiffs, including sports leagues and events, music publishers and creators, creators of news video, and other creators of professionally produced "premium" content that YouTube had no license to exploit, was being infringed constantly and on a widespread basis. *Supra* at 7-14. YouTube's deliberate decisions to leave this infringing material on its site to draw viewers – an operating premise it still relies on to this day – means that it cannot benefit from the safe harbor protection of §512(c). *ALS Scan, Inc*, 239 F. 3d 619, 625 ("The DMCA's protection of an innocent service provider disappears at the moment the service provider loses its innocence.").

This is particularly so because YouTube has and uses tools to identify content for profit-making purposes, but has chosen to ignore the specific information those tools provide about infringing content that appears on its site, or has refused to apply those very same tools to prevent infringement. In far less egregious circumstances, an internet service's deliberate choice to blind itself to specific knowledge of infringing activity has been held to constitute

---

[10] Indeed, as Viacom demonstrates (Viacom Br. at 23-29), Defendants' knowledge and awareness rose to the level of an actual intent to facilitate infringement, which clearly exceeds the level of knowledge or awareness required to defeat the DMCA defense.

"knowledge" of infringement. *See In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 650

(N.D. Ill. 2002), *aff'd,* 334 F.3d 643 (7th Cir. 2003) ("[Aimster's] ostrich-like refusal to discover

the extent to which its system was being used to infringe copyright is merely another piece of

evidence that it was a contributory infringer"). Thus, even if Defendants can somehow claim

they did not have knowledge of "specific" infringements – although, as shown above, they

clearly knew about and could identify the presence of unauthorized content owned by Class

Plaintiffs (supra, at 7-14) – they are charged with knowledge where they turn a "blind eye" to

infringing activity. *Arista Records LLC*, 633 F. Supp. 2d at 154 ("[t]urning a 'blind eye' to

infringement has also been found to be the equivalent of knowledge. Thus, knowledge of

specific infringements is not required to support a finding of contributory infringement")

(citations omitted); *In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003) ("[w]illful

blindness is knowledge, in copyright law as it is in the law generally) (citations omitted). *See

also* H.R. Rep 105-551(II) at 57 (service provider "would not qualify for the safe harbor if it had

turned a blind eye to 'red flags' of obvious infringement").

But Defendants did more than "turn[] a blind eye to 'red flags' of obvious

infringement...". H.R. Rep 105-551(II) at 57. While they have specific information about

unlicensed and infringing content identified to them through their ability to "track" that content

on the YouTube site, Defendants have opted to continue exploiting that content. *Supra* at 9-13.

YouTube also chose to use its identification tools selectively. YouTube decided early on to

terminate "community flagging" and manual review for infringements, and to refuse to deploy

simple text-based or fingerprinting systems to identify and remove infringing content, despite

knowing that the majority of the videos on its website were infringing. *Supra* at 14-20. At the

same time, YouTube uses those very tools to identify content to run targeted advertising against

it, and to manage, promote and remove the content owner by preferred content partners willing to license their content to YouTube. *Supra* at 17. YouTube's decision to offer its more sophisticated tools only to content owners willing to license YouTube to exploit their content, underscores not just Defendants' knowledge and awareness of a vast amount of infringing content, but a willful decision to minimize the documentary trail that would have identified the constant stream of evidence of unremitting infringement on the YouTube site. *Arista Records, LLC*, 633 F. Supp. 2d at 153 ("[d]efendants' failure to exercise their clear ability to filter and limit infringement under such circumstances is strong circumstantial evidence of their intent to foster copyright infringement by their users.").

Defendants should not be able to deploy their systems in a way which directly benefits them through the ability to track and monetize content on the one hand, but on the other hand ignores the plain evidence of infringing activity that those systems would otherwise bring to their attention. *See e.g., Columbia Pictures Indus., Inc. v. Fung*, No. CV 06-5578, 2009 U.S. Dist. LEXIS 122661, at *61 n.27 (C.D. Cal. Dec. 21, 2009) (evidence of liability and unlawful intent where "Defendants have profited from their users' infringement, and Defendants undisputedly have the ability to block users from Defendants' websites."). Section 512(c) cannot be read "to endorse business practices that would encourage content providers to turn a blind eye to the source of massive copyright infringement while continuing to knowingly profit." *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1177 (C.D. Cal. 2002); *see also, In re Aimster Litig.*, 252 F. Supp. 2d at 651 ("[i]t is also disingenuous of Defendants to suggest that they lack the requisite level of knowledge when their putative ignorance is due entirely to an encryption scheme that they themselves put in place.")

