```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3     ------------------------------------X
        VIACOM INTERNATIONAL, INC., COMEDY
 4      PARTNERS, COUNTY MUSIC
        TELEVISION, INC., PARAMOUNT
 5      PICTURES CORPORATION, and BLACK
        ENTERTAINMENT TELEVISION, LLC,
 6
                    Plaintiffs,
 7              vs.                    No. 07-CV-2203
 8      YOUTUBE, INC., YOUTUBE, LLC,
        and GOOGLE, INC.,
 9
                    Defendants.
10     ------------------------------------X
        THE FOOTBALL ASSOCIATION PREMIER
11      LEAGUE LIMITED, BOURNE CO., et al.,
        on behalf of themselves and
12      all others similarly situated,
13                  Plaintiffs,
                vs.                    No. 07-CV-3582
14
        YOUTUBE, INC., YOUTUBE, LLC,
15      and GOOGLE, INC.,
16      Defendants.
       ------------------------------------X
17
                      HIGHLY CONFIDENTIAL
18        VIDEOTAPED DEPOSITION OF ZAHAVAH LEVINE
                  SAN FRANCISCO, CALIFORNIA
19              THURSDAY, APRIL 2, 2009
20     BY:  KATHERINE E. LAUSTER, CSR 1894, RPR, CRR, CLR
21     Job No. 16721
22
23
24
25
```

Figueira Decl. Tab 87

```
 1                        LEVINE                      87-0002
 2    BY MR. HART:
 3        Q.   Right.  But RealNetworks had a copy on its
 4    server; correct?
 5             MR. KRAMER:  Hang on a sec.  Calls for
 6    speculation.
 7             You can answer.
 8             THE WITNESS:  I believe so.
 9    BY MR. HART:
10        Q.   Okay.  And when you say in your resume,
11    Exhibit 1, that you.
12             Managed all aspects of domestic and
13             international digital music licensing,
14    who was licensing what from whom?
15        A.   RealNetworks was licensing sound recording
16    rights from record labels.
17        Q.   Uh-huh.
18        A.   And -- primarily --
19        Q.   Okay.
20        A.   -- and music publishing rights from music
21    publishers.
22        Q.   Okay.
23        A.   And music videos from record labels.
24        Q.   Okay.  And what about music publishing
25    with respect to music videos?  Who was that licensed
```

```
1                        LEVINE                         87-0003
2    from at Rhapsody?
3         A.   It was licensed through the record labels.
4         Q.   I see.  And for music publishing rights,
5    did you deal with individual music publishers or
6    with any sort of centralized entity to secure those
7    licenses?
8              MR. KRAMER:  Objection.  The question is
9    vague.  With respect to music videos or otherwise?
10   BY MR. HART:
11        Q.   In any respect.
12        A.   We dealt with the Harry Fox Agency --
13        Q.   Okay.
14        A.   -- to get a -- a license for on demand
15   streaming of the repertoire that it represented.
16        Q.   Okay.  And do you know offhand what
17   proportion of the universe relevant to Rhapsody
18   Harry Fox represented in terms of the repertoire?
19             MR. KRAMER:  Just a second.  Is -- is that
20   information -- it's public?  It's RealNetworks'
21   information that's public?
22             MR. HART:  I'm actually not asking about
23   RealNetworks.  I'm asking about Harry Fox.
24             MR. KRAMER:  Well, you said that's
25   relevant to --
```

```
 1                      LEVINE                    87-0004
 2          MR. HART:  Well, David -- I expect David
 3   to.  That's actually his job.
 4   BY MR. HART:
 5       Q.   So please.
 6       A.   I think what I said was that the amount
 7   of -- the amount of rep- -- the amount of use of
 8   their repertoire that they will -- they were able to
 9   identify --
10       Q.   Uh-huh.
11       A.   -- was less than what they purported to
12   represent.  So there was uncertainty over how much
13   they actually represented.
14       Q.   Okay. And when you say "identify," what
15   do you mean by that?
16       A.   So the -- the operational way that that --
17   the way that that license operated was we would send
18   to Harry Fox a list of the sound recordings that we
19   had licensed from record labels.
20       Q.   Uh-huh.
21       A.   And they would send us back a "yes" or
22   "no," "cleared" or "not cleared," based on their
23   information.
24       Q.   Okay.
25       A.   And the -- the number of yeses that we
```