**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| VIACOM INT'L INC., ET AL., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | ECF Case |
| v. | ) | Civil No. 07-CV-2103 (LLS) |
| | ) | |
| YOUTUBE, INC., ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| THE FOOTBALL ASSOCIATION | ) | |
| PREMIER LEAGUE LIMITED, ET AL., | ) | |
| on behalf of themselves and all others | ) | |
| similarly situated, | ) | |
| | ) | ECF Case |
| Plaintiffs, | ) | Civil No. 07-CV-3582 (LLS) |
| v. | ) | |
| | ) | |
| YOUTUBE, INC., ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

David H. Kramer                  Andrew H. Schapiro
Maura L. Rees                    A. John P. Mancini
Michael H. Rubin                 Matthew D. Ingber
Bart E. Volkmer                  Brian M. Willen
WILSON SONSINI GOODRICH & ROSATI PC   MAYER BROWN LLP
650 Page Mill Road               1675 Broadway
Palo Alto, California 94304      New York, New York 10019
(650) 493-9300                   (212) 506-2500

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................... 1

FACTUAL AND LEGAL BACKGROUND ................................................ 4

    A.    YouTube ............................................................................... 4

           1.    How YouTube Works .............................................. 4

           2.    The Quantity And Diversity Of Videos Available On YouTube ........ 5

           3.    YouTube's Extensive Efforts To Help Copyright Owners ................. 9

    B.    Viacom ............................................................................... 11

    C.    The Putative Class Plaintiffs .......................................... 13

    D.    The Clips In Suit ............................................................. 14

    E.    The DMCA Safe-Harbor Provisions ............................... 16

SUMMARY OF ARGUMENT ................................................................. 19

ARGUMENT ......................................................................................... 21

I.    THE DMCA SAFE HARBOR PROTECTS YOUTUBE AGAINST LIABILITY FOR ALL OF PLAINTIFFS' CLAIMS .......................................................... 21

    A.    YouTube Meets The Threshold Qualifications For Safe-Harbor Protection ..................................................................... 21

           1.    YouTube Is A "Service Provider" ......................... 22

           2.    YouTube Has Registered A Designated DMCA Agent .................. 22

           3.    YouTube Has Adopted And Implemented An Appropriate Repeat-Infringer Policy ......................... 23

                a.    YouTube Has Adopted An Appropriate Repeat-Infringer Policy ............................. 23

                b.    YouTube Informs Its Users Of Its Repeat-Infringer Policy ............................. 24

                c.    YouTube Implements Its Policy In A Reasonable Manner ..... 24

           4.    YouTube Accommodates Standard Technical Measures ................. 26

    B.    Plaintiffs' Claims Involve "Storage At The Direction Of A User" ........... 27

           1.    YouTube Stores And Streams Videos Through Automated Processes Initiated By Users. ......................... 27

           2.    Section 512(c) Protects Services That Have Automated Processes To Facilitate User Access To Stored Material ............... 28

C.   YouTube Did Not Have Knowledge Of The Alleged Infringements And Responded Expeditiously To Takedown Notices For The Clips In Suit. .................................................................................... 30

  1.   Plaintiffs Have The Burden Of Showing That YouTube Had Knowledge Of The *Specific* Infringing Activity That They Allege .............................................................................. 31

  2.   YouTube Did Not Have Actual Knowledge Of The Alleged Infringements ......................................................................... 32

  3.   There Are No Facts Or Circumstances Known To YouTube From Which The Alleged Infringements Were "Apparent"............. 33

    a.   There Is No Evidence That YouTube Was Actually Aware Of Any Supposed "Red Flags" ...................................... 33

    b.   Plaintiffs' Clips In Suit Cannot Be "Red Flags" ...................... 35

      (i)   It Would Not Have Been Apparent What Many Of The Clips In Suit Even Were, Much Less That They Were Infringing................................................. 37

      (ii)  Viacom's Extensive And Varied Use Of YouTube For Marketing Negates Any Argument That The Appearance Of Viacom Content Indicates "Obvious" Infringing Activity .......................................... 39

      (iii) Viacom's "Leave Up" Practices Further Undermine Any Argument That The Presence Of Its Material Is A "Red Flag" ............................................ 45

      (iv)  The Array Of Authorized Uses Of And Complex Ownership Issues Surrounding Plaintiffs' Works Defeats Any Claim That YouTube Had Disqualifying Knowledge ................................ 49

      (v)   Fair Use And *De Minimis* Use Further Negate Plaintiffs' Ability To Show Knowledge............................ 53

  4.   YouTube Responded Expeditiously Upon Receiving Notice Of The Claimed Infringements.............................................. 55

D.   YouTube Lacks The Ability To Control The Alleged Infringing Activity. ...................................................................... 58

  1.   YouTube's Control Over Its System Does Not Give It Control Over Infringing Activity ................................................ 58

2. Legal And Practical Considerations Defeat Any Claim That YouTube Could Control The Infringing Activity By More Actively Policing Its Service .............................................................. 61

    a. The Control Test Does Not Require Service Providers To Monitor Their Services For Potential Infringement ............... 61

    b. Plaintiffs' Own Inability To Distinguish Authorized From Unauthorized Material On YouTube Shows That YouTube Lacks Practical Control Over The Alleged Infringing Activity .................................................................. 63

        (i) Plaintiffs Have Had Persistent Difficulties Determining Which Of Their Materials Are Authorized To Be On YouTube........................................ 64

        (ii) Even In This Litigation, Viacom Has Been Unable To Reliably Distinguish Authorized From Unauthorized Clips........................................................... 66

        (iii) The Class Plaintiffs Similarly Have Had Difficulties Distinguishing Authorized From Unauthorized Content. ................................................... 68

3. Any Infringing Activity Occurs Despite YouTube's Extraordinary Efforts To Combat Infringement. ........................... 70

E. YouTube Did Not Receive A Financial Benefit Directly Attributable To The Alleged Infringing Activity..................................... 71

    1. The DMCA Protects Legitimate Services That Derive Their Value From Sources Other Than Infringement.............................. 72

    2. YouTube Has A Legitimate Business Model ................................... 74

        a. YouTube Has An Overwhelming Array Of Legitimate Uses That Provide Significant Value To YouTube And Its Users.................................................................................. 74

        b. YouTube Earns Revenue From Advertising, Not Infringement................................................................ 75

        c. A Service Provider That Accepts User-Submitted Content Does Not Derive A Disabling Financial Benefit By Running Ads On Its Site.................................................... 77

II. YOUTUBE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' INDUCEMENT CLAIMS .................................................................................. 78

   A. As A DMCA-Compliant Service Provider, YouTube Is Protected Against Damages For All Forms Of Alleged Infringement. .................... 79

   B. Even Without Regard To The DMCA, Plaintiffs' Inducement Claims Fail As A Matter Of Law ............................................................. 80

      1. *Grokster* Requires A Showing That The Service Provider Specifically Intended To Encourage Third-Party Infringements .................................................................................... 80

      2. YouTube Is Not An Inducer of Infringement .................................... 84

         a. YouTube Never Encouraged Third Parties To Infringe.......... 85

         b. YouTube Is Filled With Non-Infringing Materials ................ 89

         c. YouTube Protects The Interests Of Copyright Holders.......... 91

         d. YouTube's Revenue Model Is Legitimate ............................... 96

         e. Plaintiffs' Own Actions Demonstrate YouTube's Legitimacy ............................................................................... 97

CONCLUSION ...................................................................................................... 100

## CASES

*Abilene Music, Inc. v. Sony Music Entm't, Inc.,*
   320 F. Supp. 2d 84 (S.D.N.Y. 2003) ..................................................... 53

*Arista Records LLC v. Usenet.com, Inc.,*
   633 F. Supp. 2d 124 (S.D.N.Y. 2009) ................................................... 82

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
   448 F.3d 605 (2d Cir. 2006)................................................................ 53

*Citizens United v. Federal Election Com'n,*
   130 S. Ct. 876 (2010) ......................................................................... 6

*Columbia Pictures Indus., Inc. v. Fung,*
   No. 06-CV-5578 (SVW), 2009 U.S. Dist. LEXIS 122661 (C.D. Cal. Dec. 21,
   2009)..................................................................................................... 83

*Corbis Corp. v. Amazon.com, Inc.,*
   351 F. Supp. 2d 1090 (W.D. Wash. 2004) ......................................*passim*

*Costar Group, Inc. v. Loopnet, Inc.,*
   164 F. Supp. 2d 688 (D. Md. 2001),
   *aff'd,* 373 F.3d 544 (4th Cir. 2004) ............................................... 28, 72

*Ellison v. Robertson,*
   357 F.3d 1072 (9th Cir. 2004) ........................................................ 16, 23

*Faulkner v. Nat'l Geographic Society,*
   211 F. Supp. 2d 450 (S.D.N.Y. 2002) ................................................. 52

*Hendrickson v. eBay, Inc.,*
   165 F. Supp. 2d 1082 (C.D. Cal. 2001)................................. 17, 22, 31, 59

*Io Group, Inc. v. Veoh Network, Inc.,*
   586 F. Supp. 2d 1132 (N.D. Cal. 2008) ..........................................*passim*

*Jasper v. Sony Music Entm't, Inc.,*
   378 F. Supp. 2d 334 (S.D.N.Y. 2005) ................................................. 52

*KBL Corp. v. Arnouts,*
   646 F. Supp. 2d 335 (S.D.N.Y. 2009) ................................................. 79

*Leiboviftz v. Paramount Pictures Corp.,*
   948 F. Supp. 1214 (S.D.N.Y. 1996) ................................................... 53

*Maxtone-Graham v. Burtchaell,*
    803 F.2d 1253 (2d Cir. 1986) .................................................................. 53

*MGM Studios, Inc. v. Grokster, Ltd.,*
    545 U.S. 913 (2005) ...................................................................*passim*

*MGM Studios, Inc. v. Grokster, Ltd.,*
    454 F. Supp. 2d 966 (C.D. Cal. 2006) ("*Grokster II*") ................................ 81, 85, 89

*Monotype Imaging, Inc. v. Bitstream, Inc.,*
    376 F. Supp. 2d 877 (N.D. Ill. 2005) ....................................................... 84

*On Davis v. Gap, Inc.,*
    246 F.3d 152 (2d Cir. 2001) .................................................................. 53

*Perfect 10, Inc. v. Amazon,*
    CV-05-4753, slip op. (C.D. Cal. Nov. 4, 2008) ......................................... 31

*Perfect 10, Inc. v. CCBill, LLC,*
    340 F. Supp. 2d 1077 (C.D. Cal. 2004) ............................................... 23, 73

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n.,*
    494 F.3d 788 (9th Cir. 2007) ................................................................ 83

*Perfect10, Inc. v. Amazon.com, Inc.,*
    508 F.3d 1146 (9th Cir. 2007) ........................................................... 16, 19

*Perfect10, Inc. v. CCBill LLC,*
    488 F.3d 1102 (9th Cir. 2007) ...........................................................*passim*

*Powerex Corp. v. Reliant Energy Servs., Inc.,*
    551 U.S. 224 (2007) ............................................................................ 36

*Shapiro, Bernstein & Co. v. H. L. Green Co.,*
    316 F.2d 304 (2d Cir. 1963) .................................................................. 72

*UMG Recordings, Inc. v. Veoh Networks, Inc.,*
    620 F. Supp. 2d 1081 (C.D. Cal. 2008) ("*UMG I*") .............................. 3, 28, 29, 30

*UMG Recordings, Inc v. Veoh Networks, Inc.,*
    665 F. Supp. 2d 1099 (C.D. Cal. 2009) ("*UMG II*") ..................................*passim*

TABLE OF AUTHORITIES
(continued)

**STATUTES**

Fed. R. Civ. P. 56(c) ................................................................... 21

17 U.S.C. § 107.............................................................................. 53

17 U.S.C. § 512 *et seq.*...............................................................*passim*

**OTHER AUTHORITIES**

3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright
§ 12B.04[A][2][b] (2008) ......................................................... 73

H.R. Rep. 105-551 (July 22, 1998).......................................*passim*

S. Rep. 105-190 (May 11, 1998)...........................................*passim*

Defendants YouTube, Inc., YouTube, LLC, and Google Inc. ("YouTube") submit this memorandum of law in support of YouTube's motion for summary judgment. YouTube seeks a ruling: (1) that it is protected by the safe-harbor provisions of the Digital Millennium Copyright Act, 17 U.S.C. § 512 *et seq.* ("DMCA"), for all of plaintiffs' direct and secondary copyright infringement claims; and (2) granting YouTube summary judgment on plaintiffs' claims for contributory infringement based on the theory of inducement.

## INTRODUCTION

Congress laid the legal foundation for the modern Internet era when it enacted the DMCA in 1998, protecting online services from liability for copyright infringement claims based on their users' actions. Congress recognized that robust online communications would be chilled if service providers faced unlimited damages claims based on material that their users posted or transmitted. The DMCA thus created a set of "safe harbors" immunizing service providers who respond properly to copyright holders' notifications of alleged infringement. That policy choice enabled the evolution of a new generation of websites devoted to user-generated content, letting individuals the world over express themselves and form new communities through blog posts, social networks, photography, and video.

YouTube, a free online platform for users to post their videos or watch videos posted by others, has flourished because of the DMCA. Since its founding in 2005, YouTube has had a profound impact on culture, politics, and society in this country and around the world. YouTube has afforded political candidates and elected officials a new way to communicate with the public; enabled first-hand reporting

from war zones and from inside repressive regimes; allowed unknown performers, filmmakers, and artists to rise to worldwide fame; inspired laughter at the antics of dancing babies and skateboarding dogs; let students of all ages audit classes at leading universities; and given creators of all sorts a powerful new way to promote their work to a global audience.

Plaintiffs' lawsuits seek to undo all of that. Plaintiffs demand billions of dollars from YouTube because a tiny fraction (less than *two one-hundredths* of a percent) of the videos that users have uploaded to the service allegedly infringe their copyrights. While plaintiffs now insist that YouTube is liable because it should have recognized that their content was not authorized, plaintiffs' own actions defeat that claim. Plaintiffs (along with their agents and licensees) have overtly and covertly uploaded to YouTube a vast array of their own video clips for marketing purposes. Plaintiffs have also deliberately allowed clips uploaded by others to remain on YouTube for the same reason, when they could have removed those clips with the click of a button. Remarkably, some of the very clips that plaintiffs previously authorized to be on YouTube are among those that plaintiffs have sued YouTube for hosting. And, while plaintiffs allege in their legal filings that YouTube is some kind of "pirate" site, behind the scenes Viacom thought so highly of YouTube that it tried, unsuccessfully, to buy it.

Plaintiffs' legal claims are contrary not only to their own actions, but also to established law. Section 512(c) of the DMCA sets out the safe harbor applicable to Internet sites hosting user-submitted content. YouTube, which has pioneered

efforts to protect copyright while maintaining an open environment for creative, political, and personal expression, is exactly the kind of service that Section 512(c) was enacted to protect. At the heart of the safe harbor is a notice-and-takedown procedure that requires cooperation between content owners and service providers. To claim the safe harbor, a service provider like YouTube must remove purportedly infringing materials when notified of their existence and location on its service. This regime gives copyright holders a quick and efficient way to stop any misuse of their content, while protecting service providers against the fear of crushing liability that could stifle technological innovation and free speech. In this way, the DMCA balances the interests of copyright holders with those of online services and the First Amendment rights of their users.

Summary judgment is warranted because the material facts bearing on YouTube's safe-harbor eligibility are not in dispute and the law is clear. In particular, a trio of recent decisions has held on summary judgment that a video-hosting service operating almost exactly like YouTube qualifies for the protections of Section 512(c): *Io Group, Inc. v. Veoh Network, Inc.,* 586 F. Supp. 2d 1132 (N.D. Cal. 2008); *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 620 F. Supp. 2d 1081 (C.D. Cal. 2008) ("*UMG I*"); *UMG Recordings, Inc v. Veoh Networks, Inc.,* 665 F. Supp. 2d 1099 (C.D. Cal. 2009) ("*UMG II*"). Those well reasoned decisions apply squarely to this case. YouTube is entitled to safe-harbor protection against all of plaintiffs' direct and secondary infringement claims, including their claims for "inducement" liability. YouTube is also independently entitled to summary judgment on the

plaintiffs' inducement claims because the undisputed evidence establishes that YouTube is worlds away from the type of illegitimate site deliberately designed to encourage infringement that the Supreme Court described in *MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005). To the contrary, YouTube is a quintessential forum for free expression and artistic creation.

## FACTUAL AND LEGAL BACKGROUND

### A. YouTube

Chad Hurley, Steve Chen, and Jawed Karim, friends and former co-workers at the online-payment company PayPal, conceived of the idea for YouTube in February 2005. On April 23, 2005, the founders launched the "beta" (or testing) version of the website. Decl. of Chad Hurley in Support of Defs.' Motion for Summary Judgment ("Hurley Decl.") ¶ 4. On December 14, 2005, YouTube moved out of the "beta" stage of development and officially launched its website. *Id.* ¶ 23. YouTube was named Time Magazine's "Invention of the Year" for 2006. Decl. of Andrew H. Schapiro in Support of Defs.' Motion for Summary Judgment ("Schapiro Decl.") Ex. 1.[1] In November of that year, Google acquired YouTube. YouTube has continued to innovate and grow, but its basic operations have remained the same: users upload short videos to YouTube, which stores those videos so that they can be seen by viewers around the world.

### 1. How YouTube works

The videos available for viewing on YouTube—including those at issue in this case—are uploaded by YouTube's millions of users, who range from families posting

---

[1] Exhibits to the Schapiro Declaration are referred to herein as "Schapiro Ex. __."

their home movies to the largest movie and television studios posting clips for promotional purposes. Decl. of Hunter Walk in Support of Defs.' Motion for Summary Judgment ("Walk Decl.") ¶ 3; Decl. of Michael Solomon in Support of Defs.' Motion for Summary Judgment ("Solomon Decl.") ¶ 5. A user uploads a video by visiting the YouTube website, creating an account, and then selecting a video file from the user's computer to upload and store on YouTube's computer servers. *Id.* ¶ 3. Uploaded video files are automatically processed by YouTube's system into various formats that are stored in such a way that anyone with Internet access can view them, whether from a personal computer or a mobile device like Apple's iPhone. *Id.* ¶¶ 6-7. YouTube does not charge users either to upload or view videos. Hurley Decl. ¶ 2. YouTube generates revenue to help offset the cost of hosting and streaming of videos by allowing advertising to be displayed on certain pages of its website. Decl. of Suzanne Reider in Support of Defs.' Motion for Summary Judgment ("Reider Decl.") ¶ 3.

2.  The quantity and diversity of videos available on YouTube

YouTube contains an astonishing range of videos. Any attempt to summarize the breadth and diversity of what YouTube's users have created and posted is necessarily inadequate. (Although it only scratches the surface, a short video called "This Is YouTube," which can be found at http://www.youtube.com/watch? v=ojqWclLQOxk and is also attached to this brief, provides a useful introduction to the array of creative and inspiring material found on YouTube. *See* Schapiro Ex. 2.)

YouTube's users have filled the service with personal videos of endless variety: from amateur dance and comedy routines to raw video footage taken on the

streets of Tehran as the Iranian government clashed with students; from clips of cats playing the piano to instructional videos teaching people how to fix a leaky faucet or bake a chocolate cake. Walk Decl. ¶¶ 9, 14, 20. While many of these videos are homemade using amateur equipment, YouTube has also become a platform for aspiring artists and filmmakers, who have posted their own short films that are professional in quality if not in budget. *Id.* ¶ 16.

YouTube is a prominent source of political information. *Cf. Citizens United v. Federal Election Com'n*, 130 S. Ct. 876, 917 (2010) (describing potential impact of campaign finance law on "movies, television comedies, or skits onYoutube.com"). To give just a few examples: (1) during the 2008 election, all the major candidates for President posted videos to YouTube; (2) in two of the 2008 presidential debates, Americans were able to pose questions directly to the candidates through videos uploaded to YouTube; (3) the White House posts a weekly video address on YouTube, and the President recently sat down for an interview in which he answered questions from ordinary people submitted through YouTube, an event described in the *New York Times* as "the 21st century equivalent of Roosevelt's fireside chats"; (4) the 111th Congress created a "hub" on YouTube for members of the House and Senate to post videos about the issues of the day, and hundreds of members of Congress have set up their own channels on YouTube. Walk Decl. ¶ 6.

For efforts like these, John McCain's presidential campaign congratulated YouTube for its "groundbreaking contributions" to the democratic process: "By providing a platform for political candidates and the American public to post, view,

share, discuss, comment on, mash-up, re-mix, and argue over campaign-related videos, YouTube has played a prominent and overwhelmingly positive role in the 2008 election." Decl. of Zahavah Levine ("Levine Decl.") ¶ 29 & Ex. 13.

