UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VIACOM INT'L INC., ET AL.,<br><br>Plaintiffs,<br>v.<br><br>YOUTUBE, INC., ET AL.,<br><br>Defendants | ECF Case<br>Civil No. 07-CV-2103 (LLS) |
| THE FOOTBALL ASSOCIATION PREMIER LEAGUE LIMITED, ET AL., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>YOUTUBE, INC., ET AL.,<br><br>Defendants. | ECF Case<br>Civil No. 07-CV-3582 (LLS) |

**DECLARATION OF MICAH SCHAFFER IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, Micah Schaffer, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am a former employee of YouTube, Inc. ("YouTube"). While employed at YouTube, I held the following titles: Director of Community Development; Community Advocate; Associate Principal of YouTube Operations; Senior Specialist, Consumer Operations; and Policy Analyst. I worked at YouTube as a full-time employee from January 3, 2006 until July 7, 2009. My job duties varied when I first started at the company given its small size at that time. Eventually, my job responsibilities focused on YouTube's handling of inappropriate content on the website, copyright and DMCA compliance, and issues related to user behavior and

interactions. I worked in and helped set the policies for YouTube's Safety, Quality, and User Advocacy ("SQUAD") department. I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently to them.

2. Almost immediately upon starting work at YouTube, I became of aware of companies using YouTube for marketing purposes. For example, in January 2006, I viewed a clip on YouTube that Nike had uploaded for promotional purposes to the account "Nikesoccer" featuring the soccer player Ronaldinho. I discussed this clip with other employees at YouTube, including the founders, and there was a general awareness at the company that this type of corporate marketing was taking place on YouTube. Indeed, at one point in its history, the Nike Ronaldinho clip was the most-watched video on YouTube. I learned later that Nike had also uploaded the exact same clip to YouTube using the account "JoeB" to make it appear as if that version of the clip had been uploaded to YouTube by an ordinary user unaffiliated with Nike. *See* http://www.youtube.com/watch?v=KNwLn85I75Y. I also learned from press accounts in the fall of 2006 that Nike acknowledged that the company posts videos to websites like YouTube using usernames unconnected with the company to appeal to younger audiences.

3. During my employment at YouTube, I experienced many instances in which YouTube became aware of the presence of content on the service that looked like it was professionally produced, but did not know whether the rights holder had uploaded that content or was allowing that content to remain on YouTube for promotional reasons. The appearance on YouTube of a short, satirical music video called "Lazy Sunday" in December 2005 and early 2006 illustrates this point. I had intimate knowledge of the "Lazy Sunday" video because I was responsible for the website of the comedy group, The Lonely Island, whose members created it. I knew

that the video had aired on NBC's Saturday Night Live, but when I first saw it on YouTube, on December 18, 2005, I did not know whether NBC was allowing user-uploaded versions of Lazy Sunday to remain on YouTube for promotional purposes. Based on my involvement with The Lonely Island and conversations with a member there, I believed that the writers and producers of Saturday Night Live thought that the presence of "Lazy Sunday" on Internet video websites like YouTube was providing marketing benefits for the show.

4. When I started at YouTube, I learned from Chad Hurley that he had contacted NBC in late December 2005 and asked whether NBC had authorized the posting of "Lazy Sunday" to YouTube or whether it was otherwise allowing that video to appear on YouTube. During the entire month of January 2006, the "Lazy Sunday" video remained accessible through YouTube and was watched millions of times as we waited for NBC's response. Ultimately an NBC representative thanked YouTube for reaching out and asked YouTube to remove Lazy Sunday from the website. Other YouTube employees and I then searched for versions of "Lazy Sunday" on YouTube and removed all of the ones we could find. We informed our users about this development in a blog post and directed them to visit NBC's website if they wanted to view the "Lazy Sunday" clip: "NBC recently contacted YouTube and asked us to remove Saturday Night Live's 'Lazy Sunday: Chronicles of Narnia' video. We know how popular that video is but YouTube respects the rights of copyright holders. You can still watch SNL's 'Lazy Sunday' video for free on NBC's website." A true and correct copy of an internal email message reflecting that blog post is attached hereto as Exhibit 1.

5. In addition to Nike's marketing and the ambiguity surrounding the appearance of Lazy Sunday on YouTube, I learned in early 2006 that various musicians, movie studios and television producers were also using YouTube to

promote their content. For example, music groups like Pretty Girls Make Graves, Early Man, Anti-Flag, Taking Back Sunday, OK Go and Hard-Fi were uploading videos to promote their music and build "buzz" about their bands. Television programmers like MTV2, VH-1 and BSkyB were also uploading materials to YouTube in early 2006 along with movie studios like Dimension Films and Paramount Classics (owned by Viacom).

