# Schapiro Exhibit 1

**TIME** | Nation | World | Business | Arts | Sci-Health | Photos | Current Issue | Search

# Best Inventions 2006

**TIME**

⇨ **WEB SHOPPING GUIDE** ⇨ **TECH BUYER'S GUIDE** ⇨ **BEST INVENTIONS** ⇨ **GADGET OF THE YEAR**

↩ previous | next

**More Categories:**
Best Inventions for:
» Transportation
» The Home
» Meals and Cooking
   Clothing
   Toys
   Medicine
   Safety
   The Military
» Using Light



VOTE FOR THE YEAR'S BEST GADGET





**BEST INVENTION**                    ✉ E-MAIL
» YOUTUBE

Meet Peter. Peter is a 79-year-old English retiree. Back in WW II he served as a radar technician. He is now an international star.

One year ago, this would not have been possible, but the world has changed. In the past 12 months, thousands of ordinary people have become famous. Famous people have been embarrassed. Huge sums of money have changed hands. Lots and lots of Mentos have been dropped into Diet Coke. The rules are different now, and one website changed them: YouTube.

It's been an interesting year in technology. Nintendo invented a video game you control with a magic wand. A new kind of car traveled 3,145 miles on a single gallon of gas. A robot learned to ride a bike. Somebody came up with a nanofabric umbrella that doesn't stay wet. But only YouTube created a new way for millions of people to entertain, educate, shock, rock and grok one another on a scale we've never seen before. That's why it's Time's Invention of

Exhibit A
11

the Year for 2006.

But if YouTube is the Invention of the Year, who exactly invented it?

Let's be clear: we know who started it. That would be three twentysomething guys named Steve Chen, Chad Hurley and Jawed Karim. At a Silicon Valley dinner party one night in 2004 they started talking about how easy it was to share photos with your friends online but what a pain it was to do the same thing with video.

So they did something about it. They hacked together a simple routine for taking videos in any format and making them play in pretty much any Web browser on any computer. Then they built a kind of virtual video village, a website where people could post their own videos and watch and rate and comment on and search for and tag other people's videos. Voilˆ: YouTube.

But even though they built it, they didn't really understand it. They thought they'd built a useful tool for people to share their travel videos. They thought people might use it to pitch auction items on eBay. They had no idea. They had opened a portal into another dimension.

The minute people saw YouTube they did its creators a huge favor: they hijacked it. Instead of posting their home movies, they posted their stand-up routines and drunken ramblings and painful-looking snowboarding wipeouts. They uploaded their backyard science projects, their delivery-room footage and their interminable guitar solos. They sent in eyewitness footage from the aftermath in New Orleans and the war in Baghdad—from both sides. They promulgated conspiracy theories. They sat alone in their basements and poured their most intimate, embarrassing secrets into their webcams. YouTube had tapped into something that appears on no business plan: the lonely, pressurized, pent-up video subconscious of America. Having started with a single video of a trip to the zoo in April of last year, YouTube now airs 100 million videos—and its users add 70,000 more—every day.

What happened? YouTube's creators had stumbled onto the intersection of three revolutions. First, the revolution in video production made possible by

Exhibit A
12

cheap camcorders and easy-to-use video software. Second, the social revolution that pundits and analysts have dubbed Web 2.0. It's exemplified by sites like MySpace, Wikipedia, Flickr and Digg—hybrids that are useful Web tools but also thriving communities where people create and share information together. The more people use them, the better they work, and more people use them all the time—a kind of self-stoking mass collaboration that wouldn't have been possible without the Internet.

The third revolution is a cultural one. Consumers are impatient with the mainstream media. The idea of a top-down culture, in which talking heads spoon-feed passive spectators ideas about what's happening in the world, is over. People want unfiltered video from Iraq, Lebanon and Darfur—not from journalists who visit there but from soldiers who fight there and people who live and die there.

The videos may not be slick, but they're real—and anyway, slick is overrated. Slick is 2005. The yardstick on YouTube is authenticity. That's why celebrities like Paris Hilton and P. Diddy can compete with a cute sleepy kitty and a guy doing a robot dance—and lose. That's why Peter's crusty, good-natured reminiscences have made him the all-time second-most-subscribed-to uploader on YouTube. That's why Michael J. Fox let his Parkinson's tremors show. That's why politicians have suddenly started to act like real human beings in their campaign ads, and why some—like Senator George Allen of "Macacagate" fame—have been busted for getting a little too real.

Less than a year after its launch, YouTube has become a media giant in its own right. Last month the company moved out of its 30-person office above a pizzeria in San Mateo, Calif., and into an office building in nearby San Bruno. Oh, and on Oct. 16 Hurley and Chen sold the company to Google for $1.65 billion.

With that kind of money behind it, YouTube has to start conducting itself with a little more legal and financial gravitas. That means making money—mostly through advertising—and convincing the TV, movie and music executives who find copyrighted material on YouTube that it's a revenue opportunity and not grounds for litigation. The learning curve is still steep. "The people marketing content see it as a

great new platform, but the legal side of the business doesn't know how to react," Hurley says. "We have instances where someone within the company uploaded something, and the other side's asking you to take it down."

But YouTube isn't Napster. It already has partnerships with NBC, CBS, Universal Music, Sony BMG and Warner Music. And come on—it's the one place on the Net where people willingly, knowingly click on ads, like Nike's legendary clip of sharpshooting soccer star Ronaldinho. If you can't find money on YouTube, you're in the wrong economy, buddy.

YouTube is ultimately more interesting as a community and a culture, however, than as a cash cow. It's the fulfillment of the promise that Web 1.0 made 15 years ago. The way blogs made regular folks into journalists, YouTube makes them into celebrities. The real challenge old media face isn't protecting their precious copyrighted material. It's figuring out what to do when the rest of us make something better. As Hurley puts it, "How do you stay relevant when people can entertain themselves?" He and his partners may have started YouTube, but the rest of us, in our basements and bedrooms, with our broadband and our webcams, invented it.

Exhibit A
14

# Schapiro Exhibit 2

# VIDEO EXHIBIT: FILED MANUALLY

# Schapiro Exhibit 3

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

VIACOM INTERNATIONAL INC., COMEDY )
PARTNERS, COUNTRY MUSIC )
TELEVISION, INC., PARAMOUNT )
PICTURES CORPORATION, and BLACK )
ENTERTAINMENT TELEVISION LLC, )   Case No.
                                )  1:07CV02103
                Plaintiffs,     )
                                )
            vs. )
                                )
YOUTUBE, INC., YOUTUBE, LLC, )
and GOOGLE, INC., )
                                )
                Defendants.     )
_____)


VIDEOTAPED DEPOSITION OF TOM FRESTON

New York, New York

Friday, September 11th, 2009


REPORTED BY:
ERICA RUGGIERI, CSR, RPR
JOB NO: 17617

1

2

3

4                     September 11, 2009

5                        9:52 a.m.

6

7            VIDEOTAPED DEPOSITION OF TOM

8       FRESTON, held at the offices of Mayer

9       Brown, 1675 Broadway, New York, New York,

10      pursuant to notice, before Erica L.

11      Ruggieri, Registered Professional Reporter

12      and Notary Public of the State of New

13      York.

14

15

16

17

18

19

20

21

22

23

24

25

A P P E A R A N C E S

FOR THE PLAINTIFFS:

    JENNER & BLOCK, LLP
    BY:  SUSAN KOHLMANN, ESQ.
    919 Third Avenue 37th Floor
    New York, NY 10022-3908
    (212)891-1690
    Skohlmann@jenner.com

FOR THE DEFENDANTS

    MAYER BROWN, LLP
    BY:  ANDREW SCHAPIRO, ESQ.
        CHRISTINE M. HERNANDEZ, ESQ.
    1675 Broadway
    New York, New York  10019
    (212) 506-2146
    Aschapiro@mayerbrown.com

FOR THE WITNESS

    KENDALL BRILL KLIEGER, LLP
    BY:   RICHARD B. KENDALL, ESQ.
    10100 Santa Monica Blvd., Suite 1725
    Los Angeles, California  90067

ALSO PRESENT:

    MARK C. MORRIL, ESQ., Viacom

    SALLIANNE BROWN, Videographer

1                    FRESTON

2           MR. KENDALL:  Vague and

3       ambiguous and overbroad.

4           A.    I would say generally speaking.

5  10:11:44     Q.    And certainly as you sit here

6       today, you can't think of anything that VO

7       is not -- you are not aware of anything

8       that VO is not doing that you think it

9       should be doing to protect content owners,

10  10:11:56  correct?

11           MS. KOHLMANN:  Objection.

12           MR. KENDALL:  Objection, calls

13       for expert testimony.  Foundation.

14       Calls for speculation.

15  10:12:03     A.    Again it's hard for me to say.

