# SCHAPIRO DECLARATION EXHIBITS CONTINUED

# Schapiro Exhibit 14

From: "Ganeless, Michele" <Michele.Ganeless@comedycentral.com>
Date: Thu, 1 Mar 2007 09:42:26 -0500
To: "Cucci, John" <John.Cucci@mtvstaff.com>
Subject: Re:

Very.  I could be totally off here...but something tells me cahan may be involved.  Where else could it come from?
------------------------
Sent from my BlackBerry Wireless Handheld

----- Original Message -----
From: Cucci, John
To: Ganeless, Michele
Sent: Thu Mar 01 09:40:51 2007
Subject: Fw:

Scary

----- Original Message -----
From: Fahey Rush, Colleen
To: Ganeless, Michele
Cc: Cucci, John
Sent: Thu Mar 01 09:39:16 2007
Subject: Re:

I have no idea , doesn't sound familiar to me at all.  I will look into it, but I don't even think we were asked for this data.

----- Original Message -----
From: Ganeless, Michele
To: Fahey Rush, Colleen
Cc: Cucci, John
Sent: Thu Mar 01 09:37:32 2007
Subject: Fw:

Hey there -- see john's note below.  That number doesn't jive with any of our internal data.  Do you know where he got that number and/or how the data was compiled?
------------------------
Sent from my BlackBerry Wireless Handheld

----- Original Message -----
From: Cucci, John
To: Ganeless, Michele; Flannigan, Erik
Cc: Herzog, Doug
Sent: Thu Mar 01 09:32:44 2007
Subject:

On the earnings call, Dooley mentioned comedy traffic is up 90% since youtube takedown.

HIGHLY CONFIDENTIAL

# Schapiro Exhibit 15

From: "Ganeless, Michele" <Michele.Ganeless@comedycentral.com>
Date: Tue, 6 Mar 2007 18:21:08 -0500
To: "Weinstein, Caleb" <Caleb.Weinstein@mtvn.com>, "Herzog, Doug" <
    Doug.Herzog@comedycentral.com>, "Flannigan, Erik" <Erik.
    Flannigan@mtvstaff.com>, "Cucci, John" <John.Cucci@mtvstaff.com>
Subject: RE: Viacom Chairman Said Traffic at Company Sites Increased

But he specifically says traffic went up after we sent the notice.


>_____
>From:    Weinstein, Caleb
>Sent:    Tuesday, March 06, 2007 6:20 PM
>To: Ganeless, Michele; Herzog, Doug; Flannigan, Erik; Cucci, John
>Subject: RE: Viacom Chairman Said Traffic at Company Sites Increased
>
>I bet he is looking at year over year stats…
>
>caleb.weinstein@mtvn.com
>office: +1.212.767.4086
>
>_____
>From: Ganeless, Michele
>Sent: Tuesday, March 06, 2007 6:19 PM
>To: Herzog, Doug; Flannigan, Erik; Weinstein, Caleb; Cucci, John
>Subject: Viacom Chairman Said Traffic at Company Sites Increased
>
>
>First -- someone should tell him that "cats peeing in toilets" is funnier than "a cat going to the bathroom".
>Second -- he is still out there touting that traffic increased back to our sites after the takedown -- which our data contradicts.
>
>Do any of you know where that is coming from?  I'm afraid he's gonna bring this up in tomorrow's meeting, and the fact is, even though we're doing far better than a year ago, traffic to our site has been decreasing over the last four weeks.
>
>
>
>Dauman Lauds Decision to Pull Clips from YouTube
>Viacom Chairman Said Traffic at Company Sites Increased
>
>By Mike Farrell 3/6/2007 5:43:00 PM
>100,000 video clips from viral-video site YouTube resulted in increased traffic to the media giant's own Web sites and, more important, enabled the company to further monetize that content, chairman Philippe Dauman told an audience of investment bankers and investors Tuesday.  <http://digg.com/submit?
>phase=2&url=www.publishersweekly.com/article/CA6422088.html&title=Dauman Lauds Decision to Pull Clips from YouTube&bodytext=Viacom's decision to pull more than <span>
>Viacom's decision to pull more than  <http://multichannel.com/article/CA6412990.html> 100,000 video clips from viral-video site YouTube <http://multichannel.com/article/CA6412990.html>  resulted in increased traffic to the media giant's own Web sites and, more important, enabled the company to further monetize that content, chairman Philippe Dauman <http://multichannel.com/article/CA6374280.html>  told an audience of investment bankers and investors Tuesday.
>Viacom ordered YouTube <http://www.youtube.com>  to take down more than 100,000 clips of its content in February. At the Bear Stearns Media Conference in Palm Beach, Fla., Tuesday, Dauman said that while YouTube honored that request for the most part, it was a move to protect its brand and its advertisers.
>"We found that when we sent out the take-down notice to YouTube ... we found traffic increasing back to our own sites. We are able to monetize that increased traffic; this is high-value traffic," he added. "The premium-branded advertisers aren't, in my opinion, going to spend a lot of money for the YouTube viewers who are looking at the user-

HIGHLY CONFIDENTIAL

VIA 01129009

generated content of a cat going to the bathroom."

>Dauman said Viacom's recent deal with <http://multichannel.com/article/CA6417734.html> Joost <http://multichannel.com/article/CA6417734.html> shows that the media company is not averse to its content appearing on other sites as long as it is adequately compensated. He added that Viacom is open to establishing a relationship with YouTube in the future, but it is not critical to Viacom's business.

>"We may do a deal with [YouTube] someday on terms that meet our criteria, or we may not," Dauman said. "In the meantime, we're pursuing our own initiative, and we're doing business with those who will respect our content and create an environment that works for us."

>He added that while online is an important part of the business and is growing, it isn't the only part of the business.

>"People consume entertainment in many different ways and many different formats,>" Dauman said. "They may want to go to your main environment … but you may also want to catch it on the run on your phone. I think you have to have the flexibility to serve customers where they are."

>He added that there are substantial opportunities in building Viacom>'s international presence, as well as bolstering existing domestic networks. Shortly after becoming CEO last year, he authorized a three-year plan to develop more original programming at BET.

>Dauman also restructured affiliates sales at Viacom's flagship MTV Networks <http://multichannel.com/article/CA6420380.html> and tied executive pay to meeting business-performance targets.

>"Candidly, there were people in some parts of our company who had gotten way overpaid for what they were doing in a really changed world," he said. "Affiliate sales is one good example. We restructured it, we're going to save a lot of money we can put into programming and, guess what, we're going to do a much better job for our affiliates. Because we have restructured the organization to meet today's needs, not yesterday's needs."

>

HIGHLY CONFIDENTIAL



**Schapiro Exhibit 16**

From: "Clayman, Greg" <Gregory.Clayman@mtvn.com>
Date: Tue, 10 Jul 2007 13:51:17 -0400
To: "Salmi, Mika" <Mika.Salmi@mtvn.com>
Subject: Re: curious what your team's reaction to this is?

You gonna tell Fricklas and Dooley that we pretty much agree with this assesment? And that nobody at MTVN wants this lawsuit?. It's only going to get worse.

----- Original Message -----
From: Salmi, Mika
To: Holt, Courtney; Youngwood, Stephen; Flannigan, Erik; Bierer, Gideon; Stirratt, Nada; Clayman, Greg; Miller, Kenny; West, Denmark; Rockwell, Nick
Sent: Tue Jul 10 13:41:04 2007
Subject: Fw: curious what your team's reaction to this is?

Pretty scathing....

----- Original Message -----
From: Fricklas, Michael
To: Salmi, Mika
Cc: Dooley, Tom
Sent: Tue Jul 10 12:38:32 2007
Subject: FW: curious what your team's reaction to this is?

Mika - what do you think?

_____

From: Bombassei, James
Sent: Tuesday, July 10, 2007 10:02 AM
To: Fricklas, Michael
Subject: FW: curious what your team's reaction to this is?

fyi

Jim

_____

From: Greenfield, Rich (NYC) [mailto:RGreenfield@palicapital.com]
Sent: Monday, July 09, 2007 1:01 PM
To: Bombassei, James
Subject: curious what your team's reaction to this is?

_____

From: Greenfield, Rich (NYC)
Posted At: Monday, July 09, 2007 1:01 PM
Posted To: @Google News
Conversation: The dismal failure of Viacom's YouTube strategy
Subject: The dismal failure of Viacom's YouTube strategy

The dismal failure of Viacom's YouTube strategy <http://www.thepomoblog.com/archive/the-dismal-failure-of-viacoms-youtube-strategy/>

According to data provided to me by Hitwise <http://www.hitwise.com> , Viacom's Comedy Central and MTV websites have lost market share since the company ordered YouTube to pull copyrighted videos from the popular

VIA 01623231

online video aggregator in February. This despite clear statements by Viacom that YouTube was standing in the way of its ability to make money from its content on its own sites.

Viacom assumed the traditional model of scarcity would reward their strong arm tactics against YouTube, but it hasn't, and it won't, because Viacom — like so many other mainstream media companies — can't see beyond the traditional economic walls that surround its empire. Abundant micro-media is killing (or already has killed) the old model, and it shows no signs of letting up. You only need to consider that while traffic to comedycentral.com has gone down 11% since February, and MTV.com has seen a 14% traffic loss, traffic to YouTube has gone up an amazing 39% during the same period.

In March, Viacom CEO Philippe Dauman told shareholders, "Our content was a substantial part of the traffic on (YouTube). We are very pleased to have more traffic on our sites since we took down our video from YouTube because we are able to monetize that as opposed to someone else doing so." Apparently not.

Moreover — and this is truly amazing — during the same period, YouTube has been providing a steadily increasing amount of traffic to those two sites. That's right. Upstream traffic from YouTube to comedycentral.com has increased 17% since February. Traffic from YouTube to MTV.com has gone up a whopping 38%.

So let's accurately understand the picture. Viacom sued Google to remove copyrighted videos from YouTube, because YouTube was in the position of making money off Viacom's content. In so doing, they assumed that people who wanted to see the various Jon Stewart (and other) clips would make their way to comedycentral.com, where they could have the same experience offered on YouTube, except with Viacom's ads attached. From a traditional media perspective, this makes perfect sense.

However, the opposite has happened. Not only have people not gone to comedycentral.com to see the clips in numbers anywhere near YouTube's, the site and MTV.com have lost market share since Viacom pulled the clips from YouTube. YouTube, meanwhile, continues to show explosive growth and is actually feeding Viacom's properties with an increasing amount of traffic — all without compensation, I should add. (Where's the quid pro quo love, Mr. Dauman?)

And without all those people swapping and emailing the Stewart clips or the Colbert clips, their influence will begin to decay as well. Out of sight, out of mind. And soon the audience for these shows will be limited to hard-core fans and nothing more.

I know this drives people nuts, but we simply cannot ignore the power of the personal media revolution in what's taking place across the media landscape today. The Media 2.0 disruption isn't about online brand-extension, multi-platform delivery schemes, deals with Joost, or anything else that tries to protect the Media 1.0 paradigm. And it's not (just) about technology either.

It's all about people — informed, empowered, enabled, involved, and connected people — people who are fleeing the relentless assault of mass marketing and building new value chains and a new media economy in the process. Involving ourselves in all of this is more than just the right thing to do; it's an absolute necessity of doing business in the world to come.

(Edited 7/9 to reflect market share versus "traffic")

---

Pali Research

650 Fifth Avenue, 6th Floor | New York, NY 10019

Tel: 212-259-5176 | Fax: 928-752-7501

E-mail: rgreenfield@palicapital.com | AOL IM: richgreenfield1

Richard S. Greenfield

VIA01623232

**Managing Director**

**Media Analyst: Entertainment & Cable**

VIA 0 1 6 2 3 2 3 3

**Schapiro Exhibit 17**

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

VIACOM INTERNATIONAL, INC., COMEDY )
PARTNERS, COUNTRY MUSIC. )
TELEVISION, INC., PARAMOUNT )
PICTURES CORPORATION, and BLACK )
ENTERTAINMENT TELEVISION, LLC, )
 )
        Plaintiffs, )
 )
vs. ) NO. 07-CV-2103
 )
YOUTUBE, INC., YOUTUBE, LLC, )
and GOOGLE, INC., )
 )
        Defendants. )
———————————————————————————)
 )
THE FOOTBALL ASSOCIATION PREMIER )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all )
others similarly situated, )
 )
        Plaintiffs, )
vs. ) NO. 07-CV-3582
 )
YOUTUBE, INC., YOUTUBE, LLC, and )
GOOGLE, INC., )
 )
        Defendants. )
———————————————————————————)

VIDEOTAPED DEPOSITION OF OLIVER WEINGARTEN
TAKEN ON TUESDAY, DECEMBER 15, 2009
AT THE OFFICES OF MAYER BROWN INTERNATIONAL, LLP
201 BISHOPSGATE
LONDON EC2M 3AF, UNITED KINGDOM

JOB NO. 18276

1                 A P P E A R A N C E S

2

3

4        FOR THE CLASS PLAINTIFFS, PREMIER LEAGUE:

5

6        PROSKAUER ROSE, LLP
         By:  HAL S. SHAFTEL, Esq.
               WILLIAM HART, Esq.
7        1585 Broadway
         New York, NY 10036-8299
8        212.969.3230
         hshaftel@proskauer.com
9

10       FOR THE DEFENDANTS, YOUTUBE, INC., YOUTUBE, LLC, AND
         GOOGLE, INC.:
11

12       MAYER BROWN, LLP
         By:  BRIAN M. WILLEN, Esq.
13       1675 Broadway
         New York, NY 10019-5820
14       212.506.2146
         bwillen@mayerbrown.com
15
         MAYER BROWN INTERNATIONAL, LLP
16       By:  MAHISHA RUPAN, Esq.
         201 Bishopsgate
17       London EC2M 3AF
         United Kingdom
18       +44(0)2031303172
         mrupan@mayerbrown.com
19

20       AOIFE DOWNES, Court Reporter
21

22       MIKE PRITCHARD, Videographer

23

24

25

1   responsibilities are?

2   A.   My responsibilities vary from dealing with sponsorship

3   issues, from managing various pieces of litigation that the

4   Premier League are involved in, and to piracy issues,

5   whether related to pubs and clubs and foreign satellite

6   decoder cards to Internet piracy to working with various

7   other rights owners, whether in sport or creative industry

8   on mutual issues.  It's non-exhaustive.

9   Q.   You understand that you also may be asked questions

10  outside the topics in the deposition notice but that you      10:02

11  have personal familiarity with?

12  A.   Yes.

13  Q.   And you understand that you are testifying under oath?

14  A.   Yes.

15  Q.   Is there any thing that would prevent you from

16  answering the questions that I ask as honestly and as

17  completely as you can?

