# SCHAPIRO DECLARATION EXHIBITS CONTINUED

# Schapiro Exhibit 21

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

VIACOM INTERNATIONAL, INC., COMEDY )
PARTNERS, COUNTRY MUSIC.            )
TELEVISION, INC., PARAMOUNT         )
PICTURES CORPORATION, and BLACK     )
ENTERTAINMENT TELEVISION, LLC,      )
                                    )
            Plaintiffs,             )
                                    )
    vs.                             ) NO. 07-CV-2203
                                    )
YOUTUBE, INC., YOUTUBE, LLC,        )
and GOOGLE, INC.,                   )
                                    )
            Defendants.             )
_____)
                                    )
THE FOOTBALL ASSOCIATION PREMIER    )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all     )
others similarly situated,          )
                                    )
            Plaintiffs,             )
    vs.                             ) NO. 07-CV-3582
                                    )
YOUTUBE, INC., YOUTUBE, LLC, and    )
GOOGLE, INC.,                       )
                                    )
            Defendants.             )
_____)

HIGHLY CONFIDENTIAL
VIDEOTAPED DEPOSITION OF THERESA TORRANCE

LOS ANGELES, CALIFORNIA

WEDNESDAY, JANUARY 21, 2009

1               JANUARY 21, 2009

2                   8:41 a.m.

3

4      HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF

5      THERESA TORRANCE, at MAYER BROWN ROWE & MAW,

6      350 South Grand Avenue, 25th Floor, Los Angeles,

7      California pursuant to notice, before me,

8      ANDREA M. IGNACIO HOWARD, CLR, CCRR, RPR, CSR

9      License No. 9830.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    A P P E A R A N C E S:

2

3    FOR NATIONAL MUSIC PUBLISHERS' ASSOCIATION; RODGERS

4    & HAMMERSTEIN ORGANIZATION; STAGE THREE MUSIC (US),

5    INC.; EDWARD B. MARKS MUSIC COMPANY; FREDDY

6    BIENSTOCK MUSIC COMPANY D/B/A BIENSTOCK PUBLISHING

7    COMPANY, AND ALLEY MUSIC CORPORATION:

8        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

9        By:  DAVID S. STELLINGS, Esq.

10           ANNIKA K. MARTIN, Esq.

11       250 Hudson Street, 8th Floor

12       New York, New York 10013-1413

13       (212) 355-9500 akmartin@lchb.com

14

15   FOR THE DEFENDANTS YOUTUBE, INC., YOUTUBE, LLC and

16   GOOGLE, INC.:

17       MAYER BROWN, LLP.

18       By:  REGINALD R. GOEKE, Esq.

19           AMANDA HINE, Esq.

20       1909 K Street, N.W.

21       Washington, D.C., 20006-1101

22       (202) 263-3241 rgoeke@mayerbrown.com;

23               ahine@mayerbrown.com

24

25

1      A P P E A R A N C E S:

2

3          ALSO PRESENT:

4              Mitch Lerman, Videographer.

5

6                      ---oOo---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          TORRANCE

2   09:06:21     A    Yes.

3   09:06:21     Q    Do you -- do you have anyone who works under

4   09:06:25   you in that capacity?

5   09:06:26     A    Yes.

6   09:06:26     Q    Who is that?

7   09:06:27     A    I had Amy Lynch, and before her, Kenneth

8   09:06:36   Buchanan.

9   09:06:39     Q    Anyone else?

10  09:06:40     A    That's it.

11  09:06:41     Q    Okay.

12  09:06:42     A    Sorry.  There was one brief person.  Lisa,

13  09:06:47   and I can't recall her last name.

14  09:06:52     Q    Okay.  We'll call her Lisa "Blank."

15  09:06:58          If any of those three individuals had been

16  09:07:02   asked to perform a search to determine if the works

17  09:07:06   identified on pages six and seven were licensed for

18  09:07:08   use on YouTube, would you have been aware of that?

19  09:07:11     A    Not necessarily.

20  09:07:12     Q    And why is that?

21  09:07:14     A    Well, they could have discussed it with

22  09:07:16   Lionel Conway and done it as well.

23  09:07:20     Q    To your knowledge, did that happen?

24  09:07:22     A    Not to my knowledge.

25  09:07:22     Q    And other than individuals who worked in the

TORRANCE

| 1 | | TORRANCE |
|---|---|---|

09:07:28  licensing group, were you aware of anyone else at

09:07:32  Stage Three who would typically review Stage Three's

09:07:38  file to determine if a work had been licensed?

09:07:41     A  Jonathan Ross, who was the executive

09:07:45  assistant to Lionel Conway, and Amy Lynch.

09:07:51     Q  And what is Amy Lynch's position?

09:07:55     A  She assists the president and also assisted

09:07:58  me.

09:08:01     Q  And, to your knowledge, did either of those

09:08:03  individuals perform any search to determine whether

09:08:07  the works identified on pages six and seven had been

09:08:10  licensed to anyone for use on the Internet?

09:08:12     A  Not to my knowledge.

09:08:13     Q  Okay.  Do you know whether at the time that

09:08:29  this complaint was filed, whether Stage Three had

09:08:36  issued any takedown notice to YouTube to take down the

09:08:39  works identified on pages six and seven?

09:08:42     A  No.

09:08:42     Q  No, they did not?

09:08:46     A  Right.  Correct.

09:08:49     Q  Do you know whether subsequent to bringing

09:08:54  this action, whether Stage Three has issued any

09:08:58  takedown notice to YouTube with respect to the works

09:09:00  identified on pages six and seven?

```
 1                          TORRANCE

 2    09:09:02      A   No, they did not.

 3    09:09:05          MR. STELLINGS:  He's asking if you know.

 4    09:09:07          Do you?  Do you know whether Stage Three has

 5    09:09:10     since the lawsuit started?

 6    09:09:13          THE WITNESS:  Since before the class action,

 7    09:09:14     right, is what you asked?

 8    09:09:16          MR. GOEKE:  Q.  This -- no, the first

 9    09:09:17     question was since before the class action.  I think

10    09:09:20     your answer to that was "no."

11    09:09:21          My second question is, since the class action

12    09:09:24     has been started, whether Stage Three has issued any

13    09:09:27     takedown notice to YouTube with respect to these

14    09:09:30     works?

15    09:09:31      A   No, not that I know of.

16    09:09:32      Q   Okay.  And other than through the complaint

17    09:09:56     itself, are you aware of any other fashion in which

18    09:10:00     YouTube may have been put on notice that Stage Three

19    09:10:05     was claiming that the works identified on pages six

20    09:10:08     and seven were infringing as posted on YouTube?

21    09:10:12          MR. STELLINGS:  Object to the form of the

22    09:10:13     question, but you can answer, if you know.

23    09:10:15          THE WITNESS:  Not that I'm aware.

24    09:10:24          MR. GOEKE:  Q.  Do you know whether Stage

25    09:10:35     Three has identified any other works over -- over
```

1          TORRANCE

2  09:10:38   which it intends to assert a claim in this action?

3  09:10:41      A   Not that I'm aware of.

4  09:10:42      Q   Can you briefly describe for me the Stage

5  09:11:29   Three business in term -- what -- as what you

6  09:11:32   understand it does in terms of how it generates

7  09:11:35   revenue?

8  09:11:38          MR. STELLINGS:   Object to the form of the

9  09:11:39   question.

10  09:11:40         MR. GOEKE:   Yeah, it's a -- it's a --

11  09:11:41         MR. STELLINGS:   It's very broad.

12  09:11:42         MR. GOEKE:   It's very, very broad.

13  09:11:43      Q   Yeah, I'm just -- I'm just trying to get your

14  09:11:45   understanding of what Stage Three's business is, if

15  09:11:47   you could just generally describe the term.

16  09:11:50      A   We are in the business of music publishing.

17  09:11:56   We control the intellectual property compositions

18  09:12:01   through the signing of writers and through

19  09:12:07   acquisitions, and we license those compositions and

20  09:12:16   are compensated for licensing those compositions.

21  09:12:31      Q   And Stage Three's revenue is brought in as a

22  09:12:36   percentage of the licensing fees that you obtain; is

23  09:12:39   that fair?

24  09:12:43      A   Can you be more specific?

25  09:12:45      Q   Yeah.  Maybe I'll ask it more generally.



# Schapiro Exhibit 22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE FOOTBALL ASSOCIATION PREMIER
LEAGUE LIMITED, BOURNE CO. (together
with its affiliate MURBO MUSIC
PUBLISHING, INC.), CHERRY LANE
MUSIC PUBLISHING COMPANY, INC.,
CAL IV ENTERTAINMENT LLC, ROBERT
TUR d/b/a LOS ANGELES NEWS SERVICE,
NATIONAL MUSIC PUBLISHERS'
ASSOCIATION, THE RODGERS &
HAMMERSTEIN ORGANIZATION, STAGE
THREE MUSIC (US), INC., EDWARD B.
MARKS MUSIC COMPANY, FREDDY
BIENSTOCK MUSIC COMPANY d/b/a
BIENSTOCK PUBLISHING COMPANY,
ALLEY MUSIC CORPORATION, X-RAY
DOG MUSIC, INC., FÉDÉRATION
FRANÇAISE DE TENNIS, THE MUSIC
FORCE LLC, and SIN-DROME RECORDS,
LTD. on behalf of themselves and all others
similarly situated,

        Plaintiff,

     v.

YOUTUBE, INC., YOUTUBE, LLC and
GOOGLE, INC.,

        Defendants.

Case No. 07 Civ. 3582 (LLS)

**THE RODGERS & HAMMERSTEIN
ORGANIZATION'S RESPONSES AND
OBJECTIONS TO DEFENDANTS' FIRST
SET OF REQUESTS FOR ADMISSION TO
THE RODGERS & HAMMERSTEIN
ORGANIZATION**

Pursuant to Rule 36(a) of the Federal Rules of Civil Procedure, Named Plaintiff The

Rodgers & Hammerstein Organization ("RHO") hereby responds and objects to the Requests for

Admission (the "Requests") propounded by Defendants YouTube, Inc., YouTube LLC and

Google, Inc. ("YouTube" or "Defendants").

## GENERAL OBJECTIONS

The following general objections and statements ("General Objections") apply to each of the particular Requests propounded by Defendants and are hereby incorporated within each response set forth below. All of the responses set forth below are subject to and do not waive the General Objections:

1. RHO objects to the Requests on the ground that RHO is still in the process of gathering and analyzing information relevant to these Requests. RHO has not completed its review and analysis of all discovery obtained by the parties in this and the related *Viacom* action. Additionally, defendants and non-parties have produced more than 1.5 million pages of documents since October 13, 2009. RHO has not yet examined each document produced by defendants or otherwise in this action for the purpose of determining which individual allegations of the Second Amended Class Action Complaint ("Complaint") it might support, nor has RHO completed depositions that may more fully reveal facts and information relevant to these Requests. As discovery is not yet closed, including deposition and expert discovery, and the production of remaining data and/or documents, RHO's responses to these Requests are preliminary and tentative subject to completion of discovery and following an adequate opportunity to review and analyze all discovery in this action.

