# SCHAPIRO DECLARATION EXHIBITS CONTINUED

# Schapiro Exhibit 115

Subject:    RE: youtube
From:       Kadetsky, Deborah <EX:/O=VIACOM/OU=MTVUSA/CN=RECIPIENTS/CN=USER
            ACCOUNTS/CN=USER/CN=KADETSKD>
To:         Carbone, Tony
Cc:         Date:       Tue, 15 Aug 2006 20:52:54 +0000

i gotta send something to our friends at youtube, she wrote me back in a flash that they're down already. so great.

_____

From: Carbone, Tony
Sent: Tuesday, August 15, 2006 4:38 PM
To: Kadetsky, Deborah
Subject: FW: youtube

_____

From: Hohman, Ryan
Sent: Tuesday, August 15, 2006 4:37 PM
To: Carbone, Tony
Subject: RE: youtube

Here's two more.  There's a few random clips of Sumthin', without the poop.  If you want these removed I can get you the links.  Let me know.  -Ryan

http://youtube.com/watch?v=z0lkTYOFwfs
http://youtube.com/watch?v=H5C6LJ6NQqw

_____

From: Carbone, Tony
Sent: Monday, August 14, 2006 8:44 PM
To: Hohman, Ryan
Subject: youtube

can you check again in the mornig plz?  these people just won't give up...i'll also give you the rundown in the morning as to why this is such a big deal

thx man

# Schapiro Exhibit 116

Subject:     FW: Urgent request
From:        "Cahan, Adam" <EX:/O=VIACOM/OU=MTVUSA/CN=RECIPIENTS/CN=CAHANA>
To:          'Zahavah Levine'
Cc:          chris@youtube.com; chad@youtube.com
Date:        Tue, 05 Sep 2006 18:21:22 +0000

Really appreciate the speedy action here. Goes a long way with our programmers.
~Owe you one :)
Adam

_____

From: Kadetsky, Deborah
Sent: Tuesday, September 05, 2006 2:04 PM
To: Cahan, Adam; Rinzel, Mike; Taylor, Benjamin; Maxwell, Tony; Carbone, Tony
Cc: Kiechlin, Hank; Imm, Tina; Olde, Jeff
Subject: RE: Urgent request

fyi, folks. looks like the video has been officially removed.
http://www.youtube.com/watch?v=O735CLKre8w

_____

_____

From: Zahavah Levine [mailto:zahavah@youtube.com]
Sent: Tuesday, September 05, 2006 10:35 AM
To: Cahan, Adam; chris@youtube.com; chad@youtube.com
Subject: RE: Urgent request

No problem Adam, we will take it down right away.

Best,

Zahavah

_____

From: Cahan, Adam [mailto:Adam.Cahan@mtvn.com]
Sent: Tuesday, September 05, 2006 7:13 AM
To: chris@youtube.com; chad@youtube.com; Zahavah Levine
Subject: Urgent request
Importance: High

YouTube Team -

Sorry to reach out to you directly on this but incredibly urgent from our perspective. (legal will be
reaching out)

"nystudent" - someone internal at MTV Networks has released upcoming episodes of our Celebreality -
Flavor Flav episode.

Anything you can do to quickly take this down would be greatly appreciated.

 <http://www.youtube.com/watch?v=O735CLKre8w> http://www.youtube.com/watch?
v=O735CLKre8w

Confidential                                                                    VIA02088065

# Schapiro Exhibit 117

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

VIACOM INTERNATIONAL, INC., COMEDY )
PARTNERS, COUNTRY MUSIC. )
TELEVISION, INC., PARAMOUNT )
PICTURES CORPORATION, and BLACK )
ENTERTAINMENT TELEVISION, LLC, )
                                  )
              Plaintiffs, )
                                  )
            vs. ) NO. 07-CV-2103
                                  )
YOUTUBE, INC., YOUTUBE, LLC, )
and GOOGLE, INC., )
                                  )
              Defendants. )
_____)
                                  )
THE FOOTBALL ASSOCIATION PREMIER )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all )
others similarly situated, )
                                  )
              Plaintiffs, )
vs. ) NO. 07-CV-3582
                                  )
YOUTUBE, INC., YOUTUBE, LLC, and )
GOOGLE, INC., )
                                  )
              Defendants. )
_____)

VIDEOTAPED DEPOSITION OF MARCO BERROCAL
NEW YORK, NEW YORK
NOVEMBER 5TH, 2009

JOB NO. 18082

1

2               VIDEOTAPED DEPOSITION OF MARCO

3       BERROCAL, held at the offices of Mayer

4       Brown, 1675 Broadway, New York, New

5       York, pursuant to notice, before

6       Maureen Ratto, Registered Professional

7       Reporter and Notary Public of the State

8       of New York on November 5, 2009, at

9       10:10 a.m.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         A P P E A R A N C E S

2

3        FOR THE PLAINTIFFS:

4        PROSKAUER ROSE, LLP

5        BY: WILLIAM M. HART, ESQ.

6            DANIEL P. GOLDBERGER, ESQ.

7        1585 Broadway, New York, NY 10036

8        (212)969-3095

9        whart@proskauer.com

10

11       FOR THE BOURNE DEFENDANTS:

12       MAYER BROWN, LLP

13       BY:  CHRISTINE M. HERNANDEZ, ESQ.

14           GREGORY FRANTZ, ESQ.

15       1675 Broadway, New York, NY 10019

16       (212) 506-2146

17       Chernandez@mayerbrown.com

18

19

20

21

22

23

24

25

1          Q.   I'm not asking for substance of

2     discussion you had with counsel over

3     legal advice. I'm asking to the extent

4     that you are the one who makes the

5  14:32:51   ultimate decision, other than

6     information that you have received from

7     counsel, do you base your decision on

8     any other factors?

9          MR. HART:  That's a different

10 14:33:03   question.

11         A.   Well, each particular case I

12    would look at it and a fair use maybe

13    one matter. There maybe other issues

14    that were brought up. So, in a vague

15 14:33:28   respect there could be other factors

16    that I'm considering.

17         Q.   What other issues would you

18    consider in conjunction with fair use?

19    Can you give me an example?

20 14:33:40        MR. HART:  I won't let you

21    answer that question.  If there are

22    other considerations that you raised

23    and discussed with counsel. It's only

24    going to be independent of your

25 14:33:48   discussions with counsel.

1          Q.   Can you answer the question,

2     keeping in mind counsel's instruction?

3          A.   Can you repeat it, please?

4          Q.   I'm asking you what other issues

5  14:34:06  would you consider in conjunction with

6     fair use? Can you give me an example?

7          MR. HART:  Maintain my objection

8     and the way that question came out has

9     other form problems but go ahead.

10 14:34:29  A.   Anything that would be brought

11    up at that point we would clearly

12    discuss with our counsel. There maybe

13    one thing we think of is fair use but

14    there maybe other issues but it's all

15 14:34:43  discussed with my attorneys.

16         Q.   Okay. Has there ever been an

17    instance when Bourne decided not to

18    take any action or otherwise send a --

19    strike that.

20 14:35:01       Has there ever been an instance

21    where Bourne decided not to issue a

22    take-down as a result of a fair use

23    analysis?

24         A.   No.

25 14:35:28  Q.   With respect to take-downs that

1        Bourne has sent to YouTube or have been

2        sent on Bourne's behalf to YouTube, in

3        what amount of time does YouTube on

4        average respond to that take-down

5    14:36:11    notice?

6               MR. HART:  Objection to form,

7        respond.

8        A.    I would say within 24 hours.

9        Q.    Are you -- to your knowledge,

10   14:36:43   has YouTube ever taken more than 24

11       hours to respond to a take-down notice

12       concerning the Bourne work?

13              MR. HART:  Maintain an

14       objection, form, respond.

15   14:36:59   A.    I don't absolutely -- I don't

16       recall thinking why did this take so

17       long.

18       Q.    Do you have any objection as to

19       the length of time it takes YouTube to

20   14:37:12   take down a specific URL containing

21       what Bourne believes to be infringing

22       content?

23              MR. HART:  Aside from the

24       allegations in the lawsuit.

25   14:37:36   MS. HERNANDEZ:  Counsel, I take

1          issue with your clarification.

2                    MR. HART:  It's not a

3          clarification, it's an objection.

4                    MS. HERNANDEZ:  Well then you

5   14:37:42   can make your objection but there is no

6          need to make some purported

7          clarification to my question.

8               A.    Can you repeat it then?

9               Q.    Absolutely. Do you have any

10  14:37:54   objection as to the length of time it

11         takes YouTube to take down a specific

12         URL containing what Bourne believes to

13         be infringing content?

14                   MR. HART:  Objection. Lack of

15  14:38:02   foundation, misleading, disregards

16         everything about this lawsuit. You're

17         free to answer.

18              A.    No.

19                   MR. HART:  What? You put up your

20  14:38:28   hand like wait a minute. What?

21              A.    I guess thinking it out, I mean,

22         the time it took for them to respond.

23         This part of my feeling is that it

24         shouldn't have been up there in the

25  14:38:39   first place, so I don't know if that's

1          Does it say Murbo?

2                    MR. HART:  To hold the right to

3          what?

4                    MS. HERNANDEZ:  I'm trying to --

5   15:15:08    the copyright ownership in the Murbo

6          catalogue.

7               A.    If the --

8                    MR. HART:  I caution you not to

9          speculate.

10  15:15:19    A.    A Murbo agreement with a BMI

11         writer which pretty much decides

12         whether the writer belongs to BMI we

13         would do an agreement with Murbo and

14         the writer.

15  15:15:30    Q.    Does Bourne have any

16         sub-publishers?

17              A.    Yes.

18              Q.    Who are the sub-publishers?

19              A.    We have various sub-publishers

20  15:15:52    throughout the world.

21              Q.    And what about in the US, is

22         there a sub-publishing entity?

23              A.    No.

24              Q.    What about in Canada, is there a

25  15:16:10    sub-publishing entity?

1           A.    We have a company in Canada.

2           Q.    What is the name of that

3   company?

4           A.    Bourne Canada.  We also have a

5   15:16:29   representative who collects performance

6    and collects some royalties for us on

7    our behalf in Canada.

8           Q.    What entity -- what is that

9    entity called?

10  15:16:44   A.    Radio Chart Facts.

11          Q.    Are they authorized -- is Radio

12   Chart Facts authorized to issue

13   licenses on behalf of Bourne?

14          A.    No.

15  15:16:55   Q.    Does Bourne Canada issue

16   licenses?

17          A.    I can only speak since '06. And

18   as I recall, it has not.

19          Q.    Why can you only speak since

20  15:17:26   '06?

21          A.    Bebe Bourne, my mother, handled

22   it before then. So I don't recall

23   seeing a Bourne Canada license but I

24   can't outright say no.

25  15:17:39   Q.    What function does Bourne Canada

1          perform?

2                    A.    It collects royalties, say, from

3          the Canadian Mechanical Society.

