1    CacQfooC

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------x
     VIACOM INTERNATIONAL, INC. et
4    al.
                    Plaintiffs,
5               v.                          07 CV 2103 (LLS)
     YOUTUBE, INC. et al.
6               Defendants.
     ------------------------------x
7    THE FOOTBALL ASSOCIATION PREMIER
     LEAGUE LIMITED, et al.
8               Plaintiffs

9         v.                                07 CV 3582 (LLS)

10   YOUTUBE, INC. et al.

11              Defendants.

12   x------------------------------x

13                                          New York, N.Y.

14                                          October 12, 2012
                                            2:30 p.m.
15
     Before:
16
                    HON. LOUIS L. STANTON,
17
                                            District Judge
18

19

20

21

22

23

24

25

```
1

2                      APPEARANCES
   SHEARMAN & STEARLING LLP
3       Attorney for Plaintiffs Viacom
   STUART J. BASKIN
4
   JENNER & BLOCK LLP
5       Attorneys for Plaintiff
   SUSAN J. KOHLMANN
6   SCOTT B. WILKENS

7   PROSKAUER ROSE LLP
        Attorneys for Premier League Plainiff
8   CHARLES SIMS
   WILLIAM M. HART
9
   BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
10      Attorneys for Plaintiffs co-counsel Football League
   JEREMY P. ROBINSON
11
   QUINN EMANUEL LLP
12       Attorneys for Defendants
   ANDREW SCHAPIRO
13

14  WILSON SONSINI GOODRICH & ROSATI PC
        Attorneys for Defendants
15  DAVID H. KRAMER
   BRIAN N. WILLEN – Of Counsel
16

17

18

19

20

21

22

23

24

25
```

1          (In open court)

2          THE COURT:  Familiar faces.  Welcome back.

3          Where do we stand?  Mr. Schapiro?

4          MR. SCHAPIRO:  Your Honor, the Second Circuit, after

5     sending the case back, asked what we thought were four fairly

6     clear questions or sent the case back for resolution of four

7     discrete issues, and the Court then crystallized that even

8     further in its letter to the parties of a few months ago.

9          The Second Circuit asked the Court to determine

10    whether on the current record Youtube had knowledge or

11    awareness of any specific infringement.  We think that the

12    plaintiffs have been given more than enough opportunity in the

13    flurry of letters to point to some specific clips in suit of

14    which Youtube had actual or red-flag knowledge.  They haven't

15    been able to muster it.  They seem to want to be able to ignore

16    the direction to point to specific infringements.

17         Second, the Second Circuit said that this Court should

18    determine whether on the current record Youtube willfully

19    blinded itself to specific infringements.  Again, we'll rest on

20    the letters here, but there's been a back-and-forth with many

21    letters written, and the plaintiffs seem intent on trying to

22    resurrect their general knowledge standard rather than

23    answering the question posed by the Second Circuit and this

24    court.

25         Third, the Second Circuit asked this Court to

determine whether Youtube had the right and ability to control

infringing activity within the mean of Section 512(c)(1)(B),

and, again, the parties have laid out their positions in

letters before this Court, and we do not believe that the

plaintiffs have made any showing that would allow them to

survive a renewed summary judgment.

Then, finally, the Second Circuit asked this Court to

determine whether any clips in suit were syndicated to a third

party, and, if so, whether that syndication occurred by reason

of storage at the direction of the user within the meaning of

the statute.

In short, we've had this exchange, it seems like at

the end of the day, we're still, to some extent, talking past

each other, and, so, waiting for guidance from your Honor,

because the Second Circuit said that after we've hashed some of

this out, the Court should permit renewed motions for summary

judgment as soon as practicable.  That's from the Second

Circuit decision.

We think now is practicable, and so we think that's

where we need to go, but, of course, we would probably require

some indication from your Honor as to which of us is

understanding the Second Circuit's ruling accurately.

THE COURT:  Baskin.

MR. BASKIN:  Good afternoon, your Honor.  I will also

happily stand on the papers we presented to the Court in quite

1  detailed --

2        THE COURT:  A little louder.

3        MR. BASKIN:  We presented to your Honor quite detailed

4  analysis of all four issues.  Of course, it's in the context of

5  summary judgment, so that, as your Honor knows, the standard is

6  all evidence has to be weighed in favor of the plaintiffs for

7  this purpose.

8        Our proposition to the Court -- and, again, I'm happy

9  to stand on the papers we submitted, which goes into it in

10  substantial detail, that this is not even a close case, and,

11  from a summary judgment point of view, there is no chance,

12  especially since the Second Circuit particularized that the

13  issues, specifically the issues of willful blindness, and the

14  issue of writing ability to control are factual issues which,

15  in large measure, turn on issues of intent, so they are

16  quintessentially issues that are not subject to summary

17  judgment.  We think that there's no chance of a summary

18  judgment ruling here.  We understand your Honor may well have

19  to give them the opportunity to move for summary judgment.  We

20  will answer.