Even when Defendants received a statutory takedown notice from a content owner identifying specific infringing videos on the YouTube website, Defendants' policy was to take down only the videos at the specific web address identified in the takedown notice, and to apply a "hash mark" to those videos – a device that Defendants knew was inadequate to prevent the reappearance of even the slightest variation of the same content on its site. SUF ¶ 17. The takedown notices provide all the information Defendants need to identify infringing content and its owner: an identification of the copyrighted works at issue, the material claimed to be infringing, as well as the bona fides of the copyright claimant, set forth under penalty of perjury, along with contact information, including the claimant's email address. *See* 17 U.S.C. §512(c)(3), describing the elements of a statutory notification. The infringing works identified in these notices submitted by Class Plaintiffs were precisely identified, and Defendants had no hesitation about copying and accessing those infringements for a variety of revenue-generating purposes when it suited them. SUF ¶ 18. Additionally, pursuant to the plain meaning of 17 U.S.C. §512(c)(3)(A)(ii), "the notification requirements are relaxed to the extent that, with respect to multiple works, not all must be identified – only a 'representative' list." *ALS Scan,* 239 F.3d at 625. Yet, Defendants did nothing meaningful to prevent reposts of the specific infringing material that was identified to them by Class Plaintiffs. SUF ¶ 17.[11]

Once a copyright holder has notified a service provider of the name of an infringed work, the service provider has an obligation to "search [its] index and block all files which contain that

---

[11] YouTube was already scanning every video uploaded to its site, and had the ability to easily run them against a fingerprint of the video identified in the takedown notice, as it did to block "reposts" for those content partners who had licensed their copyrighted works to YouTube. SUF ¶¶ 28, 29; *see also* Viacom SUF ¶¶ 293-295. Nor did Defendants run text-based filters for the title of the copyrighted work, or other metadata identifying infringements, as they did for preferred content partners, based on information supplied in takedown notices. SUF ¶ 34.

particular noticed work." *A&M Records v. Napster, Inc.*, 284 F.3d 1091, 1096 (9th Cir. 2002).

Once on notice, the service provider is equally obliged to "patrol its system and preclude access

to potentially infringing files listed in its search index." *A&M Records v. Napster, Inc.*, 239 F.3d

1004, 1027 (9th Cir. 2001). This obligation may include the use of filtering technology or other

mechanisms capable of identifying infringed works, and is not limited to the requirements

imposed under the DMCA, but reflects the principles of contributory and vicarious copyright

infringement on which the DMCA is based. *See A&M Records*, 284 F.3d at 1097 (Napster must

"affirmatively use its ability to patrol its system..." which "reflects the legal principles of

contributory and vicarious copyright infringement that we previously articulated"); *see also,*

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007) ("Google could be

held contributorily liable if it had knowledge that infringing Perfect 10 images were available

using its search engine, could take simple measures to prevent further damage to Perfect 10's

copyrighted works, and failed to take such steps"). That Defendants chose to take these steps

using "industry standard" tools for preferred content partners not only underscores Defendants'

knowledge of, but also its ability to control, the infringing activity on the YouTube site.

III.    **Defendants' Right And Ability To Control Infringing Activity While At The Same Time Profiting From That Activity Disqualifies Them From Any Safe Harbor Under Section 512(c).**

Defendants' right and ability to control the content appearing on the YouTube site is

pervasive and is central to their business of "monetizing" that content and disqualifies

Defendants from the §512(c) safe harbor, because Defendants receive a financial benefit directly

attributable to the infringing activity which they have the right and ability to control. 17 U.S.C.

§512(c)(1)(B). This is based on traditional, common law standards for vicarious liability. H.R.

Rep. 105-551(I) at 25-26 ("The financial benefit standard in subparagraph (B) is intended to

codify and clarify the direct financial benefit element of vicarious liability" and "[t]he 'right and ability to control' language in Subparagraph (B) codifies the second element of vicarious liability."). *See* Viacom Br. at 55-56.

A.     **Defendants Have the Right and Ability to Control the Infringing Activities**

Defendants exhibit their right and ability to control infringing activity on their website in a multitude of ways. For example, YouTube and Google made deliberate decisions not to employ "community flagging" and manual video review systems, even though they knew such systems could identify infringing content either before or after it was uploaded to the YouTube website, and even though they continue to use such systems to screen their video inventory and remove other "inappropriate" content. The descriptive metadata associated with the videos uploaded to YouTube also provide an efficient way for YouTube to identify and remove content through searches, something Defendants do for preferred content partners. *Supra* at 16-18. Prior to acquiring YouTube, Google employed automated keyword filtering to remove likely infringing content before it was exploited on the website. YouTube considered implementing such a system, but decided instead to keep the infringing content on its site. *Supra* at 16. Defendants also offered text-based filtering to identify infringing content to preferred content partners willing to strike a licensing deal with YouTube. *Supra* at 16-18. The video metadata also formed the basis for search queries, which Defendants used to tie infringing videos to targeted, subject-specific advertising on YouTube's Search Pages, a practice which not only amply demonstrates YouTube's ability to use such key word descriptors to identify and manage content on its site, but evidences an obvious financial benefit directly from infringing material. SUF ¶¶ 36, 40. Defendants also selectively deployed their fingerprinting technology, choosing