The embrace of YouTube by official bodies extends far beyond our shores. The Vatican, the Iraqi government, the Kremlin and heads of state from Israel to South Korea to Estonia have each established dedicated YouTube channels through which they regularly upload videos. Walk Decl. ¶ 8. So have the Queen of England and the United Nations. *Id.* Leading colleges and universities, including Yale, Stanford, Cambridge, and the University of Michigan, have posted tens of thousands of video lectures on every academic subject imaginable. *Id.* ¶ 12. Students seeking admission to those colleges, and colleges seeking to recruit students, have likewise turned to YouTube. *Id.* ¶ 13. Nonprofit organizations such as the American Red Cross and the World Food Program use YouTube to publicize their causes, including relief efforts following the Haiti earthquake, the plight of endangered animals, and child malnutrition. *Id.* ¶ 10. And law enforcement officials have posted videos to YouTube seeking the public's help in identifying criminal suspects. *Id.* ¶ 19.

To complement this already vast library of videos, YouTube has negotiated content partnerships with a host of media companies and other copyright holders. Decl. of Christopher Maxcy in Support of Defs.' Motion for Summary Judgment ("Maxcy Decl.") ¶ 9. Hundreds of television and movie studios (including CBS, NBC/Universal, BBC, and Lions Gate); sports teams and leagues (including the

NBA and NHL); all of the major record labels (Universal Music Group, Sony Music, Warner Music Group, and EMI) and music publishers have embraced YouTube's service through partnership agreements. *Id.* ¶ 9. Under such arrangements, these companies make their content available to YouTube users either by uploading it directly or by "claiming" videos containing their material that other YouTube users have posted. *Id.* ¶ 10. Even without such express partnerships, many professional content owners—including plaintiffs themselves—routinely post their material on YouTube for promotional or other purposes and authorize marketing agencies and licensees to do the same. *See* Section I.C.3.b.ii-iv, *infra*.

YouTube's growth has been swift:

- At the time YouTube officially launched its service in December 2005, it was receiving more than 6,000 new video uploads each day, and its users were watching more than 2.5 million videos each day.

- By February 2006, the number of uploads had increased to 20,000 per day, and users were watching more than 18 million videos per day.

- In the month of July 2006, users uploaded over 2.1 million video clips to the site, and watched a total of more than 3 billion videos.

- By December 2007, users were uploading more than 300,000 videos each day and site traffic had soared to 800 million daily video views.

- By July 2008, uploads had reached more than 400,000 per day.

*See* Hurley Decl. ¶ 23 & Exs. 28, 29. In the nearly five years that the site has been in existence, over 500 million videos have been posted on YouTube. Levine Decl. ¶ 26. Today, more than 24 hours of new video is uploaded every minute; to watch all the video uploaded to YouTube in a single day would take a person four years watching around the clock. Hurley Decl. ¶ 26.

### 3. YouTube's extensive efforts to help copyright owners

Although YouTube cannot control what its tens of millions of users post to the service each day, since its early days YouTube has taken numerous steps to deter users from uploading unauthorized copyrighted material and to assist content owners in policing their copyrights. YouTube has, among other things: (1) required users to agree to terms of use that explicitly prohibit them from submitting copyrighted material that they are not authorized to upload; (2) provided a "Copyright Tips" page to help users understand the basics of copyright law; (3) repeatedly reminded users, via multiple messages displayed each time they upload a clip, that they are prohibited from uploading copyrighted content unless they have the right to do so; (4) imposed a 10-minute limit for most videos submitted by ordinary users to prevent the posting of full-length television shows and feature films; (5) registered a DMCA agent to receive notices from copyright holders of alleged infringement; (6) expeditiously removed allegedly infringing materials upon receiving such notices; (7) terminated and blocked the accounts of users suspected to be repeat infringers; and (8) maintained a dedicated team of employees on call around the clock to assist copyright owners in removing unauthorized material; Levine Decl. ¶¶ 5-10, 12, 14, 17-19; Hurley Decl. ¶¶ 20-21.

YouTube also makes available various technological measures to help content owners protect their rights. As YouTube has grown, its copyright tools have become more sophisticated. In early 2006, YouTube rolled out an easy-to-use tool that enables copyright holders to search for videos, mark those that allegedly infringe, and request their removal with the click of a button, rather than having to prepare

individual paper or email DMCA notices. Levine Decl. ¶ 18. At around the same time, YouTube deployed "hashing" technology that creates a unique digital signature for each video removed in response to DMCA takedown notices and automatically prevents identical copies of the removed video from being posted. *Id.* ¶ 25.

In February 2007, YouTube started using audio "fingerprinting" technology licensed from a company called Audible Magic. That same year, after an extraordinary effort, YouTube launched a more advanced content-identification system (called "Content ID"), which uses audio *and video* fingerprinting technology developed in-house by Google and YouTube engineers specifically for use on YouTube. Decl. of David King in Support of Defs.' Motion for Summary Judgment ("King Decl.") ¶¶ 2, 3, 14-20. This powerful technology scans every one of the hundreds of millions of videos uploaded to YouTube and, within seconds, compares each with a vast library of reference files provided by participating copyright holders. *Id.* ¶¶ 3, 23, 26. If a match is identified, the system automatically applies the content owner's instructions about what to do: whether to block the matching video from appearing on YouTube, "track" how users are watching it, or "monetize" the video by permitting advertisements to be shown alongside it. *Id.* ¶ 24. YouTube's cutting-edge Content ID system has been used by a long list of content owners worldwide to make their own choices about how, where, when, or whether they want their content to appear on YouTube. *Id.* ¶ 25.

Copyright holders repeatedly have praised YouTube, both for its service generally as well as for its efforts and tools to help combat copyright abuse. In 2006, the Motion Picture Association of America (the anti-piracy association for the major movie studios) told the press: "YouTube has been a good corporate citizen and taken off copyrighted material." Levine Decl. ¶ 32 & Ex. 14. That same year, NBC hailed YouTube as a "bright light" on copyright protection and proclaimed that:

> YouTube is the perfect online media partner to promote NBC's marquee entertainment to their audience and explore new and creative ways to harness the power of viral video in a manner that respects copyrights. We applaud YouTube for their continued willingness to work with us to remove any unauthorized NBC content and protect our copyrighted material. We are thrilled to be partnering with this forward-thinking company.

*Id*. ¶ 33 & Exs. 15, 16. Warner Music similarly lauded YouTube's "commitment to creating a framework in which the needs of [its] users and copyright holders can coexist in a mutually beneficial environment." *Id*. & Ex. 17.

**B.  Viacom**

Plaintiff Viacom, Inc. is a media conglomerate. Viacom alleges copyright infringement with respect to television programs appearing on the following networks that it controls: (1) MTV and MTV2; (2) VH1; (3) Comedy Central; (4) Country Music Television ("CMT"); (5) Black Entertainment Television ("BET"); and (6) Nickelodeon. Viacom Am. Compl. ¶ 20. Viacom also brings suit over motion pictures allegedly owned by its subsidiary Paramount Pictures. *Id*. ¶ 18.

Notwithstanding its litigation claims, Viacom has embraced YouTube to advance its business. Viacom employees and dozens of separate third-party marketing agencies working on its behalf have posted a host of clips from Viacom

television programs and movies to YouTube. *See* Section I.C.3.b.ii, *infra*. Viacom has also instructed its monitoring agents to leave up on YouTube entire categories of user-posted videos containing Viacom content. *See* Section I.C.3.b.iii, *infra*. In addition, both before and after bringing this lawsuit, Viacom spent significant sums of money running advertisements for its content on the YouTube website. Reider Decl. ¶ 3. In July 2006, Viacom even sought to purchase YouTube, after Viacom's "best minds" concluded that it would be a "transformative acquisition" for Viacom. Schapiro Ex. 3 (77:7-15), Ex. 4 (65:5-14). To the frustration of many within the company, Viacom's efforts to acquire YouTube proved unsuccessful. *See id.* Ex. 5 (VIA00885981).

In addition, in early 2006, Viacom proposed the idea of a content-partnership agreement with YouTube, which the parties negotiated for months. Maxcy Decl. ¶ 8; *see also* Schapiro Exs. 6, 7. Before a deal could be struck, however, Google announced that it was acquiring YouTube. With Google now sitting at the table, Viacom opted for a "strong arm approach" under which it would "push for significantly better terms." *Id.* Ex. 8; *see also id.* Ex. 9. During these negotiations, Viacom deliberately allowed its content to remain on YouTube, in part because it thought that "having the content there was valuable in terms of helping the rating of our shows." *Id.* Ex. 4 (132:19-133:24).

After the negotiations stalled, Viacom developed a plan to send YouTube a large DMCA takedown notice in the hopes of gaining leverage and "provide [Viacom] the economics" it had requested. *Id.* Ex. 10. Viacom wanted a mass

takedown to occur in "one dramatic event (as opposed to drips)." *Id*. To that end, Viacom put in place a "find and hold" strategy: For months, it searched YouTube for videos allegedly containing Viacom content, but instead of promptly requesting their removal, Viacom added the clips to an internal list. *Id*. Ex. 11 (161:9-21, 167:10-18, 202:14-19). Viacom finally issued its orchestrated mass takedown on February 2, 2007. Decl. of Micah Schaffer in Support of Defs.' Motion for Summary Judgment ("Schaffer Decl.") ¶ 14. By the next business day, YouTube had taken down virtually all the videos that Viacom's mass takedown notice identified. *Id*. Despite Viacom's apparent expectations that YouTube's traffic would decrease and traffic to Viacom's own websites would soar after those videos were removed, neither prediction came true. Hurley Decl. ¶ 26; *see also* Schapiro Ex. 13 (234:17-288:14), Ex. 14, Ex. 15. Viacom then turned to litigation, filing this lawsuit on March 13, 2007 and demanding one billion dollars. Viacom Am. Compl. ¶ 10.[2]

### C. The Putative Class Plaintiffs

The putative class plaintiffs are a diverse group of content owners from several nations. Thirteen of the putative class plaintiffs are music publishers that claim copyright interests in various musical compositions and/or sound recordings.[3]

---

[2] Some of Viacom's executives soon came to doubt the wisdom of that strategy. *See, e.g.,* Schapiro Ex. 16 (VIA01623231).

[3] Those plaintiffs are: Bourne Co. ("Bourne") and its affiliate Murbo Music Publishing, Inc. ("Murbo"); Cherry Lane Music Publishing Company, Inc. ("Cherry Lane"); Cal IV Entertainment, LLC ("Cal IV"); The Rodgers & Hammerstein Organization ("R&H"); Stage Three Music (US), Inc. ("Stage Three"); Edward B. Marks Music Company, Freddy Bienstock Music Company d/b/a Bienstock Publishing Company and Alley Music Corporation (collectively, "Carlin"); X-Ray Dog Music, Inc. ("XRD"); and The Music Force Media Group LLC, The Music Force

Two of the putative class plaintiffs are sports associations. The Football Association Premier League Limited ("Premier League") alleges infringement of rights in audio-visual broadcast footage of soccer matches that the League organizes among a mutable group of English soccer clubs, who are also the League's shareholders. Schapiro Ex. 17 (10:16-18, 15:7-20). Fédération Française de Tennis ("FFT"), which organizes the annual French Open tennis tournament, makes claims based on broadcast footage of various matches played at the French Open between 2003 and 2008. SACAC ¶¶ 31-32. Plaintiff Robert Tur d/b/a Los Angeles News Service ("Tur") is a helicopter pilot who asserts copyright in news footage. SACAC ¶ 21. National Music Publishers' Association ("NMPA"), a trade organization of music publishers, also claims to represent the class, though it owns no copyrighted works and has identified no alleged infringements. *Id.* ¶¶ 22-23. Like Viacom, the putative class plaintiffs have frequently authorized their content—including works in suit—to appear on YouTube. *See* Section I.C.3.b.(iv), *infra*.

### D.    The Clips In Suit

Viacom alleges that 63,497 user-uploaded video clips that once appeared on YouTube infringed copyrights in approximately 500 different television programs and motion pictures that Viacom claims to own.[4] Decl. of Michael Rubin in Support of Defs.' Motion for Summary Judgment ("Rubin Decl.") ¶ 7 (attaching lists of clips in suit). These clips have been removed from YouTube; most were the subject of

---

LLC and Sin-Drome Records, Ltd. (collectively, "Music Force"). Second Amended Class Action Complaint ("SACAC") ¶¶ 16, 18-20, 24-30, 33.

[4] We refer to the allegedly infringing video clips as the "clips in suit" and the plaintiffs' works that those clips are alleged to have infringed as the "works in suit."

DMCA notices, and taken down in response. *See* Schapiro Ex. 18 (Housley Dep.141:10-19, 148:8-18); Levine Decl. ¶¶ 19-21. The majority of Viacom's clips in suit are under four minutes long; many are under one minute long; and some are fewer than ten seconds long. Rubin Decl. ¶ 15 (examples).

Among the clips in suit are a number of videos that Viacom's own employees and agents uploaded to the service. Rubin Decl. ¶ 6-14. Viacom attempted in the final days of discovery to dismiss some of the allegedly infringing clips that YouTube's discovery efforts had revealed were actually posted at Viacom's direction. *Id.* But even then, Viacom missed a number of *other* clips in suit that Viacom or its agents had posted. *Id.* Many other clips in suit, even if not themselves directly uploaded to YouTube by Viacom, are identical to or indistinguishable from the promotional materials that Viacom has authorized to appear on YouTube. Section I.C.3.b.ii, *infra.* And an untold number of other clips in suit are videos that Viacom deliberately had allowed to remain on YouTube. Section I.C.3.b.iii, *infra.*

The putative class plaintiffs have collectively identified some 13,500 clips in suit and nearly 900 works in suit. Rubin Decl. ¶ 16. These works range from musical compositions to television broadcast feeds of foreign soccer matches to videos of news events. The putative class plaintiffs' clips in suit—which likewise have been removed from YouTube (Levine Decl. ¶¶ 19, 21)—vary considerably: from grainy handheld footage shot by spectators at sporting events and rock concerts, to short soccer and tennis highlights; from home videos of ordinary people lip-synching or singing karaoke, to movie trailers and music videos. Many of those clips are

effectively indistinguishable from a wide range of videos on YouTube that no one has ever alleged to be infringing. A considerable number of the class plaintiffs' clips in suit are extremely short; the Premier League alone is suing over dozens of clips under five seconds long and at least one that is *one second long*. Rubin Decl. ¶ 16. In addition, the putative class plaintiffs have claimed infringement of numerous works that they have licensed to be on YouTube, as well as other works that various co-owners and/or sub-publishers have a right to post or license. Section I.C.3.b.iv, *infra*.

### E. The DMCA Safe-Harbor Provisions

Congress enacted the DMCA in recognition that in "the ordinary course of their operations, service providers must engage in all kinds of acts that expose them to potential copyright infringement liability." S. Rep. 105-190, at 8 (May 11, 1998). The statute aims to "facilitate the robust development and world-wide expansion of electronic commerce, communications, research, development, and education in the digital age" (*id.* at 1-2), by limiting online service providers' "legal exposure for infringements that may occur in the course of their activities." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007) (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004)).

The DMCA was the product of negotiations between the major copyright holders and online service providers. *See* S. Rep. 105-190, at 9. It balances the interests of content owners seeking to protect their copyrights and service providers seeking protection from infringement claims that might deter valuable technological innovation and stifle freedom of expression. *See Corbis Corp. v. Amazon.com, Inc.*,

351 F. Supp. 2d 1090, 1098 (W.D. Wash. 2004). By "limiting the liability of service providers" for the actions of people who use their websites and web-based services, the DMCA was intended to ensure that "the variety and quality of services on the Internet will continue to expand." S. Rep. 105-190, at 8.

The safe harbor at issue here applies to service providers, like YouTube, that store information on their own systems at the direction of users. 17 U.S.C. § 512(c). Its protections have been applied to a variety of established Internet sites that host user-submitted material, including Amazon.com and eBay (*Corbis*, 351 F. Supp. at 1110-11; *Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082 (C.D. Cal. 2001)), as well as video-hosting sites almost identical to YouTube (*Io*, 586 F. Supp. 2d at 1155). The Section 512(c) safe harbor presumptively applies to a service provider that meets the threshold "conditions for eligibility" set out in Section 512(i) and designates an agent to receive "notifications of claimed infringement" (§ 512(c)(2)).

The agent's role is to facilitate the notice-and-takedown regime at the heart of the safe-harbor. Using the procedures described in the statute, copyright holders can avoid a costly and time-consuming judicial process by notifying service providers that certain material stored on their systems is not authorized to be there. § 512(c)(3). The copyright holder must identify the work that it owns and believes to be infringed, identify the location of the allegedly infringing material on the service provider's system, and certify its claims under penalty of perjury. § 512(c)(3). Service providers in turn must respond expeditiously by taking down or blocking access to that material. § 512(c)(1)(C). The DMCA also gives the users

who posted the material subject to a takedown notice an opportunity to contest the copyright owner's claim by filing a counter-notice confirming that they have the authority to upload the work in question.  § 512(g)(3).

In creating this carefully calibrated regime, Congress decided that copyright holders, rather than service providers, should bear the primary responsibility for pursuing unauthorized uses of copyrighted materials.  The "DMCA notification procedures place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement— squarely on the owners of the copyright."  *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007); *see also UMG II*, 665 F. Supp. 2d at 1112.  Indeed, the statute expressly provides that a service provider need not monitor its service for possible infringement to obtain safe-harbor protection.  17 U.S.C. § 512(m); *see also* S. Rep. 105-190, at 44; H.R. Rep. 105-551 (Part 2) (July 22, 1998), at 53.

There are only two circumstances in which a qualifying service provider loses the protection of Section 512(c)'s safe harbor.  Each involves a bad-faith refusal to stop some specific instance of infringing activity.  First, the safe harbor does not apply if the provider acquires "actual knowledge" that particular material stored on its system is infringing—or becomes aware of "facts or circumstances from which infringing activity is apparent"—and fails to expeditiously remove or disable access to the material in question.  § 512(c)(1)(A).  Second, the safe harbor does not apply where the service provider "receive[s] a financial benefit directly attributable to the infringing activity" in a circumstance where it "has the right and ability to control

such activity." § 512(c)(1)(B). As the text and structure of these provisions make clear, a finding that a service provider is ineligible for DMCA protection based on either knowledge-plus-failure-to-disable or control-plus-financial-benefit must be made as to *particular* alleged infringements. *UMG II*, 665 F. Supp. 2d at 1111-12.

The protection conferred by the safe harbors is broad. A qualifying service provider "shall not be liable for monetary relief" (§ 512(c)(1)) and is subject only to a "limited" form of injunctive relief described in section 512(j). *Amazon.com*, 508 F.3d at 1158. These protections apply no matter what type of infringement is alleged, shielding "qualifying service providers from liability for all monetary relief for direct, vicarious and contributory infringement." H.R. Rep. 105-551 (Part 2), at 50; *see also CCBill*, 488 F.3d at 1117.

## SUMMARY OF ARGUMENT

Section 512(c) of the DMCA bars all of plaintiffs' direct and secondary infringement claims. *First*, YouTube meets all the threshold qualifications necessary for safe-harbor protection: YouTube is a service provider; it has registered a designated agent to receive notifications of alleged infringement; and YouTube has adopted and implemented an appropriate policy for terminating the accounts of "repeat infringers." *Second*, each of the infringement claims that plaintiffs assert arises by reason of the storage of videos on YouTube at the direction of users. An unbroken line of cases, including recent decisions involving a video-hosting service just like YouTube, confirms that Section 512(c) bars such claims.

*Third*, plaintiffs cannot show that YouTube had knowledge that any of the particular clips at issue were infringing plaintiffs' copyrights but failed to remove

those clips expeditiously. There is no evidence of "actual knowledge," and (particularly in light of plaintiffs' widespread authorization of their content to appear on YouTube) plaintiffs cannot establish that YouTube was aware of "facts or circumstances" making the supposedly infringing nature of those clips "apparent." *Fourth*, YouTube did not receive "a financial benefit directly attributable to the infringing activity" while maintaining the "the right and ability to control such activity." YouTube has neither a legal duty nor the practical ability to monitor the hundreds of millions of videos on its service in an effort to identify potentially infringing activity. YouTube's lack of practical control is confirmed by the plaintiffs' own inability to readily distinguish which appearances of their material on YouTube are authorized and which are not. YouTube works hard to prevent infringement and help copyright holders protect their rights. Finally, because YouTube has a legitimate advertising-based business model that generates revenue from the service's broad array of non-infringing uses, YouTube does not run afoul of the DMCA's financial benefit test.

Because YouTube qualifies for the safe harbor, it is protected against all of plaintiffs' claims, including their claims of "inducement." But even without regard to the DMCA, plaintiffs' inducement claims fail. YouTube simply is not the kind of "pirate" service—one set up with the "patently illegal objective" of encouraging its users to infringe and comprised overwhelmingly of infringing material—that the Supreme Court described in *Grokster*: YouTube was founded with a legitimate purpose and has never encouraged its users to infringe; YouTube houses an

indescribable diversity of non-infringing material; and YouTube has taken industry-leading steps to deter copyright violations. The legitimacy of YouTube's service is confirmed by the range of extraordinary uses to which it has been put, including as an unmatched platform that the plaintiffs themselves have used extensively—and still use—to promote their content.