6. Given my extensive experience reviewing videos on the YouTube website during the course of my employment, it was and is my belief that these instances where YouTube learned about promotional uses by major media companies were only the tip of the iceberg of the overall marketing taking place on YouTube. In many cases, I strongly suspected that content that appeared to be professionally produced had in fact been uploaded by the rights holder or with the rights holder's permission for marketing purposes. In other cases, I believed that major content owners were acquiescing to their content appearing on YouTube because of the promotional benefit that those clips provided. That belief was informed, in part, by the routine practice of major media companies selectively removing some of their content from YouTube, while apparently letting other content remain active.

7. While I was aware of specific promotional uses of YouTube by the media companies and music groups listed above, my primary job responsibility in early 2006 was to deal with inappropriate material appearing on the service, including material that was alleged to infringe copyright. In the course of handling DMCA take-down requests from rights holders and DMCA counter-notifications from users, I regularly encountered situations where marketing departments or marketing agencies would upload content to YouTube on behalf of content owners and then representatives from the legal departments of those content owners mistakenly would request the removal of that very content. For example, Viacom-owned Paramount Classics uploaded a

trailer to YouTube to promote the movie "An Inconvenient Truth" in April 2006. *See* http://www.youtube.com/watch?v=TUiP6dqPynE. Viacom then issued a take-down notice under the DMCA for that clip in May 2006 claiming it was a copyright infringement, and YouTube removed the clip. Paramount Classics then reached out to YouTube to tell us that the clip was authorized and that the clip should not have been removed. YouTube then reinstated the video. In February 2007, Viacom again sent YouTube another DMCA notice alleging that the Inconvenient Truth trailer that its employee had uploaded to YouTube was infringing. YouTube again removed the video and it remains inaccessible to this day.

8. In another example, CBS sent YouTube a DMCA take-down notice asking us to remove certain videos featuring Katie Couric. We did so promptly and CBS then retracted its DMCA notice. The videos, which were uploaded to the YouTube account "TXCANY," had in fact been uploaded to YouTube by a marketing agency working on behalf of CBS called Electric Artists.

9. This pattern of self-inflicted infringement claims repeated itself often and was well known to the YouTube employees working in the SQUAD department. If lawyers from major media companies were making mistakes about the allegedly infringing status of clips on YouTube despite their superior knowledge of the content at issue and the corporate policies of their clients, it seemed inconceivable to us that YouTube employees could make reliable determinations about the authorization status of clips on YouTube merely because they appeared to be professionally produced.

10. During my time working at YouTube, we took seriously the concerns of copyright holders who believed that their content was appearing on YouTube without authorization. We promptly removed as a matter of course video clips that were identified in valid DMCA take-down notices. When we thought that DMCA notices

were defective in some way, we had a policy of sending follow-up messages to the complaining party to elicit further information to enable us to find and remove the offending content.

11. While YouTube did not ever manually screen all of the videos uploaded by its users during my time at the company, in 2006, we sometimes spot checked videos after they had been uploaded and removed content on behalf of companies such as the Cartoon Network, NBC, Fox Television, World Wrestling Entertainment, Lucasfilm and the Recording Industry Association of America ("RIAA"). These reviews ordinarily took place in consultation with those companies and were usually targeted to particular programs or music groups based on our communications with the rights holders.

12. We conducted this spot checking because we had every interest in working with rights owners and no interest in hosting unauthorized content. However, proactive review was problematic for several reasons. First, it did not scale given the increasingly large number of videos being uploaded to YouTube at the time. Second, we quickly learned that proactive removal of content was not very effective. We sometimes removed content that was not, in fact, owned by the media companies on whose behalf we were conducting proactive monitoring.

13. Our proactive review and removal of content related to American Idol stands out as having led to a number of false positives. We then faced complaints from upset users whose content had been removed without cause. On another occasion in August 2006, YouTube received a DMCA take-down notice from Lucasfilm that contained a request to remove a specific video along with a vaguely-worded statement asking YouTube generally to remove content related to Star Wars movies. In response, we engaged in the proactive review and removal of 1029 videos. We then heard back from Lucasfilm that some of the content we removed had been authorized,

as the company generally permits its fans to "remix" and create mash-ups of its content. Lucasfilm asked that we restore all of the videos that we had proactively removed on its behalf and tell our users that the removals had taken place based on a "misunderstanding" instead of because of Lucasfilms' take-down notice. We complied with that request. Attached hereto as Exhibits 2, 3 are true and correct copies of email messages between representatives from Lucasfilm and me reflecting this incident. These experiences taught us that the rights holders themselves were in a much better position to make determinations about the authorization status of videos appearing on YouTube, and we strived to offer them tools that would assist them in doing so.