16       I'm not that close to their day-to-day

17       operations.

18           Q.    Nevertheless --

19           A.    My assumption --

20  10:12:12     MR. KENDALL:  Wait, wait.  Asked

21       and answered and same objections.

22           Q.    Go ahead.

23           A.    My assumptions is that they are

24       doing their best to abide by the copyright

25  10:12:21  rules.

1           FRESTON

2                Q.    And do you know of anything that

3          VO does in that regard, that YouTube does

4          not do?

5    10:12:29          MS. KOHLMANN:  Objection.

6                      MR. KENDALL:  Objection.  Calls

7                 for speculation.  Lacks foundation.

8                 Calls for expert testimony.  Calls for

9                 a legal conclusion.  Overbroad.  Vague

10   10:12:38          and ambiguous.

11               A.    I'm not by any means an expert

12          on everything that YouTube does, or VO,

13          for that matter.

14                     It was VO's position that they

15   10:12:51   were going to go out of their way to

16          secure deals with professional content

17          producers.  I know that for a fact.  They

18          secured many, but I can't say how it might

19          have compared vis-a-vis to --

20   10:13:10     Q.    I just want to restate my

21          question, which is, with regard to

22          user-generated content, as you sit here

23          today, do you know of anything that VO

24          does with regard to copyright that YouTube

25   10:13:22   does not do?

1                  FRESTON

2          MR. KENDALL:  I have all the

3     same objections.

4     A.    But no.

5  10:13:25     Q.    While you were at Viacom, Viacom

6     acquired, from time to time, on-line

7     properties; is that correct?

8     A.    Yes.

9     Q.    Are you familiar with -- I

10  10:13:50  believe it was under your stewardship that

11     Viacom acquired a company called Atom

12     Entertainment; is that correct?

13     A.    Yes.

14     Q.    And Atom Entertainment, at one

15  10:14:03  time, had a service called Addicting

16     Clips; is that correct?

17     A.    Yes.

18     Q.    In the course of making -- in

19     the course of acquiring Atom Entertainment

20  10:14:24  and Addicting Clips, am I right to assume

21     that Viacom conducted due diligence?

22          MR. KENDALL:  Lacks foundation.

23     Assumes facts not in evidence, and

24     calls for speculation.

25  10:14:40     A.    Due diligence was done.

1      FRESTON

2          Q.    But it was always done when

3      there was an acquisition at Viacom, right?

4          A.    Always.

5  10:14:48    MR. KENDALL:  Objection,

6          overbroad.

7          Q.    And the Addicting Clips service

8      respected copyright, correct?

9          MR. KENDALL:  Calls for a legal

10 10:15:00    conclusion.  Lacks foundation.  Calls

11          for expert testimony.

12          Again, I'll caution you not to

13          provide expert testimony.

14          A.    I'm having trouble recalling

15 10:15:11  exactly what the format of Addicting Clips

16      was, but the overriding operating

17      philosophy was that whatever they were

18      doing was -- did not have copyright

19      issues.

20 10:15:26    Q.    And do you recall whether

21      Addicting Clips, on its website -- I'm not

22      asking you for expert testimony.  To be

23      honest, I'm not sure what that objection

24      means, caution you not to provide expert

25 10:15:41  testimony.  You are not an expert.  I'm

1    FRESTON

2         MR. SCHAPIRO:  To the best of

3    our knowledge, both were sent to the

4    witness.  But we can ask him.

5  11:12:56         MR. KENDALL:  Why don't you find

6    that out.  Maybe the witness recalls

7    that something was sent to him or

8    maybe not, but let's not assume it

9    until we get there.

10  11:13:04    Q.    Do you recall reviewing a

11   Powerpoint that looked like this, or

12   something like this?

13         MR. KENDALL:  Vague and

14   ambiguous.

15  11:13:08    A.    Well, I know I would have

16   received a presentation about YouTube,

17   most likely in Powerpoint format.  This

18   would look -- well, this is a Powerpoint

19   format.

20  11:13:22    Q.    So without asking whether this

21   was the exact one, in this Powerpoint --

22   which was produced by some people at

23   Viacom, apparently -- YouTube is described

24   as "The dominant platform for consumers as

25  11:13:36  they migrate to video to express

1                          FRESTON

2            themselves."

3                     Do you recall whether that was

4            your view of YouTube at the time?

5   11:13:42     A.    Well, I think that was a view

6            that was supported by traffic statistics.

7                     Q.    And in the second bullet point,

8            YouTube is described, or a YouTube

9            purchase is described as "a transformative

10  11:13:57   acquisition for MTV Networks/Viacom in the

11           Internet space."

12                    Do you recall whether that was

13           your view of a possible YouTube

14           acquisition?

15  11:14:06     A.    Definitely.

16                    Q.    On page 4, which is Bates

17           stamped 10132348, there is a slide

18           entitled "YouTube Is a Video Utility

19           Serving an Extremely Long Tail of

20  11:14:47   Content."

21                    Do you know what the "long tail"

22           means?

23                    A.    It means a lot of things that

24           may individually get very small usage

25  11:15:00   levels but, on aggregate, rolls up to a

FRESTON

1   lot of usage.

2       Q.    So when you say, "It means a lot

3   of things," you are not testifying it has

4   11:15:09   many meanings, you're saying the meaning

5   of it is?

6       A.    In this case it would mean that

7   there is an extremely large archive

8   library of content, much of which may have

9   11:15:23   very limited appeal.

10      Q.    And the second bullet point

11  says, "Consumption of branded content on

12  YT is low.  There are no movie trailers in

13  the top 30, nor are there any clips from

14  11:15:44   popular TV shows."

15          Do you understand "branded

16  content" to mean movie or TV content?

17      A.    That would generally mean

18  professionally produced content, as

19  11:15:58   opposed to user-generated content.

20      Q.    So the team that produced this

21  Powerpoint is saying that among the top

22  30, there were no movie trailers or clips

23  from TV shows, correct?

24  11:16:09          MR. KENDALL:  Wait.  I'm going

# Schapiro Exhibit 4

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
————————————————x

VIACOM INTERNATIONAL, INC., COMEDY
PARTNERS, COUNTRY MUSIC TELEVISION,
INC., PARAMOUNT PICTURES CORPORATION,
and BLACK ENTERTAINMENT TELEVISION,
LLC,

        Plaintiffs,

        vs.            NO. 07-CV-2103

YOUTUBE, INC., YOUTUBE, LLC,
and GOOGLE, INC.,

        Defendants.
————————————————x

THE FOOTBALL ASSOCIATION PREMIER
LEAGUE LIMITED, BOURNE CO., et al.,
on behalf of themselves and all
others similarly situated,