18  A.   No.

19  Q.   You are not taking any medication?

20  A.   No.                                                      10:02

21  Q.   OK.  Can you tell me, generally, what is The Football

22  Association Premier League?

23  A.   Yes.  It may be easier to refer to it as Premier

24  League because we rebranded from the Football Association

25  Premier League a few years ago.  Our company name is The

1    Football Association Premier League Limited; we are known

2    day-to-day as the Premier League or the PL.  We are made up

3    of 20 shareholders, who are the 20 football clubs that play

4    in the Premier League competition on a seasonal basis,

5    subject to relegation at the end of each season, which runs

6    from sometime in August to sometime in May.  Three teams

7    are relegated at the end of each season.  Three teams from

8    the Football League are promoted to the Premier League

9    competition.  The title sponsor of our competition is

10    Barclays, so the competition is known as the Barclays    10:03

11    Premier League, and we have a mandate from our shareholders

12    to maximize revenues in various streams for them, as well

13    as to organise the competition on a day-to-day basis.

14    Q.   Are you done?

15    A.   Yes.

16    Q.   Does each club own an equal share in the League?

17    A.   Yes, each club has one share, which transfers upon

18    relegation to the team that is promoted.

19    Q.   How many different clubs have been in the League since

20    it was founded?    10:04

21    A.   I can't recall off the top of my head.  I would need

22    to check.

23    Q.   Can you give me a ballpark figure?

24    A.   If you don't hold me to it.  In excess of 30.

25    Q.   And when was the League actually founded?

1    A.   1992.

2    Q.   Is the Premier League the only professional football

3    league in the United Kingdom?

4    A.   No.

5    Q.   What are the others?

6    A.   You have the Football League that comprises the

7    Championship League 1 and League 2, you have the Scottish

8    Premier League and you have the Scottish Football League,

9    and you have, in England, various other competitions that

10    have some degree of organisation, possibly sponsorship, but   10:05

11    they may not have professional players in them.  So as far

12    as one would recognise the organised and professional

13    competitions, those are probably the ones that I have

14    mentioned.

15    Q.   Does the Premier League play any role in organising

16    the matches that are played in those other leagues that you

17    mentioned?

18    A.   Absolutely not.

19    Q.   How many Premier League matches are played each

20    season?   10:06

21    A.   380.  Each team plays twice against another team, so

22    you would have a home and away fixture, if that makes

23    sense.

24    Q.   It does.  Do the clubs that are in the Premier League

25    play in matches that are not Premier League matches?

1    match.

2    Q.   OK.  Fair enough.  How about this:  When a team that

3    is currently in the Premier League plays in a match that is

4    not organised by the Premier League, is the uniform that

5    that club wears the same as when it's playing in a Premier

6    League competition?

7    A.   It can vary, and the sleeve badges and the numbers

8    will be different.

9    Q.   How are they different?

10   A.   When you play in the Premier League competition, you      10:10

11   have a sleeve badge that has our competition logo on it and

12   the numbers are certain Premier League design numbers with

13   the Premier League logo, the lion logo at the bottom of

14   each number as well.

15   Q.   But the colours of the uniforms tend to be the same?

16   A.   Depending on who they are playing against.

17   Q.   Sorry, how does it vary depending on who they are

18   playing against?

19   A.   Because if there are clashes in colours, they will use

20   any opportunity to wear another kit.                          10:10

21   Q.   Are the kits that the clubs have, owned by the clubs

22   or by the League?

23   A.   The actual clothing?

24   Q.   Yes?

25   A.   They are owned by the clubs.

1    Q.    OK.   It's the clubs are responsible for designing and

2    providing the uniforms to their players?

3    A.    Yes.

4    Q.    OK.   Are you familiar with the complaint that has been

5    filed in this case by the Premier League?

6    A.    Yes, I am.

7    Q.    Now, in that complaint, the Premier League claims to

8    own, and this is a quote "audiovisual footage consisting of

9    soccer matches".   What are the soccer matches that the

10   Premier League owns the footage of?                         10:11

11   A.    The Premier League owns the footage in the matches

12   that take place and broadcast and filmed by our host

13   broadcasters in the Premier League competition.   That is

14   380 matches on a seasonal basis.

15   Q.    Now, does the Premier League have any copyright

16   ownership interest in any non-Premier League matches?

17 MR. SHAFTEL:   Objection to form.

18   A.    The Premier League only has copyright ownership in

19   respect of Premier League matches or matches organised

20   under the auspices of the Premier League, so that would     10:12

21   include our Asia Trophy, because that is our competition,

22   as we perceive it.

23   Q.    So the Premier League doesn't own the copyright in

24   footage of the FA Cup, for example?

25   A.    That's correct.

1    Q.   And that is true even where those matches might

2    feature a team that is currently playing in the Premier

3    League?

4    A.   Yes.

5    Q.   So other than the match footage of Premier League

6    matches, what other copyrights does the Premier League own?

7    MR. SHAFTEL:  Objection to form.

8    Q.   Do you understand my question?

9    A.   Could you repeat it, please?

10    Q.   Sure.  So we have talked about the actual footage of        10:13

11    matches organised by the Premier League and broadcast by

12    the Premier League's host broadcasters.  In addition to

13    that footage, are there other kinds of copyrights that the

14    Premier League owns?

15    A.   So you are excluding all audiovisual works now,

16    including our audiovisual works of our international

17    broadcasters?

18    Q.   No, I am saying in addition to what we just spoke

19    about?

20    A.   OK.                                                          10:13

21    Q.   What other copyrights?

22    MR. SHAFTEL:  Objection.

23    A.   Well, any Premier League footage that is received by

24    any Premier League licensee or which originates from the

25    ground, as in the stadium, the Premier League owns the

1    A.   Is there a weekly report, did you ask me?

2    Q.   Yes.

3    A.   There has been for some time, but it's not as

4    frequent, it's not as required.

5    Q.   What do you mean, "it's not as required"?

6    A.   I don't require it as often as I did in the past

7    because we have issued proceedings against YouTube.  A lot

8    of the takedowns that they took down were obviously

9    relevant for discovery.  YouTube continues to be a problem.

10   We are using the content ID technology -- we trialed it and  18:16

11   we have now signed NDA and trying to finalise the

12   agreement.  I am more interested in how many clips they are

13   taking down after those matches have been fingerprinted.

14   So what I am trying to say is that my requirements change

15   throughout the season and I will instruct NetResult to give

16   me something different on an ad hoc basis.  So whereas, in

17   the past, they might have sent me a number of takedowns and

18   URLs; now, once Perform, who have sent the reference file

19   to YouTube, once Perform have sent me a spreadsheet

20   including copying NetResult in, once they have sent that     18:17

21   spreadsheet showing the matches that are finger-printed,

22   NetResult will add to the column to show how many takedowns

23   they took down, alongside how many were caught by the

24   technology.

25   Q.   So is that the only reporting that you now get from

1    NetResult about takedowns on YouTube?

2    A.  Well, that is almost weekly, anyway.  That is what I

3    require at the moment, unless there is something else

4    specific.

5    Q.  Do you know -- we looked, earlier, at the list of

6    allegedly infringing clips that Premier League has

7    identified, a massive document; do you recall that?

8    A.  Yes.

9    Q.  Do you know whether each of those clips had been the

10    subject of a DMCA takedown notice before it was identified   18:18

11    as infringing in this litigation?

12    A.  Are you asking -- could you maybe repeat the question

13    instead of me asking what I thought you asked?

14    Q.  I can.  My question was, do you know whether each of

15    the clips that Premier League has identified as infringing

16    were the subject of a DMCA takedown notice before they were

17    identified as being infringing clips for purposes of this

18    lawsuit?

19    A.  NetResult will always send a DMCA takedown notice in

20    respect of our clips and we were pulling down clips before   18:19

21    we issued proceedings.  Has that answered your question?

22    Q.  Is that a 'yes'?

23    A.  I am slightly confused by your question.  I am not

24    understanding whether you are asking if we have always sent

25    DMCA takedown notices or if we sent down DMCA takedown

1   notices in respect of those clips but only in respect of

2   the lawsuit?

3   Q.   OK.  What I'm asking is whether each of those clips

4   had been the subject of a DMCA takedown notice at one time?

5   A.   Yes, we always send -- in fact, it's the only way we

6   can get our clips removed, by sending a DMCA takedown

7   notice, unless we are using a filtering technology.

8   Q.   Are there clips that NetResult issued DMCA takedown

9   notices for to YouTube that are not on the list of alleged

10   infringements that have been identified in this case?  18:20

11   A.   There possibly could well be.

12   Q.   Do you know, sitting here today, whether there are?

13   A.   Well --

14  MR. SHAFTEL:  Don't guess.

15   A.   Those only go up to a certain date, and we continue to

16   remove clips, so the answer, logically, has to be yes.

17   Q.   Right.  What about during the time period that you

18   were identifying alleged infringements in this case, were

19   there clips that had been taken down from YouTube by

20   NetResult that the Premier League did not identify as  18:20

21   allegedly infringing clips for purposes of this case?

22   A.   I think there may have been some clips that were not

23   stored by YouTube -- not by YouTube, sorry, by NetResult,

24   but that would be the only --

25  MR. SHAFTEL:  I think the answer is 'yes' or 'no'.

1   A.   I think the answer is probably yes.

2   Q.   When you say that there were some clips that were not

3        stored by NetResult, what are you referring to?

4   A.   For evidence-gathering.

5   Q.   What was NetResult storing?

6   A.   Well, once the clip is taken down, they may not have

7        saved the clip that was taken down; they may just have had

8        the URL, but if you clicked on that URL, you are not going

9        to be able to see the clip because the clip has been

10       removed.                                          18:22

11  Q.   So was there a practice that NetResult had of

12       downloading clips from YouTube that it was sending takedown

13       notices about?

14  MR. SHAFTEL:  Objection.

15  A.   NetResult need to view each clip before they can take

16       it down.

17  Q.   Did NetResult store a copy of the video that it issued

18       a takedown notice for?

19  MR. SHAFTEL:  Objection.  Lack of foundation.

20  A.   I can't definitively state that.                 18:22

21  Q.   I mean, do you know, one way or another, whether

22       NetResult was making copies of the YouTube videos that it

23       was sending takedown notices about?

24  A.   I think at some point in time they have made copies

25       for evidential purposes.

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


VIACOM INTERNATIONAL, INC., COMEDY )
PARTNERS, COUNTRY MUSIC. )
TELEVISION, INC., PARAMOUNT )
PICTURES CORPORATION, and BLACK )
ENTERTAINMENT TELEVISION, LLC, )
                                )
            Plaintiffs,         )
                                )
vs.                             ) NO. 07-CV-2103
                                )
YOUTUBE, INC., YOUTUBE, LLC, )
and GOOGLE, INC., )
                                )
            Defendants.         )
_____ )
                                )
THE FOOTBALL ASSOCIATION PREMIER )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all )
others similarly situated, )
                                )
            Plaintiffs,         )
vs.                             ) NO. 07-CV-3582
                                )
YOUTUBE, INC., YOUTUBE, LLC, and )
GOOGLE, INC., )
                                )
            Defendants.         )
_____ )

VIDEOTAPED DEPOSITION OF OLIVER WEINGARTEN
TAKEN ON WEDNESDAY, DECEMBER 16, 2009
AT THE OFFICES OF MAYER BROWN INTERNATIONAL, LLP
201 BISHOPSGATE
LONDON EC2M 3AF, UNITED KINGDOM

JOB NO. 18278

1               A P P E A R A N C E S

4   FOR THE CLASS PLAINTIFFS, PREMIER LEAGUE:

6   PROSKAUER ROSE, LLP
     By:  HAL S. SHAFTEL, Esq.
          WILLIAM HART, Esq.
7   1585 Broadway
    New York, NY 10036-8299
8   212.969.3230
    hshaftel@proskauer.com

11  FOR THE DEFENDANTS, YOUTUBE, INC., YOUTUBE, LLC, AND
    GOOGLE, INC.:

13  MAYER BROWN, LLP
    By:  BRIAN M. WILLEN, Esq.
14  1675 Broadway
    New York, NY 10019-5820
15  212.506.2146
    bwillen@mayerbrown.com

16  MAYER BROWN INTERNATIONAL, LLP
17  By:  MAHISHA RUPAN, Esq.
    201 Bishopsgate
18  London EC2M 3AF
    United Kingdom
19  +44(0)2031303172
    mrupan@mayerbrown.com

21  AOIFE DOWNES, Court Reporter

23  MIKE PRITCHARD, Videographer

1     A.   Blogger and NetResult.

2     Q.   Who's Phil Stubbs?

3     A.   An employee of NetResult.

4     Q.   And does it appear that NetResult in this situation

5     was acting on behalf of the Premier League?

6  MR. SHAFTEL:  Objection.

7     A.   His e-mail says he is acting on behalf of Football

8     DataCo Limited.

9     Q.   I believe you testified yesterday that Football DataCo

10    Limited was a joint venture that was set up by the English    09:07

11    Premier League and the Scottish Premier League?

12    A.   And the football leagues, yes.

13    Q.   Now, is the -- on the first page, it refers to a --

14    looks like a URL that has the terms "Bolton" and

15    "Blackburn" in it?

16    A.   Yes.

17    Q.   Do those mean anything to you?

18    A.   They are two teams, possibly, in the League.

19    Q.   Bolton and Blackburn are teams that play in the

20    Premier League?    09:07

21    A.   Currently.

22    Q.   And the e-mail from Blogger says that "After reviewing

23    your complaint and the blog in question, the use of this

24    ESPN video falls under the doctrine of fair use as it is a

25    news and sports commentary.  Therefore, it does not

1    constitute as copyright infringement and we will not remove

2    the post." Do you see that?

3    A.   Yes.

4    Q.   Did you have any discussions with anyone in the

5    Premier League about this episode?

6    MR. SHAFTEL:  Objection to form.

7    A.   I don't remember this episode.

8    Q.   Does it appear to be a situation in which there was a

9    claim of fair use as to a video that had been taken down at

10   the Premier League's behest by NetResult?                    09:08

11   MR. SHAFTEL:  Objection.  Lack of foundation.  Witness doesn't

12   recall the document or the episode.

13   A.   On the face of it, from looking at this document, but,

14   as I say, I don't remember the issue or the episode.

15   Q.   It's correct that you have been designated as the

16   Premier League's corporate representative to speak about,

17   among other things, fair use?

18   MR. SHAFTEL:  He went through this yesterday.

19   Q.   Is that right?

20   A.   Yes.                                                     09:08

21   Q.   And this is not an e-mail that you saw in preparing

22   for this deposition?

23   A.   I looked at a number of documents.  I don't recollect

24   this one particularly.

25   Q.   OK.  Put that aside.  At the very end of the testimony

1    yesterday, you talked about an automated takedown tool that

2    YouTube provided to the Premier League, is that right?

3    A.    Yes.

4    Q.    Do you know what that tool was called?

5    A.    I believe there is a term by which it's referred, but

6    the name doesn't immediately spring to mind.

7    Q.    Does CVP ring a bell?

8    A.    Content Verification Programme.

9    Q.    Is that the tool that you are referring to?

10   A.    I want to be careful not to get mixed up between what    09:09

11   YouTube is currently calling its fingerprinting tool, which

12   I think is probably content ID, is that right --

13   Q.    I am here to ask the questions, not answer them, but

14   go on.