2. In responding to these Requests, RHO does not concede the relevance, materiality or admissibility of any of the admissions or responses sought herein. RHO's responses are made subject to and without waiving any objections as to relevancy, materiality, admissibility, vagueness, ambiguity, competency or privilege.

3. RHO does not waive any of its rights to object on any ground to the use of its responses herein.

4.      RHO objects to the Requests to the extent that they set forth compound, conjunctive or disjunctive statements.

5.      RHO objects to each request, instruction or definition to the extent that they seek to impose obligations beyond those imposed or authorized by the Federal Rules of Civil Procedure, the Civil Local Rules of the United States District Court for the Southern District of New York ("Civil Local Rules"), or the applicable standing orders and orders of this Court.

6.      RHO objects to each request, instruction or definition to the extent that it would require the disclosure of information that is outside the scope of information relevant to this case or that is otherwise improper.

7.      RHO objects to each request, instruction or definition to the extent that it would require the disclosure of information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

8.      RHO objects to each request, instruction or definition to the extent that it would require the disclosure of information generated or compiled by or at the direction of RHO's counsel.

9.      RHO objects to each request, instruction or definition to the extent that it would require the compilation or review of information otherwise within Defendants' possession, custody or control or more easily accessible to Defendants.

10.     RHO objects to each request, instruction or definition to the extent that they are vague, ambiguous, overly broad or unduly burdensome.

11.     RHO objects to each request, instruction or definition to the extent that they purport to require separate responses for each "Accused Clip" as compound and unduly burdensome.

12.    RHO objects to each request to the extent that they fail to specify an applicable time period and are thereby vague, ambiguous and overbroad.

13.    RHO objects to each request as premature to the extent that it calls for expert opinion.

14.    RHO objects to each request to the extent that it calls for a legal conclusion.

15.    RHO objects to each request, instruction or definition to the extent that they purport to require RHO to respond to Defendants' characterizations of legal contentions or call for the application of law to fact to the extent such request seeks disclosure of privileged information.

16.    RHO objects to the definitions of "RHO", "RHO's", "you" and "your" as overly broad and unduly burdensome, and further objects to the extent it seeks to impose obligations broader than those specified by Federal Rules of Civil Procedure 26, and Civil Local Rule 26.3(c)(5). RHO further objects on the grounds that the definition includes an unknown and unknowable number of "present and former agents, employees, representatives, accountants, investigators, attorneys," "person[s] acting or purporting to act on its behalf", and "other person[s] otherwise subject to its control, which controls it, or is under common control with them." Moreover, this definition includes "affiliates," "divisions," and "units" without any explanation of those terms' meaning. RHO further objects to the extent these definitions call for privileged information and to the extent they seek information outside of Plaintiffs' possession, custody or control. In responding to the Interrogatories, Plaintiffs will construe the terms "RHO", "RHO's", "you" and "your" to mean Named Plaintiff RHO.

17.    RHO objects to the definitions of "Work(s) In Suit" and "Accused Clip(s)" as compound, vague and ambiguous. RHO further objects to the extent these definitions call for

privileged information. RHO further objects to the definitions of "Work(s) In Suit" and "Accused Clip(s)" to the extent such definitions attempt to limit the number or identity of infringed works or instances of infringement for which RHO seeks recovery. As set forth at paragraph 74 of the Second Amended Complaint, the infringed works specified by RHO in this litigation are "representative of Protected Works that are and have been infringed by Defendants and/or YouTube's users." Similarly, the infringements identified in Exhibit A to the Complaint and within the Complaint are representative and not an exhaustive list of the ongoing and massive infringement by Defendants. RHO reserves all rights to identify additional infringements and infringed works.

18.     RHO objects to the definition of "substantially DMCA-compliant takedown notice" as vague and ambiguous as it requires a qualitative judgment and lacks common or ready definition.

19.     Where RHO indicates a lack of information or knowledge sufficient to admit or deny a specific request, this lack of information or knowledge follows a reasonable inquiry by RHO, and the information known or readily obtainable by RHO is insufficient to enable the party to admit or deny.

20.     RHO reserves the right to supplement or amend these responses. These responses should not be construed as, and do not constitute, a waiver of RHO's right to prove additional facts at summary judgment or trial or any other rights.

21.     These general objections are continuing and are incorporated by reference in RHO's answers to each of the Requests set forth below. Any objection or lack of objection to any portion of these Requests is not an admission. RHO reserves the right to amend, supplement, modify, or correct these responses and objections as appropriate.

## RHO'S RESPONSES AND OBJECTIONS
## TO SPECIFIC REQUESTS FOR ADMISSION

### REQUEST FOR ADMISSION NO. 1:

Admit that at all relevant times YouTube was a "service provider" as that term is used in 17 U.S.C. § 512(k)(1)(B).

### RESPONSE TO REQUEST FOR ADMISSION NO. 1:

RHO objects to this Request on the grounds that it is vague and ambiguous, including the term "at all relevant times." RHO further objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections, RHO admits that the YouTube website in part, provides or operates facilities for, among other things, "online services or network access" as those terms are used in 17 U.S.C. § 512(k)(1)(B), and otherwise denies the request.

### REQUEST FOR ADMISSION NO. 2:

Admit that at all relevant times, YouTube stored material "at the direction of a user" as that phrase is used in 17 U.S.C. § 512(c)(1).

### RESPONSE TO REQUEST FOR ADMISSION NO. 2:

RHO objects to this Request as vague and overbroad, including with respect to the terms "at all relevant times" and "material," which are undefined terms. RHO further objects to this Request to the extent it calls for a legal conclusion. YouTube is a media entertainment enterprise that engages in an array of directly and secondarily infringing activities that are neither storage nor at the direction of a user, such as, without limitation, transforming, copying and distributing material without the direction of a user. Subject to and without waiving the foregoing objections, RHO denies this Request.

**REQUEST FOR ADMISSION NO. 3:**

Admit that the material you allege to infringe your copyrights in this case was stored on the youtube.com service "at the direction of a user" as that phrase is used in 17 U.S.C. § 512(c)(1).

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

RHO objects to this Request for Admission as vague and overbroad, including with respect to the term "material," which is an undefined term. RHO further objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections, RHO denies this Request.

**REQUEST FOR ADMISSION NO. 4:**

Admit that all of your copyright infringement claims in this action allege infringement of copyrights "by reason of the storage at the direction of a user" of material that resides on a system or network controlled or operated by or for YouTube, as set forth in 17 U.S.C. § 512(c)(1).

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

RHO objects to this Request for Admission as vague and overbroad, including with respect to the term "material," which is an undefined term. RHO further objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections, RHO denies this Request.

**REQUEST FOR ADMISSION NO. 5:**

Admit that at all relevant times, YouTube had "designated an agent to receive notifications of claimed infringement" as set forth in 17 U.S.C. § 512(c)(2).

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

RHO objects to this Request on the grounds that it is vague and ambiguous, including the term "at all relevant times." Subject to and without waiving the foregoing objections, RHO denies this Request.

**REQUEST FOR ADMISSION NO. 6:**

Admit that on every occasion that you sent YouTube a DMCA takedown notice relating to an accused clip, YouTube responded "expeditiously," as that phrase is used in 17 U.S.C. § 512(c)(1)(A)(iii), to remove or disable access to the material claimed to be infringing.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

RHO objects to this Request on the grounds that it is vague and ambiguous, including the term "material". RHO further objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections, RHO denies this Request.

**REQUEST FOR ADMISSION NO. 7:**

Admit that on every occasion that you sent YouTube a DMCA takedown notice relating to an accused clip, YouTube responded within seventy-two business hours to remove or disable access to the material claimed to be infringing.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

RHO objects to this Request on the grounds that it is vague and ambiguous, including the term "material." Subject to and without waiving the foregoing objections, RHO denies this Request.

**REQUEST FOR ADMISSION NO. 8:**

Admit that for all of the accused clips, prior to receiving a DMCA takedown notice from you identifying those specific clips, YouTube did not have "actual knowledge" that the material

was infringing, as described in 17 U.S.C. § 512(c)(1)(A)(i).

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

RHO objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections, RHO denies this Request.

**REQUEST FOR ADMISSION NO. 9:**

Admit that on no occasion did YouTube fail to expeditiously remove or disable access to an accused clip to the extent YouTube became aware of facts or circumstances from which infringing activity was apparent, as described in 17 U.S.C. § 512(c)(1)(A)(ii).

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

RHO objects to this Request as compound. RHO further objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections, RHO denies this Request.

**REQUEST FOR ADMISSION NO. 10:**

Admit that YouTube lacked the right and ability to control the infringing activity alleged by you in this case, as described in 17 U.S.C. § 512(c)(l)(B).

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

RHO objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections, RHO denies this Request.

**REQUEST FOR ADMISSION NO. 11:**

Admit that YouTube did not receive a financial benefit directly attributable to the infringing activity alleged by you in this case, as described in 17 U.S.C. § 512(c)(1)(B).

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

RHO objects to this Request to the extent it calls for a legal conclusion. Subject to and

without waiving the foregoing objections, RHO denies this Request.

**REQUEST FOR ADMISSION NO. 12:**

Admit that at all relevant times, access to and use of the youtube.com service was provided to users by YouTube free and without charge.

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

RHO objects to the request as compound. RHO further objects to the terms "at all relevant times", "access" and "use" as vague and ambiguous. For example, "use" of and "access" to the youtube.com website includes various activities, such as advertising. Subject to and without waiving the foregoing objections, RHO denies that "use" of the youtube.com website was provided free and without charge.

**REQUEST FOR ADMISSION NO. 13:**

Admit that at all relevant times YouTube had adopted and reasonably implemented, and informed its subscribers and account holders of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of YouTube who were repeat infringers, as described in 17 U.S.C. § 512(i)(1)(A).

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

RHO objects to this Request as vague and ambiguous, including the terms "at all relevant times", "reasonably implemented" and "appropriate circumstances". RHO further objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections, RHO denies this Request.

**REQUEST FOR ADMISSION NO. 14:**

Admit that at no time relevant to this lawsuit have there been any "standard technical measures" in existence as that term is defined in 17 U.S.C. §§ 512(i)(1)(B) and 512(i)(2).

**RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

RHO objects to this Request as vague and ambiguous, including the term "in existence". RHO further objects to this Request to the extent it calls for a legal conclusion. RHO further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. Subject to and without waiving the foregoing objections, RHO denies this Request.

**REQUEST FOR ADMISSION NO. 15:**

Admit that you do not claim in this case that YouTube failed to comply with 17 U.S.C. §§ 512(i)(1)(B) (i.e., YouTube accommodates and not interfere with "standard technical measures" to the extent any exist).

**RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

RHO objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections, RHO denies this Request.

**REQUEST FOR ADMISSION NO. 16:**

Admit that some of the accused clips were uploaded or authorized to be uploaded by you onto the youtube.com service.

**RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

RHO denies this Request.

**REQUEST FOR ADMISSION NO. 17:**

Admit that some of the accused clips were uploaded or authorized to be uploaded by you onto the youtube.com service for marketing or promotional purposes.

**RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

Subject to and without waiving the foregoing objections, RHO denies this Request.