4                    Q.    Does it perform any other

5  15:17:56  function?

6                    A.    None that I recall.

7                    Q.    Setting aside whether Bourne

8          Canada did or did not actually issue

9          licenses, is Bourne Canada authorized

10 15:18:14  to issue licenses for songs in the

11          Bourne catalogue?

12                   A.    No. Again, I say that since '06,

13          I would handle it. There's -- in any

14          correspondence going to Bourne Canada

15 15:18:33  would come to me.

16                   Q.    Do you know if prior to '06

17          Bourne Canada was authorized to issue

18          licenses, whether they did or not?

19                   A.    They would not issue a license

20 15:18:55  without the permission of Bourne.

21                   Q.    And how does Bourne Canada --

22          how did Bourne Canada seek the

23          permission of Bourne?

24                   MR. HART:  Lack of foundation.

25 15:19:19          A.    Well, requests could have gone



# Schapiro Exhibit 118

| From: | Jenn Duran[jduran@x-raydogmusic.com] |
| Sent: | Tuesday, October 6, 2009 07:14:44 PM |
| To: | Copyright Service[copyright@youtube.com] |
| CC: | Tim Stithem[tim@x-raydogmusic.com]; Mitch Lijewski[mitch@x-raydogmusic.com] |
| Subject: | Take Down Notice |
| Attachments: | XRD Boston Celtics You Tube Links Takedown.DOC |

Please see the attached Takedown Notice.

Thanks very much,
Jenn

Jenn Duran
*Manager of Licensing & Finance*
**X-Ray Dog Music, Inc.**
1023 North Hollywood Way, Suite 103
Burbank, CA 91505
(818) 597-4859 phone
(818) 783-9236 fax
(818) 497-4028 mobile

AIM: xrdjenn

jduran@x-raydogmusic.com

Confidential

October 5, 2009

YouTube, Inc.
c/o Copyright@youtube.com

Dear Sir/Madam:

I, Jenn Duran, state under penalty of perjury that I am authorized to act on behalf of X-Ray Dog Music, Inc., the owner of exclusive rights in the works identified below. I have a good faith belief that use of the material in the manner complained of below is not authorized by X-Ray Dog Music, Inc., its agents, or the law, and as a result of being posted to YouTube, has been downloaded and copied by others for commercial use, such as unauthorized use by a sports team. The information provided herein is accurate to the best of my knowledge.

I hereby request that you immediately remove the infringing material at the locations specified below and all other locations on your site.

Nothing in this letter serves as a waiver of any rights or remedies with respect to the alleged infringements, all of which are expressly reserved. In particular and without limitation, this notice is without prejudice to the positions that (1) 17 U.S.C. 512 does not apply and (2) you have an affirmative obligation to prevent or limit infringement of my exclusive rights regardless of whether you receive a takedown notice.

Should you need to contact me, I may be reached at Jenn Duran jduran@x-raydogmusic.com.

Sincerely,

Jenn Duran
*Manager of Licensing & Finance*
**X-Ray Dog Music, Inc.**
1023 North Hollywood Way, Suite 103
Burbank, CA 91505
(818) 597-4859 office
(818) 783-9236 fax

Identification of the copyrighted work claimed to have been infringed, and the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed:

| # | Copyrighted Work | Infringing URL |
|---|------------------|----------------|
| 1 | Darkest Empire | http://www.youtube.com/watch?v=h6jPa_PMDhU |
| 2 | Darkest Empire | http://www.youtube.com/watch?v=boelq04QuuU |

1

Confidential                                                                                              XD00063615



# Schapiro Exhibit 119

| | |
|---|---|
| **From:** | Copyright Service[copyright@youtube.com] |
| **Sent:** | Wednesday, October 7, 2009 12:53:40 AM |
| **To:** | Jenn Duran[jduran@x-raydogmusic.com] |
| **CC:** | Tim Stithem[tim@x-raydogmusic.com]; Mitch Lijewski[mitch@x-raydogmusic.com] |
| **Subject:** | Re: [#522573033] Take Down Notice |

Dear Jenn,

Thank you very much for your notification. The content has been removed.

Sincerely,

The YouTube Team

Original Message Follows:
------------------------
From: Jenn Duran <jduran@x-raydogmusic.com>
Subject: Take Down Notice
Date: Tue, 06 Oct 2009 11:14:44 -0700

> Please see the attached Takedown Notice.
>
> Thanks very much,
> Jenn
>
>
>
> Jenn Duran
> Manager of Licensing & Finance
> X-Ray Dog Music, Inc.
> 1023 North Hollywood Way, Suite 103
> Burbank, CA  91505
> (818) 597-4859 phone
> (818) 783-9236 fax
> (818) 497-4028 mobile
>
> AIM: xrdjenn
>
> jduran@x-raydogmusic.com
>
>



**Schapiro Exhibit 120**

**From:** Courtney Nieman
**Sent:** Wednesday, June 07, 2006 8:20 PM
**To:** heather gillette
**Subject:** RE: [html] RE: Content Verification Program - Videos flagged by bayp1s1t

Thanks - that's exactly what I needed to know.  It will be my pleasure to talk you up to the Paramount Executives.

Courtney

---

**From:** heather gillette [mailto:heather@youtube.com]
**Sent:** Wednesday, June 07, 2006 12:49 PM
**To:** Courtney Nieman
**Subject:** RE: [html] RE: Content Verification Program - Videos flagged by bayp1s1t

Dear Courtney,

If we receive the notification during normal business hours then we take them down in about a half an hour.  If it is received outside of business hours it takes about 8 hours.

Thank you very much for acknowledging our prompt responses!

Heather

---

**From:** Courtney Nieman [mailto:courtneyni@baytsp.com]
**Sent:** Wednesday, June 07, 2006 12:39 PM
**To:** heather gillette
**Subject:** RE: [html] RE: Content Verification Program - Videos flagged by bayp1s1t

Heather,

I want to bring YouTube up and give you credit for the means and speed you perform the take down task.  In case I am asked, what is that average time between a request for removal and the actual removal, when someone uses your tool and method?

Our phone call with Paramount takes place at 4pm today, so any response before then will be appreciated.

Courtney

---

**From:** heather gillette [mailto:heather@youtube.com]
**Sent:** Wednesday, June 07, 2006 11:49 AM
**To:** csm
**Subject:** [html] RE: Content Verification Program - Videos flagged by bayp1s1t

Removed, thank you!

---

**From:** YouTube Service [mailto:service@youtube.com]
**Sent:** Wednesday, June 07, 2006 8:49 AM
**To:** csm@baytsp.com; Copyright Bulk
**Subject:** Content Verification Program - Videos flagged by bayp1s1t

 YouTube Logo

The following videos have been flagged as infringing by bayp1s1t (the content owner) and need to be reviewed for deletion:

6/23/2008

HIGHLY CONFIDENTIAL

BAYTSP 002369678

http://www.youtube.com/watch?v=SxvPLYnxZWE&search=Over%20The%20Hedge%20Lycaein
http://www.youtube.com/watch?v=cGcUjf2i35M&search=Over%20The%20Hedge%20Lycaein
http://www.youtube.com/watch?v=JEGkTb_dI64&search=Over%20The%20Hedge%20Lycaein
http://www.youtube.com/watch?v=d0YTYYiF8yg&search=Over%20The%20Hedge%20Lycaein
http://www.youtube.com/watch?v=KTNNzqEZYLE&search=Over%20The%20Hedge%20Lycaein
http://www.youtube.com/watch?v=MFfUVdBajbs&search=Over%20The%20Hedge%20Lycaein
http://www.youtube.com/watch?v=wxtv1TR3vdQ&search=Over%20The%20Hedge%20Lycaein
http://www.youtube.com/watch?v=MJMtvWQ4pgo&search=Over%20The%20Hedge%20Lycaein
http://www.youtube.com/watch?v=2oWuWoxpoxE&search=Over%20The%20Hedge%20Lycaein

If you are the content owner, you are receiving this email as verification that we have received your deletion requests.

---------------------------------------------------------------------------------------------------------------------------------------------------------

Copyright © 2006 YouTube, Inc.

copyright_cop.tmpl

--
No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.1.394 / Virus Database: 268.8.2/357 - Release Date: 6/6/2006

--
No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.1.394 / Virus Database: 268.8.2/357 - Release Date: 6/6/2006

6/23/2008

HIGHLY CONFIDENTIAL

BAYTSP 002369679



**Schapiro Exhibit 121**

Courtney,

Thanks for your explanation! It makes much more sense now. Did you notice any that did not get removed from yesterday? Or even previous days? I got 2 more from Viacom today (IDs: 158-4328 & 158-4329) that were blank as well. I'm assuming that if you aren't getting videos that weren't removed it isn't a problem. But I want to keep you updated in case it is. Let me know if you need any more info, or if you want me to forward the specific emails back to you.

Misty
The YouTube Team

PS Don't work too late!

Courtney Nieman wrote:
> Misty,
>
> That's good to know that you only got one blank email.  We are only
> sending 1 or 2 emails at you each day, but each email may contain a
> number of videos.  We can check in the morning.
>
> To summarize how things work on our end...We have a crawlers that find
> infringements on a number of protocols (including YouTube).  In the case
> of streaming video, we take the list and "hash it", that is we manually
> check each link to be sure it is out client's content.  Then we build a
> list of enforceable infringements, and bundle them together by property
> holder.  Then one email per property holder gets sent to the streaming
> video source, i.e. YouTube.
>
> To follow up, we check the next day if the video came down.  If not we
> will contact YouTube and dbl check that the email arrived, and if not we
> will re-send the email.  We enjoy the relationship we have with you and
> always talk positively about the YouTube experience when it comes to
> copyright enforcement.
>
> For now, we'll check on the clips in the morning and follow up with
> Heather and/or yourself at that time.
>
> PS - I'm working late because of another customer issue - there is never
> any rest for customer service.  Have a good night and I'll touch base
> tomorrow.
>
>
> Courtney
>
> -----Original Message-----
> From: Copyright Service [mailto:copyright@youtube.com]
> Sent: Tuesday, October 17, 2006 6:06 PM
> To: Courtney Nieman
> Subject: Re: [Fwd: Notice ID: 158-4325 Notice of Unauthorized Use of
> Viacom Property]
>
> Courtney,
>
> I believe this is the only blank email we have gotten so far today. But

1

```
> I know in the past we have gotten a few that were blank. Do you have a
> list of the videos you would like removed? I can double check that they
> were taken down. Also, I can forward any in the future that we get that
> are blank. I am assuming that the system is finding no videos that are
> in the search terms but is still sending us an email?
>
> Misty
>
>
> Courtney Nieman wrote:
>> Misty,
>>
>> I'm not sure what the problem is, but we are looking into it.  Does
>> this mean you have not taken down any videos today that belong to
>> Viacom?  If that is the case can you send me a list of "notice id"s
>> that have come up blank.  We can resend if necessary.
>>
>>
>> Courtney
>>
>> -----Original Message-----
>> From: Copyright Service [mailto:copyright@youtube.com]
>> Sent: Tuesday, October 17, 2006 4:49 PM
>> To: Courtney Nieman
>> Subject: [Fwd: Notice ID: 158-4325 Notice of Unauthorized Use of
>> Viacom Property]
>>
>> Hey Courtney,
>>
>> Ive been getting a few blank no-reply emails a day... Do you know why
>> they are coming through empty? I just don't want us to miss anything,
>> if it is possible there is some sort of error before the message is
> sent?
>> Thanks so much!
>>
>> Misty
>>
>>
>
```