21        We think, as your Honor knows, however, we should not

22  delay this case progressing in an orderly fashion towards

23  trial, and at the same time that we brief summary judgment or

24  they brief summary judgment, we believe your Honor should put

25  us on a quite accelerated schedule, accelerated in the sense a

schedule with a clear trial date in mind; that we try to get to

trial within the next nine, ten, eleven months; and that you

have parties, obviously, with a lot of resources and a lot of

availability here, and the parties are perfectly capable of

proceeding on multiple tracks.  So we believe, your Honor, we

should have -- if summary judgment should proceed, let it

proceed, but since we think the likelihood of anyone getting

summary judgment on this record is, quite frankly, remote,

particularly where issues of intent are the driving issues,

your Honor should go further and should put us on an orderly

path to trial.

THE COURT:  Mr. Sims.

MR. SIMS:  Your Honor, I largely agree with what

Baskin had to say.  I would add that in light of the way the

Second Circuit approached these issues, class plaintiffs have

concluded that they will not move for summary judgment.  So

that should make things easier.  We understand Mr. Schapiro

intends to, and we will, of course, respond.

We have indicated to the Court in the letters that

there is a small amount of discovery that we do want on the

issues that the Second Circuit left open for discovery.  We

don't see any reason why that can't be done consistent with --

THE COURT:  Why hasn't it been done?  It's been months

since we met.

MR. SIMS:  Your Honor --

1          THE COURT:  There is no stay of discovery in effect.

2          MR. SIMS:  It was our understanding that you had

3     control over how we were going to proceed.  You asked for these

4     letter briefs.  We think we can get our requests in within ten

5     days or a week even and we don't see why that needs to

6     interfere with the schedule that would otherwise be reached.

7     We're prepared to --

8          THE COURT:  Baskin, I take it you are complete on

9     discovery?

10          MR. BASKIN:  Your Honor, the only discovery we ask

11     is -- the Second Circuit proposed that for reasons of the

12     storage issue, that we have to identify which of our --

13          THE COURT:  The syndication issue.

14          MR. BASKIN:  Yes, the syndication issue.

15          -- which of our clips were in fact syndicated.  It's a

16     clear factual, easy factual inquiry.  The only ones who have

17     the record are Youtube.  So, we just want their assistance in

18     identifying which of our clips they in fact syndicated, so if

19     your Honor concludes, as we think you will, that syndication

20     remains a live issue for trial, we can identify which of our

21     clips were in the process of being syndicated.  Beyond that, we

22     need no discovery, your Honor.

23          MR. SIMS:  That, your Honor, is one of the --

24          THE COURT:  Are you contemplating doing that discovery

25     after the motions for summary judgment if they're denied, or is

1    there something you need for the motions for summary judgment?

2         MR. BASKIN:  Either way, your Honor.  We could do it

3    after summary judgment once the motions, as we hope, are

4    denied.

5         All we need for trial, we need to be able to

6    identify -- if we prevail on the storage issue, as we think we

7    will, for purposes of trial, we need to identify which of our

8    clips are on their system.  Only they have that information.

9         So, we are happy to wait and do that after the summary

10   judgment briefing, or, frankly, I think it's discovery we can

11   do simultaneously with the briefing.  I think it will take 30

12   days tops to compile that data.  I don't think it should be an

13   issue that slows down the Court's schedule --

14        THE COURT:  I would have thought that any necessary

15   discovery would have been accomplished by this time by able

16   counsel proceeding to get what they thought they needed, and if

17   there was some objection to it or you thought it wasn't

18   allowed, I'd hear about it.

19        MR. SIMS:  Your Honor, given how things had been

20   organized here, it never occurred to us that we were able to go

21   forward with that.  I think we would have had a response from

22   Mr. Schapiro that the Court had concluded discovery years ago.

23        So, if I misunderstood, we're wrong, but we think it

24   can be done expeditiously.  There are only five pretty targeted

25   matters that we want and we think if we can get responses back

1  within 45 days, it won't delay the briefing.

2         THE COURT:  What's your response on discovery,

3  Mr. Schapiro?

4         MR. SCHAPIRO:  Your Honor, there were two years of

5  discovery in this case, 30 million pages of documents

6  exchanged, 148 depositions.

7         THE COURT:  Oh, look, that was true before this Court

8  of Appeals' opinion.  The Court of Appeals wrote what it wrote

9  bringing us up into the 21st Century.

10        What is your position on discovery with the next round

11  of summary judgment briefing in view?

12        MR. SCHAPIRO:  Our position is that on the syndication

13  question, once we receive guidance from the Court about which

14  party is understanding the Second Circuit's position on

15  syndication correctly, that we should be able to answer a few

16  interrogatories if Viacom wants to send them to us and show

17  them, we think we can establish to their satisfaction that no

18  clips in suit were manually delivered for syndication in the

19  way that the Second Circuit was thinking.  We can answer that

20  question for them.

21        Mr. Sims in the class, in one of its earlier

22  letters --

23        THE COURT:  In other words, you want to apply the

24  limiting word "manually?"

25        MR. SCHAPIRO:  Yes, your Honor.

1          THE COURT:  Baskin thinks that's immaterial.

2          MR. SCHAPIRO:  That's why we think that before we

3    start down the path of discovery, we would need your Honor to

4    weigh in and clarify that issue.  We think it's quite clear,

5    but there is a gap between the parties.

6          THE COURT:  And with respect to Mr. Sims?

7          MR. SCHAPIRO:  Mr. Sims, as I understand it, based on

8    one of the early letters they sent, wants to go into discovery

9    about all sorts of things that have nothing to do with any

10   clips in suit.