31

to identify content owned by those with whom it secured licenses, but not those unwilling to license or too small for YouTube to be concerned about. *Supra* at 19-21.

Defendants' conscious decision to deploy the processes and technologies at their disposal in a limited fashion or not at all is itself a choice that plainly shows both their right as well as their ability to control – when they choose to – the infringing content which is key to YouTube's success. *See MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 939 (2005) ("While the Ninth Circuit treated the defendants' failure to develop such [filtering] tools as irrelevant because they lacked an independent duty to monitor their users' activity, we think this evidence underscores Grokster's and StreamCast's intentional facilitation of their users' infringement."); *Cybernet Ventures*, 213 F. Supp. 2d at 1177 -1178 (DMCA does not "endorse business practices that would encourage content providers to turn a blind eye to the source of massive copyright infringement while continuing to knowingly profit").

In *Cybernet*, the Court found that the defendant Cybernet, which provided age verification services for adult entertainment websites, had the right and ability to control as contemplated by the DMCA because it "prescreens sites, gives them extensive advice, [and] prohibits the proliferation of identical sites… ." *Cybernet Ventures*, 213 F. Supp. 2d at 1181-82. YouTube does all of these things and more. YouTube screens videos "24 hours a day, 365 days a year" to remove inventory that in its discretion it deems "inappropriate." SUF ¶ 6. YouTube also uses fingerprinting technology to ensure that when users search YouTube's video inventory, the search results remove duplicate videos. SUF ¶ 39. YouTube also gives extensive advice to content owners whose content it wishes to promote on its website, including advice on how comply with copyright laws. SUF ¶¶ 24, 39 ("Copyright 101 for YouTube Partners"). YouTube actively promotes some of its video inventory to its audience. SUF ¶ 39. And YouTube controls

the distribution of its video inventory to multiple media platforms like mobile phones and television. *Id.* That constitutes a disqualifying "right and ability to control" even under the most stringent reading of the DMCA. *Compare UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099 (C.D. Cal. 2009), a case on which Defendants place great weight, but one where "[n]one of those factors" mentioned in *Cybernet* – pre-screening of content, providing advice to users, and removing identical content – were established. *Id.* at 1114.[12]

Likewise, Defendants decision to utilize digital fingerprinting to monetize content, but to ignore the "matches" that identified infringing content, is a choice that not only amounts to willful copyright infringement, but evidences a profound ability to identify, manipulate and control infringing content on their system, when it is to their benefit. *In re Aimster Copyright Litig.*, 252 F. Supp. 2d at 655 ("Defendants argue that Aimster's architecture prevents them from discovering the 'physical internet address' of their users. [...] Yet, there is nothing about the right and ability to control which requires Defendants to have such precise identifying knowledge."). Although specific knowledge of the infringing content is not required to establish Defendants' right and ability to control that content, the systems Defendants used to maximize traffic and revenue provided them with such specific knowledge, which they chose to ignore. *See* pp. 10-13, *supra*. This goes well beyond the DMCA requirement that Defendants not have the right and ability to control the infringing activities in order to benefit from the 512(c) safe harbor.

### B. Defendants Receive a Direct Financial Benefit From the Infringing Activity on the YouTube Website

YouTube has previously argued that the "financial benefit" standard in § 512(c) is

---

[12] *UMG v. Veoh* is different than this case in other ways. See Viacom Br. at 52, 60.

different than that required by the common law. *See* Opening Brief of Defendant YouTube, Inc. in *Robert Tur v. YouTube, Inc.*, Appeal No. 07-56683 (9th Cir.), at 41-46. That argument has already been rejected by the Ninth Circuit Court of Appeals in *Perfect 10, Inc. v. CCBill, LLC*, which held that for purposes of the DMCA, "'direct financial benefit' should be interpreted consistent with the similarly-worded common law standard for vicarious copyright liability." 488 F.3d 1102, 1117 (9th Cir. 2007). Courts have repeatedly held that the requisite "[f]inancial benefit exists where the availability of infringing material acts as a draw for customers," (*A&M Records*, 239 F.3d at 1023 (9th Cir. 2001) (quotation marks omitted)), and that "[t]here is no requirement that the draw be 'substantial'." *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (citation omitted). *See also In re Aimster Copyright Litig.*, 252 F. Supp. 2d at 655 (financial benefit established where "the existence of infringing activities act as a draw for potential customers"); *see also* Nimmer on Copyright, §12B.04[A][2].