## ARGUMENT

### I. THE DMCA SAFE HARBOR PROTECTS YOUTUBE AGAINST LIABILITY FOR ALL OF PLAINTIFFS' CLAIMS.

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). There is no genuine issue as to any material fact bearing on YouTube's entitlement to the Section 512(c) safe harbor.[5]

### A. YouTube Meets The Threshold Qualifications For Safe-Harbor Protection.

YouTube readily satisfies the DMCA's threshold conditions for protection under Section 512(c). YouTube is a "service provider" (17 U.S.C. § 512(k)(1)(B)) and has registered an agent to receive notifications of claimed infringement (§ 512(c)(2)).

---

[5] The DMCA safe harbors "apply if the provider is found to be liable under existing principles of law." S. Rep. 105-190, at 19. It is a well recognized procedure for courts to address the applicability of the safe harbors on summary judgment before liability for direct or secondary infringement has been adjudicated. *See, e.g.*, *Io*, 586 F. Supp. 2d 1132. *Cf.* 17 U.S.C. § 512(*l*) (service provider's failure to qualify for safe-harbor protection "shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense"). In making this motion, YouTube of course reserves its arguments that plaintiffs' claims fail without regard to the DMCA—and YouTube expressly seeks summary judgment on plaintiffs' claims for contributory infringement based on the theory of inducement. *See* Section II, *supra*.

YouTube has also implemented a policy for terminating accounts of repeat infringers and does not interfere with any "standard technical measures." § 512(i).

### 1. YouTube Is A "Service Provider."

As used in Section 512(c), "the term 'service provider' means a provider of online services or network access, or the operator of facilities therefor." 17 U.S.C. § 512(k)(1)(B). This definition readily encompasses a website like YouTube that provides online services (in the form of hosting user-submitted material) to Internet users. *See, e.g., Corbis,* 351 F. Supp. 2d at 1100 ("there is no doubt that Amazon fits within the definition"); *Hendrickson*, 165 F. Supp. 2d at 1088 ("eBay clearly meets the DMCA's broad definition of online 'service provider'"). Indeed, in recent litigation involving a very similar video-hosting service (Veoh), the plaintiffs in that matter did not even try to dispute that Veoh was a "service provider." *Io*, 586 F. Supp. 2d at 1143; *UMG II*, 665 F. Supp. 2d at 1106-07.

### 2. YouTube Has Registered A Designated DMCA Agent.

Also undisputed is the fact that by October 2005, YouTube had formally registered with the Copyright Office a designated agent to receive notices of claimed infringements. Hurley Decl. ¶ 21. Even before then, YouTube made available prominently on its website all the information about its DMCA agent that the statute requires. *Id.*; *see also* Levine Decl. ¶¶ 14-15. The YouTube website has consistently offered detailed instructions about the information that copyright holders should include in any notices that they wish to send to YouTube's designated agent. Levine Decl. ¶¶ 15-16; Hurley Decl. ¶ 21.

### 3. YouTube Has Adopted And Implemented An Appropriate Repeat-Infringer Policy.

A service provider seeking safe-harbor protection must have "adopted and reasonably implemented, and inform[] subscribers and account holders . . ., of a policy that provides for the termination in appropriate circumstances of subscribers and account holders . . . who are repeat infringers." § 512(i)(1)(A). This requires a service provider to (1) adopt a policy to terminate the accounts of repeat infringers; (2) communicate that policy to users; and (3) implement that policy in a reasonable manner. *Ellison*, 357 F.3d at 1080; *Corbis*, 351 F. Supp. 2d at 1099. YouTube meets all of these requirements. *See* Levine Decl. ¶¶ 27-31; Hurley Decl. ¶ 21.

#### a. *YouTube has adopted an appropriate repeat-infringer policy*.

YouTube has long had a robust policy for terminating the accounts of repeat infringers. In virtually all cases, YouTube terminates the accounts of users who receive three "strikes" for violating the terms of use relating to copyright. Levine Decl. ¶ 27. A strike is issued when YouTube receives a takedown notice for material that a user has uploaded. *Id.* ¶¶ 27-29. When YouTube terminates a user's account, YouTube removes *all* of that user's videos, not merely those against which allegations of infringement have been levied, and it permanently blocks the account from being reestablished. *Id.* ¶ 30.

Courts have uniformly concluded that policies akin to YouTube's are reasonable as a matter of law. *See Perfect 10, Inc. v. CCBill, LLC*, 340 F. Supp. 2d 1077, 1089 (C.D. Cal. 2004) (no genuine issue of fact that service provider had adopted a repeat-infringer policy where its policy stated "that it will terminate or

disable the accounts of . . . clients who are accused of infringing third-party copyrights"); *id*. at 1094 n.12 (holding that policy of terminating accounts "after 3 notifications is reasonable"); *UMG II*, 665 F. Supp. 2d at 1117-18.

b.      *YouTube informs its users of its repeat-infringer policy*.

YouTube communicates its repeat-infringer policy to users in multiple ways, including by publicizing it throughout the YouTube website.  When registering to upload videos, users must agree to YouTube's Terms of Use, which set forth its repeat-infringer policy.   Levine Decl. ¶ 27 & Exs. 1-2, 7-8.   YouTube also prominently displays the policy on its "Copyright Tips" pages.  *Id*. ¶ 9 & Ex. 7.  And, whenever a user's video is removed due to alleged copyright infringement, YouTube sends an email reminding the user that the user's account is subject to termination if improper behavior continues.  *Id*. ¶ 23 & Ex. 12.  YouTube's efforts are more than sufficient to inform users of the repeat-infringer policy.  *See, e.g.*, *Corbis*, 351 F. Supp. 2d at 1101-02 (holding that Amazon communicated its repeat-infringer policy by requiring users to accept terms of use informing them that repeated violations could result in their suspension).

c.      *YouTube implements its policy in a reasonable manner*.

"Because [a service provider] does not have an affirmative duty to police its users, failure to properly implement an infringement policy requires a showing of instances where a service provider fails to terminate a user even though it has sufficient evidence to create actual knowledge of that user's *blatant, repeat infringement of a willful and commercial nature*."  *Corbis*, 351 F. Supp. 2d at 1104 (emphasis added).  There is nothing like that here.

24

YouTube has both "a working notification system" and "a procedure for dealing with DMCA-compliant notifications." *CCBill*, 488 F.3d at 1109. YouTube has taken pains to make its notification system easy and efficient for copyright holders to use. Levine Decl. ¶¶ 17-18. Early in its existence, YouTube created a first-of-its-kind automated tool that lets copyright holders click a button to send electronic DMCA notices directly to YouTube's agent. *Id*. ¶ 18. YouTube also implemented "hashing" technology to create a digital signature of each video removed via a takedown notice and to automatically block users from uploading identical copies of that video. *Id*. ¶ 25.

YouTube's process for responding to takedown notices is similarly efficient. Given the policies that it has long had, YouTube is usually able to remove or block access to a video identified in a DMCA-compliant notice within a matter of minutes. *Id*. ¶ 19. YouTube also sends an email message to any user whose videos are the subject of a takedown notice, giving the user an opportunity to challenge the notice, but warning that repeated disregard for copyright law will result in the termination of that user's account. *Id*. ¶ 23. A computerized system then tallies the number of strikes that each user's account receives. *Id*. ¶ 28. In virtually all cases (with exceptions not relevant here), when an account receives three strikes—or where YouTube determines that a particular user who has received fewer than three strikes is nonetheless flagrantly abusing the service's terms of use—YouTube terminates the account and removes *all* of the user's videos. *Id*. ¶ 30. YouTube

prevents users whose accounts have been terminated from creating new accounts by recording and blocking the user's email address. *Id.*

Applying these policies, YouTube has terminated more than 400,000 user accounts based at least in part on copyright strikes. *Id.* ¶ 31.[6] YouTube's dedication to DMCA compliance has drawn widespread praise. *Id.* ¶¶ 22, 32-33 & Ex. 11 (examples). There can be no doubt that YouTube reasonably implements its repeat-infringer policy. *See Io*, 586 F. Supp. 2d at 1143 (relying on similar facts to find that Veoh reasonably implemented its policy).

4. <u>YouTube Accommodates Standard Technical Measures</u>.

The final threshold qualification for safe-harbor protection requires service providers to accommodate and not interfere with "standard technical measures." § 512(i)(1)(B). That is a defined term, which applies only to "technical measures used by copyright owners to identify or protect copyrighted works" that have been "developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process" (among other requirements). § 512(i)(2). The required standards-setting process has never occurred, however, and thus as a matter of law there are currently no relevant "standard technical measures" with which YouTube could have interfered. In any event, YouTube goes beyond the DMCA and freely makes available sophisticated technology that helps copyright holders—including Viacom—automatically identify their content on YouTube. Section II.B.2.c, *infra*.

---

[6] Reflecting the overwhelming legitimate usage of YouTube, that figure represents only a small fraction of the over 250 *million* registered YouTube accounts. *Id.* ¶ 31.

**B.      Plaintiffs' Claims Involve "Storage At The Direction Of A User."**

The Section 512(c) safe harbor applies to any claim for "infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider."  17 U.S.C. § 512(c)(1).  Plaintiffs' claims, which arise from materials stored on YouTube's system at the direction of its users, fall squarely within this provision.

1.      YouTube Stores And Streams Videos Through Automated Processes Initiated By Users.

The clips in suit were uploaded by YouTube users—including plaintiffs and their agents.  Solomon Decl. ¶ 5.  The facts concerning how such videos come to be stored on YouTube's system, and what happens to them once they are there, are undisputed.  *Id*. ¶¶ 2-10 (describing how videos are uploaded to YouTube and transcoded into different file formats, how YouTube's system stores videos, and how videos are "streamed" in response to users' playback requests).  These facts establish a number of important propositions: (1) videos (including the clips at issue in this case) reside on YouTube's system at the direction of users; (2) during the upload, storage, and playback processes, a certain number of copies of those videos are made automatically by operation of YouTube's system; and (3) those copies are made to facilitate the efficient storage and viewing of user-submitted videos.  *Id*. ¶¶ 6-8.  In other words, the replication, transmittal, and display of videos on YouTube—the actions that are the subject of plaintiffs' infringement claims—occur through the operation of automated computer processes in response to the direction

of users.  *Id.* ¶ 2.  As we now discuss, an unbroken line of cases confirms that such actions are covered by the Section 512(c) safe harbor.

> 2.  Section 512(c) Protects Services That Have Automated Processes To Facilitate User Access To Stored Material.

Courts applying Section 512(c) have uniformly held that the safe harbor is not limited to mere storage of material, but also protects online services that make user-uploaded material more readily accessible.  *See, e.g.*, *Corbis*, 351 F. Supp. 2d at 1110-11 (granting summary judgment that Amazon was protected by Section 512(c) for service enabling vendors to upload images onto Amazon's servers that were then displayed to users); *Costar Group, Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 701-02 (D. Md. 2001), *aff'd*, 373 F.3d 544 (4th Cir. 2004) (online database of real-estate listings compiled from user submissions and made accessible to users on request is protected by Section 512(c)).  Indeed, no court has *ever* held that such functions fall outside the reach of the safe harbor.

Directly on point are a pair of recent decisions holding that an Internet video-hosting service (Veoh) is protected by Section 512(c).  Those rulings explain that "service providers seeking safe harbor under Section 512(c) are not limited to merely storing material" (*Io*, 586 F. Supp. 2d at 1147) and that the statute covers "software functions" that are "directed toward facilitating access to materials stored at the direction of users" (*UMG I*, 620 F. Supp. 2d at 1088).  Those principles apply directly to this case.

Like YouTube, Veoh "operates an internet-based service that allows users to share videos with others, free of charge."  *UMG I*, 620 F. Supp. 2d at 1082.  Veoh is

more than an online video-storage warehouse; it has implemented various features "directed towards providing access to material stored at the direction of users." *Id.* at 1092. To that end, Veoh (1) automatically creates additional copies of user-uploaded videos; (2) converts user-uploaded videos into Flash format (and other formats playable on mobile devices); and (3) allows users to "stream" copies of videos onto their computers. *Id.* at 1084-85. The court in *UMG I* had little trouble concluding that "the section 512(c) limitation on liability applies to service providers whose software performs these functions for the purpose of facilitating access to user-stored material." *Id.* at 1088.

That decision followed a similar ruling in *Io*, 586 F. Supp. at 1147. *Io* expressly rejected the argument that Veoh fell outside Section 512(c) because it gives users access to the videos it hosted "as a means of distribution . . . and not just storage." *Id.* at 1146-47. What matters is that Veoh "established a system whereby software automatically processes user-submitted content and recasts it in a format that is readily accessible to its users. . . . Inasmuch as this is a means of facilitating user access to material on its website," Veoh did not lose the safe harbor "through the automated creation of these files." *Id.* at 1148.

YouTube is indistinguishable from Veoh in these respects. As described above, video files are uploaded to YouTube "through an automated process which is initiated entirely at the volition" of its users. *Io*, 586 F. Supp. 2d at 1148. The reproduction, distribution, and display at issue here occur via software functions triggered automatically by user requests. Solomon Decl. ¶ 2. Those functions are

"undertaken to make it easier for users to view" used-submitted videos stored on YouTube. *UMG I*, 620 F. Supp. 2d at 1092. As a matter of law, therefore, YouTube's automated processes for formatting, storing, and streaming videos uploaded by users fall within Section 512(c). This result furthers the basic purpose of the safe harbor: "if providing access could trigger liability without the possibility of DMCA immunity, service providers would be greatly deterred from performing their basic, vital, and salutary function—namely, providing access to information and material for the public." *Id*. at 1089.

### C. YouTube Did Not Have Knowledge Of The Alleged Infringements And Responded Expeditiously To Takedown Notices For The Clips In Suit.

Having established all the threshold qualifications for the Section 512(c) safe harbor, YouTube is protected unless plaintiffs can demonstrate the existence of one of two disqualifying circumstances: (1) that YouTube had knowledge of the specific instances of infringement that plaintiffs allege (or received a DMCA-compliant notice regarding those claimed infringements), but failed to act "expeditiously" to remove or disable access to the offending material; *or* (2) that YouTube had the "right and ability to control" the infringing activity alleged and received "a financial benefit directly attributable" to that activity. 17 U.S.C. § 512(c)(1)(A), (c)(1)(C), (c)(1)(B). We start with the first point: YouTube did not have the kind of knowledge that would have required it to remove any of the video clips at issue in this case without first receiving a proper DMCA takedown notice.

1. <u>Plaintiffs Have The Burden Of Showing That YouTube Had Knowledge Of The *Specific* Infringing Activity That They Allege.</u>

Courts applying Section 512(c) have consistently found that to disqualify an otherwise-eligible service provider from safe-harbor protection, the plaintiff must come forward with evidence that the service provider had knowledge of particular infringing material on its service, but declined to expeditiously remove it. If the plaintiff fails to do so, the service provider is entitled to summary judgment on this element. *See UMG II*, 665 F. Supp. 2d at 1110 (granting summary judgment where "UMG has not provided evidence establishing that Veoh failed to act expeditiously whenever it had actual notice of infringement").[7]

It is not sufficient for the plaintiff to show "a provider's general awareness of infringement." *UMG II*, 665 F. Supp. 2d at 1111.[8] The knowledge required by Section 512(c) is instead knowledge of the *specific* infringing activity that the

---

[7] *See also Perfect 10, Inc. v. Amazon*, CV-05-4753, slip op. at 8 (C.D. Cal. Nov. 4, 2008) ("Although A9 has the ultimate burden of proving its affirmative defense, it is Perfect 10's burden to show that A9 had actual knowledge of infringement within the meaning of Section 512(c).") (attached as Schapiro Ex. 19); *Io*, 586 F. Supp. 2d at 1148-49 (granting service provider's motion for summary judgment under Section 512(c) where copyright holder failed to come forward with sufficient evidence of actual or constructive knowledge); *Corbis*, 351 F. Supp. 2d at 1107-09 (same; faulting copyright holder for providing "no evidence from which such actual knowledge could be gleaned" and "no evidence from which to infer that Amazon was aware of, but chose to ignore, red flags").

[8] *See also Io*, 586 F. Supp. 2d at 1148-49 (copyright owner failed to raise a "genuine issue of material fact as to whether Veoh had the requisite level of knowledge or awareness that *plaintiff's copyrights* were being violated") (emphasis added); *Corbis*, 351 F. Supp. 2d at 1108 ("The issue is whether Amazon actually knew that *specific* zShops vendors were selling items that infringed Corbis' copyrights") (emphasis added); *Hendrickson v. eBay*, 165 F. Supp. 2d at 1093 (granting summary judgment to service provider that "did not have actual or constructive knowledge that *particular* listings were being used by *particular* sellers to sell pirated copies" of the particular work in suit) (emphases added).

plaintiff alleges. The text and structure of the statute make that clear. A service provider retains safe-harbor eligibility if, upon obtaining knowledge of the infringement, it "acts expeditiously to remove, or disable access to, *the* material." § 512(c)(1)(A)(iii) (emphasis added). Section 512(c), that is, does not focus on knowledge alone, but instead uses knowledge to trigger a duty to remove the particular material that the service provider knows is infringing. Such expeditious removal is possible only if the provider knows with specificity what it must remove. A service provider that merely has generalized knowledge of infringement occurring somewhere on its system cannot do what the statute demands. YouTube therefore would have disqualifying knowledge for purposes of these cases only insofar as it failed to expeditiously remove a *particular* clip in suit that it knew to be infringing. For a variety of reasons, plaintiffs cannot make that showing.

> 2. YouTube Did Not Have Actual Knowledge Of The Alleged Infringements.

There is no evidence that YouTube had "actual knowledge" that any of the clips in suit were infringing plaintiffs' copyrights. *See, e.g.*, *Corbis*, 351 F. Supp. 2d at 1108 (finding plaintiff's evidence of actual knowledge "wholly insufficient").[9]

---

[9] Most of the clips in suit were brought to YouTube's attention by way of a DMCA notice. *See* Schapiro Ex. 17 (186:9-187:7), Ex. 18 (141:10-19, 148:8-18). YouTube promptly complies with such notices by removing the videos identified in them. Levine Decl. ¶ 19; Section I.C.4, *infra*. Some of the putative class plaintiffs' clips were never the subject of any takedown request prior to being identified as alleged infringements in this case. *See* Schapiro Ex. 20 (94:19-95:6) (admitting that Carlin did not send takedown notices for any clips in suit); Ex. 21 (26:15-21) (admitting that Stage Three did not send takedown notices for clips identified in its complaint); Ex. 22 (Response 35) (same for R&H). Those plaintiffs' decisions to forego sending DMCA notices for their clips "stripped [them] of the most powerful evidence of a service provider's knowledge." *Corbis*, 351 F. Supp. 2d at 1107. To the extent that

3. <u>There Are No Facts Or Circumstances Known To YouTube From Which The Alleged Infringements Were "Apparent</u>."

As an alternative to actual knowledge, "a service provider may lose immunity if it fails to take action with regard to infringing material when it is 'aware of facts or circumstances from which infringing activity is apparent.'" *CCBill*, 488 F.3d at 1114 (quoting 17 U.S.C. § 512(c)(1)(A)(ii)). This provision is triggered only where "the service provider deliberately proceeded in the face of *blatant* factors of which it was aware." *Corbis*, 351 F. Supp. 2d at 1108 (emphasis added) (citation omitted); *see also Io*, 586 F. Supp. 2d at 1148. A showing of so-called "red-flag" knowledge requires, first, that the service provider was actually aware of the facts or circumstances from which the infringing activity was supposedly apparent. *See* S. Rep. 105-190, at 40. If so, the question then becomes whether the proffered circumstances were so blatant that they required the service provider to remove the material at issue without any takedown notice from the copyright owner. Plaintiffs' knowledge claims fail at both stages of the analysis.

a. *There is no evidence that YouTube was actually aware of any supposed "red flags."*

Because "a service provider need not monitor its service or affirmatively seek facts indicating infringing activity," YouTube may not be charged with knowledge based on circumstances that it did not actually know about, but perhaps could have uncovered by more actively monitoring user activity. S. Rep. 105-190, at 44; *see also*

---

those clips had not already been removed, YouTube took them down shortly after they were identified in their pleadings as clips in suit. Levine Decl. ¶ 21.

17 U.S.C. § 512(m). That requirement is important here because YouTube employees have never even seen the overwhelming majority of the more than 500 million videos that have been posted to the service. Levine Decl. ¶ 28; Schaffer Decl. ¶ 11; Hurley Decl. ¶ 18. The hundreds of thousands of videos uploaded to YouTube each day are processed and stored automatically by YouTube's computer systems without any human involvement or intervention. Solomon Decl. ¶ 6. And, consistent with the express terms of the DMCA, YouTube does not manually review or proactively monitor the mass of user-submitted videos. Levine Decl. ¶ 26; Schaffer Decl. ¶ 11; Hurley Decl. ¶ 18. Ordinarily, therefore, no one at YouTube will know that a given video has been posted at all, let alone have actually viewed that video. *Id*. As a matter of law, moreover, a service provider's generalized understanding that materials containing copyrighted content were stored on its system is not enough to establish awareness of obvious infringing activity. *See UMG II*, 665 F. Supp. 2d. at 1108 (rejecting argument that a provider's knowledge that it was "hosting user-contributed material capable of copyright protection" creates potentially disqualifying knowledge).