14. On Friday, February 2, 2007, Viacom sent YouTube a mass DMCA take-down notice identifying approximately 100,000 clips that it wanted removed from YouTube. In response, YouTube engineers wrote and deployed a custom computer program to disable the identified videos from our website and worked through the weekend to ensure that it ran effectively. By the end of the next day, a Saturday, YouTube had, with immaterial exceptions, removed all of the clips that Viacom had identified in its mass take-down notice.

15. The fall-out from Viacom's mass take-down further enforced what we had already come to recognize: widespread promotional marketing on YouTube by major media companies severely complicated any effort to make authorization determinations regarding YouTube videos based on a brief review of them. Viacom, for its part, identified many of its own authorized marketing videos as "infringing" in the mass take-down. SpikeTV (a Viacom subsidiary) reported to YouTube that its account had been suspended because of Viacom's mistakes. Steve Farrell of SpikeTV wrote to YouTube on February 4, 2007: "I know you're removing Viacom material, but you've suspended our account mistakenly. We entered into an agreement last

year with YouTube for an official Spike channel. All of those clips were legal. Exclusion of the clips hosted within our Directors Channel should have been part of the cease and desist order from Viacom. Please reinstate the account immediately." A true and correct copy of Mr. Farrell's message to YouTube and a follow-up conversation between Heather Gillette, who was the head of SQUAD at the time, and me is attached hereto as Exhibit 4.

16. In the mass take-down, Viacom also misidentified as infringing numerous authorized videos that had been uploaded by its own marketing agent, WiredSet, resulting in the suspension of WiredSet's YouTube account. Paramount Pictures' official YouTube account, Paraccount, received two copyright strikes as a result of mistakes in Viacom's mass take-down and then YouTube suspended the account in early March 2006 when Viacom sent a third erroneous DMCA notice regarding content uploaded by its own employees. Viacom also issued erroneous take-down notices for the following YouTube accounts that it owned or controlled: (1) MTV2's official account "MTV2"; and (2) VH1's "bestweekevertv."

17. Authorized videos not even owned by Viacom were also caught up in Viacom's mass take-down. The record label for the band Panic! At The Disco reached out to YouTube to express its serious concern that Viacom had caused the band's music videos wrongfully to be removed from YouTube. A true and correct copy of an email thread reflecting this exchange is attached hereto as Exhibit 5. SonyBMG complained to YouTube that its artists' accounts had been suspended based on Viacom's mistakes: "This makes no sense given the fact that it was cleared footage . . . . To say that the label is concerned is a huge understatement! Can you help me reestablish their access as quickly as possible?" A true and correct copy of an email message from SonyBMG containing this statement is attached hereto as Exhibit 6.

The Warner Music Group likewise complained that one of its authorized accounts had been suspended based on videos misidentified in Viacom's mass take-down and said that they were "certainly frustrated by this blatant abuse of the DMCA takedown statute." A true and correct copy of an email message from the Warner Music Group containing this statement is attached hereto as Exhibit 7.

18. Other famous YouTube users who had their accounts suspended based on erroneous identifications in Viacom's mass take-down include: (1) the musician Sean "P. Diddy" Combs; (2) the non-profit organization PETA; and (3) the musician Nelly Furtado. Viacom also misidentified as infringing videos associated with the accounts of other well known musicians such as Kid Rock, Paula DeAnda and Toby Keith. Viacom often retracted these erroneous DMCA notices when they were brought to the attention of its monitoring agent, BayTSP.

19. We happened to learn about these instances of Viacom's erroneous take-down requests and account terminations because they involved high-profile users who had the ability and incentive to reach out to YouTube and try to rectify Viacom's mistakes. We also received numerous DMCA counter-notices from ordinary users whose videos were wrongfully identified by Viacom as infringing in the mass take-down. Beyond these cases where we learned explicitly of Viacom's errors in the mass take-down, I believe that Viacom made many other mistakes given that many users lacked the sophistication, know-how or energy to try to challenge Viacom's claims.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed the 2nd day of March 2010, at San Francisco, California.