        Plaintiffs,

        vs.            NO. 07-CV-3582

YOUTUBE, INC., YOUTUBE, LLC,
and GOOGLE, INC.,

        Defendants.
————————————————x

VIDEOTAPED DEPOSITION OF MICHAEL WOLF
NEW YORK, NEW YORK
FRIDAY, APRIL 17, 2009

JOB NO.: 16687

584ffb46-7a6e-4834-9ab5-d178479cf79c

1

2

3

4

5

6

7

8               APRIL 17, 2009
                 10:02 a.m.

9

10

11              VIDEOTAPED DEPOSITION OF MICHAEL

12       WOLF, held at the offices of CAHILL GORDON &

13       REINDEL, LLP, 80 Pine Street, New York, New

14       York, pursuant to subpoena, before JENNIFER

15       OCAMPO-GUZMAN, a Shorthand Reporter and

16       Notary Public of the State of New York.

17

18

19

20

21

22

23

24

25

584ffb46-7a6e-4834-9ab5-d178479cf79c

1

2      A P P E A R A N C E S:

3

4    FOR THE PLAINTIFFS VIACOM INTERNATIONAL,

5    INC.:

6        JENNER & BLOCK, LLP

7        BY:  SUSAN J. KOHLMANN, ESQ.

8        919 Third Avenue, 37th Floor

9        New York, New York 10022-3908

10       (212) 891-1690 skohlmann@jenner.com

11

12    FOR THE DEFENDANTS YOUTUBE, INC., YOUTUBE,

13    LLC and GOOGLE, INC.:

14       WILSON SONSINI GOODRICH & ROSATI, PC

15       BY:  BART E. VOLKMER, ESQ.

16       650 Page Mill Road

17       Palo Alto, California 94304-1050

18       650-565-3508 bvolkmer@wsgr.com

19

20

21

22

23

24

25

584ffb46-7a6e-4834-9ab5-d178479cf79c

1

2      APPEARANCES (Continued):

3

4      FOR THE DEPONENT:

5          CAHILL GORDON & REINDEL, LLP

6          BY:  ADAM ZUROFSKY, ESQ.

7          BY:  CHRISTOPHER A. GORMAN, ESQ.

8              80 Pine Street

9              New York, New York 10005-1702

10         (212) 701-3137 azurofsky@cahill.com

11         (212) 701-3119 cgorman@cahill.com

12

13

14     ALSO PRESENT:

15         CARLOS KING, Videographer

16

17

18

19

20

21

22

23

24

25

584ffb46-7a6e-4834-9ab5-d178479cf79c

| | | |
|---|---|---|
| | 1 | Wolf |
| 11:23:01 | 2 | A. I think Judy was looking for a |
| 11:23:05 | 3 | large scale acquisition, which would be |
| 11:23:10 | 4 | comparable to the acquisition by News Corp of |
| 11:23:17 | 5 | MySpace. |
| 11:23:17 | 6 | Q. And you thought that -- pardon me. |
| 11:23:22 | 7 | And she thought that an acquisition |
| 11:23:26 | 8 | by Viacom of YouTube would be comparable to |
| 11:23:30 | 9 | the News Corp acquisition of MySpace? |
| 11:23:33 | 10 | MR. ZUROFSKY: Objection to form, |
| 11:23:34 | 11 | calls for speculation. The document |
| 11:23:37 | 12 | speaks for itself. |
| 11:23:38 | 13 | MS. KOHLMANN: Objection. |
| 11:23:39 | 14 | A. Once again, I'd be speculating. |
| 11:23:42 | 15 | It's hard for me to remember her state of |
| 11:23:47 | 16 | mind here and so it's possible that's what |
| 11:23:49 | 17 | she meant. |
| 11:23:50 | 18 | Q. Is that how you viewed it at the |
| 11:23:54 | 19 | time, that an acquisition of YouTube by |
| 11:23:56 | 20 | Viacom would be comparable to the News Corp |
| 11:23:58 | 21 | acquisition of MySpace? |
| 11:24:05 | 22 | A. At the time, and, again, I would |
| 11:24:07 | 23 | just be thinking about my points of view |
| 11:24:08 | 24 | then, I was looking at -- we wanted to look |
| 11:24:13 | 25 | at YouTube as an acquisition on its own |

584ffb46-7a6e-4834-9ab5-d178479cf79c

|       |                                                      |
|-------|------------------------------------------------------|
|       | 1    Wolf                                             |
| 11:24:16 | 2    merits, not necessarily how that would have   |
| 11:24:20 | 3    compared to the acquisitions that were done   |
| 11:24:23 | 4    by other companies.                            |
| 11:24:24 | 5        Q.   And when you wrote, "We should get    |
| 11:24:34 | 6    our best minds together and figure out how to |
| 11:24:36 | 7    make it a business," did MTV Networks end up   |
| 11:24:38 | 8    putting its best minds together to look at a   |
| 11:24:43 | 9    potential acquisition of YouTube?              |
| 11:24:44 | 10       MR. ZUROFSKY:  Objection to form.          |
| 11:24:45 | 11       But answer, you can answer.                |
| 11:24:48 | 12       A.   At the time I considered these to     |
| 11:24:50 | 13   be our best minds and, therefore -- and, yes, |
| 11:24:52 | 14   we did put them together.                      |
| 11:25:03 | 15       MR. VOLKMER:  Let's mark Exhibit 5.        |
| 11:25:16 | 16       (Exhibit Wolf-5, E-mail dated              |
| 11:25:16 | 17       7/6/06, Bates No. VIA00613122, marked      |
| 11:25:16 | 18       for identification, this date.)            |
| 11:25:34 | 19       MR. VOLKMER:  This is a July 6,            |
| 11:25:37 | 20       2006, e-mail that Adam Cahan sent to       |
| 11:25:42 | 21       Judy McGrath and Michael Wolf.  The        |
| 11:25:43 | 22       subject line is "Update from the plane."   |
| 11:25:47 | 23       Q.   If you'd just let me know when        |
| 11:25:48 | 24   you've had a chance to review that document,   |
| 11:25:50 | 25   Mr. Wolf?                                      |

584ffb46-7a6e-4834-9ab5-d178479cf79c

|              |    |                                        |
|--------------|----|----------------------------------------|
|              | 1  | Wolf                                   |
| 11:25:51     | 2  | A.    Okay.   Thank you.               |
| 11:26:35     | 3  | Q.    And if could you turn to the fifth |
| 11:26:37     | 4  | paragraph, and the title of that paragraph is |
| 11:26:39     | 5  | "YouTube"?                             |
| 11:26:40     | 6  | A.    Yes.                             |
| 11:26:43     | 7  | Q.    Mr. Cahan writes, "We had a very |
| 11:26:45     | 8  | deep conversation over an hour about the |
| 11:26:47     | 9  | potential" -- "about the potential, the risk |
| 11:26:49     | 10 | and why strategically it is so critical." |
| 11:26:52     | 11 | Do you know who Mr. Cahan is           |
| 11:26:55     | 12 | referring to when he says "we" in that |
| 11:26:57     | 13 | sentence?                              |
| 11:27:05     | 14 | A.    I didn't write this memo.  It was |
| 11:27:07     | 15 | written by Mr. Cahan, and -- and I don't know |
| 11:27:09     | 16 | who was on the plane with him, so I don't |
| 11:27:12     | 17 | know who the "we" was.                 |
| 11:27:13     | 18 | Q.    Based on your experience and your |
| 11:27:20     | 19 | position at the time, who would you guess was |
| 11:27:22     | 20 | the person on the plane or the people on the |
| 11:27:25     | 21 | plane with Mr. Cahan?                  |
| 11:27:27     | 22 | MR. ZUROFSKY:   Objection, calls for   |
| 11:27:31     | 23 | speculation.                           |
| 11:27:31     | 24 | MS. KOHLMANN:   Objection.             |
| 11:27:31     | 25 | A.    I'd be taking a guess and I really |

584ffb46-7a6e-4834-9ab5-d178479cf79c

|  |  |  |
|--|--|--|
|  | 1 | Wolf |
| 13:42:51 | 2 | MR. ZUROFSKY: Objection to form. |
| 13:42:53 | 3 | A. It could be that we were discussing |
| 13:42:55 | 4 | those deal -- those terms or it could be |
| 13:42:57 | 5 | that -- that those were the deal terms we |
| 13:43:00 | 6 | were proposing. I really can't tell by this |
| 13:43:02 | 7 | memo and I can't remember when I wrote it. |
| 13:43:03 | 8 | Q. Could it also be the case that |
| 13:43:07 | 9 | those deal terms that we just went over had |
| 13:43:10 | 10 | not been discussed between the parties as of |
| 13:43:14 | 11 | October 3, 2006? |
| 13:43:15 | 12 | MR. ZUROFSKY: Objection to form. |
| 13:43:17 | 13 | MS. KOHLMANN: Objection to form. |
| 13:43:18 | 14 | A. It's possible, yes. |
| 13:43:20 | 15 | Q. You're just not sure one way or the |
| 13:43:22 | 16 | other? |
| 13:43:25 | 17 | A. I'm not sure. Lots of information. |
| 13:43:26 | 18 | Lots of things that go past what I was doing |
| 13:43:30 | 19 | as the president of the company and I just |
| 13:43:33 | 20 | can't remember what happened in each of these |
| 13:43:36 | 21 | situations. |
| 13:43:36 | 22 | Q. When Viacom and MTVN were |
| 13:43:46 | 23 | negotiating with YouTube in the summer and |
| 13:43:49 | 24 | fall of 2006, was it aware of the presence of |
| 13:43:53 | 25 | Viacom content on the YouTube website? |

584ffb46-7a6e-4834-9ab5-d178479cf79c

|  |  |  |
|---|---|---|
|  | 1 | Wolf |
| 13:43:56 | 2 | MR. ZUROFSKY: Objection to form. |
| 13:43:57 | 3 | A. First of all, I don't know if |
| 13:43:59 | 4 | Viacom was negotiating with YouTube. I was |
| 13:44:02 | 5 | in charge of MTV Networks. I don't know if |
| 13:44:05 | 6 | Viacom, there was any other independent of |
| 13:44:09 | 7 | MTV Networks' negotiation. |
| 13:44:11 | 8 | Q. Okay. So I'll rephrase the |
| 13:44:12 | 9 | question. |
| 13:44:13 | 10 | When MTVN was negotiating with |
| 13:44:16 | 11 | YouTube in the summer and fall of 2006, was |
| 13:44:18 | 12 | it aware of the presence of Viacom content on |
| 13:44:20 | 13 | the YouTube website? |
| 13:44:22 | 14 | MR. ZUROFSKY: Objection to form. |
| 13:44:24 | 15 | A. I don't recall one way or the |
| 13:44:26 | 16 | other. |
| 13:44:30 | 17 | Are you asking about this memo or |
| 13:44:32 | 18 | just in general? |
| 13:44:33 | 19 | Q. I'm not asking about the memo, just |
| 13:44:36 | 20 | in general. And this goes throughout the |
| 13:44:38 | 21 | entire period of the negotiations between |
| 13:44:39 | 22 | YouTube and Google and MTVN, at any time in |
| 13:44:44 | 23 | those negotiations was MTVN aware of the |
| 13:44:48 | 24 | presence of Viacom content on the YouTube |
| 13:44:50 | 25 | website? |