15   A.    -- and what CVP is.  So I would prefer to refer to it

16   as the automated takedown tool because that is

17   distinguishable from the first takedown tool, which was a

18   man which was sending e-mails.

19   Q.    The automated takedown tool.  And I think it was your

20   testimony yesterday that Premier League was only provided    09:10

21   with the automated takedown tool after this lawsuit was

22   filed?

23   A.    Or around the time, I said that a number of things had

24   happened before we were provided with that takedown tool.

25   Q.    OK.  Well, let's look at another document.  This one

1    we have marked as Exhibit 19.

2    (Exhibit 19 marked for identification)

3    Do you recognise this document?  I should say, for the record,

4    that this is a document produced by the Premier League with

5    Bates number PL00000458.

6        A.    Yes.

7        Q.    What is this?

8        A.    This is log-in for the Content Verification Programme.

9        Q.    So does this refresh your recollection at all about

10    when Premier League signed up for the Content Verification    09:12

11    Programme?

12        A.    Yes, it was after we sent the Cease & Desist letter.

13        Q.    So it was in November of 2006?

14        A.    Yes.

15        Q.    That is before this lawsuit was filed, correct?

16        A.    It is, yes.

17        Q.    At the time that Premier League signed up for the

18    Content Verification Programme, had you previously had any

19    face-to-face meetings with YouTube or Google about

20    copyright issues?                                             09:12

21        A.    Not face-to-face meetings, as far as I can recollect.

22        Q.    What did Premier League do in order to sign up for the

23    Content Verification Programme?

24        A.    We engaged in correspondence with YouTube, which

25    included, my recollection, sending a form of a Cease &

1    Desist letter, outlining our concerns with the YouTube

2    website and attached URLs showing infringing content that

3    was prior to this e-mail, from my recollection.

4    Q.    And in response to receiving your Cease & Desist

5    letter, did YouTube offer to sign Premier League up for the

6    Content Verification Programme?

7    A.    I think there is a gap in the time, but subsequently,

8    at some point after receipt of the letter, yes.

9    Q.    Do you recall when the Cease & Desist letter was sent?

10   A.    From recollection, I think it was at least a full          09:13

11   month before.

12   Q.    Sometime in October of 2006?

13   A.    Yes, beginning of October 2006.

14   Q.    Did YouTube ever tell Premier League that it needed to

15   licence content to YouTube in order to get access to the

16   Content Verification Programme?

17   MR. SHAFTEL:  Objection to form.

18   A.    They told us that we would need to do a partnership in

19   order to get access to the technology, their filtering

20   technology.                                                      09:14

21   Q.    My question was, did YouTube tell Premier League that

22   it needed to licence content to YouTube in order to get

23   access to the Content Verification Programme?

24   MR. SHAFTEL:  Objection to form.

25   A.    Not as far as I can remember.

1    Q.   And at the time that Premier League signed up for the

2    Content Verification Programme, it was not licence in

3    content to YouTube, correct?

4    A.   We have never licensed content to YouTube.

5    Q.   You testified yesterday that when Premier League got

6    access to the automated takedown tool, and this is a quote

7    from your testimony, "It meant that we did not have to send

8    an e-mail with infringing URLs and be at the behest of

9    YouTube in respect of the time it took them to take it

10   down, and we would, therefore, be able to instantly remove    09:15

11   the content." Is that an accurate description of how the

12   Content Verification Programme worked?

13 MR. SHAFTEL:  Objection to form.  Misstates the full testimony

14 from yesterday on those issues.

15   A.   I didn't deal with the takedown programme on a

16   day-to-day basis; I stated in my testimony I allowed

17   NetResult to carry this out for us.  But that was my

18   understanding.

19   Q.   So the CVP gave Premier League the ability to

20   instantly take down content without having to send an        09:15

21   e-mail to YouTube each time it wanted to take down a video?

22 MR. SHAFTEL:  Objection.

23   A.   That is my recollection, as far as I can remember, but

24   we still had problems dealing with this tool.

25   Q.   Did the tool make it easier for Premier League to

1     remove videos from YouTube?

2  MR. SHAFTEL:  Easier than what?

3     Q.  Easier than the situation had been before?

4  MR. SHAFTEL:  Objection.

5     A.  I would -- wouldn't say it was easier; it was still as

6     cost intensive and time intensive and we still had issues

7     in respect of repost and private videos being shared, but

8     it was another form of takedown that made NetResult's job

9     slightly more manageable in the grand scheme of things.

10     Q.  The Premier League, in fact, used the Content     09:16

11     Verification Programme tool to remove videos from YouTube,

12     correct?

13     A.  Yes.

14     Q.  Do you know approximately how many videos Premier

15     League caused to be removed from YouTube using CVP?

16     A.  I know more or less a cumulative figure, to date, of

17     how many videos have been removed, which is approaching

18     30,000, from my recollection.

19     Q.  30,000 total?

20     A.  Yes.     09:17

21     Q.  That is not necessarily limited to the ones that were

22     removed using CVP specifically?

23     A.  I have no reason to break it down.

24     Q.  I am going to show you another document.

25  (Exhibit 20 marked for identification)

1    This is a document produced by Premier League with the Bates

2    number PL00000574.  Do you recognise this?

3       A.    I do.

4       Q.    What is this?

5       A.    This is an e-mail confirmation from YouTube confirming

6    videos that we submitted had been deleted, videos of

7    infringing Premier League content had been taken down.

8       Q.    This is taken down through the Content Verification

9    Programme?

10      A.    That is what I believe, yes.                        09:18

11      Q.    Did Premier League receive other e-mails like this one

12   confirming that videos had been removed using CVP?

13      A.    We would have received a limited amount, but I believe

14   at some point the details were changed so that NetResult

15   could manage this and I wouldn't need to get involved on a

16   daily basis.

17      Q.    Are you aware of any videos that Premier League or

18   NetResult requested be removed from YouTube using the CVP

19   tool, that were not, in fact, removed?

20   MR. SHAFTEL:  Objection to form.  You mean the specific URLs or   09:19

21   the --

22      Q.    Yes, I mean specific videos that either Premier League

23   or NetResult requested be removed using CVP, that were not

24   removed?

25      A.    Well, I would count reposts of the same video as not

1  video ID, in 2009?

2  A.  We have had meetings and calls.

3  Q.  So how many communications, whether in person or on

4  the phone, in 2009?

5  A.  We have certainly had, I think, two meetings.  We have

6  had a variety of e-mail exchanges with not just the legal

7  people but also the product people, such as Matt Wiseman, I

8  think his name is, and we have had, I think, on occurrence,

9  a telephone call or conference call.

10  Q.  Who has had the e-mail exchanges with Matt Wiseman?    11:47

11  A.  There have been other people involved, but certainly

12  Matt and myself have had direct e-mail contact.

13  Q.  Did those e-mail -- did the e-mails between you and

14  Matt Wiseman include Google's lawyers?

15  A.  I think so.  I certainly know that Harbinger has, and

16  someone else, have been involved in this process, and then

17  I have been dealing with Google's lawyers on various

18  agreements, as well.

19  Q.  You have had e-mail exchanges with Matt Wiseman alone?

20  A.  I don't think we have ever had unilateral              11:48

21  correspondence; I think other parties have always been

22  involved from both sides, as far as I can recollect.

23  Q.  What other parties?

24  A.  Parties from Google and YouTube, parties from -- on

25  the Premier League's behalf, whether it's Perform or

1      NetResult, because the data that is compiled by a variety

2      of parties for us.

3      Q.   Is the Premier League aware that certain of the

4      Premier League clubs have uploaded videos to YouTube?

5      A.   Videos of what?

6      Q.   Well, videos of anything, for starters?

7  MR. SHAFTEL:  Objection.

8      A.   It's very generic.

9      Q.   I am allowed to ask a generic question.  Is the

10     Premier League aware that any of the clubs have uploaded        11:49

11     any videos to YouTube?

12

13     MR. SHAFTEL:  Objection.

14     A.   Yes.

15     Q.   And the Premier League is aware that certain of the

16     clubs have opened channels on YouTube?

17     A.   Yes.

18     Q.   Do you know which clubs specifically have either

19     uploaded videos or created channels?

20     A.   From what I can recollect, Chelsea and Aston Villa.        11:49

21     Q.   Do you know whether the clubs were uploading videos to

22     YouTube before this litigation began?

23     A.   Not in respect of Aston Villa.  I am aware Chelsea had

24     a club channel before the litigation began.

25     Q.   Do you know when Aston Villa created its channel?

1    A.   I can't recollect that.

2    Q.   But you think it was sometime after the litigation?

3    A.   I think so.

4    Q.   When did Premier League first learn that the clubs,

5    some of the clubs, were posting videos on YouTube?

6    A.   I was aware of Chelsea's club channel prior to the

7    litigation commencing.

8    Q.   Were you aware of Chelsea's club channel being

9    contemplated before it was actually launched?

10   A.   No.                                              11:50

11   Q.   So you only learned of it after it was actually

12   created?

13   A.   Yes.

14   Q.   Do you recall how you learned that Chelsea had created

15   a channel on YouTube?

16   A.   No.

17   Q.   How did you learn that Aston Villa had created a

18   channel on YouTube?

19   A.   The club notified me.

20   Q.   When did they notify you?                        11:51

21   A.   I can't recall specifically.

22   Q.   Was it sometime after their channel launched?

23   A.   I believe so.

24   Q.   So before this case began, were the clubs allowed to

25   post videos on YouTube without telling the Premier League

1     in advance?

2     MR. SHAFTEL:  Objection.  What kind of videos?

3         Q.  Well, let's start with the generic question of whether

4     they were allowed to post videos on YouTube?

5     MR. SHAFTEL:  But I think -- objection.

6         A.  I can make it simple:  They can post whatever they

7     want as long as it's not Premier League footage, and they

8     are aware of that, Chelsea were aware of that.

9         Q.  And that was true before the case began, correct?

10        A.  Yes.                                              11:52

11        Q.  And that is still true now?

12        A.  That they cannot post Premier League match footage?

13        Q.  That the clubs can post whatever videos they want so

14    long as it's not Premier League match footage?

15        A.  When I say they can post what they want, that is

16    subject to whatever other arrangements they have in place,

17    but as far as I am concerned with Premier League match

18    footage, they cannot post Premier League match footage.

19    Whatever other clubs do with Premier League match footage

20    is their prerogative.                                    11:52

21    MR. SHAFTEL:  Can we just have the witness's last answer

22    read back.

23    (Record read)

24        A.  If that is how it came across, that is not what was

25    meant to be said.  Whatever a Premier League club does with

1    non-Premier League match footage is its prerogative.  As

2    far as I am concerned, and the clubs are aware, they cannot

3    upload Premier League match footage to the YouTube website.

4    Q.   Did the Premier League have a policy that it had to

5    review videos that the clubs were uploading to YouTube

6    before they were uploaded, to make sure that the clubs were

7    abiding by that limitation?

8    MR. SHAFTEL:  Objection to form.

9    A.   Repeat the question, please.

10   Q.   Sure.  Did the clubs -- did the League review videos     11:53

11   uploaded by the clubs to ensure that the clubs were abiding

12   by the restrictions that you just described?

13   MR. SHAFTEL:  Objection.

14   A.   The League did not review each video that Chelsea

15   posted.

16   Q.   Did it review any of the videos that Chelsea posted,

17   before they were posted?

18   A.   No.

19   Q.   Did it review any of the videos that Aston Villa

20   posted?                                                        11:54

21   A.   No.  The clubs are aware of the rights landscape and

22   they have their own websites where they have the Premier

23   League match on it.

24   Q.   Did the League have an understanding as to why certain

25   of the clubs were posting videos to YouTube?

1  MR. SHAFTEL:  Objection to form.

2      A.   I don't believe we had an understanding that the --

3      using Chelsea as the example, were posting videos to

4      YouTube as opposed to they had a channel.

5      Q.   Are you aware that, in that channel, Chelsea uploaded

6      videos to YouTube?

7      A.   I have been told since.

8      Q.   When did you first learn that Chelsea was uploading

9      videos to YouTube?

10      A.   I wasn't specifically told that they were uploading     11:55

11      videos to YouTube; I was told the sort of content that was

12      on their channel.

13      Q.   Was it your understanding that Chelsea and Aston Villa

14      created their YouTube channels for promotional purposes?

15  MR. SHAFTEL:  Objection to form.

16      A.   I am not sure the word "promotional purposes" -- or

17      the words "promotional purposes" were used.

18      Q.   What is your understanding of why Chelsea created its

19      channel?

20      A.   To direct those who may be infringing content to their   11:55

21      club channel, to the legitimate source.

22      Q.   Was the purpose of the Chelsea channel, at least in

23      part, to promote the Chelsea Football Club?

24  MR. SHAFTEL:  Objection.  Lack of foundation.

25      A.   I don't know.

1    Q.   What about the Aston Villa channel?

2    MR. SHAFTEL:  Objection.

3    A.   I also don't know.

4    Q.   You said that the rules were that the clubs were

5    allowed to post whatever videos they wanted to YouTube so

6    long as they didn't include Premier League match footage?

7    A.   I didn't say that is the rules.

8    Q.   What did you say?

9    A.   I said from my perspective, if that is what they want

10   to do, but there are no written rules that say "you are          11:56

11   allowed to do this".  There are prohibitions and there

12   are in deed of licence grants to them as to what they are

13   allowed to do with Premier League match footage, but I

14   didn't say there are rules in respect of other rights

15   owners' content.

16   Q.   But from Premier League's perspective, Premier League

17   doesn't object to the clubs posting non-Premier League

18   match footage on YouTube?

19   MR. SHAFTEL:  Objection to form.

20   A.   I would prefer the clubs did not have a relationship         11:57

21   with YouTube.

22   Q.   But you understand that some of them do?

23   A.   Yes.

24   Q.   And you haven't attempted to forbid them from having

25   that relationship?

1   A. Chelsea's and - both - Aston Villa's club channels

2  were done without prior notice to the Premier League.

3   Q. But since the Premier League became aware of those

4  channels, it hasn't attempted to shut them down, has it?

5 MR. SHAFTEL: Objection.

6   A. No.

7   Q. So have the clubs always abided by the rule that

8  forbids them from posting Premier League match footage on

9  YouTube?

10 MR. SHAFTEL: Objection. Lack of foundation.   11:58

11   A. As far as I am aware.

12   Q. Are you aware of any occasions where clubs posted

13  videos on YouTube that contained Premier League match

14  footage?

15 MR. SHAFTEL: Objection.

16   A. I may recall one instance where somebody at a club

17  posted something in error but removed it immediately as

18  soon as they realised what they had done was wrong.

19   Q. I am going to mark an exhibit. This will be Exhibit

20  30.   11:59

21 (Exhibit 30 marked for identification)

22 This is an e-mail produced by the Premier League on behalf of

23 the Premier League clubs, it's Bates number PLC00000597. Have

24 you seen this document before?

25   A. I have, yes.

1     Q.   This is an e-mail from the Aston Villa Football Club,

2     correct?