**REQUEST FOR ADMISSION NO. 18:**

Admit that you have uploaded videos or authorized videos to be uploaded onto the youtube.com service.

**RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

RHO objects to this Request on the grounds that it is vague and ambiguous, including the term "service". RHO further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. RHO further objects to this Request on the ground that it requires the compilation or review of information otherwise within Defendants' possession, custody or control and more easily accessible to Defendants. Subject to and without waiving the foregoing objections, RHO admits that it uploaded one video presentation to YouTube that was at all times kept "private" by RHO and was viewable only by certain executives at RHO and Imagem, and denies that the video contained any work-in-suit or any of RHO's licensed works.

**REQUEST FOR ADMISSION NO. 19:**

Admit that you have uploaded videos or authorized videos to be uploaded onto the youtube.com service for marketing and promotional purposes.

**RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

RHO objects to this Request on the grounds that it is vague and ambiguous, including the terms "service", "marketing", and "promotional". RHO further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. RHO further objects to this Request on the ground that it requires the compilation or review of information otherwise within Defendants' possession, custody or control and more easily accessible to Defendants. Subject to and without waiving the foregoing objections, RHO denies

this Request.

**REQUEST FOR ADMISSION NO. 20:**

Admit that, with respect to some videos or accused clips uploaded or authorized to be uploaded by you to the youtube.com service, you concealed the fact that the uploading of the clips or videos was done by you or at your direction.

**RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

RHO objects to this Request on the grounds that it is vague and ambiguous, including the terms "service" and "concealed." Subject to and without waiving the foregoing objections, RHO denies this Request.

**REQUEST FOR ADMISSION NO. 21:**

Admit that you agreed to YouTube's Terms of Service when you uploaded videos and the accused clips, or authorized videos and the accused clips to be uploaded onto the youtube.com service.

**RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

RHO objects to this Request on the grounds that it is vague and ambiguous, including the terms "service" Subject to and without waiving the foregoing objections, RHO admits this Requests only insofar as the Terms of Service are legally enforceable and that RHO would not have been permitted to upload videos without accepting Defendants' non-negotiable terms. Subject to and without waiving the foregoing objections, RHO admits that it uploaded one video presentation to YouTube that was at all times kept "private" by RHO and was viewable only by certain executives at RHO and Imagem, and denies that the video contained any work-in-suit or any of RHO's licensed works. RHO denies this Request in all other respects.

**REQUEST FOR ADMISSION NO. 22:**

Admit that you expressly licensed YouTube under your copyrights as to all accused clips and videos that you or your agent uploaded onto the youtube.com service.

**RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

RHO objects to this Request to the extent it calls for a legal conclusion and not the admission or denial of a fact. RHO further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. Subject to and without waiving the foregoing objections, RHO denies this Request, but admits that YouTube's terms of service on the YouTube website purport to claim a "worldwide, non-exclusive, royalty-free, sublicenseable and transferable license to use, reproduce, distribute, prepare derivative works of, display, and perform the User Submissions in connection with the YouTube Website and YouTube's (and its successors' and affiliates') business, including without limitation for promoting and redistributing part or all of the YouTube Website (and derivative works thereof) in any media formats and through any media channels" with respect to all videos uploaded to the YouTube website..

**REQUEST FOR ADMISSION NO. 23:**

Admit that you have issued licenses that grant the licensee the right to exhibit and distribute the work on websites, including YouTube.com.

**RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

RHO objects to this Request on the grounds that it is vague and ambiguous, including the terms "exhibit", "distribute", "the work" and "on websites". RHO further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. RHO further objects to this Request on the ground that any rights extended to a licensee of RHO

content do not extend to parties such as unauthorized uploaders of content or YouTube, neither of whom derive any rights under such license. Subject to and without waiving the foregoing objections, RHO denies that language granting rights in a license can be read in isolation, and states that it must be read in light of other terms and restrictions in that license. RHO admits that it has granted a limited number of licenses that grant certain rights, subject to various limitations, including without limitation, limitations on duration, territory, and use of musical compositions only in connection with particular video footage and in some cases, limitations to particular websites; among such licenses, there are an even smaller number that have granted licensees the right to use certain musical compositions on YouTube in combination with certain specified footage and in exchange for the payment of a license fee, subject to such additional restrictions, such as duration, territory and other restrictions of the type described above.

## REQUEST FOR ADMISSION NO. 24:

Admit that you have issued licenses for works-in-suit that grant the licensee the right to exhibit and distribute the work on websites, including YouTube.com.

## RESPONSE TO REQUEST FOR ADMISSION NO. 24:

RHO objects to this Request on the grounds that it is vague and ambiguous, including the terms "exhibit", "distribute", "the work" and "on websites". RHO further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. RHO further objects to this Request on the ground that any rights extended to a licensee of RHO content do not extend to parties such as unauthorized uploaders of content or YouTube, neither of whom derive any rights under such license. Subject to and without waiving the foregoing objections, RHO denies that language granting rights in a license can be read in isolation, and states that it must be read in light of other terms and restrictions in that license. RHO admits that

it has granted a limited number of licenses that grant certain rights, subject to various limitations, including without limitation, limitations on duration, territory, and use of musical compositions only in connection with particular video footage and in some cases, limitations to particular websites; among such licenses, there are an even smaller number that have granted licensees the right to use certain musical compositions on YouTube in combination with certain specified footage and in exchange for the payment of a license fee, subject to such additional restrictions, such as duration, territory and other restrictions of the type described above. RHO admits that there are some licenses that have granted the licensee the right to exploit a work-in-suit in certain specific and identifiable contexts on certain specified websites, including youtube.com, subject to the various restrictions identified above. See also RHO's responses to Requests nos. 26-29.

## REQUEST FOR ADMISSION NO. 25:

Admit that on no occasion did you inform YouTube of the presence of any authorized videos on the YouTube.com site.

## RESPONSE TO REQUEST FOR ADMISSION NO. 25:

RHO objects to this Request on the ground that it is vague and ambiguous, including the terms "inform" and "any authorized videos." RHO further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. Subject to and without waiving the foregoing objections, RHO denies this Request to the extent it implies that RHO has an obligation to inform YouTube of the presence of "any authorized videos" on the YouTube website and further denies this Request to the extent it implies that YouTube is not on active or constructive notice whether it is authorized to exploit the videos on its own website, and further denies this request to the extent it implies that YouTube does not have access to information furnished by RHO that would allow YouTube to determine if the presence of videos

containing RHO content are authorized. As a business practice, it is ordinarily incumbent upon the party exploiting content, i.e. YouTube, to seek and obtain appropriate license as well as information concerning the owner and/or administrator of which it is exploiting. Such information is readily and publicly available including through public databases identifying RHO as the administrator of and/or owner of the works in suit and other RHO content.

**REQUEST FOR ADMISSION NO. 26:**

Admit that the license agreement produced at RH00063998-64003 grants the licensee the right to exhibit and distribute the work on websites, including YouTube.com.

**RESPONSE TO REQUEST FOR ADMISSION NO. 26:**

RHO objects to this Request on the grounds that it is vague and ambiguous, including the terms "exhibit", "distribute", "the work" and "on websites". RHO objects to this Request on the grounds that the requested matter is not relevant to this case, because there is no evidence that Defendants or the uploader of any infringing clip has represented that they have a license to post RHO content on YouTube. RHO further objects on the ground that any rights extended to a licensee of RHO content do not extend to parties such as unauthorized uploaders of content or YouTube, neither of whom derive any rights under such license. Subject to and without waiving the foregoing objections, RHO states that the license produced at the Bates numbers above grants certain rights to exploit RHO's content on the Internet subject to the express terms of the agreement, including the fee paid by the licensee. In the case of the license listed above, the use of the work is limited to a 35-second portion of the composition, synchronized with the described video, for use in-context only during a two-year term only.

**REQUEST FOR ADMISSION NO. 27:**

Admit that the license agreement discussed in the email chain produced at RH00064869-

907 grants the licensee the right to exhibit and distribute the work on websites, including YouTube.com.

**RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

RHO objects to this Request on the grounds that it is vague and ambiguous, including the terms "exhibit", "distribute", "the work" and "on websites". RHO objects to this Request on the grounds that the requested matter is not relevant to this case, because there is no evidence that Defendants or the uploader of any infringing clip has represented that they have a license to post RHO content on YouTube. RHO further objects on the ground that any rights extended to a licensee of RHO content do not extend to parties such as unauthorized uploaders of content or YouTube, neither of whom derive any rights under such license. Subject to and without waiving the foregoing objections, RHO states that the license produced at the Bates numbers above grants certain rights to exploit RHO's content on the Internet subject to the express terms of the agreement, including the fee paid by the licensee. In the case of the license listed above, the use of the work is limited to a 60-second portion of the composition, synchronized with the described video, for use in-context only during a nine-month term.

**REQUEST FOR ADMISSION NO. 28:**

Admit that the license agreement produced at RH00066694-98 grants the licensee the right to exhibit and distribute the work on websites, including YouTube.com

**RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

SRHO objects to this Request on the grounds that it is vague and ambiguous, including the terms "exhibit", "distribute", "the work" and "on websites". RHO objects to this Request on the grounds that the requested matter is not relevant to this case, because there is no evidence that Defendants or the uploader of any infringing clip has represented that they have a license to

post RHO content on YouTube. RHO further objects on the ground that any rights extended to a licensee of RHO content do not extend to parties such as unauthorized uploaders of content or YouTube, neither of whom derive any rights under such license. Subject to and without waiving the foregoing objections, RHO states that the license produced at the Bates numbers above grants certain rights to exploit RHO's content on the Internet subject to the express terms of the agreement, including the fee paid by the licensee. In the case of the license listed above (which is a duplicate of the license listed in Request 27), the use of the work is limited to a 60-second portion of the composition, in synchronization with the described video, for use in-context only during a nine-month term.

**REQUEST FOR ADMISSION NO. 29:**

Admit that the license agreement produced at RH00064614-16 grants the licensee the right to exhibit and distribute the work on websites, including YouTube.com

**RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

RHO objects to this Request on the grounds that it is vague and ambiguous, including the terms "exhibit", "distribute", "the work" and "on websites". RHO objects to this Request on the grounds that the requested matter is not relevant to this case, because there is no evidence that Defendants or the uploader of any infringing clip has represented that they have a license to post RHO content on YouTube. RHO further objects on the ground that any rights extended to a licensee of RHO content do not extend to parties such as unauthorized uploaders of content or YouTube, neither of whom derive any rights under such license. Subject to and without waiving the foregoing objections, RHO states that the license produced at the Bates numbers above grants certain rights to exploit RHO's content on the Internet subject to the express terms of the agreement, including the fee paid by the licensee. In the case of the license listed above, the use

of the work is limited to a 7-, 16- or 30-second portion of the composition, in synchronization with the described video, for use in-context only.

**REQUEST FOR ADMISSION NO. 30:**

Admit that you never informed YouTube of the existence of the license agreements set forth in Requests 26-29.