HIGHLY CONFIDENTIAL

BAYTSP 001125402



# Schapiro Exhibit 122

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


VIACOM INTERNATIONAL, INC., COMEDY )
PARTNERS, COUNTRY MUSIC.            )
TELEVISION, INC., PARAMOUNT         )
PICTURES CORPORATION, and BLACK     )
ENTERTAINMENT TELEVISION, LLC,      )
                                    )
            Plaintiffs,             )
                                    )
        vs.                         ) NO. 07-CV-2103
                                    )
YOUTUBE, INC., YOUTUBE, LLC,        )
and GOOGLE, INC.,                   )
                                    )
            Defendants.             )
_____)
                                    )
THE FOOTBALL ASSOCIATION PREMIER    )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all     )
others similarly situated,          )
                                    )
            Plaintiffs,             )
        vs.                         ) NO. 07-CV-3582
                                    )
YOUTUBE, INC., YOUTUBE, LLC, and    )
GOOGLE, INC.,                       )
                                    )
            Defendants.             )
_____)

VIDEOTAPED DEPOSITION OF WARREN SOLOW
NEW YORK, NEW YORK
JANUARY 14TH, 2010

JOB NO. 18509

1

2          VIDEOTAPED DEPOSITION OF WARREN

3     SOLOW, held at the offices of Wilson,

4     Sonsini, Goodrich & Rosati, PC, 1301

5     Avenue of the Americas, New York, New

6     York, pursuant to notice, before

7     Maureen Ratto, Registered Professional

8     Reporter and Notary Public of the State

9     of New York on January 14, 2010, at

10    10:13 a.m.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APPEARANCES

FOR THE PLAINTIFFS:

JENNER & BLOCK, LLP

BY: SUSAN J. KOHLMANN, ESQ.

919 Third Avenue, New York, NY 10022

(212)891-1690

skohlmann@jenner.com


FOR THE DEFENDANTS:

WILSON, SONSINI, GOODRICH & ROSATI, LLP

BY:  MICHAEL H. RUBIN, ESQ.

650 Page Mill Road, Palo Alto, CA 94304

650-849-3311

MRUBIN@wsgr.com

1    right?

2              MS. KOHLMANN:  Objection.

3    Misstates the record.  You can answer.

4        A.    Importance is a subjective word

5  14:40:10    but that certainly is information that

6    I'd like to have.

7        Q.    What value does that information

8    provide to you in the execution of your

9    responsibilities at Viacom?

10  14:40:17    A.    It adds an increased level of

11    precision.

12        Q.    In what sense?

13        A.    It helps mitigate the removal of

14    clips that some parts of the

15  14:40:38    organization would prefer to stay in

16    place.

17        Q.    It prevents Viacom from

18    mistakenly removing content that it

19    itself has authorized to be on the

20  14:40:50    service.  Isn't that right?

21              MS. KOHLMANN:  Objection as to

22    form.

23        A.    Those are your words.  I

24    answered that using my words a moment

25  14:40:57    ago.

1          Q.    Is there anything inaccurate

2     about what I said?

3          A.    I prefer to speak with my own

4     words and not another person's words.

5  14:41:05   So I'll stick with the answer I used

6     originally.

7          Q.    Is there anything inaccurate

8     about what I said?

9          A.    I have no idea. I'd prefer my

10 14:41:12   words and not yours.

11         Q.    I'm just trying to get some

12    clarity here, Mr. Solow.

13         A.    I think the best way to get

14    clarity is to accept the words that I

15 14:41:21   use.

16         Q.    But do you see a difference

17    between the version of your statement

18    and mine?

19         A.    I don't know how you define the

20 14:41:32   words that you use.  I know how I

21    define the words that I use.  So I'm

22    more comfortable using the words that

23    come out of my mouth.

24         Q.    Viacom hires third parties to

25 14:41:59   upload content to YouTube from time to

1          time.  Isn't that right?

2          A.    I believe that to be so.

3          Q.    Is information related to that

4          activity also provided to your

5   14:42:13    department?

6                MS. KOHLMANN:  Objection as to

7          form.

8          A.    Information of that variety has

9          been provided to my department.

10  14:42:21    Q.    Do you also instruct Mr. Housley

11         to maintain information related to that

12         activity?

13         A.    Yes.

14         Q.    Have you ever heard the term,

15  14:43:14    Mr. Solow, white list?

16         A.    Yes.

17         Q.    What do you understand the term

18         white list to mean?

19         A.    In what context?

20  14:43:28    Q.    In the context in which you

21         heard it in your employment capacity at

22         Viacom.

23         A.    I've heard our approved outside

24         counsel list referred to in that list,

25  14:43:47    preferred vendor lists, I've heard

 1          lists of video content that we would

 2          like, that has been authorized for

 3          placement in various locations on the

 4          internet referred to in that regard

 5  14:44:10  also.

 6              Q.    Have you also heard lists of

 7          authorized user names from whom

 8          postings to websites such as YouTube

 9          should not be removed referred to as a

10  14:44:25  white list?

11                  MS. KOHLMANN:   Objection as to

12          form.

13              A.    I've heard of -- not lists of

14          user names but that user name -- user

15  14:44:39  names have been a component of such

16          white lists, yes.

17              Q.    Is the information that

18          Mr. Housley compiles, that we were just

19          referring to a moment ago, referred to

20  14:44:53  as a white list?

21              A.    By some people.

22              Q.    By you, Mr. Solow?

23              A.    Generally not.

24              Q.    Have you ever referred to that

25  14:45:02  as a white list?

1          A.    I may have been on

2        communications where the term is used

3        but I generally try to avoid it because

4        I find it offensive.

5  14:45:15    Q.    What do you find offensive about

6        that term?

7          A.    I see a racial component in the

8        entomology of that phrase that I find

9        offensive.

10  14:45:29    Q.    Interesting.  It is a term that

11       is used at Viacom to describe, as you

12       explained, content that's been

13       authorized to be on the YouTube service

14       and should not be removed, though,

15  14:45:43    right?

16          MS. KOHLMANN:  Objection as to

17       form.

18          A.    I have noted the use of the term

19       white list and various usages at

20  14:45:55    Viacom.  I often make my objections

21       known then also.

22          Q.    Well, to be clear, going forward

23       in the line of questioning that I'm

24       going to ask you about, I may refer to

25  14:46:13    that phrase from time to time,

1      certainly not meant to relay any racial

2      overtone whatsoever.  I'm simply

3      referring to it because it is the way

4      Viacom has referred to it in documents

5   14:46:22   produced to us and we want to make sure

6      we are consistent with the internal

7      terminology, to the extent there are

8      other ways of referring to it in-house,

9      I understand that it may be done that

10  14:46:32   way, for ease of reference in the

11     deposition.

12        A.    I completely understand that.

13        Q.    Your content based objection is

14     duly noted and I can see the basis for

15  14:46:42   it.

16        A.    I understand.

17        Q.    Please take no offense of the

18     use of the term today.

19        A.    I won't.

20  14:46:49      Q.    But do you understand what I

21     mean when I refer to white list in the

22     context of the uploading activity that

23     Viacom and its agents have done and are

24     doing on the YouTube website?

25  14:47:01      MS. KOHLMANN:  Objection as to

1     form.

2          A.     I -- I am familiar and -- with

3     the use of that term in some quarters

4     around the company for purposes,

5  14:47:19     including online posting of clips.

6          Q.     And it won't lead to any

7     ambiguity if I use that term in

8     connection with the YouTube website in

9     question?

10 14:47:31          MS. KOHLMANN:  Objection.

11         A.     The use of the term itself

12    won't.  The context may --

13         Q.     Of course.  Of course.

14         A.     -- may be different.

15 14:47:38     Q.     I want to make sure we have the

16    use of the term itself grounded.

17         A.     Yes. I got you.

18         Q.     Now that we got that out of the

19    way.  You indicated a moment ago that

20 14:47:56  Michael Housley, at your direction,

21    maintains a set of information related

22    to the uploading activity of Viacom and

23    its agents on the internet including on

24    the YouTube website.  Is that right?

25 14:48:13     A.     That's correct.

1     Q. Do you know if that information

2    is provided to BayTSP?

3    A. Yes.

4    Q. Is that information provided to

5 14:48:25 BayTSP?

6    A. Yes.

7    Q. How is that information provided

8    to BayTSP?

9    A. I'm not sure.

10 14:48:39 Q. Have you ever received that

11    information via e-mail?

12    A. Can you rephrase the question?

13    I'm not sure what information you're

14    referring to.

15 14:48:53 Q. How does Michael Housley store

16    that information?

17    MS. KOHLMANN: Objection as to

18    form.

19    A. I believe he stores it

20 14:49:02 electronically.

21    Q. In what form does Michael

22    Housley store that information

23    electronically?

24    A. I'm not sure.

25 14:49:07 Q. Is it maintained in a database?

1           A.    I'm not sure.

2           Q.    Is it maintained in an Excel

3     spread sheet?

4           A.    It could be but I'm not sure.

5   14:49:19   Q.    Have you ever requested that

6     Mr. Housley provide you with that

7     information?

8           A.    I have no recollection of asking

9     for it.

10  14:49:31   Q.    And you have no idea, as you sit

11    here today, whether he ever sent it to

12    you?

13          A.    I have no recollection of

14    Michael sending it to me.  He sits so

15  14:49:47   close to me that if I wanted to see

16    something, I have a habit of going and

17    invading his personal space and looking

18    over his shoulder and things.

19          Q.    Other than BayTSP do you know if

20  14:50:01   there is any other third parties or

21    Viacom agents to whom that information

22    has been provided?

23          A.    I don't have specific knowledge

24    of that but I wouldn't be surprised.

25  14:50:18   Q.    Can you identify any third

1           video in the three years that passed

2           between or two years that -- two and a

3           half years that passed between your

4           creating this screen shot and the

5   16:59:14   upload of the video. I just don't know

6           -- I'm not a frequent flier in that

7           regard.

8           Q. The takedown notice then that

9           was originally sent for the video

10   16:59:31   identified in Exhibit 18 was erroneous,

11           wasn't it?

12           MS. KOHLMANN: Objection as to

13           form.

14           A. It was mistaken.

15   16:59:54   MR. RUBIN: I'd like to mark

16           Exhibit 21.

17           (SolowP-21, is received and

18           marked for identification.)