11         He wants to know about all these clips in the

12   so-called Otto declaration that they submitted, none of which

13   are clips in suit, all of which post date the time at issue in

14   this case.

15         They were asking about things that we do in Germany in

16   response to a German court order that's on appeal.  So, our

17   sense is that the class's proposed discovery is anything but

18   targeted.

19         Viacom's request for discovery on syndication do seem

20   targeted, and I'm sure if we meet and confer, assuming that

21   your Honor gives us guidance that allows us to be talking about

22   the same thing, I'm sure we can work out with Viacom targeted

23   discovery with a schedule which presumably would be with the

24   interrogatories.

25         THE COURT:  Mr. Sims.

1          MR. SIMS:  Your Honor, I have five items here.  I

2     would suggest that we propound them to Mr. Schapiro, and if he

3     has a problem, we could try to work them out.  Otherwise, we

4     can come to you or to a magistrate.  But they're five items.

5     It's not millions of pages we're seeking.  It's not lots of

6     depositions we're seeking.

7          I do want to correct a misstatement that has been made

8     twice, which the works identified in the Otto declaration are

9     not in the lawsuit.  To the contrary, they are exactly the same

10    works in suit that we have been suing about for five years that

11    we now find out are still sitting in Youtube never having been

12    taken down and are sitting in Youtube-generated channels.

13          THE COURT:  Why don't you ask they be taken down if

14    you object to that?

15          MR. SIMS:  Well, I would have thought, number one,

16    that our letters were perfectly clear requests for those to be

17    taken down.  And, number two --

18          THE COURT:  Excuse me?  What was that?

19          MR. SIMS:  The letters that we've sent make perfectly

20    clear our position and identified precisely where they were.

21    They comply with all of the requirements of --

22          THE COURT:  Of notice.

23          MR. SIMS:  -- of that.  In addition, the point we're

24    trying to make -- one of the points in the lawsuit is that once

25    we send take-down notices, they have obligations.  What they're

1  doing in Europe is they take the material identified in a

2  take-down notice, they make a reference file of it, and exclude

3  additional copies of that same work at the threshold.  Our

4  point is that's what they should be doing here.

5          The other declaration lists and provides links, if

6  your Honor wanted to see them, to exactly the works that we

7  have been suing about for five years that are still being

8  distributed to the public by Youtube on channels which they

9  admit -- because they create them -- are the most popular

10 material available.  They only create a channel when it's

11 something that's particularly popular and interesting to

12 people.

13         So, they are continuing to use the very works in suit.

14 This is not about new works.  We're not suing about new works.

15 We understand the Court's ruling years ago on that point.  But

16 these are the same old things that are still being shown on

17 Youtube, and, of course, we're allowed to talk about it in

18 connection with summary judgment and point out that they

19 have --

20         THE COURT:  You say they appear on some list of works

21 in suit that you have filed in this case.

22         MR. SIMS:  Absolutely.

23         THE COURT:  All right.

24         MR. SCHAPIRO:  Your Honor, either unintentionally or

25 artfully, Mr. Sims is conflating works in suit with clips in

suit, OK?  What is at issue in this case are clips, and both

this court and the Second Circuit made that clear.  Every clip

in suit -- the Second Circuit's decision says this; your Honor

decided it.  The record is closed on that.  Every clip in suit

has been taken down.

A work in suit is a show, a television show.  So, the

show might be Sponge Bob Square Pants or it's a particular

episode of a show.

A clip is the excerpt that was posted to Youtube.  So

I need to make two things very clear.  Every clip in suit was

taken down before the Court issued its first summary judgment

ruling in this case.

Second, as soon as they sent us the Otto declaration,

we took down everything identified in the Otto declaration.

They should have sent it to us years ago, but it ultimately

doesn't matter because whatever they might say about what we're

able to do in terms of identify -- let me back up for a moment.

The class has always taken the position that we should

extrapolate, and once we take down one version of something

that belongs to them, we should find or identify other versions

and take them down.  That's what Mr. Sims is talking about

here.  And there is no reading of the Second Circuit's decision

in which that would be relevant to any renewed summary judgment

papers.  So that discovery would all be for naught.

MR. SIMS:  Your Honor, in the first place, most of

1    these re-posts are not different versions.  They are the same

2    audio or the same audio and video precisely -- maybe a little

3    longer or a little shorter -- but the same, and so one of our

4    clients, for example, is suing on the song *Smile* because they

5    wrote the song *Smile*.  And a copyright lawsuit is about

6    centrally the plaintiff's work which is being sued about, and

7    the plaintiff comes into the court and says, "You're copying

8    this work."  The fact that they are continuing to copy the work

9    is, of course, always relevant to injunctive relief at a

10   minimum, and also to the questions of control, and to the

11   question of willful blindness.

12        If they have our works that we've already sent them

13   take-down notices for, and they're identifying those works so

14   precisely that they are matching advertisements to them or

15   collecting all of these x-ray dog songs, for example, into

16   channels that they are finding, our submission is -- and

17   nothing that the Second Circuit or this Court has indicated is

18   to the contrary -- that that will allow a jury to find control

19   plus sufficient to defeat the safe harbor or willful blindness

20   because if they can find it for purposes of matching an ad or

21   putting in a channel, then they're consciously avoiding that

22   knowledge by pretending that they don't know it's there for

23   copyright enforcement purposes.