Defendants' own internal documents admit to the value of the infringing material at issue here: Google's purchase of YouTube for over $1.65 billion was based on an analysis that 60% of YouTube's video streams were "premium" copyrighted content, 90% of which was unlicensed. *Supra* at 5. The "draw" of such material in attracting "eyeballs" is more than sufficient to establish that Defendants enjoy a direct financial benefit from the presence of Class Plaintiffs' material on their site for the purposes of the DMCA. SUF ¶ 15 ("our users do want to watch professional content, but we [...] haven't yet licensed the content that they're looking for" ). *See A&M Records*, 239 F.3d 1004 at 1023 (9th Cir. 2001) and *Ellison*, 357 F.3d at 1079.

In addition to relying on infringing material to build its audience, Defendants profit directly from selling advertisements to viewers who are watching or seeking out infringing material. Until January 2007, YouTube served advertisements on watch pages for all videos,

including the 60-80% of its inventory it knew was infringing. *Supra* at 17-18. After January

2007, YouTube served advertisements next to users' searches, *despite knowing that most users*

*were* searching for unlicensed premium content. *Id.* YouTube also targets advertisements to the

specific keywords being searched for, so that it can profit from specific searches for Class

Plaintiff content – including the names of Class Plaintiffs and their specific works – thereby

deriving additional, and very direct financial benefits from infringing content well within

Defendants' control. *Supra* at 17-18.

Defendants' success in building a business of unprecedented size and reach in a matter of

eighteen months depended on the value of content that is owned by Class Plaintiffs. In the face

of this record, Defendants cannot deny that they have achieved a direct financial benefit from the

infringing activities at issue.

## CONCLUSION

Accordingly, Class Plaintiffs respectfully request that their motion for partial summary

judgment be granted.

Dated: New York, New York
       March 5, 2010

Respectfully submitted,

*Louis M. Solomon*
Louis M. Solomon
William M. Hart
Hal S. Shaftel
Noah Siskind Gitterman
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036
Telephone: (212) 969-3000
Email: lsolomon@proskauer.com
*-and-*
Max W. Berger

John C. Browne
BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Email: mwb@blbglaw.com
*Attorneys For Lead And Named Plaintiffs And*
*Interim Class Counsel For The Prospective*
*Class*

Daniel Girard
Aaron Sheanin
Christina Connolly Sharp
GIRARD GIBBS LLP
601 California Street, 14th Floor
San Francisco, CA 94108
*-and-*
Gerald E. Martin
Laurel Johnston
BARRETT JOHNSTON & PARSLEY
217 Second Avenue North
Nashville, TN 37201
*-and-*
Kevin Doherty
BURR & FORMAN LLP
700 Two American Center
3102 West End Avenue
Nashville, TN 37203
*Attorneys for Cal IV Entertainment LLC*

David S. Stellings
Annika K. Martin
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10017-2024
Tel. (212) 355-9500
Fax. (212) 355-9592
*-and-*
Jacqueline Charlesworth
James E. Hough
MORRISON & FOERSTER
1290 Avenue of the Americas
New York, New York 10104

Phone (212) 468-8158
Facsimile (212) 468-7900
*Attorneys for the National Music Publishers'*
*Association, Rodgers & Hammerstein*
*Organization, Stage Three Music (US), Inc.,*
*Edward B. Marks Music Company, Freddy*
*Bienstock Music Company d/b/a Bienstock*
*Publishing Company, and Alley Music*
*Corporation*

Christopher Lovell
Christopher M. McGrath
LOVELL STEWART HALEBIAN LLP
61 Broadway, Suite 501
New York, New York 10110
Telephone: (212) 608-1900
Facsimile: (212) 719-4677
*-and-*
Jeffrey L. Graubart
LAW OFFICES OF JEFFREY L.
GRAUBART
350 West Colorado Boulevard, Suite 200
Pasadena, California 91105-1855
Telephone: (626) 304-2800
Facsimile: (626) 304-2807
*-and-*
Steve D'Onofrio
5335 Wisconsin Avenue, N.W. Suite 950
Washington, D.C. 20015
Telephone: (202) 686-2872
Facsimile: (202) 686-2875
*Attorneys for The Music Force Media Group*
*LLC, The Music Force LLC, and Sin-Drome*
*Records, Ltd.*