Accordingly, there is no evidence that YouTube was actually aware of "facts or circumstances" from which the alleged infringements of their clips in suit were supposedly "apparent." *Io*, 586 F. Supp. 2d at 1149 & n.10 (finding lack of knowledge where "there is no evidence to suggest" that Veoh was aware of the circumstances supposedly amounting to a red flag). For this reason alone, plaintiffs' ability to show "red flag" knowledge fails.

b.     *Plaintiffs' clips in suit cannot be "red flags."*

Even if plaintiffs could point to evidence that YouTube had actually seen certain of the clips in suit, it would not advance their case. The nature of those clips—and plaintiffs' own widespread authorization of their content to appear on YouTube in many different forms—negate any basis for imputing knowledge of the alleged infringements to YouTube.

The test for whether a particular video amounts to a red flag requiring removal by the service provider even in the absence of a DMCA notice is "whether infringing activity would have been apparent to a reasonable person operating under the same or similar circumstances." H.R. Rep. 105-551 (Part 2), at 53; S. Rep. 105-190, at 44. A red flag, that is, must be something "blatant" (*Corbis*, 351 F. Supp. 2d at 1108), from which the infringement is "obvious" (S. Rep. 105-190, at 44; H.R. Rep. 105-551 (Part 2), at 57). That formulation is strict, and rightly so. Distinguishing infringing from non-infringing activity is challenging, particularly for service providers as compared to copyright holders. Service providers have limited, if any, information about any number of relevant issues: what copyright owners have rights in which works; what materials those rights holders have licensed to which third parties; which materials copyright owners or licensees have chosen to put on the Internet for promotional reasons; and what uses of a given work would be considered fair. The DMCA's knowledge test was designed against that backdrop to ensure that service providers would not be required "to make discriminating judgments about potential copyright infringement." H.R. Rep. 105-551 (Part 2), at 58.

Congress thus made clear that no red flag would exist where the circumstances leave uncertain whether the material at issue is protected by copyright at all, whether a particular use of copyrighted material is licensed or, if unlicensed, whether the use of the material might be a fair use. *Id*. at 57-58.[10] A service provider has no "investigative duties" to make such determinations. *CCBill*, 488 F.3d at 1114. Instead, the service provider must remove material on its own—without receiving a takedown notice—only where the infringement would be "apparent from even a brief and casual viewing." *Corbis*, 351 F. Supp. 2d at 1108 (quoting H.R. Rep. 105-551 (Part 2), at 58). "This high bar for finding 'red flag' knowledge is yet another illustration of the principle underlying the DMCA safe harbors, that the burden is on the copyright holder, not the service provider, to identify copyright infringement." *UMG II*, 665 F. Supp. 2d at 1111; *see also CCBill*, 488 F.3d at 1114 (the DMCA does "not place the burden of determining whether [the works] are actually illegal on a service provider").

In this case, therefore, plaintiffs would have to be able to show not just that YouTube actually saw each clip at issue (or the supposed "red flags" associated with it), but also that YouTube would have been able to discern immediately that the clip

_____

[10] Although this legislative history specifically refers to the Section 512(d) safe harbor, which protects "information location tools," the red-flag knowledge provision for that safe harbor (§ 512(d)(1)) is identical to the one in section 512(c). "A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning"—a rule "doubly appropriate here" since the two provisions were added "at the same time." *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007); *see Corbis*, 351 F. Supp. 2d at 1108 (relying on this legislative history in applying Section 512(c)).

was an obvious infringement of plaintiffs' copyrights.  At a minimum, any clip that (1) leaves doubt about whether it was authorized to be on YouTube (for any number of reasons, including the obscurity of the material or the actions of the copyright owner—or owners—in posting, licensing, or deliberately leaving content on YouTube), or (2) gives rise to a reasonable claim of fair use, does not present sufficiently "blatant factors" to trigger a duty to remove it absent a proper request by the rights holder.  Plaintiffs cannot overcome these hurdles.

(i)   <u>It would not have been apparent what many of the clips<br>in suit even were, much less that they were infringing</u>.

As an initial matter, it is not immediately obvious what many of the clips in suit even *are*, much less that they supposedly infringe plaintiffs' copyrights.  While Viacom has suggested that all of its content is "readily identifiable," that is not true of many of the works at issue in this case.[11]  The melodies and lyrics of many of the putative class plaintiffs' musical compositions—and the video footage that plaintiff Tur has put at issue—likewise would not be readily recognizable to YouTube.[12]  Plaintiffs cannot seriously contend that it would have been apparent to any reasonable service provider "from a brief and casual viewing" of short clips from

---

[11] Among Viacom's works in suit are: *Call to Greatness*, *Distraction*, *Dog Bites Man*, *Gerhard Reinke's Wanderlust*, *The Hollow Men*, *Human Giant*, *Insomniac with Dave Attell*, *Noah's Arc*, *Premium Blend*, *Rob and Big*, *Run's House*, *Shorties Watchin' Shorties*, *Stardust*, *A Shot At Love*, *The Shot*, *Trick My Truck*, *True Life: I'm An Alcoholic*, *Viva Hollywood*, *Viva La Bam*, *The White Rapper Show*, *Wildboyz*, and *Wonder Showzen*.  *See* Rubin Decl. Exs. 117, 120.

[12] Among the titles of the works that the putative class plaintiffs have put at issue are: "Dethroned"; "Here Comes The King"; "Off The Hook"; "Oh Yeah"; "The Shankill Butchers"; "Jager Yoga"; "Pursuit: Motorcycle Into Bus"; "Dangerous Pursuits"; and "North Hollywood Shootout."  *See* Rubin Decl. Ex. 129.

works like these that they misappropriated plaintiffs' copyrighted content. *Corbis*, 351 F. Supp. 2d at 1108.[13]

Even if one could discern that some of these clips were commercially produced (which in many instances is far from obvious or simply not true), that certainly does not indicate "obvious" infringement. *See Io*, 586 F. Supp. 2d at 1149 (rejecting argument that "the professionally created nature of submitted content constitutes a per se 'red flag' of infringement sufficient to impute the requisite level of knowledge"); *Corbis*, 351 F. Supp. 2d at 1109 (service provider's knowledge that certain types of works may be "the subject of online copyright infringement" does not create red-flag knowledge). That is especially true for YouTube, which hosts all sorts of professional material that is uploaded with full authorization. Maxcy Decl. ¶¶ 3-5, 9-10; Walk Decl. ¶¶ 3-4.

---

[13] That reality is perhaps best illustrated by actually looking at a few examples of the clips in suit, which we respectfully invite the Court to do. *See* Schapiro Ex. 181A/181B (supposedly a clip from *Shorties Watching Shorties*); Ex. 182A/182B (supposedly from *A Shot at Love*); Ex. 183A/183B (supposedly from *Viva Hollywood*); Ex. 184A/184B (supposedly from *Wildboyz*); Ex. 185A/185B (supposedly from *The White Rapper Show*); Ex. 186A/186B (supposedly from *So NoTORIous*); Ex. 187A/187B (supposedly from *Run's House*); Ex. 188A/188B (supposedly from *Human Giant*); Ex. 189A/189B (supposedly from *Distraction*); Ex. 190A/190B (supposedly from a Premier League match); Ex. 191A/191B (supposedly from a different Premier League match); Ex. 192A/192B (supposedly containing excerpt from "American Beauty Theme"); Ex. 193A/193B (short homemade clip of man supposedly playing "Pretending" on the electric guitar); Ex. 194A/194B (supposedly from "Pursuit: Motorcycle Into Bus"); Ex. 195A/195B (supposedly from a French Open match).

(ii) <u>Viacom's extensive and varied use of YouTube for marketing negates any argument that the appearance of Viacom content indicates "obvious" infringing activity</u>.

Even assuming that YouTube reviewed a given clip that obviously contained plaintiffs' copyrighted material, plaintiffs' widespread use of YouTube to market and promote their content—uses that continued even in the midst of this litigation—defeats any notion that the presence of their material on YouTube creates a fact or circumstance from which infringing activity is apparent.

From YouTube's earliest days, many major media companies, including NBC, Disney, Fox, BSkyB, the Weinstein Company—and Viacom itself—have uploaded video clips from their movies and television shows to YouTube for promotional purposes. Decl. of Arthur Chan ("Chan Decl.") ¶¶ 4, 5, 9; Decl. of Daniel Ostrow ("Ostrow Decl.") ¶¶ 2, 4, 5, 6; Rubin Decl. ¶ 2 & Exs. 1-41. Two facets of this practice are especially relevant to the DMCA's knowledge inquiry because they so significantly complicate the task of distinguishing between authorized and unauthorized uploads: (1) the sheer number of authorized video clips that Viacom (and other media companies) have allowed to flood YouTube; and (2) the opaque manner in which those clips are frequently placed on YouTube.

Viacom alone has uploaded thousands of videos to YouTube to market hundreds of its programs and movies, including many that are now works in suit. *See, e.g.,* Rubin Decl. ¶¶ 2, 14, 18 & Ex. 1, Exs. 3-16, Ex. 17 ("we've uploaded a boatload of clips onto YouTube for distribution"), Ex. 18-30, Ex. 31 (long list of videos uploaded to YouTube by Viacom's marketing agent). Viacom does so for a simple reason: this kind of marketing works. As a Viacom employee explained to

*The Wall Street Journal*: "you almost can't find a better place than YouTube to promote your movie." Schapiro Ex. 23 at 3; *see also id.* Ex. 24 (70:16-71:24); Rubin Decl. Ex. 3, Ex. 9 (GOO001-01855886) ("we're using YouTube for all of our online video, and we love it"). Likewise, an MTV marketing executive described posting clips to YouTube as a "no brainer" and raved that the benefits of placing content on YouTube were "overwhelming." Schapiro Ex. 25 (43:17-22), Ex. 26. YouTube played such an important role in Viacom's marketing strategy that even the filing of this lawsuit did not curtail its uploading. Rubin Decl. ¶¶ 2, 3 & Exs. 23-31, 60-66; Schapiro Ex. 27 (23:3-24:23).

This so-called "viral marketing" is not confined to Viacom. As one of Viacom's own marketing agents explains in a sworn declaration accompanying this motion, the "practice by viral marketers of using YouTube to promote music, television programs, and motion pictures is widespread." Ostrow Decl. ¶ 6; *see also* Chan Decl. ¶¶ 3, 4, 9; Rubin Decl. ¶ 2 & Exs. 2, 32-41; Schapiro Ex. 28 (GOO001-05161257-58). Given the broad scope of this marketing, YouTube could not be charged with knowledge of infringement merely because it came across a video that was clearly from a professionally produced television show or movie.

Although Viacom sometimes places materials on YouTube openly,[14] much of its marketing activity takes place covertly.[15] Like many other large content owners,

---

[14] Paramount, for example, posted nearly 100 clips to YouTube using its official "Paraccount." Schapiro Ex. 29 (38:10-21), Ex. 30. MTV has similarly uploaded numerous videos to YouTube through its "MTV2" account. *See* Schapiro Ex. 31 (26:20-27:10). Various other Viacom entities have done the same, through accounts

Viacom regularly uses so-called "stealth marketing" to get its content onto YouTube. The goal is to create the appearance of authentic grass-roots interest in the content being promoted. Chan Decl. ¶¶ 4, 10; *see also* Rubin Ex. 10 (Viacom employees discussing posting YouTube videos under "fake grassroots account"); Rubin Decl. ¶ 2 & Exs. 1, 3-9, 11-31; Schapiro Ex. 34 (VIA00434221) (Paramount SVP of Marketing: clips posted to YouTube "should definitely not be associated with the studio - should appear as if a fan created and posted it").

Viacom has used a variety of means to conceal its connection to many of the videos that it has uploaded to YouTube:

- Viacom has hired an army of third-party marketing agents to upload clips on its behalf. Schapiro Ex. 35; Chan Decl. ¶ 5.[16]

- Viacom and its agents use YouTube accounts that lack any discernable connection to Viacom (such as "MysticalGirl8," "Demansr," "tesderiw," "GossipGirl40," "Snackboard," and "Keithhn"). *See* Ostrow Decl. ¶ 6; Chan Decl. ¶ 4; Rubin Decl. ¶ 5(a)-(f).

- Viacom has deliberately used email addresses that "can't be traced to [Viacom]" when registering for YouTube accounts. Schapiro

---

such as "Paramount Vantage," "Paramount Classics" and "SpikeTV." *Id.* Ex. 24 (22:11-22:20), Ex. 32 (151:17-152:20).

[15] *See* Rubin Ex. 19 (VIA00345822) (instructing that clip "get posted on YouTube asap … NOT WITH A PARAMOUNT LOGO OR ASSOCIATION"), Ex. 15 (VIA00369535–36) ("THIS MUST BE VIRAL AND NOT DIRECTLY CONNECTED TO US!"); Schapiro Ex. 33 (FS048715-16) (describing online marketing plan as a "covert operation").

[16] Viacom used at least 18 separate firms to upload content to YouTube on its behalf: ICED Media (Schapiro Ex. 36); Special Ops Media (*id.* Ex. 37); M80 (*id.* Ex. 38); WiredSet (*id.* Ex. 39, 43); New Media Strategies (*id.* Ex. 40); Cornerstone Promotions (*id.* Ex. 41); Fan2Band (*id.*); Fanscape (*id.*); Total Assault (*id.*); Filter Creative Group (*id.*); Carat (*id.* Ex. 42); T3 (*id.*); BuzzFeed (*id.*); ADD Marketing (*id.* Ex. 43); TViral (*id.* Ex. 44); Deep Focus (*id.* Ex. 45 (28:7); Red Interactive (*id.* (28:6-7); and Palisades Media Group (Chan Decl. ¶¶ 3-4).

Ex. 46; *see also* Rubin Ex. 22 (videos should be "uploaded from [a] personal [account] and not associated with the film"), Ex. 26.

- Viacom employees have made special trips away from the company's premises (to places like Kinko's) to upload videos to YouTube from computers not traceable to Viacom. *See* Schapiro Ex. 47 (158:20-22); *see also* Schapiro Exs. 48, 49.

- Viacom has altered its own videos to make them appear stolen, like "footage from the cutting room floor, so users feel they have found something unique." Rubin Ex. 4.[17]

Viacom's efforts to hide the source of the content it caused to be posted on YouTube were too good: despite its elaborate process for identifying the clips in suit, Viacom and its lawyers were unable to recognize that dozens of the clips alleged as infringements in this case were uploaded to YouTube with Viacom's express authorization. *See* Section I.D.2.b.(ii), *infra*.

In addition to its stealth marketing practices, Viacom has further obscured the line between authorized and unauthorized clips by broadly releasing various videos featuring its content. Schapiro Ex. 27 (205:17-206:2). These videos are designed to spread virally over the Internet to generate publicity for Viacom's television shows and movies. When users post these videos, as Viacom hopes that they will, on sites like YouTube, Viacom acknowledges that their presence is authorized. *See id*. at 206:4-20.[18] Because YouTube lacks an accounting of what

---

[17] *See also* Rubin Ex. 20 (describing how Viacom would "rough up" clips with time codes and other internal studio markings to make them seem illicit, even though the clips were actually part of a carefully crafted marketing initiative), Ex. 14 ("the goal is to make [the video clip] looked 'hijacked'"); Schapiro Ex. 50 (VIA10406143) (promotional video "[d]eliberately made to look like it was cut together by a 16 year old").

[18] *See also* Rubin Ex. 23 (BAYTSP003732680) (memorializing Viacom's instructions to BayTSP to "not remove" any YouTube video that matches one uploaded from an

these promotional videos look like, even if YouTube were to recognize that a given clip contains Viacom content, YouTube would not be able to tell whether that particular clip is one that Viacom has approved for promotional distribution across the Internet. It is not even clear that having such an accounting would help: Viacom itself was confused on this point when selecting its clips in suit, many of which turn out to be *identical* to Viacom's authorized promotional videos. Rubin Decl. ¶ 17 (identifying over a hundred identical matches between clips in suit and Viacom's approved promotional videos).

These activities bear directly on YouTube's knowledge of alleged infringing activity. Through press accounts and occasional direct contacts, and often just by accident or anecdote, YouTube knew generally that some of these promotional activities were occurring. Schaffer Decl. ¶¶ 7-8; Decl. of Roelof Botha ("Botha Decl.") ¶¶ 11-12; Rubin Decl. ¶ 1, Exs. 2, 32-41. But YouTube also knew that the marketing activity it actually became aware of was just the tip of the iceberg, and that Viacom and a wide variety of major media companies were extensively using the service for promotional purposes without telling YouTube (or anyone else) what they were doing. Schaffer Decl. ¶ 6; Maxcy Decl. ¶¶ 3-7; Schapiro Ex. 53 (March 2006 email discussing news article about Fox uploading material to YouTube;

approved Viacom account); Schapiro Ex. 51 (VIA11787096) (Viacom attorney instructing BayTSP that "viral advertising" videos "should stay up"), Ex. 52 (VIA00431656) (Viacom employee stating that a clip in suit is "approved" because it is promotional video), Ex. 27 (207:9-22) (Paramount executive confirming that a clip in suit was approved to be on YouTube because it was promotional).

YouTube PR director notes: "This is exactly why we don't really know who is uploading the content."); Botha Decl. ¶ 11-12.

This fact is powerfully demonstrated by examining the countless errors that Viacom and many other content owners make in sending takedown notices to YouTube. YouTube routinely received takedown requests that were subsequently withdrawn after the media companies who sent them realized that their notices had been targeted to content that they themselves had uploaded or authorized. *E.g.,* Rubin Decl. ¶ 4 & Exs. 69-83. Both before and well into this litigation, Viacom's own monitoring agent, BayTSP, identified as "infringing" many videos that had in fact been posted to YouTube with Viacom's permission. These self-inflicted infringement claims led to counter-notices from Viacom's marketers, sheepish retractions from BayTSP, and even to the suspension of Viacom's own authorized YouTube accounts for supposed copyright violations. *See e.g., id.* ¶ 3 & Exs. 42-68; *see also* Section I.D.2.b.i, *infra*.

In *UMG II*, the court relied on the fact that a *single* artist affiliated with the plaintiff had uploaded *one* video to Veoh in finding that Veoh could not be charged with knowledge of the infringements that plaintiff alleged. 665 F. Supp. 2d at 1110 n.13. The evidence of Viacom's viral and stealth marketing on YouTube is orders of magnitude beyond that. Those practices alone would be sufficient to preclude Viacom from claiming that the presence of a given Viacom video on YouTube is anything close to a "red flag" of obvious infringing activity.

(iii) <u>Viacom's "leave up" practices further undermine any</u>
<u>argument that the presence of its material is a "red flag."</u>

Viacom's use of YouTube for promotional purposes does not end with the videos that Viacom or its agents themselves uploaded. An equally important part of Viacom's marketing strategy has been to "leave up" (by intentionally refraining from sending takedown notices) videos containing Viacom content that may have been posted on YouTube by users with no ties to Viacom. As the former President of MTV candidly explained: "While we were issuing takedown notices against some of the content, there was other content which we were allowing to continue to be on YouTube." Schapiro Ex. 4 (194:8-11).

Viacom's "leave-up" practices are not the product of indifference, but rather are deliberate corporate policies, the details of which were known only to Viacom and its agents. Viacom authorized broad categories of its content to remain on YouTube and gave detailed (and often changing) guidelines to the agents that it hired to monitor YouTube and other websites for Viacom content. In October 2006, for example, Viacom told BayTSP (Viacom's chief monitoring agent) to leave up on YouTube all clips containing Viacom content that were shorter than 2½ minutes in length, regardless of who had posted to them. Schapiro Ex. 54 (BAYTSP 001093412). Viacom then expanded its approval of clips on YouTube, directing that all videos containing its content be left up on the site unless they constituted "full episodes" of its programs. *Id*. Ex. 55 (BAYTSP 003724704), Ex. 56 (214:25-215:6). Viacom even instructed BayTSP to leave up *full episodes* of certain programs—

including some that are now works in suit. *Id.* Ex. 57 (BAYTSP 001125605-08), Ex. 11 (115:6-118:1).

Viacom's authorization of material to remain on YouTube extends to the very programs that it has put front and center in this case, including *The Daily Show with Jon Stewart* and *The Colbert Report*. Viacom's executives felt "very strongly that [they didn't] want to stop the colbert and daily clips" on YouTube. *Id.* Ex. 58 (VIA01676948). The former President of MTV testified that Viacom did not want to take down "clips from Jon Stewart and Stephen Colbert" because "we were concerned that Jon Stewart and Stephen Colbert believed that their presence on YouTube was important for their ratings as well as for their relationship with their audience." *Id.* Ex. 4 (199:22-201:2). Accordingly, through at least October 2006, Viacom had a specific internal policy of declining to issue takedown notices for clips of those shows that were less than five minutes long. *Id.* Exs. 59, 60. Viacom later adjusted that rule and confidentially instructed its agent BayTSP to leave up all clips of these shows shorter than three minutes. *Id.*

Viacom's desire to have clips from the television program *South Park* on YouTube was, if anything, even more pronounced. Not only did Viacom apply its various leave-up rules to clips of the show, but one of Viacom's most senior executives publicly blessed users' practice of uploading clips from *South Park* to YouTube. *Id.* Ex. 61. A month later, in November 2006, when Viacom found 316 *South Park* clips on YouTube, it requested removal of only one, and chose to leave

up or "pass on" the remaining 315. *Id*. Ex. 62 (BAYTSP 001093518), Ex. 11 (134:19-136:10, 138:25-139:14).