Micah Schaffer

# Schaffer Exhibit 1

To: "Julie Supan" <julie@youtube.com>
From: "Steve Chen" <steve@youtube.com>
Cc: "'Maryrose Dunton'" <maryrose@youtube.com>, "'Chad Hurley'" <chad@youtube.com>, "'Micah Schaffer'" <micah@youtube.com>, "'Kevin Donahue'" <kevin@youtube.com>
Bcc:
Received Date: 2006-02-17 04:25:16 CST
Subject: Re: FINAL FINAL Lazy Sunday Blog -- Please POST tonight

---

posted on the website.

-s

On Feb 16, 2006, at 6:51 PM, Julie Supan wrote:

> FINAL FINAL....
>
>
>
>
>
> **********************************************************************
> ******
>
>
>
> Lazy Sunday
>
>
>
> Hi Tubers! NBC recently contacted YouTube and asked us to remove
> Saturday
> Night Live's "Lazy Sunday: Chronicles of Narnia" video. We know
> how popular
> that video is but YouTube respects the rights of copyright holders.
> You can
> still watch SNL's "Lazy Sunday" video for free on NBC's website.
>
>
>
> Some good news: we are happy to report that YouTube is now serving
> up more
> than 15 million videos streamed per day- that's nearly 465M videos
> streamed
> per month with 20,000 videos being uploaded daily.
>
>
>
> Keep broadcasting!
>
>
>
> <winmail.dat>

<?xml version="1.0" encoding="UTF-8"?>
<!DOCTYPE plist PUBLIC "-//Apple Computer//DTD PLIST 1.0//EN" "http://www.apple.com/DTDs/PropertyList-1.0.dtd">
<plist version="1.0">

<dict>
<key>date-sent</key>
<real>1140150313</real>
<key>flags</key>
<integer>570686593</integer>
<key>original-mailbox</key>
<string>pop://maryrose@dev.youtube.com/</string>
<key>remote-id</key>
<string>4352fd84000072c0</string>
<key>sender</key>
<string>Steve Chen <steve@youtube.com></string>
<key>subject</key>
<string>Re: FINAL FINAL Lazy Sunday Blog -- Please POST tonight</string>
<key>to</key>
<string>Julie Supan <julie@youtube.com></string>
</dict>
</plist>

---

# Schaffer Exhibit 2

To: "Micah Schaffer" <micah@youtube.com>
From: "Sharron Drake" <Sharron.Drake@lucasfilm.com>
Cc: "Chad@youtube.com" <Chad@youtube.com>, "Chris Carvalho" <Chris.Carvalho@lucasfilm.com>
Bcc:
Received Date: 2006-08-03 00:32:41 CST
Subject: RE: STAR WARS Fan films: Sample letter to affected parties:

---

Hi Micah:

Your response to these users is not acceptable. Do not send this response. PLEASE CALL ME IMMEDIATELY[redacted]. I am also copying Chad Hurley on this correspondence at Chris Carvalho's suggestion in case this needs to be discussed further.

Thanks,

Sharron Drake
Business Affairs, (Antipiracy)

-----Original Message-----
From: Micah Schaffer [mailto:micah@youtube.com]
Sent: Wednesday, August 02, 2006 4:07 PM
To: Sharron Drake
Cc: 'heather gillette'
Subject: Re: STAR WARS Fan films: Sample letter to affected parties:

Hi Sharron,

We've identified the 1,029 videos involved. I'm currently waiting for engineering to restore the videos and compile a list of the user's email

addresses.

We will be sending our users the following message:

Hi there,

A Star Wars related video was removed from your YouTube account as the result of a copyright and trademark related notice we received.

Lucasfilm Ltd. has since notified us that they did not intend for your content to be disabled, as such your video has now been restored.

We apologize for any inconvenience.

Thanks,

The YouTube Team

Sharron Drake wrote:
>
>
> Hi Micah:

> Thanks for your prompt assistance with all of this. As discussed on
> the
> phone this afternoon, in addition to your restoring the sites that we
> did not request to be taken down, our Director of Fan Relations would
> appreciate something sent from YouTube to notify the people affected
by
> these shut downs. He has provided a sample letter for your
> consideration. Please see below. Feel free to call me [redacted]

> to discuss.
>
> Thanks again,
>
> Sharron Drake
> Business Affairs, (Antipiracy)
> antipiracy@lucasfilm.com
> ------------------
>
> Dear Member:
> This is to notify you that we have restored or are about to restore
> your
> material that we recently removed pertaining to Star Wars. Lucasfilm
> Ltd. did not request that your piece be removed, but we inadvertently
> removed it because of a misunderstanding. We are sorry if this has
> caused you any inconvenience.
>
> YouTube Inc.
> PO Box 2503
> San Mateo, CA 94401
> Email: copyright@youtube.com <mailto:copyright@youtube.com>
>