584ffb46-7a6e-4834-9ab5-d178479cf79c

|          |    |                                              |
|----------|----|----------------------------------------------|
|          | 1  | Wolf                                         |
| 13:44:52 | 2  | MR. ZUROFSKY: Objection to form.             |
| 13:44:55 | 3  | MS. KOHLMANN: Objection.                     |
| 13:44:56 | 4  | A.   We were certainly aware that our        |
| 13:45:02 | 5  | content was on YouTube.                      |
| 13:45:03 | 6  | Q.   And during the negotiations did         |
| 13:45:11 | 7  | Viacom allow that content to stay up on      |
| 13:45:13 | 8  | YouTube?                                     |
| 13:45:14 | 9  | MR. ZUROFSKY: Objection to form.             |
| 13:45:15 | 10 | MS. KOHLMANN: Objection.                     |
| 13:45:16 | 11 | A.   The decision would have been ours,      |
| 13:45:20 | 12 | not Viacom's.  It was going to be -- but MTV |
| 13:45:26 | 13 | Networks, to the best of my recollection, we |
| 13:45:28 | 14 | allowed the content to be there.             |
| 13:45:30 | 15 | Q.   And why did you allow it to be          |
| 13:45:34 | 16 | there?                                       |
| 13:45:35 | 17 | MR. ZUROFSKY: Objection.                     |
| 13:45:37 | 18 | A.   I'd be only speculating today           |
| 13:45:42 | 19 | because I can't remember specifically, but I |
| 13:45:43 | 20 | would guess that, that we thought that we    |
| 13:45:47 | 21 | could do a deal with YouTube and that also at|
| 13:45:53 | 22 | the same time we thought that having the     |
| 13:45:55 | 23 | content there was valuable in terms of       |
| 13:45:59 | 24 | helping the ratings of our shows.            |
| 13:46:24 | 25 | MR. VOLKMER: Let's go off the                |

584ffb46-7a6e-4834-9ab5-d178479cf79c

                                    Wolf

13:46:25  2      record.

13:46:26  3              THE VIDEOGRAPHER:  The time is

13:46:27  4      1:44 p.m., and we're off the record.

13:51:31  5              (A brief recess was taken.)

13:51:31  6              THE VIDEOGRAPHER:  The time is

13:51:42  7      1:50 p.m., and we're back on the record.

13:51:44  8      BY MR. VOLKMER:

13:51:44  9          Q.   On Monday, October 9, 2006, Google

13:51:53  10     issued a press release announcing that it was

13:51:55  11     acquiring YouTube.  Do you remember having a

13:51:58  12     conversation with Eric Schmidt the preceding

13:52:01  13     weekend in which you discussed Google's

13:52:03  14     potential acquisition of YouTube?

13:52:06  15         A.   I don't remember the exact dates of

13:52:08  16     the things that you're describing to me, but

13:52:11  17     I certainly remember having discussion with

13:52:14  18     Eric Schmidt before, before the potential

13:52:19  19     acquisition, before the acquisition of

13:52:21  20     YouTube took place.

13:52:22  21         Q.   And what do you recall about that

13:52:24  22     conversation?

13:52:29  23         A.   To the best of my ability to

13:52:33  24     recall, I remember him telling me that they

13:52:36  25     were considering acquiring YouTube, that I

584ffb46-7a6e-4834-9ab5-d178479cf79c

|          |    |                                         |
|----------|----|-----------------------------------------|
|          | 1  | Wolf                                    |
| 14:13:16 | 2  | possibility that if a deal was not reached, |
| 14:13:20 | 3  | that Viacom would either do takedown notices |
| 14:13:26 | 4  | -- I think most part, MTV Network people did |
| 14:13:30 | 5  | not discuss litigation.  I think they   |
| 14:13:32 | 6  | discussed takedown notices.  And the Viacom |
| 14:13:35 | 7  | legal people were discussing litigation.  And |
| 14:13:43 | 8  | other Viacom senior executives.         |
| 14:13:51 | 9  | Q.   Mr. Cahan was an MTV Networks       |
| 14:13:56 | 10 | employee, right?                        |
| 14:13:57 | 11 | A.   Yes.                               |
| 14:13:59 | 12 | MR. VOLKMER:  I would like to mark      |
| 14:14:00 | 13 | Exhibit 15.                             |
| 14:14:23 | 14 | (Exhibit Wolf-15, E-mail dated          |
| 14:14:23 | 15 | 10/9/06, Bates No. VIA02090176, marked  |
| 14:14:23 | 16 | for identification, this date.)         |
| 14:15:31 | 17 | A.   I've read the memo.                |
| 14:15:32 | 18 | Q.   And this is an e-mail sent by Adam  |
| 14:15:36 | 19 | Cahan to Michael Wolf on October 9, 2006. |
| 14:15:39 | 20 | Mr. Cahan writes in the first sentence, "I |
| 14:15:42 | 21 | feel very strongly the time is now for Google |
| 14:15:44 | 22 | to negotiate with us, otherwise, we need to |
| 14:15:46 | 23 | threaten all content comes down from     |
| 14:15:49 | 24 | YouTube," and in the concluding sentence of |
| 14:15:51 | 25 | that paragraph, he says, "If we threaten we |

584ffb46-7a6e-4834-9ab5-d178479cf79c

|          |    |                                          |
|----------|----|------------------------------------------|
|          | 1  | Wolf                                     |
| 14:15:54 | 2  | can use it in negotiations for a better |
| 14:15:56 | 3  | deal."                                   |
| 14:15:56 | 4  | So the policy that Mr. Cahan is          |
| 14:15:59 | 5  | advocating here is that MTVN should not  |
| 14:16:03 | 6  | request the removal of its content but should |
| 14:16:05 | 7  | keep that content up on YouTube and threaten |
| 14:16:07 | 8  | to remove it to gain leverage in the     |
| 14:16:10 | 9  | negotiations, right?                     |
| 14:16:11 | 10 | MR. ZUROFSKY: Objection.                 |
| 14:16:14 | 11 | MS. KOHLMANN: Objection.                 |
| 14:16:15 | 12 | A. These are the kind -- we are          |
| 14:16:16 | 13 | anxious to get to a deal and these are the |
| 14:16:19 | 14 | kind of levers that we would use in any deal |
| 14:16:22 | 15 | that we were considering. We try to figure |
| 14:16:25 | 16 | out what -- where, where we had leverage and |
| 14:16:27 | 17 | where we did not.                        |
| 14:16:29 | 18 | Q. And you thought that you had          |
| 14:16:30 | 19 | leverage by threatening to issue takedown |
| 14:16:36 | 20 | notices against YouTube, correct?        |
| 14:16:38 | 21 | A. That was the --                       |
| 14:16:42 | 22 | MR. ZUROFSKY: Objection. Go              |
| 14:16:44 | 23 | ahead.                                   |
| 14:16:44 | 24 | A. That was the general thinking at      |
| 14:16:45 | 25 | MTV Networks at the time.                |

584ffb46-7a6e-4834-9ab5-d178479cf79c

1          Wolf

14:16:54   2          Q.   So if all of the MTVN content had

14:16:57   3     disappeared from YouTube in that time frame,

14:16:59   4     MTVN would have been in a worse negotiating

14:17:02   5     position, right?

14:17:03   6               MR. ZUROFSKY:   Objection.

14:17:04   7               MS. KOHLMANN:   Objection.

14:17:05   8          A.   You're asking me a hypothetical

14:17:09   9     question, sir?

14:17:11   10         Q.   I am.

14:17:12   11         A.   I can just give you an answer, you

14:17:16   12    know, based on my own opinion.  I think on

14:17:22   13    one side, MTV Networks would have had less

14:17:25   14    leverage.  On the other side, YouTube were

14:17:33   15    hardly worse off not having MTV Networks'

14:17:37   16    content.

14:17:37   17         Q.   But in this time frame, MTVN did

14:17:51   18    not have a policy of requesting that YouTube

14:17:54   19    remove its content when it became aware of

14:17:56   20    the presence of that content, right?

14:17:59   21               MR. ZUROFSKY:   Objection.

14:18:00   22               MS. KOHLMANN:   Objection.