3     A.   It is from Aston Villa, yes.

4     Q.   And this is an e-mail that Aston Villa sent in

5     response to a request that YouTube made in this case for

6     certain documents from the Premier League clubs?

7     A.   Our request to the clubs on behalf of the Defendants,

8     yes.

9     Q.   So this e-mail reflects Aston Villa's official

10    position in response to the discovery requests that were   12:00

11    made through the Premier League but ultimately by YouTube?

12  MR. SHAFTEL:  Objection to form.  Lack of foundation.

13    A.   Yes.

14    Q.   Do you have any reason to think that anything in this

15    document is inaccurate?

16    A.   No.

17    Q.   In the second paragraph under "YouTube channel,"

18    Joanne Price -- who is Joanne Price?

19    A.   In-house lawyer, Aston Villa.

20    Q.   She writes, "The club has over 70 videos on the   12:00

21    website, the vast majority of which we believe to be fully

22    in accordance with the terms of the deed of licence, being

23    behind-the-scenes or non-PL footage."  Do you have an

24    understanding of what "behind-the-scenes" refers to here?

25  MR. SHAFTEL:  Objection.

1       A.   Non-Premier League match footage such as in the

2      changing rooms or something to do with a club, some

3      information to do with a club - tour of the club, for

4      example.

5       Q.   Could it include footage of Aston Villa's practices?

6  MR. SHAFTEL:  Objection.  Don't guess.

7       A.   Training sessions.

8       Q.   Training sessions.

9  MR. SHAFTEL:  You say could or did or does?

10      Q.   You gave some examples of behind-the-scenes footage,   12:01

11      and I am asking you, from your perspective, whether another

12      example might be training footage from Aston Villa?

13      A.   I am not sure.

14      Q.   Do you agree with Ms. Price that behind-the-scenes

15      footage is fully in accordance with the deed of licence to

16      be uploaded to YouTube?

17  MR. SHAFTEL:  Objection.  Vague.

18      A.   Our understanding of behind-the-scenes footage is that

19      it's not Premier League match footage which would bring

20      them into the breach of the deed of licence, so, yes, I   12:02

21      would agree.

22      Q.   Well, Ms. Price distinguishes between

23      behind-the-scenes and non-PL footage?

24  MR. SHAFTEL:  Objection.  I think that misstates the document.

25  It's not clear.

1    Q.   Do you see that?

2    A.   Yes.

3    Q.   Do you have an understanding of what Ms. Price meant

4    by "behind-the-scenes footage"?

5    MR. SHAFTEL:  Objection to form.  Lack of foundation.

6    A.   I would guess that she means non-match action.

7    Q.   Now, this e-mail admits that Aston Villa posted videos

8    that contained match footage?

9    MR. SHAFTEL:  Objection.

10   Q.   Is that correct?                                    12:03

11   A.   Some.

12   Q.   What do you mean "some"?

13   A.   Yes, there are a couple of videos there that have

14   match footage of the 70 videos that were uploaded.

15   Q.   And you have no reason to doubt that Aston Villa, in

16   fact, uploaded videos containing match footage to YouTube?

17   MR. SHAFTEL:  Objection.  Lack of foundation.

18   A.   Other than the ones she has in this document.

19   Q.   No, no, the ones described in this document?

20   A.   I have no doubt -- I have no reason to doubt what she   12:03

21   is saying.

22   Q.   Were you aware that Aston Villa had a YouTube channel

23   before receiving this e-mail on October 5th, 2009?

24   A.   No.

25   Q.   Were you aware, before receiving this e-mail, that

1   Aston Villa had uploaded videos to YouTube?

2   A. No.

3   Q. Has Premier League actually watched the videos that

4   are listed in this e-mail?

5   A. The videos were taken down from the website and not

6   accessible.

7   Q. Did you ask Aston Villa to send you what they had

8   uploaded to YouTube?

9   A. No.

10   Q. So you haven't actually seen the videos that are  12:04

11   described in this document?

12   A. I was dealing with a lot of discovery requests from

13   the clubs and it was obviously taking up a lot of my time

14   and I was working with my external lawyers as well.

15   Q. You have no reason to doubt, though, that the videos

16   are as Ms. Price describes them in this e-mail?

17 MR. SHAFTEL: Objection. Lack of foundation. Hasn't seen the

18 videos.

19   A. I haven't seen the videos, but Joanne is regulated by

20   the Law Society for England and Wales.  12:05

21   Q. So she has an incentive to be accurate?

22   A. Yes.

23   Q. Do you have any idea when these particular videos were

24   uploaded to YouTube?

25   A. No, I don't.

1    Q.   Looking at the third video --

2    A.   Sorry, just to clarify, not in respect of the match

3    footage because there are no dates beside it.

4    Q.   Looking at the videos that are described as containing

5    still photos and commentary, there are five such videos,

6    right?

7    A.   Yes.

8    Q.   Would it have been a violation of the deed of licence

9    for the clubs to upload the five videos described here as

10   still photos and commentary?                            12:06

11   MR. SHAFTEL:  Objection.  Lack of foundation.  Witness hasn't

12   seen the photos.

13   A.   I haven't seen the photos, nor do I, therefore, have

14   something to compare to the provisions of the deed of

15   licence, but if Joanne is saying that - and, as I said, she

16   is the in-house lawyer for Aston Villa and is representing

17   her club, from a legal standpoint, knowing that if they

18   were to be in breach of the deed of licence, it would have

19   ramifications - I have no reason to doubt what she is

20   saying.                                                 12:06

21   Q.   So if they were still photos taken from Premier League

22   matches, is it your position that that would or would not

23   violate the deed of licence?

24   MR. SHAFTEL:  Objection.  Lack of foundation.  Incomplete,

25   hypothetical.

1    A.   Can you repeat the question, please?

2    Q.   Sure.  If Aston Villa had uploaded videos containing

3    still photos and commentary from various Premier League

4    matches, would it be your position that that would or would

5    not violate the deed of licence?

6  MR. SHAFTEL:  Objection.

7    A.   I would need to see the videos to see what has been

8    uploaded.

9    Q.   Do you understand, looking at the third video, which

10   is the Blackburn match, do you understand that to be the        12:07

11   match between Aston Villa and Blackburn on February 7th,

12   2009?

13   A.   I don't know what date they played Blackburn, but it

14   would appear to be from when Aston Villa played Blackburn.

15   Q.   And Aston Villa playing Blackburn was a Premier League

16   match?

17   A.   In this instance, yes, it would have been, given what

18   she is saying and directing to me.

19   Q.   Are the other teams listed here, Birmingham,

20   Liverpool, Bolton and Arsenal, are all those Premier League   12:08

21   teams?

22   A.   Yes.

23   Q.   Do you know what the match footage described in

24   Ms. Price's e-mail consisted of?

25   A.   Other than it being Premier League match footage, no,

1  featuring Aston Villa.

2      Q.   Would YouTube have any way of knowing that Aston Villa

3      didn't have the rights to upload these videos to YouTube?

4  MR. SHAFTEL:  Objection.

5      A.   YouTube have been receiving the advance notice of

6      potential infringement from the Premier League for some

7      time, and Aston Villa's matches would be contained in them.

8      YouTube also have all the documentation that we have

9      supplied throughout this case, deed of licence included, so

10     there are, potentially, a couple of ways, a few ways, that      12:09

11     YouTube would know.

12     Q.   Aston Villa had the copy of the deed of licence, too,

13     correct?

14     A.   Someone at the club -- people at the club, yes, they

15     would have.

16     Q.   Do you think Aston Villa intentionally violated the

17     deed of licence in posting these videos?

18 MR. SHAFTEL:  Objection.  Lack of foundation.  Calls for

19 speculation.

20     A.   I can't get in the minds of the media marketing team      12:09

21     who appear to have been involved in this.

22     Q.   Do you know why Aston Villa uploaded these videos to

23     YouTube?

24 MR. SHAFTEL:  Objection.  Lack of foundation.

25     A.   No.

1      Q.  Did you discuss with Ms. Price, or anyone else at

2  Aston Villa, why they had uploaded these videos to YouTube?

3      A.  I can't recall having a specific conversation with

4  Joanne particularly pertaining to these videos being

5  uploaded.

6      Q.  How about anyone other than Ms. Price?

7      A.  I have been speaking with Joanne on this issue, but no

8  one else.

9      Q.  So you haven't spoken to anyone else at Aston Villa

10  about their uploading of these videos to YouTube?      12:10

11  MR. SHAFTEL:  Asked and answered.

12      A.  No.

13      Q.  This e-mail also references a contract with Premier

14  Goals.  Do you see that?

15      A.  Yes.

16      Q.  And it says "attached," or it lists an attachment

17  "Premier Goals 2007-2010," PDF, do you see that?

18      A.  Yes.

19      Q.  Do you know whether that attachment was actually

20  attached to this e-mail that you received from Joanne      12:11

21  Price?

22      A.  I can't recollect.  I had an intense period in respect

23  of discovery the last few months.  I can't recollect,

24  but -- if it was there or not.

25      Q.  Do you know whether that attachment was produced to

1    YouTube in this case?

2    A.   If it was there, it would have been forwarded to my

3    lawyers.

4    Q.   Is there any reason that you are aware that it

5    wouldn't have been produced?

6    A.   Not that I can think of.

7    Q.   Do you know what Ms. Price is referring to when she

8    says that Premier Goals breached certain requirements in

9    the deed of licence?

10   A.   Yes.                                          12:12

11   Q.   Was that the Sohu episode that we talked about

12   yesterday?

13   A.   Yes.

14   Q.   Let's look at another document.

15   THE VIDEOGRAPHER:  Going off the record.  The time is 12:12.

16   (Off the record)

17   THE VIDEOGRAPHER:  Back on the record.  The time is 12:13.

18   Q.   We just marked Exhibit 31, a document produced by the

19   Premier League on behalf of the clubs, Bates number

20   PLC00000237.                                       12:13

21   (Exhibit 31 marked for identification)

22   A.   What was the end number?

23   Q.   237.

24   A.   It's cut off.

25   Q.   I am sorry.

1      A.   This is --

2      Q.   This is an e-mail dated October 2nd, 2009, from

3      Casimir Knight at Chelsea Football Club?

4      A.   Yes.

5      Q.   Do you recognise this document?

6      A.   I do.

7      Q.   Is this a document that was sent to you in response to

8      your transmittal of YouTube's discovery request to the

9      various Premier League clubs?

10     A.   Yes.                                                    12:14

11     Q.   And so this is Chelsea's response to that document

12     request?

13  MR. SHAFTEL:   Objection.

14     A.   Yes.

15     Q.   Do you have any reason to think that anything in this

16     e-mail is inaccurate?

17  MR. SHAFTEL:   Objection.  Lack of foundation.

18     A.   Nothing specifically to give me that impression, but

19     it's just a view of someone at Chelsea, one person at

20     Chelsea.                                                     12:14

21     Q.   Well -- but this is a response that Chelsea is making

22     to an official request from the Premier League, correct?

23     A.   Yes.

24     Q.   Who is Casimir Knight?

25     A.   He is involved with Chelsea's Digital Media side of

1  the business.

2  Q.  Does this document confirm that Chelsea set up a

3  YouTube channel in February of 2007?

4  MR. SHAFTEL:  Objection to form.

5  A.  Yes.

6  Q.  Does it confirm that the primary purpose of Chelsea's

7  channel is to promote the -- excuse me -- to promote the

8  club and Chelsea TV within this environment?

9  MR. SHAFTEL:  Objection.

10  A.  Yes, it says that.                                    12:15

11  Q.  So the reason that Chelsea set up this channel was for

12  promotional purposes, correct?

13  MR. SHAFTEL:  Objection.  Lack of foundation.  Calls for the

14  witness to speculate.

15  A.  "To promote the club and Chelsea TV within this

16  environment."

17  Q.  Do you have an understanding of what "this

18  environment" refers to?

19  MR. SHAFTEL:  Objection.

20  A.  Reading his e-mail, I'd guess he means YouTube.       12:16

21  Q.  What is Chelsea TV?

22  A.  It's the club's channel.

23  Q.  What kind of footage is shown on Chelsea TV?

24  MR. SHAFTEL:  Objection.  Lack of foundation.

25  A.  I haven't looked at Chelsea's club channel for some

1          time.  It's a pay-television channel.  It would contain

2          behind-the-scenes footage, press conferences, interviews

3          and highlights of old matches.

4          Q.   Highlights of old matches; do you mean old matches

5          that Chelsea played in the Premier League?

6     MR. SHAFTEL:  Objection.

7          A.   It could be competitions that Chelsea have played in

8          generally, it could be friendly matches - in fact, friendly

9          matches would be covered in their club channel, probably.

10         Q.   Is Chelsea allowed to show Chelsea's Premier League          12:17

11         matches on its Chelsea TV channel?

12    MR. SHAFTEL:  Objection.

13         A.   Not live.

14         Q.   But older Premier League matches involving Chelsea,

15         they are allowed to broadcast?

16    MR. SHAFTEL:  Objection.

17         A.   I would need to refer to the deed of licence, but the

18         clubs do have certain rights in matches that they

19         participated in.

20         Q.   So Chelsea believe that creating a channel on YouTube          12:17

21         would help promote both the club and its television

22         station, correct?

23    MR. SHAFTEL:  Objection.  Lack of foundation for this witness.

24         A.   That is what it says.

25         Q.   Do you have an understanding of why Chelsea thought

1     that having a channel on YouTube would help it promote the

2     club and Chelsea TV?

3  MR. SHAFTEL:  Objection.

4     A.   No.

5     Q.   Is that something that you have discussed with Chelsea

6     at any time?

7     A.   Not that I can recall.

8     Q.   You see under 2, Mr. Knight wrote, "We believe the

9     availability of football-related content via YouTube does

10     not have a material impact on the club's activity nor the    12:18

11     ability for the club to exploit its media rights."

12     A.   Yes.

13     Q.   That reflects the official position of the Chelsea

14     Football Club, correct?

15  MR. SHAFTEL:  Objection.  I don't know what you mean by

16  "official position".  Those words don't appear here.

17  MR. WILLEN:  You can make an objection --

18  MR. SHAFTEL:  I am going to object to the lousy question.  It's

19  vague and ambiguous.  We have sat for five minutes with this

20  witness, so it's perfectly clear --    12:19

21  MR. WILLEN:  You have got to stop with the speeches.

22  MR. SHAFTEL:  You stop, OK.  I am making an objection to a lousy

23  question.  You are putting a document before the witness that he

24  is not competent to speak to, and we are all listening through

25  it.  So I object for lack of foundation, for the umpteenth time,

1  with this document, I object to your putting words in this

2  document that don't exist, like "official position". I find

3  your question also -- so, lack of foundation, vague and

4  ambiguous.

5  MR. WILLEN:  The speaking objections are totally improper and I

6  would ask that you stop.  You can object to form, but not with

7  the speeches.  I appreciate it.

8  MR. SHAFTEL:  There has been no speeches, OK?  I am trying to

9  clarify the objection so you can fix the question if you'd like

10  to try to fix it.                                    12:20

11  MR. WILLEN:  Stop.  Is it your understanding that this e-mail

12  that you received from Chelsea, in response to Premier League's

13  discovery request, represented Chelsea's official position in

14  response to those requests?