**RESPONSE TO REQUEST FOR ADMISSION NO. 30:**

RHO objects to this Request on the grounds that the requested matter is outside the scope of information relevant to this case. Subject to and without waiving the foregoing objections, RHO denies this Request to the extent it implies that RHO has any obligation to inform YouTube of the existence of these license agreements. As a business practice, it is ordinarily incumbent upon the party exploiting content, i.e. YouTube, to seek and obtain appropriate license as well as information concerning the owner and/or administrator of which it is exploiting. Such information is readily and publicly available including through public databases identifying RHO as the administrator of and/or owner of the works in suit and other RHO content. RHO further denies this Request for the reasons set forth in Requests nos. 26-29.

**REQUEST FOR ADMISSION NO. 31:**

Admit that the presence on the youtube.com website of videos embodying the works in suit can have the effect of increasing consumer demand for those works.

**RESPONSE TO REQUEST FOR ADMISSION NO. 31:**

RHO objects to this Request on the grounds that it is vague and ambiguous, including the phrases "can have the effect" and "consumer demand." RHO further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. RHO further objects to this request on the ground that it seeks RHO's opinion regarding an

incomplete hypothetical question, not the admission or denial of a fact. Subject to and without waiving the foregoing objections, RHO denies that the presence of videos on Youtube.com has the effect of increasing consumer demand, including, without limitation, when the works are being made available for free on youtube.com and are a substitution of the products sold or licensed by RHO to third parties for a fee and/or otherwise damage RHO's business.

**REQUEST FOR ADMISSION NO. 32:**

Individually for each accused clip, admit that you did not send a DMCA takedown notice to YouTube within one week of becoming aware of that clip's presence on YouTube.

**RESPONSE TO REQUEST FOR ADMISSION NO. 32:**

RHO objects to this Request on the grounds that it is vague and ambiguous, including the term "becoming aware." RHO further objects to this Request on the ground that it calls for the disclosure of information protected by the attorney-client privilege and/or the work-product doctrine. RHO further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. RHO further objects to this request on the ground that it misconstrues the parties' respective obligations under applicable law. Subject to and without waiving the foregoing objections, RHO denies this Request to the extent that many DMCA takedown notices were sent to YouTube within one week of RHO discovering the infringing content. RHO states that, because of the huge volume of infringements of its works on the YouTube website, it notified YouTube in a manner compliant with the DMCA as expeditiously as possible after determining that each YouTube video that it claims as infringing in the Complaints in this action infringed its content.

**REQUEST FOR ADMISSION NO. 33:**

Individually for each accused clip, admit that you did not send a DMCA takedown notice

to YouTube within one month of becoming aware of that clip's presence on YouTube.

**RESPONSE TO REQUEST FOR ADMISSION NO. 33:**

RHO objects to this Request on the grounds that it is vague and ambiguous, including the term "becoming aware." RHO further objects to this Request on the ground that it calls for the disclosure of information protected by the attorney-client privilege and/or the work-product doctrine. RHO further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. RHO further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. RHO further objects to this request on the ground that it misconstrues the parties' respective obligations under applicable law. Subject to and without waiving the foregoing objections, RHO denies this Request to the extent that many DMCA takedown notices were sent to YouTube within one month of RHO discovering the infringing content. RHO states that, because of the huge volume of infringements of its works on the YouTube website, it notified YouTube in a manner compliant with the DMCA as expeditiously as possible after determining that each YouTube video that it claims as infringing in the Complaints in this action infringed its content.

**REQUEST FOR ADMISSION NO. 34:**

Individually for each accused clip, admit that you did not send a DMCA takedown notice to YouTube within two months of becoming aware of that clip's presence on YouTube.

**RESPONSE TO REQUEST FOR ADMISSION NO. 34:**

RHO objects to this Request on the grounds that it is vague and ambiguous, including the term "becoming aware." RHO further objects to this Request on the ground that it calls for the disclosure of information protected by the attorney-client privilege and/or the work-product doctrine. RHO further objects to this Request on the ground that the requested matter is outside

the scope of information relevant to this case. RHO further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. RHO further objects to this request on the ground that it misconstrues the parties' respective obligations under applicable law. Subject to and without waiving the foregoing objections, RHO denies this Request to the extent that many DMCA takedown notices were sent to YouTube within two months of RHO discovering the infringing content. RHO states that, because of the huge volume of infringements of its works on the YouTube website, it notified YouTube in a manner compliant with the DMCA as expeditiously as possible after determining that each YouTube video that it claims as infringing in the Complaints in this action infringed its content.

**REQUEST FOR ADMISSION NO. 35:**

Admit that, to date, RHO has not sent DMCA takedown notices to YouTube for all of the accused clips.

**RESPONSE TO REQUEST FOR ADMISSION NO. 35:**

RHO states that it sent DMCA takedown notices for all of the infringing clips identified to Defendants in the April 30, 2009 letter, and further states that upon information and belief, infringing URLs that were listed in the First and Second Amended Complaint were taken down by Defendants pursuant to the information provided in the Complaints, which fulfilled the requirements of a DMCA notice. For all other accused clips, RHO denies this Request.

**REQUEST FOR ADMISSION NO. 36:**

Admit that some of your works in suit are co-owned by third parties.

**RESPONSE TO REQUEST FOR ADMISSION NO. 36:**

RHO objects to this Request on the grounds that it is vague and ambiguous, including the terms and "third party" and "co-owned". Subject to and without waiving the foregoing

objections, RHO denies this Request.

## REQUEST FOR ADMISSION NO. 37:

Admit that for the works in suit co-owned by third parties, the co-owners are not required to consult with you or seek your permission before licensing the work.

## RESPONSE TO REQUEST FOR ADMISSION NO. 37:

RHO objects to this Request on the grounds that it is vague and ambiguous, including the terms and "third party" and "co-owned". Subject to and without waiving the foregoing objections, RHO denies this Request.

## REQUEST FOR ADMISSION NO. 38:

Individually for each accused clip, admit that you did not consult with your sub-publishers to ensure that the clip was unauthorized appear on the YouTube.com site.

## RESPONSE TO REQUEST FOR ADMISSION NO. 38:

RHO objects to this request on the grounds that it is vague and ambiguous, including the terms "consult" and "ensure". RHO further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. RHO further objects to this Request on the ground that it calls for the disclosure of information protected by the attorney-client privilege and/or the work-product doctrine. Subject to and without waiving the foregoing objections, RHO denies this Request to the extent it implies that RHO is obligated to consult with its sub-publishers to establish that each accused clip was unauthorized to appear on the YouTube website, and admits that in certain cases it did not contact its sub-publisher prior to requesting that YouTube take down an infringing clip, because in those cases RHO's sub-publishers either do not have authority under the express terms of the agreements between them and RHO to post content to youtube.com or to authorize third parties to posts clips containing

RHO content on youtube.com, a website that is available worldwide, or the sub-publisher is required to seek permission from RHO before issuing a license to grant the right to exploit RHO content on the internet. Only RHO's Italian sub-publisher has the authority to grant licenses for the use of RHO works on the internet, but that authority is limited to the territory of Italy *only*, and thus excludes YouTube and other worldwide web sites unless the content is geo-blocked to Italy.

## REQUEST FOR ADMISSION NO. 39:

Individually for each accused clip, admit that you did not consult with the co-owner(s) of the work-in-suit to ensure that the clip was unauthorized appear on the YouTube.com site.

## RESPONSE TO REQUEST FOR ADMISSION NO. 39:

RHO objects to this request on the grounds that it is vague and ambiguous, including the terms "consult", "ensure" and "co-owner". RHO further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. RHO further objects to this Request on the ground that it calls for the disclosure of information protected by the attorney-client privilege and/or the work-product doctrine. Subject to and without waiving the foregoing objections, RHO denies this request, because there are no co-owners for the works in suit and RHO controls the administrative rights for each of the works in suit.

## REQUEST FOR ADMISSION NO. 40:

Individually for each accused clip, admit that you did not consult with the writer of the work-in-suit to ensure that the clip was authorized to appear on the YouTube.com site.

## RESPONSE TO REQUEST FOR ADMISSION NO. 40:

RHO objects to this request on the grounds that it is vague and ambiguous, including the terms "consult", "ensure" and "writer". RHO further objects to this Request on the ground that

the requested matter is outside the scope of information relevant to this case. Subject to and without waiving the foregoing objections, RHO denies this Request to the extent it implies that RHO is obligated to consult with the "writer" to ensure that each accused clip was unauthorized to be on the YouTube website, and admits that, with respect to each accused clip, RHO has no obligation to consult with the "writer" of the work prior to taking action against Defendants for infringements of RHO's works.

**REQUEST FOR ADMISSION NO. 41:**

Individually for each accused clip, admit that you did not consult with any of your licensees to ensure that the clip was not authorized to appear on the YouTube.com site.

**RESPONSE TO REQUEST FOR ADMISSION NO. 41:**

RHO objects to this Request on the grounds that it is vague and ambiguous, including the word "consult" and "ensure". RHO further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. Subject to and without waiving the foregoing objections, RHO denies that, with respect to each accused clip, any of the infringing clips involved licensed materials within the scope of the license.

**REQUEST FOR ADMISSION NO. 42:**

Admit that you have not signed up to use YouTube's Content Verification Program.

**RESPONSE TO REQUEST FOR ADMISSION NO. 42:**

RHO objects on the grounds that it is vague and ambiguous and that YouTube has used several euphemisms to refer to a number of "tools" that it offers to content owners. RHO further objects to this Request on the ground that it calls for the disclosure of information protected by the attorney-client privilege and/or the work-product doctrine. RHO further objects to this Request on the ground that the requested matter is outside the scope of information relevant to

this case. To the extent that the Content Verification Program "tool" is an electronic substitute for a DMCA takedown notice, RHO admits that it has not used this "tool", and otherwise denies the Request.

**REQUEST FOR ADMISSION NO. 43:**

Admit that you have not signed up to use YouTube's Content ID tool.

**RESPONSE TO REQUEST FOR ADMISSION NO. 43:**

RHO objects on the grounds that that it is vague and ambiguous and YouTube has used several euphemisms to refer to a number of "tools" that it offers to content owners. RHO further objects to this Request on the ground that it calls for the disclosure of information protected by the attorney-client privilege and/or the work-product doctrine. RHO further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. To the extent that Content ID is a tool that refers to digital fingerprinting technology, RHO states that Defendants have not made their digital fingerprinting technology readily available to Plaintiffs on reasonable terms.

**REQUEST FOR ADMISSION NO. 44:**

Admit that your writers (i.e. writers signed by RHO) have posted videos on YouTube.

**RESPONSE TO REQUEST FOR ADMISSION NO. 44:**

RHO objects to this request on the grounds that it is vague and ambiguous, including the terms "post" and "writer". Subject to and without waiving the foregoing objections, RHO admits that one of its writers has posted videos of his own compositions on YouTube. None of that writer's compositions are works-in-suit.

**REQUEST FOR ADMISSION NO. 45:**

Admit that on no occasion prior to November 7, 2007 did you inform YouTube of the

presence and location of any video on the YouTube.com site that allegedly infringed your copyrights.

**RESPONSE TO REQUEST FOR ADMISSION NO. 45:**

RHO objects to this Request on the ground that it requires the compilation or review of information otherwise within Defendants' possession, custody or control and more easily accessible to Defendants. Subject to and without waiving the foregoing objections, RHO denies this Request.