19           Q. Mr. Solow, Exhibit 21 is an

20   17:00:30   exhibit by Google in this litigation,

21           GOO 00108200963 through 69. It's an

22           e-mail sent by the e-mail address

23           Michael Housley no dash reply at

24           copyright-compliance.com to copyright

25   17:01:11   at YouTube.com on February 3rd, 2007.

1      Do you recognize this document, Mr.

2      Solow?

3          A.    No.

4          Q.    Do you know that on the date

5   17:01:35    prior to February 3rd, 2007 Viacom

6      caused a large number of takedown

7      notices to be served on the YouTube

8      website?

9          MS. KOHLMANN:  Objection as to

10  17:01:51    form.

11         A.    Yes.

12         Q.    Roughly how many videos were

13     included in takedown notices provided

14     on February 2nd, 2007 by BayTSP on

15  17:02:01    behalf of Viacom to YouTube?

16         A.    I believe it was approximately

17     102,000, 103,000.

18         Q.    Do you know how many takedown

19     notices were provided by BayTSP on

20  17:02:24    behalf of Viacom to YouTube in the

21     month of January, 2007?

22         MS. KOHLMANN:  Objection as to

23     form.

24         A.    No.

25  17:02:36    Q.    Was it zero?

 1              A.    It might be.

 2                    MS. KOHLMANN:  Objection as to

 3              form.

 4              A.    Sorry. It could be.

 5  17:02:41    Q.    If I can bring your attention,

 6              please, to page ending in 966.  Do you

 7              see there's a number of different clips

 8              on the YouTube service identified in

 9              this particular notice of alleged

10  17:03:19    infringement?

11                    MS. KOHLMANN:  Object.  Document

12              speaks for itself.

13              A.    Is this really called notice of

14              alleged infringement.

15  17:03:38    Q.    I believe the title on this

16              version of the document is notice ID

17              158-8264 notice upon authorized use of

18              --

19              A.    The answer to your question is

20  17:03:47    no.

21              Q.    Do you see there are a number of

22              different clips identified in this

23              document?

24                    MS. KOHLMANN:  Same objection.

25  17:03:58    Document speaks for itself.

# Schapiro Exhibit 123

| From: | Mark M. Ishikawa |
|---|---|
| Sent: | Wednesday, January 24, 2007 10:20 PM |
| To: | Cooper, Donna |
| Cc: | Courtney Nieman; Deana Arizala; Arielle Kim; Evelyn Espinosa; Michelena.hallie@mtvn.com; Cahan, Adam |
| Subject: | RE: [html] BET Asset List |

Donna, we are queueing up the takedown notices as instructed by Adam at MTVN.  He wants to
hold the notices as part of his strategy.  This instruction was for all Viacom assets.
Please let me know if you want your assets differently.

Thx
Mark

-----Original Message-----
From: Cooper, Donna [mailto:DONNA.COOPER@BET.NET]
Sent: Wednesday, January 24, 2007 10:09 AM
To: Mark M. Ishikawa
Subject: RE: [html] BET Asset List

Mark,

I just want to confirm the Youtube direction for BET.  Are you searching and sending take
down notices with respect to all occurrences of BET
assets, irrespective of duration or any other parameter?   If not, this
is how we would like to proceed.

Thanks,
Donna


Donna Cooper
Senior Associate General Counsel
Black Entertainment Television LLC
1235 W Street, N.E.
Washington, D.C. 20018
██████████████
(202) 635-6422 (fax)
donna.cooper@bet.net

PRIVIILEGED AND CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION
**************************************************
* CONFIDENTIALITY NOTICE *
**************************************************
This e-mail message is intended for the confidential use of the intended recipient(s).
This message may contain information that is legally protected by the attorney-client
and/or work product protections; as such, this message is privileged and may not be
disclosed except to the intended recipient(s).  If you have received this message in
error, please notify the sender immediately by e-mail, and delete all copies of this
message and any attachments.  Thank you.

HIGHLY CONFIDENTIAL                                                        BAYTSP 004282398

# Schapiro Exhibit 124

| From: | Courtney Nieman |
|---|---|
| Sent: | Sunday, January 21, 2007 5:40 PM |
| To: | Mark M. Ishikawa |
| Cc: | Evelyn Espinosa; Travis Hill |
| Subject: | Timeline |

Mark,

I received a call from Travis about 17:30 Saturday afternoon, explaining that Adam had called and was upset about the numbers. Specifically that we had reported the CIMS infringement count was over 97,000. I went back through my emails and found the report sent by Chris S. I ran the report from CIMS and confirmed that it had indeed 97K+ infringements.

At around 17:50, I called Adam from home, and he proceeded to lay out his anger at BayTSP. At that point, he said "I have reported this number (97K) to my CEO." He then went on to explain that this number was within the range for taking action, and he had communicated with his CEO that the take down would happen this week. Then he explained that he received a follow-up email for Bay stating that the number was actually closer to 72K. He could not understand a 25K swing downward. I then told Adam I understood his anger and that I was on my way in to the office too investigate, and deal with the issue. I agreed to call Adam back with an update and further information.

I arrived at Bay at around 18:15, and took Stan and Matt into my Suite C and asked for an explanation. They told me everyone had been hashing under the normal rules, and they had seen no reason for any double effort. They could not recall anyone ignoring, and re-approving an infringement, but that they had observed people skipping past approved clips to concentrate on blanks and declines.

I then went over to observe what how the group was hashing, and with the possible exception of one person, everyone was approving videos with some identifiable MTVN bug or show connection. The one person, I took a minute to correct her process, and watched her for a couple more clips. Satisfied, I went back to my desk to come up with two solutions - 1>an explanation for the severe jump in numbers, and a tool that would prevent re-hashing of the same URLs.

I then talked to Travis about changing BVM to show only results that we had not seen before. I wanted something that I could clearly see only new work being performed. That when I called Adam back, I could guarantee were work progressing forward and not going over the same ground. Travis agreed to get a new BVM within 2 hours. I also asked him why the jump was so large, and that's when I found out we had been over reporting our counts from the beginning.

I then talked Evelyn and brought her up to speed.

I called Adam and told him that we had made two major corrections to our process. That rather than the standard definition of an infringement (Filename, URL, Filesize) we would only be reporting on Unique URLs. Second a hashing tool that would prevent anyone from working through anything that was not new. His response was to convey his displeasure and utter anger at BayTSP. He stated that "at of the last calls Bay had come up with a new explanation for their failure to meet his goals." He said "I don't know what you and your people are doing. I don't know if I can trust you anymore." He then requested a call today to show him the new tool and "convince me that you are not wasting any more of my time." He then repeated his observation that if he put "lil bow wow" in as a search term into YouTube he could find "thousands and thousands of hits that are my stuff."

The threats came at the end of the call. Adam said he was at the "very end of his tolerance with Bay." Adam made it clear that this was the last straw and said "I will bring Bay Down. I will call all of my entertainment contacts, Disney, NBC, (another one that I can't remember), and tell them that BayTSP is a sham. I will drive BayTSP out of business."

I listened patiently and told him "I understand your anger, and I will do everything in my power to make sure that Bay works to meet your goals.", I then summarized the his goals for zero tolerance and 100,00 infringements. Adam clarified that he want only MTVN content, and that he "doesn't care what bucket it is in", just that we find it. He wants to have a press announcement that will say "Today MTVN is taking down 100,000 videos and will continue to do so until we are paid for our content."

I told him, I would have a new tool about 50 minutes and I would not leave until we had made significant progress. The call ended at about 19:10 PST.

1

BAYTSP 004288622

To the best of my recollection, that is what transpired on the phone with Adam.

Following that call, more Bay Staff came in, the new tool was deployed, Travis found a cache of infringement he was going to add to the count, and I saw the new report that would give me an accurate count of what was/is in CIMS for MTVN.

When Erik arrived, I went over a summary of events and the new tool. I then worked with everyone else until 1am hashing. By the time I left, we had met my goal of 3000+. We started with 71K - Travis added 2K, at 2:30 this morning I saw count of 76K. When I got up this morning at 7:15 the count was at 78,205 and right now we are at 78,321.

I have set a call/online meeting with Adam for this afternoon at 13:00 PST.

Courtney

HIGHLY CONFIDENTIAL

BAYTSP 004288623

# Schapiro Exhibit 125

Michael -

I feel very strongly that the time is now for Google to negotiate with us otherwise we need to threaten all content comes down from YouTube. I really feel every minute that goes by the industry is waiting. If we threaten to be public with our content takedown notifications than the ball starts rolling immediately. This is now, not end of week. If we threaten we can use it in negotiations for a better deal.

Eric -

I'm glad we had an opportunity to chat this weekend about the Google-YouTube connection. As you know we have to move quickly to address what our position is going to be with Google/YouTube. The default pressure at the corporate level is that we are going to have to announce that Viacom/MTVN is providing cease and desist for all our content at YouTube. As you know, we believe between SouthPark, Stewart, Colbert along with content from MTV and Nickelodeon we represent 25%+ of all content there.

Here is what I would recommend that we do. This week we need to assemble the team that will negotiate for the following priorities.

1. Google Ad Network deal, we have a proposal for how we can work together to better monetize our sites and enable Google to grow the market overall for online branded advertising. As part of this proposal we have suggested the framework and commitments for a "300x250" ad unit.

2. OnSite Paid search and contextual monetization. Our combined scale across our netowrk represents 137M uniques and 7.2B pageviews. We would like to put together what your porposal is for both monetization and operational improvements.

3. Content licensing to YouTube and the associated economics/ structure. Clsoing a deal that will represent the framework for how we work together.

4. MusicWiki we had great traction with Marissa and Susan working on the product but in light of YouTube we'll need to better understand how we work together and sepearte these offerings.

Given the folks we have met with it likely makes sense to have some combination of Susan, Tim and Joan/Marc helping sort through these negotiations.

Looking forward to your response.

# Schapiro Exhibit 126

Subject: Next rev
From: "Cahan, Adam" <EX:/O=VIACOM/OU=MTVUSA/CN=RECIPIENTS/CN=CAHANA>
To: 'Blair Harrison'
Cc: Date: Mon, 10 Jul 2006 01:44:02 +0000

List of attachments:
  Project Beagle Review 0 3 ac.ppt

CONFIDENTIAL                                                   VIA 02159159

# YouTube Review

HIGHLY CONFIDENTIAL

VIA 02159160

# Executive Summary

- Vision

- Strategic fit

- Key risks

- Valuation

    - Business Drivers

    - Monetization model

- Upside from Viacom/YouTube combination

- Competition

- Company background

1

1

## Vision For YouTube and Viacom

- We believe YouTube would make a **transformative acquisition** for MTV Networks / Viacom that would immediately make us the leading deliverer of video online, globally.

- YouTube has an extensive **global reach**: it is a top 10 site in 8 countries, a top 20 site in 18 countries, and a top 50 site in 49 countries. Overall, Alexa ranks it 19th in the world. In the US it has reached 20M+ uniques (May NetRatings)

- **MySpace** provided the platform for young audiences as they migrated from passive consumers into creator-consumers of digital content, and dominates globally as a platform for personal web pages and rich media communication.