24        MR. SCHAPIRO:  Your Honor, Mr. Sims has again used the

25   word works in suit at every turn, but these are different --

1          THE COURT:  Mr. Schapiro, I want to understand what

2     counsel is saying, but I don't want it to derail some other

3     important questions we have to discuss.  If I try to carry too

4     many points in my mind when I should be thinking about the

5     major things, I will not do a good job on either –– the major

6     or the minor things.

7          I think that deferring on these small issues for the

8     moment, Mr. Sims, you raised the question or you bring

9     tacitly –– there was a suggestion in I think some of your

10    correspondence, but certainly in some of the correspondence,

11    that the Premier League action you thought might be decoupled

12    from this action and possibly deferred until the outcome of, I

13    guess, the motions or if you have litigation to final judgment

14    of this action.

15         Do I misunderstand that that suggestion was floated;

16    And, if so, what is your present thinking about it?

17         MR. SIMS:  Your Honor, it had been our view months ago

18    that if the discovery we wanted would have made a trial on the

19    schedule that Viacom is seeking impossible, we might have

20    stepped back.  As we now think about it, looking at the small

21    amount of what we want and the development of the theories on

22    both sides in the briefing, I guess our position now is we

23    don't think that the small amount of discovery we want ought to

24    have that impact.  So, we're not looking to be decoupled.  We

25    would have acquiesced in it if necessary, but I don't think

1     it's something we're looking for.

2              THE COURT:  Isn't a consequence of that position that

3     we should consider whether the motion for class certification

4     should or should not be addressed before the motions for

5     summary judgment?

6              MR. SIMS:  Your Honor, for the same reasons why the

7     Court didn't address the class certification before, our view

8     is that the briefing on the merits on their summary judgment

9     motion -- not really the merits, but a defense -- would be

10    much --

11             THE COURT:  It can hardly be for the same reason

12    because the last time the reason was I was dismissing all those

13    portions of the case in which the class then would have had any

14    viable interest.  That mooted the certification question.

15             MR. SIMS:  Yes.

16             THE COURT:  You don't want to argue that reason, I

17    don't think.

18             MR. SIMS:  We do think that the crystallization of the

19    issues presented by the Second Circuit can most efficiently

20    happen; and, frankly, we read the Second Circuit's decision as

21    implying that the Court should turn as the first order of

22    business to the summary judgment motion that certainly --

23             THE COURT:  I don't see any such direction.

24             MR. SIMS:  Well, they use the word expeditiously.

25    They assume that it would go forward right away.

1        (Pause)

2             MR. SIMS:  The other point, your Honor, is that the

3    decision that you make on the merits of their defense will

4    really shape how we would want to pitch class certification or

5    not so that in some ways that becomes an issue which is a lot

6    easier to handle once there is more clarity on what the scope

7    of these defenses is.  So, our suggestion would be that we all

8    work hard on their summary judgment motion and turn to --

9             THE COURT:  Well, I thought you were going to pass on

10   it.

11            MR. SIMS:  No, Mr. Schapiro is not going to pass.

12   He's going to move for summary judgment, and our position would

13   be that in the course of deciding that, it will be a lot easier

14   and there will be much more focused briefing on class

15   certification than there would otherwise be.

16            THE COURT:  Mr. Schapiro?

17            MR. SCHAPIRO:  Your Honor, we set forth our position

18   on this in our letters.  We think that contrary to what

19   Mr. Sims has just said, that whatever decision your Honor would

20   ultimately make on summary judgment, no class can be certified

21   here, and that that is going to be the ultimate ruling.

22            It's within your Honor's discretion to decide, I

23   think, what's the most efficient way to order it, but as we

24   stated in our letters, we thought that it's ripe for

25   consideration now and that that would be efficient.

1          MR. BASKIN:  Your Honor, may I just be heard?

2          THE COURT:  Sure.

3          MR. BASKIN:  I enjoy being a bystander, by the way.

4          THE COURT:  Excuse me?

5          MR. BASKIN:  I said, I enjoy listening to others

6     argue.  It sharpens my skill set.

7          I don't care, your Honor, whether -- happy to brief

8     summary judgment in conjunction with the class; happy to

9     decouple them if that becomes necessary; and, yet, as your

10    Honor knows, these actions are not consolidated.  We were

11    careful not to do that precisely because we do not want,

12    obviously, the class's action to slow us down.  As long as we

13    can work in tandem, that's fine.  If summary judgment proceeds

14    in tandem, that's fine with us.  If you want to go a different

15    way, that could be worked out between you and the other

16    parties, but our goal is to have our matter, which has been

17    here awhile, to proceed to trial as rapidly as possible.  And

18    these are not, as I said, consolidated lawsuits intentionally

19    for that reason because we understood there someday might be a

20    need to decouple the lawsuits once discovery got completed.

21          THE COURT:  So, in short, your position is you'd like

22    your trial as quickly as possible.

23          MR. BASKIN:  Exactly, your Honor.  Once your Honor

24    rules on summary judgment --

25          THE COURT:  And you are in disfavor of anything that

1    might slow it down.