Viacom's confidential instructions to BayTSP about what to take down and what to leave up grew so detailed and complex that the Viacom employee responsible for overseeing the BayTSP relationship compared them to *Crime and Punishment*. *Id*. Ex. 12 ( 83:6-84:8).[19] Viacom came up with new rules every few days—sometimes even changing the rules within the same day. *Id*. Exs. 66-74. Applying these instructions, Viacom deliberately left up on YouTube thousands upon thousands of clips containing its content. *Id*. Ex. 57, Ex. 62 (Nov. 14, 2006 chart showing that Viacom's instructions led to removal of 58 videos on YouTube while leaving up 555 videos from the same group of shows), Ex. 75 (Oct. 2006 email: "We are leaving a majority of the content on YouTube"), Ex. 76 (BAYTSP 001125759) (November 16, 2006 report indicating that Bay left up 550 Viacom clips on YouTube that day). Indeed, Viacom even crafted marketing campaigns around its decisions to leave up certain user-posted videos. *See* Rubin Ex. 28 ("we will assume audiences will tape the trailer on their own and post it on YouTube – we will NOT issue take-down notices"), Ex. 12 (marketing campaign incorporating user-uploaded clips).

---

[19] *See also* Schapiro Ex. 63 (detailing complex "ground rules" for BayTSP to use in deciding whether to request takedown of Paramount content), Ex. 64 (Paramount instructions to BayTSP about what content should and should not be the subject of takedown notices), Ex. 65 (BAYTSP 003718201) (Paramount instructing BayTSP to "err on the side of leaving some infringing material up rather than being overly aggressive and taking down one of the 'many approved clips'").

Viacom publicly stated that it was choosing to allow some of its material to remain on YouTube. Schapiro Ex. 77 (discussing November 2006 news article titled "Viacom Keeps Clips on YouTube"). But Viacom did not share with YouTube its detailed and ever-changing takedown instructions to BayTSP. *Id.* Ex. 11 (118:10-19). The only way that YouTube knew which clips Viacom actually wanted to remove at any given time was from the takedown notices it received.

* * *

Viacom's leave-up policies—along with its stealth-marketing practices and authorization of promotional materials—bear crucially on the application of the Section 512(c) safe harbor. After all, if Viacom deliberately refrained from sending takedown notices for certain videos, how could it be that YouTube was obligated to remove those same videos on sight—without any request from Viacom? Moreover, in light of Viacom's decision to authorize clips of all shapes and sizes on YouTube, the presence of Viacom material there is not and cannot be a blatant indication of unauthorized activity. To the contrary, even if Viacom could show that YouTube saw a particular clip and even if YouTube had recognized that clip as Viacom's content, YouTube still would not know whether that clip was unauthorized.

In short, Viacom's conduct negates what the DMCA requires for knowledge: "obvious and conspicuous circumstances" from which YouTube could have concluded only that the video was an unauthorized infringement of plaintiffs' copyright. S. Rep. 105-190, at 49; *Corbis*, 351 F. Supp. 2d at 1109.

(iv)    <u>The array of authorized uses of and complex ownership issues surrounding plaintiffs' works defeats any claim that YouTube had disqualifying knowledge</u>.

The actions of the putative class plaintiffs equally undermine YouTube's ability to know what content is unauthorized.  Those plaintiffs have licensed much of their content to appear on YouTube in many different guises.  That negates any claim that the presence of clips with such content represents obvious infringing activity.  Those problems are compounded by the complex co-owner relationships that attend many of plaintiffs' works.

For example, Rodgers & Hammerstein ("R&H") has issued numerous licenses that allow licensees to post R&H content—including musical compositions that are now works in suit—on the Internet, including on YouTube.  *See* Schapiro Ex. 78 (132:24-135:13), Ex. 22 (Responses 26-29).  R&H has also specifically authorized its content to appear on YouTube on multiple occasions (*see id.* Ex. 79 (115:15-120:17)).  In one such instance, R&H authorized a clip of "Do Re Mi" (a work in suit) to be on YouTube in a promotional piece on Dutch television.  *Id.* Ex. 78 (194:23-196:10).[20]  In another instance, R&H authorized Turner Classic Movies to post a clip on YouTube that included the composition "My Favorite Things" (also a work in suit).  *Id.* Ex. 79 (81:2-82:2, 120:11-120:17).  R&H has also authorized numerous theater

---

[20] According to its corporate representative, R&H decided to allow this clip to remain on YouTube "[b]ecause it got a fair amount of public attention" and because R&H was "in the process of being bought by a Dutch company and it just seemed to us, from a public relations standpoint, that we were better off licensing it than sending a Takedown notice."  Schapiro Exs. 78 (195:8-197:19), 80.

companies who licensed performance rights to R&H's works to post clips of their productions on YouTube. *Id.* (29:22-30:22, 31:6-32:12).

Similarly, Cal IV has not only issued general Internet licenses for its content (including works in suit (*id.* Ex. 81), but has also authorized such works to appear specifically on YouTube for promotional purposes. *Id.* Ex. 82 (Cal IV's head of licensing stating "we are willing to grant certain promotional licenses for the YouTube platform"). Stage Three has likewise issued numerous licenses for its musical compositions (including works in suit) to appear on YouTube. *Id.* Ex. 83 (Responses 17, 19). For example, when Stage Three licensed the work in suit "Rock & Roll Queen" to appear in the film *RockNRolla*, it expressly allowed both the film company and the band to post the synchronized content on YouTube. *Id.* Ex. 84, Ex. 85 (117:20-118:20, 123:4-124:5). Cherry Lane too has authorized its content, including works in suit, to be posted on YouTube. *Id.* Ex. 86 (Response 17). Cherry Lane even sponsored a contest that specifically invited participants to "record their own versions of [a Cherry Lane] song and post the video to www.youtube.com." *Id.* Ex. 87.

These are not isolated examples. Most of the other putative class plaintiffs—including Tur, Bourne, Carlin, and X-Ray Dog—also have licensed third parties to put their content (including works in suit) on YouTube. *Id.* Ex. 88, Ex. 89 (Responses 16-18), Ex. 90 (Responses 17, 19), Ex. 91 (Responses 17, 19), Ex. 92 (124:7-125:5), Ex. 93. While FFT and Music Force deny having authorized actual works in suit to appear on YouTube, they both concede that they have posted on

YouTube other content that they own or authorized others to do so. *See id.* Ex. 94 (188:5-197:24), Ex. 95, Ex. 96, Ex. 97 (acknowledging that FFT employee created a YouTube account through which he uploaded videos "to create a little buzz"), Ex. 98 (Responses 30, 40, 41).[21] And several of the soccer clubs that make up (and own) the Premier League have created official YouTube "channels" to which they have uploaded a variety of videos, including footage of matches. *Id.* Ex. 17 (276:9-297:7), Ex. 100, Ex. 101. These plaintiffs did not inform YouTube of the details of their licensing arrangements that allow the posting of their content on YouTube. *See, e.g., id.* Ex. 102 (206:14-207:19), Ex. 85 (126:13-17), Ex. 92 (135:18-23), Ex. 79 (121:15-20). Thus, even assuming that YouTube had recognized a given clip as containing a particular class plaintiff's copyrighted material, it would not have been apparent to YouTube whether that clip was licensed or unlicensed.[22]

Apart from the putative class plaintiffs' extensive licensing practices, many of plaintiffs' works—including works in suit—are co-owned by other parties. *See id.* Exs. 83 at Response 68; 98 at Response 25; 103 at Response 33; 104 (48:16-49:12). Each of those co-owners of those works—and each of their potential licensees— would have the right to authorize the appearance of the work on YouTube

---

[21] Despite Music Force's denial, there is evidence that Music Force at least impliedly authorized one of its works in suit to be on YouTube. *See* Ex. 98 (Response 44) (admitting that the YouTube account "grumpoM" was created by a Music Force employee); Ex. 99 (screenshot of the channel for "grumpoM," which identifies a music video for the work in suit "What You Won't Do For Love" as a "Favorite" video).

[22] These complex licensing issues are further complicated by several putative class plaintiffs' use of foreign sub-publishers to license their content in various regions of the world. *See* Section I.D.2.b.iii, *infra.*

independently of the plaintiffs. *See Jasper v. Sony Music Entm't, Inc.*, 378 F. Supp. 2d 334, 346 (S.D.N.Y. 2005) ("It is basic copyright law that joint authors may legally grant a license to a third party to exploit the work without co-author consent."). Accordingly, even if YouTube had perfect knowledge of class plaintiffs' licensing activities—which it certainly did not—YouTube would have had no way of knowing whether any given clip incorporating jointly owned copyrights is authorized. Schapiro Ex. 104 (69:7-71:2) (admitting that Cal IV has no knowledge about licenses granted by other co-owners for a work in suit and would "probably not" be able to acquire such information).

Complex licensing and co-ownership arrangements of this type confirm the near-impossibility of determining whether the presence on the site of a specific clip (for which YouTube has received no DMCA takedown notice) is authorized. *Cf. Faulkner v. Nat'l Geographic Society*, 211 F. Supp. 2d 450, 475 (S.D.N.Y. 2002) (knowledge of infringement could not be established because questions of copyright ownership "turn[] on complex analysis of contractual arrangements"). Like the evidence of the widespread stealth marketing practiced by Viacom and other media companies, therefore, the plaintiffs' tangled licensing and co-ownership issues rebut any claim that the mere presence of material that might somehow be associated with these plaintiffs would be a fact or circumstance from which infringing activity is apparent.

     <u>Fair use and *de minimis* use further negate plaintiffs' ability to show knowledge</u>.

Even if plaintiffs could somehow overcome all the problems described above, considerations of fair use (and *de minimis* use) would still preclude a finding of knowledge.

The fair-use doctrine allows limited use of copyrighted material without requiring permission from the rights holders. *See generally Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006). Because neither the fair use (nor the *de minimis* use) of a copyrighted work is an infringement (*see* 17 U.S.C. § 107; *On Davis v. Gap, Inc.*, 246 F.3d 152, 172 (2d Cir. 2001)), any clip for which there is even a *debatable* claim of fair use is not one that YouTube had any obligation under the DMCA to unilaterally remove. A service provider cannot lose its safe harbor simply because it might err in making what are often complex or difficult fair-use determinations. H.R. Rep. No. 105-551 (Part 2), at 57-58).[23] Any other result would unduly limit the artistic, political, and personal freedom embodied in the fair-use doctrine, which "fosters artistic dialogue and influence within the copyright regime by protecting authors' rights [to] build upon and transform existing works without having to purchase a license to do so." *Abilene Music, Inc. v. Sony Music Entm't, Inc.*, 320 F. Supp. 2d 84, 88 (S.D.N.Y. 2003).

---

[23] *See generally Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1259 (2d Cir. 1986) ("[T]he fair use determination often requires a complex and subtle evaluation of numerous mixed issues of fact and law."); *Leibovitz v. Paramount Pictures Corp.*, 948 F. Supp. 1214, 1219 (S.D.N.Y. 1996) (describing fair-use analysis as "a complex and daunting task").

Many of the clips in suit are plausible (indeed powerful) examples of fair and/or *de minimis* uses:

- 1:27 home-movie of middle-aged man dancing in his living room to ZZ Top song with his family laughing at him in the background (Schapiro Exs. 196A/196B);

- homemade instructional video showing how to play "Jesus Just Left Chicago" on guitar (Schapiro Exs. 197A/197B);

- short fan tribute video to soccer player Eduardo Da Silva using only a few seconds of match footage (Schapiro Exs. 198A/198B);

- home video of user discussing YouTube contest with music playing in the background (Schapiro Exs. 199A/199B);

- lewd parody of "My Favorite Things" (Schapiro Exs. 200A/200B).[24]

These examples do not even include the scores of clips in suit that are extremely short, including many that are *under five seconds long* and at least one that is only *one second* long. Rubin Decl. ¶¶ 15-16.

For present purposes, the Court need not determine whether such clips actually qualify as fair or *de minimis* uses. The point rather is that these calls are sufficiently close that—even assuming that YouTube knew that the clip at issue

---

[24] *See also id.* Exs. 201A/201B (home-video footage of man vacuuming his floor then playing part of "Rough Boy" on the ukulele in his bathtub); Exs. 202A/202B (short amateurish clip of girl singing part of the "Sound of Music" in a field); Exs. 203A/203B (:33 second clip from amateur theatrical performance of "Shall We Dance"); Exs. 204A/204B (1:54 clip of man performing "Edelweiss" on piano in his living room); Exs. 205A/205B (clip from documentary about tennis player Justine Henin that uses a few seconds of French Open match footage); Exs. 206A/206B (30-second clip of man performing Yo-Yo tricks set to excerpt from the song "The Infanta"); Exs. 207A/207B (:34 second clip consisting of original solo guitar performance over instrumental section of "Rough Boy"); Exs. 208A/208B (home video footage of man playing solo guitar and trying to sing "Of Angels and Angles"); Exs. 209A/209B (homemade instructional video of man playing "Blue Jean Blues" on solo electric guitar); Exs. 210A/210B (49-second clip of man playing "Tube Snake Boogie" on solo electric guitar in his bedroom).

was on the service, contained plaintiffs' copyrighted content, and was posted without the authorization of any owner, co-owner, or licensee—YouTube still would not have been able to conclude that it was obviously infringing.

* * *

For all these reasons, plaintiffs cannot raise a genuine issue of fact about whether YouTube "had the requisite level of knowledge or awareness" that plaintiffs' copyrights were being violated. *Io*, 586 F. Supp. 2d at 1149.

        4.     <u>YouTube Responded Expeditiously Upon Receiving Notice Of The Claimed Infringements</u>.

Because YouTube otherwise lacked knowledge that any of the clips at issue here were infringing, YouTube's duty to "expeditiously" remove or block access to those videos was triggered only when it received valid notifications of claimed infringement from plaintiffs or their agents. 17 U.S.C. § 512(c)(1)(C).

Most of the clips in suit were first identified to YouTube in takedown notices. Schapiro Ex. 18 (148:8-18). YouTube has long had robust procedures in place for responding to such notices. Levine Decl. ¶¶ 14-26. YouTube removes almost all videos identified in a paper, email, or online DMCA notice within 24 hours or less. *Id*. ¶ 19. YouTube has worked hard to further expedite the DMCA process by creating an electronic takedown tool that allows copyright owners to easily search for and mark allegedly infringing videos, and send DMCA notices with a single click. *Id*. ¶ 18. The vast majority of the takedown notices that YouTube receives

are processed through this tool and thus are removed within minutes. *Id.* ¶ 19.[25]

YouTube also employs a dedicated team throughout the world to process manually-submitted DMCA notices and to assist copyright holders in providing the required information in cases where their notices are deficient. Levine Decl. ¶ 19. Applying those procedures, YouTube has removed each of plaintiffs' clips in suit that was the subject of a DMCA takedown notice. *Id.* ¶ 21.

YouTube has received frequent praise from many different copyright owners, including plaintiffs themselves, for its speedy responses to takedown notices. Levine Decl. ¶ 22.[26] Viacom's agent for sending takedown notices (BayTSP), has repeatedly acknowledged that YouTube makes it easy to send DMCA notices and

---

[25] A number of the plaintiffs have signed up for YouTube's automated takedown tool and have used it for years to secure the removal of videos containing their content. *See, e.g.,* Schapiro Ex. 17 (205:25-210:23), Ex. 105, Ex. 106 (describing Premier League's use of the tool), Ex. 107 (94:13-95:11) (acknowledging that YouTube notified FFT about the tool, that FFT signed up "to find an easy way to remove our content," and that the program "help[ed]" FFT remove clips), Ex. 108 (80:22-83:16, 84:8-16) (testifying that the tool has been "very useful" for Cherry Lane in finding and removing videos), Ex. 109 (BayTSP describing YouTube's takedown tool as "very simple and effective").

[26] *See also* Schapiro Ex. 110, Ex. 111, Ex. 112 (72:21-73:6, 82:21-83:15; 87:8-13), Ex. 113 (email from VH1's online marketing director thanking YouTube for the "quick turnaround" in removing clips), Ex. 114 (VIA10405834) (internal Viacom email explaining that YouTube has "a process in place for removal of videos, and do it all the time"), Ex. 115 (internal Viacom email describing YouTube's response to takedown requests as "so great"), Ex. 116 (email to YouTube praising the "speedy action" in responding to informal takedown request), Ex. 117 (138:25-139:17) (stating that YouTube responds to takedown notices on average "within 24 hours"), Ex. 78 (157:18-22) (stating that YouTube has always responded expeditiously to takedown notices), Ex. 20 (71:9-17) (admitting that YouTube responds to takedown notices "very quickly"), Ex. 102 (147:16-23) (agreeing that YouTube has always responded "promptly" to takedown notices), Ex. 107 (126:5-127:22) (admitting that YouTube removed all clips-in-suit within "days" of receiving a takedown notice), Ex. 118, Ex. 119 (showing that YouTube responded to XRD's takedown notice within 24 hours).

that it removes the material identified quickly and effectively.[27]  Perhaps the best example is what happened in February 2007 when, on a single day, Viacom sent YouTube a mass takedown notice pertaining to approximately 100,000 different videos, including certain of the clips in suit.  Schapiro Ex. 122 (494:4-17); Levine Decl. ¶ 20; Schaffer Decl. ¶ 14.  For months, Viacom had been accumulating these notices because it wanted, for strategic reasons, to send them all at one time.  Schapiro Ex. 4 (149:4-25;195:9-196:14), Ex. 123 ("We are queuing up the takedown notices as instructed by Adam [Cahan] at MTVN.  He wants to hold the notices as part of his strategy."), Ex. 124, Ex. 125.  Despite the unnecessary burden imposed by Viacom's stratagem, YouTube was able to remove virtually all the videos identified in Viacom's mass notice by the next business day.  *See* Levine Decl. ¶ 20; Schaffer Decl. ¶ 14.

Accordingly, there is no evidence raising a genuine factual issue about whether YouTube responded expeditiously to the takedown requests it received for the clips in suit.  *See Io*, 586 F. Supp. 2d at 1150 (granting summary judgment where evidence showed that, when service provider "receives DMCA-compliant notice of copyright infringement, it responds and removes noticed content as necessary on the same day the notice is received (or within a few days thereafter)").

---

[27] *Id.* Ex. 120 (BayTSP to YouTube: "I want to bring YouTube up and give you credit for the means and speed you perform the take down task."), Ex. 121 (BayTSP to YouTube: "We enjoy the relationship we have with you and always talk positively about the YouTube experience when it comes to copyright enforcement.").

**D.    YouTube Lacks The Ability To Control The Alleged Infringing Activity.**

The final relevant element of the Section 512(c) safe harbor is that the service provider "not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity."    17 U.S.C.  §  512(c)(1)(B).    A service provider loses safe-harbor eligibility only if the plaintiff can show *both* that the service provider had the right and ability to control the alleged infringements *and* received a financial benefit directly attributable to those infringements.    *Corbis*, 351 F. Supp. 2d at 1109. Plaintiffs can make neither showing.    We begin by addressing control: plaintiffs have advanced several theories as to why YouTube "controls" infringing activity on its site—none of them finds support in the DMCA or the cases interpreting it.

1.    <u>YouTube's Control Over Its System Does Not Give It Control Over Infringing Activity</u>.

As with knowledge, the DMCA's control inquiry is specific, not general.    The analysis focuses on the service provider's legal and practical control over *the particular infringing activity at issue*.    The statute's text makes that clear: the question is whether the service provider has the right and ability to control "*the* infringing activity" alleged by the plaintiff and to which a financial benefit is directly attributable.  § 512(c)(1)(B) (emphasis added).

Plaintiffs contend that YouTube has the right and ability to control the allegedly infringing activity at issue here because it takes place "on YouTube's own website . . . not on . . . websites controlled by others."    Viacom Am. Compl. ¶ 39; SACAC ¶ 78.    That claim ignores the text and structure of the DMCA and the cases

interpreting it, which make clear that a service provider's control of its system cannot equate to an ability to control particular infringing activity: "the plain language of Section 512(c) indicates that the pertinent inquiry is not whether [the service provider] has the right and ability to control its *system*, but rather, whether it has the right and ability to control the *infringing activity*." *Io*, 586 F. Supp. 2d at 1151. Congress presupposed that service providers would have control over their systems; the safe harbor applies to material "that resides on a system or network *controlled* or operated by or for the use of the service provider." § 512(c)(1) (emphasis added). If a service provider's control of its system amounted to control of whatever infringing activity occurred on that system, the protections offered by 512(c) would be illusory.