From jenny@youtube.com Wed Aug 2 16:54:02 2006

---

# Schaffer Exhibit 3

To: "Micah Schaffer" <micah@youtube.com>
From: "Steve Sansweet" <Steve.Sansweet@lucasfilm.com>
Cc:
Bcc:
Received Date: 2006-08-03 02:32:04 CST
Subject: RE: [Fwd: Unauthorized Use of STAR WARS Copyrights and Trademarks on various websites]

---

Thanks for the chat. Here's the note we agreed to:

Hi There--
We want to let you know that we have restored your videos that we recently removed relating to Star Wars. Lucasfilm Ltd. did not intend to request that your piece be removed, but we removed it due to a misunderstanding. We are sorry if this has caused you any inconvenience.

Thanks,
Steve

Steve Sansweet
Director of Content Management & Fan Relations
Lucasfilm Ltd.
P.O. Box 29901
San Francisco, CA 94129-0901

-----Original Message-----
From: Micah Schaffer [mailto:micah@youtube.com]
Sent: Wednesday, August 02, 2006 6:11 PM
To: Steve Sansweet
Subject: [Fwd: Unauthorized Use fo STAR WARS Copyrights and Trademarks on various websites]

-------- Original Message --------
Subject: Unauthorized Use fo STAR WARS Copyrights and Trademarks on various websites
Date: Mon, 31 Jul 2006 14:36:22 -0700
From: Antipiracy <antipiracy@lucasfilm.com>
To: <copyright@youtube.com>, <heather@youtube.com>

/V//IA ELECTRONIC MAIL //copyright@youtube.com/ <mailto:copyright@youtube.com> /; heather@youtube.com <mailto:heather@youtube.com>/

//

Heather Gillette

YouTube

71 E. Third Avenue, 2nd Floor

San Mateo CA 94401.

Re: Unauthorized Use of STAR WARS Copyrights and Trademarks on website:

http://www.youtube.com/watch?v=AC3bqyq9QQY&eurl=http%3A%2F%2Fnews%2Et=am xbox%2Ecom%2Fxbox%2F11412%2FStar%2DWars%2DForce%2DPowers%2DTech%2DDemo%2 DMovie%2F

<http://www.youtube.com/watch?v=AC3bqyq9QQY&eurl=http%3A%2F%2Fnews%2E=ea mxbox%2Ecom%2Fxbox%2F11412%2FStar%2DWars%2DForce%2DPowers%2DTech%2DDemo% 2DMovie%2F>

Gentlemen:

Lucasfilm Ltd. and its affiliated and related entities (collectively "Lucasfilm") are the exclusive owners of all rights in and to the Star Wars films, */Star Wars: Episode IV - A New Hope, Star Wars: Episode V - The Empire Strikes Back, Star Wars: Episode VI - Return of the Jedi, Star Wars: Episode I - The Phantom Menace, Star Wars: Episode II - Attack of the Clones/*, */Star Wars: Episode III - Revenge of the Sith/* and any other STAR WARS property. Those properties and the characters and unique elements which appear therein (the "STAR WARS Copyrights and Trademarks") are protected by the copyright and trademark laws of the United States and other nations.

We note that STAR WARS Copyrights and Trademarks are being posted and distributed on the above website without Lucasfilm's authorization ("Unauthorized Item"). This unauthorized use of STAR WARS Copyrights and Trademarks constitutes copyright infringement, trademark infringement and unfair competition. By this letter, we request that you immediately remove the Unauthorized Item from the above website.

We further request written assurance that you will comply with this demand. Lucasfilm is the exclusive owner of all relevant rights in and to the Star Wars Films. Pursuant to the DMCA, we have a good faith belief that any items falling into the categories identified above infringe Lucasfilm's copyrights and other intellectual property rights, and are not authorized by Lucasfilm or its agents. I am authorized to act on Lucasfilm's behalf regarding these matters. The information provided in this communication is accurate to the best of my knowledge and is provided under penalty of perjury.

Thank you for your cooperation. Nothing in this letter shall be

construed as a waiver or relinquishment of any right or remedy
possessed by Lucasfilm or any other affected party, all of which
are
expressly reserved.

Sincerely,

Sharron Drake

Business Affairs, (Antipiracy)

antipiracy@lucasfilm.com

From micah@youtube.com Wed Aug 2 19:22:25 2006

---