14:18:00   23         A.   I don't recall what our stance was

14:18:10   24    with YouTube, but to the best of my

14:18:12   25    recollection, we did not ask for takedowns

584ffb46-7a6e-4834-9ab5-d178479cf79c

|           |    |                                              |
|-----------|----|----------------------------------------------|
|           | 1  | Wolf                                         |
| 15:31:05  | 2  | A.   Yes.                                     |
| 15:31:09  | 3  | Q.   And is that 20 percent figure also       |
| 15:31:11  | 4  | based on a back-of-the-envelope calculation   |
| 15:31:15  | 5  | as opposed to a scientific study?             |
| 15:31:18  | 6  | MS. KOHLMANN:   Objection.                     |
| 15:31:19  | 7  | A.   I don't recall at that point.  By        |
| 15:31:22  | 8  | then we were looking at the number of clips.  |
| 15:31:24  | 9  | We were looking at the number of views for    |
| 15:31:27  | 10 | top clips and -- and it did appear that MTV   |
| 15:31:37  | 11 | Networks' content was -- was a large          |
| 15:31:40  | 12 | percentage or was a significant percentage of |
| 15:31:43  | 13 | YouTube consumption.                          |
| 15:31:46  | 14 | Q.   And had MTVN or Viacom undertaken a       |
| 15:31:53  | 15 | scientific study to make that determination?  |
| 15:31:56  | 16 | MR. ZUROFSKY:   Objection.                     |
| 15:31:57  | 17 | MS. KOHLMANN:   Objection.                     |
| 15:31:58  | 18 | A.   I'm not sure how scientific either       |
| 15:32:05  | 19 | ratings on the internet or television, that   |
| 15:32:09  | 20 | kind of analysis is.  I do know one way or    |
| 15:32:13  | 21 | the other, that we had engaged our research   |
| 15:32:20  | 22 | people to examine and analyze the YouTube,    |
| 15:32:28  | 23 | the consumption of YouTube clips, that it's   |
| 15:32:32  | 24 | reflected here or not, I don't remember.      |
| 15:32:33  | 25 | Q.   And in this message, you say that        |

584ffb46-7a6e-4834-9ab5-d178479cf79c

Wolf

15:32:37   2   MTVN had undertaken a very quick analysis and
15:32:40   3   it was back of the envelope.  Does that lead
15:32:46   4   to the conclusion that this was more along
15:32:48   5   the lines of a nonscientific study?
15:32:50   6          MS. KOHLMANN:  Objection.
15:32:52   7          MR. ZUROFSKY:  Objection.
15:32:52   8       A.   It could be, it could not be.  I
15:32:54   9   just don't remember at the time.
15:32:55   10      Q.   But you wrote this message to
15:33:06   11   Mr. Schmidt saying that this was a
15:33:07   12   back-of-the-envelope calculation, right?
15:33:09   13      A.   Yes, I did.
15:33:10   14      Q.   And that was an accurate statement
15:33:12   15   as far as you were concerned, correct?
15:33:15   16          MR. ZUROFSKY:  Objection.
15:33:17   17          MS. KOHLMANN:  Objection.
15:33:18   18      A.   Yes.
15:33:54   19      Q.   If you can turn to the second to
15:33:57   20   last paragraph, the one that starts, "As you
15:34:01   21   can imagine," and the second sentence is, "As
15:34:06   22   importantly we're drawing increasingly
15:34:11   23   uncomfortable with the time passing and feel
15:34:13   24   that we cannot allow our content to be at
15:34:15   25   YouTube in its current form."

584ffb46-7a6e-4834-9ab5-d178479cf79c

|          |    |                                    |
|----------|----|------------------------------------|
|          | 1  | Wolf                               |
| 15:34:18 | 2  | A.   Yes.                          |
| 15:34:19 | 3  | Q.   Are you telling Mr. Schmidt there |
| 15:34:21 | 4  | that to date Viacom and MTVN had been |
| 15:34:24 | 5  | allowing its content to be on YouTube? |
| 15:34:28 | 6  | MR. ZUROFSKY:  Objection.          |
| 15:34:29 | 7  | MS. KOHLMANN:  Objection.          |
| 15:34:30 | 8  | A.   While we were issuing takedown |
| 15:34:42 | 9  | notices against some of the content, there |
| 15:34:44 | 10 | was other content which we were allowing to |
| 15:34:46 | 11 | continue to be on YouTube.         |
| 15:34:49 | 12 | MR. VOLKMER:  Okay.  We need to    |
| 15:34:51 | 13 | change the tape.                   |
| 15:34:52 | 14 | THE VIDEOGRAPHER:  The time is     |
| 15:34:53 | 15 | 3:33, and this ends tape number 2 in the |
| 15:34:55 | 16 | videotaped deposition of Michael Wolf. |
| 15:34:58 | 17 | (A brief recess was taken.)        |
| 15:40:56 | 18 | THE VIDEOGRAPHER:  The time is     |
| 15:42:10 | 19 | 3:40 p.m., and this begins tape number 3 |
| 15:42:13 | 20 | in the videotaped deposition of Michael |
| 15:42:16 | 21 | Wolf.                              |
| 15:42:16 | 22 | MR. VOLKMER:  I would like to mark |
| 15:42:17 | 23 | Exhibit 20.                        |
| 15:42:26 | 24 | (Exhibit Wolf-20, E-mail dated     |
| 15:42:26 | 25 | 12/19/06, Bates No. VIA00174505, marked |

584ffb46-7a6e-4834-9ab5-d178479cf79c

|          |    |                                              |
|----------|----|----------------------------------------------|
|          | 1  | Wolf                                         |
| 15:42:27 | 2  | for identification, this date.)              |
| 15:42:27 | 3  | Q.    This is an e-mail exchange that        |
| 15:42:37 | 4  | Viacom produced in this litigation between   |
| 15:42:39 | 5  | Michael Wolf and Adam Cahan on December 19,  |
| 15:42:46 | 6  | 2006, and in the last in time e-mail Mr.     |
| 15:42:49 | 7  | Cahan writes, "I think when we issue the     |
| 15:42:52 | 8  | takedown we will hear from them."            |
| 15:42:55 | 9  | Did you take this to mean that               |
| 15:42:58 | 10 | Mr. Cahan suspected that when Viacom issued a |
| 15:43:02 | 11 | mass takedown to YouTube that Google would   |
| 15:43:04 | 12 | come back to the negotiating table?          |
| 15:43:07 | 13 | MR. ZUROFSKY:  Objection.                    |
| 15:43:09 | 14 | A.    Yes.                                   |
| 15:43:15 | 15 | Q.    And was that part of the               |
| 15:43:17 | 16 | negotiating strategy?                        |
| 15:43:19 | 17 | MR. ZUROFSKY:  Objection.                    |
| 15:43:19 | 18 | MS. KOHLMANN:  Objection.                    |
| 15:43:20 | 19 | A.    Yes.                                   |
| 15:43:31 | 20 | Q.    And what were the reasons that MTVN    |
| 15:43:34 | 21 | employed that strategy of issuing a massive  |
| 15:43:37 | 22 | takedown to YouTube in order to get Google to |
| 15:43:40 | 23 | come back to the negotiating table?          |
| 15:43:41 | 24 | MR. ZUROFSKY:  Objection.                    |
| 15:43:42 | 25 | MS. KOHLMANN:  Objection.                    |

584ffb46-7a6e-4834-9ab5-d178479cf79c

| | | |
|---|---|---|
| | 1 | Wolf |
| 15:43:42 | 2 | A.   In the normal course of a |
| 15:43:48 | 3 | negotiation, each side uses the levers that |
| 15:43:52 | 4 | it would have.  And one of the levers and one |
| 15:43:58 | 5 | of the different terms of the negotiation |
| 15:44:00 | 6 | would be how many clips that Viacom would |
| 15:44:05 | 7 | allow or MTV Networks really would allow to |
| 15:44:10 | 8 | have on YouTube.  This is no different than |
| 15:44:14 | 9 | the kind of negotiations we would be in with |
| 15:44:18 | 10 | a cable operator where we would say to a |
| 15:44:20 | 11 | cable operator come X date we will be -- our |
| 15:44:25 | 12 | channel will go black.  This is the kind of |
| 15:44:28 | 13 | back and forth that happens in this kind of a |
| 15:44:31 | 14 | negotiation. |
| 15:44:32 | 15 | Q.   So the threat of a massive takedown |
| 15:44:52 | 16 | was one of the levers that MTVN was using to |
| 15:44:57 | 17 | extract better terms from Google? |
| 15:44:59 | 18 | MR. ZUROFSKY:  Objection. |
| 15:45:00 | 19 | MS. KOHLMANN:  Objection. |
| 15:45:01 | 20 | A.   It was one of the different levers |
| 15:45:05 | 21 | that MTV Networks was using in order to get |
| 15:45:11 | 22 | to the deal that we wanted. |
| 15:45:16 | 23 | Q.   And actually issuing a massive |
| 15:45:18 | 24 | takedown was also one of the levers? |
| 15:45:21 | 25 | MR. ZUROFSKY:  Objection. |