15  MR. SHAFTEL:  Objection to -- objection to form.  Objection,

16  it's vague and ambiguous.  Objection for lack of foundation with

17  respect to this document.

18      A.   I wouldn't use the words "official position," but I

19           took it as a view from 'Cas'.

20      Q.   Was 'Cas' speaking on behalf of Chelsea?          12:20

21  MR. SHAFTEL:  Objection to form.  Vague and ambiguous.  Lack of

22  foundation.

23      A.   He may have been speaking on behalf of Chelsea Digital

24           Media or he may have been speaking on behalf of Chelsea

25           Football Club.

1  Q.  Was the request that you transmitted to the clubs a

2  request to the clubs or a request to their media divisions?

3  A.  It was a request to the clubs.

4  Q.  And this e-mail was the response to that request,

5  correct?

6  MR. SHAFTEL:  Objection.

7  A.  It appears to be, yes.

8  Q.  You see he refers to, "We also have an agreement with

9  the Gifted Group, to whom we have licensed our DVD rights."

10  A.  Yes.                                                12:21

11  Q.  Do you know what the Gifted Group is?

12  A.  A DVD distributor or licensor -- licensee, sorry, of

13  Chelsea's.

14  Q.  And he says, "Relevant documentation relating to the

15  international TV and DVD rights have been posted to you

16  separately by Amanda using special delivery."

17  Do you see that?

18  A.  Yes.

19  Q.  Do you recall actually receiving those documents from

20  Chelsea?                                                12:22

21  A.  I don't recall specifically whether those documents

22  ever arrived because I subsequently asked for them to be

23  sent digitally or electronically, soft copy, but, as I say,

24  I was involved in voluminous discovery requests, so I can't

25  specifically recall.  I would need to check with my

1  counsel.

2  Q.  Are you aware of any reason why those documents

3  wouldn't have been produced to YouTube?

4  MR. SHAFTEL:  Objection.  Lack of foundation.

5  A.  No.

6  Q.  Go off the record for two seconds.

7  THE VIDEOGRAPHER:  Going off the record.  The time is 12:23.

8  (Off the record)

9  THE VIDEOGRAPHER:  Back on the record at 12:23.

10  Q.  So we have marked Exhibit 32, which is a document      12:23

11  produced by the Premier League on behalf of the clubs, with

12  the Bates number PLC00000804.

13  (Exhibit 32 marked for identification)

14  Ask whether you recognise this as a response to Premier League's

15  discovery request from the Sunderland Football Club?

16  A.  I do, yes.

17  Q.  What is SAFC TV?

18  A.  Sunderland Athletic Football Club Television.

19  Q.  Is that the same kind of channel that we talked about

20  with Chelsea TV?      12:24

21  MR. SHAFTEL:  Objection.

22  A.  I am not sure that Sunderland's channel was run on as

23  many platforms as Chelsea's.  I think it's more

24  Internet-based through their website, possibly.

25  Q.  This e-mail from Margaret Byrne says, "We have

# Schapiro Exhibit 18

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

VIACOM INTERNATIONAL, INC., COMEDY )
PARTNERS, COUNTRY MUSIC )
TELEVISION, INC., PARAMOUNT )
PICTURES CORPORATION, and BLACK )
ENTERTAINMENT TELEVISION, LLC, )
                                     )
            Plaintiffs, )
                                     )
vs.                                ) NO.
                                     ) 07-CV-2203
                                     )
YOUTUBE, INC., YOUTUBE, LLC, )
and GOOGLE, INC., )
                                     )
           Defendants. )
_____ )

VIDEOTAPED DEPOSITION OF MICHAEL HOUSLEY

NEW YORK, NEW YORK

FRIDAY, OCTOBER 3, 2008

BY: REBECCA SCHAUMLOFFEL, RPR, CLR

JOB NO. 15906

OCTOBER 3, 2008

10:00 a.m.


VIDEOTAPED DEPOSITION OF

MICHAEL HOUSLEY, taken at the offices of

WILSON, SONSINI, GOODRICH & ROSATI, 1301

Avenue of the Americas, New York, New

York, pursuant to notice, before REBECCA

SCHAUMLOFFEL, CLR, RPR.

A P P E A R A N C E S:


FOR THE PLAINTIFFS VIACOM

INTERNATIONAL, INC.:

    JENNER & BLOCK

    By:  SUSAN H. KOHLMANN, ESQ.

    919 Third Avenue, 37th Floor

    New York, New York 10022

    (212) 891-1690

    skohlmann@jenner.com




FOR THE DEFENDANTS YOUTUBE, INC.,

YOUTUBE, LLC and GOOGLE, INC.:

    WILSON SONSINI GOODRICH & ROSATI

    By:  MICHAEL H. RUBIN, ESQ.

    650 Page Mill Road

    Palo Alto, California 94304

    (650) 849-3311

    mrubin@wsgr.com

             FOR THE DEFENDANTS YOUTUBE, INC.,

          YOUTUBE, LLC and GOOGLE, INC.:

               MAYER BROWN LLP

               By:   JOHN MANCINI, ESQ.

               1675 Broadway

               New York, New York 10019

               (212) 506-2295

               jmancini@mayerbrown.com




          ALSO PRESENT:


          MANUEL ABREU, Videographer


                    ---oOo---

1              HOUSLEY

2              Q.    Is that your signature?

3              A.    Yes, it is.

4              Q.    Did you execute this

5    13:37:46  declaration on February 28, 2008 in New

6              York City?

7              A.    I believe so, yes.

8              Q.    Is that what it says in the

9              document?

10   13:37:54  A.    That's what it says.

11             Q.    Do you have any reason to

12             doubt that that was true?

13             A.    I do not.

14             Q.    Do you see what it says

15   13:38:00  above executed, the sentence above

16             that?

17             A.    Yes, I do.

18             Q.    Could you read that

19             sentence, please?

20   13:38:06  A.    "I declare under penalty of

21             perjury, under the law of the United

22             States, that the foregoing is true and

23             correct."

24             Q.    Did you understand what that

25   13:38:13  meant at the time that you signed this

document?

    A.    Yes.

    Q.    That's similar to the

13:38:18  testimony you are giving today which is

under penalty of perjury?

    A.    Correct.

    Q.    In the paragraph one on the

first page, it states that "I have been

13:38:33  manager, legal support, of Viacom Inc.

since July of 2007."

        Is there a difference

between manager, legal support and what

you referenced earlier in the

13:38:45  deposition as your current title,

manager of litigation support?

    A.    No, no difference.

    Q.    Who wrote this document?

    A.    Myself with counsel.

13:39:02    Q.    Did you participate in the

drafting of each portion of this

document?

    A.    Yes.

    Q.    Is there any portion of this

13:39:12  document that you did not draft?

1                          HOUSLEY

2              MS. KOHLMANN:  Objection.

3              Misstates the testimony.  He said

4              he drafted it with counsel.

5   13:39:24   Q.    You can answer the question.

6              A.    What was the question?

7              Q.    Is there any portion of this

8   document that you did not draft?

9              A.    No.

10  13:39:30   Q.    What does this declaration

11  describe, generally?

12             A.    The process by which we are

13  identifying works in suit.

14             Q.    If you look at paragraph

15  13:40:01   two, it says "The process by which the

16  works in suit are identified is a

17  multi-step procedure."

18                   Do you see that?

19             A.    Yes, I do.

20  13:40:13   Q.    Who designed this multi-step

21  procedure?

22             A.    It was our legal group and

23  counsel.

24             Q.    Who in the legal group?

25  13:40:24   A.    I don't know exactly.

1               HOUSLEY

2         Q.    Which counsel?

3         A.    Our outside counsel.

4         Q.    Which outside counsel?

5  13:40:31  A.    I don't know.

6         Q.    Did you have any involvement

7    in the design of the multi-step

8    procedure discussed in paragraph two?

9         A.    Only in the logistics.

10  13:40:42  Q.    What involvement did you

11   have in any way?

12        A.    It was the -- I am not sure.

13   It was the logistics of, you know,

14   setting up a room that was going to

15  13:41:12  host people, making sure that people

16   could log in appropriately, the

17   logistics.

18        Q.    Where is the room that you

19   just referred to?

20  13:41:23  A.    At 1515.

21        Q.    How big is the room?

22        A.    There is more than one room.

23   And we have moved floors.

24        Q.    How big was the first room?

25  13:41:38  A.    I don't know exactly how big

HOUSLEY

1

2          it was.

3                  Q.    How many people was it

4          designed to have?

5   13:41:44        A.    Probably fewer than we had

6          in there.

7                  Q.    How many people by number

8          was it designed to house?

9                  A.    At times, we probably had 40

10  13:41:58   people in that room.

11                 Q.    And you indicated there was

12         more than one room?

13                 A.    That's correct.

14                 Q.    Was there more than one room

15  13:42:09   at all times?

16                 A.    Yes.

17                 Q.    Was each room designed to

18         house roughly 40 people?

19                 A.    I think overall, we have had

20  13:42:25   about 60 or so people at a time.

21                 Q.    Why did you move floors?

22                 A.    I don't know.  Just part of

23         the building management.

24                 Q.    You were told to move

25  13:42:38   floors?

HOUSLEY

1

2          A.     They are using keyword or

3      tag searching.

4          Q.     Does BayTSP use

5   13:45:19   fingerprinting technology?

6          A.     They might but I don't

7      think they are for us.  But I don't

8      know.

9          Q.     Are you aware of whether

10  13:45:30   BayTSP offers fingerprinting

11      technology?

12          A.     I believe they do.

13      Recently.

14          Q.     Do you know how this

15  13:45:38   fingerprinting technology was developed

16      at BayTSP?

17          A.     No, I don't.

18          Q.     What is fingerprinting

19      technology?

20  13:45:54   A.     Generally, it is a way to

21      create a unique fingerprint of one

22      media file and be able to use this

23      fingerprint to compare against other

24      fingerprinted files.

25  13:46:19   Q.     When you say fingerprint,

HOUSLEY

2    are you referring to an actual

3    fingerprint?

4            A.    No.

5  13:46:25    Q.    What are you referring to?

6            A.    A unique identifier.

7            Q.    What does this unique

8    identifier look like?

9            A.    It is not a tangible object.

10  13:46:42  It is an electronic file.

11           Q.    Have you ever seen one?

12           A.    Seen a file?  I don't know.

13           Q.    You don't know whether you

14   have seen --

15  13:46:54   A.    I can't think --

16           Q.    Have you seen an Auditude

17   fingerprint?

18           A.    I can't think of an instance

19   where I would as an end user.

20  13:47:02   Q.    If you look at paragraph 3,

21   is it states the matching process

22   begins with a pool of clips that have

23   appeared on YouTube and that have

24   previously been identified as

25  13:47:31  potentially infringing Viacom's

1                          HOUSLEY

2          copyrights.  Those potentially

3          infringing clips must be matched with

4          specific works in which Viacom owns the

5  13:47:43  copyrights."

6                     Do you see that?

7          A.    Yes, I see paragraph 3.

8          Q.    What is the pool of clips

9          referred to in paragraph 3?

10 13:47:56  A.    These are clips that have

11         been removed from YouTube.

12         Q.    By what means were they

13         removed from YouTube?

14         A.    By BayTSP issuing a takedown

15 13:48:19  notice.

16         Q.    Is that the sole source for

17         inclusion in the pool?

18         A.    To my knowledge, yes.

19         Q.    How is it that temp

20 13:48:34  employees were able to view clips taken

21         down by BayTSP using Auditude software?

22         A.    Auditude, within its

23         application, can stream those clips.

24         Q.    How?

25 13:48:55  A.    I don't know how it works.

                                    HOUSLEY

1

2          Q.    How can Auditude stream

3     clips that are no longer live on the

4     YouTube website?

5  13:49:04    A.    Well, I mentioned that Bay

6     captures videos as takedown notices are

7     sent.

8          Q.    Correct.  But I understood

9     you also to testify that you were not

10 13:49:18  aware of any third parties that were

11    given access to those videos?

12         A.    That's correct, I did say

13    that.  I should correct the record.

14         Q.    Please do.

15 13:49:32    A.    Auditude is a third party

16    employed by Viacom who has access to

17    those videos specifically for the

18    purpose of this works in suit project.

19         Q.    When were the Auditude given

20 13:49:47  access to those videos?

21         A.    I don't know exactly.

22         Q.    Do you have any idea when

23    they were given access?

24              MS. KOHLMANN:  Objection.

25 13:49:56    You can answer.

HOUSLEY

1

2      A.      I guess it would be sometime

3      after the summer of '07.

4      Q.      After you became the manager

5  13:50:13  of legal support of Viacom?

6      A.      A manager, yes.

7      Q.      A manager.

8              To your knowledge, no

9      videos, other than those that takedown

10 13:50:30  notices, were sent by Bay exist in the

11     pool referenced in paragraph 3?

12     A.      That's correct.  To my

13     knowledge.

14     Q.      Do you see in paragraph 3

15 13:50:45  where it states "That have been

16     previously identified as potentially

17     infringing Viacom's copyrights"?

18     A.      Yes, I do.

19     Q.      To what videos, does that --

20 13:51:03  pardon me.  To what clips -- to what

21     clips does that phrase refer?

22             MS. KOHLMANN:  Object as to

23             form.  You can answer.

24     A.      It is the clips that have

25 13:51:15  been in BayTSP's -- BayTSP's takedown



**Schapiro Exhibit 19**

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

| Present: The Honorable | A. HOWARD MATZ, U.S. DISTRICT JUDGE | |
|---|---|---|

| Stephen Montes | Not Reported | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys **NOT** Present for Plaintiffs:          Attorneys **NOT** Present for Defendants:

**Proceedings:**          IN CHAMBERS (No Proceedings Held)

## ORDER GRANTING IN PART AND DENYING IN PART A9.COM'S SUMMARY JUDGMENT MOTION

## I.      INTRODUCTION

The parties are familiar with the history of this case and the proceedings on Defendant A9.com's summary judgment motion. On October 27, 2008, the Court orally issued a bench ruling granting A9.com's motion for summary judgment that it did not directly infringe or vicariously infringe the copyrights of Plaintiff Perfect 10, Inc. ("Perfect 10"). The Court incorporates by reference its oral findings and statement of reasons at that hearing.

This order sets forth the Court's ruling on the remainder of A9.com's motion, concerning its assertion that it is entitled to safe harbor in Title II of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 512(a). Defendant's evidentiary objections are addressed in an accompanying order. For the reasons stated below, the Court finds that A9.com has not met its burden of establishing that it is eligible for section 512(a) safe harbor and thus DENIES its motion as to that issue.

The Court thus GRANTS IN PART and DENIES IN PART A9.com's motion for summary judgment.[1]

---

[1] Docket No. 132.

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

## II.   LEGAL STANDARDS FOR A MOTION FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The moving party bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A fact is material if it could affect the outcome of the suit under the governing substantive law. *Id.* at 248. The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

"When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party. The moving party need not disprove the other party's case. *See Celotex*, 477 U.S. at 325. Thus, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial.'" *Cleveland v. Policy Mgmt Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (citing *Celotex*, 477 U.S. at 322).