**REQUEST FOR ADMISSION NO. 46:**

Admit that on no occasion prior to November 7, 2007 did you inform YouTube of the presence of any accused clip on the YouTube.com site.

**RESPONSE TO REQUEST FOR ADMISSION NO. 46:**

RHO objects to this Request on the ground that it requires the compilation or review of information otherwise within Defendants' possession, custody or control and more easily accessible to Defendants. Subject to and without waiving the foregoing objections, RHO denies this Request, and states that a copy of the Amended Complaint, listing video clips on the YouTube website that infringed RHO's works, was submitted to YouTube's counsel on October 8, 2007, and that the Amended Complaint, containing the same list of video clips, was filed with the Court on November 7, 2007.

**REQUEST FOR ADMISSION NO. 47:**

Admit that you retracted DMCA takedown notices sent to YouTube for one or more of your works.

**RESPONSE TO REQUEST FOR ADMISSION NO. 47:**

Subject to and without waiving the foregoing objections, RHO denies this Request.

Dated: January 12, 2010

Respectfully submitted,

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York  10013-1413
Phone:      (212) 355-9500
Facsimile:  (212) 355-9592

By: _____
     Annika K. Martin



# Schapiro Exhibit 23



Off 5 Exhibit 6
Date 7 2 , 09 Page 1 of 5
Depo/Case LIN
K.R. Kim Reichert, CSR 10986

1 of 1 DOCUMENT

Copyright 2006 Factiva, a Dow Jones and Reuters Company
All Rights Reserved

# Dow Jones Factiva

(Copyright (c) 2006, Dow Jones & Company, Inc.)

## THE WALL STREET JOURNAL

The Wall Street Journal

June 27, 2006 Tuesday

**SECTION:** Pg. A1

**LENGTH:** 2176 words

**HEADLINE:** Garage Brand: With NBC Pact, YouTube Site Tries to Build a Lasting Business --- Internet Video Service Sketches A Path to Profitability;
Difficult Copyright Issues --- Receiving 60,000 Clips a Day

**BYLINE:** By Kevin J. Delaney

**BODY:**

Over the past decade, large media and tech companies have tried to build mass-market services offering video over the Internet. Someone has finally succeeded big: a startup with 35 employees and an office over a pizza restaurant.

Through YouTube Inc.'s Web service, consumers view short videos more than 70 million times a day, ranging from clips of unicycling jugglers and aspiring musicians to vintage Bugs Bunny cartoons and World Cup soccer highlights recorded from TV. Users post more than 60,000 videos daily, with a limit of 10 minutes for most clips.

The big question for YouTube now: Can it turn this loose bazaar of videos into an enduring business?

It will take a step in that direction today when it gets a big endorsement from General Electric Co.'s NBC Universal. NBC plans to announce that it will make available on YouTube promotional video clips for some of its popular shows, such as "The Office," "Saturday Night Live" and "The Tonight Show with Jay Leno." NBC plans to market its new fall lineup using clips on YouTube, and is holding a contest for consumers to submit their own promotional videos for "The Office." It will also buy ads on the site and promote YouTube with mentions on television. That's a significant step for NBC, which earlier had demanded that YouTube take down clips of its programming.

YouTube is a classic Silicon Valley garage-to-glory tale. Two friends, Chad Hurley and Steve Chen, started a company in a garage to tackle an issue they were grappling with personally: how to share home videos online. They maxed out Mr. Chen's credit card on business expenses before a financier bankrolled them. They built a huge consumer following under the noses of richer, better-known companies with vastly larger payrolls. The young company burst forth as the dominant player.

But for every Apple Computer Inc. or Google Inc., Silicon Valley's history is filled with dozens of hot startups that gained 15 minutes of fame but couldn't sustain their brief success. YouTube's executives, including some alumni of Internet flameouts, are now furiously planning strategy and making deals to sustain their upward arc.

YouTube's 29-year-old chief executive, Mr. Hurley, and its 27-year-old chief technology officer, Mr. Chen, see two big challenges. The first is to figure out how to make money. The second is to address concerns of copyright holders that many of their TV and movie clips, music videos and songs are available through YouTube without permission.

Messrs. Hurley and Chen, who worked together at eBay Inc.'s PayPal electronic-payment unit, are trying to tackle both issues with a major stroke. They're quietly building an online-ad system with Google-scale ambitions, which they intend to use to entice producers to post their best videos on YouTube. When the system rolls out later this year, You-Tube will share revenue from ads that appear alongside some videos with the producers of those videos. Messrs. Hurley and Chen hope that Hollywood will come to see YouTube much as it now views network TV: a legitimate means of distributing content with revenue and promotional payoff.

With stepped-up ad sales, YouTube could become a bigger target for lawsuits. While much of its content consists of home-shot videos, critics say the most-viewed items often involve some type of copyright infringement. On a recent day, top-viewed videos included clips from "Today" and "The Daily Show," a shaky "Radiohead" concert video and World Cup soccer highlights recorded from TV.

YouTube says it removes clips when content owners request it, under a procedure outlined in the Digital Millennium Copyright Act of 1998. In some cases, copyright owners such as TV producers put the clips on its site themselves in order to generate buzz or to test ideas.

NBC has been among the media companies most actively requesting YouTube to take down videos that users have uploaded without permission. With today's agreement, NBC seeks to promote its shows to YouTube's audience while getting assurances that material it doesn't want on the site will be removed. "YouTube has done their work on protecting copyright and we have assurances from them they will continue to do so," says NBC Universal Television Group Chief Marketing Officer John Miller. "They are a bright light, they have a lot of traffic," he adds.

Based in San Mateo, Calif., YouTube got its start in February 2005, after a dinner party attended by Mr. Hurley, who studied design in college and sports shoulder-length hair, and Mr. Chen, a Taiwan-born engineer with small hoops in each ear. They took videos of the party, but grew frustrated when they tried to share the footage with friends. They set out to build an online service that would let them do just that. At the time, Mr. Chen was still working at PayPal. Mr. Hurley, who had designed PayPal's current logo during his 1999 job interview there, was doing consulting work.

They set up shop in Mr. Hurley's Menlo Park garage. In May 2005, they released a test version of the site on the Web with no marketing. Early videos available prominently featured Mr. Chen's cat, PJ.

The site quickly built up a following. It stood out from the growing corps of online video services, including an offering from Google, for its simplicity. YouTube serves up videos from its Web site directly or from other sites where people insert them, generally not requiring users to download any special software. To accomplish this technical feat, YouTube drew on open-source software and wrote its own code. The service can handle about 110 video formats and 64 audio formats used by digital photo and video cameras and cellphones.

It also let consumers display its videos on other sites, such as blogs or personal pages on News Corp.'s popular MySpace social networking service. Users could easily upload the video and email links to YouTube videos to each other. The influential techie site Slashdot's mention of YouTube helped boost traffic.

After seeing Mr. Chen at a party last summer, former PayPal Chief Financial Officer Roelof Botha put some clips from his honeymoon in Italy on the site. Now a partner at venture-capital firm Sequoia Capital -- known for backing Apple, Cisco, Google and Yahoo, among others -- Mr. Botha invited the YouTube co-founders to his office in mid-August. Mr. Botha says that their project shares a key attribute with some of those tech legends: "building something for a personal need that winds up being universally useful."

By September, users were viewing YouTube videos more than a million times a day. Plotting strategy with Mr. Botha in October, the YouTube founders still believed their main business opportunity involved individuals sharing home videos. The next month, they announced Sequoia had injected $3.5 million to help finance the company.

But it started becoming clear to YouTube that users were sharing more than just their own videos, and viewership stretched far beyond circles of friends. By the time of the site's official public release on Dec. 15, consumers were viewing YouTube videos more than three million times daily. Millions of users had watched clips starring Brazilian soccer star Ronaldinho posted by sneaker giant Nike Inc. A few days later, someone posted to YouTube a skit from NBC's "Saturday Night Live" dubbed "Lazy Sunday," featuring two grown men rapping about cupcakes, red licorice candy and "The Chronicles of Narnia" film.

After it turned up among user favorites on the site, Mr. Hurley on Dec. 28 emailed a contact at NBC. He asked whether NBC had provided the clip itself, and volunteered to remove it from YouTube if the video had been shared

without NBC's permission. The NBC staffer replied that he didn't know the answer, but would look into it, Mr. Hurley says.

Consumers viewed "Lazy Sunday" six million times before NBC on Feb. 3 contacted YouTube to request that it be removed, along with hundreds of other clips including Jay Leno monologues and video from the Winter Olympics.

YouTube's rising popularity led to run-ins with others. In December, MySpace blocked users from playing You-Tube videos on their MySpace pages. Consumer outcry followed and MySpace activated the YouTube feature again. A News Corp. executive later said MySpace was concerned that the YouTube videos contained porn, and only reactivated them once YouTube had given it assurances about porn filtering. (YouTube says it removes any pornography after users point it out.) Shortly after the incident, MySpace released its own video service to compete with YouTube.

As YouTube users began complaining that the system was slowing, the company spent more on technology. In January, it began displaying limited advertising to help offset its rising costs for computer equipment and telecom lines. Mr. Chen predicts YouTube will open one new data center with computers to run its service each month this year.

Thanks partly to its use on MySpace and the Saturday Night Live clip, YouTube quickly became a cultural phe-nomenon. Amateur video enthusiasts created their own video tributes to "Lazy Sunday" that they titled "Lazy Monday" and "Lazy Muncie." Videos of young people, including two Chinese students, hamming it up in front of Webcams while lip synching to popular songs were viewed millions of times.

Along the way, the entertainment world began exploring how it might benefit from YouTube's audience. The Weinstein Co., a movie company run by producers Bob and Harvey Weinstein, in April premiered the first eight min-utes of the film "Lucky Number Slevin" on YouTube. Viacom Inc.'s Paramount Vantage movie unit last Friday posted exclusively on YouTube an 83-second animated clip poking fun at Al Gore to promote its "An Inconvenient Truth" film. By midday yesterday, it had been viewed nearly 600,000 times. "As a marketer you almost can't find a better place than YouTube to promote your movie," says Andrew Lin, vice president for interactive marketing at Paramount Van-tage. Viacom owns YouTube rival ifilm.

Still, there were bumps. C-SPAN asked YouTube to take down popular clips of an appearance by television per-sonality Stephen Colbert at the White House Correspondents' Association dinner in April. C-SPAN distributed the clips free through Google's video service.

Some top tech and entertainment executives have lambasted the company -- while others have showed grudging admiration. Microsoft Corp. Chairman Bill Gates in May told attendees of The Wall Street Journal's "D" technology conference that, given the copyright issues and the lack of a clear path to profitability, his company would be "in a lot of trouble" if it did what YouTube has. But he also acknowledged spending time on the site. "I saw a bunch of old Harlem Globetrotters movies up there the other night, it's great," he said.

Google and other YouTube competitors also stepped up their games. Google simplified its video-upload interface to match what YouTube had been offering. Yahoo this month upgraded its video service to allow consumers to submit videos directly to it, competing more squarely with YouTube.