- YouTube is the **dominant platform** of choice for these audiences as they migrate to using **video** to express themselves.

- We have the opportunity to own this space, and become the **clear leader in community / user generated video globally.**

2

## Strategic Fit: Audience, Advertiser Relationships And Video Content Make Youtube A Strategic Fit For Viacom

- **Our audience** has embraced User Generated Content and this category remains unexploited by Viacom/MTVN
  - **Time spent** suggests that YouTube has garnered a significant amount of our core demographic time online with 36 minutes on average across all users
- A combined YouTube/Viacom would have scale in **advertiser relationships** in film, entertainment (17% of MTVN today), video games and other demo targeted categories including CPG.
  - With the addition of YouTube **scale** (20M+) we hope to attain a must have status with advertisers
  - Viacom can significantly **enhance CPM** based on multiplatform sales approach.
- As one of the largest owners and producers, **video** is a core competence of MTVN/ Viacom and increasingly a category online critical to our multiplatform sales.
  - Many **highly sought/ viral video** including music videos, humor and others are being sourced from UGC – e.g., "Andrew Video", "WebJunk 20" etc.

HIGHLY CONFIDENTIAL

VIA 02159163

## Key Risks And Observations

- YouTube is a **utility** that people use to contribute, share and consume video. The content that is being consumed on YouTube does not follow any video consumption model and business currently in existence.

- Consumption of **"branded" content on YT is relatively low**, in most cases lower than on IFILM, which has a fraction of its audience. For example, *Pirates of the Caribbean 2* trailers consumption on YT = 250k; consumption on IFILM = 1m. Even the much-discussed SNL "Lazy Sunday" sketch and its myriad spoofs have been seen more times on IFILM than on YouTube.

    - Only four of the top 30 most watched videos of all time on YouTube are music videos, one of which is in German. There are no movie trailers in the top 30, nor are there any clips from popular TV shows.

- Assumptions about the ability to monetize YouTube must appreciate that the site today **does not drive** any appreciable amount of traffic to branded programming. While this may change, it is important to realize that this is not the way the site functions today, and may be inconsistent with the way people *want* to use it.

- YouTube's future success is heavily dependent on its ability to continue evolving along the lines that it is today. Any justification for this deal that depends on it **becoming something that it currently is not should be discounted.**

- YouTube's traffic is currently about **80% non-US**. The distribution of this traffic around various geographic regions needs to be analyzed to determine the ability to monetize it. *A justification for this US / international mix estimate is provided in the enclosed analysis.*

- The company has strong guidelines surrounding offensive content, which are enforced by its employees and audience alike, and the property is therefore very **advertiser-friendly**.

- **Technology company** at heart – we lack expertise in that area...

4

## Considerable Risks From Unclear Business Model And Non-core Viacom Competency Requirements

- **Operational requirements and technology competency**
  - <u>Ability to hire and retain technical talent</u>: requires significant technical talent to develop targeted advertising and search related competencies. E.g., cost per play matching video to advertisers. As a corporately owned company it will be more challenging to incent new hires
  - <u>Ongoing investment in infrastructure:</u> YouTube is at an early stage of infrastructure development and will require ongoing investments in infrastructure
  - <u>Investment in innovation:</u> As a platform, YouTube requires ongoing investment in innovation to maintain the relevance of its searches and sharing technology
- **Business model:**
  - <u>Unclear monetization:</u> YouTube is an early revenue business with undefined a business model to fund ongoing operations. The company is likely to remain unprofitable in the near term
  - <u>Third party content providers:</u> ownership by a content company is likely to push other content holders to be wary of participating in the platform for fear of bias
- **Audience**
  - <u>Limited audience lock-in:</u> Unlike MySpace, there is less investment in personal profiles and personalities – with limited switching costs audiences are likely to migrate to other sources should the site's appeal be diminished (i.e. non-relevant advertising)
  - <u>Fad-driven nature:</u> Is this simply America's Funniest Home Videos?
- **Advertiser**
  - Branded advertisers have demonstrated concern over association with user generated content and may not value the impressions
- **Competition (see detailed discussion)**

5

# Valuation

- Abcdefghijkl

HIGHLY CONFIDENTIAL

## Business model drivers

- YouTube's **traffic is fragile** with respect to attempts to monetize it through traditional "inserted" video advertising.

- Audience tolerance for **pre and post-roll video advertising will be low** compared to websites that are used predominantly for the consumption of professional programming that is not available elsewhere.

- The model we have built assumes **three revenue generation models**, two of which are already in place and are well understood, one of which is new and therefore untested.

- The proposed monetization mechanisms are:

  - **Branded Premium Advertising & Sponsorships**

  - **Cost per View / "Video Ad Sense" Model**

  - **Run Of Site / Advertising Network**

7

**Monetization - Branded Premium Advertising & Sponsorships**

- Revenue will be generated from **key real estate**, and will be in the form of auctioned premium advertising and sponsorships.

- Concerns surrounding generation of significant **revenue from entertainment** advertisers (e.g. studios) include:

  - Likely lack of ability to *drive* traffic to home page and other destinations within the site,

  - Most popular and therefore valuable content – such as huge movie releases (trailers, etc.) – will likely be available freely anyway.

- **Paid Placement** – home page auction based sponsored video (i.e. one block where film studios bid for placement of their trailers)

- **Premium Content** – over time the use of ad supported premium clips/content in a separate section (i.e., Movie of the week, first looks, releases, film trailers, etc.)

8

## Monetization - Cost per View / "Video Ad Sense" Model

- Users have so much freedom of choice for the consumption of media that marketers can no longer assume they can **"buy time"** within it.

- Advertisers are becoming obliged to offer **compelling, relevant advertising** content and services. Google's advertising model made this clear, whereby advertisers not only bid for the privilege of real estate but advertising that does not make good use of available real estate is penalized.

- We propose a revenue model for YouTube that treats **advertising and content as near-equals**, as in Google's "natural v. sponsored" search results. Cost per view paid video advertising would appear throughout the YouTube site, alongside the programming.

- Advertisers would **bid for keyword-space**, and could ultimately upload their own creative.

- Audiences would be receptive to the advertisers' content because it would never be forced upon them but offered more as a *service* **or as additional content** to them.

- Advertising content that doesn't **perform** (is not watched) would be automatically discounted and would ultimately disappear.

9

VIA 02159169

## Monetization - Run Of Site / Advertising Network

- We assume the use of **advertising network** for yield management.

  - Conservatively we estimate an RPM of Y based on network experience for US, and Z for international

  - Upside from potential for cookieing users across our network

  - Upside from registration of users in a larger network

10

VIA 02159170

## A Viacom/Youtube Combination Can Represent Significant Upside For Both Companies

### Sources for potential differentiation for YouTube/Viacom

- Provide **users with fame** on television i.e., The crowd decides, we put it on air - best of appears weekly on Comedy Central and MTVN, provides additional incentive for users to upload, vote and promote themselves on YouTube

- **Brands/ editorial** fit enables us to both source **talent**, innovative **content** for consumption across platforms. We are one of the few providers willing to put edgier content on TV. Ie. User generated music video, user generated ads on television

- **Video content** – breadth and depth can power YouTube to the next level of relevance. By providing all of our clip based video in raw form – i.e. non branded editorial experience- simple search and obtain. We can push YouTube to become a more comprehensive destination and source for broader syndication

- **Promotion** – fit with our target audience and demo. We can reinforce and drive traffic/ promotion to YouTube.

11

VIA 02159171

# YouTube is a current leader with significant audience reach

Alexa Rankings – July 2006



NIELSEN NETRATINGS MONTHLY UNIQUES



- In the video category YouTube is a clear leader with **20M uniques** (NetRatings) (12.7M according to MMX) growing 100% month-on-month.

- By NetRatings it has reach **#20 online** (US only).

- YouTube has a massive global reach: **it is a top 10 site in 8 countries**, a top 20 site in 18 countries, and a top 50 site in 49 countries. Overall, Alexa ranks it 19th in the world.

- Relative to the competition it is experiencing **3-5X time spent** with an average of 36 minutes per unique per month (MMX).

## Audience Metrics - Cont

- With the nature of many-to-many video sharing, YouTube is tapping a **network effect** that will be challenging to displace

- Users continue to upload ~**70K videos per day** and invest in tagging, cataloging and sharing their videos.

- The site is expanding the breadth and depth of the content offering – with greater audience, the value of "broadcasting yourself" increases.

  *"YouTube is currently serving 70 million videos per day to six million unique users daily, up from 3 million in December, with more than 60,000 videos being uploaded per day. YouTube is serving more than 200 million page views a day and is ranked the 18th most trafficked site on the Internet, according to Alexa." – YouTube Site*



**May - Average Time Spent per Unique**
Minutes

| YouTube | MySpace Video | Google Video | eBaums World | Yahoo! Video |
|---------|---------------|--------------|--------------|--------------|
| 36.0 | 6.9 | 11.6 | 5.5 | 8.4 |

**NetRatings Monthly Unique Visitors**
Millions

Top 20 as of May

Source: Net Ratings May

4

13

## Advertisers Have Started To Migrate

- Film studio based advertising is the **#1 advertising category across** MTVN representing $517M and 17% of total dollars spent (Film $403M, HV $114M).

- As demonstrated by recent deals **(Disney, NBC, Weinstein)**, this community is particularly prone to migrate dollars quickly where the target audience aggregates.

- Additional **categories of advertisers remain unclear** – i.e. CPG association with UGC has been limited



14

HIGHLY CONFIDENTIAL

VIA02159174

## Competition From Traditional And Non-traditional Sources Is Significant

**Social Networks:**

- **MySpace** has recently developed a **video sharing service** similar to YouTube. The leverage in the scale of promoting their service may detract from YouTube usage.