2              MR. BASKIN:  Correct.

3              THE COURT:  OK. I got that.

4              MR. SIMS:  Your Honor, in just recalling the class

5    certification briefing, it was full of the merits, and it was

6    full of different branches of the merits because it was unclear

7    which of their many directions the Court might go with respect

8    to what these various defenses mean, what the elements of them

9    mean.  So, it would really be much more efficient and certainly

10   much less likely to delay things if the class certification

11   briefing were to happen afterward.  If the Court were insistent

12   on class certification earlier, I would actually want to talk

13   to my clients about decoupling.  Maybe at that point it would

14   make more sense, but I don't have an answer now because I would

15   need to talk to clients about it.

16             THE COURT:  Well, when you talk to them about

17   decoupling, I would suggest that that concept does raise other

18   issues on which you would take a position after consideration,

19   such as whether the whole case is stayed or whether any

20   discovery in it should continue, and about whether the motions

21   for certification should be stayed or should be decided before

22   any treatment about decoupling because after the motion for

23   certification is made, there might not be any class to worry

24   about, which, again, goes back to whether the certification

25   motion should be made before the renewed summary judgment

1    motion.

2         Seeing it abstractly -- because that's the only

3    position I'm able to function in; I don't know enough about the

4    considerations to see it any other way -- an observer such as

5    myself would take note of the federal rules' preference that

6    the class questions be decided promptly and near the outset of

7    the litigation, which has now gone through one summary judgment

8    and a trip to the Court of Appeals, and it's facing another

9    round, one might say isn't it about time we knew whether there

10   was a class or not.

11        Logically, there is a good deal of sense, it seems to

12   me, that before embarking on summary judgment briefing and the

13   great amount of work that involves, it might be useful to know

14   whether there was a class or not.  And that may also involve a

15   certain amount of public interest that the facilities of all

16   the counsel and the Court are not wasted on debating questions

17   which are moot if there is no class.  And, frankly, on the

18   presentations of the parties and the review of the briefs on

19   the certification submitted the last time around, the motion to

20   not certify the class is non-frivolous.

21        MR. SIMS:  Your Honor, the one thing that's come to

22   mind while you were speaking is that as you may or may not

23   know, in one of the Google Books cases, Judge Chin, acting as

24   the District Court, did certify a class, and Google took that

25   decision on a permissive interlocutory appeal.  They applied

1   for an interlocutory appeal to the Circuit, and the Circuit

2   granted review of that, quite unusually.

3           So, pending now, and being briefed sometime in the

4   future, I don't know whether you know the schedule or not, is

5   exactly the question of class certification in a copyright

6   case, and there are a lot of similarities.  So, the fact that

7   the Circuit is in the midst of thinking about that problem and

8   will come up --

9           THE COURT:  Is the class sought to be certified in

10  that case similar to the class sought to be certified here?

11          MR. SIMS:  It's a case in which Google copied millions

12  of books, and the plaintiffs are authors claiming that their

13  books were copied.  Judge Chin, in a very interesting decision

14  and acting as a district court Judge -- although he was already

15  on the bench -- did certify, but on the other hand, quite

16  unusually, the Circuit has agreed to hear that.  So, it may

17  well be that it would make more sense to get the Second

18  Circuit's views and controlling decision on that very subject.

19          THE COURT:  Well, but would it be controlling?

20          MR. SIMS:  Well, I would think that what the Circuit

21  would have to say about class certification in a copyright case

22  where the plaintiff class are various copyright holders would

23  be, if not controlling, certainly highly influential and

24  useful, and by far the leading authority on that.

25          THE COURT:  Well, this case arises under the Digital

1    Millennium Copyright Act.  Was that act involved in Judge

2    Chin's case?

3         MR. SIMS:  No, but both cases are fundamentally

4    copyright infringement case.  The DMCA does present a defense,

5    to be sure, whereas the other case I think is not a DMCA case,

6    but the Circuit has never written about copyright infringement

7    class actions before.  As I read the application for the

8    interlocutory appeal and the apposition, I do think that

9    whatever the Court says there will be highly meaningful here.

10        THE COURT:  Look, inherent in the concept of the class

11   in this case is that they all have similar rights arising out

12   of a rather broad construction of the concept of notice.  That

13   invokes the Digital Millennium Copyright Act, and I don't think

14   you can sensibly consider class coherence or even the existence

15   of the class's right without looking at the Digital Millennium

16   Copyright case; and a case that decides general copyright law

17   without attention to this particular subsection of statutory

18   modification of the matters subject to that act, I don't see

19   how it could be controlling.  It might be interesting.

20   Anything the Court of Appeals says in the area is interesting,

21   but the process of controlling seems to me a long way away.

22        If I allowed you to speak, Mr. Schapiro, what would

23   you say?

24        MR. SCHAPIRO:  I would say your Honor that the Books

25   case is a totally different case, as your Honor -- I was rising

1    to point out what your Honor already said; that was why I sat

2    down again.  This is a Digital Millennium Copyright Act case,

3    the case before your Honor.  The Books case has nothing to do

4    with that.  It is certainly the case that various Courts of

5    Appeals, including our own, may be considering various cases

6    that bear in one way or another on issues of class

7    certification at any given time, but it is not going to be

8    determinative of the outcome of this case.