Moreover, "the 'right and ability to control' the infringing activity, as the concept is used in the DMCA, cannot simply mean the ability of a service provider to remove or block access to materials posted on its website or stored on its system." *Hendrickson*, 165 F. Supp. 2d at 1093. That is because the statute requires service providers to respond expeditiously to DMCA notices by disabling access to the material claimed to be infringing. § 512(c)(1)(C). Maintaining the legal right and practical ability to take such actions thus cannot constitute the right and ability to control infringing activity. "To hold otherwise would defeat the purpose of the DMCA and render the statute internally inconsistent." *Hendrickson*, 165 F. Supp. 2d at 1093; *see also UMG II*, 665 F. Supp. 2d at 1113-15; *Io*, 586 F. Supp. 2d at

1152; *Corbis*, 351 F. Supp. 2d at 1110. YouTube thus did not control the infringing activity alleged merely because the clips in suit appeared on YouTube's service.

The critical difference between a service provider's control over its site and its ability to control any infringing activity that may occur there is particularly pronounced for a service like YouTube, which hosts an overwhelming abundance of videos that no one has ever claimed (or could claim) are infringing. *See* Walk Decl. ¶ 3. It is not remotely the case that YouTube exists "solely to provide the site and facilities for copyright infringement." *Io*, 586 F. Supp. 2d at 1153. Even the plaintiffs do not (and could not) suggest as much. Indeed, they have repeatedly acknowledged the contrary.[28] Because YouTube houses such an overwhelming volume of video content that is not, and could not possibly be, claimed to be

---

[28] *See* Schapiro Ex. 126 (VIA02159159-64) (reporting conclusion of Viacom's "best minds" that "YouTube is the dominant platform of choice for [] audiences as they migrate to using video to express themselves" and "consumption of 'branded' content of YT is relatively low"), Ex. 127 (129:21-130:14) (former Viacom employee testifying that "one of the functions that YouTube served was to enable individuals to share videos, that they had created themselves, with their friends and family, and even the public at large.), Ex. 128 (79:7-80:3, 81:17-24, 83:12-16, 84:14-18) (Chairman of MTVN admitting various socially beneficial uses of YouTube and defending her own use of YouTube as "legitimate"), Ex. 129 (215:25-218:8, 224:2-225:13) (Viacom's Executive Vice President admitting to watching non-infringing videos on YouTube), Ex. 130 (19:10-14, 55:21-24) (President of MTVN's Entertainment Group acknowledges that content owners create channels on YouTube to showcase their content and considers the use of YouTube to watch videos to be "legitimate"), Ex. 25 (253:10-19) (MTV's Executive Vice President admitting to watching authorized videos on YouTube after following the link from an artist's or label's website), Ex. 112 (16:19-25) (VH1 Vice President uploads vacation videos to YouTube to share with friends and family), Ex. 20 (100:12-103:9), Ex. 131 (in-house counsel at Carlin America has watched hundreds of videos on YouTube and has posted at least 11 videos), Ex. 78 (R&H general counsel visits YouTube "mostly to see cat videos").

infringing, YouTube's control over its various systems in no way "equate[s] to the right and ability to control infringing activity." *Id.*

> 2. Legal And Practical Considerations Defeat Any Claim That YouTube Could Control The Infringing Activity By More Actively Policing Its Service.

Plaintiffs also suggest that YouTube controls the allegedly infringing activity because it did not proactively find and remove the clips in suit. Viacom Am. Compl. ¶ 39 (alleging control because YouTube failed to find and remove videos "obviously infringing Plaintiffs' copyrights"). That argument fails for multiple reasons: the DMCA expressly provides that service providers are not required to monitor for copyright infringement to qualify for safe-harbor protection; such affirmative monitoring of hundreds of millions of videos is impracticable; and in any event monitoring would not be effective in allowing YouTube to reliably distinguish authorized from unauthorized material, as confirmed by plaintiffs' own serial inability to make such distinctions.

> a. *The control test does not require service providers to monitor their services for potential infringement.*

*First,* a service provider's ability to monitor its service for possible infringement cannot amount to potentially disqualifying control. The statute expressly bars courts from "condition[ing] the applicability" of the safe harbors on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity." 17 U.S.C. § 512(m). Accordingly, a provider's "right and ability to implement filtering software, standing alone or even along with [its] ability to control users' access, also cannot be the basis for concluding that [it] is not eligible

61

for the 512(c) safe harbor." *UMG II*, 665 F. Supp. 2d at 1113. The control inquiry does not require a service provider to "adopt specific filtering technology and perform regular searches" for potentially infringing material. *Id.*

*Second*, as a practical matter, YouTube could not manually review the massive volume of videos uploaded to its site in an effort to determine what those videos are and whether they infringe plaintiffs' copyrights. Various witnesses unaffiliated with YouTube have recognized as much.[29] We have described above the sheer scale at which YouTube operates. Hundreds of thousands of new videos are submitted to YouTube each day, over *24 hours of new video footage every minute*. Hurley Decl. ¶ 26. Faced with a service much smaller and less diverse than YouTube, which had user-submitted videos *totaling* only in the hundreds of thousands, the court in *Io* held, as a matter of law, that "no reasonable juror could conclude that a comprehensive review of every file would be feasible." *Io*, 586 F. Supp. 2d at 1153. That is true *a fortiori* of YouTube's hundreds of *millions* of videos.

For YouTube to restructure its operations to try to manually prescreen every user-submitted video would not merely have been infeasible. It would require a fundamental change in the experience that YouTube offers its users, one that the DMCA, by its terms, does not require. The court in *Io* thus squarely rejected the

---

[29] *See, e.g.,* Schapiro Ex. 132 (92:15-21) ("a big website such as YouTube's would be very difficult to find all of the content that you're looking for, just because of the volume would preclude any process that involves a manual review of videos"), Ex. 133 (36:23-37:16) (Viacom witness testifying that it would have been "cost-prohibitive" to manually review videos uploaded to Viacom-owned video service because it received *hundreds* of clips a day).

argument that "Veoh should have changed its business operations to prevent infringing activity from occurring on its site." 586 F. Supp. 2d at 1154. "Declining to change business operations is not the same as declining to exercise a right and ability to control infringing activity." *Id*. Indeed, the notion that a service provider like YouTube must "reduce or limit its business operations is contrary to one of the stated goals of the DMCA," which aims to facilitate, not squelch, electronic commerce. *Id*. (citing S. Rep. 105-190, at 1-2). For these reasons alone, YouTube cannot be charged with control over the allegedly infringing activity.

> b. *Plaintiffs' own inability to distinguish authorized from unauthorized material on YouTube shows that YouTube lacks practical control over the alleged infringing activity.*

Even assuming, however, that it were somehow feasible for YouTube to manually screen all (or even a substantial portion) of the videos on the service, that would not give YouTube the practical ability to control the infringing activity that plaintiffs allege here. That is because, as in *Io*, "there is no assurance that [YouTube] could have accurately identified the infringing content in question." 586 F. Supp. 2d at 1153. Indeed, many of the same facts that make it impossible for the plaintiffs to establish that YouTube had disqualifying knowledge simultaneously undermine their claim of control. *See* Section I.C.3.b, *supra*. Perhaps the most powerful example is *plaintiffs*' persistent inability to distinguish material that they have authorized to be on YouTube from material they now contend is unauthorized. *See Io*, 586 F. Supp. 2d at 1153 (relying on evidence of plaintiffs' own inability "to readily identify which of it works allegedly were infringed" in finding that service provider lacked practical control over the alleged infringing activity).

(i) <u>Plaintiffs have had persistent difficulties determining which of their materials are authorized to be on YouTube.</u>

The varied uses that plaintiffs have made of YouTube make it difficult even for them to easily determine whether videos containing their content are actually unauthorized to be on YouTube.[30]  Indeed, Viacom recognized that without detailed instructions and elaborate record-keeping, even its own monitoring agents would be unable to effectively distinguish clips that Viacom wanted to remain on YouTube (and other sites) from those that it wished to take down.[31]

---

[30] Schapiro Ex. 47 (45:14-46:17) (Paramount marketer admitting that she could not confirm that a clip was authorized without reference to Paramount's "array of approval processes," both "internal and external"), Ex. 25 (239:14-242:11) (MTV marketer admitting that, without speaking to other employees, she could only "guess" as to whether a particular video clip was "leaked" to YouTube at MTV's direction), Ex. 27 (55:2-56:12) (Paramount executive testifying that no one in her group kept a complete list of all of the account names used to upload Paramount materials to YouTube because "it's a large company"), (244:2-19) (same witness admitting that she needed to "check with someone in publicity" to determine authorization of various clips from Paramount movie because "certain clips were approved for different usages."), Ex. 134 (159:7-21) (Viacom employee admitting that he could not know whether Viacom content he viewed on YouTube was authorized without a determination from the legal department), Ex. 11 (150:12-151:2) (BayTSP representative agreeing with statement that "there is no way to tell from a full episode [on YouTube] whether or not the person that uploaded it had authority").

[31] Schapiro Ex. 135 (agenda for meeting between BayTSP and Paramount to discuss, *inter alia*, Bay's need to receive "[c]opies of materials being posted so we can distinguish between authorized and un-authorized materials"), Ex. 136 (109:19-112:3) (describing Paramount's instruction to BayTSP that "if they had some sense that it was an unauthorized Paramount clip, they should put in a call [to Paramount marketing for confirmation] prior to issuing a takedown notice"), Ex. 27 (172:4-173:1) (Paramount marketing executive describing process Paramount put in place with BayTSP "not only to determine if content should be removed or not, but to identify what our approved marketing materials were so we could all be on the same page in terms of what that material consisted of"), Ex. 57 (email between BayTSP and MTV to "make sure that we are all on the same page" regarding the applicable takedown rules), Ex. 137 (BAYTSP 003742451) (Paramount instructing

In an effort to prevent the removal of videos that Viacom had authorized (and to avoid the continued embarrassment of misdirected takedown notices), Viacom has tried to maintain internal "whitelists" of approved YouTube user accounts. Schapiro Ex. 122 (414:24-420:6), Ex. 139 (162:6-10, 167:22-168:7).[32] Despite Viacom's efforts, however, its whitelists consistently were incomplete and inaccurate. Rubin Decl. ¶ 5(a)-(f) & Exs. 84-116. It is not surprising, therefore, that Viacom's left hand often didn't know what its right hand was doing.[33] Viacom and

---

BayTSP: "Please do not initiate takedown actions without express prior written approval from us."), Ex. 138 (BAYTSP001125473) (Oct. 2006 email chain with Viacom representative requesting from VH1 marketing personnel "everything that you have seeded thusfar [sic] as we are engaging an outside service to send take down notices for full episodes and clips in excess of 2 minutes and 30 seconds and we don't want to have notices sent for content we seeded" and in response receiving list of YouTube clips and user names for "what we've posted as approved clips to date").

[32] Rubin Decl. ¶ 5(a)-(f); Schapiro Ex. 140.

[33] *See, e.g.,* Rubin Ex. 64 (Viacom marketing agent noting that in "big companies like our clients . . . one department isn't aware of what another department is doing."); Schapiro Ex. 65 (Paramount marketing executive explaining that "I need to speak to the publicity dep't before confirming which [videos] should be taken down"), Ex. 141 (BayTSP informing Paramount that "[w]e are going to hold off on removing the clips on YouTube cause we do not know which videos Marketing has put up"), Ex. 142 (VIA11918373) (April 2006 Paramount email chain discussing whether YouTube clips from Paramount film "MI:3," a work in suit, were authorized marketing clips), Ex. 143 (June 2007 email chain showing BayTSP unable to determine whether a series of YouTube clips from Paramount film *Transformers*, a work in suit, were authorized), Ex. 144 (May 2007 exchange between BayTSP and Paramount about YouTube clip from *Transformers*, concluding with instruction "Please do NOT take this down"), Ex. 145 (email chain showing confusion within Paramount about whether clips posted to YouTube from the film "There Will Be Blood," a work in suit, were authorized), Ex. 146 ("of course there's always the possibility that the marketing groups within the diff channels are posting without us knowing"); 147 (exchange between BayTSP and Viacom legal: Q: "Is this one of your 'approved' names: MTV2AllThatRocks?" A: "I do not know for sure."), Ex. 148 (BayTSP asking MTV whether "bestweekevertv" was "one of your authorized posting accounts on YouTube").

its agents routinely made mistakes in sending DMCA takedown notices, demanding that YouTube remove videos that, on closer inspection, turned out to have been authorized by Viacom. Rubin Decl. ¶ 3 & Exs. 42-68 (identifying numerous mistaken takedowns); Schaffer Decl. ¶¶ 15-18 (describing mistakes in Viacom's mass takedown).[34] Indeed, Viacom's mistaken takedown requests resulted on several occasions in the suspension of Viacom's *own* YouTube accounts or the accounts of its authorized marketing agents.[35] Viacom also erroneously requested the takedown of many videos that *other* content owners had authorized to be on YouTube, causing one frustrated company to complain to YouTube about Viacom's "blatant abuse of the DMCA takedown statute." Schaffer Decl. ¶ 17 & Exs. 5-7.

      (ii)    <u>Even in this litigation, Viacom has been unable to reliably distinguish authorized from unauthorized clips</u>.

Viacom's difficulties distinguishing authorized from unauthorized material on YouTube extend to its identification of allegedly infringing clips in this litigation. Viacom sued YouTube over scores of clips that Viacom (or its agents) had uploaded to YouTube. *See* Viacom's Notice of Dismissal of Specified Clips With Prejudice ("Notice of Dismissal") (Feb. 26, 2010). Viacom made those erroneous infringement allegations despite engaging in what it described as a "multi-step procedure

---

[34] *See also* Rubin Ex. 67 (Oct. 2008 email regarding mistaken Viacom takedown of clips from *Rob and Big*, a work in suit, uploaded to YouTube by one of Viacom's marketing agents); Schapiro Ex. 149 (e-mail explaining that BayTSP mistakenly took down authorized Paramount clip), Ex. 150 (emails re mistaken takedown of Paramount video on YouTube).

[35] Schaffer Decl. ¶ 15 & Ex. 4 (suspension of Spike account); *id.* ¶ 16 (suspension of official Paramount account); *id.* (suspension of Viacom marketing account); Rubin Decl. ¶ 3 & Exs. 42, 56-67 (identifying numerous other examples both before and during this litigation).

designed to accurately identify infringing content." Schapiro Ex. 178 (Feb. 28, 2008 Decl. of Michael Housley). It was only after YouTube's discovery efforts revealed what had happened that Viacom realized its mistakes, leading it—on what was to have been the final day of discovery (October 15, 2009)—to seek to withdraw hundreds of allegedly infringing clips from this case. Rubin Decl. ¶ 9.

The story does not end there, however. Viacom said that its attempted withdrawal of those clips was based on yet another "quality check" that revealed the mistaken identifications. By the time it actually got around to dismissing those clips, however, more than four months later, Viacom had discovered still *more* clips in suit that its marketing agents had uploaded, but that it had missed in its previous analyses. *See* Notice of Dismissal. Viacom's belated discovery of these additional authorized clips contradicted its verified interrogatory response, in which Viacom had sworn that it had uploaded or authorized none of the clips listed on its October 15, 2009 amended list of clips in suit. Schapiro Ex. 179. But even now— after all of Viacom's checking and rechecking, after its eleventh-hour bid to dismiss hundreds of its infringement allegations, after its interrogatory response, and after its latest attempt to clean up its list of allegedly infringing clips—Viacom *still* has not successfully identified all of the clips in suit that Viacom or its agents posted to YouTube. Despite all of Viacom's efforts, it continues to assert claims of infringement against clips that Viacom or its agents uploaded to YouTube. *See* Rubin Decl. ¶ 14 (citing examples).

These serial misidentifications bear directly on the control inquiry. In finding that Veoh lacked practical control, the court in *Io* relied on the fact that the plaintiff "in the course of discovery" had dropped *three* of the works that it had originally claimed had been infringed. 586 F. Supp. 2d at 1153. Viacom's problems go far beyond that. Both before and during this litigation, Viacom has been unable to readily or consistently discern which clips on YouTube containing its material were authorized and which were not. And if Viacom cannot effectively distinguish what it authorized from what it did not, YouTube has no chance of doing so.

> (iii) <u>The class plaintiffs similarly have had difficulties distinguishing authorized from unauthorized content</u>.

The putative class plaintiffs have had similar difficulties in determining what uses of their works on YouTube are authorized.[36] Like Viacom, class plaintiffs have sent takedown notices to YouTube that they eventually had to retract when it turned out that the videos at issue were actually authorized. These problems stem in part from the complex licensing and co-ownership practices described above. *See* Section I.C.3.b.(iv), *supra*. For example, Cal IV withdrew a DMCA notice it had sent to YouTube after another rights holder (Universal Music Group) filed a counter-notice: "At this time, CAL IV will not object to these URLs remaining on

---

[36] Schapiro Ex. 151 (e-mail between Cherry Lane employees asking whether a clip on YouTube had been licensed), Ex. 152 (111:4-24, 115:14-24) (even after consulting artist's manager about YouTube clip, Cherry Lane licensing director still could not tell "whether or not it was [licensed]."), Ex. 85 (192:17-193:10) (acknowledging that Stage Three must check extensive licensing database before sending takedown notices); *cf. id.* Ex. 153 (130:21-131:20) (witness describing "multi-step process" of determining whether a clip on YouTube is authorized: "One would have to put in [the] URL, see if it's still operable, identify if there was a sound recording associated with it and then conduct research to determine if it was licensed.").

your website until further clarification of ownership or licensing rights can be obtained." Schapiro Ex. 154, Ex. 103 (Response 23), Ex. 155 (68:9-72:14). Stage Three similarly withdrew a DMCA notice after one of its licensees (Eagle Rock Entertainment) pointed out that it was authorized to post the clip on YouTube. *Id*. Ex. 156 (ST00105023-26), Ex. 102 (151:21-154:17) (acknowledging that the takedown request notice was a "mistake" by Stage Three and its lawyers).

Further complications flow from the fact that certain of the putative class plaintiffs rely on a global network of sub-publishers to license their content in various regions throughout the world.[37] Because nothing in a YouTube clip itself reveals whether it was authorized by a sub-publisher, it may not be apparent even to the plaintiffs themselves whether a given video was unauthorized.[38] Determining authorization is not the only problem; the putative class plaintiffs have at times felt it necessary to retain *professional musicologists* just to determine whether certain YouTube clips contain content that was copied from one of their musical compositions. *See, e.g., id.* Ex. 102 (171:23-172:21), Ex. 157, Ex. 85 (217:6-220:11).

* * *

---

[37] *See* Schapiro Ex. 92 (150:13-22), Ex. 79 (100:7-15), Ex. 102 (61:25-63:22), Ex. 152 (20:15-22), Ex. 117 (153:15-154:10).

[38] *See, e.g.,* Schapiro Ex. 92 (158:11-160:7) (because YouTube clip was in an unrecognizable "Asian language of some sort," X-Ray Dog had to consult with foreign sub-publisher to determine whether it was authorized to be on YouTube; estimating that the process took "several" hours), Ex. 79 (13:23-18:20, 114:3-14) ("It did take me a couple of emails and a couple of phone calls to determine that that clip [on YouTube] was not authorized").

Plaintiffs' problems in quickly and reliably making determinations about their own content underscore some of the myriad challenges that YouTube—which has far less relevant or accurate information about plaintiffs' marketing practices, authorization decisions, and licensing and ownership arrangements—would face in even trying to distinguish, on its own, videos that are actually unauthorized from the vast sea of authorized user-submitted videos. Plaintiffs' confusion belies any suggestion that YouTube has the practical ability to control the infringing activity alleged.

3.  Any Infringing Activity Occurs Despite YouTube's Extraordinary Efforts To Combat Infringement.

The court in *Io* pointed to evidence that "Veoh has taken steps to reduce, not foster, the incidence of copyright infringement on its website" as confirming its conclusion that Veoh did not have the practical ability to control the infringing activity that plaintiffs there had alleged. *Io*, 586 F. Supp. 2d at 1154. That conclusion applies even more powerfully to YouTube. *Cf.* Schapiro Ex. 3 (27:20-28:4) (former Viacom CEO and an investor in Veoh not aware of anything Veoh does to protect copyright that YouTube does not do).

YouTube takes many steps to enforce its terms of use and assist content owners in keeping unauthorized material off the service. Videos that infringe copyright are contrary to YouTube's purpose and were forbidden by its earliest terms of service. Hurley Decl. ¶ 8; Schapiro Ex. 158 (49:8-16). And, as the site has grown, YouTube's tools for dealing with copyright issues have become increasingly more sophisticated and robust. Levine Decl. ¶ 18. YouTube's copyright-protection

apparatus of course includes full compliance with the DMCA. *See Io*, 586 F. Supp. 2d at 1153-54. And, even though the DMCA imposes no "obligation on a service provider to implement filtering technology at all" (*UMG II*, 665 F. Supp. 2d at 1111), YouTube has done just that, starting with its hashing technology in 2006, adding audio-based fingerprinting in early 2007, and launching an even more robust video-based content identification technology later that same year. King Decl. ¶¶ 4, 8, 14-15. (We discuss YouTube's various copyright-protection efforts in greater detail below. *See* Section II.B.2.c., *infra*.) There is no evidence that YouTube overrode those filtering systems to allow any of the clips at issue here to be posted or remain on the service.