| | | |
|---|---|---|
| | 1 | Wolf |
| 15:45:22 | 2 | MS. KOHLMANN: Objection. |
| 15:45:22 | 3 | A. I don't know if we had issued, at |
| 15:45:30 | 4 | that point, a massive takedown. |
| 15:45:32 | 5 | Q. Mr. Cahan says, "So far we have |
| 15:45:37 | 6 | 29,000 clips I expect that number to double," |
| 15:45:42 | 7 | suggested massive takedown had not yet |
| 15:45:44 | 8 | issued, correct? |
| 15:45:45 | 9 | MS. KOHLMANN: Objection. |
| 15:45:46 | 10 | MR. ZUROFSKY: Objection. |
| 15:45:47 | 11 | A. I don't know. I don't know if he |
| 15:45:50 | 12 | meant we've taken down 29,000 clips, or I |
| 15:45:54 | 13 | really just don't know. It's not clear from |
| 15:45:56 | 14 | this memo. |
| 15:45:56 | 15 | Q. Do you have any independent |
| 15:45:58 | 16 | recollection of MTVN accumulating clips so |
| 15:46:04 | 17 | that they could send one massive takedown to |
| 15:46:06 | 18 | YouTube as opposed to sending takedown |
| 15:46:09 | 19 | notices as they became aware of the content? |
| 15:46:11 | 20 | MR. ZUROFSKY: Objection. |
| 15:46:12 | 21 | MS. KOHLMANN: Objection. |
| 15:46:13 | 22 | A. I recall that as part of my |
| 15:46:18 | 23 | discussion with one of the MTV Networks' |
| 15:46:23 | 24 | lawyers, I recall that we did discuss that |
| 15:46:26 | 25 | they would identify a large number of clips |

584ffb46-7a6e-4834-9ab5-d178479cf79c

|   |   |   |
|---|---|---|
| | 1 | Wolf |
| 15:46:29 | 2 | and -- |
| 15:46:31 | 3 | MS. KOHLMANN: I'm going to just |
| 15:46:33 | 4 | caution you not to disclose any |
| 15:46:35 | 5 | attorney-client privileged information. |
| 15:46:37 | 6 | THE WITNESS: Okay. |
| 15:46:37 | 7 | MR. ZUROFSKY: You said that that |
| 15:46:38 | 8 | lawyer was acting on your behalf of MTV |
| 15:46:40 | 9 | Networks, that is an attorney-client |
| 15:46:43 | 10 | relationship with them. |
| 15:46:44 | 11 | A. Okay. Then -- |
| 15:46:53 | 12 | Q. Setting aside any communications |
| 15:46:56 | 13 | you had with MTV or Viacom lawyers, do you |
| 15:47:00 | 14 | have any independent recollection of Viacom |
| 15:47:02 | 15 | or MTVN accumulating clips to send to YouTube |
| 15:47:07 | 16 | in one massive takedown notice instead of |
| 15:47:10 | 17 | sending notices as they became aware of the |
| 15:47:12 | 18 | content? |
| 15:47:13 | 19 | MR. ZUROFSKY: Objection. |
| 15:47:14 | 20 | MS. KOHLMANN: Objection. |
| 15:47:15 | 21 | A. In general we identified the clips |
| 15:47:22 | 22 | and then had a sense for how many clips would |
| 15:47:27 | 23 | be available so that we could decide when and |
| 15:47:31 | 24 | if we sent a takedown notice, what would be |
| 15:47:35 | 25 | the number of clips and in what shows. |

584ffb46-7a6e-4834-9ab5-d178479cf79c

| | | |
|---|---|---|
| | 1 | Wolf |
| 15:47:38 | 2 | Q. Do you recall there being certain |
| 15:47:49 | 3 | criteria that MTVN applied in making |
| 15:47:53 | 4 | determinations about whether to send takedown |
| 15:47:56 | 5 | notices or clips? |
| 15:48:00 | 6 | MS. KOHLMANN: Objection. |
| 15:48:01 | 7 | A. I don't recall specifically. There |
| 15:48:03 | 8 | may have been some. I just don't remember. |
| 15:48:05 | 9 | Q. Do you remember there being any |
| 15:48:08 | 10 | criteria that were based on length of the |
| 15:48:11 | 11 | clip in determining whether or not MTVN |
| 15:48:17 | 12 | should issue takedown notices? |
| 15:48:19 | 13 | MS. KOHLMANN: Objection. |
| 15:48:20 | 14 | MR. ZUROFSKY: Objection. |
| 15:48:21 | 15 | A. I don't recall. |
| 15:48:21 | 16 | Q. What about particular networks or |
| 15:48:31 | 17 | franchises, do you remember whether a |
| 15:48:34 | 18 | particular clip was associated with a network |
| 15:48:37 | 19 | or franchise being a factor in whether Viacom |
| 15:48:41 | 20 | would issue a takedown notice? |
| 15:48:43 | 21 | MS. KOHLMANN: Objection. |
| 15:48:43 | 22 | A. And, again, I'm really -- it's very |
| 15:48:51 | 23 | difficult to remember these things. I |
| 15:48:54 | 24 | believe that there were clips that we did not |
| 15:48:56 | 25 | want to take down, for example, clips from |

1                           Wolf

15:49:01    2    John Stewart and Steven Colbert, and that

15:49:04    3    there were other clips that we felt we should

15:49:09    4    take down.  I just don't remember what were

15:49:11    5    the types of clips that we took down and not.

15:49:14    6        Q.   And why do you think that Viacom

15:49:16    7    wanted the John Stewart and Steven Colbert

15:49:19    8    clips to stay up on the YouTube site?

15:49:21    9             ·    MR. ZUROFSKY:   Objection.

15:49:22   10             MS. KOHLMANN:   Objection.

15:49:23   11        A.   This was an MTV Networks' decision.

15:49:25   12        Q.   Okay.  I'll restate the question.

15:49:26   13    Thank you.

15:49:27   14             Why do you think that MTVN wanted

15:49:29   15    the John Stewart and Steven Colbert clips to

15:49:32   16    stay up on the YouTube website?

15:49:35   17             MR. ZUROFSKY:   Objection.

15:49:36   18             MS. KOHLMANN:   Objection.

15:49:36   19        A.   And so I'm really giving you my

15:49:42   20    speculation today.

15:49:42   21        Q.   Sure.

15:49:42   22        A.   But we were concerned that both

15:49:49   23    John Stewart and Steven Colbert believed that

15:49:53   24    their presence on YouTube was important for

15:49:58   25    their ratings as well as for their

584ffb46-7a6e-4834-9ab5-d178479cf79c

|  | 1 | Wolf |
| 15:50:00 | 2 | relationship with their audiences, and -- and |
| 15:50:06 | 3 | to a large extent the MTV Networks senior |
| 15:50:10 | 4 | team shared that belief. |
| 15:50:12 | 5 | Q.   And did you share that belief? |
| 15:50:15 | 6 | A.   I did. |
| 15:50:15 | 7 | Q.   Can you think of any other programs |
| 15:50:18 | 8 | that fell under that category you just |
| 15:50:20 | 9 | discussed other than Mr. John Stewart's show |
| 15:50:24 | 10 | and Mr. Colbert's show? |
| 15:50:28 | 11 | A.   There are probably others.  I |
| 15:50:32 | 12 | can't, you know, I can't remember which ones |
| 15:50:34 | 13 | specifically, but overall in a company where |
| 15:50:38 | 14 | the networks are aimed at a younger audience |
| 15:50:42 | 15 | which would tend to be the same audience as |
| 15:50:44 | 16 | YouTube, we need to strike the right balance |
| 15:50:47 | 17 | between clips that we left up and clips that |
| 15:50:50 | 18 | we decided to take down. |
| 15:51:50 | 19 | MR. VOLKMER:  I am going to mark |
| 15:51:52 | 20 | Exhibit 21. |
| 15:51:52 | 21 | (Exhibit Wolf-21, E-mail dated |
| 15:51:52 | 22 | 12/23/06, Bates No. VIA00173284, marked |
| 15:52:14 | 23 | for identification, this date.) |
| 15:52:14 | 24 | Q.   This is an e-mail that Viacom |
| 15:52:50 | 25 | produced in this litigation, it's from Adam |