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Summary judgment will be entered against the non-moving party if that party does not present such specific facts. *Id.* Only admissible evidence may be considered in deciding a motion for summary judgment. *Id.*; *Beyene v. Coleman Sec. Serv., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (quoting *Anderson*, 477 U.S. at 255). But the non-moving party must come forward with more than "the mere existence of a scintilla of evidence." *Anderson*, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## III.   DISCUSSION

This ruling is necessarily abbreviated, given the Court's caseload and the extremely time-consuming burden of adjudicating Perfect 10's claims in three related cases.[2] The parties are familiar with the basic facts of the case. Only the facts material to this motion will be recited here. For clarity, the Court will refer to the defendant as "A9" and to the website it operates as "A9.com."

### A.   A9 Is Not Entitled to Summary Judgment Based Only on the Section 512(a) Safe Harbor, Given That Perfect 10's Claims Are Based on Multiple Functions

A9 operates what looks like a search engine at <www.A9.com>, but actually it aggregates search results provided by other search engines (such as Google, Alexa, or MSN). Pl.'s Supp. Statement of Uncontroverted Facts ("SGI") ¶ 1.[3] A9 then relays the search results received from those search engines to the end user. SGI ¶¶ 1-5.[4] As Perfect 10 explains the basis for its claim, several aspects of A9's search functionality and

---

[2]The other cases are *Perfect 10, Inc. v. Google, Inc.* (CV 04-9484) and *Perfect 10, Inc. v. Microsoft Corporation* (CV 07-5156). Several discovery motions and another summary judgment motion already are pending and complex case management issues remain to be resolved.

[3]Per the Court's October 6, 2008 order, Perfect 10's Supplemental Statement should have been entitled "Revised Statement of Genuine Issues." Thus the Court will refer to it as the "SGI."

[4]Perfect 10 disputes that A9 "only aggregates search results" but does not dispute that A9 does not crawl or index the World Wide Web. SGI ¶ 1.

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|

| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* |
|---|---|

search results allegedly contribute to infringement: A9's creation of a "See full-size image" link and in-line link; its display of Perfect 10's passwords and links to password hacking websites; its creation of Web Search links and cache links; its creation of email links; its display of infringers' advertisements; and its display of thumbnails.

The DMCA contains four safe harbors that can limit liability for four different functions that Internet service providers (ISPs) may perform: Section 512(a) limits the liability of ISPs when they do nothing more than transmit, route, or provide connections for material; section 512(b) protects ISPs for "system caching," that is, where they provide intermediate and temporary storage of material on a system or network under certain conditions; section 512(c) limits the liability of an ISP for material "residing on [the ISP's] system or network at the direction of its users;" and section 512(d) protects an ISP performing an "information location tool" function that merely links users to online locations containing material. *See* 17 U.S.C. § 512(a)-(d). The first safe harbor, § 512(a), does not have a notification and takedown requirement. The other three safe harbors do. *See id.*

Under the DMCA, if an ISP is found to qualify for safe harbor for one function, that does not mean it enjoys blanket protection for all of its functions. The safe harbors "describe separate and distinct functions." 17 U.S.C. § 512(n). As Congress explained in an extended example set forth in the legislative history, an ISP may be engaged in multiple functions at the same time, each of which must be analyzed under the corresponding subsection of section 512. *See* H.R. REP. 105-551 (II) (1998), at 65 (explaining that an ISP that provides a hyperlink to a site containing infringing material which it then caches (*i.e.*, stores) on its system in order to facilitate access to it by its users may attempt to seek safe harbor for (1) transitory digital network communications under subsection(a), (2) system caching under subsection (b), and (3) information location under subsection (d), depending on which functions the copyright infringement claim is based on); 3 Melville B. Nimmer, *Nimmer on Copyright* § 12B.06[A] (2008) (quoting same). The Ninth Circuit took note of the "separate and distinct functions" feature of the DMCA in Perfect 10's lawsuit against CCBill when it noted that "[e]ven if CCBill's provision of a hyperlink is immune under § 512(n), CCBill does not receive blanket immunity for its other services." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1117 (9th Cir. 2007).

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

Although A9 has asserted various safe harbors as affirmative defenses, on this motion it seeks summary judgment concerning only one: section 512(a), for its transmission of search results. A9 contends that it is a passive conduit for the search results generated by whatever search engine it used. A9 recognizes, however, that it is also an information location tool within the meaning of § 512(d), by virtue of its provision of search services and access to other websites through links. *See* Reply at 17-18. It follows that even if A9 prevailed on its section 512(a) defense, it would not thereby obtain "blanket immunity" for its other functions covered by different safe harbors. *See id.*

### B. No Genuine Factual Dispute Whether A9 Reasonably Implemented A Repeat Infringer Policy

To be eligible for any of the four safe harbors at 17 U.S.C. §§ 512(a)-(d), a service provider must first meet the threshold conditions set out in section 512(i). The first condition is that the service provider

> [H]as adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers.

17 U.S.C. § 512(i)(A). The second condition is that the service provider "accommodates and does not interfere with standard technical measures." *Id.* § 512(i)(B). Perfect 10 does not dispute that A9 fulfills the second condition. SGI ¶ 16.

Perfect 10 does dispute whether A9 satisfies the first condition, the so-called repeat infringer policy. Based on the evidence before the Court, the Court holds that no reasonable juror could find that A9 does not have a repeat infringer policy that satisfies section 512(i).[5]

---

[5]Perfect 10 raised this repeat infringer argument in opposition to A9's summary judgment motion, asking the Court to find that factual questions remain concerning A9's repeat infringer policy and to deny on that ground A9's motion regarding § 512(a) safe harbor. Although it is A9's ultimate

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

### 1. "Implementation" of a repeat infringer policy.

In its analysis of section 512(i) in *CCBill*, the Ninth Circuit asked first whether defendant implemented a repeat infringer policy, and then whether it *reasonably* implemented that policy. 488 F.3d 1102, 1110-11. It wrote that "a service provider 'implements' a policy if it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications." *Id.* at 1109. Although the statute allows a variety of procedures for dealing with notifications, the court went on, "an implementation is reasonable if, under 'appropriate circumstances,' the service provider terminates users who repeatedly or blatantly infringe copyright." *Id.* (quoting 17 U.S.C. § 512(i)(A)).

A9 has provided evidence that it does have a "working notification system" for dealing with complaints of copyright infringement arising from its website, A9.com. Included in A9.com's Conditions of Use is a "Notice and Procedure for Making Claims of Copyright Infringement," which is posted on the website. SGI ¶ 15. Perfect 10 does not challenge this showing; it merely argues that A9 has never actually removed or disabled access to infringing material.

That A9 has received and processed notifications submitted to it is supported by the declaration of A9's Vice President of Product Development, Jonathan Leblang, who was responsible for dealing with infringement notices. He stated that A9 has received just three notices of infringement and that he personally responded to each of those notices to the apparent satisfaction of the complainants. Declaration of Jonathan Leblang ¶ 5 (Declaration of Mark T. Jansen, Ex. 1). *Cf. Ellison*, 357 F.3d at 1080 (holding that AOL did not reasonably implement a termination policy when it "allowed notices of potential copyright infringement to fall into a vacuum and to go unheeded.") Although Leblang's declaration was submitted in 2005, Perfect 10 does not directly dispute that portion of his declaration and it has not attempted to depose Leblang.

---

burden to show that it satisfies the threshold requirements in section 512(i) in order to avail itself of any of the safe harbors, it did not request summary adjudication on that issue. To resolve the question A9 did put before the Court, whether it is entitled to summary judgment based on section 512(a), the Court necessarily must reach the section 512(i) issue.

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

The uncontroverted evidence shows also that A9 had "a policy that provides for the termination in appropriate circumstances of subscribers and account holders. . .who are repeat infringers." 17 U.S.C. § 512(i)(A). The only "subscribers" or "account holders" on A9.com were those users who subscribed to the "Toolbar" service, from early 2004 to the end of September 2006. SGI ¶¶ 17-18. Toolbar users were subject to an End User License Agreement that gave A9.com the right to monitor subscribers' activities, investigate any reported violation of its policies, and take any action it deemed appropriate, including terminating subscribers' access to Toolbar. SGI ¶ 19. Perfect 10 does not dispute this evidence concerning Toolbar.

Perfect 10 nevertheless argues that there is a genuine issue of material fact whether A9 even had a repeat infringer policy because *Amazon's* corporate counsel testified she did not know about A9's policies, and because *Amazon's* copyright agent did not know what a repeat infringer policy was. SGI ¶ 36. This argument is patently meritless. What Amazon's employees knew or did not know is irrelevant to A9, because the two entities handled copyright issues separately, as Amazon's corporate counsel explained. *See* SGI ¶ 36.

Perfect 10 also relies on the deposition testimony of A9's software engineer, Matthew Amacker. Amacker testified that he did not know what the legal term "repeat infringer policy" meant. Declaration of Jeffrey N. Mausner ("Mausner Decl.") (Amacker Dep. 35:11-13). Perfect 10 suggests that it is incredible that Amacker would be unfamiliar with that legal term because he was designated as the person most qualified to testify for A9 regarding A9's compliance with section 512(i). SGI ¶ 67. Although Amacker did not understand the reference to "repeat infringer policy," he did testify that A9 had "a policy that allows us to terminate folks if they are doing something wrong." Def't's Application to File Exhibits Under Seal, Ex. 6 (Amacker Dep. 6:18-20). In any event, the DMCA does not require that a service provider label its policy a "repeat infringer policy." *See Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1101 (W.D. Wash. 2004) ("Although Amazon does not use the term 'repeat infringer' or precisely track the language of the DMCA, the evidence shows that Amazon has adopted a termination policy as required under § 512(i).") That Amacker did not know the legal term "repeat infringer policy" does not cast into doubt the documentary evidence establishing that A9 did have a "working notification system" for copyright complaints and a policy providing for termination of subscribers.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

### 2. Reasonableness of A9's implementation of its policy.

Perfect 10 contends that whatever policy A9 had, it was not reasonably implemented because A9 never removed or disabled access to infringing websites. But the Court need not reach the issue whether A9 terminated infringers in the abstract, because its "policy is unreasonable only if [it] failed to respond when it had *knowledge* of the infringement." *CCBill*, 488 F.3d at 1113 (emphasis added). Although A9 has the ultimate burden of proving its affirmative defense, it is Perfect 10's burden to show that A9 had actual knowledge of infringement within the meaning of section 512(c). As the Ninth Circuit's analysis in *CCBill* made clear, it is Perfect 10 that must show that A9 knew about "flagrant and blatant copyright infringement by its users." *Id.* at 1111 (noting that "a service provider need not affirmatively police its users for evidence of repeat infringement."). This knowledge can be established by (1) actual knowledge, (2) awareness of facts or circumstances from which infringing activity is apparent, or (3) receipt of notification of claimed infringement meeting the requirements of § 512(c)(3). *Id. But see Nimmer on Copyright* § 12B.10[B][3][c] (suggesting actual knowledge may not be required in cases involving an "adjudicated copyright infringer").

Although Perfect 10 was given the opportunity to demonstrate that A9 had such knowledge, it failed to do so. It provided no evidence of A9's knowledge of any specific repeat or blatant infringer of copyrights among its subscribers or account holders. Perfect 10 does point to a DMCA notice dated January 21, 2005 that Dr. Zada sent to *Amazon*, via Amazon's designated copyright agent, Adrian Garver, complaining of infringing porn sites that Dr. Zada found using the Amazon search functionality. Supplemental Declaration of Dr. Norman Zada ¶ 3, Ex. 31. On its face that notice is immaterial, as it is a notice sent to Amazon. Perfect 10's own papers suggest that it sent DMCA notices only to Amazon. *See* SGI ¶¶ 36-37, 40. There is no evidence of any notice sent to A9's copyright agent at A9's legal department, as A9's Notice and Procedure for Making Claims of Copyright Infringement instructs, and no evidence of any notices complaining of websites found using the A9.com search functionality.

Perfect 10 does point to A9's Clickriver Ads program as supposed evidence of A9's relationship with infringers. Clickriver is a web advertising program run by A9. It operates separately from the A9.com search functionality. Declaration of Gil Sheinfeld ¶ 2. Perfect 10 argues that A9 should have terminated the advertising relationships -- *i.e.*,

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

placement of sponsored links -- it had with "usenet" websites such as giganews.com and newsrazor.net that are alleged massive infringers. This argument is misdirected, for two reasons.

First, the sponsored links on A9.com that Perfect 10 cites are not actually part of the Clickriver program, so those links are not the result of a subscriber or account relationship that A9 could terminate. A9 has made clear that the sponsored links on A9.com are *not* placed by Clickriver. None of the usenet websites that Perfect 10 points to has ever been a Clickriver subscriber. *Id.* ¶ 6. Clickriver subscribers' ads are placed on Amazon.com and other websites, *not* on A9.com, a fact that is consistent with even Perfect 10's evidence. *See* SGI ¶ 56; Declaration of Dr. Norman Zada ("Zada Decl."), Exs. 15, 29; *see also* Ex. 11 (showing usenets as sponsored links on A9.com, but not showing that Clickriver placed those sponsored links). The mere fact that these usenets' sponsored links are on A9.com does not establish that A9.com had a "business relationship" with the usenets that could be terminated. H.R. REP. 105-551 (II) at 61 n. 3, cited in *Nimmer on Copyright* § 12B.10[D][1].

Second, even assuming Clickriver was responsible for the placement of usenet websites' sponsored links on A9.com, there is no evidence that A9 knew that these websites are repeat infringers. Perfect 10 has proffered no evidence that it or any other copyright holders provided DMCA notices alerting A9 to the fact that the usenet websites contained infringing images. *See CCBill*, 488 F.3d at 1113 (remanding for consideration of defendants' response to notifications from non-party copyright holders). Nor is it apparent from the usenets' sponsored links on A9.com that the usenets are massive infringers. *See* Zada Decl., Ex. 11. Absent evidence that A9 knew that these usenets contained infringing images and failed to take appropriate action, A9 cannot be found to have failed to reasonably implement its policy for purposes of section 512(i).

### C.   A9 Has Not Shown It Qualifies for the Section 512(a) Safe Harbor (Transmission of Search Results) Because Genuine Issues Exist Regarding Whether It Retains and Modifies Search Results

Entitled "Transitory digital network communications," section 512(a) limits the liability of an ISP for "infringement of copyright by reason of the provider's transmitting, routing, or providing connections for, material through a system or network controlled or

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

operated by or for the service provider, or by reason of the intermediate and transient storage of that material in the course of such transmitting, routing, or providing connections," provided  that the ISP meets four conditions:

> (1) the transmission of the material was initiated by or at the direction of a person other than the service provider;
> (2) the transmission, routing, provision of connections, or storage is carried out through an automatic technical process without selection of the material by the service provider;
> (3) the service provider does not select the recipients of the material except as an automatic response to the request of another person;
> (4) no copy of the material made by the service provider in the course of such intermediate or transient storage is maintained on the system or network in a manner ordinarily accessible to anyone other than anticipated recipients, and no such copy is maintained on the system or network in a manner ordinarily accessible to such anticipated recipients for a longer period than is reasonably necessary for the transmission, routing, or provision of connections; and
> (5) the material is transmitted through the system or network without modification of its content.