Rumors have circulated in recent months that some major media companies have expressed interest in buying YouTube. In response Mr. Hurley says the company is not for sale. He says an initial public offering in the future is a possibility.

The YouTube co-founders decline to provide many specific details of the ad system they expect to gradually begin rolling out next month. But they say they're not fond of commercials that play before a user can watch a video, known in the industry as "prerolls." YouTube recently hired Yahoo sales executive Tony Nethercutt to build its sales team.

Consumers can now submit videos from their mobile phones, and Messrs. Chen and Hurley say they one day should be able to view YouTube clips on phones and other devices. They say they'll potentially expand beyond video to audio and other content.

For now, YouTube remains by far the most-visited video site on the Web. It attracted more than 20 million U.S. us-ers in May, compared with 11.1 million for Microsoft's MSN Video and around seven million for both MySpace's video site and Google Video, according to research firm NetRatings Inc. YouTube says behavior indicates that users are most interested in viewing clips three minutes or shorter.

Garage Brand: With NBC Pact, YouTube Site Tries to Build a Lasting Business --- Internet Video Service Sketches A Path to Profitability;  Difficult Copyright Issues --- Receiving 60,000 Clips a Day Th

"We're at the fork in the road where Google was at maybe four or five years ago before they rolled out" their current ad model, says Mr. Chen.

A big question is whether more advertising and promotions will drive away some users who like the site's edgy feeling. Consumers spoke up earlier this year when YouTube's home page began to highlight in yellow links to videos from official content partners, questioning the preferential treatment. In response, YouTube quickly removed the yellow highlighting from the page.

---

Online Today: WSJ.com subscribers can read an article about Veoh, a YouTube competitor that recently decided to pull all pornographic videos from its site, at WSJ.com/OnlineToday.



A video on YouTube, *above, viewed over one million times since June 1.*

**Eye Catching**

YouTube's unique audience compared to those of other top video sites, in millions:

YouTube ▶
MSN Video ▼
Google Video    vids.myspace.com

Dec. 2005    Jan. 2006    Feb.    March    April    May

Source: NetRatings Inc.



*Steve Chen*

Garage Brand: With NBC Pact, YouTube Site Tries to Build a Lasting Business --- Internet Video Service Sketches A Path to Profitability; Difficult Copyright Issues --- Receiving 60,000 Clips a Day Th



**Chad Hurley**

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** June 28, 2006



# Schapiro Exhibit 24

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

VIACOM INTERNATIONAL, INC., COMEDY )
PARTNERS, COUNTRY MUSIC TELEVISION, )
INC., PARAMOUNT PICTURES )
CORPORATION, AND BLACK )
ENTERTAINMENT TELEVISION, LLC, )
                            )
        Plaintiffs, )  No. 07-CV-2203
                            )
     vs.                  )
                            )
YOUTUBE, INC., YOUTUBE, LLC, AND )
GOOGLE, INC., )
                            )
        Defendants.  ·)
_____)
                            )
THE FOOTBALL ASSOCIATION PREMIER )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all )
others similarly situated, )
                            )
        Plaintiffs, )  No. 07-CV-3582
                            )
     vs.                  )
                            )
YOUTUBE, INC., YOUTUBE, LLC, AND )
GOOGLE, INC., )
                            )
        Defendants.  )
_____)

C O N F I D E N T I A L
VIDEOTAPED DEPOSITION OF ANDREW LIN
THURSDAY, JULY 2, 2009, 10:02 A.M.
LOS ANGELES, CALIFORNIA

Job No. 17155

DAVID FELDMAN WORLDWIDE, INC.
450 7th Avenue - Ste 2803, New York, NY 10123 (212)705-8585

148aaf66-7405-4ede-b447-b22b926bc84f

```
 1                UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF NEW YORK

 3

     VIACOM INTERNATIONAL, INC., COMEDY )
 4   PARTNERS, COUNTRY MUSIC TELEVISION,)
     INC., PARAMOUNT PICTURES           )
 5   CORPORATION, AND BLACK             )
     ENTERTAINMENT TELEVISION, LLC,     )
 6                                      )
                 Plaintiffs,            ) No. 07-CV-2203
 7                                      )
            vs.                         )
 8                                      )
     YOUTUBE, INC., YOUTUBE, LLC, AND   )
 9   GOOGLE, INC.,                      )
                                        )
10               Defendants.            )
                                        )
11   _____)
                                        )
     THE FOOTBALL ASSOCIATION PREMIER   )
12   LEAGUE LIMITED, BOURNE CO., et al.,)
     on behalf of themselves and all    )
13   others similarly situated,         )
                                        )
14               Plaintiffs,            ) No. 07-CV-3582
                                        )
15          vs.                         )
                                        )
16   YOUTUBE, INC., YOUTUBE, LLC, AND   )
     GOOGLE, INC.,                      )
17                                      )
                 Defendants.            )
18   _____)

19               Videotaped deposition of ANDREW LIN taken

20   on behalf of the Defendants, before

21   Kimberly Reichert, Certified Shorthand Reporter No.

22   10986 for the State of California, commencing at

23   10:02 a.m. on Thursday, July 2, 2009, at Mayer Brown

24   located at 350 South Grand Avenue, 25th Floor, Los

25   Angeles, California.
```

148aaf66-7405-4ede-b447-b22b926bc84f

1   APPEARANCES OF COUNSEL:

2   For Plaintiff VIACOM INTERNATIONAL, INC., et al. and the
     witness:

3

             JENNER & BLOCK, LLP

4           BY:  SCOTT WILKENS, ESQ.
             1099 New York Ave NW

5           Suite 900
             Washington, District of Columbia  20001

6           (202) 639-6072
             (202) 661-4832 Fax

7           swilkens@jenner.com

8

9   For Defendants YOUTUBE, INC., YOUTUBE, LLC AND GOOGLE,
     INC.:

10

             WILSON SONSINI GOODRICH & ROSATI

11          BY:  BART E. VOLKMER, ESQ.
             650 Page Mill Road

12          Palo Alto, California  94304-1050
             (650) 565-3508

13          (650) 493-6811 Fax
             bvolkmer@wsgr.com

14

15

     ALSO PRESENT:  David Cavanaugh, Videographer

16

17

18

19

20

21

22

23

24

25

148aaf66-7405-4ede-b447-b22b926bc84f

| | | |
|---|---|---|
| 10:21:13 | 1 | Q    That's the only YouTube account you've |
| | 2 | ever used in the course of performing |
| | 3 | business-related activities, the Miramax Films |
| | 4 | account? |
| 10:21:23 | 5 | A    Oh, wait.  Are you referring to my time at |
| | 6 | Paramount or -- |
| | 7 | Q    I'm referring to any time. |
| | 8 | A    If I understand the question correctly, |
| | 9 | you're asking if I have ever used any nonbusiness |
| 10:21:43 | 10 | accounts for business purposes? |
| | 11 | Q    No.  Have you ever used any YouTube |
| | 12 | account aside from the Miramax Films account for |
| | 13 | business purposes? |
| | 14 | A    No. |
| 10:21:56 | 15 | Well, define "business purposes," I guess, |
| | 16 | is the question -- is what I'm asking. |
| | 17 | Q    Uploading clips to YouTube on behalf of |
| | 18 | your employer would be a business purpose. |
| | 19 | Do you have -- are there any other YouTube |
| 10:22:10 | 20 | accounts? |
| | 21 | A    I've never used any -- I've never used any |
| | 22 | YouTube accounts other than the official studio |
| | 23 | accounts to upload official studio trailers or clips |
| | 24 | onto YouTube. |
| 10:22:23 | 25 | Q    Okay.  So which studio accounts have you |

148aaf66-7405-4ede-b447-b22b926bc84f

| | | |
|---|---|---|
| 10:22:25 | 1 | used to upload promotional material to YouTube |
| | 2 | besides the Miramax Films account that we discussed |
| | 3 | earlier? |
| | 4 | MR. WILKENS:  Objection as to form. |
| 10:22:39 | 5 | THE WITNESS:  At my time at Paramount |
| | 6 | Classics/Vantage -- |
| | 7 | BY MR. VOLKMER: |
| | 8 | Q    Yes. |
| | 9 | A    -- I would use account -- I'm sorry, the |
| 10:22:45 | 10 | question was? |
| | 11 | Q    Which studio accounts have you used to |
| | 12 | upload promotional material to YouTube besides the |
| | 13 | Miramax Films account that we discussed earlier? |
| | 14 | A    So you're referring to the user account |
| 10:22:57 | 15 | names? |
| | 16 | Q    The user account names.  Correct. |
| | 17 | A    At Paramount Classics there was an I.D. |
| | 18 | Paramount Classics and at -- and once we changed the |
| | 19 | name, it was -- another account was created called |
| 10:23:11 | 20 | Paramount Vantage. |
| | 21 | Q    Have you ever uploaded clips to YouTube |
| | 22 | using any other YouTube user name for business |
| | 23 | purposes besides Miramax Films, Paramount Vantage |
| | 24 | and Paramount Classics? |
| 10:23:33 | 25 | A    During -- |

148aaf66-7405-4ede-b447-b22b926bc84f

| | | |
|---|---|---|
| 10:23:34 | 1 | Q    Anytime. |
| | 2 | A    To the best of my recollection, no. |
| | 3 | Q    And when you were employed at Paramount |
| | 4 | Vantage, you would use YouTube to promote Paramount |
| 10:23:54 | 5 | Vantage films; is that right? |
| | 6 | MR. WILKENS:  Objection as to form. |
| | 7 | THE WITNESS:  Again, to promote. |
| | 8 | BY MR. VOLKMER: |
| | 9 | Q    I'll just make this a little easier. |
| 10:24:12 | 10 | When you were employed at Paramount |
| | 11 | Vantage, you would use YouTube in the course of your |
| | 12 | employment; correct? |
| | 13 | A    Correct. |
| | 14 | Q    And can you describe how you would use |
| 10:24:23 | 15 | YouTube? |
| | 16 | A    How I would use YouTube?  We created |
| | 17 | accounts and we would upload trailers mainly to the |
| | 18 | account.  There were -- there was a person there by |
| | 19 | the name of Kevin Donahue who helped us put the clip |
| 10:25:10 | 20 | onto the home page of YouTube.  It was a -- I would |
| | 21 | say a symbiotic relationship.  They were looking for |
| | 22 | content, good content, to help them, presumably, and |
| | 23 | we felt presumably that they could also help us. |
| | 24 | Q    By providing promotional opportunities for |
| 10:25:36 | 25 | your films? |