- MySpace may chose to **shut-down YouTube** usage which may represent up to 10% of current usage (70% of embedded, 15% of all plays are embedded)

**Video Search:**

- **Google Video, MSN video, Yahoo Video, AOL Video** Marketplace are all targeting searchable video content online. In particular Google Video is targeting the YouTube model of instant upload, viewing and tagging as a method for searching video content

**Pure Plays/ Start-ups:**

- Grouper, Revver and "hundreds" of other video sharing sites have emerged to tap this audience phenomena

**Competitive risk from NOT owning**

- Significant competitive threat from a **MySpace/YouTube consolidation**. Should MySpace acquire YouTube the consolidated value chain could represent a content development and distribution company that commands significant audience time in our core demographics

- YouTube remains one of the few pure-play companies with growing scale to acquire

15

HIGHLY CONFIDENTIAL

## Company Background

- Founded February 2005
- Site motto: "Broadcast Yourself"
- Features and usage
  - Users can instantly upload, watch, tag and share videos.
  - Getting to comprehensive  - search millions of videos uploaded by community members
  - Personalize the experience by subscribing to member videos, saving favorites, and creating playlists. Developing a persona on YouTube
  - Embed YouTube videos on websites using video implants or APIs
  - Users can make their posted videos public or private
  - Ability to watch and share videos from mobile phones or PDAs
- Management:
  - Chad Hurley – CEO & co-founder – prior Paypal
  - Steve Chen – CTO & co-founder – Prior Paypal
  - Sales and bus dev. mostly x-Yahoo! (Chris Maxcy)
- Investors:
  - YouTube announced its first round of funding in November 2005 for $3.5 million from venture-capital firm Sequoia Capital. In April 2006, YouTube received an additional $8 million in a second round of funding from Sequoia – investment led by Roelof Botha, former CFO of PayPal

16

## Sponsored video opportunity





**Schapiro Exhibit 127**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


------------------------------------X
VIACOM INTERNATIONAL, INC., COMEDY
PARTNERS, COUNTRY MUSIC
TELEVISION, INC., PARAMOUNT
PICTURES CORPORATION, and BLACK
ENTERTAINMENT TELEVISION, LLC,

        Plaintiffs,

   vs.                     No. 07-CV-2103

YOUTUBE, INC., YOUTUBE, LLC,
and GOOGLE, INC.,

        Defendants.
------------------------------------X


VIDEOTAPED DEPOSITION OF
BLAIR HARRISON
NEW YORK, NEW YORK
WEDNESDAY, DECEMBER 9, 2009




BY:  REBECCA SCHAUMLOFFEL
JOB NO. 18268

A P P E A R A N C E S:

FOR THE PLAINTIFFS VIACOM INTERNATIONAL,
INC.:
        JENNER & BLOCK, LLP
            By:  SCOTT B. WILKENS, ESQ.
                 1099 New York Avenue, NW, Suite 900
                 Washington, D.C. 20001
                 (202) 639-6000
                 Swilkens@jenner.com


FOR THE DEFENDANTS YOUTUBE, INC., YOUTUBE,
LLC and  GOOGLE, INC.:
        MAYER BROWN, LLP
            By:  ANDREW SCHAPIRO, ESQ.
                 ARIC JACOVER, ESQ.
                 1675 Broadway
                 New York, New York 10019
                 (212) 506-2146
                 Aschapiro@mayerbrown.com
                 Ajacover@mayerbrown.com



ALSO PRESENT:


Carlos King, Videographer

1                             HARRISON

2               the form.

3               Q.    In your own opinion.  Forget

4               about what she meant.

5   14:16:09        A.    For a purchase to be

6               Viacom's MySpace, MySpace was, I think,

7               the largest acquisition of a

8               user-generated digital media platform.

9               YouTube was a user-generated video

10  14:16:28   media platform, dot, dot, dot.  It

11              could be Viacom's version of same.

12              Q.    Did you ever hear discussion

13             of whether Mr. Redstone and Mr. Dauman

14             were frustrated about the fact that

15  14:16:58   Rupert Murdoch bought MySpace rather

16             than Viacom?

17              A.    I never heard anything about

18             Sumner Redstone's feelings or Philippe

19             Dauman's feelings, I think, until

20  14:17:12   Freston got fired, and then there was

21             an article everywhere.  But I think it

22             was something I read about it then.

23             But prior to that, no.

24              Q.    After Freston was fired, you

25  14:17:22   heard there was frustration about the

1                    HARRISON

2          failure to get MySpace?

3                  A.    I have a vague recollection

4          of Sumner actually saying something to

5  14:17:30    the press.

6                  Q.    In any event, in this E-mail

7          on July 5th, '06, you write to Miss

8          McGrath that you believe that "if we

9          can make a business out of it, we

10  14:17:56   should go and buy it," meaning YouTube,

11          correct?

12                 A.    Yes.

13                 Q.    And the goal was not to have

14          Viacom become a massive copyright

15  14:18:16   infringer, obviously?

16                 A.    Correct.

17                 Q.    And you detailed -- in your

18          E-mail, you listed some differences

19          between Napster and YouTube, right?

20  14:18:29       A.    I did.

21                 Q.    Do you know what you meant

22          when, at the end of this paragraph, you

23          wrote, "Napster had effectively no

24          non-infringing uses, YT had many"?

25  14:18:44       A.    Yes.

HARRISON

Q.    What did you mean?

A.    My recollection of Napster,
from the time -- because had already
14:18:53    been dead for awhile in July of '06 --
was that it was exclusively, almost
exclusively populated by music that had
been aggregated from the hard drives of
its audience, and that YouTube -- one
14:19:21    of the functions that YouTube served
was to enable individuals to share
videos, that they had created
themselves, with their friends and
family, and even the public at large.

14:19:38    Q.    And eventually, you and
others came together and put together
an analysis of a possible YouTube
acquisition, correct?

A.    Correct.

14:20:03    Q.    And the PowerPoint was
prepared, right?

A.    Yes.

Q.    By the way, do you remember
the code name for the possible
14:20:14    acquisition?

                              HARRISON

1

2          A.    I don't.  I would be amused

3          to hear it again.

4          Q.    Does "Project Beagle" ring a

5    14:20:22   bell, as in the dog that hunts a fox?

6          A.    Really?  I don't recall the

7          name.  I normally would.

8                MR. SCHAPIRO:  We are going

9          to mark Exhibit 12.  Meanwhile,

10   14:21:03   the videotape is about to run out.

11         While we mark, and you look at

12         Exhibit 12, we can changed tape.

13               THE VIDEOGRAPHER:  The time

14         is 2:21, and we are off the

15         record.

16               (Whereupon, a recess was

17         held.)

18               (Whereupon, the

19         aforementioned documents, VIA

20   14:20:58   02004550 through '4568, were

21         marked as Defendant's Exhibit

22         Harrison-12 for identification as

23         of this date by the Reporter.)

24               THE VIDEOGRAPHER:  The time

25   14:22:04   is 2:22 p.m., and we are back on

# Schapiro Exhibit 128

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

VIACOM INTERNATIONAL INC., COMEDY )
PARTNERS, COUNTRY MUSIC )
TELEVISION, INC., PARAMOUNT )
PICTURES CORPORATION, and BLACK )
ENTERTAINMENT TELEVISION LLC, )
                               )
             Plaintiffs, )
                vs. ) Case No.
YOUTUBE, INC., YOUTUBE, LLC, ) 1:07CV02103
and GOOGLE, INC., )
                               )
            Defendants. )
_____)
THE FOOTBALL ASSOCIATION PREMIER )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all )
others similarly situated, )
                               )
             Plaintiffs, )
                vs. ) Case No.
YOUTUBE, INC., YOUTUBE, LLC, and ) 07CV3582
GOOGLE, INC., )
                               )
            Defendants. )
_____)


VIDEOTAPED DEPOSITION OF JUDY McGRATH
New York, New York
Wednesday, July 29th, 2009

REPORTED BY:
ERICA RUGGIERI, CSR, RPR
JOB NO: 17161

1

2

3

4     July 29, 2009

5     8:09 a.m.

6

7     VIDEOTAPED DEPOSITION OF JUDY

8     McGRATH, held at the offices of Wilson

9     Sonsini, Goodrich & Rosati, 1301 Avenue of

10    the Americas, New York, New York, pursuant

11    to notice, before before Erica L.

12    Ruggieri, Registered Professional Reporter

13    and Notary Public of the State of New

14    York.

15

16

17

18

19

20

21

22

23

24

25

1

2          A P P E A R A N C E S

3          FOR THE PLAINTIFFS:

4          JENNER & BLOCK, LLP

5                  BY:  SUSAN KOHLMANN, ESQ.

6                  1099 New York Avenue, NW

7                  Washington, DC 20001

8                  (202) 639-6000

9                  Skohlmann@jenner.com

10

11         FOR THE DEFENDANTS:

12         MAYER BROWN, LLP

13                 BY: JOHN P. MANCINI, ESQ.

14                 1675 Broadway

15                 New York, New York  10019

16                 (212) 506-2146

17                 Jmancini@mayerbrown.com

18

19         FOR THE DEFENDANTS

20         WILSON SONSINI GOODRICH & ROSATI PC

21                 BY:   DAVID H. KRAMER, ESQ.

22                       MICHAEL H. RUBIN, ESQ.

23                 650 Page Mill ROad

24                 Palo Alto, California 94304

25                 Dkramer@wsgr.com

A P P E A R A N C E S: (Cont'd)


ALSO PRESENT:

    MICHELINA HALLEY, MTV Networks

    ANDRA SHAPIRO, MTV Networks

    CARLOS KING, Videographer

```
 1                        McGRATH
 2             A.     You mean as in socializing with
 3        people?
 4             Q.     As in making the world a better
 5  11:21:54  place.
 6             A.     No, I didn't say that.
 7             Q.     So do you believe --
 8             A.     I said this is what I did in my
 9        free time.
10  11:22:00  Q.     Ms. McGrath, I'm not asking you
11        about the article.  I'm asking you a
12        question about what you know today.
13               Sitting here, you are aware, are
14        you not, that YouTube has all sorts of
15  11:22:10  socially beneficial uses?
16               MS. KOHLMANN:  Objection.
17             A.     I'm aware that YouTube is a
18        popular video experience for millions of
19        people.
20  11:22:26  Q.     But you are aware that the video
21        experience that YouTube affords to
22        millions of people is one that in many
23        ways helps make the world a better place,
24        right?
25  11:22:37          MS. KOHLMANN:  Objection.
```

McGRATH

          A.     I would say it's a pleasurable

experience, because people -- based on its

popularity rankings.  I wouldn't make a

11:22:51  comment about whether it's making the

world a better place.

          Q.     You know, for example, that

servicemen in Iraq use YouTube to send

videos of themselves to their families,

11:23:01  right?

          A.     Yes.

          Q.     That's a good thing, right?

          A.     That's a good thing.

          Q.     That's a socially beneficial use

11:23:07  of YouTube, isn't it?

                 MS. KOHLMANN:  Objection.

          A.     Yes.

          Q.     You know that candidates running

for office use YouTube to get their

11:23:15  message to the electorate, right?

          A.     I do.

                 MS. KOHLMANN:  Objection.

          Q.     That's also a socially

beneficial use of the YouTube service,

11:23:22  right?

1                        McGRATH

2          A.    Now I see where you are going.

3                That's a beneficial aspect, yes.

4          Q.    That helps make our democracy

5    11:23:35  function better, right?

6                MS. KOHLMANN:  Objection.

7          A.    I wouldn't go so far as to make

8    that statement.

9          Q.    Do you think it helps improve

10   11:23:50  our democracy that candidates can use

11   YouTube to speak directly to the

12   electorate?

13               MS. KOHLMANN:  Objection.

14         A.    I can't say.

15   11:23:58  Q.    You know that elected officials

16   use YouTube to speak to their constituents

17   via YouTube?

18         A.    I do.

19         Q.    You think that's a socially

20   11:24:08  beneficial use of the service, right?