9         What we think probably will be determinative here is

10   the U.S. Supreme Court's intervening decision in the *Walmart v.*

11   *Dukes* case, which I think makes the bar a lot higher for the

12   plaintiff to get over.

13        THE COURT:  Yes, you put great weight on that in your

14   correspondence, it drove me to read it.  What do you see as its

15   application to this case?

16        MR. SCHAPIRO:  When we went through the first round of

17   class certification briefing, the class rested its arguments

18   primarily on the suggestion that the issues in this case were

19   generalized issues that could be decided in a generalized way,

20   and they were able to make those arguments because the Court of

21   Appeals had not yet ruled in this case that the type of

22   knowledge required is knowledge of specific infringements.  And

23   Wal-Mart --

24        THE COURT:  The individuals whose employment was

25   individually affected by the practices.

1          MR. SCHAPIRO:  Correct, your Honor.  Well, so *Wal-Mart*

2    *v. Dukes* now makes clear that where you have a need for

3    individualized inquiries of a nature that I think are plainly

4    present here after we view this case in light of the Second

5    Circuit's interpretation of this case, that you can't certify a

6    feasible class.

7          Whatever class certification briefing happens, whether

8    it's now, as we think it should be, or down the road, we think

9    it could be done very simply and efficiently by simply

10   supplementing the briefs that the parties put in originally

11   with an additional submission that takes into account

12   intervening law, whether it's *Wal-Mart v. Dukes* or the Books

13   case or anything else that either party wants to cite and the

14   Second Circuit's reading of the DMCA as it applies here.  That

15   would be a very efficient way to go forward and decide class

16   certification if the court agrees with the position that we've

17   taken about the timing.

18          THE COURT:  What were your last two words?

19          MR. SCHAPIRO:  Pardon me?

20          THE COURT:  What were your last two words?

21          MR. SCHAPIRO:  If the Court agrees with us with the

22   position we've taken about timing of class certification.

23          THE COURT:  You think it's about time, is that what

24   you said.

25          MR. SCHAPIRO:  I didn't say that, but I think that.  I

1    said about the timing.

2                THE COURT:  I see.

3                (Pause)

4                THE COURT:  Let's go back for a moment to the topic of

5    syndication, not because I particularly want to discuss

6    syndication, but because it illustrates -- I guess it's a

7    dilemma that's hard to -- I don't know the right word -- in my

8    thinking that affects a great deal of the management of this

9    case, and I think it really has to be discussed with counsel

10   and probably now.

11               The reason that the question about syndication comes

12   up is because counsel don't know which way I would interpret

13   what the Court of Appeals said on the topic.  Whether the clips

14   in issue are restrained, restricted to those that were manually

15   handled or, as the plaintiffs put it, that syndication is

16   syndication and the way it was done is immaterial to the

17   thought and the outcome of the claim.  That issue is one that

18   obviously it would be useful to have any thinking on at around

19   this stage of the case; and that is also true about the great

20   question about the degree of specificity required to be applied

21   to such evidence as the Karim memorandum or willful

22   blindness -- and let me pause, I'll come back to willful

23   blindness -- and the other topics left open for re-visitation

24   by us all after the Court of Appeals' opinion.

25               With that, I think out of the Karim memorandum, as

1   analogously involved in the willful blindness considerations,

2   it presented the fundamental question:  Willful blindness to

3   what?  Karim's memorandum gave notice of what?  In each case

4   there is a desire by the plaintiffs to say, well, it gave

5   notice to infringements in concrete matters at the minimum,

6   and, therefore, the defendants were willfully blind or were

7   informed by Karim to the specific titles that were being

8   infringed, and all they had to do was go and take it down.  I

9   may be oversimplifying it, but that thought runs through the

10  plaintiff's submissions in the case.

11          The defendants say, oh, no, it's well and good to say,

12  as Karim did, "clips of the following well-known shows can

13  still be found:  Family Guy, South Park, MTV, Cribs, Daily

14  Show, Reno 911, The Dave Chappelle.  This content is an easy

15  target," and so forth.

16          The plaintiffs say, well, there you are, there's the

17  name of the show and the confession or claim that it's riddled

18  with infringing matter; take it down.

19          But if there were to be a conversation by the

20  recipients of the Karim memo with Mr. Karim, you might think it

21  would go along something like this:  "Well, Karim, we agree

22  with you; we understand what you say.  Tell us where those

23  clips are located, and we'll take them down."

24          And he says, "Oh, gee, I found them browsing.  They're

25  all over the place.  It's stuff we ought not to be showing."

1   My point is, the language in the memo, rather likely

2   notices to which the class plaintiff's point, is perhaps not as

3   specific as a quick reading of it might make it appear.  The

4   Court of Appeals said, "A reasonable juror could conclude from

5   the March 2006 report that Karim knew of the presence of

6   Viacom-owned material on Youtube, since he presumably located

7   specific clips of the show in question before he could announce

8   that Youtube posted the content 'as of today.'  A reasonable

9   juror could also conclude that Karim believed the clips he

10  located to be infringing (since he refers to them as 'blatantly

11  illegal'), and that Youtube did not remove the content from the

12  web site until conducting 'a more thorough analysis.'"

13       Well, this leaves a point that is quite central to the

14  case following remand:  Is Karim's memo sufficiently specific

15  to impose a duty to locate the actual clips that Karim located,

16  and their brethren, and take them down or does it require

17  further steps before those specific locations can be made that

18  is the specific location the statute talks about.