For these reasons, there is no genuine factual dispute as to whether YouTube has the "right and ability to control" the instances of infringing activity alleged in this case. The Court thus need not even address the issue of financial benefit in order to conclude that YouTube is entitled to the Section 512(c) safe harbor.

### E. YouTube Did Not Receive A Financial Benefit Directly Attributable To The Alleged Infringing Activity.

Even assuming that YouTube did somehow have the right and ability to control the specific infringing activity alleged here, YouTube still would be entitled to safe harbor protection because it does not derive a financial benefit "directly attributable" to that activity. § 512(c)(1)(B). Like nearly all online service providers, YouTube earns revenue when users watch or click on the advertisements that run at various places on its website. YouTube's business model is entirely

71

legitimate, and YouTube does not seek to profit from infringement so as to run afoul of the DMCA's financial-benefit test.

1.    <u>The DMCA Protects Legitimate Services That Derive Their Value From Sources Other Than Infringement</u>.

The financial-benefit inquiry, like knowledge and control, focuses on the *particular* alleged infringements at issue. The statutory text, which refers to the benefit directly attributable to "*the* infringing activity" (emphasis added) makes that clear. 17 U.S.C. § 512(c)(1)(B). In determining which financial benefits are "directly attributable" to a particular alleged infringement, courts must be guided by the DMCA's legislative history and purpose. The financial benefit test included in Section 512(c) nods to the standard for vicarious liability under the common law of copyright infringement. *Cf. Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963). But the DMCA did not simply codify the common-law standard for vicarious liability.

To the contrary, Congress expressly crafted the safe harbors to protect even those service providers who might be found vicariously liable under the common law. *See* S. Rep. 105-190, at 20; *CoStar*, 373 F.3d at 555. Thus, rather than simply codify the common-law vicarious-liability standard for "financial benefit," Congress instructed courts applying the new DMCA test to "take a common sense, fact-based approach, not a formalistic one." S. Rep. 105-190, at 44; H.R. Rep. 105-551 (Part 2), at 54. Reading Section 512(c)(1)(B) as coterminous with the common law would be entirely at odds with that congressional judgment. Instead, the DMCA's financial-benefit analysis must be applied in a way that gives service providers *greater*

protection from liability than they would have enjoyed under the common law of vicarious infringement. *See* 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12B.04[A][2][b] (2008).[39]

The legislative history of Section 512(c)(1)(B) enunciates the proper test for financial benefit under the DMCA. Both the Senate and House reports instruct that "a service provider conducting a legitimate business would not be considered to receive a 'financial benefit directly attributable to the infringing activity' *where the infringer makes the same kind of payment as non-infringing users of the provider's service*." S. Rep. 105-190, at 44 (emphasis added); H.R. Rep. 105-551 (Part 2), at 54 (same). In other words, a service provider earns a "financial benefit directly attributable to the infringing activity" only when the infringing activity at issue generates revenue *different in kind* from the revenue the service provider earns from noninfringing activity, or when its business model is similarly illegitimate.

The financial-benefit test described by Congress distinguishes between service providers "conducting a legitimate business" and those whose value "lies in providing access to infringing material." S. Rep. 105-190, at 44-45; H.R. Rep. 105-

---

[39] The Ninth Circuit thus went astray in *CCBill* when it suggested, without any analysis, that the DMCA's financial-benefit language "should be interpreted consistent with the similarly-worded common-law standard for vicarious copyright liability." 488 F.3d at 1117. In making that statement, the court considered none of the points made above—indeed, the issue had not even been briefed by the parties or addressed by the district court. *See CCBill*, 340 F. Supp. 2d at 1105. No court in the Second Circuit (or elsewhere) has followed that particular aspect of *CCBill*, and there is no reason for this Court to embrace it.

551 (Part 2), at 54.[40]  Providers whose services have no real value other than by facilitating copyright infringement or that are intentionally skewed to profit from infringement fall on the wrong side of Section 512(c)(1)(B).  In contrast, service providers with a legitimate business model—one that derives genuine financial gain from noninfringing activity and that does not favor infringing uses—are protected.

<h4 align="center">2. <u>YouTube Has A Legitimate Business Model</u>.</h4>

YouTube conducts a legitimate business, and its revenue model does not favor infringing material in any way.  YouTube therefore does not earn a "financial benefit directly attributable to the infringing activity" for purposes of the DMCA.

a. *YouTube has an overwhelming array of legitimate uses that provide significant value to YouTube and its users.*

Legitimate uses of YouTube are vast and incontestable.  These include the wide array of personal videos created and uploaded by YouTube millions of users, as well as the professional videos that appear on the site as a result of the many licensing deals YouTube has negotiated with content owners large and small.  Walk Decl. ¶ 4; Maxcy Decl. ¶ 9.  And there is no question that YouTube generates significant value from this vast set of authorized videos.  Between 2006 and 2009, YouTube entered into thousands of direct partnership agreements—with content

---

[40] Congress wanted to protect legitimate service providers like the then-popular AOL, which charged users to connect to the Internet in increments of time.  The committee reports thus indicate that a provider who receives "fees based on the length of the message (per number of bytes, for example) or by connect time," does *not* earn a disqualifying financial benefit, even if its service is being used in part for infringement (which might increase the amount of overall usage and thus increase revenues to AOL).  S. Rep. 105-190, at 44-45.

owners including CBS, NBC, the NBA, Universal Music Group, and Warner Music Group—that provide for YouTube to run advertising against videos claimed by those owners and to share the revenue from that advertising. Maxcy Decl. ¶¶ 9-10. By themselves, YouTube's revenue-sharing deals generated approximately 35 percent of YouTube's overall revenue between 2007 and 2009. Reider Decl. ¶ 5. Most of YouTube's other revenue comes from advertisements that run on the YouTube homepage—for which advertisers generally pay a daily flat fee—and on the pages that list the results of users' search queries. Reider Decl. ¶ 5.

It is not the case therefore that YouTube's value "lies in providing access to infringing material." H.R. Rep. 105-551 (Part 2), at 54. To the contrary, YouTube is just the type of "legitimate" service provider—with a broad range of noninfringing uses that provide educational, cultural, social, and political benefits to its users and economic value to itself—that Congress intended the DMCA to protect.

> b. *YouTube earns revenue from advertising, not infringement.*

In line with the statutory language and legislative history cited above, because YouTube runs a legitimate business, it does not trigger the DMCA's financial-benefit provision as long as the revenue it earns from its noninfringing uses is not different, in kind or degree, from any revenues that might be linked to the infringing activity plaintiffs allege here.

YouTube does not earn differential revenue depending on whether material on its system is or is not infringing. YouTube generates revenue from advertising. Reider Decl. ¶ 5. Although YouTube's precise advertising options have changed

somewhat as the service has grown and evolved, in general YouTube offers three basic types of advertising:

- Each day, a single advertiser is allowed to purchase an ad that runs for a 24-hour period on the YouTube home page. *Id.* ¶ 3.

- YouTube allows advertisers to purchase advertising on the pages where the results of users' search queries are displayed. *Id.* Search results are displayed as a list of thumbnail images (and associated text supplied by users) of the videos that are responsive to the users' query. Solomon Decl. ¶ 11.

- YouTube allows ads to be displayed on pages where users can watch videos uploaded or "claimed" by one of YouTube's many content partners (content owners who have expressly indicated to YouTube that they want advertising to appear alongside videos containing their content). Reider Decl. ¶ 3.

These advertising offerings do not in any way favor videos that may not have been properly authorized to appear on YouTube over authorized videos. *Id.* ¶ 11. Nor does YouTube intentionally set out to capture revenue from users' potentially infringing activities. *Id.* The revenue earned from the homepage ads, for example, is fixed based on how long the ad runs and has no connection to the presence of any given video (or kind of videos) that may available for viewing on YouTube at any given time. *Id.* ¶ 6. Similarly, the ads that appear on search-results pages have nothing to do with the presence of any video on YouTube, or even with the particular videos that are listed in response to a user's search. *See* Schapiro Ex. 159 (172:21-25) ("Our advertising system is a completely separate system….It was independent of search. And search runs independent to advertising"). As for "watch-page" ads, YouTube allows such advertising to appear only alongside videos

that have been posted or claimed by a content partner who has affirmatively instructed YouTube to display advertising next to its videos.  Reider Decl. ¶ 9.

At certain times prior to January 2007, watch-page ads were not limited (as they have been since) to pages displaying videos affirmatively claimed and designated for advertising by a content partner.  *Id.* ¶ 10.  But that was hardly an illegitimate business model, and it certainly did not allow YouTube to generate differential or disproportionate revenue from potential copyright infringements.  To the contrary, YouTube received the same rates from ads that appeared on watch pages regardless of what videos those ads appeared next to.  *Id.*

YouTube, in short, does not engage in financial discrimination in favor of infringing material, and thus has no disqualifying "financial benefit."

> c.     *A service provider that accepts user-submitted content does not derive a disabling financial benefit by running ads on its site.*

YouTube's advertising-based business model is not merely legitimate, it is the industry standard.  *Id.* ¶ 7.  Other video-hosting services such as Daily Motion, Vimeo, Veoh, and Atom (which Viacom operates), as well as many other popular websites relying on user-submitted content (including MySpace and Facebook), all earn revenue from advertising and offer ad products comparable to those allowed by YouTube.  *Id.* ¶ 12.  Given these established practices, it cannot be the case that any service provider that hosts user-submitted content and that makes money by running advertisements fails the DMCA's financial-benefit test.  That result would gut Section 512(c)'s safe harbor, directly threatening the standard business model of online service providers engaged in storage and display of user-posted material.

Nothing in the DMCA signals a congressional intent to so upend standard Internet business practices—practices that have the additional benefit of allowing service providers to keep their services free to ordinary users uploading and viewing content. *See Io*, 586 F. Supp. 2d at 1154.

YouTube does not receive a "financial benefit directly attributable to the infringing activity" by earning revenue the same way as nearly all comparable service providers—through an advertising-based business model that in no way favors infringing material or seeks to benefit from it.

## II.     YOUTUBE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' INDUCEMENT CLAIMS.

Because YouTube is entitled to DMCA safe-harbor protection, it cannot be held liable for damages for any of plaintiffs' claims of direct or secondary infringement.  Plaintiffs have suggested otherwise, at least insofar as their claims are premised on the theory of inducement described in the Supreme Court's *Grokster* decision.  But the DMCA's text and legislative history make clear that the safe harbors apply to *all* forms of alleged copyright infringement, including contributory infringement, of which inducement is a subspecies.

But even if they were not covered by the DMCA, plaintiffs' inducement claims still could not stand.  There is no genuine issue as to any material fact bearing on plaintiffs' *Grokster* theory.  The evidence establishes beyond any reasonable dispute that YouTube is not—and never has been—a pirate site and has never encouraged its users to infringe copyrights.  To the contrary, YouTube has taken an array of

important steps to deter misuse of its system and help copyright owners find and remove any unauthorized material from the site.

**A.      As A DMCA-Compliant Service Provider, YouTube Is Protected Against Damages For All Forms Of Alleged Infringement.**

As an initial matter, a finding that YouTube is protected by the Section 512(c) safe harbor would preclude damages liability for *any* of plaintiffs' infringement theories—including inducement.  The plain language of the statute bars monetary liability "for infringement of copyright" without limitation.  And even if there were any ambiguity, the DMCA's legislative history clearly states that the safe-harbor applies to "direct, vicarious *and contributory* infringement." H.R. Rep. 105-551 (Part 2), at 50 (emphasis added).  Inducement is a form of contributory liability, as *Grokster* made clear.  *See* 545 U.S. at 930 ("One infringes contributorily by intentionally inducing or encouraging direct infringement."); *see also KBL Corp. v. Arnouts*, 646 F. Supp. 2d 335, 346 (S.D.N.Y. 2009).

Even beyond the clear text and legislative history, it would make little sense to find that a DMCA-compliant service provider is simultaneously an inducer.  It is hard to imagine how a service that meets Section 512(c)'s prerequisites— expeditiously taking down material that it knows is infringing or that a copyright holder asks to be removed; terminating repeat offenders; and lacking practical control over or financial benefit from the infringing activity—could simultaneously be a service that operates with "stated or indicated intent to promote infringing uses."  *Grokster*, 545 U.S. at 931.  Simply put, a service that complies with the safe harbors is not intentionally acting to encourage infringement and thus is not an

inducer. A finding that YouTube qualifies for DMCA protection thus shields YouTube against *all* of plaintiffs' claims, including their *Grokster* theory.

### B. Even Without Regard To The DMCA, Plaintiffs' Inducement Claims Fail As A Matter Of Law.

Even if there were no safe harbors, however, YouTube still could not be held liable for inducement. As a matter of law, plaintiffs cannot meet the stringent standard required by the Supreme Court's decision in *Grokster*.

#### 1. *Grokster* Requires A Showing That The Service Provider Specifically Intended To Encourage Third-Party Infringements.

*Grokster* held that "one who distributes a device with the object of promoting its use to infringe copyright, as shown by a clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." 545 U.S. at 936-37. To prove copyright inducement, a plaintiff must demonstrate that the defendant acted with specific intent to cause others to engage in copyright infringement:

> [M]ere knowledge of infringing potential or of actual infringing users would not be enough here to subject a distributor to liability. * * * The inducement rule, instead, premises liability on purposeful, culpable expression and conduct, and thus does nothing to compromise legitimate commerce or discourage innovation having a lawful purpose.

*Id*. at 937. "If liability for inducing infringement is ultimately found, it will not be on the basis of presuming or imputing fault, but from inferring a patently illegal objective from statements and actions showing what that objective was. *Id*. at 941.

The facts of *Grokster* illustrate the strict standard. Defendants Grokster and StreamCast distributed over 100 million copies of file-sharing software programs

that they conceded were used almost exclusively to illegally exchange copyrighted files and that they specifically intended to be used for that unlawful purpose. "[F]rom the moment Grokster and StreamCast began to distribute their free software, each one clearly voiced the objective that recipients use it to download copyrighted works, and each took active steps to encourage infringement." *Id.* at 923-24. Neither company ever tried to "impede the sharing of copyrighted files" and Grokster never "blocked[ed] anyone from continuing to use its software" for unlawful purposes. *Id.* at 926. Moreover, both of the defendants "broadcast[] a message designed to stimulate others to commit [copyright] violations." *Id.* at 938. They started distributing their software after a group of music companies sued the file-sharing network Napster for facilitating copyright infringement on a massive scale, and they deliberately targeted Napster's users and hoped to take Napster's place in the event that a court shut it down. *Id.* at 924-26.

In concluding that the defendants "acted with a purpose to cause copyright violations," the Court noted three features of the record. *Id.* at 938. The most salient was both companies' attempt to advertise to and solicit users from Napster—"a known source of demand for copyright infringement." *Id.* at 938-39. Moreover, the record revealed that 90% of the content exchanged on Grokster and 97% on Streamcast was either infringing or very likely to be infringing. *Grokster*, 545 U.S. at 922; *MGM Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 985 (C.D. Cal. 2006) ("*Grokster II*"). The "staggering scale of infringement makes it more

likely that StreamCast condoned illegal use, and provides the backdrop against which all of StreamCast's actions must be assessed." *Id.*

Two other features gave this evidence of solicitation and overwhelming infringement added significance: (1) "neither company attempted to develop filtering tools or other mechanisms to diminish the infringing activity using their software"; and (2) "the commercial sense of their enterprise turns on high-volume use, which the record shows is infringing." *Grokster*, 545 U.S. at 939-40. The Court made clear, however, that neither of these secondary facts standing alone would have been sufficient to find inducement. *Id.* at 939 n.12, 940.

Since *Grokster*, a handful of other courts have encountered defendants whose actions—and whose services—were similar to those of Grokster and StreamCast. For example, in *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124 (S.D.N.Y. 2009), another company that positioned itself as a descendant of Napster was held liable for inducement. In so holding, the court emphasized that over 94% of content files in Usenet.com's music-related newsgroups were found to be infringing or highly likely to be infringing. *Id.* at 152. Usenet.com "openly and affirmatively sought to attract former users of other notorious file-sharing services such as Napster and Kazaa" and actively promoted that, "unlike other 'lower security' file-sharing programs like Napster and Kazaa, users could conduct infringing activities anonymously." *Id.* at 152-53. In addition, Usenet.com employees "provided technical assistance to users in obtaining copyrighted content,"

including "website tutorials on how to download content, using infringing works as examples." *Id.* at 153.

Similarly, in *Columbia Pictures Industries, Inc. v. Fung*, No. 06-CV-5578 (SVW), 2009 U.S. Dist. LEXIS 122661, at *4 (C.D. Cal. Dec. 21, 2009), the court found yet another file-sharing network (Isohunt), this one with a "torrent structure" that the Court found to be "an evolutionary modification" of Napster and Grokster, to be an inducer. As in the cases discussed above, the evidence in *Fung* showed that "90%-95% of the material [available for downloading on the site] was likely to be copyright infringing, a percentage that is nearly identical to the facts in *Napster*." *Id.* at *66. Isohunt's founder had made public statements defending the site's facilitation of copyright infringement and personally provided technical assistance to users in order to help them infringe. *Id.* at *19-22. And like Grokster, StreamCast, and Usenet.com, Isohunt conveyed a clear message to its users that promoted infringement. For instance, the site encouraged users "to upload dot-torrent files of the latest blockbuster films and have them posted on the Isohunt website" (*id.* at *16) and bestowed on users honorary titles based on their level of activity, such as "I pir4te, therefore I am." *Id.* at *42-43.

In contrast, consistent with the Supreme Court's admonition (*Grokster*, 545 U.S. at 937), courts have rejected inducement claims against services that were not designed intentionally to encourage copyright infringement, even if the services could be used for infringing purposes. *See, e.g., Perfect 10, Inc. v. Visa Int'l Serv. Ass'n.*, 494 F.3d 788, 801 (9th Cir. 2007) (dismissing inducement claim against

credit-card company whose operations were unlike "[t]he software systems in Napster and Grokster [which] were engineered, disseminated, and promoted explicitly for the purpose of facilitating piracy of copyrighted music."); *Monotype Imaging, Inc. v. Bitstream, Inc.*, 376 F. Supp. 2d 877, 889 (N.D. Ill. 2005) (granting summary judgment on inducement claim where defendant's advertisements did not "specifically target[] an audience that was seeking to download copyrighted material," defendant had taken steps to prevent infringing use of its product, and it was not in defendant's business interest to have its software used for infringement).

2.     YouTube Is Not An Inducer of Infringement.

Plaintiffs' inducement claims require them to prove that YouTube acted with a "patently illegal object": to intentionally promote the use of its service to infringe copyright, which they must show "by clear expression or other affirmative steps taken to foster infringement." *Grokster*, 545 U.S. at 936-37, 941. There is nothing like that in this case. YouTube was conceived and continues to operate with the lawful objective of allowing users to post videos that they have created or are otherwise authorized to share. That has long been the message that YouTube conveyed to its users and, for the most part, is what users do. As to user-uploaded materials that might violate YouTube's copyright rules, YouTube not only responds promptly to takedown requests that it receives from copyright holders, but has also gone beyond all legal requirements to develop and implement a variety of sophisticated tools to help rights holders locate and remove unauthorized videos. Simply put, YouTube is nothing like any service that has ever been found to be an

inducer, and the undisputed facts provide no basis on which to find that YouTube actively encouraged its users to infringe plaintiffs' copyrights.

a. *YouTube never encouraged third parties to infringe.*

"The classic instance of inducement is by advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations." *Grokster*, 545 U.S. at 937. In *Grokster*, the Supreme Court pointed to direct evidence that the defendants engaged in the essence of inducement: actively and deliberately encouraging users to commit acts of copyright infringement. *Id*. at 937-38. Indeed, the whole purpose of Grokster and Streamcast was to distribute software that served the same purpose as software made by Napster, a massive secondary copyright infringer. Both companies set out deliberately to capture Napster's user base through advertising and other overt acts, and did just that. *Grokster*, 545 U.S. at 923-26; *Grokster II*, 454 F. Supp. 2d at 975-78, 985.

This case is worlds away from the paradigm described in *Grokster*. There is no evidence here of any YouTube "advertisement or solicitation" aimed at stimulating copyright violations. And YouTube was in no way intended or designed to lure users of any "pirate" service or to encourage any of its own users to infringe. Hurley Decl. ¶¶ 11, 16-22, 24-25. To the contrary, YouTube's objective from its earliest days was to provide a platform giving users a convenient way to share personal videos and to build a community around users posting and viewing such videos. *Id*. ¶ 2. In an internal email from April 2005, for instance, Hurley explained his hope "that our site would become the hub of short, personal videos." Schapiro Ex. 160; *see also, e.g., id*. Ex. 161 (June 2005 Hurley email: "I think the

key to our success is personal videos.").  YouTube's very name reflects that goal by emphasizing "you," *i.e.*, your own, original videos.  Hurley Decl. ¶ 7; *see also, e.g.*, Schapiro Ex. 162 ("The videos you upload should be about you (hence, YouTube!")).