584ffb46-7a6e-4834-9ab5-d178479cf79c

|          |    |                                                   |
|----------|----|---------------------------------------------------|
|          | 1  | Wolf                                              |
| 15:52:53 | 2  | Cahan to Judy McGrath and Michael Wolf dated      |
| 15:52:57 | 3  | December 23, 2006.                                |
| 15:52:58 | 4  | In the first paragraph, Mr. Cahan                 |
| 15:53:01 | 5  | writes, "As you know, we are gearing up for a     |
| 15:53:03 | 6  | very significant takedown at YouTube by           |
| 15:53:07 | 7  | January 2nd, 3rd, by last count the number        |
| 15:53:09 | 8  | was 50 to 70,000 clips, I suspect that number     |
| 15:53:14 | 9  | will grow before we are complete."                |
| 15:53:16 | 10 | So is it your understanding that                  |
| 15:53:21 | 11 | Viacom was continuing the project of              |
| 15:53:23 | 12 | identifying clips and not asking that they be     |
| 15:53:27 | 13 | removed so that there could be one massive        |
| 15:53:29 | 14 | takedown notice sent?                             |
| 15:53:31 | 15 | MS. KOHLMANN:  Objection.                         |
| 15:53:31 | 16 | A.   I don't know if it was MTV                   |
| 15:53:34 | 17 | Networks.  I'm sorry.  I don't know if it was     |
| 15:53:36 | 18 | MTV Networks or Viacom.  Could you repeat         |
| 15:53:40 | 19 | your question?                                    |
| 15:53:40 | 20 | Q.   Sure.  Was it your understanding             |
| 15:53:42 | 21 | that either Viacom or MTVN was continuing a       |
| 15:53:46 | 22 | project of identifying clips and not asking       |
| 15:53:49 | 23 | that they be removed so that there would be       |
| 15:53:52 | 24 | one massive takedown notice sent to YouTube?      |
| 15:53:55 | 25 | MR. ZUROFSKY:  Objection.                         |

584ffb46-7a6e-4834-9ab5-d178479cf79c

# Schapiro Exhibit 5

CONFIDENTIAL

From:     "Toffler, Van" <Van.Toffler@mtvstaff.com>
Date:     Mon, 10 Jul 2006 22:32:20 -0400
To:       "McGrath, Judy" <Judy.McGrath@mtvstaff.com>
Subject:  Re: Terrible day

I do think some of it cuts to the bone.  What happened to our what the fuck ways.  It takes 3 months and 58 meetings to get a 1million dollar acquisition done at our company.  We're fast becoming those we scorned

-----Original Message-----
From: McGrath, Judy
To: Toffler, Van
Sent: Mon Jul 10 22:10:36 2006
Subject: Re: Terrible day

Because it's our fucking company. What did you think of that fine analyst report? Tom should be fired? He's out of his mind over it. Dinner with Sumner tonite. He should pay attention to the rest of it....stop running the company for wall street.

------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Toffler, Van
To: McGrath, Judy
Sent: Mon Jul 10 21:59:38 2006
Subject: Re: Terrible day

Why not, can't prove the revenue potential?

-----Original Message-----
From: McGrath, Judy
To: Toffler, Van
Sent: Mon Jul 10 21:51:43 2006
Subject: Re: Terrible day

Probably not buying YouTube, if I had to wager.

------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Toffler, Van
To: McGrath, Judy
Sent: Mon Jul 10 21:48:23 2006
Subject: Re: Terrible day

He researches well, but in my exp hasn't been too great on our awards shows.  Yet if produced could be fine and get the boys.
On bacara, Rich and I sent the message that it is no longer cool.
Gonna get notes on the shows.
Still trying to deal with our ad shortfall.  It hurts as all else is doing well.
We buying YouTube?

-----Original Message-----
From: McGrath, Judy
To: Toffler, Van
Sent: Mon Jul 10 21:30:28 2006

Subject: Re: Terrible day

If you have the 10 second delay, I'd do it. Needs some big personality. Love him  Do the hip hop kids like him? I didn't ask about Bacara to give you a hard time, I figured it was booked. I was curious about the material. Meanwhile, a resort in Santa Barbara looks bad this year. ██████████████████████████████████
Xx

--------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Toffler, Van
To: McGrath, Judy
Sent: Mon Jul 10 21:11:06 2006
Subject: RE: Terrible day

Asked Brian to get out of Bacara, but it was booked 6 months ago and woulda cost them 50k to cancel so they scaled it back to a core team to screen shows.  I'm not going , neither are christina or rich.
I'm going out on Thursday to see the first cut of jackass as well as the freedom writers materials.  Should be interesting.
So the kids want knoxville to host vma's , what do you think?



VIA 00885982

# Schapiro Exhibit 6

From: "Bakish, Robert" <bb@viacom.com>
Date: Mon, 24 Jul 2006 15:21:50 -0400
To: "Witt, Jason" <Jason.Witt@mtvstaff.com>
Subject: RE: YouTube Term Sheet

yeah, i thought it was a bit steep, but not worried about it

will do

———

From: Witt, Jason
Sent: Monday, July 24, 2006 3:21 PM
To: Bakish, Robert
Subject: RE: YouTube Term Sheet

Banners makes $5 min CPM for hosting/serving a bit egregious, but totally viable launching pt. Thx for forwarding. Have your asst let me know when we talk to them again if not a problem.

thx.

jw

———

From: Bakish, Robert
Sent: Monday, July 24, 2006 3:19 PM
To: Witt, Jason
Subject: RE: YouTube Term Sheet

not a bad place to start. on ad inventory, they want to experiment. but they are not thinking video pre-roll. probably banners instead.

———

From: Witt, Jason
Sent: Monday, July 24, 2006 3:15 PM
To: Bakish, Robert
Subject: RE: YouTube Term Sheet

Interesting. We sell, 50/50 economics with $5 min effective CPM for trafficking by them [the latter of which I think is probably not outrageous, although we could get better].
No content obligations but no promotional obligations either.
They agree to start filtering pirated content.
Where are they on video ad inventory?
Not a terrible bid.

———

From: Bakish, Robert
Sent: Monday, July 24, 2006 3:11 PM
To: Witt, Jason
Subject: FW: YouTube Term Sheet

fyi. this just in

———

From: Chris Maxcy [mailto:chris@youtube.com]
Sent: Monday, July 24, 2006 2:59 PM
To: Cahan, Adam; Bakish, Robert
Cc: 'zahavah'; 'Kevin Donahue'
Subject: YouTube Term Sheet

Adam & Bob,

At long last, attached is a preliminary draft of the Term Sheet we've discussed. Please let me know when you are available to discuss.

Best,

Chris

_____

Chris Maxcy

VP, Business Development

YouTube, Inc.

chris@youtube.com

███████████████

www.youtube.com

# Schapiro Exhibit 7

Subject:  YouTube business development
From:     "Cahan, Adam" <EX:/O=VIACOM/OU=MTVUSA/CN=RECIPIENTS/CN=CAHANA>
To:       McGrath, Judy; Wolf, Michael
Cc:       Bakish, Robert
Date:     Thu, 13 Jul 2006 20:51:24 +0000

Judy/Michael -

Just got off the phone with the head of YouTube business development. We have an innovative deal with them on the table - still in negotiation. While it clearly needs to be vetted in terms of all the other options on the table, here is the basic construct. The good part is that we will be seen as an innovator/first to market. The realistic part is that it is highly unlikely to involve equity, but we shall see...

Components-
*      Advertising: we would be the first video provider to sell ads on their site. We would own 100% of the inventory on our content pages/views, rev share - they opened at 50/50 we are likely to end either 80/20 or 70/30 depending upon other sweeteners. No pre-roll video ads - rich media banners
*      Skinning/branding: we would be the first content provider to skin/brand a player. We convinced them that this was due to rights issues
*      Filtering: They are working on an audio filtering process whereby any content we contribute would have an audio tag they would automatically match to user submitted content, if there is a match they will tag the content as our and we can determine 3 options - claim it as ours and gets into the rev share model, take it down, or simply allow it as UGC and ignore
*      Exclusivity:  none
*      User information: attempting for user information under the umbrella that it makes the sales better on our end (they collect some behavioral and registration but early in their development)

What we are hoping to get in addition:
*      Promotional credit/guarantee: as part of the deal we are looking for some inventory to promote our content/ shows on their homepage
*      Equity - we have not opened this in the discussion yet but our return offer will be to try for some form of warrants/ equity in the company as part of a guarantee for content. Not sure this will be on the table but will look for it

Additional informational learned on the call:
*      Premium advertising: They claim to be working with the studios, Sony, Panasonic among others. Claim the advertising is premium, and have had little pushback from advertisers given the perception of YouTube brand as "cool"
*      International: claim for now that advertisers have not been demanding separation - clearly a very big driver of our model
*      Homepage/navigation pages - claim for now that up to 33% is in navigation/homepage. Not sure we agree but our model was at 5% - would swing value
*      Sun Valley - Chad Hurley, YouTube Ceo, is in Sun Valley at the Allen & Company event. We are very likely in a new zipcode unfortunately

Next steps:
*      Should get a term sheet early next week - negotiate our split into a 70/30 deal (in our favor)
*      Will engage with ad sales to go over terms and ability to sell/ what inventory etc

# Schapiro Exhibit 8

From: "Toffler, Van" <Van.Toffler@mtvstaff.com>
Date: Sat, 7 Oct 2006 15:32:57 -0400
To: "Cahan, Adam" <Adam.Cahan@mtvn.com>, "McGrath, Judy" <Judy.
McGrath@mtvstaff.com>
Subject: Re: Youtube and google

How can we be a spoiler?