17 U.S.C. § 512(a).  These five requirements "limit the range of activities that qualify under this subsection to ones in which a service provider plays the role of a 'conduit' for the communications of others."  H.R. REP. 105-551 (II) at 51; *see also Ellison v. Robertson*, 357 F.3d 1072, 1081 (9th Cir. 2004) (noting that the issue is whether AOL functioned as a "conduit service provider").

Here, the question is whether A9 may limit its liability if the infringement occurs "by reason of" its transmission of search results from an underlying search engine to the user.  17 U.S.C. § 512(a).  Based on the evidence submitted by both sides, the Court holds that Perfect 10 has raised genuine issues of material fact concerning two of the five prerequisites for this safe harbor: the requirement in section 512(a)(4) that "no copy of the material" is maintained on A9's system "for a longer period than is reasonably necessary for the transmission," and the requirement of section 512(a)(5) that "the material is transmitted through the system or network without modification of its

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

content."

### 1. Evidence concerning "Toolbar" creates a genuine issue regarding section 512(a)(4).

Section 512(a)(4) would disqualify a service provider that stored a copy of the material on its system "for a longer period than is reasonably necessary for the transmission, routing, or provision of connections." 17 U.S.C. § 512(a)(4). The operation of A9's search functionality generally would not trigger this exclusion, because it does not involve the retention of search results longer than the fraction of a second it takes to convert such results from the format (XML) in which A9 receives them into HTML format and then to pass them on to the user. SGI ¶ 9. But when A9 operated its Toolbar service (early 2004 to end of September 2006), A9 *did* store search queries and results. In a 2004 press release, A9 referred to itself as a "search engine with a memory. . . Users can view and edit past search results and sites they've visited by clicking on Search History on the A9 Toolbar. . . ." SGI ¶ 52. A9 admits that for Toolbar users it maintained users' past search queries and search results in its history server. SGI ¶¶ 24-25. It does not argue that this storage of information was merely "intermediate and transient storage." U.S.C. § 512(a). Thus, to the extent that A9 could be liable for infringement during the period that Toolbar was in operation, it has not satisfied section 512(a)(4).

### 2. A9 has not established its compliance with section 512(a)(5).

Section 512(a)(5) requires that "the material is transmitted through the system or network without modification of its content." 17 U.S.C. § 512(a)(5). The statute does not define "modification" and "content." The legislative history, however, notes that this provision does not pertain to modifications of the "form" of the material, citing as an example an e-mail transmission that appears to the recipient without bolding or italics resulting from format codes contained in the sender's message. H.R. REP. 105-551 (II) at 52.

In its initial papers, A9 flatly asserted that it "does not delete from, add to, modify, filter or edit search results." In response, Perfect 10 pointed out various aspects of A9.com's search results that suggested that A9's assertion was inaccurate. The Court has

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

grouped them into four categories: (1) A9 added "see full-size image" links, sponsored links, links for framing or in-line linking, and email links; (2) for Toolbar, A9 recommended search results based on the user's search history and added certain text and links to the search results page; (3) A9 provides search results that are different in kind, in number, and in the order in which the results are displayed from the results that a user gets by doing the same search on the underlying search engine; and (4) the URLs that are provided in A9's search results appear truncated, compared to the URLs displayed by the underlying search engine, and there are differences in layout and fonts between the providers. *See* Opp'n at 17; Zada Decl. ¶¶ 16-19.

The first and fourth categories of purported modifications are easily disposed of. The Court has already ruled that A9's linking activities are part of its function as an "information location tool," so the addition of links should not be considered in the section 512(a) analysis. As for differences in the appearance of URLs, such as the omission of "http://," A9 has established those differences are in the format, not content, of the URLs. *See* Supplemental Declaration of Matthew Amacker ("Supp. Amacker Decl.") ¶¶ 4-6, 8-9, Ex. 1. The same goes for differences in layout and fonts.

The second and third aspects of A9's search results, however, do raise triable issues as to whether they constitute modifications of content. As A9 now admits, for Toolbar users, it added a second column of search results representing the results retrieved from its "history server." The second column was displayed next to the first column, which contained results from the underlying search engine. SGI ¶ 24. A9 nonetheless contends that addition of the second column does not constitute a "modification" under section 512(a)(5) because the user's stored search results were not mixed with the regular search results. A9 also argues that the second column should be disregarded because the transmitted "material" at issue in this case is only the regular search results containing links to infringing images.

The distinction A9 draws between the two columns of search results is not convincing. A9 cites no authority for the legal proposition that this kind of an "addition" of content to the transmitted material is not a "modification." Indeed, by adding a second column of search results to the results received from the search engine, A9 changed the overall *content* provided to the user. This sets A9 apart from the conduit service that AOL provided in *Ellison v. Robertson*, 189 F. Supp. 2d 1051, 1072 (C.D. Cal. 2002),

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|----------|----------------------|------|------------------|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

*rev'd in part on other grounds*, 357 F.3d 1072 (9th Cir. 2004).  AOL's usenet servers simply transmitted newsgroup messages precisely as they were received from another usenet server.  Moreover, A9 is not correct that Perfect 10's copyright claim is based only on the regular search results; Perfect 10's infringement claim is based on *all* of the content A9 provided to the user, regardless of whether A9 was relaying content indexed by an underlying search engine or whether A9 served the content from its own "history server."  A9's addition of content to the transmitted material is inconsistent with section 512(a)'s limitation of protection to providers that are mere conduits for material.

Furthermore, Perfect 10 has provided uncontroverted evidence of differences in the search results using A9.com compared to the results for the identical search on the underlying search engine.  Zada Decl. ¶¶ 16-17.  The differences are not minor.  In one recent search, for example, A9.com yielded a total of four results, while Alexa.com, A9's current search engine provider, reported total results of about 948,000, and only one of the top six results on Alexa.com matched any of the A9.com results.  *Id.* ¶ 17, Ex. 6.  When Google was the search engine provider, there also were differences in the number and order of results.  Zada Decl. ¶¶ 18-19 (citing examples of searches from August 2005).  In response, A9 asserts that those differences are *not* due to A9's conduct, citing the testimony of Matthew Amacker.  He testified that A9 "does not modify," "reorder" or add "extra links or [] extra text" to the search results provided by the underlying search engine.  Def't's Application to File Exhibits Under Seal, Ex. 6 (Amacker Dep: 164:1-25).  Amacker did not, however, provide a factual explanation for the apparent differences in search results.  He merely speculated about why the underlying search engine might want to provide different results to A9 than it would provide on its own website.  *Id.* (Amacker Dep: 127:6-13); Supp. Amacker Decl. ¶ 3.  Given A9's failure to provide a non-speculative explanation for the differences in search results, and given that all justifiable inferences must be drawn in Perfect 10's favor, A9 has not met its burden of establishing the absence of a genuine issue of fact on the modification of content issue.
//
//
//
//
//
//

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

## IV.   CONCLUSION

For the foregoing reasons, the Court holds that there is no genuine issue of material fact regarding A9's compliance with section 512(i); it does comply.  However, there *are* genuine issues regarding two of the requirements of section 512(a).  Thus, the Court denies A9's motion for summary adjudication that it is entitled to section 512(a) safe harbor.

|  |  | : |  |
|---|---|---|---|
| Initials of Preparer | | SMO | |

# Schapiro Exhibit 20

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


VIACOM INTERNATIONAL, INC., COMEDY )
PARTNERS, COUNTRY MUSIC. )
TELEVISION, INC., PARAMOUNT )
PICTURES CORPORATION, and BLACK )
ENTERTAINMENT TELEVISION, LLC, )
                                 )
            Plaintiffs, )
                                 )
vs.                             ) NO. 07-CV-2103
                                 )
YOUTUBE, INC., YOUTUBE, LLC, )
and GOOGLE, INC., )
                                 )
            Defendants. )
_____ )
                                 )
THE FOOTBALL ASSOCIATION PREMIER )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all )
others similarly situated, )
                                 )
            Plaintiffs, )
vs.                             ) NO. 07-CV-3582
                                 )
YOUTUBE, INC., YOUTUBE, LLC, and )
GOOGLE, INC., )
                                 )
            Defendants. )
_____ )

VIDEOTAPED DEPOSITION OF THEODORA MICHAELS
SAN FRANCISCO, CALIFORNIA
SEPTEMBER 24, 2009

JOB NO. 17764

1

2      A P P E A R A N C E S :

3          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

4          Attorneys for Plaintiff and Witness

5             250 Hudson Street

6             8th Floor

7             New York, New York 10013-1413

8          BY:  ANNIKA K. MARTIN, ESQ.

9

10         MAYER BROWN, LLP

11         Attorneys for Defendant

12            1675 Broadway

13            New York, New York 10019-5820

14         BY:  CHRISTINE M. HERNANDEZ, ESQ.

15            AND

16            JASON KIRSCHNER, ESQ.

17

18      ALSO PRESENT:

19          NICHOLAS GUZMAN, Videographer

20

21

22

23

24

25

| 1 | 11:53:38 | Q. The second page of Exhibit 4, you will |
| 2 | 11:53:41 | notice that the YouTube URL to the allegedly |
| 3 | 11:53:44 | infringing video is listed; do you see that? |
| 4 | 11:53:47 | It is on the second page of Exhibit 4? |
| 5 | 11:53:49 | A. Yes. |
| 6 | 11:53:49 | Q. At the end of that paragraph? |
| 7 | 11:53:51 | Okay. And then if you compare that to |
| 8 | 11:53:53 | Exhibit 5, the URL that you give in your e-mail of |
| 9 | 11:53:59 | August 22nd, at 6:14 p.m., is that same URL, |
| 10 | 11:54:04 | correct? |
| 11 | 11:54:05 | A. Yes. |
| 12 | 11:54:05 | Q. And, to be clear, it's the only URL that |
| 13 | 11:54:08 | you include in this takedown notice to YouTube, is |
| 14 | 11:54:14 | Exhibit 5, right? |
| 15 | 11:54:16 | A. Yes. |
| 16 | 11:54:20 | Q. So in Exhibit 4, where you say, "Should |
| 17 | 11:54:22 | I include some of the other YouTube infringements |
| 18 | 11:54:26 | of this song," you do not, in fact, list any |
| 19 | 11:54:27 | additional infringements in Exhibit 5, in the |
| 20 | 11:54:27 | takedown notice; is that right? |
| 21 | 11:54:38 | A. Yes. |
| 22 | 11:54:55 | Q. With respect to the takedown notices |
| 23 | 11:54:56 | that Carlin directly sent to YouTube, did you ever |
| 24 | 11:54:59 | issue a retraction of any of those notices? |
| 25 | 11:55:03 | A. No. |

| 1 | 11:55:03 | Q. Did you ever receive a |
| 2 | 11:55:04 | counter-notification to any of those notices? |
| 3 | 11:55:08 | A. No. |
| 4 | 11:55:23 | Q. Setting aside the concept of a formal |
| 5 | 11:55:26 | counter-notice, have you ever received any |
| 6 | 11:55:29 | complaint, at all, from an individual, with |
| 7 | 11:55:32 | respect to a takedown notice you issued? |
| 8 | 11:55:34 | A. No. |
| 9 | 11:55:35 | Q. Approximately how many takedown notices |
| 10 | 11:56:22 | has Carlin sent directly to YouTube? |
| 11 | 11:56:25 | A. Fewer than one dozen. |
| 12 | 11:56:34 | Q. And generally, how quickly does YouTube |
| 13 | 11:56:37 | respond to that takedown notice? |
| 14 | 11:56:39 | A. Very quickly. |
| 15 | 11:56:42 | Q. Less than one day? |
| 16 | 11:56:45 | A. I don't remember specifically. I -- I |
| 17 | 11:56:47 | just recall that it was quickly. |
| 18 | 11:56:50 | Q. Well, if we take a look at Exhibit 5, |
| 19 | 11:56:52 | you will see that -- you will see that your |
| 20 | 11:57:11 | original notification -- excuse me, scratch that. |
| 21 | 11:57:18 | MS. MARTIN: Exhibit 3 is the original. |
| 22 | 11:57:21 | MS. HERNANDEZ: Thank you. |
| 23 | 11:57:21 | MS. MARTIN: You are welcome. |
| 24 | 11:57:22 | MS. HERNANDEZ: I knew I was looking at |
| 25 | 11:57:27 | the wrong exhibit. |

| 1 | 11:57:28 | BY MS. HERNANDEZ: |
| 2 | 11:57:38 | Q. Do you have Exhibit 3 in front of you? |
| 3 | 11:57:41 | A. Exhibit 3; yes, I do. |
| 4 | 11:57:47 | Q. You will see that your e-mail to the |
| 5 | 11:57:49 | copyright team at YouTube is from May 15th, |
| 6 | 11:57:52 | at 4:46 p.m.; is that right? |
| 7 | 11:57:56 | A. My original takedown notice? |
| 8 | 11:57:59 | MS. MARTIN: Objection. |
| 9 | 11:58:04 | Q. Around the middle of the first page? |
| 10 | 11:58:07 | A. Yes. |
| 11 | 11:58:08 | Q. Tuesday, May 15th, at 4:46 p.m.? |
| 12 | 11:58:12 | A. Yes. Mine shows 4:32. |
| 13 | 11:58:15 | MS. MARTIN: Yes. |
| 14 | 11:58:25 | MS. HERNANDEZ: I am actually going to |
| 15 | 11:58:26 | go ahead -- I apologize for the confusion. I |
| 16 | 11:58:30 | will enter another exhibit. |
| 17 | 11:58:31 | We will start over, and it will be |
| 18 | 11:58:43 | clear. I just can't get the right document |
| 19 | 11:58:47 | in front. |
| 20 | 11:58:48 | So Exhibit 6, and that is a document |
| 21 | 11:58:51 | Bates stamped CA-00025185386. |
| 22 | 11:58:55 | (Document bearing Bates |
| 23 | 10:16:23 | No. CA-00025185386 marked Carlin Exhibit 6 |
| 24 | 10:16:23 | for identification.) |
| 25 | | |

| 1 | 13:19:13 | an extensive colloquy with counsel on the |
| 2 | 13:19:13 | record, but, in terms of supplementation, I |
| 3 | 13:19:13 | mean, we have some takedown notices from the |
| 4 | 13:19:14 | Carlin production from July 2009, and from |
| 5 | 13:19:14 | December 2008. |
| 6 | 13:19:14 | MS. MARTIN:  As we got them, we sent |
| 7 | 13:19:14 | them, so I don't know that, but -- |
| 8 | 13:19:14 | MS. HERNANDEZ:  Dated July 13th, 2009, |
| 9 | 13:19:14 | the document is dated. |
| 10 | 13:19:14 | MS. MARTIN:  I understand it is after |
| 11 | 13:19:14 | the regular collection, we have been sending |
| 12 | 13:19:14 | takedown notices to you producing takedown |
| 13 | 13:19:14 | notices, even though there is no |
| 14 | 13:19:14 | supplementation, sort of overall.  I mean, |
| 15 | 13:19:14 | takedown notices for the Second Amended Class |
| 16 | 13:19:14 | Action Complaints may not have been produced, |
| 17 | 13:19:14 | yet, but they have been taken down, that is |
| 18 | 13:19:14 | my representation. |
| 19 | 13:19:15 | So what I mean is, we were under no |
| 20 | 13:19:15 | obligation to continue producing them because |
| 21 | 13:19:15 | there was no supplementation discussions.  So |
| 22 | 13:19:15 | the fact that we produced them afterwards is, |
| 23 | 13:19:15 | we just wanted the record to be complete. |
| 24 | 13:19:15 | And if we haven't gotten to the Second |
| 25 | 13:19:15 | Amended Class Action URL takedown notices, |

1   13:19:15       then we haven't gotten to it yet, the

2   13:19:15       production of them, not the takedown of them.