148aaf66-7405-4ede-b447-b22b926bc84f

| 11:40:22 | 1 | appreciated it. And I was glad to see it on the |
| | 2 | home page as with any other clip on any other site's |
| | 3 | home page. |
| | 4 | BY MR. VOLKMER: |
| 11:40:33 | 5 | Q   Did you ever tell anyone that you were |
| | 6 | thrilled that it was up there? |
| | 7 | A   I might have. I'm not sure exactly if I |
| | 8 | used those exact words, but, yeah. |
| | 9 | Q   And if you could turn to the last message |
| 11:40:59 | 10 | on the first page. |
| | 11 | A   Last message on the page or -- |
| | 12 | Q   I'm sorry, the last -- |
| | 13 | A   The bottom? |
| | 14 | Q   The bottom. |
| 11:41:08 | 15 | A   Okay. |
| | 16 | Q   You say to Mr. Donahue, "Let me know if I |
| | 17 | can ever help again in praising YouTube in to the |
| | 18 | media. You guys are always pushing the bar higher." |
| | 19 | Why were you offering to praise YouTube in |
| 11:41:25 | 20 | the media? |
| | 21 | A   At that time it could be a number of |
| | 22 | things. Maybe a little personal ego to have my own |
| | 23 | name in the press. Embarrassing enough now just to |
| | 24 | admit that. But at the time I believe that I |
| 11:41:45 | 25 | thought that YouTube was, you know, a good service |

148aaf66-7405-4ede-b447-b22b926bc84f

| 11:41:59 | 1 | and -- it was a good service and we, you know, used |
| | 2 | them. |
| | 3 | Q Do you still think that YouTube is a good |
| | 4 | service? |
| 11:42:12 | 5 | A Yes. |
| | 6 | Q What did you mean when you said that |
| | 7 | YouTube was pushing the bar higher? |
| | 8 | A I don't recall exactly what I was |
| | 9 | referring to when I said that. |
| 11:42:45 | 10 | MR. VOLKMER: I'd like to mark Exhibit 6. This |
| | 11 | is a Wall Street Journal article from June 27, 2006 |
| | 12 | that I printed up off of the Lexis Nexis service. |
| | 13 | (Defendants' Exhibit 6 was marked for |
| | 14 | identification by the deposition officer and is |
| 11:43:15 | 15 | attached hereto.) |
| | 16 | MR. VOLKMER: This article is written by |
| | 17 | Kevin Delaney and it's titled "With NBC Pact, |
| | 18 | YouTube Site Tries to Build a Lasting Business." |
| | 19 | Q And, Mr. Lin, you're quoted in this |
| 11:43:28 | 20 | article if you turn to the third page. And it's the |
| | 21 | fifth full paragraph. |
| | 22 | MR. WILKENS: You should feel free to read the |
| | 23 | article if you'd like. |
| | 24 | THE WITNESS: Okay. |
| 11:44:16 | 25 | /// |

148aaf66-7405-4ede-b447-b22b926bc84f

| | | |
|---|---|---|
| 11:44:16 | 1 | BY MR. VOLKMER: |
| | 2 | Q    The quote is "'As a marketer you almost |
| | 3 | can't find a better place than YouTube to promote |
| | 4 | your movie,' says Andrew Lin, vice president for |
| 11:44:25 | 5 | interactive marketing at Paramount Vantage." |
| | 6 | Was that an accurate quote? |
| | 7 | A    Yeah, I made the quote accurately. |
| | 8 | Q    You were not misquoted? |
| | 9 | A    Correct.  I was not misquoted. |
| 11:44:45 | 10 | Q    And that statement reflects your thinking |
| | 11 | at the time, which is the summer of 2006; correct? |
| | 12 | A    Summer, yes.  This was made -- the quote |
| | 13 | was made in the summer of 2006. |
| | 14 | Q    What was it about YouTube that made it |
| 11:45:03 | 15 | such an effective place to market films? |
| | 16 | MR. WILKENS:  Objection as to form. |
| | 17 | THE WITNESS:  What was it in particular about |
| | 18 | YouTube?  I mean, in my opinion, the -- YouTube, I |
| | 19 | believe, if I recall correctly, was very popular. |
| 11:45:33 | 20 | It was a very popular place for people to watch |
| | 21 | videos and you always want to, you know, try to get |
| | 22 | your trailer or your clip in front of people in the |
| | 23 | hopes that it will appeal to them.  YouTube is one |
| | 24 | of those places. |
| 11:45:54 | 25 | /// |

148aaf66-7405-4ede-b447-b22b926bc84f

11:45:54   1    BY MR. VOLKMER:

2        Q    And you received approval from Paramount

3    to provide this quote; correct?

4        A    I received approval from Megan Colligan,

11:46:11   5    who was the head of publicity at Paramount Vantage,

6    to speak with The Wall Street Journal.

7        Q    And from a marketing perspective, you

8    believed that YouTube was superior to other online

9    videosharing sites; is that right?

11:46:34  10        MR. WILKENS:  Objection as to form.

11        THE WITNESS:  No, I do not believe that I was

12    saying that they were superior to other videosharing

13    sites.

14    BY MR. VOLKMER:

11:46:42  15        Q    No.  I'm asking you what your belief was

16    around that time.

17             Did you believe that YouTube was superior

18    to other videosharing sites from a marketing

19    perspective?

11:46:52  20        A    No.

21        Q    Do you know if Paramount Vantage ever

22    uploaded clips to YouTube to promote the film There

23    Will Be Blood?

24        A    No.  That was after my time.

11:47:27  25        Q    Was No Country For Old Men also after your

148aaf66-7405-4ede-b447-b22b926bc84f



**Schapiro Exhibit 25**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

VIACOM INTERNATIONAL INC., COMEDY )
PARTNERS, COUNTRY MUSIC )
TELEVISION, INC., PARAMOUNT )
PICTURES CORPORATION, and BLACK )
ENTERTAINMENT TELEVISION LLC, )
                              )
           Plaintiffs, )
             vs. )  Case No. 07CV2203
YOUTUBE, INC., YOUTUBE, LLC, )
and GOOGLE, INC., )
                              )
           Defendants. )
                              )
THE FOOTBALL ASSOCIATION PREMIER )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all )
others similarly situated, )
                              )
           Plaintiffs, )
             vs. )  Case No. 07CV3582
YOUTUBE, INC., YOUTUBE, LLC, and )
GOOGLE, INC., )
                              )
           Defendants. )

VIDEOTAPED DEPOSITION OF TINA EXARHOS

NEW YORK, NEW YORK

MONDAY, FEBRUARY 23, 2009

REPORTED BY:
ERICA RUGGIERI, CSR, RPR
JOB NO: 16507

c6265d65-63a8-4fa4-b560-413d94551958

1

2

3

4               February 23, 2009

5                  9:36 a.m.

6

7         VIDEOTAPED DEPOSITION OF TINA

8 EXARHOS, held at the offices of Wilson

9 Sonsini Goodrich & Rosati, 1301 Avenue of,

10 New York, New York, pursuant to notice,

11 before before Erica L. Ruggieri,

12 Registered Professional Reporter and

13 Notary Public of the State of New York.

14

15

16

17

18

19

20

21

22

23

24

25

c6265d65-63a8-4fa4-b560-413d94551958

```
 1
 2        A P P E A R A N C E S
 3    FOR THE PLAINTIFFS:
 4        JENNER & BLOCK, LLP
 5        BY:  SCOTT B. WILKENS, ESQ
 6        1099 New York Avenue, NW
 7        Washington, D.C. 20001
 8        (202) 639-6000
 9        Swilkens@jenner.com
10
11    FOR THE DEFENDANTS
12        WILSON SONSINI GOODRICH & ROSATI, PC
13        BY: BART E. VOLKMER, ESQ.
14        650 Page Mill Road
15        Palo Alto, CA 94304
16        (650) 493-9300
17        Bvolkmer@wsgr.com
18     - and -
19        MAYER BROWN, LLP
20        BY: JASON KIRSCHNER, ESQ.
21        1675 Broadway
22        New York, New York  10019
23        (212) 506-2500
24        Jkirschner@mayerbrown.com
25
```

APPEARANCES: (Cont'd)

ALSO PRESENT:

MICHELENA HALLIE, MTV Networks

CARLOS KING, Videographer

* * *

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022   (212)705-8585

c6265d65-63a8-4fa4-b560-413d94551958

                              T. EXARHOS
article or interview.

Q.      Can I read it?

MR. WILKENS:  If you need to
read it, take your time and read it.

THE WITNESS:  Yeah, I don't
remember, so I'd like to read it.

MR. VOLKMER:  Sure.

(Witness reads document.)

A.      Okay.

Q.      So having read the article, do
you recall being interviewed for it?

A.      I don't remember the exact
interview, but I do remember the article.

Q.      And who did you talk with in
connection with this article?

A.      Again, I don't recall the
interview, but I'm sure it was the
reporter.

Q.      Mr. Morrissey?

A.      Brian Morrissey.

Q.      Do you remember speaking with
Mr. Morrissey about these issues?

A.      I don't remember the interview
itself, because it was three years ago.

c6265d65-63a8-4fa4-b560-413d94551958

                              T. EXARHOS

Q.    Do you recall sending any
e-mails about this article?

A.    I don't recall.

Q.    In the second page, the third
paragraph, there's a quote from you,
saying "For MTV, giving promotional clips
was a no brainer, because it didn't have
to pay for placement."

That refers to giving
promotional clips to YouTube, correct?

A.    Yes.

Q.    And is that an accurate quote?

A.    Yeah.  I don't remember the
interview, but I don't see anything that I
disagree with, so.

Q.    And you believed that providing
promotional clips to YouTube was a no
brainer, correct?

A.    Yes, I believed it was, you
know, a good way to market some of our
priority shows, amongst other things.  But
yes, I think that it was a mutual --
mutually beneficial relationship.  They
were receiving valuable content that we

c6265d65-63a8-4fa4-b560-413d94551958

1      T. EXARHOS

2 were providing, and they were providing

3 good promotional placement for us.

4    Q. And the promotional clips that

10:39:14 5 MTV provided to YouTube, they were

6 authorized to be on YouTube, correct?

7    A. The ones that I'm referring to?

8    Q. Right.  They were authorized to

9 be on YouTube, correct?

10:39:24 10    A. Correct.

11    Q. Do you know what the term

12 content council refers to?

13    A. It was a meeting.

14    Q. A single meeting?

10:39:38 15    A. I don't recall exactly how many

16 meetings, but I think that it might have

17 been a -- it might have been a one-time

18 meeting that we did.  I don't remember if

19 it was more than one meeting.

10:39:54 20    Q. And what was the topic of the

21 meeting?

22    A. If it's the meeting that I think

23 we are talking about, we discussed just

24 kind of in the changing environment -- you

10:40:14 25 know what, I can tell you what I know I

T. EXARHOS

Q.   Do you know if the clip that's being referenced in this e-mail contained a call to action or a tune-in message?

04:28:45

A.   I don't know.

MR. VOLKMER:  I'd like to mark Exhibit 34.

(Exarhos Exhibit 34, e-mail thread, bearing Bates number VIA02359230 to 9232, marked for identification, as of this date.)

04:29:56

Q.   This is an e-mail bearing the Bates number VIA02359230 to 9232.

(Witness reviews document.)

04:30:04

A.   Okay.

Q.   Turning to the last e-mail in the thread on September 19, 2007 at 12:23. Ms. Manning writes, "The Perez Hilton second leak video has 7,606 views in one day.  Gawker ran the YouTube video, which led to most of the views."

04:30:36

That e-mail suggests that MTV leaked a second video to YouTube, featuring Perez Hilton, to promote Celebrity Rap Superstar, right?