21               MS. KOHLMANN:  Objection.

22         A.    Well, they believe it is.

23         Q.    Do you believe it is?

24         A.    I believe there are many ways

25   11:24:20  candidates speak to people, and that's one

                        McGRATH

2        of them.

3                Q.    And that's a good thing, right?

4                MS. KOHLMANN:  Objection.

5    11:24:44    A.    I believe it's a popular

6        experience.

7                Q.    Ms. McGrath, that's not the

8        question.

9                    You know that elected officials

10   11:24:53   use YouTube to speak to their constituents

11       via YouTube, and I'm asking you whether

12       that's a socially beneficial use of the

13       YouTube service.

14               A.    In my opinion, you mean?

15   11:25:03   Q.    Do you believe it to be?

16               A.    I believe it is.

17               Q.    You are aware of the CNN YouTube

18       presidential debates, right?

19               A.    I am.

20   11:25:30   Q.    That, too, was a socially

21       beneficial use of YouTube, right?

22               A.    And CNN.

23               Q.    And YouTube, right?

24               A.    And YouTube.

25   11:25:36   Q.    Did you ever visit President

McGRATH

Obama's campaign's official channel on

YouTube?

    A.    I don't think so.

11:25:47    Q.    You are aware he had one,

though, right?

    A.    Yes.

    I went to his website.

    Q.    Don't you think that President

11:25:52 Obama's campaign channel on YouTube was a

socially beneficial use of YouTube?

    MS. KOHLMANN:  Objection.

    A.    I believe any time the president

communicates on television or on-line to

11:26:24 the population, that's a good thing.

    Q.    Including when he does so

through YouTube, correct?

    A.    Correct.

    Q.    Where he can reach an audience

11:26:38 of millions, correct?

    A.    He can reach an audience of

millions in many places.

    Q.    But on YouTube in particular,

right?

11:26:52    A.    I believe it is one of the ways

1

2          he communicates with millions of people,

3          yes.

4               Q.     And you think that's a good

5  11:26:58  thing?

6               A.     I do.

7               Q.     You would say the same thing

8          about Senator McCain's channel on YouTube,

9          right, even if you didn't vote for him?

10 11:27:05          MS. KOHLMANN:  Objection.

11               A.     Yes.

12               Q.     You believe that YouTube has

13         significant legitimate uses, don't you?

14                  MS. KOHLMANN:  Objection.

15 11:27:24         A.     I believe that YouTube has

16         legitimate uses, yes.

17               Q.     You believe those legitimate

18         uses --

19               A.     I would not --

20 11:27:31         Q.     -- are significant, in terms of

21         the overall use of the site, don't you?

22                  MS. KOHLMANN:  Objection.

23               A.     I believe most of the use of the

24         YouTube site is -- let me retract that.

25 11:27:47          What was the question again?

McGRATH

    Q.    You believe that the legitimate uses of YouTube that you referenced are significant, in terms of the overall use of the site, right?

11:27:57

    A.    I really don't know if they are a significant part of what drives the site traffic.

    Q.    You believe them to be, though, right?

11:28:05

    MS. KOHLMANN:  Objection.

    A.    I did not say that.  I have no idea.

    Q.    Do you consider your use of the YouTube service to have been legitimate?

11:29:19

    MS. KOHLMANN:  Objection.

    A.    To the best of my recollection, I would say yes.

    Q.    Ms. McGrath, Viacom considered acquiring YouTube, correct?

11:29:45

    A.    Correct.

    Q.    An acquisition of YouTube was contemplated by the most senior executives at Viacom and MTV Networks, right?

11:29:57

    MS. KOHLMANN:  Objection.

```
 1                    McGRATH
 2         A.    Right.
 3         Q.    Mr. Freston, the CEO of Viacom
 4   at the time, was involved in evaluating a
 5 11:30:08  potential acquisition of YouTube by
 6   Viacom, correct?
 7              MS. KOHLMANN:  Objection.
 8         A.    Evaluating.  Mr. Tom Freston had
 9   the ultimate decision-making on all
10 11:30:23  acquisitions, so I would -- I'm not sure
11   what you mean by involved in the --
12         Q.    He played a role in considering
13   the acquisition of --
14         A.    Yes --
15 11:30:32  Q.    -- YouTube?
16         A.    -- he did.
17         Q.    Mr. Wolf, the president and
18   chief operating officer of MTV Networks
19   was also involved or played a role in
20 11:30:40  evaluating a potential acquisition of
21   YouTube, right?
22              MS. KOHLMANN:  Objection.
23         A.    I believe he did.
24         Q.    What was your role in Viacom's
25 11:30:50  efforts to acquire YouTube?
```

# Schapiro Exhibit 129

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

VIACOM INTERNATIONAL, INC., COMEDY )
PARTNERS, COUNTRY MUSIC               )
TELEVISION, INC., PARAMOUNT           )
PICTURES CORPORATION, and BLACK       )
ENTERTAINMENT TELEVISION, LLC,        )
                                      )
                 Plaintiffs,          )
                 NO. 07-CV-2203       )
vs.                                   )
YOUTUBE, INC., YOUTUBE, LLC,          )
and GOOGLE, INC.,                     )
                                      )
                 Defendants.          )
_____)

VIDEOTAPED DEPOSITION OF ERIK FLANNIGAN
           NEW YORK, NEW YORK
        THURSDAY, OCTOBER 16, 2008


BY:  REBECCA SCHAUMLOFFEL, RPR, CLR
JOB NO. 16002

OCTOBER 16, 2008

9:30 a.m.


VIDEOTAPED DEPOSITION OF

ERIK FLANNIGAN, taken at the offices of

WILSON, SONSINI, GOODRICH & ROSATI, 1301

Avenue of the Americas, New York, New

York, pursuant to notice, before REBECCA

SCHAUMLOFFEL, CLR, RPR.

A P P E A R A N C E S:


FOR THE PLAINTIFFS VIACOM
    INTERNATIONAL, INC.:
    SHEARMAN & STERLING LLP
    By:  JOHN GUELI, ESQ.
    By:  KRISTIN FITZMAURICE, ESQ.
    599 Lexington Avenue
    New York, New York 10022
    (212) 848-4744
    jgueli@shearman.com
    kfitzmaurice@shearman.com




FOR THE DEFENDANTS YOUTUBE, INC.,
    YOUTUBE, LLC and GOOGLE, INC.:
    WILSON SONSINI GOODRICH & ROSATI
    By:  DAVID H. KRAMER, ESQ.
        CAROLINE WILSON, ESQ.
    650 Page Mill Road
    Palo Alto, California 94304
    (650) 849-3311
    Dkramer@wsgr.com
    Cwilson@wsgr.com




ALSO PRESENT:

Michelena Hallie, MTV Networks

Manuel Abreu, Videographer

1                       FLANNIGAN

2          content that we felt was put up by the

3          content owner.  Meaning, more often

4          than not when we do that, it happens on

5    11:44:09  a blog of ours.

6                 An ideal example to

7          represent this would be the Comedy

8          Central insider blog which covers

9          comedians and because many comedians

10   11:44:21  upload their content to YouTube,

11         Funnier Guy, many of their sites, we

12         often site the content being uploaded

13         by a comedian that we cover and we will

14         include an embed.  Sometimes we send

15   11:44:36  people to a site.  There is probably --

16         I suspect -- there is certainly no

17         policy that says always embed, never

18         link.

19             Q.    But the policy is embed to

20   11:44:47  content that you have a reason to

21         believe is authorized on the YouTube

22         site; is that correct?

23             A.    As it -- I wouldn't limit

24         that to YouTube.

25   11:44:57      Q.    So my original question was,

FLANNIGAN

          are there guidelines about linking to

          or embedding YouTube on your sites?

                    A.    Then I would change my

11:45:05  answer because there are guidelines

          that would go broader than YouTube.

                    Q.    Okay.  Are there any YouTube

          specific guidelines?

                    A.    Not that I know of that

11:45:15  wouldn't be true for other sites.

                    Q.    How are the folks who are

          charged with the task of embedding

          content from other online video sites

          tasked -- they are supposed to

11:45:29  determine whether the content to which

          they are linking or embedding is

          authorized?

                    A.    No one is charged with that

          task.  There is no task.  The -- in

11:46:07  many instances, again, with comedians

          being the most common example, there

          are a lot of cases like that where the

          editorial team may have an actual

          personal relationship with that

11:46:22  comedian or know that that comedian in

FLANNIGAN

fact perhaps posted that YouTube clip

on their own website, so we may not be

taking it from YouTube initially.  We

11:46:35    are taking it is from the comedian's

website.  So, we may take that as a

sort of an implication that the

comedian is okay with the content,

therefore, we are okay with that

11:46:44    content.

So that kind of criteria I

would call kind of a common sense

criteria is what is generally applied

when we decide whether we are going to

11:46:57    embed something or not.

Q.    YouTube is a very popular

for comedians to upload their own

content?

A.    Among other sites, but sure.

11:47:04    Q.    And that content is

authorized to be there by those

comedians?

A.    I couldn't say -- I can't

vouch for whether it is all is or not.

11:47:11    Certainly some pieces where they the

1    FLANNIGAN

2        channel creator, I think we take it on

3        faith that it is authorized.

4            Q.    And that's quite common in

5  11:47:20  your experience with YouTube?

6            MR. GUELI:  Objection to the

7        form of the question.

8            A.    I probably couldn't handicap

9        the commonality of that.

10 11:47:33     Q.    Can you identify for me

11       which sites within the -- within your

12       organization have imbeds as to YouTube

13       content?

14           A.    Comedy Central has from time

15 11:47:49  to time.  Spike.com has from time to

16       time.  I don't know if Gametrailers has

17       or not.  Atom, probably not; now,

18       anyway.  There is not sort of a forum

19       for it.

20 11:48:13         Who am I leaving out?  TV

21       Land, no.  Yes, I don't know.

22       Actually, maybe they have.  I don't

23       know.

24           Q.    How about flux?

25 11:48:27     A.    Flux isn't really a site.

1           FLANNIGAN

2           Q.    How would you describe flux?

3           A.    I don't manage flux.  You

4      know, it is run by different group in a

5  11:48:40  centralized organization, so it is hard

6      to describe.  It is what might be

7      commonly called a social networking

8      platform on which users can have

9      profile pages, show sites can be built.

10 11:49:02  Commenting ratings, things like that

11     have sort of standard issues, social

12     networking behaviors can be done, but

13     it is not exactly a place or a single

14     site.

15 11:49:12       Q.    Who is in charge of Flux?

16          A.    I believe today, it reports

17     up to Kenny Miller.

18               THE COURT REPORTER:  Off the

19               record.