19       I read your submissions very carefully.  I thought

20  about it a great deal, as you would expect me too, and I formed

21  at least preliminary views on what the proper rule should be.

22  On the other hand, that brings me to the dilemma.  My dilemma

23  is, I'm not only not in, I'm forbidden to enter upon, the

24  business of giving advisory opinions, and yet I feel it would

25  be helpful in this case in some way, but there are other

considerations:  Proper procedure, proper presentation of
positions for appeal and perhaps the paramount benefits of
following a well-worn procedural path so people know what to
expect, but I share with you my view that most of these
questions that are presented turn on that concept or its close
brothers or cousins in this record.  And I would like your
thoughts on what the best way is to proceed.

        That brings me back to the specific question of
syndication because this also runs through the presentations on
summary judgment.  I can't really tell you which of the views
of the scope of discovery and what is in issue in syndication
without understanding more about what syndication is.  You all
know, but I don't, and in looking in the proposed factual
submissions of the parties on the motions, I'm not given the
kind of wisdom about what syndication is, that would help me to
understand the issues about manual or electronic management.

        Now, of course I can read the Court of Appeals'
opinion and try to analyze what the judges had in mind in their
selection of words, but the process is healthier on the whole
if I give respect to their words but approach the question of
what is the proper rule with respect to syndication on a better
understanding of syndication and an independent analysis of
what should be done bearing in mind what they said about it.

        I might conclude by saying you see that briefing has
been too conceptual, it's not been anchored enough in the

evidence about the clips in suit to allow the kind of

discriminating ruling that the case deserves.  That leads me to

think that on the briefing on the motions for summary judgment

there should be, at least in form of an appendix, a statement

for each clip or work in suit.  What precise information was

given to or reasonably apparent to Youtube identifying the

location or cite of the infringing matter?  And how does that

information square with the requirements of the statute?

And a second statement:  What would Youtube have to do

in addition to locate and remove the infringing matter,

disregarding the use of its own non-standard resources, because

the Court of Appeals, I think, excluded those.  It's that type

of concrete information which would allow well-based, even if

wrong, determinations you have asked of the legal status of

that claim.

So I throw myself on your mercy.  What do you want me

to do?

MR. SCHAPIRO:  Your Honor, we would be prepared to go

ahead and submit --

THE COURT:  Let me just refer to the words of the

Court of Appeals on willful blindness.  The holding is

concisely stated:  "Because the statute does not speak directly

to the Willful Blindness Doctrine, Section 512(m) limits, but

does not abrogate the doctrine.  Accordingly, we hold that the

Willful Blindness Doctrine may be applied in appropriate

circumstances to demonstrate knowledge or awareness of specific

instances of infringement under the DMCA."

One may well ask, and Mr. Sims will be happy to

answer, how that language opens the field delineated by

Mr. Karim to successive generations of works submitted that

should have been caught by those reading Mr. Karim's

memorandum. I think he has his work cut out for him, but he's

very, very able.

Mr. Schapiro?

MR. SCHAPIRO: So, your Honor, we will, of course,

follow whatever guidance the Court has. We would be prepared

to move to summary judgment briefing and to include whether

it's as an appendix or just as part of the briefing, answers to

the two questions that your Honor posed.

THE COURT: Well, in your view they are two short

answers: None. Second answer: None.

MR. SCHAPIRO: You're right about that, your Honor.

But we think they're the right questions also, it won't

surprise you to learn. And we could meet and confer with the

plaintiffs to come up with a schedule that seems workable.

We're more than happy to have it be a short schedule. I think

the question is still before the Court about class

certification because the parties have made their positions

clear.

THE COURT: I think that the correct answer is it

1   probably ought to be now.

2           MR. SCHAPIRO:  OK.

3           THE COURT:  I wouldn't want to rule finally without

4   giving -- I don't want to take anybody by surprise.  If that's

5   a wrong conclusion, so inform me in the next ten days in

6   writing, and I'll reconsider it.  But it seems to me we've

7   reached a stage in the case where all other things are equal

8   enough that it's time now to bite that bullet in this case.  I

9   won't force you to answer now.  I want to keep it tentative.

10  I'm not doing these things off the cuff.  I've thought about

11  them.

12          MR. SIMS:  I understand.

13          Did I understand you to be asking over the last 20

14  minutes or so whether or not we all, or any of us, thought it

15  would be useful in some way to get your preliminary views?  Was

16  that a question you were propounding to us, or did I miss hear

17  it?

18          THE COURT:  Yes, it was.  Yes, it was.  But in

19  suggesting it, I have a feeling that these questions are so

20  critical to the case as it stands that those views ought not to

21  be delivered until after whatever further submissions the

22  parties want to make, and in a form which I've not been able to

23  construct myself, which makes them effective as rulings that

24  can be appealed because thereafter they're going to have a

25  great effect on the positions that people can legitimately

1    expect to survive.

2         MR. SIMS:  I, for one, would find it useful if we

3    could adjourn for five minutes, and Baskin and I could talk

4    about this.  I don't think it's necessarily impossible to find

5    a way for you to do that, and it would be helpful to all the

6    parties, but I'm not sure -- it would be helpful if we can

7    briefly confer on the question and then tell you what we think,

8    or not.