The company's slogan, "Broadcast Yourself," which the founders adopted before the site even launched, reinforces that message.  Hurley Decl. ¶ 7.  The founders wanted that slogan "to be central to the site, and to the design" so that users "will understand what the site is supposed to be when they visit." *Id.*  Ex. 8.  As Steve Chen put the point in an internal email from April 2005:  "The 'broadcast yourself' is such a succin[c]t and exact slogan for what we want." *Id.*; *see also* Botha Decl. ¶ 6 & Ex. 1 (describing YouTube's business plan in soliciting venture-capital investment: "the founders did not merely say that user-generated content was their focus, they offered that focus as the rationale for [investors] to expect the company to grow, and as a means of differentiating YouTube from other online video services in existence at the time.").

Thus, while Grokster and Streamcast deliberately tried to capture a user-base that they knew had engaged in massive copyright infringement, YouTube sought to build a new community around the idea of sharing personal or user-created videos.  Hurley Decl. ¶ 2.  In keeping with that objective, YouTube's consistent message to the public and to its users has been that users should post only videos that they had created themselves or otherwise had the rights to post. *Id.* ¶ 20; Levine Decl. ¶¶ 5-10.  By way of example, at the time of YouTube's launch in 2005:

- YouTube's founders publicized their new website to the blog "Video Link": "A site called 'YouTube' has just launched. It allows members to post and share personal videos they've made. The site aims to become a community of digital video authors and their videos." Schapiro Ex. 163.

- YouTube told the online technical publication *The Register*: "We just launched a new website, www.YouTube.com, based on the idea of video blogging where members would take clips ranging from the mundane to the fascinating. Our hope is that a community would be built around 'channels' such as 'Sports', 'Kids', 'Vacations', 'Cars', etc." *Id*. Ex. 164.

- YouTube ran the following advertisement on the website "Craigslist": "YouTube.com is a web-based community based around creative and fun videos. We are seeking folks who possess a dash of technical know-how and a truckload of flare." *Id*. Ex. 165.

These advertisements are the polar opposites of solicitations to infringe: they are invitations to share and discover personal videos. Hurley Decl. ¶ 9. Indeed, after seeing one of the site's early ads, a woman discovered YouTube and reported:

> My son-in-law is serving in Iraq right now, but his server won't let him open videos through email. My daughter has been burning DVDs of their new baby to send to him, but I wanted to find a faster way to get him in touch with his son, so I started googling for 'video blogs' and 'free video blogs' etc. Your site was listed to the right as a sponsored link. We've only just started today, so the jury is still out on whether he can open the website from there or not—still, your site is an incredible and a wonderful public service. It's easy to use too.

Schapiro Ex. 166.

YouTube continues to tell its users strongly and clearly that infringement is unlawful and therefore that users should post authorized videos. Levine Decl. ¶¶ 5-10. YouTube includes statements to that effect in its Terms of Service, in multiple bold and prominent warnings during the video-upload process, and on various pages throughout its website. *Id*. ¶¶ 6-10. In addition, YouTube has long educated users

about the basics of copyright law so that they understand the law and thus can conform their behavior to it. *Id*. ¶¶ 9-10.

Sometimes users disregard YouTube's rules and warnings. But, when such instances are brought to its attention, YouTube takes them seriously and firmly reminds users that the posting of unauthorized copyrighted material is prohibited. *Id*. ¶ 23. Thus, when YouTube removes a video based on a DMCA takedown notice, it sends this message to the user who posted it:

> Repeat incidents of copyright infringement will result in the deletion of your account and all videos uploaded to that account. In order to avoid future strikes against your account, please delete any videos to which you do not own the rights, and refrain from uploading additional videos that infringe on the copyrights of others. For more information about YouTube's copyright policy, please read the Copyright tips guide.

*Id*. Such warnings have long been part of YouTube's communications with users suspected of violating YouTube's copyright policies. *Id*. As early as April 2005, the founders created an email message that would be automatically sent to users whose videos were rejected for violating YouTube's Terms of Service; the email made clear YouTube's "rules" for what types of videos users were allowed to upload, including "No copyrighted material." Hurley Decl. ¶ 8 & Ex. 9; *see also id*. ¶ 11 & Ex. 13.[41]

Accordingly, in sharp contrast to what the Supreme Court described as the "classic instance of inducement" (*Grokster*, 545 U.S. at 937), the record here is

---

[41] In YouTube's early days, when it was sufficiently small that one-on-one communications with users seemed practical, YouTube's founders sent similar messages to users who tried to post material forbidden by the service's rules. Hurley Decl. ¶ 17. For instance, in July 2005, Chad Hurley wrote to a user whose video was rejected, explaining that "it was rejected because it was copyrighted material. We are trying to build a community of real user-generated content." *Id*. ¶ 17 & Ex. 22.

strikingly devoid of evidence that YouTube encouraged its users to violate copyright. From the very start, YouTube's communications with the public have not encouraged copyright infringement—they have actively and consistently *discouraged* it. Hurley ¶¶ 9, 20; Levine Decl. ¶¶ 5-8; Botha Decl. ¶ 16. That alone disposes of plaintiffs' inducement claims.

But even beyond the complete absence of proof that YouTube urged its users to infringe and the undisputed evidence to the contrary, none of the secondary indicia of unlawful intent that were present in *Grokster* exist here.

### b. *YouTube is filled with non-infringing materials.*

In *Grokster*, the defendants' intent to encourage copyright infringement was also inferred from evidence of how the networks were actually used. The undisputed evidence in *Grokster* demonstrated that close to 90% of the files offered for distribution on the defendants' networks, and almost 97% of the files requested for downloading, were "infringing or highly likely to be infringing." *Grokster II*, 454 F. Supp. 2d at 985. The Supreme Court relied heavily on this "staggering" scale of infringement when evaluating the defendants' liability. 545 U.S. at 923.

Plaintiffs cannot make anything close to a comparable showing of overwhelmingly infringing uses. It is undisputed that YouTube hosts an enormous set of videos that no one has claimed (or could legitimately claim) to be infringing. Just by way of example, available for viewing on YouTube are: the President's weekly video addresses; clips of popular television shows and motion pictures uploaded or claimed by the studios that own those works; highlights of the Stanley Cup Playoffs, NBA Finals, and U.S. Open, uploaded by the NHL, NBA, and USTA;

videos posted by users of their pets performing tricks; music videos uploaded or claimed by major record labels including Sony Music, EMI, Universal Music, and Warner Music Group; amateur video footage of an amazing confrontation between lions, crocodiles, and buffalo in Kruger National Park that has been viewed nearly 50 million times; holiday greetings home from soldiers stationed around the world to their families back home; videos of astronauts giving a tour of the International Space Station and responding from outer space to questions posed by YouTube users; lectures given by professors from leading universities on subjects ranging from particle physics to Shakespeare; and even a presentation given at the Library of Congress about YouTube's impact on society and culture. Walk Decl. ¶¶ 6, 7, 12, 17, 18, 20, 21. As even this brief catalogue illustrates, YouTube has succeeded in its objective of building a service that provides an unmatched platform for personal and creative expression from users around the world. Hurley Decl. ¶ 27.

The only evidence in the record here bearing on the alleged scope of infringement on YouTube is that plaintiffs collectively have identified approximately 79,000 video clips in suit. But, even accepting (counterfactually) that those clips were not authorized by plaintiffs, were not fair use, were not subject to competing ownership claims and were all actually infringing, that total would represent less than two *hundredths* of one percent of the more than 500 million videos uploaded to YouTube. Levine Decl. ¶ 26.[42]

---

[42] Even plaintiffs' own analyses of YouTube suggest that it consists overwhelmingly of user-generated material and videos appearing pursuant to YouTube's license agreements with its array of content partners. Schapiro Ex. 167 (VIA00316621)

Another possible proxy for the quantum of potentially unauthorized videos on YouTube is the total number of clips that have been the subject of a DMCA takedown notice (or an equivalent takedown request sent to YouTube by a copyright holder) as compared with the total number of clips that have appeared on the service. That percentage is less than 1%. Levine Decl. ¶ 26.[43] And that number, unlike the unabated infringement in *Grokster*, represents circumstances where YouTube has removed content in compliance with the wishes of copyright owners, further negating any inference that YouTube has been acting to foster infringement.

> c. *YouTube protects the interests of copyright holders.*

Not only is there no evidence that YouTube encouraged its users to infringe, there is overwhelming evidence that YouTube *actively discouraged* and took multiple steps to *prevent* infringement.

In *Grokster*, the Supreme Court noted that the evidence of unlawful intent was given "added significance" by the fact that the defendants did not attempt "to develop filtering tools or other mechanisms to diminish infringing activity." 545 U.S. at 939. That evidence did not form a sufficient basis to find liability, but on the facts of that case it underscored the defendants' "intentional facilitation of their

---

(Viacom presentation noting that "of YouTube's Top 100 viewed clips, nearly all are user-generated"), Ex. 168 (VIA00857223), Ex. 180 (¶ 16) ("substantial use of YouTube's websites was and is made by users uploading their own homemade movies").

[43] Similarly, the number of YouTube accounts terminated in whole or in part based on allegations of infringement represents less than *two-tenths of one percent* of the overall number of accounts registered since YouTube was founded in 2005. Levine Decl. ¶ 31.

users' infringement." *Id.*[44] Here, YouTube did not harbor intent to encourage copyright infringement, making any evaluation of its filtering efforts unnecessary. But just as Grokster and Streamcast's failure to develop filtering technologies illuminated their unlawful intent, YouTube's development and use of advanced copyright protection tools shows its good faith in working to discourage and prevent infringement.

*First*, as described above, YouTube has registered a DMCA agent, responds to takedown requests from copyright holders by expeditiously removing identified content, and terminates the accounts of repeat infringers. The file-sharing networks in *Grokster* did none of those things. *See* 545 U.S. at 926-27 (Grokster "never blocked anyone from continuing to use its software to share copyrighted files"). And because those defendants did nothing "to impede the sharing of copyrighted files," the plaintiffs had no remedy for the rampant infringement of their materials short of a judicial one. *Id.* at 926. Here, in contrast, plaintiffs have availed themselves of the rapid-response provisions of the DMCA and cannot seriously contend that YouTube failed to remove allegedly infringing videos when asked. *See* Section I.C.4, *supra*.

---

[44] The Supreme Court made clear that "in the absence of other evidence of intent, a court would be unable to find contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement, if the device otherwise was capable of substantial noninfringing uses. Such a holding would tread too close to the *Sony* safe harbor." *Grokster*, 545 U.S. at 936 n.12. That is especially true here given that YouTube, unlike Grokster and Streamcast, is a service that operates under the DMCA, which says expressly that safe-harbor protection cannot be conditioned on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity." 17 U.S.C. § 512(m).

*Second*, YouTube has long taken many other steps to discourage infringement. YouTube's Terms of Service, to which all users must agree before uploading videos, expressly prohibit copyright infringement and require users to upload only videos as to which they own all necessary rights. Levine Decl. ¶ 6. YouTube also provides copyright-education materials on its website to guide users in responsible use of the service, warns users about copyright transgressions with email messages, and when content is removed based on copyright allegations, prominently displays a message noting that fact at the location where the removed video once resided. *Id.* ¶¶ 9-11, 23-24. In addition, YouTube uses streaming technology, which is designed to allow only viewing of videos—not downloads. Solomon Decl. ¶ 10. In contrast, Grokster-type services offer files, generally full-length songs or movies, for download by users. *See Grokster*, 545 U.S. at 923. YouTube also instituted a 10-minute limit for most videos uploaded to the service to prevent the uploading of entire television shows or movies. Levine Decl. ¶ 12.

*Third*, while not required to do so by the DMCA or by the common law, YouTube has made various technological tools available to help copyright owners prevent infringement. In early 2006, YouTube implemented hashing technology, which blocks videos from being uploaded that are exact duplicates of a file previously removed based on a copyright claim. Levine Decl. ¶ 25. YouTube also worked to simplify the DMCA notice-and-takedown process for copyright holders by allowing them to send takedown notices with the click of a button. *Id.* ¶ 18; *see also id.* ¶ 17 (discussing YouTube's online form guiding content owners step-by-step

through process of sending DMCA takedown notices). In early 2007, YouTube began using audio-fingerprinting technology from Audible Magic. King Decl. ¶ 4.

Beyond all that, YouTube has built and implemented cutting-edge *video* fingerprinting technology, which scans every single video uploaded to YouTube against a vast library of reference files provided by participating copyright holders. *Id.* ¶¶ 3, 21-28. YouTube devoted over 50,000 man-hours and spent millions of dollars developing this sophisticated copyright-protection tool. *Id.* ¶¶ 11, 13-17. YouTube's technology gives copyright holders yet another way to identify their content on YouTube and choose whether—and on what terms—it should stay or go. *Id.* ¶¶ 23-25. YouTube has also built its own audio-based fingerprinting technology, which became available in early 2008. *Id.* ¶ 20.

This technology was truly industry leading: YouTube was the first (and to our knowledge the only) website dedicated to user-submitted video that built its own video fingerprinting system. *Id.* ¶ 19; Schapiro Ex. 169 (287:16-288:4) (former Paramount CTO describing YouTube's technology as the first video fingerprinting tool that "had a significant deployment"), Ex. 170 (202:23-203:3). YouTube makes its technology available for free to content owners and has worked hard to encourage as many of them as possible to use it. King Decl. ¶¶ 3, 22. These efforts have been successful: since Content ID launched in October 2007, over 1,000 copyright holders worldwide—including most major television networks, movie studios, and record labels, as well as most major sports leagues in the United States and abroad—have started using it to find and manage their content on YouTube.

King Decl. ¶ 21.[45]   YouTube's commitment to developing and deploying these advanced copyright protections represents the antithesis of inducement.

While plaintiffs will undoubtedly try to second-guess each and every decision that YouTube made related to copyright—claiming that YouTube should have done more at every step and that internal debates about copyright policies and real-time discussions about how those policies should be applied somehow show an intent to encourage user infringement—the undisputed facts show that YouTube took numerous steps to prevent copyright infringement throughout its history.   In the site's first months, YouTube's twenty-something founders grappled with how best to address situations where it seemed that users had uploaded videos in violation of YouTube's rules.   Hurley Decl. ¶¶ 15-18.   Working out of Hurley's garage, and lacking legal training or counsel, the founders first installed an ad hoc monitoring program under which they removed videos they came across that they thought might be unauthorized.  *Id.* ¶ 17.   For a short period of time in the fall of 2005, the founders tried to rely on a "community flagging" system, whereby users could flag videos as being "copyrighted" for YouTube to review and remove based on guesses about what was unauthorized.  *Id.* ¶ 20.   Quickly realizing that those approaches were flawed, and having secured financial backing from investors, YouTube consulted with outside counsel, installed a formal DMCA program, and brought in an in-house lawyer with a background in copyright law.  *Id.* ¶ 21; Levine Decl. ¶¶ 3-

---

[45] Viacom itself is one of those users; after participating in the pre-launch testing of Video ID in mid-2007, Viacom signed up to use YouTube's technology in February 2008. King Decl. ¶ 29; *see* Schapiro Ex. 171.

4, 13. As the site continued to grow, YouTube rolled out an increasingly sophisticated series of technological tools to help copyright holders prevent unauthorized materials from appearing on the service. *Id*. ¶¶ 17-19. In short, while YouTube deployed numerous measures to combat infringement, Grokster did nothing. The contrast could not be greater.

<blockquote>d. *YouTube's revenue model is legitimate.*</blockquote>

In *Grokster*, the Supreme Court inferred from the defendants' revenue model further evidence of their unlawful purpose to "cause and profit from third-party acts of copyright infringement." 545 U.S. at 941. Grokster and Streamcast gave away their software for free and then sought to earn advertising revenue through its subsequent high-volume use. Given the overwhelming evidence that the software was used almost entirely to infringe, the viability of the defendants' business model depended almost entirely on piracy. *See id*. at 939-40. (The Court was careful to point out that the evidence about the defendants' revenue model "alone would not justify an inference of unlawful intent." *Id*. at 940.)

Particularly given that YouTube is not remotely akin to Grokster and Streamcast in terms of how its service is actually used, YouTube's business model provides no comparable basis for an inference of "illegal objective." *Id*. at 941. YouTube relies on the dominant revenue model for today's Internet: free public access supported by advertising. The mainstays of the Internet economy—sites such as Google, Facebook, MySpace, Twitter, Yahoo—and Internet sites for traditional media like *The New York Times* and CNN—all use this model. Reider Decl. ¶ 12. So do Viacom's own video-sharing services. Schapiro Ex. 172 (22:10-24).

Nothing about such a website's development of a neutral, advertising-based revenue model in any way suggests a desire to encourage or profit from infringement. The only inference to draw from the fact of YouTube's reliance on advertising is its alignment with virtually every other company in its industry.

That is confirmed by YouTube's roster of advertisers. YouTube's advertising offerings have been embraced by many of the world's largest and best-known companies. Most of the nation's top 100 advertisers have purchased advertising on YouTube, including Procter & Gamble, General Electric, PepsiCo, American Express, Bank of America, Kraft Foods, and Sears. Reider Decl. ¶ 2. Large media companies and other prominent copyright owners (Time Warner, Walt Disney, News Corp., Lions Gate Entertainment, and the NBA, among many others) also routinely run ads on YouTube (and have done so for years). *Id.*; Schapiro Ex. 173 (July 2006 Viacom document discussing advertising on YouTube by Disney and Weinstein Company). Viacom itself has advertised on YouTube; between 2006 and 2008, Viacom spent well over a million dollars purchasing advertising space on the YouTube website, including on the YouTube homepage and search-results pages. Reider Decl. ¶ 4.

      e.    *Plaintiffs' own actions demonstrate YouTube's legitimacy.*

Plaintiffs' own actions confirm YouTube's legitimacy. As described above, plaintiffs' use of YouTube for marketing, promotional, and other business purposes is extensive and widespread. Viacom's marketing personnel raved about the successful promotions they were able to achieve using YouTube (*see* Schapiro Ex. 25 (43:17-22), Ex. 26) and Viacom adopted elaborate policies to ensure that an array of

Viacom-related videos would be posted to and remain up on YouTube. *See supra* I.C.3.b.ii-iii. Beyond taking advantage of the free promotional benefits that YouTube offered, Viacom has bought advertising space on YouTube for Viacom programming. Reider Decl. ¶ 4. And Viacom's executives and employees regularly use YouTube—posting, watching, and sharing personal videos, just like millions of other YouTube users around the world. *See* n.28, *supra*; *see also* Schapiro Ex. 174. On top of all that, Viacom sought to buy YouTube, which Viacom saw as a "transformative acquisition." *Id*. Ex. 175.

The putative class plaintiffs' actions similarly underscore that YouTube is far from a pirate site. As noted, class plaintiffs have consistently authorized their content to appear on YouTube (Section I.C.3.b.(iv), *supra*), and the record is replete with statements of enthusiasm for the unique creative platform that YouTube offers. *See* n.28, *supra*. As one of the class plaintiffs' designated representatives candidly acknowledged in deposition: "YouTube is a great site. *** [I]t shows interesting clips. *** I don't have a problem with YouTube. [E]veryone loves YouTube, don't they?" Schapiro Ex. 85 (248:24-249:24); *see also id*. Ex. 176 (267:4-18), Ex. 177 (authenticating article quoting Tur as saying that he "understands why people love YouTube, a democratic clearinghouse for everything from family reunions to detainee abuse, and knows that most videos are actually owned by their posters").

Assertive copyright holders like these plaintiffs simply would not interact in any of these ways—much less all of them—with a service principally dedicated to

purposeful, culpable theft of intellectual property. The undisputed evidence about what YouTube is and how plaintiffs use it leaves no room for a finding that YouTube intended to induce its users to infringe plaintiffs' copyrights.

\* \* \*

*Grokster* warns courts evaluating inducement claims against "trenching on regular commerce or discouraging the development of technologies with lawful and unlawful potential." 545 U.S. at 937. It is difficult to imagine a more apt illustration of that danger than this case. Allowing plaintiffs' inducement claims to proceed to trial would not only run afoul of the stringent standards articulated in *Grokster*, but would disrupt the careful balance between technological development and copyright protection that animates those standards.

## CONCLUSION

For the reasons above, YouTube is entitled to summary judgment (1) that it qualifies for protection under Section 512(c) of the DMCA against all of plaintiffs' direct and secondary infringement claims; and (2) on plaintiffs' claims for contributory liability under the theory of inducement.

Dated: March 11, 2010
New York, NY

Respectfully submitted,

Andrew H. Schapiro
A. John P. Mancini
Matthew D. Ingber
Brian M. Willen
MAYER BROWN LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

David H. Kramer
Maura L. Rees
Michael H. Rubin
Bart E. Volkmer
WILSON SONSINI GOODRICH & ROSATI PC
650 Page Mill Road
Palo Alto, California 94304
(650) 493-9300

*Attorneys for Defendants*