-----Original Message-----
From: Cahan, Adam
To: Toffler, Van; McGrath, Judy
Sent: Sat Oct 07 15:13:15 2006
Subject: Re: Youtube and google

He's doing it. We need to play the spoiler now and see if we can extract value here.

-----Original Message-----
From: Toffler, Van
To: Cahan, Adam; McGrath, Judy
Sent: Sat Oct 07 15:01:44 2006
Subject: Re: Youtube and google

He fuckin better-that's an epic transaction that could harsh our collective buzz

-----Original Message-----
From: Cahan, Adam
To: Toffler, Van; McGrath, Judy
Sent: Sat Oct 07 14:51:38 2006
Subject: Re: Youtube and google

Michael's going to call eric today.

-----Original Message-----
From: Cahan, Adam
To: Toffler, Van; McGrath, Judy
Sent: Sat Oct 07 14:44:28 2006
Subject: Re: Youtube and google

I would characterize it as early discussions - we've met to see where we can take a commerical relationship. if there
is a business model that would work. Nothing committed to but wanted to understand how they would want to work
together.

The youtube proposal comes down to a 70/30 for us and we sell the ads, they are looking for some way to set a
minimum on that 30 which we have continued to say no to. In addition they will provide us with a tool to "claim" user
generated content with the right to take it down or have it be a part of the overall monetization. Their hope is that the
ugc component will grow the pie for us. They have also proposed branded channel pages, and promotion that will go
with the deal.

Frankly if their name was yahoo we likely would have taken it but on the ad sales side there is concern about the
ability to achieve a high cpm on their site. Also the deal is an easier fit where we own the majority of the content eg
comedy central v. Mtv.

My perspective would be that if youtube/google does happen we need to act very quickly to say "now that there is
money involved we are taking down content and demanding a payment". Need to have a bit of a strong arm
approach to the negotiations and push for significantly better terms while we have them worried.

-----Original Message-----

VIA00613094

From: Toffler, Van
To: Cahan, Adam; McGrath, Judy
Sent: Sat Oct 07 14:31:54 2006
Subject: Re: Youtube and google

Sorry, what relationship are we working with you tube?

-----Original Message-----
From: Cahan, Adam
To: McGrath, Judy; Toffler, Van
Sent: Sat Oct 07 14:23:11 2006
Subject: Youtube and google

May have spoken too soon. Apparently the ad deal broke down late last night and potential acquisition is back on the table.

You never know with google because larry page really makes the final call. So can go either way.

If this does go through, we may need to revisit the wiki in light of the broader commercial relationship that we have been working on with youtube.

Let's see where things end up but we'll need to move very quickly if the acquisition happens.

VIA00613095

# Schapiro Exhibit 9

Subject: FW: Google
From: "Dooley, Tom" <EX:/O=VIACOM/OU=CORPUSA/CN=RECIPIENTS/CN=DOOLEYT>
To: Dauman, Philippe
Cc: Date: Wed, 29 Nov 2006 20:09:29 +0000

I think we should cut off the heads of Adam and Michael (and perhaps Judy) and send them to Eric in a box wrapped in a printed copy of their latest term sheet.
With a note that says "Before you respond - Remember our heritage - we are the people that brought you the Godfather."

>_____
>From:      Cahan, Adam
>Sent:      Wednesday, November 29, 2006 2:16 PM
>To: Dauman, Philippe; Dooley, Tom
>Cc: McGrath, Judy; Wolf, Michael; Stirratt, Nada
>Subject: Google
>
>Philippe -
>
>In the off chance that you want to resurrect the negotiations with Google, there is an opportunity to structure this in a manner that works, to provide us with $48.4M/Year (non-recoupable fee) and 70/30 advertising protecting our accounts. It would be better than any of the alternatives we have seen.
>
>That said, as you rightly point out, they have returned a document that does not reflect any of our discussions. My sense is that this is a negotiating tactic on their part (albeit a very poor choice) to provide them with leverage to "trade off" components they never expected to get.
>
>Overall our message to Google:
>*    Current deal does not reflect any of our discussions, and is much further reaching than discussed prior and not on the table - ie "all content" at Viacom sites, Television promotion, etc.
>*    Guarantee in "commitment fee" is non-recoupable (believe this was the intent) and needs a mechanism for growth based on content and/or usage because Google controls the advertising inventory (ie design, units, etc), audience via promotion and navigation - ie all the monetization. The platform puts our existing digital businesses at risk that represent $400M/Year. E.g. Google can decide no "video ads" which makes the yield/ value on our content much lower.
>*    Major deal issues: Content must be 3 minutes or under, no MFN against MTVN sites - MTVN not Viacom, commitment fee non recoupable (believe this was the intent), Ad sales sub 400 (against all content), no recouping of Google costs.
>
>DETAILED POINTS
>VIDEO COMMITMENT
>*    Commitment Fee - $242M is a non-recoupable commitment fee. Need a mechanism to grow annually based on a "content usage" or "volume" true up. Ie. Establish a threshhold on usage, the minimum is our $242M, if we exceed the number of streams globally, or the content pool itself is of a certain scale our "guarantee" grows on an annual basis. Aligns our incentives to give them more content and have it be used.
>*    Net advertising - Will not agree to Google's operating costs - have always said it was net of our agency fees. The purpose of the 30% is to cover their costs, they can monetize against all the other assets (ie search pages, homepage, navigation page, music videos, user generated, etc)
>PERFORMANCE OBLIGATION (CONTENT):
>*    Point 1 (USER UPLOADED) - All uploaded content 3 minutes not 10 minutes for User uploaded. Not sure what "affiliates" means here - potentially opens redistribution issues
>*    Point 2 (VIACOM SITES) - Not possible and never discussed, the point here is that we are enabling vast amounts of user upload which far outweigh the number of clips we currently have - ie 7800 results for South Park, we do not have 7800 clips. We cannot agree to MFN against our sites as this triggers other MFNs with our cable operators.
>*    POINT 3 (VIACOM CONTENT) - Viacom content - never discussed. This would mean Paramount.
>AD SALES CONDITION:

HIGHLY CONFIDENTIAL

>*   Top 400 Advertisers - Fall back is potentially 300. Against all content, brands, etc
>*   Ad formats - must include approval by MTVN>

VIA 00329730

# Schapiro Exhibit 10

Subject: Thoughts on final steps, strategy with GT
From: "Cahan, Adam" <EX:/O=VIACOM/OU=MTVUSA/CN=RECIPIENTS/CN=CAHANA>
To: McGrath, Judy; Wolf, Michael
Cc: Date: Sat, 23 Dec 2006 00:27:34 +0000

Judy/Michael -

As you know we are gearing up for a very significant takedown at YouTube by January 2/3 - by last count the number was ~50-70K clips. I suspect that number will grow before we are complete.

While I certainly don't want us to expect it, my suspicion is that faced with a dramatic takedown of this scale Google will provide us the economics we have requested.

That said it is absolutely critical that we play two facets of this strategy. 1. The takedowns in one dramatic event (as opposed to drips..) and 2. The story for consumers/ popular press.

Everyone seems prepared to take a very "defensive" position for popular press, I am really uncomfortable with this. We need to completely flip this on its head - use it as offense and make this about consumers. While we may have looked the bullies with YouTube, this is clearly not the case with Google. The time has really come to call them out on their own game.... the consumers...

At last count, Google is a $140B market cap company with 10k employees, and $10B in cash. We are the underdog here not the big bad media company. We have to control this spin to create an "I Want My MTV" with Google as Echostar... We need a campaign that resembles "We are really saddened that Google could not come up with a reasonable offer to enable consumers to access the content they are seeking. That a company with $10B in cash cannot find a way to work with a content company seems crazy." We follow with a plea to consumers to "email Google and tell them Bring The Clips Back."

Trust me more than anything we can do, challenging Google as a Microsoft-like evil-doer will get the founders enraged and want to solve this. They won't be able to tolerate a consumer perception shift.

This clearly requires a significant amount of coordination on our part... Would need Carol and others deeply involved to ensure we look the rebel again.

Wanted to check with both on your thoughts about this approach. I think it is the most powerful thing we can do here. If we play defense we will look like big media company goes after the consumer.

Thoughts?

CONFIDENTIAL