3   13:19:15       MS. HERNANDEZ:  Okay.

4   13:19:15  BY MS. HERNANDEZ:

5   13:19:15       Q.   And, Miss Michaels, after that extensive

6   13:19:16  colloquy among counsel, let me just make sure that

7   13:19:16  I have the record clear.

8   13:19:16       With respect to Carlin's actions, Carlin

9   13:19:16  has not sent any takedown notices for any of the

10  13:19:16  allegedly infringed clips asserted in this action,

11  13:19:16  right?

12  13:19:16       A.   Well, I have not reviewed the URLs in

13  13:19:16  this list because today's the first day I am

14  13:19:16  seeing it.  But, to my understanding, that is

15  13:19:16  correct.  I can't say with certainty, with respect

16  13:19:17  to any particular URLs, because I haven't reviewed

17  13:19:17  them.

18  13:19:17       Q.   Because you didn't review the complaints

19  13:19:17  prior to today's deposition?

20  13:19:17       A.   That's right.

21  13:19:17       Q.   Miss Michaels, who, at Carlin,

22  13:19:17  communicated with counsel in this case about this

23  13:19:17  action?

24  13:19:17       A.   Robert Bienstock, possibly Caroline

25  13:19:18  Bienstock.  I am not sure.

```
 1   13:19:18          Well -- and I have provided documents to
 2   13:19:18   Lieff Cabraser.
 3   13:19:18          Q.   Okay.  When you say, "provided
 4   13:19:18   documents," are they documents that were in your
 5   13:19:18   possession for potential production in this
 6   13:19:18   litigation?
 7   13:19:18          A.   Correct.
 8   13:19:18          Q.   Okay.  Who does Mr. Bienstock
 9   13:19:18   communicate with at counsel, with respect to
10   13:19:18   prospective litigation?
11   13:19:18          A.   I don't know.
12   13:19:18          Q.   Do you know how often Mr. Bienstock
13   13:19:18   communicates with counsel about litigation?
14   13:19:18          A.   I don't know.
15   13:19:18          Q.   Do you know what subjects Mr. Bienstock
16   13:19:18   communicates with counsel on?
17   13:19:18          A.   I don't know.
18   13:19:18          Q.   Did you discuss with Mr. Bienstock,
19   13:19:19   prior to this deposition, the communications that
20   13:19:19   he has with counsel concerning management of the
21   13:19:19   litigation?
22   13:19:19          A.   No.
23   13:19:19          Q.   If you could turn back to Exhibit 1,
24   13:19:19   miss Martin can hand it to you, if you could take
25   13:19:19   a look at Topic 8.
```

| 1 | 13:19:19 | A. Yes. |
| 2 | 13:19:19 | Q. You will see the reference in Topic 8, |
| 3 | 13:19:19 | to Carlin's role in monitoring the action and |
| 4 | 13:19:19 | responsibilities for managing counsel. |
| 5 | 13:19:19 | A. I am sorry? |
| 6 | 13:19:19 | Q. Sure. Paragraph 8, do you see that? |
| 7 | 13:19:19 | A. Yes. |
| 8 | 13:19:19 | Q. Carlin's role in monitoring the action |
| 9 | 13:19:19 | and responsibilities for managing counsel, do you |
| 10 | 13:19:19 | see that? |
| 11 | 13:19:19 | A. Yes. |
| 12 | 13:19:19 | Q. Did you prepare to testify on that |
| 13 | 13:19:19 | particular subject matter? |
| 14 | 13:19:19 | A. Briefly. |
| 15 | 13:19:20 | Q. Okay. And did that preparation involve |
| 16 | 13:19:20 | just talking with Mr. Bienstock? |
| 17 | 13:19:20 | A. Yes. |
| 18 | 13:19:20 | Q. And you said Mr. Bienstock is the |
| 19 | 13:19:20 | primary person communicating with counsel about |
| 20 | 13:19:20 | this action, is that right? |
| 21 | 13:19:20 | A. Yes. |
| 22 | 13:19:20 | Q. But you don't have any knowledge as to |
| 23 | 13:19:20 | the subjects or the frequency of Mr. Bienstock's |
| 24 | 13:19:20 | conversations with counsel, in terms of managing |
| 25 | 13:19:20 | this action? |

| | | | |
|---|---|---|---|
| 1 | 13:22:49 | A. | It would have been Robert Bienstock. |
| 2 | 13:22:51 | Q. | Would you assume that to be the case? |
| 3 | 13:23:00 | A. | Well, that would be the case for any |
| 4 | 13:23:01 | | class action. If we -- just in terms of class |
| 5 | 13:23:06 | | action law, in general, my understanding is that |
| 6 | 13:23:08 | | class representatives are required to actually be |
| 7 | 13:23:11 | | representative of the class, so I am sure that is |
| 8 | 13:23:13 | | something we would have considered. |
| 9 | 13:23:14 | Q. | Miss Michaels, you said before that you |
| 10 | 13:23:24 | | are familiar with the YouTube web site, right? |
| 11 | 13:23:27 | A. | Yes. |
| 12 | 13:23:28 | Q. | Have you watched videos on YouTube? |
| 13 | 13:23:30 | A. | Yes. |
| 14 | 13:23:31 | Q. | About how many videos do you believe you |
| 15 | 13:23:33 | | watched? |
| 16 | 13:23:34 | A. | Oh, I couldn't put a number on it, quite |
| 17 | 13:23:37 | | a few, 100, 200. |
| 18 | 13:23:38 | | MS. MARTIN: I just want to make a quick |
| 19 | 13:23:40 | | statement: This is a portion where she is |
| 20 | 13:23:42 | | testifying as personal, and not Carlin. |
| 21 | 13:23:45 | | MS. HERNANDEZ: Sure. |
| 22 | 13:23:45 | | MS. MARTIN: All right, great. |
| 23 | 13:23:47 | BY MS. HERNANDEZ: | |
| 24 | 13:23:47 | Q. | Have you posted videos to YouTube? |
| 25 | 13:23:49 | A. | Yes. |

| | | |
|---|---|---|
| 1 | 13:23:49 | Q. And what user name did you use when you |
| 2 | 13:23:52 | posted videos? |
| 3 | 13:23:54 | A. My poster name is Theodora Michaels. |
| 4 | 13:23:57 | Q. That is one name? |
| 5 | 13:23:58 | A. (No response.) |
| 6 | 13:23:59 | Q. What videos did you post? |
| 7 | 13:24:01 | A. Most of videos that I posted are of |
| 8 | 13:24:06 | videos I took of my baby niece. |
| 9 | 13:24:07 | Q. You said "most," what other sorts of |
| 10 | 13:24:10 | videos do you post? |
| 11 | 13:24:11 | A. It's, other videos are videos which are |
| 12 | 13:24:14 | excerpts of a talk that I gave which was |
| 13 | 13:24:18 | videotaped by my husband. It is called "Tolkien |
| 14 | 13:24:27 | v. Newline, The Overview of the Recent Lawsuit in |
| 15 | 13:24:38 | Plain English." It is excerpts of that talk. |
| 16 | 13:24:40 | Then there is one video of me |
| 17 | 13:24:44 | introducing the actor, Sean Astin, at an event; |
| 18 | 13:24:48 | there is one, rather poor quality, video that I |
| 19 | 13:24:55 | took of a bird in my backyard; and there is one |
| 20 | 13:25:02 | video which is a 40-second compilation of clips |
| 21 | 13:25:09 | from the TV show, "The View." There was one |
| 22 | 13:25:12 | episode where my husband was in the audience, and |
| 23 | 13:25:16 | I excerpted the 40 seconds where he is visible, |
| 24 | 13:25:21 | zoomed in on him and set it to different music and |
| 25 | 13:25:24 | posted that. |

| | | |
|---|---|---|
| 1 | 13:25:25 | Q. Approximately how frequently do you post |
| 2 | 13:25:34 | videos? |
| 3 | 13:25:34 | A. It is in spurts, so I would say, of the |
| 4 | 13:25:39 | ones that I have posted, it was in about three |
| 5 | 13:25:42 | groupings. |
| 6 | 13:25:42 | Q. And you mentioned a video of you |
| 7 | 13:25:45 | introducing Sean Astin, I guess? |
| 8 | 13:25:48 | A. Yes. |
| 9 | 13:25:49 | Q. Who shot that video? |
| 10 | 13:25:50 | A. My husband. |
| 11 | 13:25:51 | Q. Okay. |
| 12 | 13:25:51 | MS. HERNANDEZ: I am going to mark, as |
| 13 | 13:26:18 | Exhibit 10, some printouts from the YouTube |
| 14 | 13:26:21 | web site of Miss Michaels' channel. |
| 15 | 13:26:26 | (Printouts of Miss Michaels' channel on |
| 16 | 10:16:23 | YouTube marked Carlin Exhibit 10 for |
| 17 | 10:16:23 | identification.) |
| 18 | 13:26:27 | MS. HERNANDEZ: And just for the record, |
| 19 | 13:26:56 | the date on which these documents were |
| 20 | 13:26:59 | printed from the YouTube web site is on the |
| 21 | 13:27:01 | bottom of the first two pages, were printed |
| 22 | 13:27:03 | on September 18th, and the third page was |
| 23 | 13:27:06 | printed on September 24th. |
| 24 | 13:27:08 | BY MS. HERNANDEZ: |
| 25 | 13:27:08 | Q. Did you get a chance to review it? |

| | | |
|---|---|---|
| 1 | 13:27:17 | A.   Yes. |
| 2 | 13:27:18 | Q.   Okay. |
| 3 | 13:27:18 | Is this a true and correct copy of the |
| 4 | 13:27:25 | way the Theodora Michaels YouTube channel appears |
| 5 | 13:27:29 | on YouTube? |
| 6 | 13:27:29 | A.   Yes.  With the exception that my baby |
| 7 | 13:27:32 | niece looks such cuter on the original. |
| 8 | 13:27:36 | Q.   Fair enough, fair enough. |
| 9 | 13:27:38 | And then, if you look on the third page |
| 10 | 13:27:40 | of this exhibit -- |
| 11 | 13:27:41 | A.   Yes. |
| 12 | 13:27:41 | Q.   -- it says, "Videos (11)," and then |
| 13 | 13:27:47 | there is 11, sort of thumbnail images of videos. |
| 14 | 13:27:52 | Have you ever posted any videos to |
| 15 | 13:27:55 | YouTube -- first -- let me strike that. |
| 16 | 13:27:58 | The videos that are shown here on the |
| 17 | 13:28:01 | third page of this exhibit, are they, in fact, all |
| 18 | 13:28:04 | the videos that you uploaded? |
| 19 | 13:28:05 | A.   Yes. |
| 20 | 13:28:05 | Q.   Have you ever hosted any videos to |
| 21 | 13:28:08 | YouTube that are not shown on the third page of |
| 22 | 13:28:10 | this exhibit? |
| 23 | 13:28:10 | A.   No. |
| 24 | 13:28:10 | Q.   And you see the thumbnail image and the |
| 25 | 13:28:20 | title, "Best of the View"; do you see that? |

1   13:28:23        A.    Yes.

2   13:28:23        Q.    And it states, "one month ago," is that

3   13:28:28    correct, in indicating that you posted that video

4   13:28:31    about a month ago?

5   13:28:32        A.    Yes.

6   13:28:33        Q.    And is this video, "Best of the View",

7   13:28:39    the one you referenced earlier, with your husband

8   13:28:42    in the audience?

9   13:28:43        A.    Yes.

10  13:28:43        Q.    Okay.

11  13:28:44            MS. HERNANDEZ:   I am going to mark as

12  13:28:59            Exhibit 11, again, two pages printed from the

13  13:29:02            YouTube web site, of a video posted by user

14  13:29:07            name Theodora Michaels, the user name for

15  13:29:11            Miss Michaels, and these were printed on

16  13:29:12            September 18th.)

17  13:29:14            (Printouts of Miss Michael's channel on

18  10:16:23            YouTube marked Carlin Exhibit 11 for

19  10:16:23            identification.)

20  13:29:14            THE WITNESS:   Okay.

21  13:29:49    BY MS. HERNANDEZ:

22  13:29:49        Q.    Have you had a chance to look at it?

23  13:29:51        A.    Yes.

24  13:29:51        Q.    And Miss Michaels, is this a true and

25  13:29:53    correct copy of the YouTube web page for the "Best

| | | |
|---|---|---|
| 1 | 13:29:57 | of The View" video that you testified you |
| 2 | 13:30:00 | uploaded? |
| 3 | 13:30:00 | A.   Yes. |
| 4 | 13:30:00 | Q.   Okay. |
| 5 | 13:30:01 | And this is a clip from the TV show, |
| 6 | 13:30:05 | "The View," from an episode that aired on |
| 7 | 13:30:09 | August 5th, 2009; that is right? |
| 8 | 13:30:11 | A.   Yes. |
| 9 | 13:30:13 | Q.   And "The View" plays on the network ABC, |
| 10 | 13:30:16 | right? |
| 11 | 13:30:16 | A.   Yes. |
| 12 | 13:30:16 | Q.   How did you come to have, in your |
| 13 | 13:30:19 | possession, the video clip that you uploaded as |
| 14 | 13:30:22 | "Best of the View"? |
| 15 | 13:30:22 | A.   I downloaded it from -- from either the |
| 16 | 13:30:29 | official ABC web site or the official web site for |
| 17 | 13:30:32 | "The View."  I forget which one. |
| 18 | 13:30:35 | Q.   And you write, in the top right-hand |
| 19 | 13:30:46 | box, "I've never seen the show, but that is my |
| 20 | 13:30:49 | Kevin in the red shirt, dancing with the cast of |
| 21 | 13:30:52 | Hair, on 8/5/09." |
| 22 | 13:30:57 | A.   I zoomed in on him as much as iMovie |
| 23 | 13:31:06 | allows. |
| 24 | 13:31:06 | Q.   "Smiley Face," did you write that? |
| 25 | 13:31:11 | A.   Yes. |