04:30:52

c6265d65-63a8-4fa4-b560-413d94551958

1          T. EXARHOS

2               MR. WILKENS:  Objection.

3          A.    Well, there was definitely video

4     of the show and on all the sites that she

04:31:17    5     listed.

6          Q.    Including YouTube?

7          A.    Yes.

8          Q.    And MTV was responsible for the

9     leaking of that second Perez Hilton video,

04:31:31    10    correct?

11              MR. WILKENS:  Objection.

12         A.    It's not clearly stated.  I'm

13    not sure.

14         Q.    Isn't that the most reasonable

04:31:47    15    inference of this document, that MTV was

16    behind the leaking of the Perez Hilton

17    videos to promote the show Celebrity Rap

18    Superstar?

19              MR. WILKENS:  Objection.

04:32:02    20         A.    We were definitely in promotion

21    mode for this show.

22              See, again, I can't say

23    definitively based on this e-mail, because

24    I wasn't overseeing this specific

04:32:12    25    campaign.  You could make that guess, but

c6265d65-63a8-4fa4-b560-413d94551958

T. EXARHOS

1

2 I can't tell you definitively.

3     Q.    Right.  But you have

4 considerable expertise in marketing,

5 especially the marketing practices at MTV.

6 There might be no one who is more

7 qualified to make a guess about what's

8 happening in this e-mail than you.  And I

9 want to know what you think is the most

10 likely scenario here.

11           Is this clip being leaked to

12 YouTube with MTV's authorization?

13           MR. WILKENS:  Objection.

14     A.    Yeah.  Well, I have expertise.

15 I just don't have the specifics around

16 this campaign.  So again, my guess,

17 without the definitive knowledge, is that

18 it was; but it's a guess, because I don't

19 have the information.

20     Q.    Okay.  And if you could turn to

21 the last page.

22     A.    Uh-hum.

23     Q.    The title is More Perez Hilton

24 Freaking Out.

25           Do you know what that video was?

04:32:23 (line 5)
04:32:32 (line 10)
04:32:50 (line 15)
04:33:03 (line 20)
04:33:17 (line 25)

1       T. EXARHOS

2           A.      It was, I believe it was from

3       the show Celebrity Rap Superstar.  And

4       Perez Hilton was freaking out.

04:33:37  5         Q.      And do you know if this

6       particular clip at 2359232 was authorized

7       to be on YouTube by MTV?

8           A.      Again, I think this is the clip

9       that Andrea Manning is referring to, so --

04:34:04  10    yeah.  Again, we were promoting the show

11      at that time.  I don't remember the

12      specifics of that clip, so I can't tell

13      you definitively.

14          Q.      You don't know one way or the

04:34:19  15    other whether this clip is authorized to

16      be on the YouTube service?

17          A.      Around this specific clip, I

18      don't know.

19          Q.      What would you need to find out?

04:34:30  20        A.      I could easily -- I could have

21      called on Andrea and found out.  I mean

22      whoever was responsible for that campaign,

23      I would have been able to find out.

24          Q.      And the user, the YouTube user

04:34:42  25    here is gossip girl 40.

c6265d65-63a8-4fa4-b560-413d94551958

1                T. EXARHOS

2              Are you familiar with that

3  YouTube user?

4       A.     No.

04:34:48  5       Q.     Have you ever heard that user

6  name before, gossipgirl40?

7       A.     No.

8       Q.     Do you know if that's somebody

9  at MTV?

04:34:59  10       A.     I don't.

11       Q.     Do you know if it's someone

12  working at MTV's direction?

13          MR. WILKENS:  Objection.

14       A.     I don't.

04:35:29  15          MR. WILKENS:  Is this a good

16  time for a break?

17          MR. VOLKMER:  It is.  Let's take

18  a break.

19          THE VIDEOGRAPHER:  The time is

04:35:34  20  4:36 p.m., and that's -- we are taking

21  a break.

22          (Whereupon, there is a recess in

23  the proceedings.)

24          THE VIDEOGRAPHER:  The time is

04:49:42  25  4:50 p.m. and we are back on the

c6265d65-63a8-4fa4-b560-413d94551958

1          T. EXARHOS

2      record.

3          Q.    Back on.

4                Does MTV engage in any marketing

04:49:50    5      for shows that are no longer on the air

6      and for which they, they have not put out

7      a DVD?

8          A.    Not that I can think of, no.

9          Q.    Do you know why that is?

04:50:05   10          A.    Well, my primary goal, from a

11      marketing perspective, is to drive people

12      back to either watch our shows or go to

13      our website or buy our products.  So if

14      there was no call to action like that,

04:50:23   15      then we wouldn't be actively marketing

16      anything.

17          Q.    Because there's nothing to

18      market, right?

19          A.    Yeah.

04:50:32   20          MR. WILKENS:  Objection.

21          A.    I can't think of an instance

22      where we would be.

23          Q.    Okay.  I'm going to read off a

24      list of shows that I have here, and I'd

04:50:43   25      like you to tell me whether MTV or its

c6265d65-63a8-4fa4-b560-413d94551958

T. EXARHOS

Q.    Of which band?

A.    I think it was M Ward.

Q.    Do you know if that M Ward clip
04:59:27    was authorized to be on the YouTube
service?

A.    I believe, if I remember how I
linked to it, I think that I linked to it
from either his official site or maybe
04:59:44    from the labels.  I don't remember.

Q.    From Merge Records?

A.    (Witness nods.)

Q.    So if you had linked to the M
Ward clip either from M Ward's site or
04:59:59    from the Merge Record label's site, you
believe that the clip is authorized?

A.    If that's the way I accessed it,
I would -- that's what I would think, yes.

Q.    For the videos that you have
05:00:19    watched on YouTube, do you consider any of
them to be infringing any copyrights of a
third party?

MR. WILKENS:  Objection.

A.    I don't know what agreements
05:00:32    YouTube has with any content providers, so

c6265d65-63a8-4fa4-b560-413d94551958

1

2    I'm not sure.

3       Q.   And to make that determination

4    about whether the videos you watched were

05:00:41    5    infringing any copyrights, what kind of

6    information would you need?

7       MR. WILKENS:  Objection.

8       A.   Again, I think YouTube would be

9    making those determinations, not me.

05:00:58    10       Q.   So you don't know one way or the

11    other whether the clips that you watched

12    on the YouTube service were infringing any

13    copyrights?

14       A.   Yeah. I mean I don't know

05:01:10    15    definitively.  I don't really watch that

16    much on YouTube, so you know, generally,

17    if I am watching it's either something

18    like a video that I linked to from an

19    artist's site or a label.

05:01:33    20       Q.   Do you think it's the

21    responsibility of YouTube users to make

22    determinations about whether the videos on

23    the YouTube service are infringing or not?

24       MR. WILKENS:  Objection.

05:01:50    25       A.   I don't know if that's my

c6265d65-63a8-4fa4-b560-413d94551958

1          T. EXARHOS

2     judgment call to make.

3          Q.    But you said that you thought it

4     was YouTube's responsibility to make those

05:01:59    5     calls and not a user like yourself, right?

6          MR. WILKENS:  Objection.

7          A.    Yeah.  I'm not -- I don't know

8     how a regular user would be able to make

9     those determinations.  I think the hope

05:02:17   10     would be that YouTube would be making

11     those.

12          Q.    Have you continued to use the

13     YouTube website after this lawsuit was

14     filed?

05:02:27   15          A.    I have occasionally, yes.

16          Q.    Do you know anyone who has

17     uploaded clips to YouTube that infringe

18     third-party copyrights?

19          A.    At MTV?

05:02:44   20          Q.    Anywhere, anyone.

21          MR. WILKENS:  Objection.

22          A.    Not that I know of.

23          Q.    Do you know of anyone who uses

24     YouTube to facilitate piracy?

05:02:56   25          A.    No.

c6265d65-63a8-4fa4-b560-413d94551958

                         T. EXARHOS

         Q.    Okay.

               MR. VOLKMER:  I'd like to mark

         Exhibit 35.

05:03:53       (Exarhos Exhibit 35, mail

         thread produced by Viacom, bearing

         Bates range VIA00330560 to 561,

         marked for identification, as of

         this date.)

05:03:52 Q.    This is an e-mail thread that

         Viacom produced in this litigation, with

         the Bates range VIA00330560 to 561.

               (Witness reviews document.)

         A.    Okay.

05:04:29 Q.    And in the second-to-last in

         time e-mail from Mr. Cohn to you, at 11:31

         on 10/29/2006, he's referencing an album

         by the band The Hold Steady; is that

         right?

05:04:42 A.    He is.

         Q.    You respond, "I'm watching the

         video on YouTube right now."

         A.    I am.  I do say that, yes.

         Q.    Which video were you watching?

05:04:50 A.    I don't remember.

c6265d65-63a8-4fa4-b560-413d94551958

# Schapiro Exhibit 26

Subject: RE:
From: "Exarhos, Tina" <EX:/O=VIACOM/OU=MTVUSA/CN=RECIPIENTS/CN=EXAROST
>
To: Graden, Brian
Cc: Date: Fri, 03 Mar 2006 17:35:40 +0000

YouTube touting "official partnership"...in a way that seems, well "official." It's not. But we DID give them the content, and they did give us (as I think you saw) home page, premium positioning. Result has been overwhelming in just 24 hours. COuldn't ask for better mktg (w/ no dollars) on mtv2.

Content council couldn't be coming at better time.

———

From: Graden, Brian
Sent: Fri 3/3/2006 12:21 PM
To: Exarhos, Tina
Subject: RE:

what happened with the u tube thing... i can't follow?..
b

———

From: Exarhos, Tina
Sent: Friday, March 03, 2006 9:19 AM
To: Graden, Brian
Subject: RE:

Def felt like we turned a corner! We've been working hard for that....good news, which I know is the case, we can turn the ship.

and how do you like the YouTube shitstorm this am?

———

From: Graden, Brian
Sent: Fri 3/3/2006 12:17 PM
To: Exarhos, Tina
Subject: RE:

back now courtesy of air mcgrath yesterday.... i like how the other .000005 lives.... urge demo was good, if it all works.... lots of features, lots of good natured hedging... we'll see... strikes me that, without a device somehow tethered to all we put forward, you're singing to the hills... i just made that up, it's not from the john popkoski book of business analogies clearly... see you tuesday, glad you're coming.... how is your presentation?

p.s. you've heard -- yesterday was a HOME RUN... i'd say a corner was turned
b

———

From: Exarhos, Tina
Sent: Thursday, March 02, 2006 9:19 PM
To: Graden, Brian
Subject: RE:

heading out Tues am. Going to do a meeting or two, then head to SB.

HIGHLY CONFIDENTIAL

Also, didn't realize you were finally getting in to see URGE demo today. What did u think? Wish I'd tagged along. when do u head home?

———

From: Graden, Brian
Sent: Fri 3/3/2006 12:17 AM
To: Exarhos, Tina
Subject: RE:

that is fantastic!... going there now... hey when do u come out?
b

———

From: Exarhos, Tina
Sent: Thursday, March 02, 2006 8:30 PM
To: Graden, Brian
Subject:

check out #1 featured video on YouTube today....Milanakos from content we provided to promote new season + dvd.

VIA 00330334