20 11:49:48       THE VIDEOGRAPHER:  The time

21               is 11:49 a.m.  This completes tape

22               number one of video deposition of

23               Erik Flannigan.

24               (Whereupon, an

25 11:49:55       off-the-record discussion was

```
 1                         FLANNIGAN

 2                    held.)

 3                         THE VIDEOGRAPHER:  The time

 4                    is 2:26 p.m.  This is the

 5    14:25:54        beginning of tape number three of

 6                    the video deposition of Erik

 7                    Flannigan.

 8              BY MR. KRAMER:

 9                    Q.    Mr. Flannigan, have you ever

10    14:25:59        watched videos on YouTube?

11                    A.    I have.

12                    Q.    How many?

13                    A.    I don't know.

14                    Q.    Hundreds?

15    14:26:09              MR. GUELI:  Are you asking

16                    for work related or just personal?

17                         MR. KRAMER:  Just asking how

18                    many videos he watched on the

19                    YouTube service.

20    14:26:18        A.    A few hundred.

21                    Q.    Less than a thousand, do you

22              think?

23                    A.    Probably, yes.

24                    Q.    You still use YouTube to

25    14:26:27        watch videos today?
```

1                          FLANNIGAN

2              A.    I do.

3              Q.    How often would you say you

4        have used the service; once a day, once

5   14:26:32  a week, once a month?

6                   MR. GUELI:  Again, just for

7              clarification, are you drawing any

8              distinction between work related

9              versus personal use here?

10  14:26:41        MR. KRAMER:  No, I am not.

11             A.    Probably -- once a week is

12       probably a fair characterization.

13             Q.    Do you watch YouTube videos

14       while you are at work?

15  14:26:52  A.    I have.

16             Q.    Do you watch them while you

17       are at home?

18             A.    I have?

19             Q.    For the videos you watched,

20  14:26:59  did you consider them to be infringing

21       any copyrights?

22                   MR. GUELI:  Object to the

23             form of the question.

24             A.    Some yes, some no.

25  14:27:10  Q.    So setting aside the ones

1                                    FLANNIGAN

2              that you believe infringed copyrights

3              owned by Viacom, have you watched any

4              videos on the YouTube service that

5    14:27:18  believe infringe copyrights?

6                   A.   Yes.

7                   Q.   So were you engaged in

8              copyright infringement to your

9              understanding by watching videos that

10   14:27:27  you considered infringing?

11                       MR. GUELI:  I object to the

12                  form of the question.

13                  A.   Legally, I have no idea.

14                  Q.   What information would you

15   14:27:33  need to make that determination?

16                  A.   I have no idea what I would

17             need.

18                  Q.   Have you watched videos on

19             the YouTube service that you believe

20   14:27:41  did not infringe a third-party

21             copyrights?

22                  A.   Yes.

23                  Q.   What is the distinction

24             between those two types of videos in

25   14:27:50  your mind?  How are you making the

FLANNIGAN

distinction between those you believe

did infringe copyrights and those you

believe did not?

14:28:10          A.    I would characterize the

ones that I believe didn't -- I can

think of examples -- types of examples

in my mind where, for instance, the

person who uploaded the video appears

14:28:21    in the video.  They are a friend of

mine.  They are a child of a friend of

mine.  They are someone like that.  I

know the person, they put the video up

or they are -- to go one step further,

14:28:33    they are a stand-up comedian that

appears to control the channel.  Every

video they have is from them.  They

write notes, saying, hi, fans, I am

doing this, this and that.  It seems

14:28:44    pretty clear passing the common sense

test that this comes from the person

that puts it up there in the first

place.

                 The ones in the other

14:28:51    category would be where the uploader is

1    FLANNIGAN
2           extremely unlikely to have been the
3           originator or possibly the owner of
4           content that I know to be generally
5    14:29:04  owned by someone else or the nature of
6           the way they posted the content implies
7           an amateurism to suggest they were not
8           authorized agents.
9               Q.    Do you personally know any
10   14:29:18  other people who view videos on
11           YouTube?
12               A.    I do.
13               Q.    How many people do you know
14           view YouTube?
15   14:29:25      A.    You know, I've never
16           surveyed them.
17               Q.    Is it hundreds?
18               A.    Probably in the hundreds,
19           yes.
20   14:29:31      Q.    And what -- we are talking
21           about friends, family, co-workers?
22               A.    Certainly co-workers.
23           Friends, family, probably not as much.
24               Q.    To your knowledge, do these
25   14:29:43  people that you know that use YouTube

```
1                          FLANNIGAN
2            use it to watching infringing videos?
3                        MR. GUELI:  Object to the
4                   form of the question.
5   14:29:49      A.    I don't know what they are
6            using YouTube to watch necessarily.
7                   Q.    Do you know of any your
8            co-workers at Viacom that use YouTube
9            to watch infringing videos?
10  14:29:59           MR. GUELI:  Object to the
11                  form of the question.
12                  A.    I know co-workers who have
13           watched infringing videos on YouTube.
14           I don't know that they use it to watch
15  14:30:18  infringing video.
16                  Q.    Who do you know has watched
17           infringing videos on the YouTube
18           service?
19                  A.    I couldn't possibly have
20  14:30:26  enough detail to know.  I can only
21           presume.
22                  Q.    Okay, so when you answered
23           the last question before --
24                  A.    Actually, you're right.  I
25  14:30:32  presume they do.  I certainly have no
```

FLANNIGAN

2 tracking of what their viewing habits

3 are.

4          Q.     Do you personally know

5 14:30:38  people that have uploaded clips to the

6 YouTube service?

7          A.     I do.

8          Q.     Do you know people that have

9 uploaded clips to the YouTube service

10 14:30:47  that violate third-party copyrights?

11                MR. GUELI:  Objection to the

12          form.

13          A.     Not with certainty, no.

14          Q.     So you can't identify anyone

15 14:31:15  that you know personally that's

16 uploaded video clips in violation of a

17 party's copyright?

18                MR. GUELI:  Objection to the

19          form.

20 14:31:22  A.     I can't think of an example.

21          Q.     How many of the people that

22 you know use YouTube to upload video

23 clips?

24          A.     I don't know.

25 14:31:32  Q.     I will phrase it slightly

1                      FLANNIGAN

2           differently.  How many people do you

3           know that upload video clips to the

4           YouTube service?

5   14:31:39      A.    I would give the same

6           answer.  I haven't tracked what they

7           have done.  You know, I really don't

8           know.  It could be 100 of them, it

9           could be 20 of them.  I really have no

10  14:31:52  idea who has actually uploaded and

11          hasn't uploaded.

12              Q.    You personally have uploaded

13          clips to the YouTube service?

14              A.    I have.

15  14:31:59      Q.    So, you have an account at

16          the YouTube service, right?

17              MR. GUELI:  It is a question

18              -- you know, this is -- I think if

19              you want to ask him about his work

20  14:32:09      related use of YouTube, that's

21              fine, but his personal use, you

22              know --

23              MR. KRAMER:  Stop the

24              speaking objections.

25  14:32:20      MR. GUELI:  -- is not

1                    FLANNIGAN

2          appropriate.

3               Q.    Do you have an account on

4          the YouTube service?

5    14:32:23         MR. GUELI:  Answer yes or

6                    no.

7               Q.    Do you have an account on

8          the YouTube service, sir?

9               A.    Yes.

10   14:32:29         Q.    Did you understand that when

11         you uploaded material to the YouTube

12         service you were granting YouTube a

13         right to make those materials available

14         to other users of its service?

15   14:32:38         MR. GUELI:  Object to the

16                   form of the question.

17              A.    I was aware of the

18         availability of the content by

19         uploading to the YouTube service to

20   14:32:47   other users.

21              Q.    Did you understand that you

22         were representing to YouTube that you

23         had the rights to share the materials

24         that you were uploading to the service?

25   14:32:53         A.    I did.

1                    FLANNIGAN

2            Q.    When you were uploading

3     videos to the YouTube service, you were

4     notified in the process that you needed

5 14:33:00  to ensure you have the rights to share

6     the content you were uploading, didn't

7     you?

8            A.    Right.

9            Q.    You were given that

10 14:33:08 notification, right?

11            A.    Was I given the

12     notification?

13            I believe through the

14     process of uploading a video, you were

15 14:33:24 asked that question.

16            Q.    And you confirmed that you

17     had the right to share the videos that

18     you uploaded to the YouTube service,

19     right?

20 14:33:29  A.    Correct.

21            Q.    When was the last time you

22     uploaded a video to the YouTube

23     service?

24            A.    Probably two months ago,

25 14:33:40  perhaps.

1       FLANNIGAN

2          Q.    How many videos in total

3    have you uploaded to YouTube?

4          A.    Somewhere in the five to six

5    14:33:46   range.

6          Q.    What were they?

7          A.    They were my friend, Madi

8    Diaz, a musician who my wife is the

9    manager of.  Some performances that she

10   14:33:57   had given.

11         Q.    Did you have the right to

12   share those clips through the YouTube

13   service?

14         A.    I did.

15   14:34:00   Q.    Who gave you those rights?

16         A.    Madi herself.

17         Q.    Why did you upload those

18   video clips to YouTube?

19         A.    I uploaded those clips to

20   14:34:10   YouTube so Madi could see performances

21   that I had shot for her.

22         Q.    So this is videos of

23   performances of Madi Diaz that you shot

24   yourself?

25   14:34:21   A.    Correct.

1                              FLANNIGAN

2              Q.    And you then uploaded those

3       performances to YouTube?

4              A.    That's correct.

5    14:34:27    Q.    Did any of those videos

6       infringe any third-party's copyrights?

7                    MR. GUELI:  Object to the

8              form.

9              A.    To the best of my knowledge

10   14:34:36   as Madi is the songwriter and owns her

11      performance and granted me the right to

12      do it and knew I was putting them up on

13      YouTube, no.

14             Q.    Did you -- so, is it your

15   14:35:08   testimony that the only videos that you

16      have uploaded to the YouTube service

17      are videos of Madi Diaz's concerts?

18             A.    Five of the six were or four

19      of the five.  One of them is not.

20   14:35:20   Q.    What is the sixth?

21             A.    Amy Winehouse.

22             Q.    Do you know Amy Winehouse?

23             A.    I don't.

24             Q.    So, do you have any reason

25   14:35:27   to -- did you have the rights to upload

1                        FLANNIGAN

2          Amy Winehouse footage to the YouTube

3          service?

4                 A.    Probably not.

5   14:35:33       Q.    When did you upload the Amy

6          Winehouse clip to the YouTube service?

7                 A.    Some time in 2007.

8                 Q.    But you represented to

9          YouTube that you had the authority to

10  14:35:50  upload that clip when you did, right?

11               A.    I did.

12              Q.    So you lied to YouTube?

13              A.    I interpreted it as

14          something that I -- I wouldn't say I

15  14:36:07  lied.  I would say I gave the -- I

16          represented that I could represent the

17          copyright and there is some copyright

18          of that recording that I actually

19          probably do own because I shot the

20  14:36:17  footage.  So, whether the complete

21          copyright story behind that clip was

22          answered by the question that YouTube

23          asked me, that, I don't know.

24              Q.    Did you upload Madi Diaz

25  14:36:29  video clips to other video sharing