9         THE COURT:  Sure.  Adjourn for five minutes or for

10   several days.

11        MR. BASKIN:  I don't need several days, your Honor.

12        THE COURT:  Excuse me?

13        MR. BASKIN:  I'm pretty confident we don't need

14   several days.  I'm not sure we need five minutes.  As your

15   Honor said in the course of some of your discussion, I think

16   it's imperative that this be placed in a proper procedural

17   context to protect the parties' rights to appeal.  Obviously,

18   we're going to be making a very copious record on summary

19   judgment with respect to what we think the proper reading of

20   all of the issues, not just actual notice, but willful

21   blindness and the other issues are as well.  We look forward to

22   making that record.  I'm highly confident either your Honor

23   will agree with us or you won't.  And if you agree with us, the

24   case will proceed.  If you don't agree with us, we'll take it

25   up on appeal, but I think it's important that we not delay any

1   longer, and I think we should give you a record that's

2   concrete. You'll give us your best learning, your best

3   judgment on the rules and how you interpret these various

4   principles, and then, as I said, either the case will proceed

5   in an orderly fashion to trial or will proceed to an orderly

6   fashion on appeal, but I think there's no purpose in deferring

7   or doing any intermediate steps. I think we're all entitled to

8   make our proper record, and I'm sure your Honor respects that

9   as well.

10          So, my proposal would be, your Honor, that I would

11  propose -- but I think that since we've already, or a lot of

12  us, obviously have researched it, we've briefed a lot of the

13  issues as part of our preliminary showing to you, I would

14  propose that we proceed on the following basis:   That

15  Mr. Schapiro file his opening brief by November 16, which is a

16  little more than a month. I will respond by December 17 or 16,

17  also a month. He could reply by January 8 or so, which would

18  be three weeks. And then your Honor will have a record in

19  front of you that is specific and concrete. You can rule.  If

20  you rule with us, as I think you should, then we could head

21  towards a trial roughly in July of 2013. If you rule against

22  us, we will take an appeal as quickly as we can and get the

23  case righted, but I think it's important, your Honor, that we

24  not -- we get out of this sort of procedure we have where a

25  proper record that is not being made. I don't think it's fair

1  to the parties for a proper record not to be made.

2          MR. SCHAPIRO:  We agree in concept.  I think the

3  schedule is a little bit aggressive when I know what other

4  people's schedules and obligations are.  I'm sure if we meet

5  with Baskin and adjust it by a couple of weeks, we could do

6  that.  There are a lot of clips involved.

7          MR. BASKIN:  That will be fine, your Honor.  We can

8  meet and try and adjust it a couple of weeks, as long as we are

9  on an orderly path.

10         THE COURT:  That's fine.  A lot of what I was saying

11  was a plea for more concrete discussions informed by the facts

12  and procedures taken by the parties on what was done and not

13  done, and up until now it's been very much in terms of

14  categories of documents and assertions that are not clear on

15  what exactly they cover and what they don't.  Although they're

16  clear intellectually, they're not clear in the way that normal

17  summary judgment motions are, and I need that -- for example, I

18  need a much more clear description of why the plaintiffs think

19  that the tracking process gave knowledge to the defendants that

20  they didn't have before.  I've puzzled it out, and I think

21  there may be a derivative way that it could have been derived

22  from what was going on.  Maybe that's the meaning of the

23  argument, but I need these things clearly.  In this case after

24  so much to deny summary judgment on the grounds that perhaps it

25  isn't clear enough would really be a waste of time.

1          Well, then I will expect that.  You did not set a date

2     for briefing the class certification motion, Mr. Schapiro,

3     or -- well, you have no concern with it.

4          MR. SCHAPIRO:  We would probably want to confer with

5     Mr. Sims, but we could come up with a schedule as well that

6     would be a fairly quick one.  Is your Honor amenable to --

7          THE COURT:  A lot of it is in the briefs as of the

8     date they spoke.

9          MR. SCHAPIRO:  Yes.  Would your Honor endorse the

10    proposal which would be to resubmit briefs that were submitted

11    earlier with supplements updating legal developments including

12    the Second Circuit's ruling in this case?

13         THE COURT:  Sure.  You don't even have to submit them.

14    I have copies of them.

15         MR. SCHAPIRO:  Even better.  I think we can do that

16    fairly quickly, and we'll just touch base with Mr. Sims.  How

17    about we put in a letter to the Court detailing where we are

18    with scheduling within the next seven days?  And we can tell

19    you what schedules we've worked out between the parties.

20         THE COURT:  Sure.

21         MR. SIMS:  Your Honor, as I understand it -- we're

22    glad to do that, but I understand that we are also left to

23    consider whether we think decoupling was a good idea -- is a

24    good idea or not.  So, in the context of having the discussion

25    with Mr. Schapiro, we're going to address that with our clients

1    as well.

2              THE COURT:  Yes.  And I will pray for some detail as

3    to what the word decoupling really entails.

4              MR. SIMS:  Means.  As in everything in this case, it

5    requires more specificity.

6              THE COURT:  Obviously, there are various weights and

7    measures to be taken, but your preference in that would be

8    useful.  OK.  Thank you all very much.

9              (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25